EXHIBIT B

1                 UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        --oOo--

4    THE VINEYARD HOUSE, LLC,

5              Plaintiff,

6    vs.                                   Case No.

                                           4:19-cv-1424-YGR

7    CONSTELLATION BRANDS U.S.

     OPERATIONS, INC.,

8

               Defendant.

9    _____/

10

11

12

13

14              DEPOSITION OF MARK de VERE

15               THURSDAY, FEBRUARY 6, 2020

16

17

18

19

20

21

22   Reported by:

23   Anrae Wimberley, CSR No. 7778

24   Job No.  3967633

25   Pages 1 - 169

                                             Page 1

1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3   --oOo--
4   THE VINEYARD HOUSE, LLC,
5        Plaintiff,
6   vs.                  Case No.
                         4:19-cv-1424-YGR
7   CONSTELLATION BRANDS U.S.
    OPERATIONS, INC.,
8
        Defendant.
9   _____/
10
11
12
13
14
15      Transcript of deposition of MARK de VERE,
16  taken at Buchalter, 55 Second Street, Suite 1700,
17  San Francisco, California 94105, beginning at 10:28
18  a.m. and ending at 3:47 p.m. on Thursday, February
19  6, 2020, before Anrae Wimberley, Certified Shorthand
20  Reporter No. 7778.
21
22
23
24
25
                                              Page  2

1          I N D E X
2   EXAMINATION BY:                    PAGE
3   MR. BALES                       6, 113
4
5          --oOo--
6        E X H I B I T S
7
8   EXHIBIT      DESCRIPTION          PAGE
9   Exhibit 93   Plaintiff The Vineyard House    6
10      LLC's Notice of Deposition of
11      Defendant's Percipient Expert
12      Mark de Vere; 3 pages
13
14  Exhibit 94   Letter dated 12/16/19 from      11
15      Colbert to Zwang and Bales;
16      1 page
17
18  Exhibit 95   Letter dated 1/8/20 from        39
19      de Vere to Zwang and Bales;
20      3 pages
21
22  Exhibit 96   Statement of Rebuttal           39
23      Percipient Expert Mark de Vere;
24      352 pages
25
                                              Page  4

1   APPEARANCES:
2   For Plaintiff The Vineyard House, LLC:
3      BUCHALTER
4      BY:  PETER BALES, ESQ.
5      55 Second Street, Suite 1700
6      San Francisco, California 94105-3493
7      (415) 227-0900
8      pbales@buchalter.com
9
10  For Defendant Constellation Brands U.S. Operations,
11  Inc.:
12      HUNTON ANDREWS KURTH LLP
13      BY: EDWARD COLBERT, ESQ.
14      2200 Pennsylvania Avenue, N.W.
15      Washington, D.C. 20037
16      (202) 955-1500
17      ecolbert@huntonAK.com
18
19  Also present:
20      LONETTE MERRIMAN, Vice President,
21      Associate General Counsel for
22      Constellation Brands, Inc.
23          --oOo--
24
25
                                              Page  3

1        E X H I B I T S (Cont'd)
2   EXHIBIT      DESCRIPTION              PAGE
3   Exhibit 97   Settlement Agreement; Bates    148
4      BV 0055 thru 69
5
6          --oOo--
7
8   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
9          PAGE   LINE
10          54    12
11          --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page  5

**Page 18**

1    A.  Yes.
2    **Q.  I am entitled to ask you what opinions you**
3  **currently anticipate offering at trial.**
4    **Do you understand that?**
5    MR. COLBERT:  Objection; mischaracterizes your
6  question.
7    You may respond.
8    THE WITNESS:  I understand.
9  BY MR. BALES:
10    **Q.  So I'm currently asking you, as you sit**
11  **here today, what opinions you currently anticipate**
12  **offering at trial.**
13    MR. COLBERT:  Object to the form of the
14  question; vague and premature.
15    You may respond.
16    THE WITNESS:  Again, it will depend on what
17  opinions I am asked to offer, depends what subjects
18  I'm asked to testify on.  I think one area that I do
19  have an opinion on that I suspect will come up is
20  that I believe To Kalon is a trademark owned by
21  Robert Mondavi.
22  BY MR. BALES:
23    **Q.  Let me try to ask this another way.**
24    **What opinions were you asked to offer for**
25  **this litigation?**

**Page 19**

1    MR. COLBERT:  Objection; premature, vague.  To
2  the extent it calls for communication of
3  attorney-client, I'll object to that, if it's
4  outside the scope of what he's been offered for in
5  terms of expert witness.
6    You may respond.
7    THE WITNESS:  I was not asked to bring any
8  opinions.  I was asked to be an expert.
9  BY MR. BALES:
10    **Q.  Okay.  So when you wrote this letter dated**
11  **January 8th, 2020, you stated, "I'm prepared to**
12  **testify about the geographic significance in the**
13  **wine business"; right?**
14    A.  I've read that.
15    **Q.  Were you asked by Constellation to provide**
16  **an opinion about the geographic significance in the**
17  **wine business?**
18    A.  I was not asked for any particular
19  opinion.
20    **Q.  I understand that.**
21    **But were you asked to provide an opinion**
22  **about the geographic significance in the wine**
23  **business?**
24    A.  I was not asked to provide an opinion.
25    **Q.  Then how did it come about that you just**

**Page 20**

1  provided an opinion about the geographic
2  significance in the wine business?
3    MR. COLBERT:  Objection; mischaracterizes the
4  document, vague.
5    You may respond.
6    THE WITNESS:  Could you remind me specifically
7  which document we're referring to?
8  BY MR. BALES:
9    **Q.  Again, we're referring to the January 8th,**
10  **2020 letter.**
11    MR. COLBERT:  Has that been marked as an
12  exhibit?
13    MR. BALES:  No, sir.
14    THE WITNESS:  May I see it, please.
15  BY MR. BALES:
16    **Q.  We're going to look at it.  But I'm just**
17  **asking you what your assignment was in this case.**
18  **I'm entitled to ask that.**
19    MR. COLBERT:  This is not a memory contest.  If
20  you're asking him what's in the letter -- you're
21  asking him to remember the specific words in the
22  letter or are you asking him his opinion on various
23  issues dealing with geographical or geological
24  factors in the wine business?
25    You can ask him those, but I don't think

