# EXHIBIT C



F I L E D
San Francisco County Superior Court

NOV 2 9 2016

CLERK OF THE COURT
BY: _Alicia Green_
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| JEREMY J. NICKEL and THE VINEYARD HOUSE, LLC, <br><br> Petitioners, <br><br> vs. <br><br> FAR NIENTE WINE ESTATES, LLC; FAR NIENTE WINERY, INC.; NICKEL & NICKEL VINEYARDS, LLC; FN CELLARS, LLC; and FN LAND, LLC <br><br> Respondents. | Case No. CPF-16-514929 <br><br> [~~SECOND AMENDED PROPOSED~~] JUDGMENT IN CONFORMITY WITH FINAL ARBITRATION AWARD |

[~~SECOND AMENDED PROPOSED~~] JUDGMENT IN CONFORMITY WITH FINAL ARBITRATION AWARD

[SECOND AMENDED PROPOSED] JUDGMENT

Pursuant to this Court's Orders denying the Amended Petition of Petitioners Jeremy J. Nickel and The Vineyard House, LLC to Correct or Vacate the Arbitration Award, dated August 24, 2016, and confirming the Final Arbitration Award as made, dated October 6, 2016, and in accordance with California Code of Civil Procedure § 1287.4:

**JUDGMENT IS HEREBY ENTERED** in conformity with the Final Arbitration Award served on the Parties in this matter on January 13, 2016 by the Honorable James L. Warren (Ret.), as a result of the Parties' August 2015 arbitration proceeding before JAMS San Francisco, Reference No. 1100080365, attached hereto as Exhibit A ("Final Arbitration Award").

Pursuant to the Final Arbitration Award and this Court's Order dated October 6, 2016, Respondents are entitled to pre-award interest on the monetary award of $366,336 at the rate of 10% per annum for the period from the filing of the Demand for Arbitration on March 12, 2015 until the date of entry of the Final Arbitration Award on January 13, 2016; post-award interest (characterized in the Final Arbitration Award as "post-judgment interest" and in this Court's Order dated October 6, 2016 as "prejudgment interest on a sum certain") at the rate of 10% per annum for the period thereafter until entry of this Judgment; and post-judgment interest at the rate of 10% per annum for the period until full and final satisfaction of this Judgment.

Nothing in the above paragraph shall limit or modify the injunctive, declaratory or other relief set forth in the Final Arbitration Award.

Dated: __11\29\16__

_____
HON. HAROLD E. KAHN
SUPERIOR COURT JUDGE

[SECOND AMENDED PROPOSED] JUDGMENT IN CONFORMITY WITH FINAL ARBITRATION AWARD

# EXHIBIT A

Hon. James L. Warren (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA  94111
Telephone (415) 982-2635
Facsimile (415) 982-5287


## JAMS ARBITRATION

| | |
|---|---|
| FAR NIENTE WINE ESTATES, LLC; FAR NIENTE WINERY, INC.; NICKEL & NICKEL VINEYARDS, LLC; FN SELLERS, LLC; FN LAND, LLC<br><br>Claimants,<br><br>vs.<br><br>JEREMY J. NICKEL; and THE VINEYARD HOUSE, LLC<br><br>Respondents. | JAMS Reference No. 1100080365<br><br><br><br>**FINAL AWARD** |


I.  __Introduction__

On March 12, 2015, pursuant to section 32 of the parties' August 14, 2014 Settlement Agreement, Claimants Far Niente Wine Estates LLC, Far Niente Winery, Inc., Nickel & Nickel Vineyards, LLC, FN Cellars, LLC and FN Land, LLC, ("Claimants" or "Far Niente") filed a Demand for Arbitration with the San Francisco office of JAMS, asserting claims for trade secret misappropriation under the California Uniform Trade Secret Act, trademark infringement and false designation of origin under the Lanham Act, unfair competition, false advertising, breach of contract, breach of fiduciary duty and declaratory relief against Respondents, Jeremy Nickel ("Jeremy")[1] and The Vineyard House[2] (collectively, "Respondents").  On August 10, 11, 12, 18, 19, 25 and 26, 2015, the undersigned held an arbitration hearing in this matter.

---

[1]      For ease of understanding references to the parties throughout this Award, the Arbitrator shall refer to Jeremy Nickel and to his father, Gil Nickel, by their first names.

At that hearing, Claimants were represented by Kenneth Hausman, Jeremy Kamras and Lara Palanjian of the law firm of Arnold & Porter LLP. Respondents were represented by Glenn Zwang, Richard Darwin and Peter Bales of the law firm of Buchalter Nemer PLC. The following witnesses testified at the hearing:

(1)    Dirk Hampson, Director of Winemaking and CEO, Far Niente Wine Estates;

(2)    Jeremy Nickel, Owner of The Vineyard House and Shareholder at Far Niente wineries;

(3)    Bruce Silverman, Claimants' Advertising Expert;

(4)    Mary Grace, Vice President of Marketing and Communications, Far Niente Wine Estates;

(5)    Peter Storm, Claimants' Digital Forensic Examiner;

(6)    Bertha Rodriguez, Human Resources Director, Far Niente;

(7)    Ernest Bowen, Claimants' IT Consultant;

(8)    Greg Regan, Claimants' Damages Expert;

(9)    Helene Weiss, Former Employee of Far Niente;

(10)   John Martini, Founder and CEO of Wine Leverage;

(11)   Craig Norris, Sales Manager at The Vineyard House Winery;

(12)   Naomi Fine, Respondents' Expert from Protect Data;

(13)   Terry Lloyd, Respondents' Damages Expert;

(14)   Scott Lewis, Owner of V Wine Cellar;

(15)   Aaron Fishleder, President of Vinescape;

(16)   Andrew Simpson, Claimants' Civil Engineer Expert; and

(17)   Tom Bearer, Business Advisor, The Vineyard House.

At the hearing, the parties introduced, and the undersigned accepted into the record, dozens of exhibits, those most relevant to this Final Award being designated by "Ex. XXX."

Prior to the hearing, on August 5, 2015, the parties submitted simultaneous pre-arbitration briefs. Following the hearing, the parties submitted proposed final arbitration awards and statement of reasons. Thereafter, on November 4, 2015, the Arbitrator issued his Tentative Final Award, in which he set forth his tentative findings of fact and determinations of law as to

---

[2]    Although The Vineyard House LLC was not a party to the Settlement Agreement, Respondents withdrew their objections to its participation in these arbitration proceedings.

all issues presented, and in which he invited the parties to submit further suggestions and briefing regarding the scope of the injunction that would become part of the Arbitrator's Final Award in this matter (*see,* Interim Final Award, Section (V)(1)). On December 7, 2015, the parties complied with this directive. In addition, on December 11, 2015 and December 14, 2015, the parties filed their Supplemental Submissions re Final Award. The Arbitrator has carefully considered these submissions and, in connection with his review of the relevant evidence submitted in connection with the arbitration hearing, now issues the Final Award in this matter.

For convenience, this Final Award restates in full – modified, where necessary, for clarity either as to text originally stated or with respect to the Arbitrator's final determinations entered at the conclusion of this Final Award – the content of the Tentative Final Award, with the intention that this Final Award shall operate as the conclusive resolution of all items presented to the Arbitrator for decision.

II.     **Facts**[3]

        A. **Background of and Relationship Between Individuals and Entities**

        Gil Nickel, an iconic presence in the California wine industry for years, founded Far Niente Winery ("FNW") in Napa County, California in 1979. Since then, Far Niente has established four affiliated wineries – Nickel & Nickel, Dolce Winery, EnRoute Winery and Bella Union Winery (the "Far Niente Wineries" or the "Far Niente Family of Wines") (Tr., Vol. 1 at 39:21-40-25). When FNW was established, Jeremy, Gil's only child, was 5 years old, and when Nickel & Nickel was established, Jeremy was 12 (Tr., Vol. 1 at 43:10-44:10).[4] "Far Niente," "Nickel & Nickel," and "DOLCE" are all federally registered trademarks belonging to FN Cellars, which is a wholly owned subsidiary of Far Niente Wine Estates (*see,* p. 5, *infra,* for a further discussion relating to formation of and relationship between FN Cellars, Far Niente Wine Estates and the individual wineries). Each of these trademarks was originally held by the individual entities (Tr., Vol. 1 at 71:4-75:5; Ex. 130).

---

[3]     The factual findings that follow are necessary to this Final Award. They are derived from admissions in the pleadings and the testimony and evidentiary exhibits presented at the hearing. To the extent that any of these findings differs from any party's position, that is the result of the Arbitrator's determinations as to credibility and relevance, burden of proof considerations, legal principles, and the weight given to the evidence, both oral and written.

[4]     The evidence established that Gil was quite proud of Jeremy, and introduced him to the business at a fairly early age.

3

When Gil passed away from cancer in 2003, he bequeathed to his son Jeremy, to his nephew Erik, and to his widow Elizabeth, ownership interests in the Far Niente Wineries' real estate and operating entities (Tr., Vol. 1 at 49:4-50:3, 151:2-52:4). Specifically, Gil bequeathed to Jeremy and Erik a 35% ownership share each, and to Elizabeth a 10% ownership share in the Far Niente Wineries. He bequeathed to Jeremy and Erik a 45% ownership share and to Elizabeth a 10% ownership share in all vineyard properties (*Id.*). Dirk Hampson and Larry Maguire, who had been employed by the Far Niente wineries since 1982 and 1983, respectively, had each previously purchased a 10% interest in the Far Niente Wineries-related operating entities (*Id.*), bringing the ownership total to 100%. Dirk and Larry took over management of the wineries after Gil's death.

In addition to the foregoing, Gil separately bequeathed to Jeremy a nine-acre parcel adjacent to the so-called Stelling Vineyard known as the Vineyard House (the "Vineyard House Parcel"). In 2010, Jeremy founded The Vineyard House, LLC, under which he started producing wine under the name "The Vineyard House" ("TVH"). TVH is a very limited production wine; the company produces only about 400 cases each year (Tr., Vol. 1 at 56:18-21, 152:5-7). Bottles of TVH wine typically sell between $150-$200, although on occasion special vintages will be offered for as much as $650 (*see,* Claimants' Supp. Submission re Final Award, Ex. 4). Jeremy is TVH's sole owner (Tr., Vol. 1 at 133:14-15). Despite the acknowledged quality of its wine, during its first two years of operation, TVH generated only minimal sales (*see,* Ex. 20).

**B.     Dispute and Settlement Agreement Relating to FNW's Intellectual Property[5]**

After Gil's death, a dispute arose between Jeremy and the other company shareholders (referred to in the Settlement Agreement as "BELD" after the first names of the other shareholders in the Far Niente wineries – Beth, Erik, Larry and Dirk). While the details of that dispute were not in themselves particularly germane to this arbitration – and the Arbitrator intentionally did not review available evidence describing the merits of that dispute – they did provide the genesis for what eventually became the lawsuit at bar. To the extent pertinent to this litigation, in August 2010, Jeremy initiated a derivative action in Napa County Superior Court alleging that two of the other owners of the Far Niente wineries – Dirk Hampson and Larry

---

[5]     The Settlement Agreement additionally addressed certain water rights issues. Because these are conceptually distinct from the intellectual property rights issues, they are discussed separately (*see,* pp. 41 *et seq., infra*).

Maguire – along with the Far Niente Wineries' chief financial officer, were inappropriately managing the Far Niente Wineries to the wineries' detriment, and to the detriment of Jeremy's interests in them (Tr., Vol. 1 at 52:8-53:10, 122:4-123:8, 152:5-23; Ex. 2). To address this derivative suit, the Far Niente Wineries nominated two independent directors to the Board, Judges W. Scott Snowden (Ret.) and Richard Bennett (Ret.), whose job it was to form a special litigation committee to investigate Jeremy's allegations on behalf of the defendant corporate boards (Id.). On November 14, 2012, Jeremy's action was dismissed on summary judgment by Judge Diane M. Price after the investigation by Judges Snowden and Bennett concluded that Jeremy's claims should not be pursued (Id.). Jeremy did not appeal this dismissal (Id. at 152; Ex. 2).

In December 2012, shortly after Jeremy's derivative suit was dismissed, the owners and managers of the Far Niente Wineries approved a corporate reorganization whereby each of the real estate and operating entities would transfer all or substantially all of their assets and liabilities to a newly-formed holding company – Far Niente Wine Estates, LLC ("FNWE") – in exchange for ownership interests in FNWE (Tr., Vol. 1 at 54:5-8, Ex. A-2).[6] Jeremy did not support this reorganization (Tr., Vol. 1 at 54:8-11), and the relationship between Jeremy and the other owners of FNWE descended into what appears to have been fairly constant strife (Tr., Vol. 1 at 60:3-69:4). Eventually, the parties determined that there was no realistic way for them to continue forward together, and they embarked on a negotiation that would result in a complete separation between Jeremy and the Far Niente Wineries (Tr., Vol. 1 at 70:20-22; 93:9-11; 358:9-13; 460:8-12). The purpose of this negotiation was to resolve all disputes and claims between Jeremy on the one hand, and BELD and the FNW-related entities on the other, and to separate forever and permanently any business relationship between them (Ex. 1254).

The negotiations took over a year but, eventually, on August 14, 2014, the parties entered into the Amended and Restated Confidential Settlement and Mutual Release Agreement (the "Settlement Agreement") (Ex. 158). This Settlement Agreement, which governs much of the disputes at issue here, established, *inter alia*, a series of purchase options that would ultimately terminate any relationship between Jeremy and the FNW-related entities and their other owners (BELD) (Ex. 158; Tr., Vol. 1 at 55:2-60:16). The Settlement Agreement contemplated a

---

[6]     Claimants FN Cellars, LLC and FN Land, LLC are wholly-owned subsidiaries of FNWE (Arb. Demand, ¶13).

complicated and carefully negotiated method for doing that. First, it provided an option for BELD to buy out Jeremy. If BELD failed to do so, it provided an alternative option for Jeremy to buy out BELD. If neither side exercised its buy-out option, the Settlement Agreement provided that the businesses would be sold and the proceeds divided among the parties (Ex. 158, §§14, 17, 18).

