United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE VINEYARD HOUSE, LLC.,** | Case No.  4:19-cv-01424-YGR |
| Plaintiff, | CONSOLIDATED CASE |
| v. | **PRETRIAL ORDER NO. 2 RE: MOTIONS *IN LIMINE*, AND *DAUBERT* MOTIONS** |
| **CONSTELLATION BRANDS U.S. OPERATIONS, INC.,** | Dkt. Nos. 144, 145, 146, 148, 149, 152, 154 |
| Defendant. | |

| |
|---|
| **CONSTELLATION BRANDS U.S. OPERATIONS, INC.,** |
| Plaintiff, |
| v. |
| **THE VINEYARD HOUSE, LLC**, |
| Defendant. |

The Court, having considered the pending motions *in limine* and *Daubert* motions submitted by The Vineyard House, LLC ("TVH") and Constellation Brands U.S. Operations, Inc. ("Constellation"), **HEREBY ORDERS** as follows:[1]

## I.   THE VINEYARD HOUSE'S MOTIONS *IN LIMINE*

### A.   Motion to Exclude Introduction of or Reference to Prior Irrelevant Arbitration (Dkt. No. 144)

TVH moves for an order precluding Constellation from introducing evidence of or making reference to a prior arbitration and arbitration award involving TVH's sole member, Jeremy J. Nickel.  The motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1]  As a general proposition, the Court generally denies motions brought under Federal Rules of Evidence ("FRE") 403 in a bench trial.  Rarely do the moving papers provide sufficient context and the Court need not be concerned with a jury hearing the evidence.  Such motions can be made during the bench trial.

The documents involving Jeremy Nickel in a prior arbitration are generally inadmissible because the arbitration order constitutes hearsay. *See* FED. R. EVID. 801. Unless exceptions apply, hearsay is not admissible. FED. R. EVID. 802. No exceptions have been appropriately identified by Constellation.

However, the information and conduct reflected in the prior arbitration may be relevant and elicited from Mr. Nickel during cross-examination. More specifically, evidence that Mr. Nickel referred to TVH land as the "Halter Valley Parcel" is relevant to the issues in this litigation. Further, it is possible that the referenced documents may be necessary for impeachment purposes by Constellation. *See* FED. R. EVID. 608. Nothing in this Order would exclude such examination and use of documents.

**A.      Motion to Exclude Deposition Testimony of Robert Mondavi (Dkt. No. 146)**

TVH moves for an order precluding the introduction deposition testimony of Robert Mondavi from a prior action to which TVH was not a party. The motion is **DENIED**.[2]

Robert Mondavi's testimony is admissible under both FRE 804(b)(1) and 807, even though it was not conducted pursuant to Federal Rule of Civil Procedure 32. FRE 804(b)(1) provides a relevant exception to the hearsay rules. The exception applies when the declarant is unavailable and involved:

> (1) Testimony that:
> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
> (B) is now offered against a party who had - or, in a civil case, whose predecessor in interest had - an opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination.

FED. R. EVID. 804(b)(1).

No one reasonably disputes that Mr. Mondavi's testimony satisfies these first two elements: Mr. Mondavi passed away prior to this action and his testimony was given at a previous lawful deposition. With respect to the third, TVH does not persuade. TVH avers that it is not

---

[2]    The unopposed request for judicial notice – requesting judicial notice of the caption page of the prior action involving Mr. Mondavi and the Limited Liability Company Articles of Organization filed with the California Secretary of State – is **GRANTED**. (Dkt. No. 147.)

United States District Court
Northern District of California

United States District Court
Northern District of California

successor in interest to the litigants in the previous litigation (the "*Schrader* action.").[3]  Under the Federal Rules of Evidence, "predecessor in interest" is meant to be read generously where a former action involved a party with similar motives to cross-examine as the present party on similar issues.  *See Culver v. Asbestos Defendants (BP)*, No. C 10-03484 SI, 2010 WL 5094698, at *4 (N.D. Cal. Dec. 8, 2010) (adopting interpretation of Third, Fourth, and Sixth Circuits that Rule 804's "predecessor in interest" limitation is meant to be read generously where former suit involved a party with similar motivation to cross-examine on similar issues as the present party); Wright & Miller, FED. PRAC. & PROC. EVID. § 7073 (2014 ed.) ("courts have interpreted the phrase predecessor in interest to extend beyond privity to encompass parties sharing a 'community of interest.'").

Mr. Mondavi's testimony satisfies the third element for myriad reasons.  First, TVH here is raising identical claims as plaintiff in the *Schraeder* action in seeking cancellation of the *same* incontestable trademark.  With respect to that same trademark, TVH alleges that Mr. Mondavi himself committed fraud on the Patent and Trademark Office.  Thus, a "similar motive to develop testimony" exists.  TVH's argument that the deposition lacked an aggressive cross-examination does not compel a different result.  The rule only requires an "opportunity to develop the testimony."  In fact, under the rule, an actual examination of the witness the predecessor in interest need not have occurred.  *See United States v Koon*, 34F.3d 1416, 1427 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996).  Excluding Mr. Mondavi's testimony would prevent this Court from considering reliable and sworn testimony directly relevant to the issues in this litigation.  Moreover, the Court understands that TVH seeks to introduce statements of Mr. Mondavi *not* made under oath.

Alternatively, under FRE 807 hearsay may be offered where a defendant provides sufficient evidence of trustworthiness and the evidence is more probative on the point for which it is offered than other evidence available.  FED. R. EVID. 807.  Mr. Mondavi's testimony is relevant

---

[3]  *Robert Mondavi Winery, a California corporation v. Schrader Cellars, LLC*, Case No. C-02-5311, Northern District of California.

1    evidence about his knowledge and intent, which is material to TVH's fraud claim.

2        **B.    Motion to Exclude Evidence on Irrelevant Trademarks such as**
3             **Inglenook (Dkt. No. 149)**

4        TVH seeks an order introducing evidence pertaining to irrelevant trademarks, such as

5    Inglenook™.  The motion is **DENIED, OR ALTERNATIVELY, DEEMED WITHDRAWN**.

6        As a preliminary matter, as discussed at the pretrial conference on August 31, 2020, here,

7    both parties rely on evidence related to other trademarks through their experts.  In the absence of

8    controlling case law, the Court presented the parties with the option of admitting or excluding all

9    evidence on similar vineyard trademarks.  In response, both parties confirmed that all such

10   evidence related to other wine brands and trademarks should be admissible.

11       Moreover, TVH does not otherwise persuade to exclude evidence on Inglenook.  Whether

12   Inglenook, another vineyard in Napa Valley, is a term of geographic significance or not is, of

13   course, irrelevant to the present dispute.  However, whether a vineyard designation is, by

14   necessity, a geographic indicator, is an important issue in this case.  Indeed, as Constellation

15   highlights, Inglenook is an example of how the trademark vineyard name, does not, by definition,

16   run with the land.  In the Inglenook scenario, the land and the brand allegedly existed separately.

17   The Court thus finds that industry custom and practice in Napa Valley is relevant to this action.

18   **II.    THE PARTIES' _DAUBERT_[4] MOTIONS**

19       **A.    Motion to Exclude or Limit Certain Testimony by Paul Reidl**
20            **(Dkt. No. 145)**

21       Constellation moves for an order to exclude or limit certain testimony by Paul W. Reidl in

22   his opening report and rebuttal report on the grounds that much of the testimony is either not

23   relevant or lacks foundation as an expert and that some of the opinions are improper legal

24   conclusions. The motion is **GRANTED IN PART** and **DENIED IN PART**.

25       As a threshold matter, the parties were forewarned about identifying lawyers as experts in

26   this trademark dispute.  In large part, Mr. Reidl attempts to conclude that the rules which apply to

27

28       [4]  _Daubert v. Merrell Dow Pharms., Inc._, 509 U.S. 579, 591-94 (1993).

United States District Court
Northern District of California

United States District Court
Northern District of California

the use of AVAs or American Viticultural Areas should be, as a matter of law, equally applicable to "geographic areas," as he attempts to defines them in this case.[5]  Beyond pattern and practice testimony, he further speculates, without any articulated foundation, as to the specific motives of specific wineries' inclusion of geographic terms on their labels without identifying how he would know of such motives.  These legal opinions, conclusions as to the ultimate question before the Court regarding TVH's use of To Kalon, and his noted speculations are inappropriate for expert opinion.  At most, they are attorney argument.  For ease of reference, Attachment A hereto, takes the highlighted opening report submitted as part of the motion and strikes in red those portions to which the Court refers.

With respect to the balance of the challenged opening report, the Court considers that Mr. Reidl's expertise stems from his work as a trademark lawyer for 18 years in the wine country, and presumably he otherwise lacks expertise, or training, in history, sociology, geography, viticulture, marketing, or consumer research.  As the Court was not provided with the entirety of Mr. Reidl's deposition testimony, it cannot conclude precisely the nature of the "expertise" for which TVH is offering Mr. Reidl.  Even assuming the Court accepts him as an expert, the balance of Constellation's arguments focus on what weight, if any, the Court should afford Mr. Reidl's opinion.  On this ground, the motion is denied without prejudice to a full *voir dire* on his qualifications with respect to the precise opinions offered.

Regarding his rebuttal report, the same concerns referenced herein apply.  Many of the opinions are improper legal conclusions which are better re-packaged as attorney argument.  Given the statements stricken, some of his "opinions" may not have a sufficient basis.  The foundation for some statements (*see* Rebuttal Report, Attachment B, p. 7:6-9 highlighted) is unknown.  Mr. Reidl also appears to state as "opinions," certain historic information which, presumably, he is assuming to be true from some other expert.  Failure to articulate this distinction

---

[5]  The Court notes that Mr. Reidl failed to comply with this Court's standing order on the construction of his expert reports.  His opinions (identified as ¶¶ 5 – 29) should have been distilled and encapsulated with the balance of the report explaining the foundation for the opinion(s).  Given Mr. Reidl's failure, the Court summaries here.

1   appears to be a consistent problem in Mr. Reidl's reports: he does not distinguish between what he

2   is claiming affirmatively as an "opinion" based on his expertise versus certain "facts" he is

3   assuming to be true and for which he relies upon others.  Plaintiff is counseled to ensure clarity in

4   this distinction during trial.  An expert may rely on others for his or her opinion.  However, if the

5   trier of fact is not persuaded to believe the underlying factual testimony or if such testimony is not

6   admitted, the opinion upon which such facts are based will likely not persuade or be admissible.

   **B.      Motion to Exclude the Testimony of Matthew Ezell (Dkt. No. 148)**

9        This motion is **DENIED**.  The central issue here is whether Mr. Ezell's survey of consumer

10  confusion is relevant under FRE 702.  Constellation avers that Mr. Ezell's survey is not admissible

11  because the survey measures confusion that is not relevant to this action.  Mr. Ezell's survey

12  measures whether consumers understand that the wine labeled with a "To Kalon" reference is

13  from TVH.  Constellation asserts, however, that this case is not about confusion as to who makes

14  the wine, but rather that TVH's "H.W. Crabb's-To Kalon Vineyard" label leads consumers to

15  believe that the wines are made from grapes from the historic "To Kalon" vineyard.

16       TVH claims that Mr. Ezell designed his survey based on the language from the complaint.

17  In the operative complaint, Constellation only pleads that TVH's use of the alleged trademark was

18  likely to lead consumers to believe that Constellation was the source of Plaintiff's wine.

19  (Complaint, Dkt. No. 1, in 4:20-cv-00238-YGR, at ¶ 64.)  This is a sufficient basis for a claim of

20  relevance, and on that basis the motion is therefore denied.