**Page 21**

1  you need to ask him as a memory test what he spoke
2  about a month ago.
3    MR. BALES:  Counsel, that was a long speaking
4  objection.  Please keep your objections to form.
5  I've repeatedly reminded you of that.  I remind you
6  again.  It wastes everyone's time, it interrupts my
7  deposition, and it coaches your witness.  So please
8  don't do that.  You can speak if you want to, but
9  there is no need.  We have talked about this issue
10  many times before.
11    MR. COLBERT:  We've also talked about this.
12  You've asked the same question repeatedly and gotten
13  the same answer from the witness repeatedly.  To the
14  extent there's a waste of time, you're wasting the
15  witness' time.  You may continue.
16    Answer the question if you can, sir.
17    THE WITNESS:  May I see the document and see to
18  what you're referring?
19  BY MR. BALES:
20    **Q.  We'll go over the document in a second.**
21    **What facts or data did you consider in**
22  **forming your opinions?**
23    MR. COLBERT:  Objection; vague, lack of
24  foundation.
25    You may respond.

Veritext Legal Solutions
866 299-5127

1   question.
2         You may respond to the extent you
3   understand.
4       THE WITNESS:  Could you repeat the question,
5   please.
6   BY MR. BALES:
7       Q.  Of course.
8           **Do you consider yourself an expert in the**
9   **requirements and regulations governing wine labels?**
10          A.  I would say that relative to most people,
11  I have a good degree of expertise in that area, but
12  I'm certainly not a lawyer trained specifically to
13  work in that area, but I am familiar with the laws.
14      Q.  But would you consider yourself an expert
15  **in that area?**
16      MR. COLBERT:  Objection; asked and answered.
17  BY MR. BALES:
18      Q.  Outside of being familiar with the laws.
19      A.  The term "expert" is relative.  I would
20  say I'm probably in the top percentile relative to
21  people who deal with wines.
22      Q.  The Alcohol and Tobacco Tax and Trade
23  Bureau, you called that the TTB?
24      A.  Yes.
25      Q.  So if I said the TTB, you'll know what I'm

Page 34

1   referring to?
2       A.  Yes.
3       Q.  Do you consider yourself an expert on TTB
4   regulations for wine production and labeling?
5       A.  I consider I have a proficient knowledge
6   of them, but I would not say that I'm legally
7   trained to find loopholes in the niceties of the
8   law.
9       Q.  Have you ever testified as an expert in
10  any other lawsuit?
11      A.  No.
12      Q.  And just to be clear, you've never
13  testified as -- either in a deposition or in court
14  as an expert; right?
15      A.  No.
16      Q.  Have you ever written any expert reports
17  for any other lawsuit?
18      A.  No.
19      Q.  So this is your first time ever being
20  asked to provide an expert opinion for a lawsuit;
21  correct?
22      A.  Yes.
23      Q.  Do you consider yourself an expert on the
24  TTB regulations governing the use of vineyard or
25  farm names on labels?

Page 35

1       MR. COLBERT:  Object to the form of the
2   question; vague, misstating regulations.
3         You may respond.
4       THE WITNESS:  And you're asking about two
5   separate subjects there, but with regards to the
6   laws governing vineyard names on labels, I believe I
7   am very familiar with the laws.
8   BY MR. BALES:
9       Q.  And why do you say that I'm talking about
10  two different subjects on that question?
11      A.  Could you repeat the question.
12      Q.  Yes.
13          Do you consider yourself an expert on the
14  TTB regulations governing use of vineyard or farm
15  names on wine labels?
16      A.  The reason I say you're asking two
17  different questions is the use of vineyard
18  designation is regulated by the TTB.  As far as I'm
19  aware, farm names are not.
20      Q.  Do you consider yourself an expert on the
21  requirements and regulations on petitioning the TTB
22  to approve American Viticultural Area?
23      A.  I am familiar with the process.  Again,
24  I'm not legally trained in the minutia of the
25  legalities and the legal process of filing the

Page 36

1   paperwork and process.
2       Q.  Do you consider yourself an expert on
3   California specific regulations governing the use of
4   wine labels?
5       A.  Again, I am very familiar with the
6   regulations.  I'm not legally trained in the fine
7   details of the legal process.
8       Q.  What California regulations are you aware
9   of governing wine labels?
10      MR. COLBERT:  Object to the form of the
11  question.
12      THE WITNESS:  One law that California has in
13  place is that anything labeled as coming from
14  California must be made 100 percent from grapes
15  grown in California.
16  BY MR. BALES:
17      Q.  Any others that you're aware of?
18      A.  I think TTB regulations cover the rest of
19  the regulations that would be pertinent in
20  California.
21      Q.  Have you seen any consumer surveys or
22  polls that you considered in forming your opinions?
23      MR. COLBERT:  Could you read that back, please.
24      (Record read by reporter as follows:
25      "Question:  Have you seen any consumer

Page 37

1      surveys or polls that you considered in
2      forming your opinions?")
3      THE WITNESS:  I've had a long career in the
4   wine business.  One sees polls posted in the press.
5   BY MR. BALES:
6      Q.   And my question is specific in forming
7   your opinions in this lawsuit.  So let me ask it
8   again.
9          Have you seen any consumer surveys or
10   polls that you considered in forming your opinions
11   in this lawsuit?
12      MR. COLBERT:  Object to the form of the
13   question as vague and unbounded by time.
14          You may respond.
15      THE WITNESS:  My opinions are formed by a
16   career in the wine business, so there are many
17   influences that have come in to forming my opinions
18   or building what I consider expertise.
19   BY MR. BALES:
20      Q.   Understood.  My question is different.
21   So, please, listen to my question.
22          Have you seen any consumer surveys or
23   polls that you considered in forming your opinions
24   in this lawsuit?
25      MR. COLBERT:  Object to the form of the