A key consideration in the Settlement Agreement focused on the right of FNWE, with its established trademarks and concomitant goodwill, to continue selling its wines in a manner that was wholly disassociated from Jeremy, while simultaneously allowing Jeremy to continue his work in the winery field under his own name, but not riding the coattails of the FNWE brands or the goodwill of the Nickel family wines. The Agreement thus provided that Jeremy could "use the names 'Jeremy Nickel' and 'Jeremy Nickel Cellars' in connection with his winery business," but that he could "not infringe or violate any trademark, trade name, or other intellectual property right held by the FNW Entities" (Ex. 158, §4). The Settlement Agreement also required that Jeremy not "interfere, impede or take any action that could reasonably be expected to adversely affect the efforts of the Other Parties to secure new investors . . . that . . . would provide the funds necessary [to purchase Jeremy's interests in the Far Niente wineries]," and that Jeremy "cooperat[e] with [Far Niente's] marketing and sales efforts" (Ex. 158, §§5 & 6(a)).

The Settlement Agreement contained an arbitration clause that, in relevant part, provides:

> Any disputes arising out of or relating to this Agreement, the Property Distribution Agreement, or the Water Rights Easement or the interpretation or enforcement of any such agreements . . . shall be resolved by final and binding arbitration in San Francisco, California, before a single arbitrator . . . . The costs of the arbitration shall be shared 50/50 between Jeremy, on the one hand, and FNW, on the other hand. Each party shall bear its own legal fees in the arbitration . . . This Agreement shall be construed in accordance with applicable substantive California law (*Id.*, §32).

The Settlement Agreement set forth a two-step release mechanism. The first release, which was effective upon the initial close, was between Jeremy and BELD (*Id.*, §24). The second release, which will become effective upon the buy-out of Jeremy or of BELD or of the sale of the wineries, is between Jeremy and the Far Niente entities (*Ibid.*). The Settlement Agreement defined what each release would encompass:

> For purposes of this Section 24, "Released Claims" shall mean all claims (including, without limitation, claims for attorney's fees,

6

costs, damages, penalties or restitution), debts, liabilities, demands, obligations, costs, fees, expenses, actions and causes of action whatsoever, of every nature, character and description, known, unknown, discovered, undiscovered, suspected or unsuspected which are owned or held or have been owned or held by the releasing party against (or related to) any released Party on or prior to the Release Effective Date . . . . (*Ibid.*).

## C. Jeremy's Efforts to Market TVH Wines

Long before he executed the Settlement Agreement, Jeremy had started developing TVH into what he one day hoped would become a new "cult wine" in the Napa Valley, perhaps on a par with Screaming Eagle, Harlan Estate, Scarecrow, Colgin Cellars and Levy & McClellan (Tr., Vol. 2 at 365:24-366:2). One of Jeremy's somewhat unique approaches to the sale of TVH wine was to dedicate the wine to the memory of his father, Gil, and to donate 10% of the proceeds from the sale of each bottle to cancer research. Jeremy's motto, as he explained at the hearing, was: "Here is to the things that we do in our lives that would make our parents proud" (Tr., Vol. 2 at 288:1-6). Jeremy testified earnestly about his passion for his wine, of his respect for Gil, and for his desire to do something in the wine business that would, as per his motto, "make his father proud." The problem came from the way Jeremy went about doing this. His blending of his own name, Gil's name, the TVH name, the names of the Far Niente wineries, references to the "Far Niente Family of Wines," and the interrelationship between all of them, has resulted in actual and potential confusion in the marketplace as to which wine is produced by which wine entity. This confusion catalyzed the present arbitration.

### i. Jeremy's Acquisition and Use of Far Niente's 25,000 Customer List

The parties have essentially stipulated that, as Claimants alleged, sometime before the Settlement Agreement was signed, Jeremy "acquired a FNW list containing the names of approximately 25,000 people" (Resp. Proposed Arb. Award, p. 2) (the "25,000 Customer List"). More than 7,000 of those individuals had purchased wine from Far Niente since January 1, 2012 (*see,* Ex. 1288). This list included approximately 90% of Far Niente's 6,000 active wine club members as of February 2012 (Ex. 6, Ex. D). Apparently this list included phone numbers, street addresses and/or e-mail addresses for many of these 25,000 people, but it did not include any

purchasing history, customer preferences, wine club membership, or other personal information (Tr., Vol. 2 at 412:21-413:5).[7]

Jeremy confirmed under oath that the 25,000 Customer List was a Far Niente list containing names and contact information that came from Far Niente (Tr., Vol. 1 at 139:21-41:4). He refused to testify, however, as to how he obtained the list, despite admonitions by the Arbitrator that this would result in an inference adverse to him (Tr. Vol. 1 at 137:9-15: "I am not going to comment on how I acquired the list and I understand your position your honor but I need to protect individuals or companies from further harm and I'm going to stick to those guns. . . I'm not going into any further explanation of how I acquired the list"). Jeremy admitted that he used the list to "target patrons of [Gil Nickel's] brands." When Jeremy was asked if it was his intention to target those 25,000 Far Niente contacts in the future for the benefit of his TVH campaign, Jeremy responded: "Yes, that is correct" (Tr., Vol. 1 at 170:13-15), even though he knew he had no permission to use the 25,000 FNW Customer List (*see*, Tr., Vol. 1 at 157:9-13).

Jeremy also obtained and used other FNW customer, friends and family, and guest lists. When Kivu Consulting conducted its forensic examination of Jeremy's laptop, it found a copy of FNW's 2011 Friends and Family List as well as the "2008 Friends and Family Master List2," "N&N Grand Opening Guest List," "Master 2011 Friends and Family List," and "2008 Master List of Friends and Family Holiday Wine Giveaway" (Ex. 7 at 161). Jeremy was aware that he was in possession of these lists as evidenced by a 2012 e-mail that he sent to Todd Blum, Tom Bearer and Helene Weiss explaining that his "Master List" included "FN Lists, NN lists, BELD's Friends and Family List" (Tr., Vol. 1 at 180:25-181:25; Ex. 288).

In the fall of 2014, Jeremy engaged two solicitation companies – Chatterbox Wine Marketing Services ("Chatterbox") and Wine Leverage – to conduct phone, e-mail and letter solicitation campaigns on TVH's behalf using FNW's 25,000 Customer List. Jeremy signed the agreement with Chatterbox on August 15, 2014, the day after he signed the Settlement Agreement (*see*, Tr., Vol. 1 at 146:24-47:20). Although Jeremy testified that he had no concern

---

[7]     The actual list that Jeremy took has never been found. He testified that it was on a disk that he downloaded to his laptop computer, after which he lost the disk itself. By order of the Arbitrator, Jeremy's laptop was examined by an independent third party forensic expert, Kivu Consulting, as a result of which a variety of different lists were identified and produced. It was never entirely clear whether any one of them -- or parts of them – were the original "25,000 Customer List."

that using FNW's 25,000 Customer List would violate the Settlement Agreement,[8] he also testified that he "did not know that" the list contained any intellectual property or any confidential information (Tr., Vol. 1 at 148:11-14). Moreover, in response to a question by the Arbitrator, he testified that he never sought any advice, legal or otherwise, either about what the term "intellectual property" meant as used in the Settlement Agreement, or whether his marketing uses of the Far Niente Winery lists or trademarks would violate that Agreement (Tr., Vol. 2 at 444:13-445:3). He simply went ahead and did it.

When he retained his telemarketing firms, Jeremy provided them with a script that he apparently wrote himself. In this script, Jeremy directed the Chatterbox marketers to tell customers: "I am calling on behalf of Jeremy Nickel with Far Niente, Nickel & Nickel, and Dolce wineries in Napa Valley . . . Jeremy Nickel has asked me to extend a curtsy [sic] call to patrons of his family's wines to . . . let you know that Jeremy Nickel has launched a new proprietary 'cult' wine called 'The Vineyard House'" (Ex. 245). Jeremy instructed the telemarketers to explain that "Gil Nickel (Founder of Far Niente, Dolce, and Nickel & Nickel wineries) pas[s]ed away" in 2003, that Gil was Jeremy's father, and that "The Vineyard House is located directly behind Far Niente" (Id., Ex. 250). He similarly instructed the Wine Leverage employees to identify themselves as "calling on behalf of Jeremy Nickel (co-founding partner of Far Niente, Nickel & Nickel, and Dolce wineries in Napa Valley," and to be reaching out "to patrons of his family's wines . . . ." (Ex. 250). Callers were instructed to end each conversation with: "On behalf of Jeremy and the entire Nickel family, thank you very much for your time and patronage" (Ex. 245). In the view of Bruce Silverman, Claimants' expert on advertising matters, these scripts "were intentionally composed in such a manner as to confuse consumers into believing that TVH was an integral part of, or at minimum, affiliated in some way with Far Niente" (Ex. 4, ¶ 25). The Arbitrator agrees.

In furtherance of his efforts to create the impression that TVH was somehow involved with the Far Niente Wineries, Jeremy sent Chatterbox various marketing materials to incorporate into their efforts, including a biography which states that "[w]hen Jeremy is not preoccupied by TVH *or other family enterprises*, he dedicates as much time as possible to his family, friends and communities both near and far" (Ex. 15) (emphasis added). In all of the foregoing examples, and

---

[8]     "Q: Did you have any concern that using that [25,000 Far Niente] list might violate the settlement agreement? A: I did not" (Tr., Vol. 1 at 149:9-11).

9

others introduced into evidence throughout the hearing, the implication that Jeremy and TVH are affiliated in some way with the Far Niente Wineries – his family's "other enterprises" – is inescapable.

Jeremy testified that he intended the callers to follow his script: "More or less, it was what I had intended them to say" (Tr., Vol. 2 at 418:6-12). Jeremy's marketers followed his instructions. In a voice-mail message left by a Wine Leverage telemarketer, which was replayed at the hearing, the caller clearly stated that he was calling: "on behalf of Jeremy Nickel of Nickel & Nickel and Far Niente" (Ex. 163). Interestingly, this recorded message was played during the testimony of John Martini, the owner of Wine Leverage, who had just finished testifying (a) that his callers did not – and would not – reference Jeremy Nickel in such a way, and (b) that it would be counterproductive for them to do so (Tr., Vol. 4 at 868:19-869:4; 903:2-904:9).[9] Mr. Martini sought to avoid this uncomfortable situation when he testified that his callers actually used a "sales pitch" that had been created by his son, Alex Martini, but neither Mr. Martini nor Respondents ever produced this sales pitch, despite subpoenas directed at Wine Leverage calling for its production (Tr., Vol. 4 at 859:23-24). The evidence established that, while there was inevitably variation in the actual language used because of all the different human beings involved in the sales calls, the Chatterbox and Wine Leverage sales personnel more or less followed Jeremy's sales script, as he had instructed them to do.

Chatterbox and Wine Leverage ultimately made a total of 32,564 calls to Claimants' customers (Ex. 41). They also sent e-mails to those customers stating that the e-mails were "from" "Nickel & Nickel co-founder Jeremy Nickel," and noting that TVH's wines were dedicated to Jeremy's late father "Gil Nickel – founder of Far Niente, Nickel & Nickel and Dolce wineries" (Ex. 157). Other e-mails to Claimants' customers included wine reviews that stated that TVH wines were the "vision of Jeremy Nickel, of the Far Niente and Nickel & Nickel dynasty," while yet other e-mails contained a picture of Jeremy with the caption "Jeremy helping with the Far Niente bottling" (Exs. 26, 297; Tr., Vol. 4 at 962:2-63:3 (Craig Norris, TVH employee, testifying that he asked Chatterbox to include this picture in e-mails to customers "per [Jeremy's] instructions").

---

[9]    Jeremy also, albeit most likely unintentionally, contradicted Mr. Martini when he testified that the two dozen Wine Leverage caller conversations that he listened in on used this same language (Tr., Vol. 2 at 472:17-19).

These marketing efforts succeeded in increasing TVH's wine sales dramatically. Despite the high quality of his wine, what Jeremy could not achieve using his own marketing materials he accomplished using FNW's. For example, both parties' damages experts agreed that TVH's marketing campaigns using Far Niente's 25,000 Customer List generated nearly $300,000 in sales for TVH (Ex. 5 at 3; Ex. 1003.006).

Not surprisingly, TVH's marketing pitch caused some of Claimants' customers to believe that Respondents' wines were offered by, associated with, or sponsored by the Far Niente Wineries.[10] For example, notes from Chatterbox employees contained the following observations:

- "The[] [customers] love Nickel & Nickel and are very excited about being called and being added to the Friends and Family list [for TVH]."
- "Craig loves all Nickel family wines and thought he would really enjoy the different vintages from TVH and ordered a case of each 2008, 2009, 2010."
- "They both love the Nickel families wines so were excited to hear about TVH."

(Ex. 13).

Mary Grace and Dirk Hampson, both senior executives with FNWE, testified that Claimants received unsolicited inquiries and complaints by e-mail and phone from some of FNW's customers who stated that they had received calls and/or e-mails to visit TVH or buy allotments of its wine. These customers reported that they were confused about whether TVH was associated with the Far Niente wineries (Tr., Vol. 1 at 76:12-85:2, Vol. 3 at 576:13-80:10, 591:12-597:21; Exs. 134, 136, 137, 156, 164, 146, 172). Grace and Hampson were extremely upset by this, as a result of which they sent an e-mail to all Far Niente wine club members on March 2, 2015 to clarify that there was no relationship between the Far Niente Wineries and TVH (Ex. 160; Tr., Vol. 1 at 84:14-85:10). Mary Grace explained that Far Niente felt the need to "dispel the confusion that because we were hearing from customers and we were seeing e-mails that the Vineyard House is marketing its brands alongside ours, we had to make it really clear to our club members that the Vineyard House is not one of our brands" (Tr., Vol. 3 at 580:3-10).

FNW received many responses to their e-mail, some of which included the following:

---

[10]      Mr. Silverman testified that Jeremy's unnecessary and inappropriate references to Fan Niente's products and properties was "*intended* to communicate an association between TVH and Claimants" (Ex. 40, ¶ 41) (emphasis added).