21       The argument that there has been a change is theory is not appropriately resolved in the

22  context of this motion.[6]  While the motion is denied, again, the Court will weigh Mr. Ezell's

23  testimony accordingly.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

---

[6]  TVH appears to argue that Constellation's theory of confusion as to the source of the grapes is not mentioned or implied as part of the federal infringement cause of action in the complaint, or in the Joint Statement of Claims and Defenses.  (*Citing id*. at ¶¶ 64, 71, 76; Joint Statement of Claims and Defenses, in 4:19-cv-01424, Dkt. No. 98, a p. 7.)

United States District Court
Northern District of California

United States District Court
Northern District of California

C.   **Motion To Exclude Portions of the Report and Testimony of Mark De Vere and to Strike Portions (Dkt. No. 152)**

This motion is **GRANTED IN PART** and **DENIED IN PART**.  Aspects of Mr. De Vere's testimony are admissible under FRE 702, given Mr. De Vere has worked in the Napa wine industry for the past twenty-eight years and is responsible for marketing and sale of Constellation's wine and consumer education.  Mr. De Vere's training and experience qualify him to testify about winemakers and the industry.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993.)  To the extent Mr. De Vere does not offer legal conclusions or opinions beyond the scope of his expertise when testifying on industry practice, such opinions are appropriate. However, in Attachment C, the Court identifies, by striking, those inadmissible portions upon which Mr. De Vere either lacks a foundation for the opinions, the statements are based on speculation and not expertise or constitute inappropriate legal opinions.

D.   **Motion to Exclude the Report and Testimony of Susan Schwartz McDonald And, In the Alternative, Strike Portions of the Same (Dkt. No. 154)**

This motion is **DENIED.**  Ms. McDonald meets all the requirements under FRE 702 and *Daubert* for her expert testimony to be admissible: she qualifies as an expert, her testimony is helpful, and her opinion is reliable.  *See* FRE 702; *Daubert*, 509 U.S. at 579.

TVH does not challenge Ms. McDonald's expertise.  Rather, TVH seeks to exclude Ms. McDonald's expertise on grounds that she is unqualified because she did not conduct consumer surveys on consumer confusion or market research related to this particular matter.  However, Ms. McDonald's expertise in marketing makes her testimony reliable even if Ms. McDonald did not conduct specific research regarding "To Kalon."  Ms. McDonald, holds a doctoral degree, possesses numerous qualifications, is the president of a marketing and consulting organization, has academic expertise and work experience in marketing, social psychology, and communications theory, and has chaired trade associations and lectured on marketing at universities.  Moreover, Ms. McDonald does not intend to testify about legal issues but rather on consumer understanding of brands, which is relevant to the issues in this action.  Ms. McDonald does not need to have conducted surveys or specialize in the wine industry in order to provide testimony on how consumers generally interpret labels on wine bottles. Once again, the issue is one of weight, not

admissibility.  Again, although the motion is denied, the Court will otherwise weigh her testimony accordingly.  *See Primiano*, 598 F.3d at 565.

## III.     TRIAL CONSIDERATIONS

Having now reviewed numerous of the parties' experts reports to resolve the pending motions, the Court encourages the parties to meet and confer to determine whether it would be appropriate for the Court to admit some of the reports, or portions thereof.  While the parties may still want to conduct direct examination, preadmission of some of the reports, or portions thereof, may expedite trial testimony and result in a more comprehensive record.

To the extent agreeable, such reports should be listed as a trial exhibit.  If only a portion is to be admitted that portion should have a sub-designation, such as the full report may be Exhibit 101 but the portion to be admitted designated as Exhibit 101-A.

This Order terminates Docket Numbers 144, 145, 146, 148, 149, 150, 152, 154, and 157.[7]

**IT IS SO ORDERED.**

Dated: September 16, 2020

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

---

[7]  For purposes of these motions, the Court need not rely on matters which were filed with a request to seal.  Thus, while the Court **GRANTS** such motions (Dkt. Nos. 150, 157), it does so only given the procedural context.  The parties should not assume that the material will be sealed at trial.  This is a public forum and damages information is frequently made public.  The parties should carefully consider what, if any, evidence it asks the Court to seal at trial.

United States District Court
Northern District of California

ATTACHMENT A

1   BUCHALTER
    A Professional Corporation
2   GLENN P. ZWANG (SBN: 112295)
    JEFFREY M. JUDD (SBN: 136358)
3   PETER BALES (SBN: 251345)
    55 Second Street, Suite 1700
4   San Francisco, CA 94105-3493
    Telephone: 415.227-0900
    Fax: 415.227.0770
5   Email:   gzwang@buchalter.com
             jjudd@buchalter.com
6            pbales@buchalter.com

7   BUCHALTER
    A Professional Corporation
8   FARAH P. BHATTI (SBN: 218633)
    18400 Von Karman Avenue, Suite 800
9   Irvine, CA 92612-0514
    Telephone: 949.760.1121
    Fax: 949.720.0182
10  Email:   fbhatti@buchalter.com

11  Attorneys for Plaintiff
    THE VINEYARD HOUSE, LLC
12  *Attorneys for Plaintiff, The Vineyard House, LLC*

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15  **THE VINEYARD HOUSE, LLC,**          Case No. 4:19-cv-1424-YGR

16              Plaintiff,

17       vs.                             **RULE 26 DISCLOSURE STATEMENT
                                         AND DECLARATION OF
18  CONSTELLATION BRANDS U.S.            PAUL W. REIDL**
    OPERATIONS, INC.,**
19              Defendant.

20

21

22              **RULE 26 DISCLOSURE STATEMENT AND
                 DECLARATION OF PAUL W. REIDL**

23

24
                                    -1-
25  RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

# **TABLE OF CONTENTS**

                                                                        Page

TABLE OF CONTENTS …………………………………………………..         2

INTRODUCTION ……………………………………………………          3

EXECUTIVE SUMMARY ………………………………………………...        3

OPINIONS ……………………………………………………………         4

QUALIFICATIONS ………………………………………………….        12

EXHIBITS ……………………………………………………………        21

COMPENSATION ……………………………………………………....        21

EXHIBIT A …………………………………………………………...        22

EXHIBIT B …………………………………………………………..        23

EXHIBIT C ………………………………………………………….        24

EXHIBIT D …………………………………………………………...        25

EXHIBIT E …………………………………………………………...        26

EXHIBIT F ………………………………………………………….        27

EXHIBIT G …………………………………………………………...        28

EXHIBIT H ………………………………………………………....        30

EXHIBIT I ………………………………………………………        32

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

I, Paul W. Reidl, declare as follows:

## INTRODUCTION

1.      My name is Paul W. Reidl.  I am the principal attorney in the Law Office of Paul W. Reidl, located at 25 Pinehurst Lane, Half Moon Bay, California 94019.  My professional qualifications are summarized in paragraphs 12-21 of this Declaration.

2.       I have been retained in this case by the Plaintiff, The Vineyard House, LLC, ("TVH") to testify on the use of geographic and historical terms and trademarks in the wine business, focusing on Napa Valley.  Counsel for TVH has provided me with, and I have reviewed, the documents referenced in Exhibit A.  I have also reviewed the materials noted in Exhibit A.

3.      My opinions flow from the documents provided to me by counsel for TVH, my own research, and my own knowledge and experience in the wine business and in the labeling, marketing, registration and use of trademarks, geographic terms, and historical terms for wine in the United States.

## EXECUTIVE SUMMARY

4.      Geographic and historical terms are very important to the wine business because wine is an agricultural product.  There is a long tradition of using geographic and historical terms on wine labels in order to ground the wine in the "terroir" of its origin.  In Napa Valley, it is not uncommon for one winery to own a trademark comprising a geographic term but for others within that geographic area to use the geographic term as a geographic indication or a vineyard designation in order to give the wine a "sense of place."  It is also not uncommon for wineries to use the history of their property or winery, in a non-trademark sense, to provide information to consumers as part of their marketing "story."  This historical information further grounds the wine in a specific geographic place.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

## OPINIONS

5.     Wine grapes are grown on parcels called "vineyards."  After the grapes are harvested, their juice is extracted by crushing or pressing.  Wine is made by fermenting the juice. Fermentation occurs when yeast (either natural yeast or introduced yeast) in the juice digests the sugars in the juice and secretes alcohol.  Once the fermentation is completed, the wine may then be aged in oak barrels or with oak staves or chips.  Some wines may also undergo a secondary ("malolactic") fermentation to produce a creamier, buttery flavor.

6.     In the United States, there are generally two traditional types of brand names for wines:  geographic terms and personal names.  Both types of traditional brand names are used for the same basic purpose, namely, to impart a sense of uniqueness to the wine in the bottle.

7.     Geographic brand names are a "New World" adaptation of the European geographic indication system.  For centuries, the most prominent feature on the label of European wines was the name of the geographic area in which the grapes were grown and the wine was made.  This system is generally called the geographic indication system.  It has various names in various countries, such as Appellation d Origine Contrôlée (France), the Indicazione Geografica Tipica (Italy) and Denominazione di Origine Controllata (Italy).  Chianti, Bordeaux, Rioja and Champagne are well-known examples of European geographic indications.  The administrative bodies for these regions establish rules and regulations for grape growing and wine making, with one intended result being that the wines from the region have many of the same flavor characteristics.

.     The geographic indication system also functions as a symbol of quality and trust. The premise of the geographic indication system is the belief that the "terroir", i.e., the climate,

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

1   soil and topography of the growing area, plays a dominant role in determining the flavor profile of

2   the grapes and ultimately the wine.

3        9.     The wine industry and culture in the United States is relatively new compared to

4   Europe.[1]  There were wineries and vineyards in Napa Valley prior to the onset of Prohibition in

5   1920, some of which are still there today:  To Kalon, Charles Krug, Beringer, Inglenook, Beulieu,

6   Italian Swiss Colony, and others.  Prohibition crushed the wine business (although some wineries

7   muddled through by making sacramental wine and wine for medicinal purposes), but the business

8   resumed when Prohibition ended in December 1933.  Even though the wine industry in the United

9   States was in its infancy, wine marketers and winemakers understood the importance of "terroir"

10   to determining the quality and flavor profile of the wine; however, they did not have the European

11   tradition of designated growing areas or the regulatory regime to lend legitimacy to the terroir of

12   the specific geographic area.

13        10.     In the United States, the use of geographic (and personal) names in the wine

14   business allowed vintners to create their own "story" about the quality of their wines.  The use of

15   geographic terms gave wine marketers the opportunity to talk about the terroir even though the

16   geographic area was not a formally designated geographic indication and supported by the quality

17   assurance criteria of the European regulatory regime.  By using a geographic brand or vineyard

18   name, the winegrower offered consumers a sense of a place for the origin   the wine.

19   of place was buttressed by providing the consumer with information regarding the history of the

20   vineyards or winegrowing family.

21   //

22   

23        [1]     Hence, wines originating in Europe are sometimes referred to as "Old World Wines" and
wines originating in the Americas, Australia and New Zealand are sometimes referred to as

24   "New World Wines."

-5-

25   RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

11.     There is now an established geographic indication system in the United States called "American Viticultural Areas" ("AVAs") [2]   The geography, or terroir, of the wine serves as a starting point for the "story" about the brand which is, in turn, the focal point of the marketing efforts for it.  The "story" is particularly important because it helps to differentiate the wine from those of competitors and, in the case of larger producers like Constellation or Gallo, from the multiple brands in the producer's portfolio.  The "story" positions the brand and tells consumers why they should be interested in buying it. This is particularly important for premium and ultra-premium wines because at these high price points customers pay close attention to the labels and the information about the wines because they are looking for small differences between wines made by multiple producers.