Page 38

1   question.  Are you asking him opinions set down in
2   writing and produced to you or -- the witness has
3   already demonstrated that he doesn't understand the
4   question when it's unbounded as to time.
5      MR. BALES:  Again, Counsel, please.  Speaking
6   objections, stop them.
7      MR. COLBERT:  Counsel, please stop harassing
8   the witness.  You may proceed.
9      MR. BALES:  I'm not harassing the witness
10   whatsoever.  Just trying to get the answer to my
11   question.
12   BY MR. BALES:
13      Q.   So as you sit here today, can you identify
14   any consumer surveys or polls that you considered in
15   forming your opinions in this lawsuit?
16      A.   I cannot identify any specific research or
17   polls.
18      Q.   Have you done or directed any consumer
19   surveys or polls in forming your opinions?
20      MR. COLBERT:  Object to the form of the
21   question.
22      THE WITNESS:  Not specific to this case.
23          (Plaintiff's Exhibits 95 and 96 were
24          marked.)
25   BY MR. BALES:

Page 39

1      Q.   The court reporter has handed you two
2   exhibits, Exhibit 95 and 96.
3          96 is a letter dated January 8th, 2020 --
4      MR. COLBERT:  Objection.  That's 95, isn't it?
5   Am I correct?
6      MR. BALES:  I'll accept that objection.  Let
7   me --
8   BY MR. BALES:
9      Q.   Every once in a while he gets me.  Let me
10   start over.
11      A.   We got you.
12      Q.   He got me.  I admit it.  A lawyer admits
13   when he's gotten gotten.  I got got there.  I
14   misspoke the exhibit number.  Let me start over.
15          You have two exhibits in front of you, 95
16   and 96.
17          Exhibit 95 is a letter dated January 8th,
18   2020 and it's signed by you on the third page;
19   correct?
20      A.   Yes.
21      Q.   And Exhibit 96 is a Statement of Rebuttal
22   Percipient Expert Mark de Vere.  And on page 10,
23   it's signed by you on January 8th, 2020 as well.
24      A.   Yes.
25      Q.   Exhibit 95 -- you wrote this entire thing

Page 40

1   by yourself?
2      A.   Yes.
3      Q.   Did counsel assist you in the writing of
4   this?
5      A.   I reviewed it with my internal colleague,
6   but not with outside counsel.
7      Q.   So you made the first draft of this?
8      A.   I believe so.
9      Q.   And there's only one draft of this?
10      MR. COLBERT:  Object to the form of the
11   question.
12      THE WITNESS:  I don't recall how many drafts
13   there were because I had discussions with my
14   internal colleague.
15   BY MR. BALES:
16      Q.   And who was the internal colleague that
17   you talked with about Exhibit 95?
18      A.   Lonette Merriman.
19      Q.   Were there multiple drafts, as you recall
20   it, and this was the final version of those drafts?
21      A.   This is the final version.
22      Q.   Did you discuss Exhibit 95 with anyone
23   else?
24      A.   No.
25      Q.   Exhibit 96 -- did you write Exhibit 96, at

Page 41

Pages 38 to 41

**Page 42**

1 least the written portion up to your signature?
2    A.  Yes.
3    Q.  And you wrote this originally?  It wasn't
4 a draft that was provided to you?
5    A.  I wrote this.
6    Q.  And were there multiple drafts of this as
7 well or only one draft?
8    A.  I'm sure there were multiple drafts.
9    Q.  And who did you discuss Exhibit 96 with
10 before finalizing?
11    A.  My colleague, Lonette Merriman.
12    Q.  Let's turn to Exhibit 95.
13    What is Exhibit 95?
14    A.  It appears to be a letter dated January
15 the 8th in regard to The Vineyard House versus
16 Constellation Brands U.S. Operations, Inc.
17    Q.  Why did you write the letter dated
18 January 8, 2020 that's Exhibit 95?
19    A.  Because these are my opinions about the
20 laws and regulations in labeling wines.
21    Q.  Are these all your opinions about the laws
22 and regulations in labeling wines?
23    MR. COLBERT:  Object to the form of the
24 question.
25    THE WITNESS:  These are specific to the use of

**Page 43**

1 trademarks, brands and geographical indications.
2 BY MR. BALES:
3    Q.  Let me ask it another way.
4    Other than the written opinions set forth
5 in Exhibit 95 about the laws and regulations in
6 labeling wines, do you have other opinions on that
7 same topic that you anticipate offering at trial
8 that are not written here?
9    MR. COLBERT:  Objection to the form.
10    You may answer.
11    THE WITNESS:  Not that I currently anticipate
12 being asked at trial, but I do not know what I'll be
13 asked at trial.
14 BY MR. BALES:
15    Q.  Understood it could change.
16    But as you sit here today, these are the
17 opinions you have on that topic?
18    A.  On this topic, yes.
19    Q.  And Exhibit 96, what is that?
20    A.  This is my rebuttal or, to put it another
21 way, my opinion of why the opinions of the expert
22 report of Doug Frost and Mr. Weis are incorrect.
23    Q.  And your opinions as to why those expert
24 reports are incorrect, as you sit here today, are
25 all set forth in writing in this report?

**Page 44**

1    A.  Again, the experts can have many opinions.
2 I put what I believe to be sufficient opinions in
3 here that would rebut the so-called expert report.
4    Q.  And let me ask it another way.  I
5 understand you may do more work and you may change
6 opinions or add opinions at trial.
7    But as you sit here today, the opinions
8 that you have on those two reports are set forth in
9 this written report that is Exhibit 96?
10    A.  At the time of writing it, I felt the
11 opinions expressed in here were sufficient to rebut
12 the so-called expert report I'd been asked to rebut.
13    Q.  And you wrote this report on January 8th,
14 2020?
15    A.  It was submitted on that date.  I would
16 have written it possibly in days preceding that
17 also.
18    Q.  Since writing that report up until today,
19 do you still believe that this written report is
20 sufficient to rebut the opinions offered by those
21 two reports that you reviewed?
22    A.  Until asked further questions, I feel that
23 the opinions I put in here sufficiently rebut the
24 so-called expert report.
25    Q.  So let me now ask you:  Are all the

**Page 45**

1 opinions that you have for this lawsuit, as you sit
2 here today, set forth in Exhibit 95 and 96?
3    MR. COLBERT:  Objection.
4    You may respond.
5    THE WITNESS:  As I sit here today, I believe
6 the opinions pertinent to these issues are set forth
7 here.
8 BY MR. BALES:
9    Q.  Let's turn to Exhibit 95 dated
10 January 8th, 2020.
11    In the first paragraph, it states, in
12 part, "I am prepared to testify about geographic
13 significance in the wine business."
14    What do you mean by "geographic
15 significance in the wine business"?
16    A.  I mean by that sentence that I believe
17 that if questions come up in the category of
18 geographic significance, that I believe I would be
19 able to answer them in a meaningful way.
20    Q.  Understood.
21    What do you mean by the category that you
22 described in your letter as "geographic
23 significance"?
24    A.  I mean the significance of geography or
25 geographical details.