- "I was under the impression that [TVH] was part of the Nickel & Nickel wine club that we are in, and I was considering getting on their program . . . . Just curious, we have enjoyed the Nickel & Nickel wines for a number of years now and I thought The Vineyard House would make a great addition."
- "I certainly understood from [the TVH call and e-mail] that the wineries were related."
- "I did receive the [TVH] e-mail and joined the[ir] club as I thought it was from your vineyard."
- "I would like to know how TVH obtained my contact information, if it is not affiliated with Far Niente/Nickel & Nickel?"
- "I too have received this 'special' offer to join TVH, and believe I was told it was associated with Nickel & Nickel. I was curious how they obtained my phone number and email from you if they are not associated as they have called and emailed me."
- "So I got this email [from TVH,] not sure if [TVH] is related to your vineyard as it says it is?"
- "I was contacted and thought they were connected or got my email through being a member of Nickel and Nickel wine club."
- "I received both phone calls and emails from the Vineyard House and from my perspective a relationship was implied. I was surprised, though, because it is not Far Niente's style to market so assertively" (Exs. 108-13, 115-26, 131, 132, 137, 159).

As a result of Jeremy's marketing efforts, FNWE sent him a cease and desist letter demanding that he stop using Far Niente's intellectual property as part of his TVH sales pitches. When that failed, Far Niente instituted the present arbitration. The Arbitrator now looks at the several asserted causes of action.

## III.    Discussion of Far Niente's Intellectual Property Causes of Action

### A.    Trade Secret Misappropriation under the California Uniform Trade Secret Act

A cause of action for monetary relief under California's Uniform Trade Secret Act ("CUTSA") consists of the following elements: (1) possession by the plaintiff of a trade secret; (2) the defendant's misappropriation of the trade secret through wrongful acquisition, disclosure or use; and (3) resulting injury to the plaintiff (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4[th] 210, 220, citing Cal.Civ.Code §§3426.1-3426.3). "The first of these elements is

typically the most important, in the sense that until the content and nature of the claimed secret is ascertained, it will likely be impossible to intelligibly analyze the remaining issues" (*Id.* at 220).

### i.   Is Far Niente's 25,000 Customer List A Trade Secret Under CUTSA?

Section 3426.1(d) of CUTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy" (Cal.Civ.Code §3426.1(d)). Information has "independent economic value" if it provides the plaintiff with a "substantial business advantage" by virtue of not being known to the public or the plaintiff's competitors" (*Morlife Inc. v. Perry* (1997) 56 Cal.App.4[th] 1514, 1522). Efforts that are "reasonable under the circumstances" to maintain a possible trade secret's secrecy may include: (1) telling employees that something is a trade secret; (2) limiting access to it; (3) requiring confidentiality agreements; and (4) marking the trade secret with warnings or reminders of confidentiality (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4[th] 292, 304).

### a.   Independent Economic Value

Claimants contend that all of FNW's customer lists, including its 25,000 Customer List, derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. The Arbitrator agrees.

Mary Grace credibly and persuasively testified at the hearing about Far Niente's process in developing its customer lists over a period of more than ten years. During her testimony she explained that the salaries of the direct-to-consumer program employees involved in cultivating these customers and wine club members totaled roughly $1.5 million a year in recent years (Tr., Vol. 3 at 545:25-548:2). "[T]he chief factual issue in determining whether a customer list is a trade secret is the amount of effort involved in compiling it" (*Cellular Accessories For Less, Inc. v. Trinitas LLC*, No. CV 12-06736 DDP (SHx) (C.D. Cal. Sept. 16, 2014) 2014 WL 4627090, at *3). Here, based on Mary Grace's testimony, supported by others, the Arbitrator is satisfied that Claimants have shown that FNW put substantial effort into compiling its customer lists.

Moreover, FNW's customer identities are valuable to FNW's business (*see*, Tr., Vol. 3 at 569:5-13, where Mary Grace testified that FNW's wine club lists consist of "extremely valuable

contacts" that form a "vital part of FNW's business"). Indeed, wine club lists are one of the main ways that luxury wine is sold (Tr., Vol. 1 at 90:12-15-91). Even Jeremy's telemarketing expert, John Martini, testified that wine club lists are a winery's "treasure" (Tr., Vol. 4 at 851:5-9).

Focusing on FNW's wine club list specifically, Dirk Hampson testified that the average wine club member remains active for more than two years, during which time they spend over $1,000 annually (Tr., Vol. 1 at 91:9-14). He testified that FNW's wine club member lists are not only valuable for cultivating customers to continue to buy wine at the winery, but they are also helpful "to develop relationships with the customer" so that the customer will "buy from the stores and restaurants where they live and where they travel" (Tr., Vol. 3 at 549:24-550:6). These lists provide FNW with a substantial business advantage by virtue of not being known to the public or its competitors (see, Morlife, supra, 56 Cal.App.4th at 1522).

Disclosure of FNW's customer lists to the public or its competitors would diminish their value because a customer list's "disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested" (see, Id. at 1521-22). This is exactly what happened here.

In 2012, Jeremy had been able to get a scant 102 customers on TVH's own customer list (Tr., Vol. 1 at 161:11-13; Ex. 290). Before using FNW's 25,000 Customer List, Respondents had conducted solicitation campaigns with Wine Leverage using TVH's own customer list, but the campaigns only generated sales of roughly $64,000 (see, Ex. 20). In the fall of 2014, however, TVH kicked off its telemarketing efforts using the 25,000 Customer List, soliciting customers who had already shown a willingness to buy Napa Valley Oakville cabernet sauvignon direct from a winery such as FNW. As a result, TVH's sales rose dramatically. During February and March 2015 alone, TVH sold $245,000 of wine to customers on FNW's 25,000 Customer List (Ex. 5 at 5). This represents a vast increase from prior years when TVH had only sold $7,000 (2012), $19,000 (2013) and $5,000 (2014) during this same two-month time frame.

FNW's customer list caused TVH's club membership numbers to swell from fewer than 100 to more than 500 (Id.). These numbers corroborate the testimony of Dean Bowen who explained: "[FNW's] customer list is one of their largest assets outside of land and buildings, and

14

if that asset was released or given to somebody else, . . . it could . . . mean cash to somebody else" (Tr., Vol. 3 at 744:11-20).

These numbers belie Jeremy's position that FNW's customer list only "contained a few kernels of value," (*see,* Resp. Proposed Arb. Award, p.7), as does the fact that Jeremy spent more than $157,000 to have Chatterbox and Wine Leverage solicit customers using that list. Jeremy even testified that he will continue to use the list unless he is enjoined from doing so (*see,* Tr., Vol. 2 at 277:6-11; Vol. 1 at 149:14-20). If these lists had no value to Respondents, why would Jeremy have put so much time, money and effort into using the lists and why would his efforts have been such a success? The answer, the Arbitrator posits, is self-evident.

Jeremy next argues that the list is not really a "customer list" at all, relying on the fact that fewer than 30% of the 25,700 names had actually purchased any wine from Claimants within the last three and a half years. This argument fails to address the observation of Peter Storm, Claimants' forensic expert, who opined that approximately 90% of Far Niente's roughly 6,000 wine club members as of February 2012 were included in the 25,000 list (*see,* Ex. 6, Ex. D). Thus, while not all names on the list may have been actively purchasing Claimants' wines at the time that it was acquired by Jeremy, the list contained the names of thousands of individuals who were – and who fit the precise demographic of the TVH winery.

Even if a wine list member is not a current purchaser, the evidence established that wine club member lists remain valuable. As Mary Grace explained, FNW continues to use information pertaining to members who have cancelled their memberships because those prior members can often be persuaded to join another club, or they may be persuaded rejoin the same club at a later date (Tr., Vol. 3 at 570:20-71:18). Thus, lists of inactive wine club members have at least the potential for economic value derived from not being generally known to the public or to competitors. Moreover, as Dirk Hampson explained, wine club lists do not get stale over time because they represent "key customers that have visited the winery, been to [FNW] events, supported [FNW], even if they don't belong, they go out and buy our wines in restaurants, and oftentimes they end up rejoining or being the source for other members" (Tr., Vol. 1 at 91:15-23).

Jeremy finally argues that the 25,000 Customer List has no value because it does not contain any information reflecting customer preferences, purchase history, spending patterns, etc. In support of this somewhat counterintuitive argument, Jeremy can cite no case law requiring

15

that such indicators are necessary for a customer list to be considered a trade secret. The Arbitrator finds as a matter of law that the 25,000 Customer List, as constituted, had independent economic value.

### b. Secrecy

Claimants' contention that their customer lists were "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy" is less persuasive (*see,* Cal.Civ.Code §3426.1(d)). While it is clear that Claimants took some measures to try to protect the secrecy of their lists, the Arbitrator finds that those measures were not sufficient to meet the relevant legal standards (*see, In re Providian Credit Card Cases* 96 Cal.App.4[th] at 304, where the court held that the basic requirements for successful claim of secrecy protection include: (1) restricting access and physical segregation of the information; (2) confidentiality agreements with employees; and (3) marking documents with warnings or reminders of confidentiality)).

Although Claimants' witnesses testified to the contrary, there was no persuasive evidence that Claimants meaningfully restricted access to its customer list information. Yes, Claimants contracted with an information technology vendor, Netflow, to monitor the security of Claimants' servers, and yes, Claimants maintain their customer lists in Vin65, which is password protected (Tr., Vol. 3 at 724; Vol. 3 at 555, 732-34). But Claimants admit that they provided a wide variety of employees and contractors with access to these systems, and the evidence demonstrates that these individuals were not really asked or required to keep the client lists confidential. They may have done so on an *ad hoc* basis, but that is legally insufficient to satisfy this criterion of CUTSA.

FNW's somewhat haphazard efforts to protect its customer lists were illustrated by several witnesses. Helene Weiss, who worked for Claimants for over 20 years before she was terminated for unspecified reasons, testified that during the time she had access to Claimants' customer lists she was never asked to sign a nondisclosure or confidentiality agreement (Tr., Vol. 4, 791:15-20). Ms. Weiss testified that she never received any instructions or guidance from anyone at FNW or Nickel & Nickel regarding customer lists and how they should be treated (*Id.* at 792:8-12). Ms. Weiss testified that FNW never provided her with any sort of training regarding confidentiality (*Id.* at 793:3-6). Further, Ms. Weiss explained that when she was fired, she did not have an exit interview with Claimants, and Claimants did not take any measures to ensure that she was not removing confidential information from the premises (*Id.* at 793:8-11).

16

Similarly, current TVH employee Craig Norris worked in sales for Claimants for seven years and had access to Claimants' customer lists. Mr. Norris was never asked to sign a nondisclosure or confidentiality agreement (*Id.* at 946:25-947:8), and he testified that Claimants never provided him with any training on confidentiality (*Id.* at 947:9-16). As was the case with Ms. Weiss, when Mr. Norris left the company in 2010, Claimants did not inquire of him as to whether he had any confidential information (*Id.* at 947:17-23; *see also* Tr., Vol. 2). The same can be said for third parties who were given access to the customer lists, such as Amy Predmore of designthis!, Dean Bowen of NetFlow, and Doug Hoogervorst of Target. These entities, and the individuals who worked for them, were not told to keep the lists confidential nor were any of them required to sign a nondisclosure agreement (Vol. 3, 641:21-648:18, 659:9-661:6, 746:10-20, 766:1-769:15; 721:9-13:, 747:17-25; Vol. 5 at 1160:25-1161:14).

Claimants introduced no evidence that they ever affirmatively marked the customer lists with warnings or any other type of legend that would advise a reader that the information contained therein was confidential. To the contrary, the evidence affirmatively indicated that this was not the case (Tr., Vol. 4 at 1028:8-17; Vol. 3 at 709:13-19). Claimants did not have a formal policy manual for employees describing customer lists as trade secrets, or instructing employees to keep their contents confidential. The best that Claimants could come up with was testimony that there is a "Confidentiality" section in its employee handbook that talks generally about an employee's responsibility to safeguard "confidential and proprietary information" (*see,* Tr. Vol. 3 at 393:7-694:25; Ex. 191). While such a reference is helpful as part of an overall plan to maintain the confidentiality of trade secret information, it is insufficient and not "reasonable under the circumstances" in order to maintain its secrecy (*see, generally, Gemisys Corp. v. Phoenix Am., Inc.* (Mar. 18, 1999 N.D. Cal.)1999 WL 417411, *9-14).

Claimants contend that their failure to have individuals sign a non-disclosure agreement is not fatal to their claim because they took other precautions to keep the customer lists secret, such as verbally telling their vendors and employees that the information was confidential and limiting access to information on a need to know basis. Claimants' weak evidence of such measures was sporadic, at best. In any event, these oral conversations are not sufficient to overcome either the fact that Claimants failed to document that the customer lists were confidential, or their failure to require anyone utilizing the lists to sign a confidentiality agreement.

17

Claimants contend that not requiring non-disclosure agreements was reasonable under the circumstances because it was consistent with industry norms, citing the testimony of Doug FitzGibbon who founded Red Dog Marketing and who testified that he never entered into confidentiality agreements in connection with his winery consulting work (*see,* Tr., Vol. 5 at 1165:25-1166:6). While there is nothing in the evidence to indicate that Mr. FitzGibbon was not truthful and credible when responding to counsel's questions, Respondents also introduced the credible testimony of Ms. Weiss and Mr. Norris, who were both asked to sign non-disclosure agreements when they began working for their new employers (*see,* Tr., Vol. 4 at 795:15-21, where Ms. Weiss testified that when she went to work for Caymus Winery she had to sign a non-disclosure within the first two hours of employment; Tr., Vol. 4 at 948:11-20, where Mr. Norris testified that when he took a new position at Duckhorn Winery, he was required to sign a confidentiality agreement before he started). Thus, at least some wineries formally prioritize their employees' confidentiality by putting processes in place to ensure that customer lists are kept secret. While there was no testimony specifically showing that trade secret law was different with respect to wineries than to other entities that try to keep trade secret information from becoming public, the better practice under established law is for a company to rely on written policies, and not simply on *ad hoc* word-of-mouth warnings.

Moreover, Claimants' contention that their employees and vendors subjectively believed and understood that customer contact information was confidential is unpersuasive. Such third-party beliefs do not amount to reasonable measures to protect a trade secret and are irrelevant to the question of whether Claimants took affirmative steps to protect their confidential information.

In light of this deficiency, Claimants' CUTSA claim must fail.