12.     Focusing on terroir in wine labeling and marketing is an inherent characteristic of the wine business because wine is an agricultural product made from grapes.  The wine tradition and culture – whether in the Old World or the New World -- is of vineyards, soil, geography, seasons and climate.  The winemaker can only work with the grapes that the terroir provides.  For this reason, for all types of table wine brands (geographic, personal names, fanciful), many winery web sites and labels talk about the land, its history, and the climate in which the grapes were grown. This is especially so at premium and ultra-premium price points.[3]

---

[2]     The principal difference between the European system and the American system is that the American system only establishes the geographic boundaries for the specific AVAs.  Unlike in Europe, there are not voluminous rules and regulations about how the grapes must be grown and the wines much be made for each specific AVA. Winegrowers in an AVA are subject only to the general TTB rules and regulations about winemaking which are applicable to all wines made in the United States.

[3]     One exception to this might be value priced, semi-generic wines that are sold in larger containers or boxes, e.g., 1.5, 3 or 5 liters.  Another might be wines that bear a "California" designation because these tend to be less expensive wines made from grapes grown in the Central Valley.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

13.     The emphasis on terroir is also carried forward onto wine labels.   The terms "Vineyards" and "Ranches" are commonly added to the place name or the personal name to further ground the wine in a specific geographic location.   In fact, vineyard names are themselves geographic names because they are the name of the geographic place where the grapes are grown. Examples of vineyard names are Asti Vineyards, Frei Vineyards, Stagecoach Vineyards, and, of course, To Kalon.   In short, wine marketing and labels have conditioned consumers to associate brands with a geographic place, a person, or both.   This is important to establishing the legitimacy of the brand and differentiating it from the competition and the other brands within the winegrower's portfolio.

14.     To Kalon is an example of a traditional geographic name.  The term was coined by Hamilton Crabb (one of the pioneer winegrowers in Napa Valley) as the name for his vineyard properties and is associated with that specific geographic place.  Using it on a wine label gives the wine a sense of place of origin, i.e., "this wine originated from one of the oldest vineyard properties in Napa Valley, To Kalon."  It imbues the wine with a sense of history and place, just like (for example), Frei Vineyards in Sonoma County.[4]

15.     Geographic terms can become protectable trademarks if, through extensive use and promotion, they become identified with a single source.   A good example would be London Fog for clothing.   That mark has been used and promoted for coats and jackets for decades so, over time, consumers began to view it as designating a single producer of coats and jackets.   But even though it has become a trademark, others who make clothing in London can still use the geographic term "London" to tell consumers where the goods are made.   The existence of a trademark does

---

[4]     Frei Vineyards was planted in the late 19th Century by the Frei family.  Julie Gallo bought grapes from the Frei family which were used, in part, for Hearty Burgundy.  When the Frei family retired, the Gallo family purchased the vineyard.  Gallo continues to operate it.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

not prevent them from telling consumers, in a non-trademark way, that their clothing was made in London. This is important to clothing producers because the term "London" communicates information about quality, style, and sophistication.

16.     Napa Valley is perhaps the most well-known AVA in the United States.  There are numerous sub-AVAs within the Napa Valley AVA.  Each bears the name of a geographic feature or something historical about the area.  These include: Los Carneros, Howell Mountain, Wild Horse Valley, Stags Leap District, Mt. Veeder, Atlas Peak, Spring Mountain District, Oakville AVA, Rutherford, St. Helena, Chiles Valley, Yountville, Diamond Mountain District, Coombsville, Oak Knoll District and Calistoga.

17.     It is not uncommon for a winery to own a trademark for the name of an AVA and for other wineries located in the geographic area to use the term on wines made from grapes grown in the geographic area.  For example, there is a Stags Leap winery that is owned by the Australian company, Treasury Wine Estates.  It owns several Federal trademark registrations for Stags Leap. However, others in the Stags Leap area use the Stags Leap geographic term on their wines to indicate to consumers the geographic origins of the wine.  These include Clos du Val winery, Shafer Vineyards, Silverado Vineyards, Chimney Rock Cellars, Pine Ridge and others. Photographs that I personally downloaded from the internet are attached as Exhibit B.  These show that Stags Leap uses the geographic term as a trademark, while others use the geographic term to describe the geographic place in which the grapes for the wine were grown.[5]

18.     The Atlas Peak AVA is another example.  Accolade Wines owns a trademark registration of Atlas Peak for wine, yet wineries in the AVA use the geographic term on their wines

---

[5]     I have limited my examples to Napa Valley but this practice exists for other AVAs in other geographic locations, such as Dry Creek Valley in Sonoma County and Red Mountain in Washington State.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

to indicate to consumers the geographic origins of the wine. These include Hall, Krupp and Stagecoach, and Rombauer. Photographs that I personally downloaded from the internet are attached as Exhibit C. These show that Accolade uses the geographic term as a trademark, while others use the geographic term to describe the geographic place in which the grapes for the wine were grown.

19. Constellation owns a brand that is identical to the name of a Napa Valley AVA, Wild Horse, yet wineries in this geographic area use the term as a geographic term on wines made from grapes grown in that area. Photographs that I personally downloaded from the internet are attached as Exhibit D. These show that Constellation uses the geographic term as a trademark, while others use the geographic term to describe the geographic place in which the grapes for the wine were grown.

20. Similarly, a winery in the Carneros geographic area is named Domaine Carneros and has a Federal registration for that trademark. Yet, as with other AVAs, wineries located in that geographic area use the term as a geographic term to communicate to consumers where the grapes for the wine have been grown. Photographs that I personally downloaded from the internet are attached as Exhibit E. These show that Domaine Carneros uses the geographic term as a trademark, while others use the geographic term to describe the geographic place in which the grapes for the wine were grown.

21. Another example is the Rutherford AVA. Cakebread Cellars owns a Federal registration of Rutherford Reserve. Yet, as with other AVAs, wineries located in that geographic area use the term as a geographic term to communicate to consumers where the grapes have been grown. Photographs that I personally downloaded from the internet are attached as Exhibit F.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

These show that Rutherford uses the geographic term as a trademark, while others use the geographic term ~~to describe the geographic place in which the grapes for the wine were grown~~.

22. ~~This is also true for the To Kalon Vineyard.~~ Defendant Constellation owns the trademark, but others use the mark on their wines b~~ecause the grapes for the wines were grown the historic To Kalon property.~~ Photographs that I personally downloaded from the internet are attached as Exhibit G. These show that others use the geographic term to ~~describe the geographic place in which the grapes for the wine were grown.~~

23. It is important to place these labels in the context of the Federal regulatory scheme. This is administered by the Alcohol and Tobacco Tax and Trade Bureau ("TTB") in the Department of the Treasury.[6] Under TTB rules:

    a. Wines may only be labeled with an AVA if 85% of the grapes used to make that wine originate from the AVA.

    b. Wines may only bear a vineyard designation if 95% of the grapes used to make that wine were grown in the vineyard.

    c. All labels, including those with a vineyard designation, must have a brand name. As a practical matter, this means that vineyard designations or AVAs only appear as secondary designations on labels because the primary designation must be the brand name. Thus, for example, the typical label architecture of a lawful (hypothetical) label might look like this:

//

//

---

[6] TTB was created by the Homeland Security Act of 2002 ("HSA"). Previously, the Federal regulatory scheme was administered by the Bureau of Alcohol, Tobacco and Firearms ("BATF") in the Department of the Treasury. The HSA sent BATF and its law enforcement functions to the Department of Justice. It stripped-out its regulatory functions and kept them with Treasury under the newly-created TTB.

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

CABIN CREEK [brand name]

Robin's Vineyard [vineyard designation]

Stags Leap District [AVA]

    d.    A winery may continue to use a registered trademark that is the same or similar to the name of an AVA if that trademark was approved for use by TTB's predecessor agency before July 7, 1986, or if there is sufficient information on the label to indicate to consumers that the wine does not originate from that geographic area.

    e.    TTB has historically ceded its statutory authority over trademarks to the United States Patent and Trademark Office. This was done many years ago in an interagency memorandum of understanding. TTB's policy is not to get involved in disputes between trademark owners.

    24.    Thus, there is a duality in the marketplace. There are trademarks with hic names, and vineyards/AVAs with the same or a highly similar name. As a practical matter (with the exception of several very large vineyards), the regulatory requirements described in paragraph 23 necessarily limit the quantity of wines that can be labeled with an AVA or a vineyard designation. The scarcity of supply means that these wines usually command a premium or ultra-premium price. Because these wines must also have a brand name on the label and, further, because the purchasers of wines at these price points tend to be more discriminating than the average wine consumer who might purchase on impulse, there are fewer opportunities for consumer confusion.

    25.    The geographic "story" for a wine is often complemented by a description of the history of the vineyard or the winegrower. This information can be (and is) provided on the back label of a wine bottle; however, due to space constraints, the detailed information is most

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

commonly found on the winery's web site. This information does not act as a trademark (i.e. as a brand name for the wine) but, instead, is meant to elaborate on the "story" that is started by the geographic term on the label or the brand name. Photographs that I personally downloaded from the internet which illustrate the use of an historical description of the vineyards or winery are attached as Exhibit H.

26. TVH also uses historical information on the back labels of wines made from grapes grown on its ~~To Kalon~~ property. This use is consistent with what I have personally observed in the wine business. Photographs that I personally downloaded from the internet which illustrate their use of an historical description of the property are attached as Exhibit I.

27. I ~~am unaware of any judicial decision that enjoined the use of an AVA that was similar to a trademark, or the accurate, non-trademark use of a geographical term or historical information about the property on which the grapes used for the wine were grown.~~

28. I was not asked to opine on whether the property owned by TVH that is at issue in this case is part of what would be considered the historic To Kalon property established by Hamilton Crabb.

29. I understand that discovery has not been completed as of the date of this Declaration. In particular, no fact witnesses have been deposed. Accordingly, if I am asked to supplement this Declaration once that discovery is completed, I will do so and submit a supplemental Declaration.

## QUALIFICATIONS

30. I received a Bachelor of Arts degree in political science and speech communication, with a minor in theology, from The George Washington University in Washington, D.C. with highest honors, Phi Beta Kappa, in 1977. I received a J.D. degree from The George Washington

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

University, with high honors and Order of the Coif, in 1980. I was a member of the The George Washington University Law Review and authored a case note.

31.    While I was in law school I was on the faculty of the Columbian College of Arts and Sciences of George Washington University. I also worked as a Law Clerk/Summer Associate at three firms in Washington, D.C.: Connor, Moore    Corber; Rose, Schmidt, Dixon, Hasley, Whyte and Hardesty; and Crowell & Moring.

32.    From 1980 through 1990, I was with the firm of Crowell    Moring in Washington, D.C. My practice focused on business counseling and litigation in the business law area, primarily antitrust, contracts and natural resources law. I worked on several intellectual property cases while at Crowell & Moring.

33.    From February 1991 – January 2009, I was Associate General Counsel of E.    J. Gallo Winery ("Gallo") in Modesto, California. Gallo is the largest wine producing and marketing company in the world. I represented Gallo in a variety of matters, primarily litigation, global intellectual property (patent, trademarks, copyright and advertising) and international regulatory matters. I was responsible for Gallo's global trademark protection program.

34.    During most of my eighteen (18) years at Gallo, I was responsible for all of the intellectual property aspects of branding, labeling and packaging, including trademark clearance. I worked closely with Gallo's co-founder (Ernest Gallo), the Marketing Department, and later the various Business Units on brand development and strategy. I reviewed thousands of prospective brand names and label designs, prosecuted hundreds of trademark applications, litigated oppositions and cancellation proceedings, litigated Federal Court cases, prosecuted UDRP actions, and participated in and attended numerous brand/packaging/program development and strategy meetings and conference calls. Among other things, in connection with these activities I read

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

extensively in the wine area, frequently visited retail outlets where wines were sold, performed numerous COLA and TESS searches, and reviewed brand plans, consumer research, promotional materials, and the like.