Veritext Legal Solutions
866 299-5127

1    Q.   Can you give me an example of what a
2    geographical detail is that you believe falls within
3    your category of geographic significance?
4        A.   If anyone in the wine business labels a
5    wine implying it comes from California, that is a
6    geographic region.  And there are rules and laws and
7    implications to using that geographical indicator,
8    for example.
9        Q.   One of the topics that you state in this
10   letter, in the first paragraph, that you're prepared
11   to testify are, "the elements that would be relevant
12   to determining an American Viticultural Area (AVA)."
13       What are the elements that would be
14   relevant to determining an AVA?
15       A.   Typically the TTB will require an
16   application to be made.  They will spell out
17   specifically what they're looking for and often ask
18   for further clarification.  They typically require a
19   degree of geographical consistency, or there must be
20   a contiguous or a geographically definable area.
21       Frequently geographic features, such as a
22   river, for example, or a mountain range, for
23   example, would be considered when defining the
24   borders.  And I believe they also often look for
25   usage or relevance to the industry.

Page 46

1    Q.   What do you mean by "usage or relevance to
2    the industry" as one of the elements that is
3    considered?
4        A.   I believe their intention is that the name
5    they are giving protection to is not just something
6    totally fanciful that has been made up by someone
7    with a particular interest.
8        Q.   Understood.
9        So two of the elements that you believe
10   are relevant to determining an AVA are a
11   geographically defined area and usage or relevance
12   in the industry.
13       Are there any other elements that you
14   believe would be relevant to determining an AVA?
15       A.   It is a long and complex application
16   process, but those are the major elements.
17       Q.   Any other elements that you believe would
18   be relevant to determining an AVA, outside the two
19   you've identified thus far?
20       A.   In general terms, those are the main
21   issues.  I believe every application is considered
22   specific, and there might be specific requirements
23   that need to be proven for other applications.
24       Q.   In the second paragraph, in the first
25   sentence, you use the term "geographic

Page 47

1    appellations."
2        What are those?
3        A.   They are geographic designations that are
4    defined -- I suppose the phrase is "politically."
5    For example, California is a geographic appellation.
6    I think it is commonly known that there are borders
7    to California.  I assume it's considered political.
8    I don't know exactly what law defines the borders of
9    California, but I think it is commonly understood
10   that there are borders.
11       Q.   So you use the words "geographic
12   appellations" and "official political regions"
13   interchangeably, if I'm understanding you correctly?
14       MR. COLBERT:  Object to the characterization of
15   the document.
16       THE WITNESS:  That's not entirely true.
17   BY MR. BALES:
18       Q.   So I think you've defined what you mean by
19   "geographic appellations"; correct?
20       A.   May I read the whole sentence?
21       Q.   You may.  If you need to review anything
22   in these reports again to answer my questions,
23   please feel free to do so.  Speak up and tell me you
24   need to do so, and you're entitled to do so.
25       A.   So you're implying that I would use the

Page 48

1    term "geographical appellations" interchangeably
2    with "political regions."  And that's not entirely
3    true because I also say "or when they are American
4    Viticultural [regions]."
5        Q.   So I'm trying to understand the difference
6    between them.
7        Let me ask this question:  What is an
8    official political region, in your opinion?
9        MR. COLBERT:  Objection; asked and answered.
10       You may respond.
11       (Discussion off the record.)
12   BY MR. BALES:
13       Q.   So the question is, what do you mean by
14   "official political regions" in Exhibit 95?
15       A.   That is my phrase or description of a
16   region such as California, which I believe is
17   considered a political region, or Monterey County,
18   which I believe is a political region, or Napa
19   County, which I believe is a political region.
20       Q.   And then how -- what -- how do political
21   regions and geographic appellations differ, in your
22   mind?
23       MR. COLBERT:  Objection.
24       You may respond.
25       THE WITNESS:  I would consider political

Page 49

Pages 46 to 49

1   the To Kalon Vineyard; correct?
2       A.   The difference is price is defined by much
3   more than solely where they come from.
4       Q.   But where they come from is one of the
5   factors; correct?
6       MR. COLBERT:  Object to the characterization of
7   testimony.
8           You may respond.
9       THE WITNESS:  The difference in price is based
10  on the quality and character of the wine and our own
11  internal marketing decisions.
12  BY MR. BALES:
13      Q.   Turning back to Exhibit 95, on the second
14  page, sir, the first paragraph at the top.  You
15  state, in the first sentence, that "Neither the
16  United States nor California have vineyard
17  registration or recordation requirements nor
18  opportunities."
19          What do you mean by "registration or
20  [recording] requirements"?
21      A.   You're not required to register or record
22  the name of your vineyard in the way that it might
23  be required or recorded in some other countries.
24      Q.   What do you base that on?
25      A.   I know of no requirements or opportunities

Page 74

1   to do that.
2       Q.   When you say "opportunities to do that,"
3   what do you mean by that?
4       A.   I mean if somebody wanted to register
5   their vineyard as a vineyard, I don't believe
6   there's a way to do that.
7       Q.   You state in that same paragraph, "I
8   believe that the name of every one of them would be
9   protected as a trademark."
10          And by "them," you're referring to the
11  thousands of vineyard operations in the state of
12  California?
13      A.   Yes.
14      Q.   Are you aware of what the requirements are
15  for trademark law?
16      MR. COLBERT:  Objection; asked and answered.
17          You may respond.
18      THE WITNESS:  I'm not legally trained in the
19  specifics of trademark law, but I have an
20  understanding that people working in business and
21  general people have of trademark law.
22  BY MR. BALES:
23      Q.   And why do you believe that the name of
24  every vineyard operation in California would be
25  protected as a trademark?