Based on this conclusion, it is technically unnecessary for the Arbitrator to address the additional elements of Claimants' CUTSA claim. Because those elements, and the Arbitrator's conclusions with regard to them, are directly relevant to Claimants' remaining causes of action, however, the Arbitrator addresses them seriatim below.

## ii. Was The Customer List Misappropriated Through Wrongful Acquisition, Disclosure Or Use?

The next element would be whether Jeremy wrongfully acquired the 25,000 Customer List. The answer is clearly "Yes." Jeremy's refusal to testify at the hearing as to how he

obtained the list, while acknowledging that he did not obtain it with FNW's permission, strongly supports the inference that Jeremy not only wrongfully got his hands on the 25,000 Customer List, but that Jeremy knew his conduct – whatever it may have been – was wrongful when he engaged in it (*see,* Tr., Vol. 1 at 135:5-7, where Jeremy's counsel, Glenn Zwang, explained: "We have agreed that it belonged to Far Niente and we've agreed that it was obtained without permission. They have the facts to prove misappropriation"). The undersigned advised Jeremy that his failure to testify about this topic would result in an inference adverse to him. This point will be revisited later in this Award.

### iii. Were Claimants Injured?

Claimants acknowledge that they did not quantify the dollar amount of the harm caused to them by Jeremy's use of its customer list. But, Claimants contend, the law does not require them to make such a showing (*see, Distinctive Plastics, Inc. v. Carter,* No. D064259 (Cal. Ct. App. Sept. 17, 2014) 2014 WL 4631897, *2, where the court said: "a plaintiff can prevail on a UTSA misappropriation cause of action without proving actual damages or unjust enrichment"). The undersigned agrees.

Claimants need not show the actual value of the harm that they suffered by Jeremy's use of the customer list. Instead, it is sufficient that Claimants merely demonstrate that they were harmed. Claimants have succeeded in this effort.

As a result of Jeremy's misuse of the 25,000 Customer List, Claimants lost the exclusive use and benefit of their substantial time, effort and resources in developing the list. They also lost the ability to market to their own customers (Tr., Vol. 3 at 598:4-601:2, where Mary Grace explained how, as a result of Jeremy's conduct, FNW had to delay the launch of its new EnRoute wine club and the launch of its own new brand Bella Union). As a result of Jeremy's use, Claimants' brand was diluted, as shown by the many customers who were confused about the relationship between TVH and the Far Niente wineries' brands and by the fact that customers expressed surprise and concern about the manner in which they were contacted by TVH's telemarketing firms (*see,* Ex. 111; Tr., Vol. 3 at 588:24-595:7).

### iv. Conclusion re CUTSA Claim

Claimants have failed to prove that FNW's 25,000 Customer List was the subject of efforts that were reasonable under the circumstances to maintain its secrecy. Although they have proven the other elements of a CUTSA claim, because of this failure they cannot prevail on this

19

theory. This conclusion, however, is not fatal to the remainder of Claimants' claims. Each of those additional causes of action shall be discussed, *infra*.

### B. Trademark Infringement and False Designation under the Lanham Act

Claimants are the owners of federal trademark registrations for "Far Niente," "Nickel & Nickel," and "DOLCE" (Tr., Vol. 1 at 71:4-74:25; Ex. 130). This constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate" (*see,* 15 U.S.C. §1057). Similarly, Claimants have a protectable interest in the trade names for "Far Niente," "Nickel & Nickel" and "Dolce," as these trade names have been used by the wineries to identify their business for many years (*see, Sun Microsystems Inc. v. Astro-Med Inc.*, No. C-95-20602-JW (N.D. Cal. Apr. 1, 1996) 1996 WL 369100, at *3, where the court found a protectable interest in trade names where names were "used in connection with the sale of all of Plaintiffs [*sic*] computer goods and services" since the companies' founding).

Claimants allege that Respondents have violated these registered trademarks and protectable trade names. The relevant law on this subject starts with the Lanham Act (*see,* 15 U.S.C. §§1114(1)(a); 1125(a)(1)).

Under 15 U.S.C. §1114(1)(a):

> [a]ny person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided (15 U.S.C. §1114(1)(a).

Under 15 U.S.C. §1125(a)(1):

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another

person, or as to the origin, sponsorship, or approval of his or her
goods, services, or commercial activities by another person, or (B)
in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or
another person's goods, services, or commercial activities, shall be
liable in a civil action by any person who believes that he or she is
or is likely to be damaged by such act (15 U.S.C. §1125(a)(1)).

Jeremy does not deny that he used Claimants' trade names and trademarks in his TVH
marketing endeavors. Nor could he legitimately do so in light of the clear evidence that he used
Far Niente, Nickel & Nickel and DOLCE so often and in such varied ways: Jeremy instructed his
telemarketers to tell customers that they were calling "on behalf of Jeremy Nickel with Far
Niente, Nickel & Nickel, and Dolce wineries in Napa Valley" (Ex. 245, 250; *see, also*, Ex. 163,
where the actual telemarketer references these three wineries); his telemarketers explained that
"Jeremy Nickel has asked me to extend a [courtesy] call to patrons of *his family's wines* to . . . let
you know that Jeremy Nickel has launched a new proprietary 'cult' wine called 'The Vineyard
House'" (Ex. 245, 250( (emphasis added); and his callers were instructed to end each
conversation with "On behalf of Jeremy and the entire Nickel family, thank you very much for
your time and patronage" (Ex. 245) (emphasis added).

The telemarketing firms also sent e-mails on behalf of TVH "from" "Nickel & Nickel co-
founder Jeremy Nickel," despite the fact that Jeremy was not a "co-founder" of Nickel & Nickel;
he was only 12 when the brand was formed (Ex. 157). Other e-mails to FNW's customers
included wine reviews that stated that TVH wines were the "vision of Jeremy Nickel, of the Far
Niente and Nickel & Nickel dynasty," again implying a non-existent interrelationship between
TVH and these brands (Ex. 26).

Jeremy referenced Far Niente, Dolce and Nickel & Nickel on his TVH website, noting
that he is involved with "lead[ing] Far Niente, Dolce and Nickel & Nickel to the successful
future" and referencing his longtime partnership with Larry Maguire, Dirk Hampson, Erik Nickel
and Beth Nickel, despite the long-standing and dysfunctional conflicts among these individuals
and entities (Ex. 8). Jeremy served both TVH wines and wines from the Far Niente Wineries at
TVH winemaker dinners where he actively used the Far Niente trade names and logos to
promote his own TVH wine. The language of his invitation to the September, 2013 TVH dinner
is a particularly egregious example: Jeremy will be serving "an amazing lineup of Nickel family
wines (including Far Niente, Nickel & Nickel, En Route, Dolce, and of course, The Vineyard

House," directly implying an interrelatedness between them (Ex. 342). Jeremy's invitation for a different TVH dinner actually puts The Vineyard House in the middle of the Far Niente wines that he would be serving. The conclusion is inescapable: "Indulge in an elite selection of award-winning Nickel family wines (including Far Niente, Nickel & Nickel, The Vineyard House and Dolce)" (Ex. 341). The attached menu also wrapped the names of the Far Niente Wineries' products around the TVH brand icon.

The question on infringement turns on the textbook Lanham Act standard of whether Jeremy's use of FNW's marks was likely to confuse customers about the source of his product, that is, whether Jeremy's use of the FNW marks was likely to confuse customers as to whether the new TVH label was actually a part of the family of Far Niente wines. The key decision in this area is *AMF Inc. v. Sleekcraft Boats* (9th Cir. 1979) 599 F.2nd 341 (*abrogated in part on other ground recognized by Mattel, Inc. v. Walking Mountain Prods.* (9th Cir. 2003) 353 F.3rd 792, 810 n.19). The following eight *Sleekcraft* factors inform the relevant inquiries: (1) similarity of the conflicting designations; (2) relatedness or proximity of the two companies' products or services; (3) strength of the mark; (4) marketing channels used; (5) degree of care likely to be exercised by purchasers in selecting goods; (6) Jeremy's intent in selecting and using its mark; (7) evidence of actual confusion; and (8) likelihood of expansion of product lines (*see, Brookfield Commc'ns Inc. v. W. Coast Entm't Corp.* (9th Cir. 1999) 174 F.3rd 1036, 1053-54). Almost all of these factors militate in Claimants' favor.

Claimants have introduced evidence of actual confusion among their customer base. Actual confusion constitutes "persuasive proof that future confusion is likely" (*Sleekcraft, supra,* 599 F.2nd at 352). This evidence includes the notes from Jeremy's telemarketers who spoke directly with the consumers (*see,* Ex. 13), and it includes testimony and notes from FNW staff who communicated with the customers via e-mail and telephone calls who said they were confused (*see,* Tr., Vol. 1 at 76:23-84:11, Vol. 3 at 576:13-80:10, 591:12-597:21; 594:14-96:23; Exs. 108-13, 115-26, 131, 132, 134, 136, 137, 156, 159, 164, 146, 172).

Respondents contend that Claimants have not shown that Jeremy's efforts caused any actual confusion because less than 1% of FNW's customers responded to its e-mail blast about the TVH e-mails and calls, and only six of those individuals claimed to have been confused. This argument is unpersuasive, particularly in light of the compelling testimony of Claimants' expert, Bruce Silverman. Mr. Silverman explained that what matters is not the relatively few

responses that Far Niente received to its e-mail, but the fact that they received any responses at all. According to Mr. Silverman, the fact that FNW's wine club members took time to respond in the first place indicates that a larger percentage of its members were actually confused by the Respondents' marketing campaigns (Ex. 4, ¶ 24).

Respondents also argue that Claimants failed to show any actual confusion because they failed to introduce any evidence of consumer surveys or other testing to supplement their claims. This contention was rejected more than a decade ago in *Consumer Advocates v. Echostar Satellite Corp.*, (2003) 113 Cal.App.4th 1351, 1362, where the court concluded that a plaintiff need not produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation. Instead, the *Echostar Satellite* court explained, the "falsity of . . . advertising claims may be established by testing, scientific literature, or anecdotal evidence" (*Ibid.*). This is exactly what Claimants have introduced here.

Second, not only is there a "similarity" in the designations but, as discussed, *supra*, Jeremy intentionally folded Far Niente, Nickel & Nickel and Dolce's registered trademarks and trade names into his marketing efforts for TVH wine. Third, TVH, like the FNW, sells Napa Valley Oakville cabernet sauvignon. The "products" of these companies are therefore closely related. Fourth, Jeremy does not dispute the strength of the Far Niente, Nickel & Nickel and Dolce marks. Indeed, the fact that Jeremy intentionally relied on these marks so heavily is a testament as to how strong he believes them to be. And fifth, Jeremy used marketing channels identical to those used by Claimants – he marketed his wines to Claimants' own customer list.

Claimants have successfully proven trademark infringement under Section 1114(1) of the Lanham Act. Claimants have also proven that Respondents' use of Claimants' trademarks and trade names constituted false designation of origin in violation of section 1125(a)(1) (*see, Brookfield, supra*, 174 F.3rd at 1046, n.6, where the court noted that false designation claims are subject to the "same standard" as section 1114(1) claims)).

Respondents defend their infringement by seeking refuge under the nominative fair use doctrine. Under this doctrine, a defendant may use a plaintiff's name or mark truthfully to describe the plaintiff's goods (*see, New Kids on the Block v. New America Publishing, Inc.* (9th Cir. 1991) 971 F.2nd 302, 308). Under the nominative fair use standard, the court must consider three factors: (1) whether the product was "readily identifiable" without use of the mark; (2) whether defendant used more of the mark than necessary; and (3) whether defendant falsely

23

suggested he was sponsored or endorsed by the trademark holder (*Ibid.*).  Respondents cannot satisfy this standard.

Preliminarily, the Arbitrator notes that the nominative fair use defense is not directly applicable to the fact pattern established by the evidence in this hearing.  The nominative fair use defense typically applies where the defendant has used the plaintiff's mark to describe the plaintiff's product (*Ibid.*).  This is not what occurred here.

Even if the nominative fair use defense were to apply, however, Respondents' use here goes way beyond what might be deemed "necessary."  Jeremy has set forth no legitimate reason behind his decision to instruct callers to tell potential TVH customers that they were calling "on behalf of Jeremy Nickel *with Far Niente and Nickel & Nickel wineries*" (emphasis added), and he has set forth no legitimate reason as to why he needed to instruct callers to end their conversation by stating: "On behalf of Jeremy *and the entire Nickel family*, thank you very much for your time and patronage" (*Id.*) (emphasis added).  Jeremy's family had nothing to do with his TVH project.  Respondents failed to introduce any evidence explaining why Jeremy needed to send e-mails to Claimants' customers attaching pictures with the caption: "Jeremy helping with the Far Niente bottling," (*see* Ex. 297), why Jeremy would pour Far Niente wineries' wines and use their logos at TVH winemaker dinners, or why Jeremy would link TVH wines with three of the "award-winning Nickel family wines, including Far Niente, Nickel & Nickel and Dolce" on his winemaker dinner invitations (Exs. 341; 342).  All of these references were included to imply a non-existent relationship between the Far Niente Wineries and Jeremy's separate TVH project.

Finally, Jeremy's telemarketing and advertising efforts falsely suggested that TVH was sponsored or endorsed by the Far Niente wineries, but the nominative use defense only encompasses cases "where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one" (*New Kids on the Block, supra,* 971 F.2nd at 803).  This is exactly what Jeremy did when he created the script for his telemarketers, when he designed his website, and when he planned for and marketed his winemaker dinners.  In each of these endeavors he implied that he and his TVH brand were part of the Far Niente Wineries' dynasty, thereby "capitaliz[ing] on consumer confusion" and "appropriate[ing] the cachet" of the Far Niente wineries' brands.

The fact that Jeremy sometimes used the words "independent," "proprietary," or "project" when referring to TVH is not persuasive.  These phrases were not utilized frequently,

and when they were used they almost always implied that TVH was different from, but not unrelated to, the FNW, Nickel & Nickel and Dolce brands. Jeremy only cited one or two of examples of times in which he explicitly separated out the brands (*see, e.g.,* Ex. 1234, where Jeremy states: "The Vineyard House (also known by its acronym 'TVH') is a separate independent wine brand that is not a part of the 'Far Niente' portfolio"), whereas the record is replete with examples of instances where the brands were impliedly linked. For example, the solicitation company employees were instructed by Jeremy to explain:

> Because of TVH's limited production (of less than 500 cases per vintage) and Jeremy's mandate that 10% of all TVH proceeds be donated to cancer research, The Vineyard House is (and will remain) a separate and independent project *not offered or available at any other Nickel family estate or wine club* (Exs. 245, 250) (emphases added).