35. From February 2009 to the present I have been the principal attorney in the Law Office of Paul W. Reidl. I provide a full range of legal and consulting services in the trademark area to clients in various sectors, including the wine industry. I also advise clients on alcohol beverage regulatory, copyright, and general business matters.

36. My practice is principally a trademark practice. Many of my clients make and sell alcohol beverages, specifically wine. My business requires me to stay abreast of legal developments in the trademark area, wine markets, market trends, marketing, and other aspects of the business. I must also stay abreast of trends in consumer behavior and taste, the retail environment, and marketing and promotional techniques generally. My clients range from a billion-dollar company to start-ups.

37. I have written and spoken on various issues and written numerous articles on trademark law and other subjects. These include:

- Vell, Vell, Vell (a biography of my grandfather), in pre-publication;

- Trademark and Copyright Issues in the Wine World: Tips for Reducing Risk and Maximizing Brand Protection, National Business Institute (Sacramento, California)(September 2019);

- What Goods are Related to Wine and Why Does it Matter, International Wine Lawyers Association Annual Meeting (Lausanne, Switzerland) (July 2019);

- IP Risk Management for Craft Distillers, American Distilling Institute Annual Meeting (Denver, Colorado) (March 2019);

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

- Leadership in INTA, INTA Annual Meeting (Seattle, Washington) (May 2018);

- Protecting Brands Through Trademark Law, American Distilling Institute Annual Meeting (Portland, Oregon) (March 2018);

- Defending Yourself From Trademark Infringement, Distillers Magazine (Fall 2017);

- USPTO/INTA Industry Training Seminar, Wine Industry (Alexandria, Virginia) (December 2016);

- Resolving and Anticipating Contract, Label and Trademark Issues in the Wine Business (National Business Institutes) (Sacramento, California) (November 2016);

- Understanding New World Wine Labels, INTA Annual Meeting (Orlando, Florida) (May 2016);

- Intellectual Property and Wine Law, NBI Wine Law Symposium (San Francisco, California) (December 2015);

- Understanding Wine Labels: What is the Meaning of All This Gibberish? INTA Annual Meeting (San Diego, California) (May 2015);

- How and Why to Protect Your Intellectual Property, American Distilling Institute (Louisville, Kentucky) (March 2015);

- Trademark Issues in the Wine Business (Philadelphia Intellectual Property Association, Philadelphia, Pennsylvania) (February 2015);

- Intellectual Property Issues in Wine Law (Sacramento, California) (December 2014);

-15-

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

- No Trade, No Trade Mark: An Exploration of the Nuances of Trademark Use, State Bar of California Intellectual Property Section Annual Meeting (Los Angeles, California) (November 2014);

- Trade Dress Law, IP Issues in the Food and Beverage Industries (Napa, California) (October 2014);

- Managing Brand Risks in a Global Marketplace (with Judith Schwimmer and Jerry Jolley), 8th Annual Conference on Best Practices in Winery Operations (Napa, California) (March 2014);

- Using Expert Witnesses in the United States, AIDV Annual Meeting (Vienna, Austria) (October 2013);

- Think Big! Ethics and Personal Responsibility (with James McCarthy and Michael Mettauer), INTA Annual Meeting (Dallas, Texas) (May 2013);

- Understanding New World Wine Labels, INTA Annual Meeting (Dallas, Texas) (May 2013);

- Brand Protection and Strategy in the Wine Sector (with Jeffrey Friedman), 7th Annual Conference on Best Practices in Winery Operations (Napa, California) (March 2013);

- Protecting Brands Through Trademark Licensing: A Convergence of Legal and Business Objectives, Intellectual Property Owners Association Annual Meeting (San Antonio, Texas) (September 2012);

- What Hath Al Gore Wrought: The Impact of (New) Electronic Media on Intellectual Property Rights Risks, Alcohol Beverage Law and Technology Conference (San Francisco, California) (May 2012);

-16-

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

- Understanding New World Wine Labels, INTA Annual Meeting (Washington, D.C.) (May 2012);

- Social Media Tips and Pitfalls, Managing Intellectual Property Magazine (February 2012);

- Supply Contracts: Coping With the Three Tier Distribution System in the United States, AIDV Annual Meeting (Logrono, Spain) (October 2011);

- Using Social Media in Personal Branding, INTA Annual Meeting Workshop (San Francisco, California) (May 2011);

- Understanding New World Wine Labels, INTA Annual Meeting (San Francisco, California) (May 2011);

- Kendall-Jackson v. E. J. Gallo Winery: Anatomy of a Trademark and Trade Dress Case, Dallas Bar Association (Dallas, Texas) (April 2011);

- Brand Protection in the Social Media Environment, SOCIALEX Forum on Legal Issues in Social Media (Washington, D.C.) (March 2010);

- Geographic Indication Registration Systems for Wines, AIDV Annual Meeting (Trier, Germany, 2009);

- Market Evolution and Brand Collision, INTA Annual Meeting (2009);

- Contributing author to FAB JOB GUIDE TO BECOMING A WINERY OWNER (B. Pearce, ed.) (2009);

- Trademark Dilution (University of Southern California I.P. Law Institute, 2008);

- Trade Practices and Intellectual Property, Chapter 9 in POINT OF PURCHASE ADVERTISING (Point of Purchase Advertising Int'l) (2008);

-17-

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

- Careers in Trademark Law, INTA Young Practitioners Forum (San Francisco, 2007);

- The Survey Blues, INTA Annual Meeting (2007) (with Dr. Gerald R. Ford);

- Geographic Indications, Trademarks, and International Issues, Guest Lecturer, Seminar on Advanced Trademark Law, The George Washington University Dean Dinwoodey Center for Intellectual Property Studies (2007, 2008);

- The Trademark Dilution Revision Act of 2006, The George Washington University Dean Dinwoodey Center for Intellectual Property Studies (2006);

- Global Trademark Programs: What You Should Know, INTA Roundtable Forum, (Beijing, China, 2006);

- Strategic Considerations in Global Trademark Registration and Enforcement Programs, INTA China Forum (Hangzhou, China, 2006);

- Maximizing Portfolio Value Through Licensing and Franchising, INTA China Forum (Hangzhou, China, 2006);

- Living in the Age of the Lightning Brand, President's Address, INTA Annual Meeting (2006);

- In Vino Veritas: Ruminations on the Labeling of Wines, INTA Annual Meeting (2005);

- Strategic Considerations in Cross-Border Litigation, INTA Leadership Meeting (2003);

- Geographic Indications and Wine Trademarks, INTA Bulletin (September 2003);

- On Treaties, 93 TRADEMARK REPORTER 99 (2003);

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

- Creating and Managing an International Trademark Portfolio, Intellectual Property Law for Corporate Counsel (Northstar 2003);

- USPTO Class 33 Training Session (Arlington, VA, 2002);

- New Member Orientation; How to Survive the Annual Meeting, INTA Annual Meeting (2002);

- Beer and Wine Advertising and Promotion … Why It's Not all "Fun and Games," INTA Annual Meeting (2000);

- Beyond the Vineyard: Miscellanea That Will Amaze Your Friends and Confound Your Colleagues, INTA Trademark and Paralegal Forum (San Francisco, 1999);

- Creating and Managing a Global Trademark Portfolio, Practicing Law Institute Understanding Basic Trademark Law Program (San Francisco, 1999 – 2010);

- The Use of Survey Evidence in Dilution Cases: Corporate Counsel Challenges, INTA Dilution and Famous Marks Forum (Washington, D.C. 1998);

- Keys to an Effective Trademark Enforcement Program, 20th Annual Intellectual Property Law Institute, State Bar of California (Monterey, 1995);

- Co-Author (with J. MacLeod, R. McMillan), Coal Supply Contracts, Chapter 23 in ENERGY LAW (Matthew Bender, 1990);

- Author (and co-author with T. Biddle) of five Chapters in Mine Safety and Health Law, 1 COAL LAW AND REGULATION (Matthew Bender, 1983); and

- Note, 48 G.W.U.L. REV. 791 (1980) (discussing constitutional limitations on the assessment of license fees by federal agencies)

38.     Beginning in 1994 I served on various committees and held various leadership positions in the International Trademark Association ("INTA"), which is the global association of

trademark owners and professionals.  I was the President and Chairman of the Board of INTA in 2006.  During that year I travelled extensively in furtherance of INTA's public policy objectives, including meeting with government officials in New York, Brussels, Toronto, San Francisco, Washington, D.C., Alexandria, VA, and Beijing and Hangzhou, China.  I was a member of the Task Force that drafted the Trademark Dilution Revision Act of 2006 and worked on securing its passage.  I was also named one of the fifty (50) must influential people in global intellectual property by Managing Intellectual Property magazine.

      a.    As an INTA volunteer, I chaired the Geographic Indications Task Force, the Treaty Analysis Committee, and was the Vice President responsible for the Geographic Indications and Treaty Analysis Committees. After my tenure as President, I was a member of the Geographic Indications Committee.  All of these committees dealt with issues concerning geographic names and trademarks.

      b.    Although I am no longer an INTA officer or committee member, I still follow developments in the wine trademark and geographic indications area because I receive the same quarterly reports that are sent to the Officers and the Board of Directors.

      39.    I have been named as one of the top 1000 trademark lawyers in the world by the World Trademark Review since approximately 2010. I have been named the "California Trademark Firm of the Year" by M    A Global International and globallawexperts.com since 2013, and as one of the top trademark lawyers in California by American Lawyer Media. I have appeared in Who's Who in Trademark Law since 2016.

      40.    I am a member of the State Bar of California, the bars of the California Federal courts, and the Intellectual Property Law Section of the California Lawyers Association.  I am also

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

a member of L 'Association International des Juristes du Droit de la Vigne et du Vin (AIDV) (International Wine Law Association), and on the Board of Directors of their United States chapter.

41.     I have not testified as an expert witness at a deposition or at trial in the last four (4) years.

## EXHIBITS

42.     My testimony may be supported by future deposition testimony and the exhibits thereto.  If I am asked to develop a demonstrative Exhibit or other Exhibit, I will supplement this Declaration.

## COMPENSATION

43.     My fees for this engagement consist of billable hours and expenses.  My hourly billing rate for this engagement is $500.

I make this Declaration having been advised of the penalties for perjury on this 16th day of December, 2019, at Half Moon Bay, California.