Page 75

1       A.   Because if they have used that name and
2   traded under it, traded using that name, I believe
3   that many of them will have registered as a
4   trademark.  But my understanding is that usage alone
5   would give them protection of the trademark.
6       Q.   What do you base that on?
7       A.   I've been in the wine business for many
8   years.  And I'm not legally trained in the details
9   of trademark law, but I believe that amount of
10  understanding of how trademarks work to protect
11  businesses is what many people in business or many
12  ordinary people would have as an understanding of
13  trademark.
14      Q.   Is it your opinion that the term
15  "vineyard" in the wine industry is a complex
16  concept?
17      A.   Yes, I think it's fair to say that the
18  word "vineyard" could be made into a complex
19  concept.
20      Q.   But the term "vineyard" in the wine
21  industry does incorporate a physical location;
22  correct?
23      A.   Not always.
24      Q.   Usually does the word -- the term
25  "vineyard" in the wine industry incorporate a

Page 76

1   physical location?
2       A.   It depends on context.
3       Q.   You say, "A 'vineyard' is a complex
4   concept incorporating not just the physical
5   location."
6           So by that, I read that to mean that it
7   does incorporate physical location, but you tell me
8   if I'm reading that wrong.
9       A.   Thank you for referring to this particular
10  context.  A vineyard is a complex concept
11  incorporating not just physical location of vines,
12  yes.  In this context, yes.
13      Q.   So the term "vineyard" in the wine
14  industry generally does incorporate a physical
15  location; correct?
16      MR. COLBERT:  Objection; asked and answered.
17          You may answer again.
18      THE WITNESS:  There are many uses as brands
19  where you don't think there is any -- where some
20  wines use it almost fancifully.
21  BY MR. BALES:
22      Q.   Does the term "vineyard" incorporate the
23  qualities that are due to the location of that
24  vineyard?
25      MR. COLBERT:  Could you read that back, please.

Page 77

Pages 74 to 77

**Page 86**

1   are specific as to where they come from.

2     Q.  Robert Mondavi Winery advertises where it

3  comes from; right?

4     A.  All our wines have an appellation of

5  origin, an AVA on them, yes.

6     Q.  The Inglenook example that you give in

7  your report, didn't Constellation own that trademark

8  at one point?

9     A.  I believe they did.

10    Q.  Do you know why they sold it to Wine

11  Group?

12    A.  I do not.

13    Q.  Do you know what use they made of that

14  trademark?

15    MR. COLBERT:  Objection; vague.

16    THE WITNESS:  I believe they sold wine under

17  that trademark.

18  BY MR. BALES:

19    Q.  Do you know where the grapes came from

20  that Constellation used to sell wines using that

21  Inglenook trademark?

22    MR. COLBERT:  Objection; lack of foundation.

23     You may respond.

24    THE WITNESS:  I do not.

25  BY MR. BALES:

Page 86

**Page 87**

1    Q.  You state, in the second paragraph on

2  page 2 of Exhibit 95, that "Only  then could the

3  current winery on that site produce wines under the

4  name that the original business on that site had

5  used."

6     What do you base that on?

7    A.  I base it on a common knowledge in the

8  wine business that prior to then, that winery was

9  not allowed to trade under the name Inglenook.  It

10  was commonly known that they could not because

11  Inglenook was a trademark that had been sold

12  multiple times many years previously.

13     And my understanding is that everyone knew

14  that they could not trade under the name Inglenook

15  because it was a trademark owned by somebody else.

16  And only then -- when, at huge expense, they

17  purchased the trademark back, only then were they

18  able to trade under that name.

19    Q.  Do you know if Coppola ever made any

20  effort to use the name Inglenook prior to purchasing

21  the trademark?

22    A.  It would seem extremely improbable and

23  unlikely because it's fairly well known in the world

24  of business that if you try to use somebody else's

25  trademark, it is against the law.

Page 87

**Page 88**

1    Q.  Okay.  That's an example of a question

2  that you didn't answer.  And this is just -- I'm not

3  trying to be difficult.

4     I just want the question -- do you

5  personally know, whether based on facts or data that

6  you've reviewed, if Coppola ever made any effort to

7  use the name Inglenook prior to purchasing the

8  trademark?

9    A.  I think it would be extremely unlikely.

10    Q.  I understand you believe that it would be

11  extremely unlikely for the reasons you've already

12  told me, but that's not my question.  My question is

13  not do you believe it is unlikely or likely.

14     My question is, do you know, based on

15  either documents you've reviewed, data you've

16  reviewed or your own personal knowledge based on

17  your experience, whether Coppola ever made any

18  effort to use Inglenook prior to purchasing the

19  trademark; yes or no?

20    A.  I cannot say I know.

21    Q.  Thank you.

22     Yes, no or I don't know; do you know if

23  Coppola had a legal right to use the name Inglenook

24  without purchasing the trademark?

25    MR. COLBERT:  Objection; calls for a legal

Page 88

**Page 89**

1  conclusion.

2    THE WITNESS:  Without a legal training, it's

3  hard for me to say I know, but it was commonly

4  understood that he did not have a right to use it.

5  BY MR. BALES:

6    Q.  Why do you believe it was commonly

7  understood that he did not have a right to use the

8  name Inglenook before purchasing the trademark?

9    A.  There were general conversations in the

10  industry referencing that's why he did not use it.

11  And many people in business know that if somebody

12  else uses and owns a trademark, you're not allowed

13  to use that trademark.

14    Q.  The next paragraph on page 2 of

15  Exhibit 95, the last sentence states, "Permitting

16  use by persons other than the owners of those names

17  would lead to confusion of the public as to the

18  source of the wine."

19     What do you base that on?

20    A.  My understanding of the many viewpoints in

21  which the value of a trademark is considered

22  valuable.  And one of the reasons why the government

23  protects it is to avoid consumer confusion.

24     If anybody were allowed to label their

25  toothpaste Colgate, I think that would lead to

Page 89

Veritext Legal Solutions
866 299-5127

1  consumer confusion.  I think it's a fairly
2  reasonable assumption.
3       Q.  Are there any facts or specific data that
4  you base your opinion on that we just read there?
5       A.  No.
6       Q.  You use Martha's Vineyard as an example of
7  a well-known and valuable vineyard designation;
8  correct?
9       A.  Yes.
10       Q.  Do you know if Martha's Vineyard is a
11  registered trademark?
12       A.  I do not know if they have registered it,
13  but I would be very surprised if they had not.
14       Q.  So you believe that that is a registered
15  trademark?
16       MR. COLBERT:  Objection.
17          You may respond.
18       THE WITNESS:  It would be my assumption.
19  BY MR. BALES:
20       Q.  Do you know who owns that trademark if it
21  is a registered trademark?
22       A.  I do not.
23       Q.  Assuming it is a trademark, do you know if
24  any persons other than the owner of that trademark
25  uses the name Martha's Vineyard to sell wine?