While this paragraph does state that TVH was a "separate and independent project," it does so in a way that clearly implies that TVH is still a part of the Nickel family brands, but only a different "project" of it.

Respondents have failed to prove their nominative fair use defense. Claimants prevail on their Lanham Act claims.

### C. Unfair Competition

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ." (Cal. Bus. & Prof. Code §17200). "[A] violation of another law [including the Lanham Act] is a predicate for stating a cause of action under the UCL's unlawful prong" (*Berryman v. Merit Prop. Mgmt., Inc.* (2007) 152 Cal.App.4th 1544, 1554; *Clearly v. News Corp.* (9th Cir. 1994) 30 F.3rd 1255, 1262-63). Here, because Claimants prevail on their Lanham Act claims, they have successfully proven that Respondents' actions constitute unfair competition under the UCL and common law (*See DocMagic, Inc. v. Ellie Mae, Inc.* (N.D. Cal. 2010) 745 F. Supp. 2nd 1119, 1146).

### D. Breach of Settlement Agreement

Pursuant to section 4 of the parties' Settlement Agreement, Respondents have an obligation not to "infringe or violate any trademark, trade name, or other intellectual property right held by" Claimants (Ex. 158, §4). Under section 5 of the Settlement Agreement,

Respondents agreed not to "interfere, impede or take any action that could reasonably be expected to adversely affect the efforts of the Other Parties [including Claimants] to secure new investors . . . that . . . would provide the funds necessary [to purchase Jeremy's interests in the Far Niente wineries]" (*Id.*, §5).  Under section 6(a) of the Settlement Agreement, Respondents agreed to cooperat[e] with [Far Niente's] marketing and sales efforts."

Based on Respondents' violation of the Lanham Act, discussed, *supra*, Respondents have clearly breached section 4 of the Settlement Agreement.  Even Respondents' trade secrets expert implicitly agreed: Naomi Fine testified that parties can protect, via contract, intellectual property that does not rise to the level of a trade secret (Tr., Vol. 4 at 1031:15-18).  Jeremy's use of FNW's 25,000 Customer List, while not a violation of the CUTSA because of FNW's failure to take appropriate steps to protect the confidentiality of the information on the List, nevertheless constituted a violation of his obligation under the Settlement Agreement not to "infringe or violate any . . . intellectual property right held by" Claimants.

Respondents also breached their obligations under section 5 of the Settlement Agreement.  As Dirk Hampson testified, in light of Jeremy's conduct, Claimants' investment bankers advised Claimants to delay their efforts to find investors to fund a buy-out of Jeremy's interests.[11]  Mr. Hampson explained that he sought to extend the option to find investors because of the uncertainty that had been created by the confusion that Jeremy instilled between the TVH and the FNW wineries' marks.  Thus, "the direct advice of [Claimants'] investment bankers was that any sort of uncertainty makes that process more difficult, and we chose to delay going to market for that exact reason" (Tr., Vol. 1 at 94:23-95:1).  Because Claimants believed what they had been told by their bankers and acted accordingly, Respondents' actions inherently interfered with and impeded Claimants' ability "to secure new investors . . . that . . . would provide the funds necessary" to purchase Jeremy's interests in the Far Niente wineries (*see,* Ex. 158, §5).

---

[11]      Respondents argue that the Arbitrator improperly allowed this testimony for the truth of the matter asserted, when they claim that it is clearly hearsay (Respondents' Letter Brief, December 11, 2015, pp. 6-7).  The Arbitrator disagrees.  Whether Claimants' investment bankers in fact believed that Claimants should delay their efforts to buy out Jeremy's interests isn't the issue; it's whether, as Mr. Hampson testified, he made the decision to delay the buy-out efforts based on what he testified the bankers told him.  Mr. Hampson was subject to full cross-examination on whether his testimony regarding what the bankers said to him was accurate, and he did not retract or correct it.  Therefore, as an evidentiary matter, the record supports Mr. Hampson's testimony that he acted in a certain way (delaying the buy out) because of what he testified the bankers told him.  This testimony was not introduced to prove that the banker's statement was correct, or the bases behind it.  Instead, it was introduced to show the effect of the words on the hearer (*i.e.*, Mr. Hampson), which does not amount to inadmissible hearsay in California (*see,* Cal. Prac. Guide, Civ. Trials & Ev. Ch. 8D-B, 8:1049).

However, Claimants did not put on any evidence of monetary or other damages flowing from this breach. Accordingly, while they did prove a breach of section 5, they are not entitled to any separate financial recovery because of it. Moreover, while in their Fifth Cause of Action Claimants seek "[a]n injunction ... to provide Claimants with complete relief," the Arbitrator does not find that separate injunctive relief is necessary to deal with Respondents breach of section 5 of the Settlement Agreement. The injunctive relief entered at the conclusion of this Final Award is sufficient to cover all wrongful conduct of which Claimants complain.

Finally, Respondents breached section 6(a) of the Settlement Agreement by not "cooperating with [FNW's] marketing and sales efforts," since the consumer confusion resulting from Respondents' actions forced FNW to delay the launch of its new EnRoute wine club and the launch of its new Bella Union brand (*see*, Tr., Vol. 3 at 598:4-601:2). As Mary Grace explained, what was FNW supposed to say to its customers in light of their earlier confusion regarding FNW's association (or not) with TVH. Would FNW have sent a letter announcing the launch of the new brand that stated "[t]his really is us, this really is a new brand from Far Niente?" (*Id.*). As with the breach of section 5 of the Agreement, however, Claimants did not adduce any evidence of separate monetary damages flowing them the breach of section 6. As with the breach of section 5 of the Agreement, the Arbitrator finds that the injunctive relief entered at the conclusion of this Award is sufficient so cover Respondents' breaching conduct.

Claimants have successfully proven their Breach of Settlement Agreement claim, and have proven their right to recover monetary damages based on the breach of section 4 of that Agreement.

### E.  False Advertising

To state a claim for injunctive relief under California Business and Professions Code section 17500, Claimants must prove that Respondents engaged in "false, unfair, misleading or deceptive advertising" that had the tendency to deceive the public (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 331-32). In light of the breadth of this statute, it encompasses "not only those advertisements which have deceived or misled *because* they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive (*Ibid.*).

Here, as discussed, *supra*, the evidence showed that Respondents' use of Claimants' trademarks and trade names actually misled consumers about the origin of Respondents' wines and their affiliation with Claimants. While certain aspects of Respondents' use of the trademarks

27

and trade names may, at times, have actually been true (*i.e.*, Gil *was* Jeremy's father, TVH *is* located directly behind FNW, Jeremy *is* and *was* involved in the Far Niente wineries, etc.), Jeremy's misuse of this information tended to mislead or deceive the customers of Far Niente wineries. Respondents' use of the trademarks and trade names by making "statement[s]," in connection with advertising, "which [are] untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading," was therefore a violation of section 17500 (*see,* Cal. Bus. & Prof. Code §17500). Claimants have prevailed on their False Advertising claim.

### F. Breach of Fiduciary Duty

Preliminarily, the Arbitrator notes that in his June 16, 2015 Case Management Order No. 3. he concluded that the question of whether Jeremy breached his fiduciary duty through his conduct with respect to customer lists was outside the scope of this arbitration. That ruling controls here. Claimants' current breach of fiduciary duty cause of action only pertains to whether Claimants' trademarks were infringed by Jeremy.

As discussed, *supra*, under the Lanham Act, the evidence adduced at this hearing established that Jeremy infringed upon Claimants' trademarks. The question remains whether Jeremy, as a director of FNW, thereby breached his fiduciary duty to the corporation by engaging in that conduct.

By virtue of his position as a director, Jeremy owed Far Niente a fiduciary duty of the highest good faith, loyalty, honesty integrity, and confidentiality (*Wolf v. Sup. Ct.* (2003) 107 Cal.App.4th 25, 29-30; *Oakland Raiders v. Nat'l Football League* (2005) 131 Cal.App.4th 621, 632-33). Jeremy admitted as much at the hearing:

> Q: Did you understand that you had a fiduciary duty to Far Niente
> Winery, Inc. as a director?
> A: I did.

(Tr., Vol. 1 at 141).

Jeremy's duty included the obligation "not only affirmatively . . . [to] protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers" (*see. Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2nd 327, 345). Jeremy knowingly

28

infringed FNW's intellectual property rights for the benefit of his own winery, however, and he falsely advertised that TVH was associated with FNW, thereby unfairly competing with FNW. Moreover, Jeremy wrongfully obtained copies of FNW's 25,000 Customer List, (and other FNW lists) when he knew that FNW considered that information confidential, and when he knew that he didn't have authority to use it. In doing all of the foregoing, Jeremy breached his fiduciary duty to FNW. Claimants have successfully proven this cause of action.

## IV. Claimants' Relief

### A. Injunctive Relief

In light of their successful UCL and Lanham Act claims, Claimants are entitled to injunctive relief (*see,* 15 U.S.C. §1116(a); Cal. Bus. & Prof. Code §17203). The specific relief that Claimants initially sought included: (1) an order restraining and enjoining Respondents from infringing or violating Claimants' trademarks, trade names or other intellectual property, including, *inter alia,* Claimants' customer lists; (2) an order requiring Respondents and their agents and contractors to deliver to Claimants, *inter alia*, all of Claimants' customer lists and to not retain those lists in any form; (3) an order removing Jeremy as director of FNW effective immediately and precluding him from serving, as director or manager of any of claimants or their affiliates; and (4) an order allowing for a one year extension of the initial one year term provided in Section 14(a) of the Settlement Agreement regarding exercise of the BELD Option. Since the Tentative Final Award issued, however, Claimants have brought to the Arbitrator's attention additional infringing conduct by Respondents, as a result of which they now seek an expanded form of injunctive relief. That additional relief is discussed is Section IV(A)(ii), *infra.*

### i. Respondents' Stated Intent to Continue to Infringe on Claimants' Intellectual Property Rights

Through evidence adduced at the hearing Claimants have abundantly shown the need to prevent Respondents' continued misuse of Claimants' intellectual property. During the hearing, Jeremy testified that he intends to continue to use FNW's 25,000 Customer List as well as other lists that he has on his laptop if not enjoined from doing so in this proceeding. Indeed, when asked if he thought he still had the right to use the 25,000 Customer List, notwithstanding his simultaneous admission that the list was misappropriated, Jeremy responded: "Yes" (Tr., Vol. 1 at 149:14-16). When asked if he thought that he still had the right to use any of the other FNW lists that Kivu Consulting's forensic analysis discovered on his laptop, he indicated he did,

although he agreed ultimately to abide by the Arbitrator's ruling (Tr., Vol. 2 at 354:25-55:6). This representation notwithstanding, it appears that following issuance of the Tentative Final Award, Jeremy and Respondents engaged in conduct – whether characterized as a "mistake" or not – that further infringed on FNW's intellectual property rights (*see* discussion, Section IV(a)(ii), *infra*).

During the hearing, Jeremy also asserted that he will continue serving Far Niente wineries' wines at his TVH wine dinners, and he will continue to use Far Niente's wineries' trademarks and logos in his marketing campaigns (*see,* Tr., Vol. 2 at 325:8-26:12, 462:8-463:7). It appears, again, that post-issuance of the Tentative Final Award, Respondents have indeed done so, notwithstanding the Arbitrator's explicit findings that this conduct was improper. Claimants are therefore entitled to further protection from Respondents' future use (or misuse) of their trademarks, trade names and other intellectual property, including their customer lists.

### ii.   Respondents' Infringing Conduct Following Issuance of the Tentative Final Award

The Arbitrator issued his Tentative Final Award on November 4, 2015. Since that time, and notwithstanding the injunctive provisions stated therein, Claimants assert that Respondents have engaged in a variety of conduct that continues to misuse Claimants' intellectual property rights. Much of this misuse turns on two factors: (1) Respondents' continued use of the FNW customer lists, and (2) the rather amorphous use of "factual statements" relating to Jeremy, his father, his association with the Far Niente Family of wines, his relationship – or lack thereof – to the "second Nickel" in the Nickel & Nickel Winery name, etc. Each of these areas requires the Arbitrator's attention.

#### (a)   Respondents' Continued Use of Customer Lists

Apparently, on at least two occasions in close proximity to the filing of the Tentative Final Award, Respondents distributed email solicitations to Claimants' customers who were neither Respondents' customers from earlier efforts, nor had independently requested information from TVH (Claimants' Supp. Submission re Final Award, December 7, 2015, pp. 1-2; Exs. 1, 2). Respondents' counsel later confirmed that there had been "a mistake made by TVH with respect to the lists used" in sending these solicitations, and represented that steps would be taken "immediately" to ensure that there would be no repeat (*Id.,* p.3; Ex. 3). Two weeks later, however, TVH again sent out solicitations to persons apparently on Far Niente

customer lists (*Id.,* p. 2, Ex. 4). Respondents have admitted that this happened, and ascribed the error to an employee of Jeremy's, who, although directed to do so, "realized that he had not properly 'scrubbed' the [FNWE] list" (Respondents' Supp. Letter Brief, December 12, 2015, pp. 1-2). In recognition of this error, Respondents represent that they have created a new list that includes only those individuals who (a) have actually purchased TVH wine in the past or who have signed up for the TVH Founders Club, and (b) individuals who have affirmatively requested information from TVH. Respondents state that they are willing to turn this list, as well as the lists used to distribute the October 15th, November 12th, and December 1st 2015 email campaigns (*Ibid.,* p. 2), over to Claimant's counsel.[12] In the Arbitrator's view, this should satisfy Claimants' request that Respondents turn over to them the various lists used by TVH to conduct the identified marketing efforts.