_____
Paul W. Reidl

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

## **EXHIBIT A**

First Amended Complaint and Exhibits

First Amended Answer

https://napavintners.com/

USPTO TESS web site

The web sites of the various wineries mentioned herein

Google.com

The TTB COLA web site

https://www.stagsleapdistrict.com/

http://www.atlaspeakappellation.com/

https://en.wikipedia.org/wiki/Wild_Horse_Valley_AVA

http://www.americanwineryguide.com/regions/rutherford-ava-wineries/

www.beckstoffervineyards.com

https://vinepair.com/articles/to-kalon-napa-vineyard-mondavi/

https://www.guildsomm.com/public_content/features/articles/b/stamp/posts/the-true-story-of-to-kalon-vineyard

USPTO TMEP

27 CFR Part 9

ATF decision on Wild Horse Valley AVA Rulemaking, 53 Fed.Reg 48244 (11/30/88)

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

**EXHIBIT B**







RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

**EXHIBIT C**







RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

**EXHIBIT D**









RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

**EXHIBIT E**









-26-

**EXHIBIT F**









RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

**EXHIBIT G**





RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL







RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

# EXHIBIT H

COLUMBIA
WINERY
PROUDLY CRAFTED IN THE STATE OF WASHINGTON
In 1962, a relentlessly curious group of friends sought to prove the world-class quality of Washington wines, establishing what would become Columbia Winery. Today, Columbia Winery continues to craft acclaimed wines from distinctive regions throughout Washington.
Our Riesling opens with a pleasant bouquet of white flowers. On the palate, juicy notes of apricot and honey combine with crisp minerality and bright acidity for a refreshing, dry style.
VINTAGE: 2018
TYPE: Riesling
AVA: Ancient Lakes of Columbia Valley
WE INVITE YOU TO VISIT US AT WWW.COLUMBIAWINERY.COM OR OUR TASTING ROOM IN THE HEART OF WOODINVILLE, WASHINGTON
VINTED & BOTTLED BY COLUMBIA WINERY, WOODINVILLE, WA
CONTAINS SULFITES © 2017 COLUMBIA WINERY 750 mL
GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.
FPO

Est. 1890
FREI BROTHERS
RESERVE
Andrew Frei founded the Frei Brothers Winery in 1890 with the belief that great wine begins with great grapes. He located his vineyard in the heart of Sonoma County, one of America's most awarded winemaking regions. Today, we carry on the Frei Brothers heritage with wines whose distinctive aromas and flavors capture the land and climate of their individual growing region.
Alexander Valley, Sonoma's premier Cabernet Sauvignon appellation, is the source of grapes for this wine. This full-bodied wine has classic aromas and flavors of cassis, eucalyptus, and dark berries, complemented by a touch of sweet vanilla and toasty oak.
We invite you to enjoy our wines with family and friends.
www.freibrothers.com (866) 346-3963
PRODUCED & BOTTLED BY FREI BROS. WINERY, HEALDSBURG, CALIFORNIA 95448
750 ML • CONTAINS SULFITES
© FREI BROS. SONOMA 2007 • CABERNET SAUVIGNON
GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.
F.P.O.

SONOMA COAST
San Francisco
PACIFIC OCEAN
SONOMA COAST
CHARDONNAY
The original homestead of MacMurray Ranch was settled over 150 years ago in the Russian River Valley of Sonoma County. Actor Fred MacMurray purchased the ranch in the 1940's and farmed it for over 50 years. Today, the legacy of the ranch carries on as a premier vineyard and inspiration for the wines we craft at MacMurray Ranch. We are committed to cool climate varietals and expressing the unique qualities from where the fruit is sourced. Our Sonoma Coast Chardonnay offers a rich mouth feel and sweet aromatics with ripe fruit flavors of melon, citrus, and a hint of vanilla.
©MacMurray Ranch 2009
PRODUCED & BOTTLED BY MACMURRAY RANCH, HEALDSBURG, CALIFORNIA • CONTAINS SULFITES • 750mL
GOVERNMENT WARNING: (1)ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2)CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.

PRODUCED & BOTTLED BY
Schrader Cellars
ANGWIN, CALIFORNIA
707-942-1212
The grapes used in the creation of this wine came from the Beckstoffer Family's portion of H. W. Crabb's original To Kalon Vineyard which was established in 1868.
CONTAINS SULFITES 750 ML
GOVERNMENT WARNING: (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.



RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

1

**EXHIBIT I**

2

3

Founded by 2nd generation vintner Jeremy Nickel, The
Vineyard House (or "TVH") is a tribute to Jeremy's late father,
and hero, Gil Nickel, founder of two of Napa Valley's most
iconic wine estates.

4

5



6

7

Former property owner & proprietor of the historic To-Kalon
Estate, H.W. Crabb, had the world's largest collection of over
300 grape varietals growing on his nursery in 1882. In honor
of Crabb's significance as a pioneering viticulturist, we named
"block 5" after his most successful varietal which was commonly
known as "Crabb's"Black Burgundy". We only produced 1,200
bottles of Cabernet Franc from the 2015 vintage and 10% of all
TVH proceeds are donated to cancer research in Gil's name.

8

9

10

"Let's raise a glass in honor of our Fathers, and to making them
proud, Cheers!"



11

12

PRODUCED & BOTTLED BY JEREMY NICKEL CELLARS,
ST. HELENA, CALIFORNIA - 750ML - ALC. 14.5% BY VOLUME
www.TheVineyardHouseWinery.com

13

**GOVERNMENT WARNING:** (1) ACCORDING TO THE
SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC
BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK
OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC
BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR
OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS.
CONTAINS SULFITES

14

15

16

17

18

19

20

21

22

23

24

-32-

25

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

Founded by 2nd generation vintner, Jeremy Nickel,
The Vineyard House (or "T.V.H.") is a tribute to
Jeremy's late father (and hero) Gil Nickel - founder
of two of Napa Valley's most iconic wine estates.

Hidden within the western foothills of Oakville lies
the "To-Kalon Valley" and at its entrance, stands
The Vineyard House — a modest two-story farm-
house that was constructed in 1853 (and resided in)
by prominent Napa Valley pioneer - Bill Baldridge,
until his death in 1889.



Subsequently, Baldridge's 165-acre estate was
acquired by H.W. Crabb and operated as part of his
"To-Kalon" estate until 1943. The property sat
mostly dormant but was revitalized in 1979 when
Gil Nickel acquired 120 acres of the Stelling Estate
which included TVH & Far Niente Winery.

Gil Nickel passed away from cancer in 2003 and
bestowed to Jeremy the historic Farmhouse and the
9-acre knoll upon which the house sits. 10% of all TVH
proceeds are donated to cancer research in Gil's name.

"Here's to honoring our parents, and to making
them proud. Cheers!"



PRODUCED & BOTTLED BY JEREMY NICKEL CELLARS,
ST. HELENA, CALIFORNIA - 750ML - ALC. 14.5% BY VOLUME
www.TheVineyardHouseWinery.com

**GOVERNMENT WARNING:** (1) ACCORDING TO THE
SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC
BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK
OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC
BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR
OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS. CONTAINS SULFITES

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

Founded by 2nd generation vintner Jeremy Nickel, The Vineyard House (or "T.V.H.") is a tribute brand honoring Jeremy's late father (and hero) GIL NICKEL- founder of two of Napa valley's most iconic wine estates.

Our Block 8 "Boss" vineyard is situated at the highest point on our 44-acre property.  The 1.3 acre "knoll" is planted to tightly-spaced Cabernet Sauvignon vines rooted in well-drained, rocky shale soil.



Former property owner, H.W. Crabb (founder of the historic "To-Kalon" estate) was quoted as saying…
"The name To-Kalon is Greek and means the highest beauty or the highest good, but I try to make it mean - the boss vineyard."

This BLOCK 8 wine is a beautiful, concentrated expression of Oakville Cabernet Sauvignon, and we (like H.W. Crabb) think it is the BOSS!

1,200 bottles produced…

Of which 10% of all proceeds will be donated to cancer research in Gil's name.

"Let's raise a glass in honor of our Fathers, and to making them proud, Cheers!"



PRODUCED & BOTTLED BY JEREMY NICKEL CELLARS,
ST. HELENA, CALIFORNIA - 750ML - ALC. 14.5% BY VOLUME
www.TheVineyardHouseWinery.com

**GOVERNMENT WARNING:** (1) ACCORDING TO THE SURGEON GENERAL, WOMEN SHOULD NOT DRINK ALCOHOLIC BEVERAGES DURING PREGNANCY BECAUSE OF THE RISK OF BIRTH DEFECTS. (2) CONSUMPTION OF ALCOHOLIC BEVERAGES IMPAIRS YOUR ABILITY TO DRIVE A CAR OR OPERATE MACHINERY, AND MAY CAUSE HEALTH PROBLEMS. CONTAINS SULFITES

RULE 26 DISCLOSURE STATEMENT AND DECLARATION OF PAUL W. REIDL

ATTACHMENT B

BUCHALTER
A Professional Corporation
GLENN P. ZWANG (SBN: 112295)
JEFFREY M. JUDD (SBN: 136358)
PETER BALES (SBN: 251345)
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: 415.227.0900
Fax: 415.227.0770
Email:    gzwang@buchalter.com
          jjudd@buchalter.com
          pbales@buchalter.com

BUCHALTER
A Professional Corporation
FARAH P. BHATTI (SBN: 218633)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Fax: 949.720.0182
Email:    fbhatti@buchalter.com

Attorneys for Plaintiff
THE VINEYARD HOUSE, LLC
*Attorneys for Plaintiff, The Vineyard House, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE VINEYARD HOUSE, LLC,** | Case No. 4:19-cv-1424-YGR |
| Plaintiff, | |
| vs. | **RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL** |
| **CONSTELLATION BRANDS U.S. OPERATIONS, INC.,** | |
| Defendant. | |

## RULE 26 DISCLOSURE STATEMENT AND
## <u>REBUTTAL DECLARATION OF PAUL W. REIDL</u>

-1-

## **TABLE OF CONTENTS**

.

Page

TABLE OF CONTENTS ……………………………………………...   2

INTRODUCTION ……………………………………………………   3

EXECUTIVE SUMMARY ………………………………………….....   3

OPINIONS (CISSEL REPORT) …..…………………………………   4

OPINIONS (MCDONALD REPORT) ………………………………   9

ADDITIONAL QUALIFICATIONS …………………………………   10

EXHIBITS ……………………………………………………………   11

COMPENSATION ……………………………………………….....   11

EXHIBIT A …………………………………………………….....   12

EXHIBIT B …………………………………………………….....   14

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

I, Paul W. Reidl, declare as follows:

## INTRODUCTION

1.      My name is Paul W. Reidl.  I am the principal attorney in the Law Office of Paul W. Reidl, located at 25 Pinehurst Lane, Half Moon Bay, California 94019.  I previously submitted a Rule 26 Disclosure Statement and Declaration in this matter on December 16, 2019 ("My Declaration.")  My professional qualifications are summarized in paragraphs 12-21 of My Declaration.

2.      I have been asked by the Plaintiff, The Vineyard House, LLC, ("TVH") to comment on the Expert Witness Reports of Robert F. Cissel ("the Cissel Report") and Dr. Susan McDonald ("the McDonald Report"), both dated December 16, 2019   In addition to those documents and materials reviewed in connection with My Declaration, Counsel for TVH has provided me with, and I have reviewed, the documents referenced in Exhibit A.

3.      My opinions flow from the documents provided to me by counsel for TVH, my own research, and my own knowledge and experience in trademark law, trademark application prosecution, the wine business and in the labeling, marketing, registration and use of trademarks, geographic terms, and historical terms for wine in the United States.

## EXECUTIVE SUMMARY OF OPINIONS

4.      **Cissel Report**. I disagree with Mr. Cissel's conclusion regarding the materiality element of the fraud claim. (See Cissel Report at 10-11.)  He assumes that  the only significance TO KALON had back in 1987 was the fact that H.W. Crabb used it decades earlier" as a trademark, and then concludes that because the trademark "had long since been abandoned" (which had been disclosed to the PTO), the applicant (Robert Mondavi Winery, or "RMW") did not fail to disclose a material fact to the PTO.  The documents identified in Exhibit A show that To Kalon had

-3-

geographic significance at the time of the application, RMW knew that, and this was **not** disclosed to the PTO.  In my opinion, RMW's failure to disclose that **To Kalon** referred to a geographic location of significance to the wine trade in Napa Valley was material, because had that fact been disclosed the application should have been denied.