Page 90

1       A.  I know that only the owner or somebody
2  licensed by the owner would use that trademark on a
3  label of wine.
4       Q.  So do you know --
5       A.  There is an island I'm aware of, but I'm
6  fairly sure that under -- on a label of wine, that
7  it would be used and protected as a trademark on a
8  bottle of Napa Valley wine.
9       Q.  So that's just where I'm going.
10          You know Martha's Vineyard is an AVA;
11  correct?
12       MR. COLBERT:  Objection.
13          Could you read that question back, please.
14          (Record read by reporter as follows:
15          "Question:  You know Martha's Vineyard is
16          an AVA; correct?")
17       MR. COLBERT:  Is that "is" or "isn't"?  I don't
18  understand.  I cannot hear the question.
19          Could you read the question back slowly.
20          Could you clarify the question because I'm
21  not hearing right.  I don't know what you're saying
22  and I don't know which Martha's Vineyard you're
23  talking about.  Go ahead.
24  BY MR. BALES:
25       Q.  You know that Martha's Vineyard is an AVA?

Page 91

1       A.  I did not know that.
2       Q.  Is it your opinion that the owner of the
3  Martha Vineyard trademark could prevent wineries who
4  sell wine from the Martha Vineyard AVA -- could do
5  so?
6       MR. COLBERT:  Objection; lack of foundation as
7  to whether Martha's Vineyard is actually an AVA or
8  not.
9          You may answer the question if you
10  understand it.
11       THE WITNESS:  I don't understand that question.
12  BY MR. BALES:
13       Q.  So assume for me that Martha's Vineyard is
14  a TTB-approved AVA.  Okay?
15       A.  Okay.
16       Q.  Do you believe that the owner of a
17  trademark for Martha Vineyard could prevent wineries
18  in the Martha's Vineyard AVA from selling and
19  labeling wine as Martha's Vineyard?
20       A.  I don't know.
21       Q.  Have you looked at any instances where a
22  winery used another winery's trademark without a
23  license agreement?
24       MR. COLBERT:  Objection to the form of the
25  question.

Page 92

1       THE WITNESS:  Can you repeat that question,
2  please.
3  BY MR. BALES:
4       Q.  Yes.
5          Have you looked for any instances where a
6  winery has used another winery's trademark without a
7  license agreement?
8       A.  I have not.
9       Q.  You state in your report that "The concept
10  of a vineyard is not the same thing as the 'land'."
11          What do you mean by that?
12       MR. COLBERT:  That's the fourth paragraph?
13       MR. BALES:  Yes, sir.
14       THE WITNESS:  A vineyard is -- can be the
15  operation that grows grapes.  Land is just land.
16  BY MR. BALES:
17       Q.  But the concept of vineyard includes land;
18  correct?
19       MR. COLBERT:  Objection to the form of the
20  question.
21          You may answer.
22       THE WITNESS:  Again, depending on context, the
23  land is a part of what we talk of as the vineyard,
24  but it is not the entirety of it.  And it could also
25  at the same time be considered separate from or

Page 93

Pages 90 to 93

1    reviewed that.  And it states the date of the
2    application, and on it states date of first use.
3        When he died is reported in history books.
4    I can't say I looked at every history book that
5    states it, but I have seen newspaper cuttings.  I
6    think I might have reviewed one of the newspaper
7    articles that mentions his death.
8        And I reviewed the assessment of his
9    estate, which also would have verified, if I needed
10   verification, the date of his death.
11       But as I say, these are dates that -- and
12   that is a fairly short piece of history that I
13   wouldn't have needed to refer to documents to state
14   that, but I probably did look at them.
15       **Q.  Do you know if -- during the time period
16   that you state, 1886 to 1899, whether To Kalon was a
17   registered trademark?**
18       A.  I believe it was a registered trademark.
19       **Q.  And who was the owner of that trademark
20   during that time period?**
21       A.  H.W. Crabb traded under that trademark.
22   It was -- the registration for the trademark was by
23   his East Coast agent, Mr. Pondorf [phonetic].  It
24   was filed by his East Coast agent anyway.
25       **Q.  How do you know that Pondorf was Crabb's**

Page 102

1    **East Coast agent?**
2        A.  There are contemporary references and
3    newspaper references.  And it's something that --
4    from, over the years, seeing references in
5    newspapers, primarily I think, or historical records
6    stating that he was the East Coast agent.
7        **Q.  You state, in this fourth paragraph on
8    page 2 of Exhibit 95, towards the end, that, "The
9    trademark is separate from the real estate."
10       What do you mean by that?**
11       A.  So as illustrated by the sentences that go
12   before that, the trademark that had been used for
13   BV 4, or Beaulieu Vineyards, is not the same as the
14   real estate, the land.
15       **Q.  So it's only to this specific example?**
16       A.  I think it could be extrapolated for
17   pretty much any example.
18       **Q.  Why?**
19       A.  Because a trademark is a name.  It is a
20   word or a set of words.  It is a mark used for
21   trade, and the name of something is different from
22   the object itself.
23       **Q.  Do you know if Beckstoffer ever made any
24   effort to use those trademark names that you
25   reference in this paragraph?**

Page 103

1        A.  I do not know, but I would be very
2    surprised because most people in business know that
3    it is unwise and not permitted to use the trademark
4    belonging to another business.
5        **Q.  In all instances?**
6        A.  I'm not a legal expert, but my opinion is
7    that most -- from a business point of view, most
8    people would know you can't just use somebody else's
9    trademark without permission.
10       **Q.  You state, at the end of your report in
11   Exhibit 95, that "Quite simply, I'm unaware of any
12   instance in California or in the United States where
13   the name of a recognized vineyard is not considered
14   the property of the owner and protected by trademark
15   law."
16       What did you do to verify that?**
17       A.  It comes from a career in the wine
18   business where I cannot think of any exceptions.
19       **Q.  You didn't do any specific research;
20   right?**
21       A.  Beyond a career working in wine and not
22   having seen an exception, no.
23       **Q.  In the Napa wine industry, you agree that
24   it's common that wineries will use geographic
25   indications on their wine labels?**