### (iii)   The "Far Niente Family of Wines"

A substantially more thorny issue is presented through Claimants' efforts to stop Jeremy from using, and Respondents' argument that the Arbitrator has no jurisdiction to prohibit Jeremy from using, factually correct statements in his marketing materials to describe his relationship with Gil, to state that he is the second "Nickel" in Nickel & Nickel Winery, to show photos of Jeremy "helping " to bottle Far Niente wines as a youngster, to state that TVH is adjacent to Far Niente Winery, and similar such matters. A resolution of these competing points of view requires the Arbitrator to revisit and separately discuss, in the context of a forward looking injunction based on Jeremy's historical practices, the manner in which Jeremy has used "factually correct" statements in the past.

In reviewing the record in light of the parties' supplemental submissions regarding the scope of the injunction, the Arbitrator was struck by the consistent theme that Jeremy has used in his marketing materials to suggest – and in some instances to state flat out – that TVH is associated or affiliated with the "Nickel dynasty," the "Far Niente Family of Wines," or similar such familial descriptions. Jeremy's ability to do this is based largely on the fact, generously established by the evidence adduced at the hearing, that phrases involving either the name Nickel or Far Niente, including variations thereof, have gained strong secondary meaning in the high-end wine community, and surely in the community of Far Niente customers on the purloined

---

[12]      These lists will be provided to Claimants' counsel, who will maintain their confidentiality on an Attorneys' Eyes Only basis, as provided in the Protective Order in place in this arbitration.

FNW customer lists.  Indeed, in his marketing, the evidence has established that Jeremy is affirmatively trying to create a marketplace or capitalize upon an association between TVH and the names "Nickel" and "Far Niente family."  This has had the inevitable – and apparently, intended – effect of bringing TVH wines into the "Far Niente Family of Wines," even though there is no business or enological connection between the two.  For example:

- Jeremy's marketing was generally directed to "patrons *of his families wines*" (Ex. 250);
- Jeremy's telemarketers were directed by him to say they were calling "on behalf of Jeremy and *the entire Nickel family*" (Ex. 256);
- Jeremy's marketing materials state that "when Jeremy [is] not preoccupied by TVH or *other family enterprises…*" (Ex. 15);
- Jeremy's marketing materials refer to "the award-winning *Nickel family wines*" (Exs. 341, 341);
- Jeremy states that his TVH wine "is not offered or available at *any other Nickel family estate or wine club*" (Exs. 245, 250);
- Jeremy's tasting invitations announce that Jeremy will be serving "an amazing lineup of *Nickel family wines* (including Fan Niente, nickel & Nickel, EnRoute, Dolce and, of course, The Vineyard House)" (Ex. 342);
- TVH wines are "the vision of Jeremy Nickel, *of the Far Niente and Nickel & Nickel dynasty*" (Ex. 26);
- "Jeremy Nickel has asked me to extend a [courtesy] call to *patrons of his family's wines…*" (Ex. 245);
- "On behalf of Jeremy *and the entire Nickel family*, thank you for your time and patronage" (Ex. 245);
- "Indulge in an elite selection *of award-winning Nickel family wines* (including Far Niente, Nickel & Nickel, The Vintage House, and Dolce)" (Ex. 34)

The import of the foregoing, individually and surely collectively, is that there is a "family" or "dynasty" of Nickel-based wines, of which TVH is impliedly a part.  These marketing pitches have generated actual confusion among consumers in the marketplace, many of whom have apparently reached the desired conclusion: TVH is part of or affiliated with the

Far Niente family or Nickel dynasty (*see* pp. 11-12, 20-23, *supra*). Because Jeremy has knowingly created this confusion by capitalizing on, if not creating, the secondary meaning associated with wines produced under the Nickel family name, the injunction must carefully address those situations in which Jeremy may or may not use factually accurate, but nevertheless misleading, statements in connection with his marketing of TVH wines. The parties recognized the importance of this very issue when they negotiated the Settlement Agreement that largely defines the Arbitrator's jurisdiction in this case (Ex. 158).

Respondents seek preemptively to avoid an injunction that addresses Jeremy's use of the name Nickel by arguing, first, that no one owns the name and, two, that any injunction directed at the word "Nickel" is beyond the authority of the Arbitrator to issue. The Arbitrator disagrees. In Section 4 of the Settlement Agreement, the parties specifically negotiated the circumstances when Jeremy could use the name "Nickel" in connection with his wine business, and that circumstance is when "Nickel" is preceded by the word "Jeremy."[13] As a matter of contractual interpretation, the power with respect to which is given to the Arbitrator (Ex. 158, ¶ 32), it is clear that the Settlement Agreement allows both sides to operate in the wine business, but does not allow Jeremy to trade on the established intellectual property rights held by the Far Niente Entities. As Jeremy has directly recognized by his references to the "Far Niente family of wines" and the "Nickel family's wines or enterprises," there is great value to TVH if Jeremy is able to suggest a connection between TVH and the unrelated Nickel family of wines. That "value" is exactly what the parties negotiated would not be granted to Jeremy.

The Arbitrator finds that carefully crafted injunctive relief is necessary to eliminate this effect in the future. Accordingly, the Arbitrator finds that while Jeremy may truthfully state that he is Gil's son and that TVH is, at least in part, operated as a tribute to his father, he may not (even if factually accurate) state in marketing materials that he is part of Gil's "family," at least as the statement deals with anything that is wine-related. He may not suggest in his marketing materials that he is the second "Nickel" in Nickel & Nickel Winery, not because it may not be factually true, but because Jeremy's past muddling of this fact has been done in a manner that has blurred the distinction between his wine and his father's "Family of Wines." He may not in

---

[13]     Paragraph 4 of the Settlement Agreement provides: "The Parties agree that Jeremy may use the names ·Jeremy Nickel and ·Jeremy Nickel Cellars' in connection with his winery business [but he may not otherwise] infringe or violate any trademark, trade name or other intellectual property right held by the FNW Entities" (Ex. 158.003).

his marketing materials state that he is or was an owner of or on the Boards of Directors of Far Niente, Dolce, Nickel & Nickel, EnRoute or Bella Union, again not because it is factually inaccurate but because Jeremy's past use of these facts in his marketing efforts have tended to blur the distinction between the Far Niente Family of Wines and his separate, unconnected commercial venture, The Vineyard House.

### (iv)   The "Nickel Barn"

As noted above, he Settlement Agreement provides for a clean separation between Jeremy's wine business and that of his father, but permits both entities to operate their separate winery businesses. Accordingly, the Agreement allows Jeremy to refer to his wine business as the Jeremy Nickel Winery, or variations thereof. It now appears that Jeremy is constructing a winery-related building on The Vineyard House property that he is calling generically the "Nickel Barn." This is directly contrary to the terms the parties negotiated in Paragraph 4 of the Settlement Agreement. The Arbitrator will enter an injunction that permits Jeremy to denominate his building as "The Jeremy Nickel Barn," "Jeremy Nickel's Barn," "Jeremy's Barn," or some variation thereof, but under Paragraph 4 of the Settlement Agreement, Jeremy will be directed to modify his marketing materials so that there is no longer a reference simply to the "Nickel Barn." The basis for this ruling is that, under Paragraph 4 and taken together with all other facts adduced in this arbitration, the name "Nickel Barn" in connection with the TVH Winery property risks creating confusion in the marketplace by suggesting that a neutrally denominated "Nickel Barn" is in some way related to Far Niente or Nickel Family wineries, which, the evidence adduced at the hearing roundly established, has now gained a distinctive secondary meaning in the world of Napa Valley wines referred to throughout this Final Award. The clarifying addition of Jeremy's first name (or some other denomination) is the remedy the parties negotiated and will thus be sufficient to distinguish Jeremy's winery buildings from buildings otherwise related to the Nickel Family or dynasty which, in part because of Jeremy's efforts to make it so, perforce refer to Gil and the wineries that he established.

### (v)   Advertising or Serving Far Niente Wines at TVH Events

A second dicey issue is whether Jeremy may or may not serve or refer to Far Niente wines at events designed to promote TVH wines. Again, looking at the whole picture, the Arbitrator finds that specific limitations are required to avoid creating the misimpression that TVH is commercially related to any wines in the Far Niente Family. The Arbitrator also finds,

34

however, that Jeremy should be able to compare and contrast his TVH wines with other high-end wines from the Napa Valley or elsewhere, including those produced by Far Niente. On considered reflection, the Arbitrator believes that the following compromise will effectively satisfy both of the foregoing goals. It will therefore be ordered that Jeremy may refer to Far Niente wines in his marketing materials and at TVH tastings, provided that he complies with the following two conditions:

First, if a bottle of wine from the Far Niente family of wines is to be featured on any TVH written or visual marketing materials (the Arbitrator overrules Claimants' objection to Jeremy's use of any Far Niente-related names, logos, etc., provided that such use is as specified in this Final Award), that material will contain a specific disclaimer, in typeface and font identical in size and boldness to that used to describe the advertised event (excluding the large or bolded type typically used to herald the event itself) that states that "The Vineyard House is an independent business venture owned and operated by Jeremy Nickel and is not associated or affiliated in any way the Far Niente, Nickel & Nickel, Dolce, EnRoute or Bella Union wineries;"

Second, *in addition*, for *each* bottle of a Far Niente-related wine featured, the material must visually present at least one bottle of a wine from a winery or vineyard not associated with Far Niente. For example, if Jeremy wishes to sponsor a tasting that compares a TVH wine with a Far Niente and a Nickel & Nickel wine, he must additionally feature *two* wines from wineries not associated with Far Niente (in this example, there would be five wines featured). Further, for visual presentations, a wine from a non-Far Niente vineyard must be placed between the TVH wine and the Far Niente wine, so that there is no suggestion that TVH wines, by being visually grouped next to other Far Niente wines, are in some way associated with FNWE's products. Moreover, at the event itself, the menu identifying the wines in the tasting must contain a similar disclaimer and, if the wines are grouped together on a table or other presentation service, there must be a table tent or teepee, conspicuously placed next to the TVH bottles of wine, with a similar disclaimer. Under no circumstances may Jeremy sponsor a tasting or other marketing event in which a TVH wine and wines from the Far Niente family are the only wines featured.

(vi)    Physical Location of The Vineyard House Property

Claimants have submitted evidence suggesting that consumer confusion is also created when The Vineyard House property is described as being right next to or near Far Niente's winery or vineyard properties. While this description may be factually true, looking at the

evidence as a whole, the Arbitrator finds that, while Jeremy should be allowed to describe the location of The Vineyard House, and while he should be able to place its location in context with other vineyards or winery properties, he may not do so solely with respect to Far Niente properties. Thus, while Jeremy may truthfully state that his property is adjacent to (or in the same terroir as) certain Far Niente properties, his description must also identify other wineries within reasonable geographic proximity. At the hearing, for example, the parties introduced evidence showing that the Futo, Paradigm, Harlan and Robert Mondavi properties were all in close proximity to The Vineyard House; these would be appropriate properties to use in the geographic description. Alternatively, Jeremy may want to compare TVH wines with other "cult" wineries that are not adjacent to TVH properties, but are nevertheless suitable for comparison with TVH wines. If Jeremy wants to include a Far Niente wine in this category, he must use a commercially reasonable selection of additional wineries to ensure that the selected Far Niente wine is merely one of several wines chosen for comparison, not that there is any connection between the Far Niente wine and the TVH·wine.

**B.   Claimants' Request that Jeremy be Removed from the Board of FNW**

The Arbitrator is satisfied that by the injunctive relief specified above, Claimants' request that Jeremy be removed as a Director of FNW is not necessary. Assuming that he abides by the terms of the within injunction, Jeremy will no longer be able to use Claimants' intellectual property in a manner contrary to his fiduciary obligations.

Moreover, removing Jeremy from the Board of Directors is too attenuated from the powers given to the Arbitrator in the parties' Settlement Agreement. Section 32(a) provides that "[a]ny disputes arising out of or relating to this Agreement . . . or the interpretation or enforcement of any such agreements . . . shall be resolved by final and binding arbitration . . . ." (Ex. 158, §32(a)). Section 4 states that "any dispute among [the parties] relating to claims of infringement or other intellectual property claims shall be resolved through final and binding arbitration in accordance with Section 32" (*Id.*, §4). Whether Jeremy breached his fiduciary duty by infringing on Claimants' intellectual property rights falls squarely within these provisions. Removing Jeremy from FNW's board of directors, however, takes the dispute one step further. If Claimants wish to seek to remove Jeremy from FNW's board of directors, it will have to do so in different proceedings. Under JAMS Rule 19(b), the Arbitrator is only empowered to "grant any remedy or relief that is just and equitable and *within the scope of the Parties' agreement . . .*"

(JAMS Streamlined Arbitration Rules and Procedures, Rule 19(b) (emphasis added)). Claimants' request does not fall within this provision.

### C.   Claimants' Request to Modify the Buy Out Terms in the Settlement Agreement

Claimants originally requested that the Arbitrator enter an Award that would give Claimants an additional year to buy-out Jeremy's interests pursuant to the Settlement Agreement. In the Tentative Final Award, the Arbitrator agreed that the evidence supported this remedy and included it as part of the Award.  In their Supplemental Submissions, Claimants now ask the Arbitrator to order that certain payments made by Claimants under the timetable set forth in the Settlement Agreement either be refunded or treated as credits against future payments.  The Arbitrator revisits afresh this aspect of the Award.

On considered reflection, based on his re-review of the relevant hearing evidence and with the benefit of additional briefing of the parties, the Arbitrator now concludes that his tentative award adding one year to the buy-out provisions of the Settlement Agreement was ill-advised. Section 32 of the Settlement Agreement, entitled "Jurisdiction, Arbitration and Choice of Law," provides that "the Arbitrator ... shall conform any award *to the terms of this Agreement*" (Ex. 158.020) (emphasis added).  It does not give the Arbitrator jurisdiction or authority to change the terms of the Agreement, even though, under established California law, "arbitrators ... enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of arbitration, *so long as the remedy may be rationally derived from the contract and the breach*" (*Advanced Micro Devices*, 9 Cal.4th 362, 383) (emphasis added).  Here, while the Agreement certainly could have been more specifically drafted to allow (or remove the power from) the Arbitrator to change the terms of the Agreement, a fair interpretation of the contract as a whole leads the Arbitrator to conclude that an extension or other modification of the terms of the Settlement Agreement is beyond his jurisdiction.  With this modification to the Final Award, the Arbitrator is indeed conforming his Award "to the terms of [the Settlement] Agreement.  Accordingly, the request to extend or otherwise modify the terms of the Settlement Agreement is denied.