5.   **McDonald Report**. In my opinion, Dr. McDonald's analysis is theoretical and has little relevance to the wine business.  She assumes that principles and practices applicable in the healthcare, pharmaceutical and technology sectors also apply to the wine business.  Dr. McDonald therefore assumes, without citing any empirical support, that                         TVH's labels and conclude that the references to "To Kalon Vineyard" relate solely to a "brand" rather than a geographic location.  Based on my years of experience in the wine business generally, and with wine marketing and labels in particular, her assumption is incorrect.  As explained in My Declaration, wine is a product of the land.  Wineries include the names of vineyards on labels precisely because they reflect the name of the geographic area on which the wine grapes are grown.  At this price point (i.e. ultra premium wines costing over $150 a bottle), where consumers will exercise caution and care in their purchases, the consumer take away from seeing To Kalon Vineyard on the label is that this is the geographic place where the grapes were grown.  This marketplace reality is bolstered by the facts that others also use To Kalon or To Kalon Vineyard on their labels.

## OPINIONS

**CISSEL REPORT**

6.   ~~One issue in this case is whether To Kalon is a geographic term.~~  In my previous report, I opined that it was.  My Declaration ¶ 14.  ~~It is the name for the historic H.W. Crabb~~

-4-

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

1  property in Napa Valley and it is associated with and known as that specific place by the wine

2  trade and consumers of these wines

3      7.      The Cissel Report discusses the procedures followed by the Trademark Office in

4  examining the To Kalon application in 1987.   In Section V of his report, he opines on the

5  "materiality" element of Plaintiff's fraud claim.  Mr. Cissel states:

6          Nor is the fact that To Kalon was historically used by H.W. Crabb on his winery

7          material.  That mark had long since been abandoned…..  That being the case, the

8          only significance TO KALON had back in 1987 was the fact that H.W. Crabb used

9          it decades earlier.   But, as discussed, the Applicant disclosed that fact to the

10         Examining Attorney so there was no omission of a material fact.

11  Cissel Declaration at 11.

12      8.      I read Mr. Cissel's Report, including the Exhibits attached to it, very carefully and

13  did not find any support for his opinion that: "[T]he **only** significance TO KALON had back in

14  1987 was the fact that H.W. Crabb used it decades earlier." (emphasis added.)  The evidence

15  identified in Exhibit A shows that To Kalon was commonly used in the wine trade to describe a

16  specific geographic location in the Oakville area of Napa Valley.

17      9.      Abandonment of trademark rights is a defined concept in trademark law.  It means

18  that the use of a mark was discontinued by its owner with the intention of not resuming such use.

19  15 U.S.C. § 1127.  If a trademark becomes abandoned, it may be adopted by a third party.  It is not

20  uncommon for businesses to resurrect old, abandoned brands, e.g., MAICO and INDIAN for

21  motorcycles, PINE BROS. for throat lozenges, etc. Vermont Country Store specializes in such

22  resurrected brands. *See* https://www.vermontcountrystore.com/specialty-shops/category/brands-

23  from-the-past.

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

10. ~~In my opinion, geographic terms are different from trademarks. Geographic terms cannot be abandoned because at their core they are the name of a specific place. For example, Mt. McKinley in Alaska is still "Mt. McKinley" even though it is now often referred to as Denali. The same can be said about Ayers Rock/Uluru, Zaire/Congo, British Honduras/Belize, and my home town, Spanishtown/Half Moon Bay. Similarly, Tenochtitlan is still the name of a city state in Mexico even though the Aztec civilization has long since vanished. Yugoslavia and the USSR may no longer exist, but they are still geographic terms.~~

11. Thus, Mr. Cissel has **assumed** that To Kalon has no meaning other than as an abandoned trademark. Then, after setting up this strawman, he knocked it down by observing that the historical **trademark** usage was fully disclosed to the Examining Attorney, and therefore no material facts were withheld from the PTO. Under the scenario described by Mr. Cissel, from a procedural standpoint, everything was perfectly proper because abandoned marks can be used and registered by third parties not associated with the original owner.

12. ~~Every geographic term begins as a coined term, whether it is the French trappers naming the Teton range in Wyoming, the Spanish explorers naming Palo Alto, St. Junipero Serra naming Santa Clara, or Mr. Crabb naming his property To Kolon. The fact that Mr. Crabb was long dead and his business long gone does not eliminate or diminish the legacy left by~~ the ~~geographic term To Kalon. The~~ question Mr. Cissel should have asked is whether at the time of the application, To Kalon was the name of the geographic place known as To Kalon Vineyard, just as Monticello is the name of the Jefferson homestead in Virginia and Mt. Vernon is the name of the Washington homestead on the Potomac. The documents identified in Exhibit A show that the term To Kalon was used to describe the site of the historic Crabb property at the time RMW filed the application, and that Mr. Mondavi knew that To Kalon referred to the historic Crabb property.

The basis of this highlighted opinion is not explained adequately.

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

13.    This is why I disagree with Mr. Cissel's conclusion regarding materiality. Unlike trademarks, geographic terms cannot be abandoned.  Like the Cissel Report, RMW's November 25, 1987 Office Action response ignored the geographic significance of To Kalon in the wine trade and, instead, misrepresented that "TO KALON … has no present meaning or significance in the [wine] trade or industry."  The response implied that the use of To Kalon had ended decades earlier when in fact it was still in use, because people still referred to the property as To Kalon vineyard, including RMW and its President, Robert Mondavi.  The contemporary writings of Mr. Robert Mondavi and others which show that despite the loss of trademark significance, To Kalon was still known as the name of a specific geographic place.  In my opinion this information was material and should have been disclosed to the PTO.

14.    Mr. Cissel places great stock in the regularity of the examination procedures applied to the To Kalon application.  But this proves nothing.  Prior to the creation of the internet, Examining Attorneys relied primarily on the truthfulness of the statements made to them by counsel. Examining Attorneys had few feasible options: with the possible exception of dictionary definitions and gazetteers, reference books, and the NEXUS database, their ability to verify responses to Office Actions was limited.  In marked contrast, today's Examining Attorneys actively verify applicant representations, and frequently base Office Action refusals solely on the information they have obtained from internet .[1]  The resources provided by the internet have resulted in more rigorous examination, and more Office Action refusals.[2]  Thus, the

---

[1]    The TTAB has held that both Applicants and Examining Attorneys may rely on information found on the internet, subject to certain evidentiary considerations. *See Safer Inc. v. OMS Inv. Inc*. 94 U.S.P.Q.2d 1031, 1039 (TTAB 2010).

[2]    Mr. Cissel left the Trademark Office for the TTAB in 1983, prior to the advent of the internet age and its impact on trademark examination procedures.

-7-

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

Examining Attorney who reviewed the November 25, 1987, Office Action response had to accept it at face value even though RMW failed to disclose the geographic nature of the term To Kalon.

15.     Practitioners before the PTO have the same duty of candor as they have in Federal courts.  See 37 C.F.R. Part 11.  RMW's response to the Office Action ignored the geographic nature of To Kalon.  RMW also did not disclose that To Kalon was well-known in Napa Valley as the historical location of one of the Valley's most famous vineyards.  RMW also did not disclose that RMW itself used To Kalon as a geographic term with meaning in the wine business.  In my opinion, this should have been disclosed.  I therefore disagree with Mr. Cissel's conclusion.

16.     Hypothetically, if in 1987 the Examining Attorney had access to the current internet and the use of modern search engines, the search for To Kalon would almost certainly have disclosed the many articles and references to Kalon as the geographic name for the vineyard property in Napa Valley.  In my experience with post internet examination practices, the Examining Attorney probably would not have bothered with the Office Action information request but, instead, would have issued an Office Action refusal based on the findings of her research.  Thus, if the fact that To Kalon was a known geographic place been disclosed, in my experience the Examining Attorney would likely have refused registration.

17.     The fact that the Examining Attorney, and subsequent Examining Attorneys, accepted the specimens of use for To Kalon wine has no bearing on whether it is a geographic term.  Cissel Report pp. 8- 9.  Once a mark is registered, an Examining Attorney who reviews a Section 8 Declaration does not revisit the question of whether the registered mark should have been registered in the first place.[3]  The Examining Attorney simply looks at the specimen, decides

---

[3]     A Section 8 Declaration, 15 U.S.C. § 1058, is a declaration of continuing use which must be filed within the 5th and 6th years of registration, within the 10th year of registration, and every 10 years thereafter.  The Declaration must include a specimen of use.

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

if it depicts the use of the mark on the goods, and if so the Declaration is accepted.  The specimens submitted to the PTO by RMW (and, later, Constellation) were wine bottles/labels containing the term To Kalon.  They should have been approved.  But the relevant question is not whether the specimens were acceptable.  Instead, the relevant question is whether the term should have been registered in the first place due to its geographic nature.  As discussed above, the term would likely have been refused registration if the geographic significance of To Kalon had been disclosed.

**MCDONALD REPORT**

18.　　I did not see anything in the McDonald Report reflecting that she has any experience in the wine business or with wine labels, other than the ambiguous statement that she has worked for alcoholic beverage companies on issues other than labelling and brand communication. (McDonald Report ¶ 4 at p.2).  She concludes, however, that when the typical wine consumer looks at Plaintiff's labels, he or she will conclude that To Kalon Vineyard is a trademark, not a geographic term.  As one with 29 years of experience in wine labels and wine marketing, I disagree with her opinion because it is contrary to the way wines are labeled and marketed.

19.　　As I explained in My Declaration, geographic designations are critically important to wine marketing because wine is a product of the geographic area in which the grapes are grown. (My Declaration ¶¶ 12, 13).  The geographic nature of the vineyard designation is often used as part of the "story" for the wine and is frequently elaborated on in the vintner's web site. (Id. ¶ 25). A vineyard designated wine commands a higher price precisely because of its scarcity and uniqueness.  (Id. ¶ 25).  Wine labels have a very specific architecture that places the vineyard designation (usually in a smaller font) below the brand name.  This is illustrated by the labels in

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

Exhibit C, D and G of My Declaration and in Exhibit B to this Declaration, which consists of representative labels personally downloaded by me from the internet.

20.   The label architecture of Plaintiff's wine is totally consistent with wines that are vineyard designated.  This is done to communicate the terroir to the consumer.  That is why vinters put a vineyard designation on the label   to tell the consumer the geographic location in which the grapes were grown                                                  ($225/bottle.)

21.   As explained in my report, multiple parties use the term To Kalon Vineyard.  (My. Declaration ¶ ¶ 22, 26).  Given the ultra premium price points of wines bearing To Kalon Vineyard,[4] and the historic significance of the term as the name of a vineyard in the Oakville area of Napa Valley, I believe that consumers will conclude that the term is geographic and associated with this specific place.

22.   In my experience in the wine business, everyone assumes that when the label says "X vineyard(s)" below the brand name on a label, the consumer will view that as the name of the geographic place where the grapes are grown.  Consumers will not perceive it as the name of a barn, a crush pad, a fermentation tank, or a wine cellar.  The term" vineyard(s)" is the cue that this is the name of the place where the grapes were grown.

## ADDITIONAL QUALIFICATIONS

23.   According to PTO records, I have prosecuted over 800 trademark applications.  I have appeared in over 250 TTAB cases.  While an Officer of the International Trademark Association, I was responsible for the PTO Subcommittee and was involved in commenting on PTO examination procedures.  During my career I have had numerous meetings with PTO

---

[4]   My research discloses that wines bearing a To Kalon vineyard designation retail in the $150 - $500 range.

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

executives regarding examination procedures and have taught training sessions for the PTO Examining Attorneys.

24. For most of my career at Gallo, I met or spoke with marketing people on almost a daily basis concerning wine marketing and labels. This included the co-founder (Ernest Gallo), his Executive Vice President for Marketing (Albion Fenderson), and the various Vice Presidents, Directors, and Brand Managers. I participated in hundreds of meetings and provided my input (both legal and non-legal). I read and commented-on hundreds of market research documents (focus groups and surveys) regarding consumer perception of wine labels. Following my career at Gallo, I have continued working with winery owners, consultants, and marketing executives on these subjects, particularly in the context of developing new brands. Many of my clients have been Gallo marketing executives.