Page 104

1        A.  Yes.
2        **Q.  Do you agree that wineries in Napa use
3    geographic indications on their labels even if those
4    terms are included as part of another winery's
5    trademark?**
6        MR. COLBERT:  Objection.
7            Can you read that back, please.
8            (Record read by reporter as follows:
9            "Question:  Do you agree that wineries in
10           Napa use geographic indications on their
11           labels even if those terms are included as
12           part of another winery's trademark?")
13       MR. COLBERT:  Objection to the form of the
14   question.
15           You may answer.
16       THE WITNESS:  There are exceptions.  And I
17   think it would come out of historical or
18   grandfathering of those geographic names in other
19   wineries' trademarks.  But I do not accept that it's
20   standard practice to start doing it without
21   permission or precedent.
22   BY MR. BALES:
23       **Q.  What do you mean when you say "[historic]
24   or grandfathering of those geographic names"?**
25       A.  I think if I were to start, for example, a

Page 105

Pages 102 to 105

Page 122

1  trademark with historic . . . wine estate," which is
2  a clear statement of the fact that, prior to that,
3  they were disunited and separate, in many ways, that
4  would say to me that he was not able to use it prior
5  to that.
6        I do not recall, without revisiting the
7  article, whether it says verbatim France Ford
8  Coppola was previously not permitted to use that
9  name.
10      Q.  Thank you.
11      A.  But I think it highly likely that it did.
12      Q.  Thank you.
13          Turning to page 4 of your report, line 5,
14  you say, "the name was virtually unknown, even among
15  persons engaged in the business of wine."
16          What do you base that upon, sir?
17      A.  I base it on, as it were, a conversational
18  knowledge that before Mr. Mondavi revived the name,
19  it was largely unknown.  I base it on historical
20  references that actually say it was forgotten, that
21  I had read in the past.  I base it on the trademark
22  application where it was shown it had no current
23  usage in the world of wine.
24          Those would be examples of where my
25  opinion is based upon.  But it comes from what we

Page 123

1  might call common knowledge.
2      Q.  What historical references specifically
3  did you base that opinion on, as you sit here today,
4  that you can recall?
5      A.  If I were to think back, there was a book
6  written in the 1940s by Edwel Jones [phonetic].  And
7  in that -- and I can't quote it verbatim, but he
8  says -- he uses To Kalon as an example of a wine
9  that is -- a name that has past into -- long
10  forgotten.
11      Q.  Any other historical references that you
12  can recall that you relied upon?
13      A.  Again, I will say no because it's hard to
14  find historical references for something that didn't
15  exist.  In my opinion, there were no --
16      Q.  So the answer is, no --
17      MR. COLBERT:  Stop.  Stop.
18      MR. BALES:  I just don't --
19      MR. COLBERT:  Stop.  Stop.
20  BY MR. BALES:
21      Q.  I question you:  Is there other historical
22  references that you can recall that you relied upon;
23  yes or no?
24      A.  I believe that is a trick question because
25  you're asking --

Page 124

1      Q.  I'm not trying to trick you.
2      A.  -- me to say what reference do I have for
3  something that didn't exist.  There cannot have been
4  a reference for something that didn't exist.
5      Q.  Sir, you just gave me a reference.  You
6  told me about a book you thought you read -- a book
7  from the '40s from Mr. Jones.  So you relied on that
8  historical reference.
9          And so what I'm asking you, what other
10  historical references do you rely upon?
11      A.  I don't believe there was another one.
12      Q.  Okay.  Thank you.
13          Turn to page 5 of your report, please.  On
14  line 2, you state, "There was likely almost no one
15  who knew about the H.W. Crabb historic use until
16  Mr. Mondavi resurrected the name and began to
17  promote it as his brand."
18          What do you base that on?
19      A.  If there had been, it would have been
20  recorded and there would be evidence of it and there
21  would be conversation.  And if it was in current
22  usage, I imagine there would have been objection to
23  the trademark application.
24          I deduce that -- not just imagine, but I
25  deduce that if anyone else was using that name, it

Page 125

1  would have been brought up.  The fact that it was
2  not brought up as anyone else using it is partly
3  what gives evidence to I believe that it was not in
4  use.
5      Q.  Are there any historical references that
6  you rely upon for that statement?
7      A.  Not that I can recall right now.
8      Q.  Thank you.
9          Also on page 5, line 15, you say, "I
10  disagree with the suggestion that To Kalon refers to
11  a specific area within Napa Valley other than as an
12  area of land operated or managed by Robert Mondavi
13  Winery."
14          What do you base that on?
15      A.  I believe To Kalon is a trademark of
16  Robert Mondavi Winery, and so we use it for that
17  and, therefore, that is what is produced, its usage.
18      Q.  Hasn't Robert Mondavi Winery also agreed
19  that To Kalon refers to a specific area of land
20  within Napa Valley other than land operated or
21  managed by Robert Mondavi Winery?
22      MR. COLBERT:  Sorry.  Could you read that back.
23  I got confused halfway through.
24      MR. BALES:  You often do, Counsel.  It's
25  unfortunate that we have to repeat my questions all

Pages 122 to 125

1    The fact that I'm saying it doesn't exist,
2 I'm saying there is no registry of vineyards in the
3 United States.
4 BY MR. BALES:
5    **Q.   Is Constellation part of the Napa Valley**
6 **Vintners Association?**
7    MR. COLBERT:  Objection.
8       You may answer.
9    THE WITNESS:  Through some of our wineries in
10 Napa, yes, we are.
11 BY MR. BALES:
12    **Q.   And Robert Mondavi Winery is a member of**
13 **the Napa Valley Vintners Association?**
14    A.   Yes.
15    **Q.   How long have they been a member of that**
16 **Association?**
17    A.   My opinion is since 1966, when the winery
18 was founded.  Because Robert Mondavi was one of the
19 founders of the Napa Valley Vintners Association in
20 the '50s.  So I assume that when he started his new
21 winery, he would've joined the Napa Valley Vintners
22 Association.
23    **Q.   Does anybody from Robert Mondavi Winery**
24 **sit on the board for that association?**
25    MR. COLBERT:  Objection; lack of foundation.