///

///

///

37

**D.    Unjust Enrichment**

Claimants are entitled to an award for the equitable remedy of unjust enrichment in light of their successful Lanham Act and contract claims. They are not entitled, however, to the full monetary amount that they currently seek.

Greg Regan, Claimants' expert, opined that the past and expected future sales resulting from Respondents' misconduct is $1.57 million, which includes $299,000 in revenue that Respondents already unjustly earned from the time period September 1, 2014 to June 30, 2015, and $1,271,000 in future expected sales that Respondents are likely to attain from the 375 new customers that they acquired in the campaigns (Ex. 5 at 3-7; Tr., Vol. 3 at 777:14-780:11). The Arbitrator finds this sum excessive and unsubstantiated by the evidence.

Terry Lloyd, Respondents' expert, opined that from September 1, 2014 to April 30, 2015, Respondents' total "direct to consumer" sales to customers whose names appear on the 25,000 Customer List was $298,180. This number did not include sales to ten customers whose names were on the 25,000 Customer List but who had purchased wine from TVH before the telephone and e-mail campaigns began.

Respondents seek to subtract from this number the direct costs associated with the production of the wine sold ($56,398), the credit card fees charged by credit card companies on the 25,000 Customer List transactions ($8,788), and the marketing fees and commissions that TVH incurred in order to convert the names on the 25,000 Customer List into purchasing customers through direct telemarketing campaigns ($157,548), for a past unjust enrichment award totaling of $75,455.

The undersigned does not wholly agree with either party's calculations. First, with regard to past sales, the Arbitrator finds it unreasonable for Respondents to deduct the costs of their winemaker and their telemarketing firms. Winemaker costs are fixed costs, just like warehouse leases and other fixed expenses. Neither party has suggested that all of Respondents' fixed costs should be subtracted from Claimants' unjust enrichment award, and Respondents have failed to adequately explain why the fixed costs of a winemaker should be treated differently.

Moreover, as the Restatement of Torts, Section 748, comment i (1938) explains, "[o]nly when the manufacture or marketing of the infringing goods increases the joint expenses is it proper to allocate a part of [those expenses] to these goods. If the rule were otherwise, the

defendant would be permitted to retain gains made by his own wrongdoing." Applying this rule here, irrespective of whether one bottle or 10,000 bottles were produced by Respondents and sold to individuals who were on FNW's 25,000 Customer List, the cost of the winemaker was a fixed salary and by definition not a variable cost, meaning that the cost did not increase as the number of bottles sold increased (*see*, Ex. 358 at 4). This cost should not impact Claimants' total recovery.

Second, the costs of TVH's telemarketing campaigns are not deductible. Applying such a deduction would reward Respondents for Jeremy's unlawful conduct of infringing Claimants' marks and using FNW's list during the campaign (*see, Oddzone Products, Inc. v. Diana Dolls Fashions, Inc.*, No. C-92-20578-JW, (N.D. Cal. Jan. 15, 1997) 1997 WL 33019, at *3, where the court said: "since Defendant knowingly and willfully violated the terms and conditions of the Consent Judgment, it is not entitled to a deduction based on the commissions paid to its sales representatives, who, in turn, sold the infringing goods"). Respondents would not have incurred these costs had Jeremy not infringed upon Claimants' trademarks and trade names. He should not be permitted to benefit from his wrongful actions.

Finally, the Arbitrator finds Mr. Lloyd's calculation of total past profits more persuasive than Mr. Regan's calculation. Mr. Regan improperly calculated TVH's profits for the time period between September 1, 2014 to June 30, 2015. It is undisputed that TVH stopped using the 25,000 Customer List to contact customers by phone, e-mail, or any other means since the second week of March 2015. Mr. Regan's use of June 30, 2015 as the end date for the period relevant to Respondents' wrongdoing is inappropriate and irreconcilable with the evidence.

Claimants are entitled to recover $256,128, which represents Respondents' gross profits of $298,180, from which are deducted direct costs of $56,983, but which are then enhanced upward be re-inserting the alleged cost of the winemaker, $14,931 (*see*, Ex. 1003, App. 4 (Ex 1003.070)). This amount accounts for Respondents' net profits as a result of their use of FNW's 25,000 Customer List from September 1, 2014 through mid-March, 2014, less the appropriately deducted costs.

Claimants next contend that they are entitled to recover TVH's projected future profits on sales of wine sold down the road to persons on the 25,000 Customer List, an amount they peg at $1.27 million. While the Arbitrator agrees that some element of future profits is an appropriate recovery, he disagrees with the scope of Claimants' proposal. The Arbitrator is persuaded by the

testimony at the hearing that described how a customer for a high end wine, such as TVH, might make their first purchase of wine based on their direct contact with the winery using a customer list. But the evidence also showed that that same customer's subsequent purchase of the wine from a winery such as TVH is not guaranteed by the mere fact that he was contacted in the first place; future purchases are more likely going to be influenced by the wine's quality.

The evidence was compelling that individuals who purchase high-end boutique wines like TVH are knowledgeable about wine and have very high expectations about the wine's quality (Tr., Vol. 6 at 9:4-25). Such consumers will only continue to purchase fairly expensive bottles of wine like TVH's if they are happy with the quality of the wine (Tr., Vol. 6, at 20:17-20: *see. also* Ex. 1004.009). Much of Respondents' future profits, while clearly related to their initial misuse of FNW's customer lists, are more tied to the quality of their wines; Claimants may not recover for "the fruits of [Respondents'] own labors or legitimate efforts" (*see, Mattel, Inc. v. MGA Entertainment, Inc.* (9th Cir. 2010) 616 F.3rd 904, 910-11). The issue is to "tease out" those future profits that Respondents will realize because of their misuse of Claimants' intellectual property, and separate them from those profits that Respondents will legitimately realize due to the quality of the TVH wine.

While this analysis is necessarily subjective, the Arbitrator believes that the formula suggested by Respondents (as modified herein) best accomplishes the desired goal. The evidence established that Jeremy's marketing campaigns resulted in sales to about 350 specific individuals (*see*, Ex. 5, pp. 3-4). These TVH wine club members became part of TVH's Founders Club (Ex. 1192). The TVH Founders Club list identifies the future allocation of wine that each member committed to purchase when he or she joined the Club (*Ibid.*). If every TVH Founders Club member actually receives the bottles for which he or she signed up, TVH will sell 984 bottles of wine for a gross income of $147,000. Once the cost of goods sold for those bottles (about $38 per bottle per Mr. Lloyd) are accounted for (*see*, Ex. 1003, Appendix 3), the total profits from the next distribution to TVH wine club members will be $110,208. Respondents suggest that this figure should then be reduced to account for "the value added" by TVH, namely, the high quality of the TVH wine. Respondents suggest that the total profit figure should be reduced by some amount – they suggest 75% -- to account for that. However, this ignores the fact that these bottles of wine have already been signed up for; the possibility that a customer will cancel any of these ordered bottles because he or she doesn't like the quality is

40

very low. Therefore, while TVH may indeed "add value" with respect to orders placed *beyond* those for which the customer initially signed up – *e.g.*, the customer may order additional bottles beyond his first Founders Club order because he likes the wine – the profits from the initial sales are more likely than not going into TVH's pockets. The Arbitrator believes that those profits, obtained in whole through Jeremy's misuse of FNW's intellectual property, should properly be returned to Claimants. The Arbitrator awards Claimants $110,208 in future profits, for a total lost profits award of $366,336.

### j.   Pre-Judgment and Post-Judgment Interest

Claimants are seeking pre-judgment interest for their breach of contract claim from the date that they filed their Demand for Arbitration to the date of entry of this Arbitration Award, pursuant to California Code of Civil Procedure section 3287(b). Section 3287(b) specifically states: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed" (Cal. Civ. Proc. §3287(b)). Here, in light of the Arbitrator's adverse inference based on Jeremy's wrongful misappropriation of FNW's customer lists, the Arbitrator, in the exercise of discretion, awards prejudgment interest from March 12, 2015, the date the Demand for Arbitration was filed.

Claimants also seek post-judgment interest pursuant to California Code of Civil Procedure section 685.020(a). Section 685.020(a) provides that "interest commences to accrue on a money judgment on the date of entry of the judgment" (Cal. Civ. Proc. §685.020(a)). Post-judgment interest accrues automatically by force of law and not by a declaration in the judgment (*Cnty. of Los Angeles v. Salas* (1995) 38 Cal. App. 4th 510, 515). Post judgment interest, therefore, shall accrue at the rate of ten percent per annum from the date of entry of the Final Arbitration Award (*see,* Cal. Civ. Proc. §685.010).

## V.   The Water Easement Issue

### A.   Facts

As noted earlier, this arbitration also presents an issue dealing with certain water rights related to the Vineyard House property and the Stelling Vineyard located in Halter Valley. The relevant facts are as follows:

On his death Gil bequeathed to Jeremy a small property, improved with a house, located directly behind Far Niente Winery. This property was The Vineyard House. This house is generously landscaped with lawns, gardens and trees. The property has a water well on it in addition to rights to a spring located off the actual property, but to which the property has legal access. Not far away from The Vineyard House is a Far Niente related entity-owned vineyard known as the Stelling Parcel. This parcel contains a large pond used for, among other purposes, the irrigation of various Far Niente vineyards. In the late 1990s, Gil installed a water line and control system at this Parcel that was used, in part, to irrigate The Vineyard House's landscaping. It was also used to irrigate a Far Niente vineyard property adjacent to The Vineyard House known as the Halter Valley Parcel.

As part of their Settlement Agreement, the parties negotiated that Jeremy would receive ownership of the Halter Valley Parcel. Accordingly, the Settlement Agreement memorialized the parties' intent to effectuate a lot line adjustment in relation to the Stelling Vineyard/Halter Valley Parcel (Ex. 158, §3). Nickel Vineyard Company ("NVC") owned the Stelling Vineyard/Halter Valley Parcel, and NVC agreed, as part of the Settlement Agreement, that 33.6 acres of the Halter Valley portion of the Stelling Vineyard/Halter Valley Parcel would become part of the TVH Parcel (Ex. 158, §§3, 13(a)(i)).

The annexation of the Halter Valley Parcel to The Vineyard House raised an important water rights issue. Historically, the Halter Valley Parcel had been irrigated with water from the Stelling Pond. Now that there were to be two different owners of the two properties (Jeremy owned The Vineyard House and the Halter Valley Parcel, while NVC (or FN Land, LLC, as set forth in the Water Rights Easement) owned the Stelling Vineyard Parcel, which included Stelling Pond), the issue of water rights between the two had to be addressed. Accordingly, the parties executed a Water Rights Easement document, the interpretation of which is an independent issue for resolution in this Arbitration. In this Easement, the newly expanded TVH Parcel, which now included the Halter Valley Parcel, is referred to in the Water Rights Easement as the "Benefitted Parcel" (Ex. 155). The remaining Stelling Vineyard/Halter Valley Parcel containing Stelling Pond is referred to as the "Burdened Parcel" (*Ibid.*). The Settlement Agreement incorporated a "Grant of Water Rights Easement," which memorialized Jeremy's specific rights to water from the Burdened Parcel (Ex. 155 (Grant of Water Rights Easement); Ex. 158 §13(a)(i)).

42

B. **Declaratory Relief on the Water Rights Easement**[14]

Claimants seek a declaration that their obligation to make water available from Stelling Pond to Respondents is limited to that set forth in the Water Rights Easement – namely, to make water available "for vineyard irrigation purposes" on the "Halter Valley portion of the Benefitted Parcel" (*see,* Ex. 155 at 2), but not also for lawn and landscaping or any other purpose on the Benefitted Parcel. Claimants are entitled to this relief.

The Water Rights Easement memorialized Respondents' rights to water from the Burdened Parcel, on which Stelling Pond is located (Ex. 155, Recital E, which states that "the parties desire to memorialize the parties' respective rights to the use of the water supplied from the Burdened Parcel and drained to the Burdened Parcel"). The sole water right memorialized was a non-exclusive, perpetual easement "to use and take water from the Burdened Parcel for vineyard irrigation purposes on the Halter Valley portion of the Benefitted Parcel" (*Id.,* at 2). The Easement memorialized no other rights for Respondents to use water from the Burdened Parcel. It did not memorialize a right to use water for lawn and landscaping purposes at the Vineyard House or any other purpose (*Id.,* Tr., Vol. 5 at 1077:22-1078:6).

The Settlement Agreement, which expressly incorporated the Water Rights Easement (*see.* Ex. 158 at 2 (Recitals) §§ 13, 32), was intended to resolve and set forth the parties' complete rights and obligations, as the integration clause makes clear (*See* Ex. 158, §29). Specifically, section 29 states:

> This Agreement, the Property Distribution Agreement, the Water Rights Easement and the Exhibits and Schedules, if any, thereto and thereto constitute the sole and entire agreement and understanding among the Parties, and any and all prior discussions, negotiations, commitments or understanding related to the subject matter hereof, if any are merged into this Agreement (*Id.,* § 29).

The plain language of the Water Rights Easement, in conjunction with the Settlement Agreement's integration clause, confirms that Claimants are entitled to declaratory relief they seek. A fair reading of these documents – indeed, the only reading of these documents – confirms that the only right granted to Respondents was Respondents' right to use Stelling Pond

---

[14]   The Arbitrator notes that in his June 16, 2015 Case Management Order No. 3, he concluded that Claimants' water rights claim falls within the scope of the Settlement Agreement and is therefore arbitrable. While Respondents seem to assert that this issue has not yet been determined, the Arbitrator reiterates the decision he made on June 15th. The Arbitrator finds that the evidence at the hearing fully established that the very issue now up for resolution was intended by the parties to be arbitrated in the event of a dispute.

water to irrigate the vineyards on the Halter Valley portion of the TVH Parcel. There was no carve out or additional reservation of any irrigation rights for the Vineyard House landscaping.