## EXHIBITS

25. My testimony may be supported by future deposition testimony and the exhibits thereto. If I am asked to develop a demonstrative Exhibit or other Exhibit, I will supplement this Declaration.

## COMPENSATION

26. My fees for this engagement consist of billable hours and expenses. My hourly billing rate for this engagement is $500.

I make this Declaration having been advised of the penalties for perjury on this 8th day of January, 2020, at Half Moon Bay, California.

_____
Paul W. Reidl

-11-

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

# EXHIBIT A

First Amended Complaint and Exhibits

First Amended Answer

USPTO TESS and TTABVUE web sites

Google.com

Expert Report of Robert Cissel and Exhibits


1890-7-15 Pacific Wine & Spirits Review – p. 6

1891-05-04 Pacific Wine & Spirits

1892-5-7 The Breeder & Sportsman

1899-3-4 Sacramento Union – Crabb Obituary

1899-3-4 SF Call Crabb Obituary

1903-03-29 Los Angeles Herald Deaths of the Day E.S. Churchill

1903-03-31 Pacific Wine & Spirits Review Obituary E.S. Churchill

1909-10-01 St. Helena Star Wine and Vine Notes

1910-11-25 ST. HELENA STAR Vine and Vine Notes

1915 Official Napa County Map

1916-08-24 Riverside Daily Press

1916-08-24 SF Chronicle

1917-06-16 NAPA JOURNAL Churchill Case is Settled

1933-12-30 Napa Daily Register

1934-02-14 NAPA JOURNAL

1934-03-26 0R 83-206

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

1944-3-31 ST. HELENA STAR

1951-02-08 SF Chronicle

1961-01-19 SF Chronicle

1966-9-28 To Kalon Taylor to Gould

1969-01-14 LOS ANGELES TIMES

1969-01-14 SF Chronicle Mondavi Winery

1969-02 Wines & Vines

1970-09-24 Robert Mondavi Winery Received F.L. Gould items pertaining to H.W. Crabb

1980 Heintz HW Crabb, Oakville pp. 23-24

1996 Lapsley [sic] Bottled Poetry p. xvii

1998 Mondavi Harvests of Joy pp. 57-59

2008 Sullivan Napa Wine, pp. 87-88

Italian Swiss postcard_front original

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

1

**EXHIBIT B**

2

3

4

5

6



7

8

9



10

11

12

13

14

15

16



17

18

19

20

21

22

23

BN 39098649v1

24

-14-

25

RULE 26 DISCLOSURE STATEMENT AND REBUTTAL DECLARATION OF PAUL W. REIDL

ATTACHMENT C

Timothy J. Carlstedt (SBN 168855) (tcarlstedt@huntonak.com)
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, CA 94111
Tel.: (415) 975-3700
Fax: (415) 975-3701

Edward T. Colbert (ecolbert@huntonak.com)
Erik C. Kane (*Pro Hac Vice*) (ekane@huntonak.com)
William M. Merone (*Pro Hac Vice* pending) (wmerone@huntonak.com)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel.: (202) 955-1500
Fax: (202) 778-2201

*Counsel for Constellation Brands U.S. Operations, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VINEYARD HOUSE, LLC, a California limited liability company, <br><br>     *Plaintiff*, <br><br> v. <br><br> CONSTELLATION BRANDS U.S. OPERATIONS, INC., a New York corporation, <br><br>     *Defendants*. | Case No.: 4:19-cv-1424-YGR <br><br> **STATEMENT OF REBUTTAL PERCIPIENT EXPERT MARK DE VERE** |

I have reviewed the Reports of Doug Frost and of Michael Weis, submitted by Plaintiff The Vineyard House in the matter of T*he Vineyard House v. Constellation Brands US Operations*, No. 4:19-cv-1424-YGR (N.D. Cal 2019), and I am prepared to testify in this matter with respect to the matters contained in those reports.

## I.   Expert Report of Doug Frost

### A.   Opinion #1

Mr. Frost opines that among persons engaged in the wine industry (as opposed to among the general population or even among the wine purchasing public), the term TO KALON is generally understood "as being a specific geographic location in the Oakville AVA…."  He further opines that the alleged specific location has a long history of wine making and grape cultivation.  While I cannot determine from the report just what Mr. Frost means by either "generally understood" or by a "specific geographic location," the implications of this summary opinion are misleading and inaccurate.

It is accurate to say that professionals in the wine business are aware of the term TO KALON, and that they are aware that it is used exclusively on wines made by Robert Mondavi Winery directly or on wines which are made under license from and governed by Constellation Brands (the owner of Robert Mondavi Winery).

Robert Mondavi named his operations and the vineyard on which his facility sits TO KALON in the mid to late 1980s to identify his operations on that site.  However, the recognition attaches to the fact that Robert Mondavi Winery owns and operates the vineyard and applies the name to its products or those of its licensee.  The acreage on which the Robert Mondavi's To Kalon vineyard operates is approximately 550 acres of contiguous land, acquired at different times from different land owners.  Some of that land was owned by persons who at one time used the same trademark (To-Kalon) to identify products sold by such persons (like wine, port, spirits

and the like) or as the name of the company that owned some land in Napa Valley. Among those persons were H.W. Crabb (who called his vineyard Hermosa Vineyard until 1886, when he first adopted the name To-Kalon Wine Company for his operations). Others included the Churchills. I am unaware of any map during the 19th Century which applied the name TO KALON to any land. That is, use of that name can and did change, as did ownership change. Vineyard operations or company ownership of the land ranged from just over 100 acres to nearly 2000 acres, as the ownership of land or of companies changed. Even into the 20th Century that same pattern holds true. Land owned by Mr. Crabb's To-Kalon Wine Company, when sold to another, adjacent winery (e.g., Beaulieu Vineyards) was designated BV-04 for nearly fifty years and was not called To Kalon by that famous winery.

Perhaps the best-known example of this difference between brand and land can be seen in the more recent resurrection of two other 19th Century wineries: Inglenook and Far Niente. Inglenook was founded by famed pioneer Gustave Neibaum, a contemporary of H.W. Crabb. The INGLENOOK trademark was a well-known and nationally distributed wine brand used by Mr. Neibaum. In and around 1964, the brand was sold off by the owners of INGLENOOK and so, when Francis Ford Coppola purchased the Neibaum Estate, including what was at one time called "Inglenook" by Mr. Neibaum, ~~he could not use the "INGLENOOK" trademark on his wines, even as a vineyard designation.~~[1,2,3] In the case of FAR NIENTE, that was founded by John Benson, and passed out of use until Gil Nickel purchased the winery and resurrected the

---

[1] Exhibit A, Filewrapper for US Trademark, Registration No. 599456 (INGLENOOK), December 14, 1954, available at http://tsdr.uspto.gov/#caseNumber=%2071658614&caseType=SERIAL_NO&searchType=statusSearch (accessed Jan. 7, 2020).
[2] Exhibit B, "History," Inglenook, available at https://www.inglenook.com/story/history (accessed Jan. 7, 2020).
[3] Exhibit C, L. Pierce Carson, *Coppola reunites Inglenook trademark with historic Rutherford wine estate*, Napa Valley Register (Apr. 14, 2011), available at https://napavalleyregister.com/news/local/coppola-reunites-inglenook-trademark-with-historic-rutherford-wine-estate/article_4b7846aa-66ee-11e0-a8ff-001cc4c03286.html (accessed Jan. 7, 2020).

name.[4]  The current Far Niente is almost completely surrounded by Robert Mondavi Winery's To Kalon vineyard, ~~but Far Niente is not and cannot designate itself TO KALON, any more than Robert Mondavi Winery can use FAR NIENTE in its business~~.

> I was not aware; nor do I know anyone in the wine business who was aware

Until Mr. Mondavi picked that name for his operations and promoted it through diligent marketing, publications and distribution of wines under that trademark, ==the name was virtually unknown, even among persons engaged in the business of wine==.  ~~The reference may be identified geographically solely by virtue of ownership of the vineyards to which the brand applies, and not for any other reason.~~  The known geographic region designations which would apply to the Robert Mondavi Winery To Kalon Vineyard are OAKVILLE, NAPA VALLEY, or NORTH COAST, which are AVAs, or NAPA COUNTY and CALIFORNIA, which are appellations.

In his report, Frost also states that "initial point – that To Kalon generates significant discussion – is demonstrated by using 'To Kalon' as an internet search term and comparing the number of hits with the number of hits obtained by using search terms of other well-known areas and vineyards within Napa Valley."  This demonstration, however, is flawed.  First, Frost's searches for "Carneros AVA" and "Stags Leap AVA" are made narrow and specific to the wine industry by the inclusion and specific juxtaposition of the term "AVA" (a wine industry term).  In contrast, the search for "To Kalon" is presented as just two words without context, and one of them is the word "to," an extremely common word in the English and other languages.

**B.**     **Opinion #2**

Frost states that "for over 30 years that I am aware of, TO KALON has referred to as "an area within Napa Valley that generates significant discussion in the wine industry…."  I would not disagree that the knowledge of TO KALON and the discussions about TO KALON are all

---

[4] Exhibit D, "Wine History," Far Niente, available at https://farniente.com/napa-wine-estate/winery-history/ (accessed Jan. 7, 2020).

within the last 30 years (33 this year), as it was exclusively Robert Mondavi Winery, which includes its licensee, that used the name for its wines and its vineyard operations. ~~There was likely almost no one~~ who knew about the H.W. Crabb historic use until Mr. Mondavi resurrected the name and began to promote it as his brand. I also agree that the Robert Mondavi Winery produces some of the "…best grapes and wines in California…." Robert Mondavi Winery has actively worked to build the value of its TO KALON trademark. As any brand owner would do, Robert Mondavi Winery has worked diligently to let the wine industry and consumers know that its product is amongst the best in the industry.

Further, the grape production is a highly managed and closely monitored operation to which many factors contribute. The making of wine is even more subject to human intervention with the wine maker being a dominant influence. For this reason, competition for top wine makers exists, and two different wine makers could and often do create wines with different profiles even if taking grapes from the same appellation, AVA or vineyard. I disagree with suggestion that TO KALON refers to a specific area within Napa Valley other than as an area of land operated or managed by Robert Mondavi Winery. The vineyard operations and the wine making materials used at the Robert Mondavi Winery and the wine made from those materials varies even within Robert Mondavi Winery's own operations, depending as it does on year, seasonality, vine age and numerous other factors not known until harvest.

**C.    Opinion #3**

Mr. Frost opines that the ability to use the name "TO KALON" is valuable to a winery or wine maker. This is absolutely true. The name TO KALON has gathered enormous goodwill and recognition among consumers exclusively through the efforts of and use by Robert Mondavi Winery, which includes its licensee, for the last 32+ years. ~~It is no doubt for this reason that Plaintiff in this action seeks to use Robert Mondavi Winery's brand and confuse consumers, as~~

~~well as the trade.  It would elevate the reputation of Plaintiff's wines immediately, while eroding and possibly destroying the value of Robert Mondavi Winery's brand.  However, Mr. Frost's opinion applies equally to unauthorized uses of any wine brand of note, such as FAR NIENTE, GROTH, STAGLIN FAMILY, and INGLENOOK, the use of any of which would be of great value to a wine maker.~~

Use of specific vineyard names is common among wine producers, particularly as it relates to high end, or luxury, wines.   As a result of the wine making skill of the owners of these name/marks, specific sub-brands of wine have come to be well known and enjoy great acceptance by the wine consuming public and therefore among some of the most valuable property rights of the operators of those facilities.  There is no vineyard registry provided for in the United States and ~~so the sole means of protecting the valuable trademarks used by wine makers to identify their vineyards and products is trademark protection~~.   For example, a search of the U.S. Patent and Trademark Office records reveals many, many registrations that include the word VINEYARD for use in connection with "wine," including MARTHA'S VINEYARD, JOHN C. SULLENGER VINEYARD, and FAY VINEYARD.[5]  These are among some of the best known and most widely recognized single vineyard trademarks for California wines.