Page 130

1       You may respond.
2    THE WITNESS:  Currently, not that I am aware
3 of, no.
4 BY MR. BALES:
5    **Q.   When is the most recent, if you know?**
6    MR. COLBERT:  Same objection.
7       You may respond.
8    THE WITNESS:  Maybe 16 years ago.
9 BY MR. BALES:
10    **Q.   Who was that?**
11    A.   I believe Clay Gregory, who was general
12 manager a long time ago, was on the board of Napa
13 Valley Vintners Association.  I do not recall anyone
14 since then.
15    **Q.   And anyone from Constellation either?**
16    A.   Not to the best of my knowledge -- my
17 recollection.
18    **Q.   Turning back to your report, page 6.  The**
19 **last paragraph under Opinion No. 3, at line 19,**
20 **states, "Robert Mondavi registered To Kalon over 30**
21 **years ago and has been the sole person entitled to**
22 **use or license that mark for wines or for single**
23 **vineyard designations."**
24       **What do you base that on?**
25    A.   I've worked at the winery for nearly 23

Page 131

1 years.  I have seen the trademark registration.  I
2 have been explaining to people for many years that
3 it's our trademark and that we're the only people
4 entitled to use it or to license it.
5    And, again, back to -- I'm not a lawyer,
6 but a businessman's understanding of trademark law,
7 that we own the trademark and we are the only entity
8 entitled to use or license that trademark.
9    **Q.   Exhibit E on the Footnote 5 says it's the**
10 **trademark search results.**
11       **Did you do those?**
12    A.   I did not do the search personally.
13    **Q.   Who did the search?**
14    A.   I believe my colleague Lonette oversaw
15 that process.
16    **Q.   Do you know what she did to search for**
17 **those?**
18    A.   I do not.
19    **Q.   Exhibit F on page -- strike that.**
20       **Exhibit F on Footnote 5 is described as**
21 **examples of "vineyard" trademark registrations and**
22 **specimens?**
23    A.   Yes.
24    **Q.   Did you do the search for those?**
25    A.   I did not do that personally.

Page 132

1    **Q.   Who did that?**
2    A.   Again my colleague Lonette oversaw that
3 process.
4    **Q.   Do you know what she did to select these?**
5    A.   I do not know.
6    **Q.   One of these in here is a trademark**
7 **registration for Martin Stelling Vineyard.**
8    A.   Okay.  Do you have a page number?
9    **Q.   No, there's not.**
10    MR. COLBERT:  Well, at the bottom of the page
11 in Exhibit F, 1 of 2, 2 of 2, et cetera.  So there's
12 no other numbers on it?  Gives us a hint, Counsel,
13 how far in you want us to --
14    MR. BALES:  Your report, Counsel.  No page
15 numbers.  But it's, I don't know, more than halfway
16 through.
17       (Discussion off the record.)
18    MR. COLBERT:  I found it.
19 BY MR. BALES:
20    **Q.   Sir, based on your opinion that Robert**
21 **Mondavi is the sole person entitled to use or**
22 **license the To Kalon mark, is it also your opinion**
23 **that Nickel & Nickel Vineyards LLC is the sole**
24 **person entitled to use or license the term "Martin**
25 **Stelling"?**

Page 133

Pages 130 to 133

1  BY MR. BALES:
2  Q. Mr. de Vere, are you familiar with the use
3  of geographic indications on wine labels?
4  A. Yes.
5  Q. Have you looked at how the World
6  Intellectual Property Organization defines
7  geographic indications?
8  A. I have not.
9  Q. Are you familiar with the Napa Valley
10 Vintners Association's efforts to protect geographic
11 indications in the U.S. and internationally?
12 A. To an extent, I am familiar with it.
13 Q. Are you aware of the conflict in the wine
14 industry between trademark law and geographic
15 indications?
16 MR. COLBERT: Objection; presupposes a fact not
17 in evidence.
18 You may respond if you can.
19 MR. BALES: That's a first one today.
20 THE WITNESS: I'm not familiar with that
21 particular conflict.
22 BY MR. BALES:
23 Q. You're not aware of any issue in the wine
24 industry dealing with the interplay between
25 trademark law and geographic indications?

Page 166

1  A. Yes.
2  MR. BALES: I've got nothing further. I
3  appreciate your time.
4  MR. COLBERT: I thought you were going to ask
5  him about auto parts, Napa know-how.
6  Anyway, you're excused. Thank you very
7  much.
8  THE WITNESS: Thank you.
9  (Whereupon, the proceedings were concluded
10 at 3:47 p.m.)
11 ---oOo---

Page 168

1  MR. COLBERT: Object; lack of foundation.
2  You may respond.
3  THE WITNESS: I'm not aware of a particular
4  case.
5  BY MR. BALES:
6  Q. And I'm not asking if you're aware of any
7  particular case.
8  Are you aware of any issue presently in
9  the wine industry dealing with the interplay between
10 trademark law and geographic indications?
11 A. I'm not aware of any interplay currently.
12 Q. What do you know about the Napa Valley
13 Vintners Association's efforts to protect geographic
14 indications?
15 MR. COLBERT: Objection; foundation.
16 You may respond.
17 THE WITNESS: The main effort was to prevent
18 people in other places using the name Napa or Napa
19 Valley.
20 BY MR. BALES:
21 Q. Do you know why they made that effort?
22 A. I believe they were concerned that people
23 in other parts of the world might try to copy the
24 name Napa.
25 Q. And produce wine that wasn't from Napa?

Page 167

1  I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
   That the foregoing proceedings were taken
4  before me at the time and place herein set forth;
5  that any witnesses in the foregoing proceedings,
6  prior to testifying, were administered an oath; that
7  a record of the proceedings was made by me using
8  machine shorthand which was thereafter transcribed
9  under my direction; that the foregoing transcript is
10 a true record of the testimony given.
11     Further, that if the foregoing pertains to
12 the original transcript of a deposition in a Federal
13 Case, before completion of the proceedings, review
14 of the transcript ( ) was (X) was not requested.
15     I further certify that I am neither
16 financially interested in the action nor a relative
17 or employee of any attorney of any party to this
18 action.
19     IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: February 26, 2020
22
23
24     <%16617,Signature%>
25     ANRAE WIMBERLEY, CSR No. 7778

Page 169

Pages 166 to 169

Veritext Legal Solutions
866 299-5127