Evidence of the parties' intent at the time they signed these documents roundly supports this conclusion. On August 13, 2014, the day before the Settlement Agreement was signed and delivered, counsel for Respondents wrote to counsel for Claimants stating: "I hate to bother you with this factual question, especially given the 11[th] hour situation we are in. But, I have a 'deal point' issue with Jeremy. Jeremy says the reservoir on the Nickel parcel also provides water to the Vineyard House for irrigation. If those facts are correct, I need to make sure the property subject to the water easement agreement includes not only the Halter Valley parcel but the Vineyard House property" (Ex. 1303). Claimants' counsel responded, explaining that the "commitment to continue irrigation, as set forth in the Water Rights Easement, is limited to the Halter Valley property, not the Vineyard House property. To the extent [Stelling Pond] provides any irrigation to the Vineyard House property, it is not part of the existing deal for that to continue" (Id.).

After receiving this clarification, neither the draft Settlement Agreement nor the Water Rights Easement was modified in any way with respect to Jeremy's desire to use the Stelling Pond for landscape irrigation purposes at The Vineyard House. Nevertheless, Jeremy signed and delivered the Settlement Agreement, including the attached Water Rights Easement, the following day. Jeremy cannot today persuasively argue that he did not understand the scope of the Water Rights Easement to be different from that which Claimants' counsel clarified in response to his specific question on the point.

Under the Settlement Agreement, Jeremy was not granted the right to use water from Stelling Pond to irrigate the Vineyard House's lawn and landscaping. His water rights, under the Settlement Agreement and accompanying documents, are limited to use of the Stelling Pond "for vineyard irrigation purposes" on the "Halter Valley portion of the Benefitted Parcel." Jeremy argues, however, that even if the contractual language goes against him, he still has a right to use Stelling Pond water to irrigate the landscaping at The Vineyard House because he has both implied and prescriptive easements that allow him to do so. The Arbitrator addresses each position in order.

### i.      Respondents' Claim of Prescriptive easement

To establish the elements of a prescriptive easement, a claimant must show use of the property, for the statutory period of five years that has been: (1) open and notorious; (2) continuous and uninterrupted; (3) hostile or adverse to the true owner; and (4) under a claim of right (*Connolly v. Trabue* (2012) 204 Cal.App.4[th] 1154, 1162).  "Adverse use" means "only that the claimant's use of the property was made without the explicit or implicit permission of the landowner" (*Aaron v. Dunham* (2006) 137 Cal. App. 4th 1244, 1252).

Here, Aaron Fishleder, FNW's head of vineyard management, testified that FNW controls the flow of water from Stelling Pond, and until at least February 6, 2015, when FNW informed Respondents that it intended to stop supplying water for lawn and landscaping on the TVH Parcel, continued to voluntarily provide it for that purpose (Tr., Vol. 5 at 1065:8-13). Indeed, the evidence showed that there is no way for Respondents to draw water from the Stelling Pond without FNW's consent and cooperation because the FNW groundskeepers decide whether, when and how much water the TVH Parcel will receive.  FNW, therefore, has explicitly given Respondents permission to use that water for landscaping purposes through February 6, 2015. Respondents' use was therefore not "adverse, and Respondents have not satisfied the requirements to establish a prescriptive easement.

### ii.     Respondents' Claim of Implied easement

An easement will be implied when at the time of conveyance of property, the following conditions exist: (1) the owner of the property conveys or transfers a portion of that property to another; (2) the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue, meaning that the existing use must either have been known to the grantor and the grantee or have been so obviously and apparently permanent that the parties should have known of the use; and (3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4[th] 1406, 1420).  Reasonable necessity has been explained as follows:

> An easement corresponding to a use to which one part of the
> property has been subjected for the benefit of another part will not
> be implied on a severance of ownership unless the use is necessary
> for the enjoyment of the dominant tenement; mere convenience is
> insufficient. Some courts require that the use be strictly necessary;
> but the weight of authority sustains a rule less exacting than that of
> strict and indispensable necessity, namely, that the degree of

> necessity is such merely as renders the easement necessary for the
> convenient and comfortable enjoyment of the property as it existed
> when the severance was made. The test of necessity is whether the
> party claiming the right can, at reasonable cost, create a substitute
> on his own estate. It has been held that the rules as to ways of
> necessity should be applied (*Navarro v. Paulley* (1944) 66 Cal.
> App. 2ⁿᵈ 827, 830).

Respondents have failed to establish reasonable necessity here.

Claimants introduced an abundance of uncontroverted evidence that shows that Jeremy has substitute water sources on his own property – the TVH Parcel has its own well – and that there is a spring located on the adjacent Futo property for which the TVH Parcel has an express easement (Tr., Vol. 5 at 1064-65; Ex. 106 at 2). The evidence established that these sources can more than sufficiently satisfy Jeremy's lawn and landscaping needs (*see,* Tr., Vol. 5 at 1064:1-1065:7, Vol. 6 at 100:10-25, 105:24-6:2, 112:25-113:9, Ex. 360 at 2, 4).

Andrew Simpson, a civil engineer, testified that there are several options that would make it relatively easy for Respondents to get the water from the TVH Parcel well to the landscaping system in a manner that would feed the lawn and landscape irrigation system at the necessary rate (Tr., Vol. 6 at 113:18-114:4, 132:15-135:23). Further, there was ample testimony that it would not be prohibitively expensive to get the well functioning up to date: (1) $5,000-$10,000 for a tank (Tr., Vol. 6 at 114); (2) $10,000 or less for a booster pump adequate to meet the TVH Parcel's needs (Tr., Vol. 6 at 133-34); and (3) approximately $10,000 to connect the TVH Parcel well to the landscaping system (Tr., Vol. 6 at 83).

Respondents have failed to make either a legal or factual showing of reasonable necessity. They have failed to establish that they are entitled to an implied easement.

In light of the above, the undersigned is satisfied that Claimants are entitled to the declaratory relief that they seek with regard to the water rights easement.

## VI.   Conclusion and Final Award

Except for their claim under California's Uniform Trade Secret Act, Claimants have successfully proven each of their claims. Claimants are therefore entitled to the following relief:

(1) The Arbitrator orders a permanent injunction restraining and enjoining Respondents and each of them, including their agents, servants, employees, and all persons acting in concert with them or on their behalf, from infringing or violating Claimants' trademarks, trade names or other intellectual property rights; and

46

(2) The Arbitrator orders a permanent injunction restraining Respondents from stating or implying in their marketing materials that TVH wine is made by any of the FNWE wineries or that TVH is affiliated or associated with any of the FNWE wineries in any way; and

    a. For purposes of this subsection of the injunction, "any of the FNWE wineries" shall include any references to the "Far Niente family of wines," the Nickel family's wines," the "Nickel dynasty of wines," or any other similar phrase that suggests that TVH is in any way associated or affiliated with, sponsored or owned by, or supported by Gil Nickel or any of Gil's wineries, whether individually or grouped by reference as a "family" a "dynasty," or some other word tending to suggest association.

(3) Respondents and their agents, etc., as described above, are enjoined from using any of Claimants' trademarks, trade names, trade dress or other intellectual property rights in any of their marketing materials in the absence of full compliance with the following provisions:

    a. Respondents may not use any of Claimants' trademarks or trade names in their marketing materials for TVH wine unless, for each mark or name so referenced, an additional mark or name of a wine not associated FNWE, and not counting references to a TVH wine, is referenced in equal and similarly fonted type; and

        i. For purposes of this portion of the injunction, "marketing materials" shall include any written, aural or visual materials (including, by way of example only, those issued in print, through social media, via television, or over the radio) issued by TVH, including their agents, etc., as specified above, to any segment of the public, that discusses or describes the qualities, benefits, characteristics or other conditions of TVH wines, the TVH Winery, a TVH wine club, or that solicits or recommends that the recipient purchase or consume a TVH wine; and

        ii. In addition to the foregoing, any marketing material as defined above that references a FNWE wine shall state, in type and font similar is size and format to that identifying the FNWE wine, that "The Vineyard House is an independent business venture owned and operated by Jeremy Nickel and is

not associated or affiliated in any way with the Far Niente, Nickel &
Nickel, Dolce, EnRoute or Bella Union wineries."

b. Respondents may not serve any of Claimants wines at tasting, dining, wine
comparison, or other events that also feature a TVH wine unless, for each of
Claimants' wines thus served, a bottle of a wine from a winery not associated
with FNWE is also served; and

   i. For purposes of complying with this subsection of the injunction, on each
   table where TVH, FNWE and another wine is being served, as well as on a
   bar or other piece of furniture where wines being served are collected,
   there will be printed on the menu listing the wines, or if no menu is being
   used, then on each table where guests will be consuming wine, as well as
   on the bar(s) or tables from which wine is being served or on which wine
   is displayed, a printed, stand alone table tent or tepee the disclaimer set
   forth in Subparagraph 3(a)(ii), above; and

   ii. The wines from the various wineries (TVH, FNWE, and a third party
   wine) shall be grouped on the tables or listed in the menus in such a way
   that the TVH wine and the FNWE wine are separated by at least one bottle
   of the third party wine.

(4) The Arbitrator orders a permanent injunction restraining and enjoining Respondents from
using the name "Nickel" to describe their winery, their winery buildings, or any other
aspect of TVH's winery enterprise unless the name "Jeremy," in equal typeface and font,
appears immediately before "Nickel."

(5) The Arbitrator orders a permanent injunction restraining and enjoining Respondents and
their agents, servants, employees, and all persons acting thereunder, in concert with, or on
their behalf, from using Claimants' customer lists, contact lists, guest lists, Friends and
Family lists, customer databases and other intellectual property, including without
limitation, by using them or disclosing them to third parties; and

   a. The Arbitrator orders Respondents' counsel to provide Claimants' counsel,
   pursuant to the terms of the Protective Order in this case, with the new list that
   counsel have compiled that identifies those individuals who (a) have actually
   purchased TVH wine in the past or who have signed up for the TVH Founders

Club, and (b) individuals who have affirmatively requested information from TVH. Respondents shall also turn over to Claimants' counsel the lists used by TVH or its agents to distribute the October 15th, November 12th, and December 1st 2015 email campaigns referred to on page 30 of this Final Award.

(6) To effect the provisions of Subparagraph VI(5), the Arbitrator orders Respondents and each of them, including their agents, servants, employees, and all persons acting in concert with, or on their behalf, including Wine Leverage, Chatterbox Wine Marketing Services, Inc., and eCellar, to deliver immediately to Claimants, and not retain in any manner or form, all of Claimants' customer lists, Friends and Family lists, guest lists, contact lists, databases, and other intellectual property belonging to FBWE in Respondents' possession, custody or control, including any materials containing names of or information about Claimants' past or current customers, friends and family, guests, contacts or trade secrets, in whatever form and however maintained. These lists, and the lists referred to in Subparagraph VI(5), shall be delivered to Claimants' counsel within 30 days from service of this Final Award.;

(7) The Arbitrator declines Claimants' request to modify any terms of the Settlement Agreement.

(8) The Arbitrator orders the following declaratory relief regarding the water rights issue:

    a.    The Settlement Agreement and documents incorporated therein, including the Grant of Water Rights Easement, only obligate Claimants to make water available to Jeremy Nickel for irrigation of the vineyards located on the Halter Valley portion of the Vineyard House Parcel consistent with water and irrigation rights existing at the time the Grant of Water Rights Easement was recorded; and

    b.    Respondents (including their successors and assigns as owners of the Vineyard House Parcel) have no easement, right or entitlement (implied, prescriptive, express or otherwise) burdening Claimants' property for water for lawn or landscaping purposes on the Vineyard House Parcel, or for any purpose other than as expressly set forth in the Grant of Water Rights Easement.

49

(9) The Arbitrator orders Respondents to pay Claimants the amount by which Respondents have been unjustly enriched in the sum of $366,336, which represents the disgorgement of Respondents' profits, past and future as stated above, from their wrongful misappropriation and misuse of Claimants' intellectual property, including their violation of Section 4 of the Settlement Agreement.

(10) The Arbitrator awards Claimants prejudgment interest on the award set forth in Subparagraph V(6), *supra.* from March 12, 2015 to the date of the Final Arbitration Award. Thereafter, that sum will bear post-judgment interest pursuant to California Code of Civil Procedures section 685.020(a) at 10% per annum until the date that that sum is paid.

(11) Claimants are not entitled in this proceeding to remove Jeremy Nickel as Director of any Far Niente entity.

Nothing in this Final Award shall be interpreted to prohibit Respondents from continuing to do business with customers already obtained by use of FNW's 25,000 Customer List or responding to requests for information from people who may have appeared on that list.

This Final Arbitration Award is intended to address all issues presented to the Arbitrator for resolution in this matter. Any issue not specifically addressed in this Award has been adversely decided against the party bearing the burden of proof with respect to it.

IT IS SO ORDERED:

DATE: January 13, 2015

Hon. James L. Warren (Ret.)
Arbitrator

50

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Far Niente Wine Estates, LLC vs. Nickel, Jeremy J., et al.
Reference No. 1100080365

I, Tina Oja, not a party to the within action, hereby declare that on  January 13, 2016, I served the
attached FINAL AWARD on the parties in the within action by Email and by depositing true copies thereof
enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco,
CALIFORNIA, addressed as follows:

Kenneth G. Hausman Esq.
Jeremy T. Kamras Esq.
Lara Palanjian Esq.
Arnold & Porter, LLP
Three Embarcadero Center
10th Floor
San Francisco, CA  94111-4024
Phone: 415-471-3100
kenneth.hausman@aporter.com
Jeremy.Kamras@aporter.com
lara.palanjian@aporter.com
   Parties Represented:
   FN Cellars, LLC
   FN Land, LLC
   Far Niente Wine Estates, LLC
   Far Niente Winery, Inc.
   Nickel & Nickel Vineyards, LLC

Glenn P. Zwang Esq.
Richard C. Darwin Esq.
Peter H. Bales Esq.
Buchalter Nemer
55 Second St.
Suite 1700
San Francisco, CA  94105-3493
Phone: 415-227-0900
gzwang@buchalter.com
rdarwin@buchalter.com
pbales@buchalter.com
   Parties Represented:
   Jeremy J. Nickel
   Vineyard House, LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,
CALIFORNIA on  January 13, 2016.

Tina Oja
toja@jamsadr.com