Robert Mondavi registered TO-KALON over 30 years ago ~~and has been the sole person entitled to use or license that mark for wines or for single vineyard designations~~.  To this day only wines made by Robert Mondavi Winery directly, or by a person under license from and governed by Constellation Brands (the owner of Robert Mondavi Winery), have used TO KALON in connection with wines.

**D.    Opinion #4**

Mr. Frost opines similarly that "To Kalon" has been associated with "ultra-premium and

---

[5] Exhibit E (trademark search results), Exhibit F (exemplary "VINEYARD" trademark registrations and specimens).

luxury premium wines."  I agree that wines made by Robert Mondavi Winery or under license from Robert Mondavi Winery are all considered premium or luxury wines. There are no other wines sold under the TO KALON brand, but Robert Mondavi Winery made wines or Robert Mondavi Winery licensed wines.  All of that goodwill – ~~goodwill which the Plaintiff wants to usurp for itself –~~ attaches to Robert Mondavi Winery and its operations.  It was Robert Mondavi, a pioneer of the California wine industry and considered the visionary who put California Cabernet Sauvignon wines "on the map," who created that association of TO KALON with great wines.  And the reason that TO KALON only appears on "ultra-premium and luxury wines" is not by accident, but rather because Constellation Brands (the owner of Robert Mondavi Winery) only uses TO KALON on luxury wines and has diligently managed and licensed the TO KALON trademark so it only appears on high-end wines.

**E.    Opinion #5**

Mr. Frost here opines on the TTB rules and regulations and purports to apply them to his opinion.  I agree that when a specific vineyard designation is used, at least 95% of the primary wine making materials must come from that "vineyard."  However, it is up to the winery to determine what it calls its vineyard, and it is not connected to any regulatory determined "area" or "land."  Moreover, the vineyard does not have to be owned by the wine maker in order for that wine maker to use materials in its wine and to consider it as part of the 95%.  There is no "area" called TO KALON.

**F.    Opinion #6**

Mr. Frost states that he is aware of the use of TO KALON by at least 17 wineries that "market wines as originating from To Kalon."  I do not see any specific listing in Mr. Frost's report, but I am specifically aware that there are two categories: a number of small, highly regarded wineries operating under license from Robert Mondavi Winery, through Robert

Mondavi Winery's licensee Beckstoffer; and, in recent years, Schrader Cellars, which is wholly owned by the parent corporation of Constellation Brands.  Each licensee or sublicensee is strictly limited as to quality and volumes permitted under the license, which uses are monitored by Constellation Brands for compliance.

## II.    Expert Report of Michael Weis

### A.    Opinion #1

In his report, Mr. Weis states that "To Kalon is generally understood within the wine industry [to]… refer to a specific geographic location in the Oakville AVA."  There is no "geographic location" called TO KALON.  As explained at length above, any understanding of the name To Kalon in the wine industry is due to Robert Mondavi Winery's building awareness within the wine industry of its vineyard and its trademarked name.  Robert Mondavi Winery, which includes its licensee, has deliberately and actively built awareness of its brand and has associated that brand with Robert Mondavi Winery's vineyard.

### B.    Opinion #2

Mr. Weis states that "the name 'To Kalon' to mean that the wine came from grapes grown on the lands formerly owned and operated by the To Kalon Vineyard Company."  As stated above, any understanding of the name To Kalon in the wine industry is due to Robert Mondavi Winery's, which includes its licensee, telling the story behind Robert Mondavi Winery's TO KALON brand.  Robert Mondavi Winery started using the name TO-KALON (and later TO KALON) on its wines in the 1980s, and the name TO KALON was not generally known within the industry prior to that point.

### C.    Opinion #3

I agree with Mr. Weis that TO KALON wines made by Robert Mondavi Winery or under license from Robert Mondavi Winery are all considered premium or luxury wines. However, as

explained above, there are no other wines sold under the TO KALON brand, but those made by Robert Mondavi Winery or under license from Robert Mondavi Winery, which is why the name TO KALON is associated with premium or luxury wines.

### D.     Opinion #4

Mr. Weis alleges that TO KALON has only achieved fame and relevance only based on Crabb's and Churchill's use of that name (well over 60 years ago).  This is inaccurate.  Until Robert Mondavi Winery began promoting its TO KALON vineyard and trademark, the public was generally unaware of the TO-KALON name used by Crabb and Churchill.  The current reputation of the TO KALON name is the direct result of Robert Mondavi Winery's and its licensee's use of that trademark, which, for the past 30 years, has been used in connection with the high-quality wines.

### E.     Opinion #5

Mr. Weis states that wine sold under the TO KALON name command a premium price because of the high-quality nature of the wine.  The reason it commands such a price is, because Robert Mondavi Winery's vineyard operations, and the wine making materials used at the Robert Mondavi Winery, and by its closely controlled licensee, are of the highest quality.  These strictly innovative, strictly controlled, and expertly crafted wines created an extraordinary reputation for the TO KALON brand and is the reason such wine can command a high price.

### F.     Opinion #6

Mr. Weis states that "'To Kalon' designation are able to command a premium price as compared with similar Constellation Brand wines (*i.e.,* same winemaker, same vintage, and same varietal) marketed without the 'To Kalon' designation."  As stated previously, the reason TO KALON wine commands such a price is, because Robert Mondavi Winery, which includes its licensee, has actively worked to build the value of its TO KALON trademark.  Beyond the

1    reputation that Robert Mondavi Winery has built in its TO KALON brand, the price of its TO

2    KALON wines are the result of a variety of factors, including, different profiles, different

3    reputations, and different consumer appeal.

4

5

6                        Respectfully submitted this 8th day of January 2020,

7

8                                                    *Mark de Vere*

9                                                    Mark de Vere

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

January 8, 2020

**Via Email**

Glenn P. Zwang
Peter Bales
Buchalter
55 Second Street
Suite 1700
San Francisco, California 94105
gzwang@buchalter.com
pbales@buchalter.com

      Re:      *The Vineyard House v. Constellation Brands U.S. Operations, Inc.*
                         *Case No.: 4:19-cv-1424-YGR*

Dear Glenn and Peter:

As requested, I supplement my percipient witness notice consistent with the Federal Rules of Civil Procedure, as a lay expert witness.  In addition to my personal details of employment and education, set out in the letter of December 16, and as testified during my deposition of December 20, 2019, I am prepared to testify about geographic significance in the wine business, including the elements that would be relevant to determining an American Viticultural Area (AVA), such as Oakville and similar AVAs and appellations such as Napa Valley.

In the wine business, the TTB oversees and protects the use of geographic appellations when they are official political regions or when they are American Viticulture Regions (AVAs) ~~but only trademark law protects the names of vineyards~~.  For example, use of a political designation such as the state of California means that 100% of the grapes must be grown within that officially designated region; a political designation such as a county, e.g. Napa County, means that at least 75% of the grapes must come from within that county; use of an AVA, e.g. Napa Valley or Oakville, means that at least 85% of the grapes have come from within that legally defined area.  Thus, the names "California", "Napa County", "Napa Valley", or "Oakville", and their use on wines, are officially defined, and protected by the TTB.  ~~However, the names of vineyards are not protected in this way.  Thus, the owner of a vineyard name can only protect their vineyard name through trademark enforcement.~~

==The concept of a geographically significant area requires some definite boundaries.== ==In the case of political regions such as "California" or "Napa County", these boundaries are defined by legal maps.  In the case of AVAs, these boundaries are generally formed by geological features such as mountains, valleys, alluvial fans, rivers and similar identifiable features of the land.== Within any given appellation or AVA, there are almost always multiple owners of vineyard operations or winery operations, often immediately adjacent to each other. ==While there can be differences in the nature of the vineyards within an AVA or appellation, they will often be of a subtle nature and often the product of stewardship of the vineyard, growing history, vines planted and other non-geological elements.== In particular, the Robert Mondavi Winery To Kalon Vineyard is located within, and a part of, the Oakville AVA and Napa Valley AVA and is not geographically distinct from its neighbors in the same AVA.

Neither the United States nor California have vineyard registration or recordation requirements ~~nor opportunities, and so the only way to protect the name and identity of a vineyard operation is through trademark law.  There are thousands of vineyard operations in the state of California, and I believe that the name of every one of them would be protected as a trademark, if the names meet the other requirements of trademark law.  Trademark law is the only way for those operations to protect their names.  Examples in Napa would include Hyde Vineyard, Dr. Crane Vineyard, or Fay Vineyard.~~  A ==“Vineyard” is a complex concept incorporating not just the physical location of the vines, but ownership, stewardship and the like and is subject to change as ownerships change.  Indeed, it is not unusual for a well-known brand to be separated from the original vineyard used at the commencement of wine making.==

In the wine business, trademarks (and/or brands) are critical to identifying the source of the wines, and by “source” I refer to the winery producing the wine, which is not the same thing as a vineyard.  For example, Inglenook was a famous estate in Rutherford, Napa Valley, in the 19th Century, founded by Gustave Niebaum.  However, for many years, wines were made and sold under the trademark “Inglenook” by Hublein, Canandaigua, and then by The Wine Group even though they had no connection to the vineyard originally planted by Gustave Niebaum in the 19th century.  In 2011, the current owner of the land where the 19th Century winery had stood, Francis Ford Coppola, bought back the trademark “Inglenook”.  ~~Only then could the current winery on that site produce wines under the name that the original business on that site had used.~~  Even today the Inglenook vineyard or Inglenook Winery is not the same as the Neibaum operation of the 19th Century, but the brand is wholly owned and recognized in the wine business as belonging to the Francis Ford Coppola family business.

~~Unless the vineyard names and designations are protected by trademark law, there would be nothing to stop the proliferation of uses of successful brands by other businesses.  There would be no way to stop others from using the names associated with famous prestigious vineyards.  By way of example, “Martha’s Vineyard” or “Fay Vineyard” are all well-known and valuable vineyard designations.  Permitting use by persons other than the owners of those names would lead to confusion of the public as to the source of the wine.~~

==The concept of a vineyard is not the same thing as the “land” on which at any given time grapes may be grown as the land can change hands and pass in or out of use as part of a vineyard designation.==  For example, Mr. H.W. Crabb owned land in Oakville and traded under the name To Kalon for about 13 years, from 1886 to 1899.  ==Long after Mr. Crabb’s death, and long after the To Kalon name had stopped being used on wines,== Beaulieu Vineyards (“BV”), purchased a large piece of that land, and owned it for about 50 years, during which time it was commonly known as “BV-4”.  ==When Mr. Beckstoffer bought that land from BV in 1993, he did not get the right to call wine from that land “BV”, “BV-4” or “Beaulieu Vineyards”, even though that vineyard had previously been owned by a business with that name, and that vineyard had been commonly known as “BV 4”.  BV and Beaulieu Vineyards remained trademarks of the trademark owner, BV, when they sold the land.  The trademark is separate from the real estate.  Had Mr. Beckstoffer called the vineyard BV-04, it would have confused consumers into believing that the vineyard was still owned and operated by BV.==

~~Quite simply, I am unaware of any instance in California or the United States where the name of a recognized vineyard is not considered the property of the owner and protected by trademark law.~~

Yours truly,

Mark de Vere