TIMOTHY J. CARLSTEDT (STATE BAR NO. 168855)
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, California 94111
Telephone: (415) 975-3700
Facsimile: (415) 975-3701

EDWARD T. COLBERT (STATE BAR NO. DC-206425)
ERIK C. KANE (STATE BAR NO. DC-495156)
WILLIAM M. MERONE (State Bar No. DC-458104)
ARMIN GHIAM (State Bar No. DC-219290)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel.: (202) 955-1500
Fax: (202) 778-2201

*Counsel for Defendant and Counterclaim-Plaintiff,*
*Constellation Brands U.S. Operations, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VINEYARD HOUSE, LLC, a California limited liability company,<br><br>        Plaintiff and Counterclaim-Defendant,<br><br>    v.<br><br>CONSTELLATION BRANDS U.S. OPERATIONS, INC., a New York corporation,<br><br>        Defendant and Counterclaim-Plaintiff. | **CASE NOS.:  4:19-cv-01424-YGR<br>                      4:20-cv-00238-YGR**<br><br>**DEFENDANT CONSTELLATION BRANDS U.S. OPERATIONS, INC.'S PROPOSED FINDINGS OF FACTS / CONCLUSIONS OF LAW** |

Pursuant to this Court's September 2, 2020 Order (ECF 176) Defendant, Constellation Brands U.S. Operations, Inc., a New York corporation ("Constellation"), submits the following proposed findings of fact and conclusions of law.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**TABLE OF CONTENTS**

I.    PROPOSED FINDINGS OF FACT ................................................................. 1

    A.    Procedural Background........................................................................ 1

    B.    The Parties ........................................................................................... 3

    C.    Constellation's TO KALON Marks and Wine .................................... 3

    D.    H.W. Crabb's Forgotten To Kalon Brand........................................... 6

    E.    Robert Mondavi Winery's TO KALON and TO KALON VINEYARD
       Registrations ...................................................................................... 14

    F.    Robert Mondavi Winery's TO KALON and TO KALON VINEYARD
       Wine's Success .................................................................................. 15

    G.    Constellation's Licensing Program................................................... 17

    H.    The Vineyard House and The Vineyard House's Infringement of the TO
       KALON Marks ................................................................................... 20

II.   PROPOSED CONCLUSIONS OF LAW ..................................................... 31

    A.    TVH has Infringed Constellation's TO KALON Marks .................... 32

        1.    Constellation TO KALON Marks and Registrations are Valid and
            Protectable................................................................................ 33

            a)    Constellation's Registrations are Incontestable ................. 33

            b)    The TO KALON Designation is Not Geographically
                Descriptive ....................................................................... 33

        2.    Constellation has Priority in the TO KALON Marks .................... 37

        3.    TVH's Use of the TO KALON Marks Will Cause Confusion as to
            Sponsorship............................................................................. 37

            a)    Strength of Constellation's TO KALON Marks (Factor 1)................ 38

                (1)    The TO KALON Marks are Conceptually Strong.................. 38

                (2)    The TO KALON Marks are Commercially Strong ............... 40

            b)    The Proximity or Relatedness of the Goods or Services (Factor
                2) ...................................................................................... 42

            c)    Similarity of the Marks (Factor 3) .................................... 43

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

d) Evidence of Actual Confusion (Factor 4) ........................................... 47

e) Marketing Channels (Factor 5) ......................................................... 49

f) Degree of Care (Factor 6) ................................................................. 50

g) TVH'S Intent in Selecting its Marks (Factor 7) ............................... 52

h) Expansion of TVH's TO KALON Marks (Factor 8) ......................... 55

i) The Balance of *Sleekcraft* Factors Favors Constellation .................... 55

j) TVH's Actions Were Willful ............................................................. 56

B. TVH'S Promotion of Its Wine as Associated With the "Historic" TO KALON Constitutes False Advertisement ....................................................................... 56

C. TVH's Affirmative Defenses and Counterclaims Fail ....................................... 60

1. Constellation's Registrations Were Not Procured Through Fraud ................ 60

2. Constellation Rigorously Monitors Use of Its TO KALON Marks ................ 62

3. TVH's Actions are Not "Fair Use" ................................................. 67

D. TVH's False Advertising Claim Must Fail. ....................................................... 70

III. THE ISSUANCE OF AN INJUNCTION IS WARRANTED ............................................ 73

IV. CONSTELLATION IS ENTITLED TO THEIR ATTORNEYS' FEES UNDER THE LANHAM ACT ..................................................................................................... 77

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, CA 94111

## TABLE OF AUTHORITIES

**Page(s)**

**OTHER CASES**

*2Die4Kourt v. Hillair Capital Mgmt., LLC*
   692 F. App'x 366 (9th Cir. 2017) ...................................................................................76

*A.J. Canfield Co. v. Vess Beverages, Inc.*
   612 F. Supp. 1081 (N.D. Ill. 1985) .................................................................................45

*A.L.M.N. v. Rosoff*
   104 Nev. 274 (1988) .......................................................................................................32

*Accuride Int'l, Inc. v. Accuride Corp.*
   871 F.2d 1531 (9th Cir. 1989) .........................................................................................40

*Adidas Am., Inc. v. Skechers USA, Inc.*
   149 F. Supp. 3d 1222 (D. Or. 2016) ...............................................................................76

*Adolphe Lafont, S.A. v. Societa Azioni Confezioni Sportive Ellera, S.p.A.*
   228 USPQ 589 (TTAB 1985) ..........................................................................................60

*Already, LLC v. Nike, Inc.*
   568 U.S. 85, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) .................................................63

*Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*
   367 F. Supp. 3d 1072 (N.D. Cal. 2019) ..........................................................................56

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*
   926 F.2d 829 (9th Cir. 1991) ...........................................................................................42

*American Home Prods. Corp. v. Johnson & Johnson*
   577 F.2d 160 (2d Cir. 1978)............................................................................................59

*Americana Trading Inc. v. Russ Berrie & Co.*
   966 F.2d 1284 (9th Cir. 1992) ...................................................................................45, 47

*AMF, Inc. v. Sleekcraft Boats*
   599 F.2d 341 (9th Cir. 1979) ....................................................................................passim

*Anticipated Testimony of John Jarosz. Skydive Arizona, Inc. v. Quattrocchi*
   673 F. 3d 1105 (9th Cir. 2012) ...........................................................................23, 29, 59

*Arcsoft, Inc. v. Cyberlink Corp.*
   153 F. Supp. 3d 1057 (N.D. Cal. 2015) ..........................................................................74

*Blue Magic Prods., Inc. v. Blue Magic, Inc.*
   No. Civ. S-001155WBSJFM, 2001 WL 34098657 (E.D. Cal. Sept. 5, 2001) ...............63

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, CA 94111

*Boulan S. Beach Master Ass'n, Inc. v. Think Properties, LLC*
   617 F. App'x 931 (11th Cir. 2015) ..............................................................75

*Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*
   174 F.3d 1036 (9th Cir. 1999) ........................................................... passim

*Caesars World, Inc. v. Milanian*
   247 F. Supp. 2d 1171 (D. Nev. 2003) .........................................................48

*Cleary v. News Corp.*
   30 F.3d 1255 (9th Cir. 1994) .......................................................................32

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*
   142 F.3d 1127 (9th Cir. 1998) .....................................................................42

*E & J Gallo Winery v. Grenade Beverage LLC*
   No. 1:13-cv-0070-AWI-SAB, 2014 WL 4073241 (E.D. Cal. Aug. 15, 2014) ......................76, 77

*eBay Inc. v. MercExchange, L.L.C.*
   547 U.S. 388 (2006) .....................................................................................73

*Edwin K. Williams & Co. v. Edwin K. Williams & Co.-E.*
   542 F.2d 1053 (9th Cir. 1976) ...............................................................62, 63

*Entrepreneur Media, Inc. v. Smith*
   279 F.3d 1135 (9th Cir. 2002) .....................................................................53

*FreecycleSunnyvale v. Freecycle Network*
   626 F.3d 509 (9th Cir. 2010) .............................................................62, 63, 64

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*
   826 F.2d 837 (9th Cir. 1987) .......................................................................73

*GoTo.com, Inc. v. Walt Disney Co.*
   202 F.3d 1199 (9th Cir. 2000) ...............................................................53, 55

*H-D U.S.A., LLC. v. SunFrong, LLC*
   311 F. Supp.3d 1000 (E.D. Wisc. 2018) .....................................................45

*Hokto Kinoko Co. v. Concord Farms, Inc.*
   738 F.3d 1085 (9th Cir. 2013) .........................................................64, 65, 66

*IC Mktg., Inc. v. The Taunton Press, Inc.*
   No. 03-cv-3069-CO, 2005 WL 503180 (D. Or. Mar. 3, 2005) .....................74

*In re Bose*
   580 F.3d at 1243 .................................................................................34, 60

*In re Cotter & Co.*
   228 USPQ 202 (TTAB 1985) ......................................................................34

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Pebble Beach Co.*
   19 USPQ 2d. 1687 (TTAB 1991) ......................................................................34

*In re Societe Generale des Eaux Minerales de Vittel, S.A.*
   824 F.2d 957 (Fed. Cir. 1987) ........................................................................35

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*
   559 F.3d 985 (9th Cir. 2009) ..........................................................................77

*Isle of Capri Casinos, Inc. v. Flynt*
   No. 216 Civ. 06148CASMRWX, 2016 WL 6495380 (C.D. Cal. Nov. 1, 2016) ..........................48

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*
   304 F.3d 829 (9th Cir. 2002) ..........................................................................72

*JL Beverage Co., LLC, v. Jim Bean Brand Co.*
   828 F.3d 1098 (9th Cir. 2016) ................................................................... passim

*Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*
   735 F.3d 735 (7th Cir. 2013) ..........................................................................75

*Kreation Juicery, Inc. v. Shekarchi*
   No. 14 Civ. 658-DMG, 2014 WL 7564679 (C.D. Cal. Sept. 17, 2014) ..........................44

*Kwan Software Eng., Inc. v. Foray Tech., LLC*
   2014 WL 572290 (N.D. Cal. 2014) ....................................................................71

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*
   762 F.3d 867 (9th Cir. 2014) ..............................................................38, 42, 43, 47

*Lindy Pen Co. v. Bic Pen Corp.*
   796 F.2d 254 (9th Cir. 1986) ..........................................................................42

*Logan v. Burgers Ozark Cty. Cured Hams Inc.*
   263 F.3d 447 (5th Cir. 2001) ..........................................................................59

*Marketquest Group, Inc. v. Bic Corp.*
   862 F.3d 927 (9th Cir. 2017) ......................................................................33, 52

*Meeker v. Meeker*
   2004 WL 2457793 (N.D. Cal. 2004) ..................................................................68

*Monster Energy Co. v. Bestup LLC*
   395 F. Supp.3d 1334 (E.D. Cal. 2019)................................................................43

*NEO4J, Inc. v. Purethink, LLC*
   No. 5:18-cv-07182-EJD, 2020 U.S.P.Q.2d 10560, No. *7 (May 21, 2020 N.D. Cal. 2020)..........................................................................................63, 64

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*
   638 F.3d 1137 (9th Cir. 2011) ........................................................................47

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*Nova Wines, Inc. v. Adler Fels Winery LLC*
467 F. Supp. 2d 965 (N.D. Cal. 2006) ...................................................................51

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*
809 F.2d 601 (9th Cir. 1987) ...............................................................................38

*Official Airline Guides, Inc. v. Goss*
6 F.3d 1385 (9th Cir. 1993) .................................................................................51

*Omega Importing Corp. v. Petri–Kine Camera Co.*
451 F.2d 1190 (2d Cir.1971) ...............................................................................51

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*
578 F.3d 1154 (9th Cir. 2009) .............................................................................37

*OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.*
897 F.3d 1008 (9th Cir. 2018) .............................................................................60

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*
469 U.S. 189 (1985) .............................................................................................33

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*
227 F.3d 489 (5th Cir. 2000) ...............................................................................59

*Pom Wonderful LLC v. Hubbard*
775 F.3d 1118 (9th Cir. 2014) ..........................................................38, 40, 47, 53

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*
No. 13 Civ. 0512 AG, 2014 WL 12567147 (C.D. Cal. Dec. 31, 2014)................49

*Rann Pharmacy, Inc. v. Shree Navdurga LLC*
2016 WL 6876350 (E.D. Pa. 2016) .....................................................................39

*Rearden LLC v. Rearden Commerce, Inc.*
683 F.3d 1190 (9th Cir. 2012) .............................................................................42

*Rice v. Fox Broad. Co.*
330 F.3d 1170 (9th Cir. 2003) .............................................................................57

*Rio Properties, Inc. v. Rio Int'l InterLink*
284 F.3d 1007 (9th Cir. 2002) .............................................................................77

*Sam Liang v. Van Nguyen*
No. 08 Civ. 8211 PSG (JCX), 2009 WL 10671183 (C.D. Cal. Feb. 5, 2009)........49, 50

*Scotts Co. v. United Indus. Corp.*
315 F.3d 264 (4th Cir. 2002) ...............................................................................71

*Southland Sod Farms v. Stover Seed Co.*
108 F.3d 1134 (9th Cir.1997) ........................................................57, 58, 70, 71

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, CA 94111

*Stanley Black & Decker, Inc. v. D&L Elite Investments, LLC*, No. 12-CV-04516-SC
2014 WL 3728517 (N.D. Cal. July 28, 2014)................................................................56

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*
862 F.3d 1131 (9th Cir. 2017) ......................................................................................38

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*
875 F.3d 426 (9th Cir. 2017) ...................................................................................40, 42

*Switchmusic.com Inc. v. U.S. Music Corp.*
416 F. Supp. 2d 812 (C.D. Cal. 2016) ..........................................................................32

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.*
569 F.2d 731 (2d Cir. 1978)...........................................................................................51

*Time Warner Cable, Inc. v. DIRECTV, Inc.*
497 F.3d 144 (2d Cir. 2007)...........................................................................................71

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*
60 F.3d 27 (2d Cir. 1995)...............................................................................................74

*Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*
No. 14-cv-1847-JAD-VCF, 2015 WL 6501228 (D. Nev. Oct. 26, 2015) ....................76

*Transgo, Inc. v. Ajac Transmission Parts Corp.*
768 F.2d 1001 (9th Cir. 1985) .......................................................................................66

*Truong Giang Corp. v. Twinstar Tea Corp.*
2007 WL 1545173 (N.D. Cal. 2007) .............................................................................43

*U.S. Jaycees v. Philadelphia Jaycees*
639 F.2d 134 (3d Cir. 1981)...........................................................................................63

*United States Olympic Comm. v. Xclusive Leisure & Hospitality Ltd.*
2008 WL 3971120 (N.D. Cal. 2008) .............................................................................52

*Utah Medical Prod. v. Clinical Innovations*
79 F.Supp.2d 1290 (D. Utah 1999)................................................................................71

*Wallack v. Idexx Labs., Inc.*
No. 11CV2996-GPC KSC, 2015 WL 5943844 (S.D. Cal. Oct. 13, 2015) ....................64

*Water Pik, Inc. v. Med-Systems, Inc.*
No. 10 Civ. 01221, 2012 WL 2153162 (D. Colo. June 13, 2012), *aff'd, Water Pik,
Inc. v. Med-Sys., Inc.*, 726 F.3d 1136 (10th Cir. 2013)...........................................48, 49

*Wells Fargo & Co. v. ABD Ins. & Financial Srvcs.*
758 F.3d 1069 (9th Cir. 2014) .......................................................................................57

*Williams v. Gerber Prods. Co.*
552 F.3d 934 (9th Cir. 2008) .........................................................................................71

*Winter v. Natural Res. Def. Counsel*
    555 U.S. 7 (2008) ...........................................................................................................................74

*Yellow Cab Co./Sacramento v. Yellow Cab/Elk Grove*
    419 F.3d 925 (9th Cir. 2005) .......................................................................................................33

**FEDERAL STATUTES**

15 U.S.C. 1115(b) ...........................................................................................................................70

15 U.S.C. § 1052(e) .........................................................................................................................35

15 U.S.C. § 1057(e) ...........................................................................................................................5

15 U.S.C. § 1065 .......................................................................................................................passim

15 U.S.C. § 1114 .......................................................................................................................2, 31

15 U.S.C. § 1114(1), 1125(a) ........................................................................................................32

15 U.S.C. § 1115 .............................................................................................................................33

15 U.S.C. § 1115(b) ...........................................................................................................6, 33, 34, 71

15 U.S.C. § 1115(b)(4) .......................................................................................................37, 67, 69

15 U.S.C. §§ 1115(b), 1125(a) ......................................................................................................70

15 U.S.C. § 1116(a) .........................................................................................................................73

15 U.S.C. § 1117(a) .........................................................................................................................77

15 U.S.C. § 1125(a) ......................................................................................................................1, 31

15 U.S.C. § 1125(a)(1) ....................................................................................................................33

15 U.S.C. § 1125(a)(1)(a) ...........................................................................................................2, 32

15 U.S.C. § 1125(a)(1)(b) ......................................................................................................2, 31, 56

15 USC § 1114(1)(a) ...................................................................................................................32, 33

Lanham Act ...............................................................................................................................passim

Lanham Act, 15 U.S.C. § 1051 *et seq.* ..........................................................................................55

Lanham Act § 32 .............................................................................................................................32

Lanham Act § 43(a) ...........................................................................................................32, 59, 70, 72

Trademark Act of 1920 ...............................................................................................................9, 10

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**CALIFORNIA STATUTES**

Cal. Bus. & Prof. Code § 17200 ................................................................32

California Business & Professions Code § 17200 et seq. .......................... passim

California Business & Professions Code § 17500 et seq. ........................1, 31

California State Law .................................................................................55

**OTHER STATUTES**

IC 033............................................................................................................5

**OTHER AUTHORITIES**

37 C.F.R. § 2.33(a)......................................................................................37

"A 'Napa Valley Food & Wine Experience' Hosted by Jeremy Nickel" (the "TSF Event")...........................................................................26, 27, 30, 31

Century. *Anticipated Testimony of David Reibstein* ...................................6

Deven R. Desai, *From Trademarks to Brands*, 64 Fla. L. Rev. 981, 996 (July 2012) .......................41

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1.50 (2015)....................................................................................32, 75

Julie C. Frymark, Note, *Trademark Dilution: A Proposal to Stop the Infection from Spreading*, 38 Val. U. L. Rev. 165, 173 (2003) .................................41

L.R. 54-5 ....................................................................................................77

March 1980. *Anticipated Testimony of Mark de Vere* ...............................11

*Testimony of Jeremy Nickel*. COL ¶ 125 .................................................23

*TMEP*, §§ 1202, 1202.04 .........................................................................67

*TMEP* § 1210.04(c) (Oct. 2018) .............................................................35

*Trademark Manual of Examining Procedure*, § 1213.10 (Oct. 2018)..................5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

## I.     PROPOSED FINDINGS OF FACT

### A.     Procedural Background

1.     Declaratory Judgement Plaintiff The Vineyard House, LLC ("TVH") filed case no. 4:19-cv-01424-YGR (the "Declaratory Judgment Action") on March 18, 2019, alleging (i) false advertising and false designation of origin (15 U.S.C. § 1125(a)); (ii) declaratory determination as to whether TVH's proposed use of the TO KALON marks would be lawful in light of Constellation's ownership of the TO KALON and TO KALON VINEYARD marks, (iii) cancellation of U.S. Registration Nos. 1,489,619 (TO KALON) and 1,857,851 (TO KALON VINEYARD) (the "U.S. Registrations") based on a claim that the U.S. Registration were obtained by fraud on the United States Patent & Trademark Office; (iv) false advertising (California Business & Professions Code §17500 et seq.); and (v) unfair competition (California Business & Professions Code §17200 et seq.).  ECF 1.[1] TVH's claims are based on its allegation that Constellation's TO KALON marks have geographic and historic relevance and therefore cannot serve as trademarks with respect to wine.  *Id.*

2.     On July 1, 2019, TVH amended its Complaint to consolidate the second and third counts.  ECF 30.

3.     On August 17, 2020, TVH abandoned its claim that US Registrations were obtained by fraud by reason of an alleged failure to provide the Trademark Examining Attorney an English language translation of TO KALON.  (August 17, 2020 Email from Mr. Judd to the Court).

4.     On July 15, 2019, Constellation denied TVH's claims.  ECF 32.

5.     In contrast to TVH's representation to Constellation and the Court that it would not begin use of the TO KALON mark prior to the final adjudication of the Declaratory Judgment Action, during the course of Declaratory Judgment Action, Constellation discovered that TVH began to sell

---

[1] Unless indicated otherwise, all citations to the record shall refer to the record in the parent action, Case No. 4:19-cv-01424-YGR.

and ship wine bearing the TO KALON Marks, which unauthorized use would create an association between Constellation and Constellation's TO KALON Marks, grapes, and wine, on the one hand, and TVH and TVH's grapes and wine, on the other hand. *See* Infringement Action (defined below), ECF 1; *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1.

6. Consequently, Constellation filed Case No. 4:20-cv-00238-YGR (the "Infringement Action") on January 10, 2020 for: (i) federal trademark infringement in violation of 15 U.S.C. § 1114; (ii) federal false association, false designation of origin, and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(a); (iii) federal false advertising in violation of 15 U.S.C. § 1125(a)(1)(b); (iv) trademark infringement under California common law; (v) unfair competition under California common law; and (vi) unfair competition under Cal. Bus. & Prof. Code §17200 et seq. Infringement Action, ECF 1.

7. Constellation sought preliminary injunctive relief to prevent TVH from using TO KALON in conjunction with the sale of its wines. The Court granted the requested relief on February 21, 2020. Infringement Action, ECF 40. Notwithstanding the Court's clear order, TVH on multiple occasions continued to market and sell its wines using TO KALON. *See* TX1329, TX1356; *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1.

8. On February 5, 2020, TVH denied the claims set forth in Constellation's complaint in the Infringement Action. In addition to its denials, TVH raised as an affirmative defense a new allegation that Constellation had abandoned the TO KALON and TO KALON VINEYARD trademarks because Constellation's predecessor, Robert Mondavi Winery, had entered into a license without sufficient quality standards, namely a "naked license." Infringement Action, ECF 31.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

9. On February 27, 2020 the Court consolidated the Declaratory Judgment and Infringement Actions. ECF 42.

10. Constellation asserts that TVH's sale of wine using Constellation's federally registered TO KALON and TO KALON VINEYARD trademarks in association with wine (and related services, including wine tasting and event hosting) will cause consumers to believe mistakenly that TVH and TVH's products are somehow associated either with Constellation or its highly sought after and famous TO KALON and TO KALON VINEYARD grapes and wines. Infringement Action, ECF 1 at 15-16.

**B.    The Parties**

11. Plaintiff The Vineyard House LLC is a California Limited Liability Company with its principal place of business at 1581 Oakville Grade, Oakville, CA 94562, and is owned and managed by Jeremy Nickel. Nickel inherited a vineyard and winery in Napa Valley, and has begun to use TO KALON as a brand for TVH's wine products and services. *Anticipated Testimony of Jeremy Nickel.*

12. Defendant Constellation Brands U.S. Operations, Inc. is a New York Corporation with its principal place of business at 207 High Point Drive, Victor, New York 14564. Constellation promotes and sells a line of wine under the names TO KALON and TO KALON VINEYARDS and is the owner federal trademark registrations for those trademarks. Serial Nos. 1,489,619, 1,857,851; *Anticipated Testimony of Mark de Vere and Elisabeth Baron.*

**C.    Constellation's TO KALON Marks and Wine**

13. Constellation is among the largest wine producers in the United States. Constellation acquired Robert Mondavi Winery in late 2004 and is its successor-in-interest. The Robert Mondavi Winery is among the most acclaimed wineries in the world. *Anticipated Testimony of Mark de Vere.*

14. Founded by Robert Mondavi, who is considered by many as "The Father of California Wine," Robert Mondavi Winery is credited with instituting a number of innovations in the grape growing process in California. *Anticipated Testimony of Mark de Vere and Nova Cadamatre.* Over

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

the past five decades, Robert Mondavi Winery has customized viticultural and wine making practices to craft a distinctive style of wine for its TO KALON-branded wines with a consistent structure. *Id.*; *Anticipated Testimony of Nova Cadamatre*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2.

15.    Robert Mondavi Winery sells a premium line of wines under the TO KALON and TO KALON VINEYARDS marks. *Anticipated Testimony of Mark de Vere and Elisabeth Baron*; *See, e.g.*, TX1028-TX1041. ECF 98, Constellation's 1st Claim for Relief, Element 1.

16.    Robert Mondavi Winery selected the mark TO KALON for its wine beginning in the 1980s, and has since then sold wine under the trademarks TO-KALON, TO KALON, TO KALON VINEYARD, and TO KALON VINEYARD COMPANY (collectively, "Constellation's TO KALON Marks"). *Anticipated Testimony of Mark de Vere*. ECF 98, Constellation's 1st Claim for Relief, Element 1.

17.    The term TO KALON was not in use as a trademark anywhere when Mondavi selected it as Robert Mondavi Winery's trademark, nor was it meant to convey or suggest any meaning as relates to wine. *Anticipated Testimony of Mark de Vere; Anticipated Testimony of Andy Beckstoffer; Anticipated Testimony of Jeremy Nickel*; TX1062 at 82:25-83:13. Dkt. 98, TVH's 1st Claim, Defenses 2 and 6.

18.    In adopting the TO KALON Marks, Constellation was resurrecting and adopting a brand that was famous in the late nineteenth century, but which had since been "largely forgotten." *See* § I(B). *Anticipated Testimony of David Reibstein*; *Anticipated Testimony of Mark de Vere; Anticipated Testimony of Andy Beckstoffer; Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

19.    Constellation's TO KALON wines are considered some of the highest quality, most premium, expensive domestic wines available on the market today. *See Anticipated Testimony of*

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*Mark de Vere; Anticipated Testimony of Elisabeth Baron.* ECF 98, Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

20.     As a result of Robert Mondavi Winery's significant investment, growing methods, and reputation as one of the finest wineries in the United States, Constellation's TO KALON Marks are strong source identifiers in the marketplace for Constellation's TO KALON brand wines and have garnered significant goodwill.  *Anticipated Testimony of Mark de Vere; Anticipated Testimony of Elisabeth Baron.*  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 3 and 4.

21.     As evidence of its ownership of the TO KALON and TO KALON VINEYARD marks, Robert Mondavi Winery was awarded the following U.S. Trademark Registrations (the "TO KALON Registrations"):

| Mark | Date of Reg. | Reg. No. | Goods |
|------|------|------|------|
| TO KALON | May 24, 1988 | 1,489,619 | Wine (IC 033)[2] |
| TO KALON VINEYARD | Oct. 11, 1994 | 1,857,851 | Wine (IC 033)[3] |

*Anticipated Testimony of Mark de Vere*; TX1027 at 8; TX1042 at 5. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

22.     The TO KALON Registrations have achieved incontestability, which is conclusive evidence of Constellation's exclusive right to use TO KALON and TO KALON VINEYARD on

---

[2] Constellation was originally granted registrations for TO-KALON and TO-KALON VINEYARD (with hyphens).  In 2004 and 2008, however, Constellation amended its registrations (as permitted under 15 U.S.C. § 1057(e)) to remove the hyphens, modernizing them to TO KALON and TO KALON VINEYARD.  TX1027 at 1-2; TX1042 at 1-2.

[3] During prosecution, Mondavi "disclaimed" the exclusive right to use "VINEYARD" apart from the TO KALON VINEYARD mark as a whole.  A disclaimer, however, does not remove the disclaimed matter from the mark: "The mark must still be regarded as a whole, including the disclaimed matter, in evaluating similarity to other marks."  *Trademark Manual of Examining Procedure*, § 1213.10 (Oct. 2018) (citing authority). *See* COL ¶157.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

wine.  TX1027 at 3, 8; TX1042 at 3, 5; 15 U.S.C. § 1115(b). ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 5.

**D.     H.W. Crabb's Forgotten To Kalon Brand**

23.     In the early 1980s, Robert Mondavi discovered a forgotten brand, TO KALON, that had been used by Hamilton Walker Crabb[4] for his wines, and for his distribution and retail store services in the late 19th Century.  *Anticipated Testimony of David Reibstein*.  Crabb considered TO KALON his trademark and used it as a brand.  *Anticipated Testimony of David Reibstein*; TX1475 at 24; TX1102-TX1115. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

24.     In fact, Mr. Crabb applied for and was granted **one of the first trademark registrations ever issued by the U.S. Government**, securing the exclusive right to use the TO KALON designation to identify "wines and wine products" made *anywhere*:



See *Anticipated Testimony of David Reibstein*[5]; *see also* TX1069; TX1566, p. 19 ("The fine display at Platt's Hall, San Francisco, bearing the To Kalon trademark, will give an idea of the fine wines bottled at this winery") (emphasis added); ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

---

[4] Historical records inconsistently use varying first names for Mr. Crabb: Hamilton, Henry, Herbert.  Since Mr. Crabb's probate filing with Napa county indicates Hamilton, Constellation shall use that name during the course of trial.  *See* TX1440.

[5] Pohndorff & Co. was Mr. Crabb's agent in Washington, DC.  TX1475 at 13.  Before reliable transcontinental communications, registrations were often secured by agents and lawyers.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

25.    Crabb made his TO KALON wine using grapes grown by farmers at his own and other vineyards throughout Napa Valley.  *See* TX1456 at p. 9 (William Watson, founder of Inglenook, "planted about fifty acres of Malvoisie grapes that he regularly sold to H.W. Crabb"), TX1498 at p. 8 ("the wine-makers purchased [Seedless Sultana grapes] readily at thirty-two dollars per ton; and Mr. Crabb, who has made wine of it for several years, has this year [1883] secured the whole crop of that neighborhood at thirty dollars per ton"); *see also* TX198 [1891] (Mr. Crabb produced up to 500,000 gallons of wine per year); *Anticipated Testimony of Mark de Vere* (Mr. Crabb could not have made the quantities of wine attributed to him without using grapes grown elsewhere). ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

26.    The products Mr. Crabb's company manufactured were then sold across the country through a network of TO KALON stores in Chicago; Kansas City; Minneapolis; New Orleans; Washington, DC; and other cities.  *See Anticipated Testimony of David Reibstein*; TX207, p. 19 [1891]:



AN ENORMOUS WINE BUSINESS.
    Few realize the enormity of our business until they have seen the "bustling" and "stock-end" of it at our immense vaults at 27th and K sts.  A hundred thousand gallons of the choicest Wines and Brandies are stored therein.  614 14th st. is but the distributing office, where samples are shown. Visit the vaults if you would see the business.
T O · K A L O N   W I N E   C O.,
614 14th st. n.w.  Telephone 993.        se21

 [1890-1897] TX1114; TX1102; TX1104; TX1107; TX1112; TX1683 at p. 24 ("[Mr. Crabb's] practical experience … has made **the brands of his vintage** familiar to every table where good wine is served") [1890]; TX360 ("In 1886 Crabb decided to develop **a national brand** for his wines. … **The brand name was 'To Kalon'**") (emphasis added to both). ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

27.    The brand use begun by Mr. Crabb continued with Mary Churchill, whose husband had acquired approximately 368 acres of the Crabb property after Mr. Crabb's death).  Ms. Churchill

organized the "To Kalon Vineyard Company" in 1903 to conduct her business operations, which included (as stated in the company's Articles of Incorporation) the "purchase [of] grapes, fruits and berries" from third parties and "manufacture the same *into* wines, brandies, and other liquors." *See* TX1702 at 187 (emphasis added); *Anticipated Testimony of David Reibstein*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

28.  Ms. Churchill also continued to operate Mr. Crabb's network of TO KALON retail stores across the country. At no point did "TO KALON" serve as "geographic place" identifying the place where the grapes used in her wines were from, as even Ms. Churchill sold *imported* wines under the TO KALON label, and referred to TO KALON as her "TRADEMARK":



High-Grade Domestic and Imported Wines, Brandies, Whiskies, Cordials, Etc.

TO·KALON
(TRADE-MARK.)

SEND FOR PRICE LIST.

TO-KALON COMPANY, Inc.

Phone Main 998                    1405 F Street Northwest

TX1472; *see also id.,* TX1106; TX1115; TX1469; TX1110; TX1113 (other contemporaneous ads), TX1438 at 4 (advertising "To-Kalon Wines—the choicest products of the best California vineyard**s**") [plural] (emphasis added); *Anticipated Testimony of David Reibstein*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

29.  Ms. Churchill treated TO KALON as a brand and she too registered it with the U.S. Government as a trademark, claiming that "[the] trade-mark has been used continuously in business" since July 1886 (when Mr. Crabb first began use):



TRADE-MARK.

No. 53,905.                    REGISTERED JUNE 12, 1906

TO-KALON WINE CO.

WINES.

APPLICATION FILED APR. 1, 1905.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*Anticipated Testimony of David Reibstein;* TX1046..[6] In her filing, Ms. Churchill also represented that the TO KALON name was "arbitrary"—that it had no geographic or other significance and instead only functioned as a brand name for wine. *See* COL ¶133; TX1046. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

30.    It is unclear when Ms. Churchill ceased use of TO KALON, but the record suggests Ms. Churchill abandoned the mark due the start of Prohibition and likely the result of a winery fire around the same time.  In addition, in 1926 Ms. Churchill did not file an affidavit of continued use to maintain her trademark as required under the Trademark Act of 1920.  As a result the registration lapsed.  There is no evidence Ms. Churchill ever resumed her wine operations after Prohibition.  After that point, To Kalon existed only as a corporate name for a business that was not operating. *Anticipated Testimony of David Reibstein.*  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

31.    In July 1943 Ms. Churchill's company To Kalon Wine Co. (that succeeded to her rights) sold her property to a businessman named Martin Stelling, Jr., who only kept about 278 acres of her original estate and sold off approximately 90 acres to Beaulieu Vineyards.  Those 90 acres were operated by Beaulieu for approximately fifty years (1943-1993) under the vineyard designation "BV-4". *See* TX1483.  Mr. Stelling also acquired other adjacent property adding to his acreage. *Anticipated Testimony of David Reibstein.* ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

32.    In approximately 1945, Mr. Stelling purchased the Sunny St. Helena Winery from (oddly enough) Robert Mondavi's family.  Because Mr. Stelling died tragically just a few years later (in 1950), he never got the chance to make wine, and thus there is little evidence of his use of the TO

---

[6] The "To Kalon Wine Co." was Ms. Churchill's agent. *See* TX1438.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

KALON name other than as a corporate name, the TO-KALON VINEYARDS. *Anticipated Testimony of David Reibstein.* ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

33.     After Mr. Stelling died, his widow did not operate a wine making business either and slowly sold off all of his property. *See, e.g.,* TX268, TX273. By the mid-1950s, Ms. Stelling had sold everything, with the choicest parcels ending up in the hands of Ivan Schoch, who had worked for Mr. Stelling. *See* TX1494, pp. 74-75. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

34.     Mr. Mondavi purchased in 1966 a twelve-acre property on which the iconic Robert Mondavi Winery now sits, recognizing the commercial promise and natural beauty of that land. *See* TX1485 at ¶ 5. He called his operation the Robert Mondavi Winery. Over the years, Mr. Mondavi (through his eponymous company) acquired hundreds of additional adjoining acres from Mr. Schoch and others. *See id.*; Ex. TX1062 at 85:23-86:19. By 1978, the acquisitions were complete, and Robert Mondavi Winery controlled around 550 acres of contiguous, prime vineyard land, including most of Crabb's original parcels on which he operated his winery business. *See id.*; TX1485 at ¶¶ 5, 14. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

35.     Mr. Mondavi (who passed away in May 2008) testified under oath in a federal court proceeding that when he bought his first two parcels of land (in 1966 and 1968) (totaling about 262 acres) he only knew it as the "Stelling land"—at that time, he had never *heard* of "To Kalon," despite having been in the wine business most of his life. *See* TX1062 at 84:18-85:13 ("I knew the land as Stelling land … when we were interested in buying it…. I heard of Stelling, but I never heard of To Kalon."). ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

36.     Mr. Mondavi was only aware of the land as a good source for quality grapes stemming from his father (Cesare Mondavi) regularly purchasing grapes from that land while he worked at the Krug winery.  *Anticipated Testimony of Mark de Vere*; *see* TX1062 at 32:2-21, 82:25-83:13, 86:9-19, 87:21-25. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

37.     Robert Mondavi's son, Michael, who co-founded the Robert Mondavi Winery, similarly offered testimony in court that the land the company acquired in the late 1960s was from what was "commonly referred to as the 'Stelling Estate'".  While he was aware of Mr. Crabb's historic brand TO KALON, that was not common knowledge in the industry.  *See* TX1485 at ¶ 7. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

38.     After Mr. Mondavi bought his land he took it upon himself to investigate its history, and in the process came to learn about Hamilton Crabb and his TO KALON wine.  *See* TX1062 at 32:13-21, 46:14-47:18, 85:14-22.  As part of that investigation, Mr. Mondavi hired William Heintz, a historian who specialized in winery and vineyard research, to prepare a report about Mr. Crabb and his wine.  TX320.  Mr. Heintz was retained about a year after Robert Mondavi Winery made its final land purchase, and he delivered his final report in March 1980.  *Anticipated Testimony of Mark de Vere*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

39.     On the first page of his report to Mr. Mondavi, Mr. Heintz unequivocally concluded that "**To-Kalon was a brand** of [H.] W. Crabb[.]"  *See* TX1475, p. 1 (emphasis added).  Then, in the pages that followed, Mr. Heintz described Mr. Crabb's contributions to the wine industry and chronicled the success of his To-Kalon Winery.  *See*, *e.g.*, *id.*, pp. 2-4, 12-13.  Mr. Heintz further noted the Churchills' continued to use "the To-Kalon label" until the start of Prohibition, but that the business soon closed down and ceased operating and eventually Mr. Stelling purchased the property in late

1943.  *See id.*, pp. 22, 24; *Anticipated Testimony of Mark de Vere*. ECF 98, Constellation's 1st Claim

for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

40.     Mr. Heintz also concluded that the Crabb history was mostly unknown to the public

as of the date of his report in March 1980.  *See id.*, pp.  24-25. ECF 98, Constellation's 1st Claim for

Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

41.     As a result of his research, Mr. Heintz recommended that Mr. Mondavi (for business

reasons) *revive* the "largely forgotten" TO KALON brand and *reintroduce* consumers to the "even

more obscure" history of Mr. Crabb:

> The name of "To-Kalon" is largely forgotten now as a wine
> brand.  Even more obscure is the once distinguished reputation
> of Henry W. Crabb.  In the 19th century, Crabb ranked right
> behind Agoston Haraszthy, and possibly Charles Wetmore, for
> his contributions to viticulture and wine making in California.
> His wines under the To-Kalon name probably held the front rank
> nationally.
>
> Historical obscurity comes about quickly when a winery
> and a wine brand are retired or simply go out of business.
> When a pioneer wine maker has no descendants to carry on his
> name or occasionally extoll his virtues, his contributions
> are quickly forgotten no matter how great their value.
>
> The name of Agoston Haraszthy is well recognized again
> today only because of the efforts of Frank Bartholomew, who
> reopened the old Haraszthy winery in 1941.  Bartholomew has
> publicized for recent generations, the work of Haraszthy back
> in the 1850s and 1860s, otherwise few would recognize the
> name.
>
> It would not take much effort to rekindle the spirit too,
> of the To-Kalon label.

See  *id.*, pp. 24-25; *see also* TX1486 (describing Mr. Crabb and his "To Kalon Burgundy" as

"forgotten" and having "dropped out of memory" due to Prohibition) [1949]; *accord Testimony of*

*Mark de Vere*.  A search of the comprehensive LexisNexis online "News" database, which includes

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*millions* of records from *thousands* of sources, did not turn up <u>any</u> reference to "To Kalon" [or "To-Kalon" or "Tokalon"] relating to wine before January 1985 and comports with a similar search conducted by the U.S. Patent and Trademark Office Examining Attorney when reviewing the Mondavi trademark application for TO-KALON.  *See* TX1604. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

42.     Crabb's To Kalon brand had fallen into obscurity even among insiders in the Napa wine industry.   TVH's owner, Jeremy Nickel, himself had not heard of To Kalon until 2011. *Anticipated Testimony of Jeremy Nickel.*  He learned about TO KALON after he hired a research firm at a large expense to research his property.  *Id.*  Andy Beckstoffer, a well-known grower in the Napa Valley had not heard of To Kalon despite working in Napa Valley, until another celebrity winemaker Andre Tchelistcheff educated him to that obscure fact.  *Anticipated Testimony of Andy Beckstoffer*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

43.     A consummate marketer (as well as a gifted vintner), Mr. Mondavi recognized the brand potential of the TO KALON name and decided to revive the label and use it to identify wines made only from the best areas of his vineyard.  TX1062 at 36:9-37:3 ("we are taking a special section of the vineyard, which we think is the best, and applying … To Kalon to that"); *see also id.* at 45:9-15, 50:22-51:12, 69:21-70:3.  Mr. Mondavi and his company also took on the task of reintroducing the TO KALON name and Hamilton Crabb to the public, simultaneously creating both the Mondavi TO KALON brand and educating the public about Mr. Crabb's historical legacy.  *See id.* at 69:7-20 ("We popularized To Kalon"), 83:14-24, 88:1-19; *see also* TX1485 at ¶¶ 9-16.  *Anticipated Testimony of Mark de Vere*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 6.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

E.      **Robert Mondavi Winery's TO KALON and TO KALON VINEYARD Registrations**

44.     In June 1987, Robert Mondavi Winery applied for and in 1988 received a federal trademark registration for TO KALON for use on or in connection with "wine."  *See* TX1027 at 1.  A few years later, Mondavi received a second registration, this one for TO KALON VINEYARD ("VINEYARD" disclaimed), for the same goods.  *See* TX1042 at 1;  *Anticipated Testimony of Mark de Vere*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

45.     The US Patent and Trademark Office files showed that the Examining Attorney searched the Nexis online commercial database for any mention of "Tokalon," or of "Kalon" in the same document as "wine" (which search would have picked up "To Kalon" and "To-Kalon" as well), and found no references to use of the mark in connection with wine:



TX1027 at 72; *Anticipated Testimony of Robert Cissel*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

46.     The Examining Attorney inquired of Mondavi whether To Kalon "has any meaning or significance" in the wine industry, using the present tense. TX1027 at p. 47.  Mr. Mondavi answered truthfully that he believed the phrase had "no present meaning or significance" other than as a brand, but volunteered that "To Kalon" had been used as the name of a winery in the past:

> Prior to the turn of the 20th Century, there was a winery in the Napa Valley which used the name "Tokalon". Upon information and belief, that winery was sold off in parcels during the first fifteen to twenty years of the 20th Century and use of the name was discontinued.

*Id.*, p. 52.  *Anticipated Testimony of Robert Cissel*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

47.   In the years that followed, the Trademark Office reaffirmed six times (in 1994, 1999, 2004, 2008, 2013, and 2018) that Mondavi (now Constellation) has been using TO KALON and TO KALON VINEYARD as trademarks.  *See, e.g.,* TX1027 at pp. 20-24, 82-84, 97-99; TX1042 at pp. 22-25, 36, 68-70.  *Anticipated Testimony of Robert Cissel.* ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

48.   The Trademark Office has also since acknowledged that Constellation's TO KALON registrations are now "incontestable."  *See* 15 U.S.C. §1065 ("Section 15").  TX1027 at 3, 8; TX1042 at 3, 5; *Anticipated Testimony of Robert Cissel*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

### F.   Robert Mondavi Winery's TO KALON and TO KALON VINEYARD Wine's Success

49.   Since the 1980s, Constellation's TO KALON-branded wines are legendary among consumers, having earned both widespread praise and prestigious awards.  *See Anticipated Testimony of Mark de Vere*; *Anticipated Testimony of Doug Frost*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 5.

50.   For more than thirty years, Constellation (including its licensees) has been the only party to use the TO KALON trademarks with wine, creating an immense amount of consumer goodwill in the brand.  *Anticipated Testimony of Mark de Vere*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 5.

51.   Constellation has sold more *than a million* bottles of wine bearing the TO KALON or TO KALON VINEYARD brands (with an estimated retail value of more than $150 million), and invested tens of millions of dollars in what it called the "To Kalon Project"—a major renovation of its

flagship Oakville winemaking facility and visitor center.  *Anticipated Testimony of Mark de Vere*.

ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4 and 5.

52.     Between 1999 and 2001, the "To Kalon Project" significantly improved Constellation's Oakville winemaking and hospitality facility for the nearly 300,000 consumers that visit each year.  Moreover, Constellation now offers unique activities to its consumers.  These activities include taking a tour of the "To Kalon Cellar," wine tasting in the "To Kalon Room," tasting the full range of TO KALON wines through a "To Kalon Terroir Tasting," or dining in the winery's "To Kalon Garden."  This renovated facility heavily promotes the TO KALON brand by enhancing the visitor experience, which in turn further solidifies and highlights the brand's recognition as a high-end brand.  *Anticipated Testimony of Mark de Vere*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 2, 4 and 5.

53.     Constellation also expanded its use of the TO KALON Marks by launching in 2019 a new line of wines under the name TO KALON VINEYARD COMPANY rather than Mondavi Winery.  *See* TX1063.  That new line of luxury wines was developed and promoted by Constellation in partnership with widely known and acclaimed winemaker Andy Erickson ████████████ ████.  The wines under the TO KALON VINEYARD COMPANY label have been highly rated and well received in the wine community and have further helped promote and elevate the TO KALON brand.  *Id.  Anticipated Testimony of Mark de Vere; Elisabeth Baron*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 2, 4 and 5.

54.     Each of Constellation's TO KALON wines that bear the TO KALON Vineyard designation contain at least 95% of its wine from grapes sourced from Constellation's TO KALON Vineyard.  The To Kalon Vineyard encompasses Constellation's winery operations in Oakville.  That property includes portions of the historic 1868 and 1881 parcels owned by H.W. Crabb (the 359 acre property) as well as the portions of Crabb's adjacent 1891 parcel as well as other adjacent property

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

acquired by Mondavi from successors to Ms. Churchill or Martin Stelling or under contract to Mondavi. *Anticipated Testimony of Mark de Vere*; TX1089; TX1139. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defenses 4, 5 and 6.

### G. Constellation's Licensing Program

55. In keeping with maintaining its strict brand association, Constellation licenses its TO KALON brand solely to a single grape grower, Mr. Andrew Beckstoffer, pursuant to a written license agreement entered into by Mondavi in 2003 (the "License"). ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

56. In the License, Mr. Beckstoffer is permitted to sublicense certain purchasers of his grapes from his vineyard adjacent to the Mondavi TO KALON vineyard land, to use the TO KALON trademark under conditions as to the quantity of wine produced, the quality of wine produced, and the display of the TO KALON name on the labels of those wines. TX1047. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

57. In order to meet his obligations under the License, Mr. Beckstoffer is very selective about the persons to whom he will sell his grapes and provide the sublicense rights. He only works with winemakers who either have well known reputations or who are referred to Mr. Beckstoffer by a wine maker in whom Mr. Beckstoffer has confidence. *Anticipated Testimony of Mark de Vere; Elisabeth Baron; Andy Beckstoffer*; *see also* TX1416. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

58. Specifically, as required under the License, the Beckstoffer sublicensees must use at least 95% wine from grapes from the designated Beckstoffer Vineyard, purchased pursuant to a long term contract of 5 years. That wine quality must be of a nature to be considered "elite" or "ultra premium" as understood in the high end wine business, and must be sold at a minimum price, currently in 2019 of $150 or more per bottle. TX1047. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

59.    Mr. Beckstoffer further assures the quality of his sublicensees' wines, not only through his own efforts, but also by requiring submission of such wines to critical review, which reviews Mr. Beckstoffer monitors and records and publishes.   TX1282; TX1287; TX1267; TX1268; TX1269; TX1270; *Anticipated Testimony of Andy Beckstoffer*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

60.    Constellation representatives periodically meet with the winemakers who use Mr. Beckstoffer's fruit as part of Constellation's engagement in the Napa wine community and through Constellation's twice yearly TO KALON CERTIFICATION program. TX1252; TX1257; *Anticipated Testimony of Nova Cadamatre*; *Mark DeVere*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

61.    In addition, Constellation personnel observe the progress of the grapes on Beckstoffer's vineyard during the growing season, and test grape lots purchased under the Beckstoffer sublicense program.   *Anticipated Testimony of Nova Cadamatre*.   Further, General Manager for Grower Relations, Scott Warren has monthly meetings with Mr. Beckstoffer.  *Id.*  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

62.    To further assure quality of the sublicensee's wines, Constellation's winemaking team routinely tastes and analyzes wines labeled with the TO KALON mark. TX1249; TX1251; TX1252; TX1253; TX1260; TX1261. These have been done in formal settings (TO KALON Certification), as well as organized tastings by the winemaking department and the marketing department.   *Id.*; *Anticipated Testimony of Mark de Vere; Anticipated Testimony of Nova Cadamatre.*   ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

63.    Other tastings by Constellation personnel include the Napa Valley Wine Auction, Premier Napa Valley, Taste of Oakville, and other informal gatherings of local winemaking groups including Oakville winegrower meetings. *Anticipated Testimony of Nova Cadamatre; Mark de Vere.*

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

64.     In addition to the organoleptic tastings conducted by Constellation personnel, the Constellation wine making team also periodically conducts scientific tests of Beckstoffer sublicensee wines.  These include tests for chemical properties, such as acidity, but also the less common testing for phenols. TX1249; TX1251; TX1258; TX1260; TX1265; *Anticipated Testimony of Nova Cadamatre*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

65.     In addition to its own tastings of the sublicensee wines, Constellation tracks all published reviews of wines using TO KALON under sublicense from Beckstoffer, to assure that the wines created meet the quality standards expected and required under the License.  Constellation records these reviews and, should any sublicensee wine show poorly, would flag the problem to the company.  There was no evidence that the sublicensees' wines were not of an "elite" or "ultra-premium" quality.  Quite to the contrary, they enjoy very high levels of performance.  *Anticipated Testimony of Elisabeth Baron*; *see, e.g.*, TX1240; TX1241; TX1242; TX1243; TX1244; TX1246; TX1247; TX1248. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

66.     Constellation also keeps track of labeling seeking to use TO KALON, through a continual review of applications by the sublicensees for a Certificate of Label Approval (COLA) which would include the TO KALON designation.  *Anticipated Testimony of Nova Cadamatre*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

67.     Constellation also monitors any actions of the Alcohol and Tobacco Tax and Trade Bureau that might involve a Beckstoffer Sublicensee. Specifically, any failure to comply with regulations, including the requirement that a wine with a "single vineyard designation" (like To Kalon Vineyard) must use at least 95% grapes from that vineyard would generate a public "offer of compromise" requiring correction of any violations of TTB regulations.  *See, e.g.*, TX1253, TX1257;

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

TX1159; *Anticipated Testimony of Nova Cadamatre*. *Anticipated Testimony of Elisabeth Baron*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

68.    Constellation has a system in place for monitoring the marketplace and coordinating through the legal department to ensure protection of the TO KALON brand and licensee compliance. Constellation's marketing department and winemaking departments will coordinate with the legal department.  Constellation's legal department has had both informal oral communication as well as formal written communications with Mr. Beckstoffer or his counsel, and with Beckstoffer sublicensees when deemed necessary or advisable.  *See, e.g.*, TX1065; *Anticipated Testimony of Nova Cadamatre; Elisabeth Baron*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4.

### H.    The Vineyard House and The Vineyard House's Infringement of the TO KALON Marks

69.    TVH is owned and managed by Jeremy Nickel, who inherited a vineyard and buildings in Napa Valley.  TVH for a number of years sold wines under the brand THE VINEYARD HOUSE. *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1.

70.    In 2018, TVH set out to change the branding and the marketing used in connection with its wines.  Mr. Nickel made the decision for TVH to begin using TO KALON or TO KALON VINEYARD on its wines.  TVH did so to increase the perception of quality of TVH's wine and to increase awareness of its wines through concerted publicity and marketing using TO KALON.  The purpose of this project was to increase sales through use of Constellation's trademarks and free ride on the very valuable goodwill build up by Mondavi Winery over more than thirty years.  *Id*.  ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

71.     TVH admits that the TO KALON name and marks are valuable and that value would benefit any person using it to sell wine.  *Anticipated Testimony of Jeremy Nickel; Anticipated Testimony of Doug Frost*. ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

72.     Despite admitting to having spent much of his childhood and adult life in Oakville, California, and working in the grape growing and winemaking industries, during his December 17, 2019 deposition, Nickel admitted that the first time he heard of H.W. Crabb and Crabb's use of TO KALON was in 2011, *after* he inherited the land on which TVH's vineyard is situated, and *after* hired a research firm to conduct extensive historical research on his property.  *Anticipated Testimony of Jeremy Nickel*.  ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4 and 6.

73.     There is no evidence that any part of TVH's vineyard is located on any land that was used by Crabb as a vineyard.  The evidence suggests that the Crabb portion of the TVH property was in timber and water storage. *See, e.g.*, TX1002 at 19-20; TX1003 at 9-10; TX1440 at 4; TX1313. More specifically, the TVH land does not include any portion of the Crabb original 359 acre tract (consisting of the "Home Tract" and the "Lewelling Tract") used by Crabb to grow grapes and on which the Crabb Winery was located.  *Id.* ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4 and 6.

74.     When Mr. Crabb died, the Probate Records establish that the appraiser for the estate listed and separately valued two distinct tracts of land: the 359-acre "To Kalon Vineyard Property" (comprised of Home Tract acquired in 1868 and the Lewelling Tract acquired in 1881); and the non-adjacent "Baldridge Tract" acquired later in 1891.  TX1440 at 4. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4 and 6.

75.     The Probate records establish that, while the "To Kalon Vineyard Property" included a significant value for the existence of vines and vineyard operations, the Baldridge Tract had no value

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

whatsoever for vines or any vineyard operation assets. The appraiser described the Baldridge Tract merely as having "valuable timber." *See Id.* In fact, TVH admits **it has no proof** Mr. Crabb <u>ever</u> grew a single grape on the Baldridge Tract for his TO KALON brand wines. *See* TX1002 at 19-20; TX1003 at 9-10; TX1440 at 4; TX1475 at 15; *Anticipated Testimony of Mark de Vere*; *Anticipated Testimony of Jeremy Nickel; Anticipated Testimony of Miltenberger*. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4 and 6.

76.     There is no evidence that anyone ever referred to any portion of TVH's property as TO KALON. This included Mr. Crabb himself, the appraiser and Mr. Nickel's own family. Rather, the evidence establishes that Mr. Nickel and his father Gil Nickel, from whom Mr. Nickel inherited the property, referred to that property as HALTER VALLEY. In fact, when first considering a new branding program for its wines, TVH originally considered HALTER VALLEY and included that name on drafts of new labels before ultimately using TO KALON. The evidence also establishes that Mr. Nickel knew at the time he made that fateful decision that TO KALON was a trademark of Constellation and that he had been advised not to do so because of Constellations trademark rights. *Anticipated Testimony of Jeremy Nickel*; *see also* TX1382; TX1386 at 3; TX1341; TX1333; TX1390 at 3. ECF 98, Constellation's 1st Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 4 and 6.

77.     Beginning in June 2018, TVH began attacking Constellation's TO KALON Marks by filing the following trademark applications for wine in the United States Patent and Trademark Office. These marks incorporate Constellation's mark TO KALON in its *entirety*:

| Mark | Appl. No. |
|---|---|
| H.W. CRABB'S TO-KALON VALLEY | 88/009,718 |
| H.W. CRABB'S TO-KALON VALLEY VINEYARD | 88/009,715 |
| TO-KALON ESTATE | 88/009,713 |
| TO KALON FIRST GROWTH | 88/009,711 |
| TO KALON GRAND CRU | 88/009,709 |
| TO KALON HALTER | 87/945,348 |
| TO KALON VALLEY VINEYARD | 87/945,345 |

| Mark | Appl. No. |
|------|-----------|
| TO KALON VALLEY | 87/945,344 |
| TO KALON HALTER VALLEY VINEYARD | 87/945,342 |
| TO KALON VINEYARD HALTER VALLEY | 87/945,337 |
| TO KALON VALLEY | 87/945,332 |
| TO KALON VINEYARD COMPANY | 87/945,330 |
| TO KALON 1889 | 87/945,321 |
| TO KALON HALTER VALLEY | 87/944,973 |
| HALTER VALLEY TO KALON VINEYARD | 87/944,970 |
| CRABB'S HALTER TO KALON VALLEY | 87/944,926 |

In filing those applications, TVH was required to declare under oath that TVH had a good faith intent to use some those names as trademarks in selling its wines. *Anticipated Testimony of Jeremy Nickel*. COL ¶125; ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

78.     TVH also prominently displays multiple signs on its property that say "To Kalon Vineyard" viewable to visitors at its property where it hosts events, gives tours of its vineyard, and from which it sells wines and sells grapes to other vintner. *Anticipated Testimony of Jeremy Nickel*; TX1350. ECF 98, Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

79.     To further create an association between TVH's wines and grapes with Constellation's brand, Jeremy Nickel created another corporation To Kalon Stock Farm, LLC ("TSF"), and acquired an equestrian farm in Wellington, Florida ("TSF Farm").   *See* TX1327; *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

80.     After purchasing the TSF Farm, Nickel re-named the farm from "Vimana Equestrian Farm" to "To Kalon Farm." *See* TX1373 at 11.  Although the TSF Farm provides equestrian services, Nickel almost immediately tried to closely associate the Farm with TVH to promote TVH and its wines. *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

81.     For example, the TSF Farm displays TVH as its primary sponsor, prominently displaying the TO KALON mark in conjunction with TVH and its wines:



*See* TX1401; *Anticipated Testimony of Jeremy Nickel*.  ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

82.     TVH also regularly sponsors events at the TSF Farm, co-marketing the TVH wines in conjunction with the TO KALON mark.  In a promotional video commissioned by TSF to promote To-Kalon Farm, rather than displaying TSF's logo or an image of the To-Kalon Farm—as one would expect—the video immediately displays a flag bearing TVH's stylized logo featuring TVH's name and clusters of grapes. TX1299; *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

83.     Situated in front of the gated entrance to To-Kalon Farm are wine barrels featuring TVH'S ***The Vineyard House***'s name, and has branded TVH hurdles for its horse track, further

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

associating the TVH with the TO KALON mark. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.





TX1279; *Anticipated Testimony of Jeremy Nickel*.

84.     On March 19, 2019, To-Kalon Farm hosted "A 'Napa Valley Food & Wine Experience' Hosted by Jeremy Nickel" (the "TSF Event").  *Anticipated Testimony of Jeremy Nickel*; TX1314; TX1316; TX1317; TX1299.  The TSF Event provided guests with TVH's wine, and promoted TVH's wine with signage, centerpieces, flags, and created a promotional video for the event where it provided users with TVH's web address.  *Id.*  TVH even solicited orders for its wines at the TSF Event and sent follow up emails to the To-Kalon Farm attendees to solicit further sales of its wines.  TX1335.  ECF

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

85.     TVH planned and advertised another wine festival at the To-Kalon Farm in 2020. TX1329.   Ultimately, it cancelled the event in view of the preliminary injunction.   *Anticipated Testimony of Jeremy Nickel.*  However, TVH is actively planning to host future wine events at the To-Kalon Farm.  *Id.* ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

86.     Although TVH affirmatively represented to the Court that it would not sell wine using the TO KALON Marks until the Declaratory Judgment Action was finally adjudicated (*see* Infringement Action, ECF 40), during the December 17, 2019 deposition of Jeremy Nickel, Mr. Nickel unexpectedly announced that TVH had already begun to sell and ship wine bearing the TO KALON. *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

87.     According to Nickel, TVH was selling a 2015 Cabernet Sauvignon blend to consumers that featured use of "To-Kalon Vineyard" on the back label, and with the shipments of the 2015 Cabernet Sauvignon, TVH included a card insert offering for sale other wines, namely TVH's 2015 Cabernet Sauvignon (Block 8) and 2015 Cabernet Franc (Block 5).  *Anticipated Testimony of Jeremy Nickel*.  The Block 8 wine also featured To-Kalon Vineyard on the back label and the Block 5 wine featured To-Kalon Vineyard on both the back label and prominently on the front label:

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

| TVH'S 2015 CABERNET FRANC | |
|---|---|
| FRONT LABEL | BACK LABEL |
|  |  |

TX1302-TX1309; *Anticipated Testimony of Jeremy Nickel*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

88.     Since issuance of the preliminary injunction, TVH has rebranded its three wines by placing a sticker over the use of "TO KALON VINEYARD" on the front and back labels and replacing the vineyard name with HERMOSA VALLEY. *Anticipated Testimony of Jeremy Nickel*. The labels though are flimsy Brother® label maker stickers that are easily removed. *See, e.g.*, TX1347; TX1357; TX135; TX138. Should the Court not enter a permanent injunction, TVH intends to resume labeling its wines with TO KALON. *Anticipated Testimony of Jeremy Nickel*. In addition, TVH has already applied for Certificates of Label Approval from the Alcohol and Tobacco Tax and Trade Bureau ("TTB") for its 2016 vintage red wines bearing the TO KALON trademark on the front and back labels. TX1143. Moreover, since issuance of the preliminary injunction, TVH has continued to promote its wines on social media using the TO KALON Marks. *See, e.g.*, TX1405; TX1406;

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

TX1407; TX1408. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

89. Prior to TVH's use of the TO KALON Marks, TVH's wine did not enjoy the consumer recognition or commercial success that TVH hoped to achieve with its products. The evidence shows that TVH adopted the confusingly similar H.W. CRABB'S TO KALON VINEYARD mark to trade off the extensive consumer recognition and commercial success enjoyed by Constellation's TO KALON Marks, and which TVH's wine failed (and continues failing) to achieve. *See, e.g.*, TX1361; TX1362; TX1365-TX1369. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

90. After TVH commenced use of the TO KALON marks in its promotions and marketing, TVH began to see an increase in sales from that association with the TO KALON name and marks.
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████. *Anticipated Testimony of John Jarosz; see, e.g.*, TX1361; TX1362; TX1365-TX1369. TVH presented no evidence as to the reason for such increases, not having conducted any analyses to explain the substantial increase in TVH's sales in 2018. *Anticipated Testimony of John Jarosz*. ECF 98, Constellation's 1st Claim for Relief, Element 3; 2nd Claim for Relief, Element 2; 3rd Claim for Relief, Element 2; Constellation's 1st Claim for Relief, Element 2; 2nd Claim for Relief, Element 1; 3rd Claim for Relief, Element 1; TVH 1st and 2nd Claims, Defense 3.

91. The increase in TVH's sales coincided with the appearance of the "H.W. Crabb's To Kalon Vineyard" sign on TVH's property, Mr. Nickel's work on the design of the bottle label adding various iterations of "To Kalon," and TVH's applications to register trademarks using "To Kalon." *See, e.g.*, TX1385; TX1403; TX1544; TX1574; TX1576; TX1578-TX1690.

92. TVH's wine bearing the TO KALON VINEYARD designation is also of a different nature and style than the Robert Mondavi Winery TO KALON branded wines. *Anticipated Testimony*

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*of Nova Cadamatre*.  ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

93.     The physical location of the TVH vineyard is materially different from that of the Robert Mondavi's TO KALON Vineyard in Oakville.  The Robert Mondavi vineyard properties are located on the valley floor on alluvial soil, while TVH's vineyard is located on the steepest region of Oakville on residual soil. TX1681; TX1687. These differences in soil, elevation, exposure, slope and other differences greatly impact the profile of the grape produced on each property, including pH (or acidity) and tannins.  Those differences materially impact the wines made from those grapes.  *Id*; *Anticipated Testimony of Nova Cadamatre*.  ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

94.     Based on these differences, TVH's property produces what are known as mountain fruits, which in general have lower concentration of color and body.  Mountain fruits have more austerity to the palate, *i.e.*, the tannin will stand out a bit more and they have more herbal characteristic to them because they do not get as much afternoon sun. Additionally, mountain fruits tend to have a higher pH.  These differences can impact the wine structure produced from each property, i.e., acidity, the tannin, the texture of tannin, and concentration.  As a result, wine produced from a mountainous vineyard, such as TVH's property, will have a different structure than wine produced from the Robert Mondavi TO KALON Vineyard.  TX1681. ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

95.     These differences in topography and soil composition are borne out by the comparative differences in testing of Constellation's vs. TVH's wine.  Phenolic testing of TVH's 2015 cabernet wine (the specific wine accused of infringement) evidences extremely low tannin content compared to Mondavi wines and Beckstoffer sourced wines.  TX1419.  As a result, the TVH wine will exhibit to the consumer a different, softer texture and less acidity compared to the Mondavi and Beckstoffer TO KALON wines.  *Anticipated Testimony of Nova Cadamatre*.  ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

96.     In addition, the differences in the source grapes and the winemaking techniques between TVH and Constellation evidence a significantly different style of wine.  Chemical testing of the accused TVH wine against Mondavi TO KALON wine evidences bears out the expected differences.  For example, the TVH wine exhibits much higher residual sugar content, which makes the wine sweeter on the palate.  The TVH wine also showed a much lower level of titratable acidity, which measure the total acidity that touches the palate, affecting the mouth feel of the wine. *Anticipated Testimony of Nova Cadamatre*. ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

97.     The Constellation TO KALON wines, including those of the authorized Beckstoffer sublicensees, have historically been of a uniform style with comparable levels of titratable acidity, residual sugar, and tannin content that is commensurate with "traditional" Napa style cabernets.  As a result, although the wines can vary slightly from winemaker to winemaker, to the consumer they will be perceived to be of a similar style of wine.  In contrast, the TVH wines will exhibit a completely different style to consumers.  *Id*.  ECF 98, Constellation's 3rd Claim for Relief, Element 3; Constellation's 3rd Claim for Relief, Element 4; TVH 1st and 2nd Claims, Defense 3.

## II.     **PROPOSED CONCLUSIONS OF LAW**

98.     TVH asserts a number of claims in the Declaratory Judgment Action, and, in particular: (i) false advertising and false designation of origin (15 U.S.C. § 1125(a); (ii) declaratory determination as to TVH's proposed use,  Constellation's ownership, of the TO KALON mark; (iii) cancellation of U.S. Registration Nos. 1,489,619 and 1,857,851; (iv) false advertising (California Business & Professions Code §17500 et seq.); and (v) unfair competition (California Business & Professions Code §17200 et seq.).  ECF 30.

99.     Constellation asserts the following claims in the Infringement Action: (i) federal trademark infringement in violation of 15 U.S.C. § 1114; (ii) federal false association, false designation of origin, and unfair competition in violation of 15 U.S.C. § 1125(a); (iii) federal false advertising in violation of 15 U.S.C. § 1125(a)(1)(B); (iv) trademark infringement under California common law; (v) unfair competition under California common law; and (vi) unfair competition under Cal. Bus. & Prof. Code §17200 et seq.  Infringement Action, ECF 1.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

100.   Constellations' claims (i)-(ii) and (v)-(vi) turn on essentially the same test, and its respective claims for trademark infringement, false designation of origin, and unfair competition under both federal and California state laws are "substantially congruent." *See* 15 U.S.C. § 1114(1), 1125(a); Cal. Bus. & Prof. Code § 17200; *see also Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 n.8 (9th Cir. 1999)); *A.L.M.N. v. Rosoff*, 104 Nev. 274, 277, 281 (1988); *Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir. 1994) (the Ninth Circuit "has consistently held that … actions pursuant to [the UCL] are 'substantially congruent' to claims made under the Lanham Act [and] 'the ultimate' test is 'whether the public is likely to be deceived by the similarity of the marks'"); *Switchmusic.com Inc. v. U.S. Music Corp.* 416 F. Supp. 2d 812, 826 (C.D. Cal. 2016) (law claim for trademark infringement requires a showing that there is a likelihood of confusion.); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1.50 (2015) ("McCarthy").

A.   **TVH has Infringed Constellation's TO KALON Marks**

101.   Section 32 of the Lanham Act imposes liability for "us[ing] in commerce any ... copy, or colorable imitation of a registered mark ... which … use is likely to cause confusion, or to cause mistake, or to deceive." *See* 15 USC § 1114(1)(a).

102.   Section 43(a) of the Lanham Act imposes liability for using  "… on or in connection with any goods…or any container for goods, uses in commerce any …symbol, or device, … which— (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association … with another person, or as to the origin, sponsorship, or approval of his or her goods … or commercial activities by another person, …." 15 U.S.C. § 1125(a)(1)(A).

103.   Section 32 of the Lanham Act, prohibits infringement of federally registered trademarks, and section 43(a) prohibits, *inter alia*, infringement of unregistered (*i.e.*, "common law") trademarks.  *Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 n. 6, 8 (9th Cir. 1999).

104.   Constellation must prove that (i) Constellation owns a valid and enforceable trademark, (ii) Constellation has priority in the trademark over TVH, and (iii) that TVH's use of the TO KALON Marks in a manner similar to Constellation's use, without Constellation's consent, is likely to cause

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

confusion, mistake or to deceive ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods. *See* 15 U.S.C. § 1114(1)(a); 15 U.S.C. § 1125(a)(1).

105.    Constellation bears the burden of proving each element of each of its claims by a preponderance of the evidence.  *See Yellow Cab Co./Sacramento v. Yellow Cab/Elk Grove*, 419 F.3d 925, 928 (9th Cir. 2005); *accord Marketquest Group, Inc. v. Bic Corp*., 862 F.3d 927, 937 (9th Cir. 2017).

### 1.    Constellation TO KALON Marks and Registrations are Valid and Protectable

#### a)    Constellation's Registrations are Incontestable

106.    Constellation's federal trademark registrations for TO KALON and TO KALON VINEYARD (U.S. Trademark Registration Nos. 1,489,619 and 1,857,851) create a legal presumption that Constellation's TO KALON Marks are valid and enforceable.  15 U.S.C. § 1115.

107.    Since these Registrations are now incontestable they are therefore conclusive evidence of the validity of these registrations, Constellations' ownership of the TO KALON Marks, and of Constellation's exclusive right to use the TO KALON Marks in commerce. 15 U.S.C. § 1115(b) (an incontestable registration is "conclusive evidence … of the registrant's exclusive right to use the registered mark... on or … with the goods … specified in the [registration]").

108.    Those registrations are also "conclusive evidence" that (a) the registrations were validly issued, and thus the marks are not "descriptive" (including "geographically descriptive"), and TO KALON and TO KALON VINEYARD function as marks for "wine."  *See* 15 U.S.C. § 1115(b); *see also generally Park ʼN Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-201 (1985) ("Congress determined that a sound public policy requires that trademarks should receive nationally the greatest protection that can be given them.  Among the new protections created by the Lanham Act were the statutory provisions that allow a federally registered mark to become incontestable.") (internal citation omitted).

#### b)    The TO KALON Designation is Not Geographically Descriptive

109.    To overcome the presumption of validity and enforceability of the TO KALON Trademarks, TVH has alleged that the registrations were obtained by fraud on the United States Patent

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

& Trademark Office because the applicant, Robert Mondavi Winery, failed to disclose to the Trademark Examining Attorney that TO KALON was a geographically significant term.

110.    In order to carry its burden of proving this alleged "fraud" on the USPTO, TVH must prove not only that: (a) wine consumers at the time of the application in the mid-1980s *primarily understood* the term TO KALON to designate a specific geographic area, but also that (b) Mondavi knew that is how consumers understood the term, (c) that Mondavi made an affirmative representation that was false; (d) that Mondavi knew the statement was false at the time of making the statement and that he intended to deceive the Trademark Examiner; and (e) that the false statement was material to the decision to issue the registration.  *See* Dkt. 81 at pp. 1-2 *citing In re Bose*, 580 F.3d at 1243.

111.    Because the incontestable Registrations provide *conclusive* evidence that the TO KALON Marks are *not* geographically descriptive, TVH has a very high burden.  *See* 15 U.S.C. § 1115(b).  TVH is required to prove such geographic descriptiveness as well as all the other elements of its fraud claim by clear and convincing evidence.  *See In re Bose*, 580 F.3d at 1243.  "'[T]he very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.'"  Dkt. 81 at pp. 1-2 *citing In re Bose*, 580 F.3d at 1243.

112.    For a mark to be considered geographically descriptive, "its *primary significance* to the relevant consumers … [must] be that of a geographic location," rather than a brand.  *TMEP*, § 1210.02(b) (Oct. 2018) (citing authority) (emphasis added); *cf. also In re Cotter & Co.,* 228 USPQ 202, 205-06 (TTAB 1985) (despite being the name of a town, WESTPOINT was not geographically descriptive because its primary significance was as the name of the United States Military Academy); *TMEP,* § 1210.02(b)(i) (Oct. 2018) ("if the most prominent meaning or significance of the mark is not geographic, or if the mark creates a separate readily understood meaning that is not geographic, registration must not be refused"); *see also In re Pebble Beach Co.*, 19 USPQ 2d. 1687, 1688 (TTAB 1991) ("The mere fact that a term may be the name of a place that has a physical location does not necessarily make that term primarily geographically descriptive …. If that were so, the name of literally every retail store or restaurant would be primarily geographically descriptive, since the public

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

would associate the name with the physical place where the services were rendered or the goods sold."); *see also* 15 U.S.C. §1052(e).

113.    Furthermore, even if the primary significance of a mark were a geographic location (rather than the name of the business operating at a particular place), if that location is so obscure that the average consumer for the goods (here, wine) would not recognize it "as an indication of the geographic source," the mark still cannot be considered geographically descriptive.  *See TMEP* § 1210.04(c) (Oct. 2018); *see also In re Societe Generale des Eaux Minerales de Vittel, S.A.*, 824 F.2d 957, 959-60 (Fed. Cir. 1987) (even though applicant's goods originated from the town of Vittel, France, VITTEL was not primarily geographically descriptive because the name was not generally known to consumers, who were more apt to view it as functioning as a brand) ("[T]he evidence is inadequate to show that the bulk of cosmetics purchasers, or even a significant portion of them, would, upon seeing the word Vittel on [the goods] conclude that it is a place name and that the [goods] came from there, rather than simply a trademark or trade name of a manufacturer like Chanel, Bourgois, or Vuitton.").

114.    TVH also alleges that it has a "fair use" right to use TO KALON to describe the history and geographic location of its property.

115.    TVH, however, fails to offer any evidence that the "primary significance" of "To Kalon" among consumers in the mid-1980s (as to the fraud claim) or currently (as to the fair use defense) was as a geographic location.  Similarly, TVH has failed to provide evidence that any consumers perceived the TVH land ever to be known as TO KALON, much less that it was the "primary significance" of TO KALON.  Plaintiff has little proof anyone even *used* "TO KALON" in any manner with the public since Mr. Stelling's family gave up on his winery dreams more than thirty years before Mondavi resurrected and adopted the TO KALON Marks.

116.    TVH offered no probative evidence that Robert Mondavi knew that "To Kalon" was geographic (even assuming it was) at the time that the trademark application was filed in 1987.  TVH offers only passages from Mr. Mondavi's biographical book *The Harvest of Joy*.  The book's author used the name "To Kalon" when referencing the land Mr. Mondavi purchased in the 1960s.  That book was written more than 30 years after Mr. Mondavi purchased the land and 10 years *after* the subject

trademark application was filed.  According to Mr. Mondavi's sworn testimony in a prior federal civil action, he commissioned the book in order to promote his TO KALON brand.  *See* TX1062 at 83:14-24 ("I used that terminology [in the book] afterwards 'cause I felt 'To Kalon' was a better name than 'Stelling property.' … We were trying to build the name as we went along.  I mean common sense, isn't it?"); *see also id.*, p. 13 (82:11-24) ("[W]e felt the name To Kalon was a better name to use [in the book] than Stelling or anything else in that regard.  And that's why I referred to it as To Kalon.").

117.    Even if Mr. Mondavi knew at the time of filing the application in 1987 that the term "TO KALON" has been used by a prior wine maker who owned a portion of the Mondavi To Kalon vineyard property, that does not establish that the term was "primarily geographically significant."

118.    Moreover, Robert Mondavi *did* disclose the prior use of TO KALON by prior winemakers but that such use had ceased by early in the 20th Century.  (*See* FOF 46).

119.    TVH also offers no proof that Mr. Mondavi believed that *ordinary wine consumers* thought "To Kalon" primarily conveyed a geographic meaning.  Indeed, the evidence is uncontroverted that the historian hired by Mr. Mondavi to conduct research, Heintz, reported to Mr. Mondavi  that although "To-Kalon" used to be "the brand" of Mr. Crabb, both it and Mr. Crabb had since been "largely forgotten" by 1980.

120.    Nor has TVH offered any proof that TO KALON has any geographic meaning (whether historically or currently).  TVH produced no maps which refer to TO KALON as a geographic area. In fact, TVH is unable even to define what geographic area supposedly is encompassed by the label TO KALON other than by referring tracts owned at the time of a prior owner's death.  If the definition of a geographic area is dependent on the fact of ownership, and that ownership can and did change over time, it cannot support a finding of geographic significance.

121.    The evidence of record establishes that the use of TO KALON, by Robert Mondavi and by others, was as a brand and/or as a corporate name.  This is true both currently as to Mondavi/Constellation, and historically as to Mr. Crabb and Ms. Churchill.

122.    In order to succeed on its claim of "fair use" of Constellation's trademark TO KALON, TVH would be required to prove as a threshold issue, that its use was "other than as a trademark". There is abundant evidence that TVH has treated TO KALON as a trademark and that TVH has used

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

and wishes to continue to use TO KALON as trademark.  TVH has applied for trademarks including TO KALON and stated under oath that it intended to use them as trademarks.  *See* 15 U.SC. § 1115(b)(4).

### 2. Constellation has Priority in the TO KALON Marks

123.    "It is a cardinal principle of federal trademark law that the party who uses the mark first gets priority." *One Indus., LLC v. Jim O'Neal Distrib.*, *Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009).

124.    It is undisputed that Constellation registered the marks TO KALON and TO KALON VINEYARD in connection with wines in 1988 and 1994, respectively claiming dates of first use back to 1987.  *See* U.S. Reg. Nos. 1,489,619 and 1,857,851.  Constellation has made continuous use of these marks and has maintained the above registrations by filing the required maintenance and specimens with the Trademark Office.  *See* '619 and '851 filewrappers; *see generally* §I(b).

125.    It is also undisputed that TVH began filing trademark applications in 2018 with the USPTO that incorporate the TO KALON Mark in its entirety.  In filing those applications, TVH stated under oath that it believed that the TO KALON containing applications were properly trademarks and would be used as such, and that TVH has the "exclusive" right to use those marks.  37 C.F.R. § 2.33(a); *Anticipated Testimony of Jeremy Nickel.*

126.    Accordingly, Constellation has priority of rights in TO KALON and TO KALON VINEYARD.

### 3. TVH's Use of the TO KALON Marks Will Cause Confusion as to Sponsorship

127.    In the Ninth Circuit, courts consider the following factors in determining whether a likelihood of confusion exists: (i) strength of the plaintiff's mark; (ii) proximity of the goods; (iii) similarity of the marks; (iv) evidence of actual confusion; (v) marketing channels used by the parties to advertise the goods;(vi) and degree of care likely to be exercised by the purchaser; (vii) defendant's intent in selecting the mark; and (viii) likelihood of expansion of the product lines.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-54 (9th Cir. 1979).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

128.   "The touchstone for trademark infringement is likelihood of confusion, which asks whether a reasonably prudent marketplace consumer is likely to be confused as to the origin of the good or service bearing one of the marks." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 862 F.3d 1131, 1135 (9th Cir. 2017).

129.   The *Sleekcraft* factors are not the only factors a court may consider in a likelihood of confusion analysis.  Rather, they "act as 'guideposts' […] and are adaptable to specific cases." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 874 (9th Cir. 2014).

130.   Here, the Court must decide whether a reasonably prudent consumer is likely to assume that TVH's use of the mark TO KALON in connection with its wines, including, without limitation by selling wines bearing the designation "H.W. CRABB'S TO-KALON VINEYARD," by promoting its wines through Nickel's owned "TO KALON Farm," and TVH's repeated public references and attempts to associate its wine with Constellation or with Constellation's TO KALON VINEYARD wines is likely to cause consumers mistakenly to associate TVH and its wines with Constellation or its TO KALON Marks.  *Cf. Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 604 (9th Cir. 1987); *Pom Wonderful*, 775 F.3d at 1125.

### a)   Strength of Constellation's TO KALON Marks (Factor 1)

131.   The "strength" of a mark represents how likely it is to be remembered by the public and associated with the mark's owner: "The stronger a mark … the greater the protection it is accorded by the trademark laws." *Brookfield Comm.*, 174 F.3d at 1058.  Courts evaluate the "strength" of a mark in terms of both its "conceptual" and "commercial" strength. *JL Beverage Co., LLC, v. Jim Bean Brand Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)).

### (1)   The TO KALON Marks are Conceptually Strong

132.   "A mark's conceptual strength 'depends largely on the obviousness of its connection to the good or service to which it refers.'" *JL Beverage*, 828 F.3d at 1107 (quoting *Fortune Dynamic,*

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

*Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1032–33 (9th Cir. 2010)).  In turn, the obviousness of a mark's connection to the goods or services turns on whether it is an arbitrary, fanciful, suggestive, descriptive, or generic mark.  *See id.*  (*citing Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011)).

133.    "Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and 'trigger the highest degree of trademark protection.'"   *JL Beverage*, 828 F.3d at 1107 (*quoting Surfvivor*, 406 F.3d at 631). Suggestive marks are just that—they "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product."  *Id.*  "Descriptive marks define a particular characteristic of the product in a way that does not require any imagination," and generic "marks" are not marks at all; they are words that "describe the product in its entirety" and "are not entitled to trademark protection."  *Id*.

134.    TO KALON is a fanciful mark.  The fact that lexicographers or devotees of antiquity may recognize the word is irrelevant to the fact that the word is totally unfamiliar to the ordinary consumer."  *Warner Bros.*, 2013 WL 12114836 at *4 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 11:5); *see also id.* at *3-*4 (HOBBIT "fanciful" for fantasy creatures even though it appeared in a list of "supernatural creatures" released in the late 1800s); *Le Blume*, 293 F. at 353-54 (ORIGAN "fanciful" for perfume despite appearing in the dictionary as a "rare" word meaning "wild marjoram"); *Rann Pharmacy, Inc. v. Shree Navdurga LLC*, 2016 WL 6876350, *4 (E.D. Pa. 2016) (RANN "fanciful" for pharmacy services even though it was an old Irish-English word meaning "a stanza") ("Because 'rann' is out of common usage, the mark RANN PHARMACY is fanciful and therefore inherently distinctive") (citing *McCarthy*, § 11:5).

135.    The phrase was not known (and certainly not in "common use") among wine consumers when Constellation adopted it in the mid-1980s, *see* TX1475 at p. 24 ("'To-Kalon' is largely

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

forgotten"), and even if some people *had* heard of the phrase at that time, their knowledge likely would have been just of its past use *as a brand*. *Anticipated Testimony of David Reibstein. See also* TX1062 at 32:2-21, 82:25-83:13, 84:18-85:13, 86:9-19, 87:21-25; *Anticipated Testimony of Andy Beckstoffer; Anticipated Testimony of Jeremy Nickel.*

136.    Thus, even if TO KALON *had been* in "common use" among wine consumers when adopted (or even now), *but see supra*, that would merely make the mark "arbitrary," leaving it conceptually still very strong. *See Brookfield Comm.*, 174 F.3d at 1058; *Pom Wonderful*, 775 F.3d at 1126; *Stone Creek*, 875 F.3d at 433.

### (2)    The TO KALON Marks are Commercially Strong

137.    Placement along the conceptual distinctiveness spectrum is not the only way to assess a mark's strength.    Whereas "fanciful" and "arbitrary" marks are already considered strong, a "suggestive" mark typically needs to be "strengthened by such factors as extensive advertising, length of exclusive use, public recognition and uniqueness." *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989); *Brookfield Comm.*, 174 F.3d at 1058.

138.    By any measure, the TO KALON Marks must be considered commercially strong.

139.    Constellation has had the exclusive right to use the TO KALON and TO KALON VINEYARD marks for more than thirty years, and during that time it has sold more than a million bottles of wine. *Anticipated Testimony of Mark de Vere.*

140.    Constellation's TO KALON wines are featured regularly in wine and other publications read by the type of consumers likely to purchase ultra-premium wines, and they have won numerous prestigious national awards. *Anticipated Testimony of Mark de Vere; Anticipated Testimony of Elisabeth Baron.*

141.    The company also invested heavily in promoting its TO KALON brand to consumers, particularly those who visit its Oakville winery, and it recently expanded its reach with the launch of its new TO KALON VINEYARD COMPANY line of limited-production wines. *Id.*

142.     Constellation has spent significant money and resources on its promotional efforts for its TO KALON wine, and, as a result, has been recognized through earned media, including media attention, press campaigns, industry awards, word-of-mouth, and social media.  *Id.*

143.     These efforts resulted in TO KALON becoming one of the most-recognized names in the ultra-premium wine segment today.  *Id.*

144.     As even TVH's expert, Mr. Frost admits, "[f]ew names are immediately recognized within [the high-end wine] segment.  **To Kalon is one.**"  ECF45-2, ¶ 13 (emphasis added); *see also Frost Rep.*, ¶¶ 6 ("For over 30 years … the 'To Kalon' designation has been associated with ultra-premium … wines."), 17 ("Consumers expect a higher quality wine from a grower or wine maker that uses the To Kalon designation.").

145.     Mr. Frost also <u>quantified</u> that including the TO KALON name on a product *adds value*, allowing producers to charge more than they otherwise could for a wine of that type.  *See id.*, ¶¶ 14-17 ("[W]ines designated as 'To Kalon' are frequently marketed at a higher price point than other similar wines that original from within the Napa Valley."); *see also id.*, pp. 16-22 (Figs. 4-10).

146.     That ability to charge more for a wine because consumers recognize the TO KALON brand and expect "a higher quality wine" is the *essence* of marketplace recognition and "commercial strength."[7]

147.     In fact, since Prohibition, the record establishes that only Constellation and its licensees have used the TO KALON Marks in connection with wines.  TVH introduced no evidence showing that any other third parties are actually using the TO KALON name.

---

[7] *Accord, e.g.,* Julie C. Frymark, Note, *Trademark Dilution: A Proposal to Stop the Infection from Spreading*, 38 Val. U. L. Rev. 165, 173 (2003) ("[T]the value of the trademark not only allows the manufacturer to keep other potential sellers out of the market, but it also enables the trademark owner to charge more for the product.") (citing Beverly W. Pattishall et al., *Trademarks and Unfair Competition*, pp. 207, 211 (5th ed., 2002)); *see also* Deven R. Desai, *From Trademarks to Brands*, 64 Fla. L. Rev. 981, 996 (July 2012).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

148.   Thus, the TO KALON Marks are both conceptually and commercially strong marks.

**b)     The Proximity or Relatedness of the Goods or Services (Factor 2)**

149.   The proximity of the goods factor depends upon whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. *See Sleekcraft*, 599 F.2d at 350; *accord La Quinta Worldwide LLC*, 762 F.3d. at 875.

150.   The Ninth Circuit defines "relatedness" broadly, typically requiring only that the parties participate in the same general industry. *See*, *e.g.*, *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1128, 1131 (9th Cir. 1998) (finding relatedness where the plaintiff's business was organizing Star Trek conventions and the defendant was a film studio that "participates more generally in the entertainment business"); *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832-33 (9th Cir. 1991) (finding a potential for consumer confusion where the parties both provided "financial services").

151.   Direct competition between the parties is not required for offerings to be considered "related." *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012) (holding that the plaintiff "need not establish that the parties are direct competitors" and that related services "are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark") (internal citation omitted).

152.   The Ninth Circuit, however, has even gone so far as to explain that if virtually identical marks are used for the same goods, "likelihood of confusion would follow as a matter of course." *Brookfield Comm.*, 174 F.3d. at 1056; *see also Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256-57 (9th Cir. 1986) (reversing trial court finding of no confusion even though the other six *Sleekcraft* factors all weighed against a finding of likelihood of confusion); *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("identical marks paired with identical goods can be case-dispositive").

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

153.    Here, there can be no dispute that Constellation and TVH both use the TO KALON and TO KALON VINEYARD marks on the same products—ultra-premium wines, including Cabernet Sauvignon varietals, that originate from Napa Valley and command prices of over $200 or more.

154.    The parties, therefore, are not merely offering "related" goods—they are offering "*identical* goods." *Cf. Monster Energy Co. v. Bestup LLC*, 395 F. Supp.3d 1334, 1347, 1353-54 (E.D. Cal. 2019) (competing energy drink considered "identical goods"); *Truong Giang Corp. v. Twinstar Tea Corp.*, 2007 WL 1545173, *1-*2, *6 (N.D. Cal. 2007) (competing tea products are "identical goods"); *cf. also AMF*, 599 F.2d at 350 ("related goods" need not be identical, they must only be "reasonable thought by the buying public to come from the same source if sold under the same mark") (quote omitted).

155.    Coupled with the parties' use of the same TO KALON and TO KALON VINEYARD mark, this factor strongly suggests that confusion is likely to occur.

156.    In addition, TVH is using the TO KALON and TO KALON VINEYARD marks in conjunction with its vineyards and grape sales to other wineries.  The use the identical mark on highly complementary products is also likely to cause confusion.

### c)    Similarity of the Marks (Factor 3)

157.    "Similarity of the marks 'has always been considered a critical question in the likelihood-of-confusion analysis.'"  *See JL Beverage Co. LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1109 (9th Cir. 2016) (internal citations omitted).  Similarity of the marks is judged based on the sight, sound and meaning of the marks, *Sleekcraft*, 599 F.2d at 351, with similarities weighing more heavily than differences. *Id.*  Marks are considered as a whole as they appear in the marketplace, including any disclaimed material.  *See e.g., La Quinta Worldwide LLC*, 762 F.3d at 875.

158.    Similarity in sound is especially important where, as here, the parties' marks are spoken aloud and the products offered under the parties' respective marks are often recommended via word-of-mouth.  *See id.* ("Sound is also important because reputation is often conveyed word-of-mouth.");

*Kreation Juicery, Inc. v. Shekarchi*, No. 14 Civ. 658-DMG, 2014 WL 7564679, at *7 (C.D. Cal. Sept. 17, 2014) (holding that where both sides "rely heavily on word of mouth . . . similarity in sound weighs more heavily than similarity in appearance").

159.     Because TVH is using the TO KALON and TO KALON VINEYARD marks, use of different colors or stylization carry little weight.  *See Kreation Juicery*, 2014 WL 7564679, at *7 (marks were similar despite plaintiff's logo for "Kreation" using "leafy plant blossoms" and defendant's logo for "Creation" "look[ing] like Scrabble tiles" where products sold via word-of-mouth).  In this case, the use by TVH of TO KALON is in block letters virtually indistinguishable from use by Constellation.

160.     The fact that TVH has attempted to dodge an infringement claim by adding additional words to the TO KALON marks, such as "*H.W. Crabb's* To-Kalon Vineyard", carries little weight.  The registered marks of Constellation are contained in their entirety in the use by TVH, and the principal part of TVH's use is "TO KALON VINEYARD."

161.     The wine TVH started offering is shown below.  As can be seen, it uses TO-KALON VINEYARD as a brand prominently on the front label, prefaced only by the added signifier "H.W. CRABB'S."  *Accord McDonald Rep.*, ¶¶ 11-18, 20.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111



TX1302-TX1309.

162.    As the Trademark Office explained when TVH applied for its own trademark registration, adding "H.W. CRABB'S" to the distinctive TO KALON mark does little to remove the potential for consumer confusion.  *See* TX1544 at p. 3 (of the Office Action).  In fact, because Constellation already licenses another party (Andy Beckstoffer) to use TO KALON VINEYARD with an added signifier, TVH's use of H.W. CRABB'S TO-KALON VINEYARD is likely to *heighten* the potential for confusion by leading consumers to think that TVH is another authorized licensee.  *See A.J. Canfield Co. v. Vess Beverages, Inc.*, 612 F. Supp. 1081, 1086-87 (N.D. Ill. 1985) (consumers were more likely to believe that defendant's products, which featured a house mark in addition to plaintiff's mark, were affiliated with plaintiff where plaintiff licensed others to use its mark with their own house marks); *aff'd*, 796 F.2d 903 (7th Cir. 1986); *see also H-D U.S.A., LLC. v. SunFrong, LLC*, 311 F. Supp.3d 1000, 1031 (E.D. Wisc. 2018).

163.    Furthermore, TVH's use of its house mark in connection with its TO KALON products does not dispel a likelihood of confusion.  *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1    1284, 1288 (9th Cir. 1992) (holding that use of a "housemark . . . does not, as a matter of law, render

2    [defendant's] use of [the mark] non-similar to [plaintiff's] trademark").

3        164.   For the same reason, comparing TVH's bottle design with specific Constellation uses

4    does not reflect the marketplace story.  Below are a few ways in which Constellation's TO KALON

5    VINEYARD mark is currently used with wines—by Constellation itself (ROBERT MONDAVI,

6    HIGHEST BEAUTY), by its affiliated company (SCHRADER) under license, and by its third-party

7    licensee (Mr. Beckstoffer) (PAUL HOBBS, CARTER CELLARS):









TX1553.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

165.    The only commonality among these distinguished wines (beyond their premium prices, source of their grapes, and style of wine) is the use of the TO KALON VINEYARD designation.  *See id.*  TVH's "H.W. CRABB'S TO-KALON VINEYARD" wine would thus fit right in and be seen by consumers as an additional use of the venerable TO KALON VINEYARD name.  *Anticipated Testimony of Susan McDonald*.

166.    The Parties' TO KALON and TO KALON VINEYARD marks are nearly identical in appearance and identical when spoken, thus weighing in favor of a likelihood of confusion.

### d)      Evidence of Actual Confusion (Factor 4)

167.    The absence of evidence of actual confusion is not dispositive.  *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (holding that "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.") (quoting *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1456 (9th Cir. 1991)).

168.    Where an accused infringer's marketing of the accused product has been *de minimis*, the actual confusion factor is rendered neutral.  *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876 (9th Cir. 2014) (holding that the actual confusion factor is "'weighed heavily only when . . . the particular circumstances indicate such evidence should have been available.'") (internal citations omitted); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1131-32 (9th Cir. 2014) (finding a lack of actual confusion evidence "unnoteworthy," and considering the factor "neutral" where such evidence is unavailable).

169.    Neither party is aware of documented instances of actual confusion, which is not unusual under the circumstances.  Actual confusion has not occurred yet because TVH's use of the "TO KALON" name, to date, has been *de minimis* and there has not been a meaningful opportunity for consumers to be confused.  TX1379 at 5-6; *see Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (promotion of a mark on the internet "does not shed much

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

light on the likelihood of consumer confusion"); *Caesars World, Inc. v. Milanian*, 247 F. Supp. 2d 1171, 1199 (D. Nev. 2003) (holding that where the defendant only used the mark at-issue on his website, "the Court does not it find it surprising that there is no evidence of actual confusion. This factor is therefore neutral.").

170.    TVH only began selling its TO KALON wine in a small quantity to wine subscription members for a single vintage and only had the products on the market for three months before the Court entered the preliminary injunction.  TX1379 at 5-6; *Anticipated Testimony of Jeremy Nickel*; Infringement Action, ECF 40.

171.    During the course of the litigation, TVH commissioned a consumer survey from Dr. Ezell (the "Survey") to show that there is not a likelihood of confusion. TX1417. The Survey, however, does not offer meaningful evidence regarding the likelihood of confusion in this case.  *Anticipated Testimony of Matthew Ezell*.

172.    Specifically, the Survey is not given any weight because the legal question he purports to answer is fundamentally irrelevant.  *Anticipated Testimony of Matthew Ezell*; TX1417.  TVH's use of the TO KALON marks and TVH's references to H. W. Crabb's To Kalon Vineyard are likely to mislead relevant consumers as to *source of the grapes* in TVH's bottle, whereas the Survey broadly seeks to establish whether consumers would be confused as whether Constellation manufactured or authorized TVH's wine. TX1417; *See Isle of Capri Casinos, Inc. v. Flynt*, No. 216 Civ. 06148CASMRWX, 2016 WL 6495380, at *6 (C.D. Cal. Nov. 1, 2016) (Holding that "'[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.' . . . [and that here] the survey is entitled to little weight because it did not replicate marketplace conditions."); *See Water Pik, Inc. v. Med-Systems, Inc.*, No. 10 Civ. 01221, 2012 WL 2153162, at *4-5 (D. Colo. June 13, 2012), *aff'd, Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1145 (10th Cir. 2013) (declining to consider defendant's likelihood

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

of confusion survey where the court found that that the survey universe was "overinclusive" because it did not "limit survey respondents to prospective users of [defendant's] goods").

173.    Second, the Survey failed to employ even basic protocols to identify respondents that are purchasers of wine at the relevant price points online or through wine clubs. *Anticipated Testimony of Susan McDonald; Anticipated Testimony of Matthew Ezell.* It likewise failed to employ traditional screening methods to avoid "bots," and to insure participants were the appropriately responding to the Survey's questions. *Id.* In short, the Survey employed a sample of consumers whose market participation is in serious doubt, posed the wrong set of questions to such consumers, and failed to take proper safeguards to ensure the scientific accuracy of the results. *Id.*

174.    These flaws taken together render the Survey irrelevant to the issues in this case and, thus, should be afforded little if any weight as a valid measure of actual or likely confusion in this case.

175.    Since there is no evidence of actual confusion, this factor is neutral.

e)    **Marketing Channels (Factor 5)**

176.    "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Where two products bearing the same or similar marks are sold under the same roof, this factor weighs in favor of confusion. *See QS Wholesale, Inc. v. Rox Volleyball, Inc.*, No. 13 Civ. 0512 AG, 2014 WL 12567147, at *8 (C.D. Cal. Dec. 31, 2014) (denying defendant's motion for summary judgment on likelihood of confusion); *Sam Liang v. Van Nguyen*, No. 08 Civ. 8211 PSG (JCX), 2009 WL 10671183, at *6 (C.D. Cal. Feb. 5, 2009) (holding that where there was "evidence in the record that both parties' goods are to be solder under the same roof . . . this factor weighs in favor of finding the probability of a likelihood of confusion.").

177.    Both parties' TO KALON wine marketed and advertised through the same type of subscription "wine clubs", via wine events, through advertising and marketing on the Internet, and

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

word of mouth through wine enthusiasts and retailers.  The overlap in marketing channels weighs in favor of a finding of likelihood of confusion.

178.     Like many Napa County wineries, Constellation and TVH market their ultra-premium products in similar ways and target similar consumers.  *Anticipated Testimony of Jeremy Nickel; Anticipated Testimony of Elisabeth Baron.*  Both parties maintain websites where they promote their wines and solicit consumers to join their respective "wine clubs," which entitles the consumer to purchase an "allotment" of in-demand wines.  *Id.*  (TVH has offered its new TO KALON VINEYARD wine to club members who purchased other wine products), *id* (Constellation is offering its new TO KALON VINEYARD CO. wine as well as its existing line of TO KALON wines to consumers on its allocation list).  Both parties also traditionally sell through the standard "three-tier" distribution channels, meaning their products can often be offered by the same retailers.  *See id.*  Constellation also sells TO KALON wines direct to consumers at its Oakville winery, and just down the road, TVH is seeking a license to do the same.  *See id.*

179.     In addition, both parties' products are reviewed and "rated" by the same national wine magazines, such as Wine Enthusiast.  *Id.*  Wine ratings are one of the most important ways by which ultra-premium wines are "advertised" to consumers willing to spend more than $200 for a bottle of wine.  *Id.*

180.     Constellation and TVH both consider and market their wines as "luxury goods," and employ marketing practices aimed at customers in the luxury market.  *Anticipated testimony of Elisabeth Baron and Mark de Vere and Jeremy Nickel.*

### f)     Degree of Care (Factor 6)

181.     "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353 (citing *HMH Publishing Co., Inc. v. Lambert*, 482 F.2d 595, 599 n.6 (9th Cir. 1973)).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

182.     When goods are expensive, a reasonably prudent consumer is likely to exercise greater care when making a purchasing a decision.  *AMF*, 599 F.2d at 353.  Purchaser care, however, primarily helps eliminate *mistaken* purchases (*i.e.*, buying one product while believing you are actually buying a different one), it does little to guarantee that "confusion as to association or sponsorship"—the primary concern here; *see* pp. 9-10, *supra*—will not arise.  *See id.*

183.     Although TO KALON VINEYARD wines are expensive relative to other wines, they are not truly "expensive."  They are not motorboats (*Sleekcraft*, 599 F.2d at 353) or ad placements (*Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393-94 (9th Cir. 1993)) costing thousands of dollars and involving a multi-stage purchase process.  They are consumables, purchased primarily by high-net-worth individuals accustomed to casually spending $100 or more on a bottle of wine.  *See Anticipated Testimony of Elisabeth Baron*.

184.     And like other wine consumers, many of them rely solely on brand identifiers to inform their purchases—few are experts at distinguishing the myriad wines in the market today.  *Cf., e.g., Stark*, 907 F. Supp. 2d at 1065 ("wine is considered a good with which the average consumer does not exercise care when purchasing"); *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 981 (N.D. Cal. 2006) (considering the typical wine purchaser "unsophisticated"); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2d Cir. 1978) ("[T]he average American who drinks wine on occasion can hardly pass for a connoisseur of wines."); *see also Brookfield Comm.*, 174 F.3d at 1060 (suggesting that if a product is targeted both to discriminating and casual buyers, "the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer") (dicta) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 283 (3d Cir.1991)); *see also Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

185.    More fundamentally, though, even if all wine purchasers *were* sophisticated, no amount of care could correct the false impression of affiliation created by TVH's use.  TVH is representing that an ultra-premium wine produced in Oakville originates from "TO-KALON VINEYARD," which is the *same* mark Constellation and all of its sublicensees use for the *same* purpose with the *same* type of wine.

186.    "Where the products are identical and the marks are strongly similar … the sophistication of the buyers *cannot* be relied on to prevent confusion, and this factor will not mitigate the likelihood of confusion."  *United States Olympic Comm. v. Xclusive Leisure & Hospitality Ltd.*, 2008 WL 3971120, *7 (N.D. Cal. 2008) (emphasis in original) (citing *Eclipse Assoc., Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)).

187.    Accordingly, this factor is neutral and cannot mitigate the likelihood of confusion arising from TVH's actions.

### g)    TVH'S Intent in Selecting its Marks (Factor 7)

188.    "When considering forward confusion, [the court] ask[s] whether defendant in adopting its mark intended to capitalize on plaintiff's good will."  *Marketquest Group, Inc. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017).

189.    This factor "favors the plaintiff 'where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.'"  *JL Beverage*, 828 F.3d at 1111 (quoting *Brookfield*, 174 F.3d at 1059).  "When 'an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public.'"  *Id*. (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993)); *Sleekcraft*, 599 F.2d at 354 (holding that where the alleged infringer knowingly adopts a mark similar to another's, there is a presumption that the public will be deceived).

190.    "The relevant inquiry is not [the defendant's] intent, but rather whether it adopted the [disputed mark] with the knowledge that the mark already belonged to [the plaintiff.]" *Id*.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

191.    It is uncontroverted that TVH was aware of Constellation's registered trademark registration and use of its TO KALON Marks prior to adopting its use of TO KALON.  In fact, TVH's own Chief Financial Officer warned its principal and sole owner Mr. Nickel of Constellation's trademark rights and the likelihood it was encroaching on Constellation's rights.  TX1341.

192.    Although proof of "intent" is not necessary to support a finding of infringement, *e.g.*, *Pom Wonderful*, 775 F.3d at 1132; *GoTo.com*, 202 F.3d at 1208 (describing the intent factor as having "minimal importance"), when a party "adopts his designation with the intent of deriving benefit from the reputation of the [senior user's] trade-mark," a court is justified in inferring that "there are confusing similarities" between them.  *Brookfield Comm.*, 174 F.3d at 1059.

193.    This factor thus favors the trademark owner where "the alleged infringer adopts his mark with knowledge, actual or constructive, that it was another's trademark."[8]  *See id.*; *see also AMF*, 599 F.2d at 354 ("When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived.").

194.    TVH adopted its H.W. CRABB'S TO-KALON VINEYARD designation knowing that Constellation owned incontestable federal registrations for TO KALON and TO KALON VINEYARD.  *See, e.g.,* TX1341; *Anticipated Testimony of Jeremy Nickel*.  Indeed, the purpose of filing the Declaratory Judgment Action was supposedly to *cancel* Constellation's federal registrations and gain approval to use the TO KALON name.  *See, e.g.,* ECF 1, ¶¶ 3, 4; *see also* ECF 45-1, p. 20 (complaining that Constellation's rights "prevented [TVH] from entering the market") (emphasis removed); *cf.* TX1378 at p. 7 (TVH only began offering their new wine for sale in December 2019).

---

[8] "Intent" in the context of a *Sleekcraft* analysis is not synonymous with "bad faith."  "The point is not that an intent to confuse is relevant as some measure of culpability."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002).  "Rather, the alleged infringer's judgment as to what is likely to be confusing is relevant because it may well be accurate."  *Id.*; *see also Brookfield Comm.*, 174 F.3d at 1059 (actionable intent may reflect either an "intent [to] deriv[e] benefit from the reputation of the [senior] trade-mark" *or* an "intent to deceive the public").

195.     In fact, the U.S. Trademark Office *warned* TVH that using "TO-KALON VINEYARD" on wine (even if prefaced with "H.W. CRABB'S," as Defendant is doing) would likely cause confusion with Constellation's TO KALON VINEYARD mark.  *See* TX1544 at p. 4 ("In light of the similarities between the marks and the relatedness of the goods, it is likely that consumers who encounter the parties' goods will falsely conclude that they originate from the same source.")

196.     Furthermore, it's clear that TVH was aware that TO KALON had a strong reputation among consumers, that the right to produce wines bearing the TO KALON VINEYARD designation was both limited and valuable, and that wineries allowed to put "TO KALON" on their wine labels could command premium prices for their products.  *See Anticipated Testimony of Doug Frost*.

197.     TVH also blatantly attempted to associate itself with the TO KALON mark by sponsoring a horse farm in Wellington, FL owned by TVH's principal that he conveniently renamed to TO KALON.  TVH sponsors events at this forum associating its Vineyard House name as well as its wines (whether bearing the TO KALON mark on the bottles or not) with the TO KALON name, advertising its wine events in association with TO KALON.  In fact, promotional videos for events at the TO KALON farm prominently display the TVH name as well as displaying its wines.  Even more on the nose, TVH placed its TVH wine barrels featuring The Vineyard House name at the *front gate* to the TO KALON farm.  If there ever were a more purposeful association, it would be hard to find.

198.     Because TVH adopted the H.W. CRABB'S TO-KALON VINEYARD designation with the intent of deriving a benefit from the reputation of the TO KALON name, TVH clearly intended for consumers to believe that its goods are associated with (*e.g.,* licensed by) Constellation or its TO KALON VINEYARD wines.  *See Brookfield Comm.*, 174 F.3d at 1059.

199.     Because TVH adopted the H.W. CRABB'S TO-KALON VINEYARD name with the knowledge that the mark TO KALON already belonged to Constellation and with indifference to

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Constellation's prior rights in the TO KALON Marks, this factor favors a finding of likelihood of confusion in Constellation's favor.

### h) Expansion of TVH's TO KALON Marks (Factor 8)

200. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (internal citations omitted).

201. Similarly, the "likelihood of expansion" factor (Factor 8) is also irrelevant because the products are already considered related. *See JL Beverage*, 899 F. Supp. 2d at 1008 (citing *Playboy Enters., Inc. v. Netscape Commc'ns Corp.,* 354 F.3d 1020, 1029 (9th Cir. 2004)).

202. Constellation has presented evidence that the parties already compete in the same market (and submarket) segment (ultra-premium, Napa County wines produced in Oakville); there is no need to consider the potential for "expansion" —the parties already directly compete. *See GoTo.com*, 202 F.3d at 1209 ("Because [defendant] and [plaintiff] compete with one another …, we decline to evaluate the issue of whether there is a likelihood of expansion of their product lines.").

203. Thus, this and the remaining factors factor favors a likelihood of confusion and TVH's use of the TO KALON Marks, including it use of H.W. CRABB'S TO KALON VINEYARD infringes Constellation's trademarks.

### i) The Balance of *Sleekcraft* Factors Favors Constellation

204. On balance, all of the relevant *Sleekcraft* factors favor Constellation or are neutral.

205. Accordingly, TVH's actions, as described above, constitute trademark infringement as well as unfair competition in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* and related provisions of California State Law, including California Business & Professionals Code § 17200 et seq., and common law trademark infringement.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

#### j)     TVH's Actions Were Willful

206.    "[I]n order to prove willfulness… [a trademark owner] must show that [the infringer's] infringement is willfully calculated to exploit the advantage of an established mark or that [the infringer] is attempting to gain the value of an established name of another." *Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1103 (N.D. Cal. 2019).

207.    Here the record establishes that TVH was clearly aware of Constellation's trademark rights, having conducted its own trademark search, was even warned both internally and by the USPTO that its proposed used of TO KALON might cause confusion with Constellation's rights, and did so notwithstanding such warnings.

208.    Moreover, the record establishes that TVH sought to exploit the goodwill of the existing TO KALON mark to its own commercial advantage to help boost its sales.

209.    Finally, the record establishes that TVH continued to exploit the TO KALON mark even during the pendency of this litigation by launching its branded wines well aware of its potential liability and even in violation of this Court's preliminary injunction entered against it.  *See e.g., Stanley Black & Decker, Inc. v. D&L Elite Investments, LLC, No. 12-CV-04516-SC*, 2014 WL 3728517, at *2 (N.D. Cal. July 28, 2014) ("[T]here is powerful evidence of willfulness here because Defendants continued to infringe upon Black & Decker's trademarks even after the Court entered a temporary restraining order ('TRO') and a preliminary injunction prohibiting them from doing so.")  *citing Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003).

#### B.     TVH'S Promotion of Its Wine as Associated With the "Historic" TO KALON Constitutes False Advertisement

210.    In order to prove a false advertising claim under 15 U.S.C. § 1125(a)(1)(B), a Plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement
>
> about its own or another's product; (2) the statement actually deceived or

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products.

*Wells Fargo & Co. v. ABD Ins. & Financial Srvcs.*, 758 F.3d 1069, 1071 (9th Cir. 2014) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997).

211.    Commercial advertising is defined as "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) the representations must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).

212.    "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland*, 108 F.3d at 1139.

213.    As explained above in regards to Constellation's trademark infringement claim, TVH purposefully and prominently references "TO KALON VINEYARD" and "H.W. CRABB'S TO KALON VINEYARD" on the front and back labels of its wine. *See* FOF ¶¶ 74-78, COL ¶ 161; *accord Anticipated Testimony of Susan McDonald.*  It also displays multiple signs on its property that say "To Kalon Vineyard" viewable to visitors at its property where it hosts events, tours its vineyards, and sells both wines and grapes to third parties, and hosts co-promotion events with Nickel's To-Kalon Farm. *Expected Testimony of Jeremy Nickel*; supra, FOF ¶¶ 65-73.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

214.    The purpose in advertising its vineyard and wine as "H.W. CRABB'S TO KALON VINEYARD" is to lead consumers to the erroneous belief that TVH's vineyard and wine are associated with the "historic" TO KALON Vineyard owned by H.W. Crabb.  *Anticipated Testmony of Jeremy Nickels.*

*215.*    In addition to its infringing use of TO KALON, by associating itself with Crabb, whose grapes and wine were known to be of high quality, TVH can sell its wine at a substantial premium. *Anticipated Testimonies of Jeremy Nickels, David Reibstein; Doug Frost.*

216.    However, TVH's claim is based on the <u>false</u> assertion that its vineyard rests within the property that comprised Mr. Crabb's vineyard.  Although the TVH vineyard contains some small portion of the Baldridge Tract, which was owned by Crabb for a period, there is no evidence that the Baldridge Tract was used by Crabb for grape growing or wine making.  *See* TX1440 at 4, 16.

217.    Indeed, the historical record of Crabb's land makes the falsity of this claim quite clear. When Mr. Crabb died, the appraiser for his estate listed and valued the 359-acre "To Kalon Vineyard Property" (comprised of the 1868 and 1881 Parcels) *separately* from the non-adjacent "Baldridge Tract," which the appraiser described only as having "valuable timber."  *See id.*

218.    When challenged, TVH admitted **it has no proof** Mr. Crabb <u>ever</u> grew a single grape on the Baldridge Tract for his TO KALON brand wine.  *See* TX1495 at 4 ("We just don't know"); *see also* TX1002 at 19-20; TX1003 at 9-10; TX1440 at 4; TX1475 at 15; *Anticipated Testimony of Mark de Vere*; *Anticipated Testimony of Jeremy Nickel; Anticipated Testimony of Miltenberger*.

219.    Moreover, there no proof that anyone ever referred to TVH's property as TO KALON (whether historically or currently), not even Jeremy Nickels.  Indeed, both Mr. Nickel and his father, repeatedly referred to that land as HALTER VALLEY, a name reflected in both legal disputes between Mr. Nickel and his family over his property, as well as on early drafts of TVH's labels for the subject wines before it decided to associate itself with the TO KALON name.  *Expected Testimony of Jeremy Nickel*; TX1382; TX1386 at 3; TX1341; TX1333; TX1390 at 3.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

220.    When, as is here, a claim is literally false, Constellation need not provide evidence on whether the claim was deceptive or material.  *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("[W]hen the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers [because] [i]n such a circumstance, the court will assume that the statements actually misled consumers."); *Logan v. Burgers Ozark Cty. Cured Hams Inc*., 263 F.3d 447, 462 (5th Cir. 2001) (ruling with literal false statements, a plaintiff need not show that these statement "did not mislead [] customers and that the advertising did not affect their purchasing decision [were] inconsequential"); *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978) ("Deceptive advertising or merchandising statements may be judged in various ways. If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product.")

221.    Nonetheless, the impact of associating itself with the TO KALON name is clear—once TVH began to associate itself with "TO KALON," it immediately began to see a substantial increase in sales, including a 51.3 percent increase in direct-to-consumer sales and a 28.6 percent increase distributor sales. *Anticipated Testimony of John Jarosz;* TX1361-TX1369.  TVH has failed to provide an alternative explanation for such a dramatic increase in sales, thus it can be only be attributed to sudden promotion of its wine with Crabb and the TO KALON name.  *Anticipated Testimony of John Jarosz. Skydive Arizona, Inc. v. Quattrocchi*, 673 F. 3d 1105, 1110-11 (9th Cir. 2012) ("Although materiality in false advertising claims is 'typically' proven through consumer surveys, nothing in the Lanham Act, nor under our precedents, requires a plaintiff to use such surveys.") (citing *Southland Sod Farms*, 108 F.3d at 1140); *Skydive Arizona, Inc. v. Quattrocchi,* 673 F.3d 1105 (9th Cir. 2012) (holding that a declaration may support a finding of materiality).

222.    Consequently, TVH's advertisement of its vineyard and wines using the TO KALON name or the H.W. Crabb name constitutes false advertising under Section 43(a) of the Lanham Act.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

**C.     TVH's Affirmative Defenses and Counterclaims Fail**

**1.     Constellation's Registrations Were Not Procured Through Fraud**

223.    "A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof." *In re Bose*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).  "[T]he very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.  There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Id.* (*quoting Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB1981)); *accord OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018) ("We agree and join the Federal Circuit in requiring clear and convincing evidence for the elements of fraud on the [Trademark Office].") (referencing *In re Bose*).

224.    To cancel Constellation's TO KALON registration, TVH must prove each of the following elements by clear and convincing evidence: (1) Robert Mondavi (acting through his company) supposedly made a false representation to the Trademark Office; (2) he *knew* the representation was false; (3) he *intended to deceive* the Trademark Office and trick it into granting the registration; and (4) *but for* that false representation, the Trademark Office would have denied the registration.  *See Bose*, 580 F.3d at 1245; *accord OTR Wheel Eng.,* 897 F.3d at 1019 (applying the same standard); *see also Adolphe Lafont, S.A. v. Societa Azioni Confezioni Sportive Ellera, S.p.A.*, 228 USPQ 589, 593 (TTAB 1985) ("the concept of fraud … involves a willful withholding by the applicant, with intent to deceive, of material facts which, if disclosed, would result in refusal by the Office to register the mark").

225.    Proof the applicant willfully intended to deceive the Trademark Office is always of critical importance— "absent the requisite intent to mislead …, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation."  *Bose*, 580 F.3d at 1243; *see also id.* at 1245 ("Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis…'[S]uch intent can be inferred from indirect and circumstantial

evidence[,] [b]ut such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement.'") (*quoting Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)) (brackets and ellipses added).

226.    TVH alleges that by failing to disclose the purported association of the TO KALON name with Crabb's original estate, Mondavi committed "geographic fraud" on the USPTO.

227.    TVH does not (and cannot) prove "fraud," because the fraud did not happen.

228.    First, TVH has failed to offer any proof that TO KALON has any geographic meaning (whether historically or currently).  No maps refer to TO KALON as a geographic area.  Moreover, TVH cannot even define what geographic area supposedly encompasses the label TO KALON.  Thus, it cannot show a false statement was made to the Trademark Office.

229.    Second, there is no evidence Mondavi knew that "To Kalon" was geographic (even assuming it was).  Indeed, Mr. Mondavi testified that before he bought the property, he had never even *heard* of "To Kalon," despite having worked in the wine industry all his life. *See* TX1062 at 84:18-85:13 ("I knew the land as Stelling land … when we were interested in buying it…. I heard of Stelling, but I never heard of To Kalon.").

230.    Third, it is quite clear Mondavi had no intention of deceiving the Trademark Office as Mondavi *himself* disclosed the historic relevance of the name to the Trademark Office.  In response to the Examining Attorney asking whether "To Kalon" "has any meaning or significance" in the wine industry (note the use of the present tense), TX1027 at p. 47, Mr. Mondavi answered truthfully that he believed the phrase had "no present meaning or significance" other than as his brand.  Mondavi disclosed that "To Kalon" had been used as the name of a winery in the past, TX1027 at p. 52. *Anticipated Testimony of Robert Cissel*.

231.    Finally, even if Mondavi failed to disclose any "geographic" significance, it is also clear that the Trademark Office conducted its own search and determined that there is no impediment to Mondavi registering the TO KALON Marks.  As part of its examination of Mondavi's applications, the U.S. Trademark Office conducted *its own search*, and found that the names TO KALON and TO

KALON VINEYARD were not "geographically descriptive," and that the "specimens" the company submitted demonstrated proper use of the names *as trademarks*.

232.    The Examining Attorney even searched the vast Nexis online commercial database for any mention of "Tokalon," or of "Kalon" in the same document as "wine" (which search would have picked up "To Kalon" and "To-Kalon" as well), and, himself found no references to use of the mark in connection with wine:



TX1027 at 72; *Anticipated Testimony of Robert Cissel*.

233.    Thus, TVH cannot prove that the TO KALON Registrations were procured through fraud.

### 2.    Constellation Rigorously Monitors Use of Its TO KALON Marks

234.    TVH argues that Constellation abandoned its trademark rights because it failed to exercise quality control over its licensees.  Infringement Action, ECF 31.  "A trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained.'" *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010).  "Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof." *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-E.*, 542 F.2d 1053, 1059 (9th Cir. 1976).

235.    "Naked licensing occurs when a licensor does not exercise adequate quality control over its licensee's use of a licensed trademark *such that the trademark may no longer represent the quality of the product or service the consumer has come to expect*."  *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 512 n.1 (9th Cir. 2010) (*emphasis added*).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

236.    "As the Ninth Circuit observed in *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977), the proponent of a claim of insufficient control must meet a high burden of proof.  The purpose of the control requirement is the protection of the public. … We thus do not believe that the Philadelphia Jaycees have proved abandonment under section (b) of the statutory definition. We conclude that, although the United States Jaycees did display a degree of tolerance toward some of its disobedient chapters in the use of its marks, such conduct did not …cause its marks to lose their significance.  The National therefore has not abandoned its marks." *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 (3d Cir. 1981);  *see also Blue Magic Prods., Inc. v. Blue Magic, Inc.*, No. Civ. S-001155WBSJFM, 2001 WL 34098657, at *5 (E.D. Cal. Sept. 5, 2001) (holding that court must determine if lack of control caused a trademark to lose significance in order to find abandonment); *accord Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99, 133 S. Ct. 721, 731, 184 L. Ed. 2d 553 (2013) (noting that naked licensing can result in loss of significance of a trademark that *may* warrant cancellation).  "Naked licensing" can occur only where a trademark owner "fails to exercise adequate quality control over the licensee" and as a result the trademark "loses significance.

237.    "[T]he amount of control required varies with the circumstances." *Edwin K. Williams & Co. v. Edwin K. Williams, Etc.*, 542 F.2d 1053 , 1060 (1976); *accord Freecycle*, 626 F.3d at 518 ("[T]he standard of quality control and the degree of necessary inspection and policing by the licensor will vary with the wide range of licensing situations in use in the modern marketplace.").

238.    A finding of naked licensing, however, is an exception, not the rule.  "Because the theory is essentially that a party forfeited trademark rights, the Ninth Circuit has described the standard required of the trademark challenger as 'stringent.'" *NEO4J, Inc. v. Purethink, LLC*, No. 5:18-cv-07182-EJD,  2020  U.S.P.Q.2d  10560,  No.  *7  (May  21,  2020  N.D.  Cal.  2020)  (*quoting FreecycleSunnyvale*, 626 F.3d at 514).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

239.    To determine if naked licensing has occurred, courts apply a two-part test.  First, courts ask if there is an express contractual right to control the licensee.  Second, if there is not an express contractual provision, courts determine if the licensor actually control the licensee. *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010);  *see also, Wallack v. Idexx Labs., Inc.,* No. 11CV2996-GPC KSC, 2015 WL 5943844, at *9 (S.D. Cal. Oct. 13, 2015) ("First, the court looks at whether the license contains an express contractual right to inspect and supervise the licensee's operations. Second, if there is no express contractual right to inspect, then courts look at whether the licensor demonstrated actual control over the trademark.")  If a licensor satisfies the first prong, that by itself is sufficient to defeat a naked licensing claim because it would otherwise render the second prong of the test superfluous.

240.    However even the absence of an agreement with quality control provisions "is not conclusive evidence of lack of control."  *NEO4J, Inc. v. Purethink, LLC*, No. 5:18-cv-07182-EJD, at *7 (quoting *FreecycleSunnyvale*, 626 F.3d at 516); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085 , 1098 (9th Cir. 2013) ("[e]ven absent formal quality control provisions, a trademark owner does not abandon its trademark where the particular circumstances of the licensing arrangement suggests that the public will not be deceived") (internal quotes and citation omitted).  "[A] licensor need only exercise 'control sufficient to meet the reasonable expectations of customers.'" *Freestyle*, 626 F.3d 519 (quoting McCarthy, § 18:55).

241.    Although TVH has sought to discredit Constellation's ownership by alleging it does not properly perform quality control on its licensee, Beckstoffer Vineyards, Constellation has shown both a contractual and circumstantial control over its licensees and sublicensees.

242.    In keeping with maintaining its strict brand association, the only parties permitted to use Constellation's TO KALON Marks for wine are Constellation and its subsidiaries, and a select group of nearby wineries that are sub-licensed by Mr. Andy Beckstoffer, a celebrated grape-grower in

his own right.  *Anticipated Testimony of Nova Cadamatre.*

243.    Constellation's written license with Beckstoffer strictly limits the manner in which it may authorize use of the TO KALON Marks on sublicensee wine labels, the quality and price of the wine for which they may use the TO KALON Marks (which must be a proven ultra-premium wine), the source of the  grapes used in making the sublicensee's wines (which must be made up 95% grapes from 89 acres defined in the license agreement), the annual volume of cases of wine each  may produce.   In addition, the contract requires Beckstoffer to ensure that all licensed wines meet applicable standards for ultra-premium and luxury wines.  TX1047 at 3.  The express contractual provisions giving a contractual right to maintain quality and quality assurance by itself is sufficient to defeat TVH's affirmative defense of naked licensing.

244.    There exists ample evidence of actual monitoring and inspection of the sublicensees as well.   Constellation winemaking team routinely both organaleptically tastes and chemically and phenolicly analyzes wines labeled with Beckstoffer's TO KALON along with its own Mondavi TO KALON wines.  *Anticipated Testimony of Mark de Vere*; *Anticipated Testimony of Nova Cadamatre*. These have been done in formal settings such as the TO KALON CERTIFICATION as well as organized tastings for the winemaking and marketing departments.  *Id.*  In addition, regular informal settings where these tastings also occurred included Napa Valley Wine Auction, Premier Napa Valley, Taste of Oakville, and informal gatherings of local winemaking groups including Oakville winegrower meetings and Napa Technical Group.  *Id.*  Constellation's winemakers also regularly work with sub-licensees winemakers to inform their winemaking practices.   *Anticipated Testimony of Nova Cadamatre.*

245.    Additionally, to track actions of its licensees and sub-licensees, Constellation reviews Certificate of Label Approval (COLA) applications which carry the TO KALON designation through the Alcohol and Tobacco Tax and Trade Bureau (TTB), and tracks and reports on wine ratings, price

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

and case production in the press for any anyone using its TO KALON Marks, including the Beckstoffer sub-licensees. *Anticipated Testimony of Nova Cadamatre; Anticipated Testimony of Elisabeth Baron*.

246. Further, Constellation regularly monitors the marketplace actions of Mr. Beckstoffer and his sublicensees. Constellation's legal department reaches out to Mr. Beckstoffer to ensure appropriate actions are taken when questions arise. *Anticipated Testimony of Nova Cadamatre*; *Elisabeth Baron*; *see e.g.*, TX1065. Mr. Beckstoffer himself reaches out to his sublicensees to ensure their compliance when an issue is brought to his attention. *Anticipated Testimony of Andy Beckstoffer*; TX1006; TX1068.

247. In addition, a licensor may rely on its licensee to monitor the quality of its sublicensees. *Hokto Kinoko Co. v. Concord Farms, Inc*., 738 F.3d 1085, 1098 (9th Cir. 2013) (licensor could rely on US licensee to monitor quality control); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1017–18 (9th Cir. 1985) (licensor could rely on licensee to maintain quality control given licensee's "overall knowledge and ability in product development for this market"). Here, Constellation's sole licensee Andy Beckstoffer rigorously maintains the quality of its sublicensees' wines. Mr. Beckstoffer handpicks the sublicensees only after vetting the sublicensees' winemaker's track record. In addition, Mr. Beckstoffer controls the quality of the source grapes contractually required to be used in the sublicensees' wines. Further, Mr. Beckstoffer regularly checks the quality of the sublicensees' wines and requires that the sublicensees submit their wines for critical reviews that Mr. Beckstoffer monitors. *Anticipated Testimony of Andy Beckstoffer*; TX1416; TX1282.

248. It is clear that Constellation has not only met its duty to perform quality control over the Beckstoffer licensees, but given that Constellation is literally a neighbor to the sublicensees, Constellation is able to keep a much closer eye than typically exists in a licensor-licensee relationship. For example, Constellation's wine makers frequently transit the Beckstoffer vineyard land and observe the grapes being grown and even taste them during the growing season. Since Constellation's sister

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

winery, Schrader, is itself a sublicensee of Mr. Beckstoffer, Constellation is kept informed of the periodic grape testing done by Schrader during each growing season.

249.    The evidence of record establishes as well that TO KALON as a trademark is still highly prized, used only by Constellation and its sublicensees, is heavily promoted by Constellation and enjoys extremely high acceptance in the wine marketplace.  It has not lost the function of serving as a trademark and consequently TVH has failed to meet its high burden of establishing a naked licensing defense.

### 3.    TVH's Actions are Not "Fair Use"

250.    TVH alleges it is entitled to make a "fair use" of TO KALON to refer geographically to the area in which it grows its grapes and refer to H.W. Crabb's historical vineyard operation.  Yet, TVH cannot establish either because TO KALON is not a geographic reference and TVH fails to present any evidence that its property was used by Mr. Crabb as part of his historic vineyard operation. In any event, TVH is foreclosed from asserting a fair use defense because it is using TO KALON as a trademark.

251.    The first requirement of the "fair use" defense is that the use a party seeks to exclude from a claim of infringement must be "otherwise than as a mark."  15 U.SC. § 1115(b)(4).  A phrase functions as a trademark if it is used to "identify and distinguish" a party's goods from those sold by others and to indicate source.  *See id*, § 1127; *see also TMEP*, § 1202.  TVH's use is as a trademark and so it fails on this threshold question and no further inquiry is necessary.  However the record establishes that TVH fails to meet any of the standards of "fair use."

252.    TVH would also have to prove that when consumers see H.W. CRABB'S TO KALON VINEYARD on bottles of TVH wine, they will consider it a common phrase in ordinary use or as merely conveying general information about the product, and not as a trademark.  The use by TVH clearly is to distinguish its products.  *See TMEP*, §§ 1202, 1202.04; *Anticipated Testimony of Susan McDonald*.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

253.    TVHs argues that putting H.W. CRABB'S TO KALON VINEYARD on the  labels of its wines would not be seen as distinguishing the product from those made by others.  That argument in the context of the record in his case is frivolous.  The Trademark Office has repeatedly found that putting the name of a vineyard on a label is a trademark use. *See Anticipated Testimony of Robert Cissel; Anticipated Testimony of Paul Reidl.*

254.    Furthermore, *this Court* has also held that putting a vineyard name ["Meeker Vineyard"], even "in small letters," on the front of a wine label [shown below] "to state where the grapes used for that particular wine were grown" is "the very essence of use as a mark" and thus cannot be a "fair use":



*See Meeker v. Meeker*, 2004 WL 2457793, *8, 10 (N.D. Cal. 2004).

255.    In addition, TVH *itself* is seeking to federally register several "vineyard designations" **as trademarks**, *see, e.g.*, TX1576, TX1578, TX1579, including for a use that is indistinguishable from how TVH uses H.W. CRABB'S TO-KALON VINEYARD today:

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

| H.W. CRABB'S TO-KALON VALLEY VINEYARD (U.S. Serial No. 88009715) | H.W. CRABB'S TO-KALON VINEYARD (Current Use) |
|---|---|
|  |  |

*Compare* TX1690; *Anticipated Testimony of Jeremy Nickel*.

256.    TVH has put forth no evidence that would support a finding that it is using the phrase H.W. CRABB'S TO-KALON VINEYARD "otherwise than as a mark," *cf.* 15 U.S.C. § 1115(b)(4), let alone to carry its burden of proof.  *Cf. Perfect 10*, 508 F.3d at 1158 (9th Cir. 2007) (party that seeks to rely on an affirmative defense in opposition to a motion for a preliminary injunction must show "a likelihood that its affirmative defense will succeed).

257.    The second requirement of the "fair use" defense (assuming the subject use is "otherwise than as a mark") is that the phrase in question must be "descriptive of … the goods or services of [the] party, or their geographic origin."  15 U.S.C. § 1115(b)(4).[9]  TVH claims that TO-KALON VINEYARD is "geographically descriptive."

258.    However, as noted supra, the TO KALON Mark is a ***brand***, and has never identified a single contiguous plot of land either, and each of the prior brand's owners used the brand in connection with grapes grown on their own respective lands (whose borders changed several times) and grapes purchased from others. *Anticipated Testimony of David Reibstein*; TX1069; TX1045.

---

[9] The Lanham Act also imposes a further requirement of "good faith."  15 U.S.C. § 1115(b)(4).  Given that TVH's clear intent and conduct, even objectively, it cannot avail itself to a fair use defense.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

259.   Indeed, TVH and at least one third party claiming geographic significance cannot agree on what geographic area that term allegedly label refers to.  *Anticipated Testimony of Jeremy Nickel*; TX1342.

260.   Even if TO KALON were geographically descriptive (*but see* TX1485 at 2; 15 U.S.C. 1115(b)), and even if Constellation's trademarks did not prevent such use, TVH has no right to use such a term to describe the origins of its goods because it has presented no evidence that Mr. Crabb ever historically used TVH's land as part of his vineyard operation.  To the contrary, Mr. Crabb's probate records and all historical reports fail to find any evidence that Mr. Crabb ever grew grapes on TVH's property and so any use by TVH of TO KALON to describe its land or products would be false and deceptively misleading.  *See* TX1002 at 19-20; TX1003 at 9-10; TX1440 at 4; TX1475.

261.   Accordingly, TVH cannot claim that its use of the TO KALON Marks is justified as "fair use."

**D.   TVH's False Advertising Claim Must Fail.**

262.   As noted above, FOF 74-76, elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

263.   Because TVH cannot cancel Constellation's TO KALON registrations, *see supra*, its "false advertising" claims (Counts I, III, and IV) fail as a matter of law.  A party's use of its own registered mark for the covered goods cannot possibly be "unfair" or "false or misleading."  *See Mighty Enterprises*, 2015 WL 276771, *3; *Thermos*, 1995 WL 842002, *7; *cf.* 15 U.S.C. §§ 1115(b), 1125(a).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

264. The basis for TVH's claims is its repeated intonation that saying Constellation's wines come from "To Kalon Vineyard" is somehow "*literally* false." To prove literal falsity, however, a party must establish that the statements are "unambiguously" false, meaning the language cannot be subject to more than one reasonable interpretation. *See Kwan Software Eng., Inc. v. Foray Tech., LLC*, 2014 WL 572290, *5 (N.D. Cal. 2014); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002) ("Because the graphic can reasonably be understood as conveying different messages, [plaintiff's] literal falsity argument must fail."). Furthermore, that critical assessment as to the different ways a statement could be interpreted must be conducted from the perspective of a reasonable consumer. *See*, *e.g.*, *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir. 2008); *see also Utah Medical Prod. v. Clinical Innovations*, 79 F.Supp.2d 1290, 1309 (D. Utah 1999) ("While actual consumer confusion is not necessary to assert a claim of literal falsity, the perspective of the relevant consumer population is necessary in determining whether the advertising could be viewed as false.").

265. TVH, however, offers no evidence that consumers understand TO KALON today as functioning as anything *other than a brand*—and a brand of Constellation (Mondavi Winery). Given that Constellation has been selling TO KALON wines for more than thirty years to the exclusion of all but its sublicensees, TVH has failed to carry this burden.

266. For example, Plaintiff does not offer a consumer survey or any other objective proof as to how consumers understand the phrase with respect to its historic and/or allegedly geographic origins.[10] *Cf. Kwan Software*, 2014 WL 572290, *5 ("Literal falsity is a question of fact."); *cf. also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144-45 (9th Cir. 1997).

---

[10] It is worth noting here that Constellation, unlike Mr. Crabb, makes its TO KALON and TO KALON VINEYARD wines almost exclusively (95%+) from grapes grown on land Mr. Crabb once owned, or the adjoining "Doak Extension." TX1089; TX1139. Purely as a matter of trademark law, however, Constellation *could* use grapes from anywhere (subject to regulatory labeling requirements) and still call its wine "TO KALON." *See* 15 U.S.C. § 1115(b).

267.   Even if TVH had established its false advertising claim, its claim must fail based on laches.  Laches determines whether a party unreasonably delayed in filing suit such that it would be inequitable to enforce such a dilatory claim.  Courts apply a two-step process to determine laches.  "First, we assess the length of delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action.  Second, we decide whether the plaintiff's delay was reasonable.  The reasonableness of the plaintiff's delay is considered in light of the time allotted by the analogous limitations period."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (citations omitted).

268.   "[I]f the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit."  *Id.* at 837 (internal citations omitted).  "We further hold, consistent with our precedent, that in determining the presumption for laches, the limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action."  *Id.* Based on the analogous California false advertising claim, the limitations period to apply laches is three years.  *Id.* at 838.

269.   Here, TVH did not file its false advertising claim until March 2019.  However, the record establishes that TVH was well aware of TO KALON at least as early as 2011, well before the 3-year limitations period.  Moreover, Constellation's sale of its TO KALON branded wines was open and notorious for more than 30 years.  In addition, TVH's principal Mr. Nickel grew up in Napa and in fact lived directly *across the street* from the Mondavi Winery with its TO KALON VINEYARD sign facing his childhood home right on Highway 29.  Napa is a small community and that Mr. Nickel and TVH could have been unaware of Constellation's ongoing sale of its TO KALON wines defies belief.

270.   As such, TVH's false advertising claim is barred based on laches.

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

271.   In addition, TVH's false advertising claim is barred based on unclean hands.  "To prevail, the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

272.   Here, TVH's false advertising claim is premised on Constellation's alleged use of TO KALON to suggest its wines are associated with H.W. Crabb's historic vineyard under the same name. However, TVH seeks to exploit TO KALON for the same purpose.  TVH advertises and labels its wine products using the TO KALON label and refers to the historic H.W. Crabb To Kalon Vineyard. TVH has even applied for its own trademarks covering TO KALON.  Yet, TVH fails to present any evidence that its property was historically used by H.W. Crabb in his vineyard operations.

273.   As such, TVH cannot complain of Constellation's alleged false or misleading statements when TVH makes such a claim itself in its advertising without any substantiation. Therefore, TVH's false advertising claim must fail.

274.   Accordingly, TVH has not shown that Constellation was falsely advertising its products sold under Constellation's own, incontestable trademarks.

## III.   THE ISSUANCE OF AN INJUNCTION IS WARRANTED

275.   The district court is vested with the "power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of the trademark owner. *See* 15 U.S.C. § 1116(a).

276.   To obtain a permanent injunction, a party must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

277.     Constellation has demonstrated: (1) actual success on the merits; (2) a likelihood of irreparable injury if injunctive relief is not granted; (3) a balance of hardships favoring Plaintiff; and (4) that an injunction will advance the public interest.  *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008).

278.     First, as shown *infra*, Constellation has achieved actual success on its trademark infringement and unfair competition claims.

279.     Second, if an injunction were not granted, Constellation would suffer irreparable injury from the ongoing damages to its goodwill and diversion of customers to TVH's infringing goods and services.

280.     "Irreparable harm is … harm for which there is no adequate legal remedy. *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015) (quoting *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)).

281.     "Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate.  This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *see also IC Mktg., Inc. v. The Taunton Press, Inc.*, No. 03-cv-3069-CO, 2005 WL 503180, at *14 (D. Or. Mar. 3, 2005) ("Where the availability of a product is essential to the life of a business or increases sales beyond sales of the product, the damages caused by the loss of the product will be more difficult to quantify, and injunctive relief is appropriate.").

282. Constellation has proven that it is likely that Constellation will suffer an irreparable injury based on evidence that, absent an injunction, Constellation will (1) lose prospective customers and business opportunities as a result of confusion of its customers and potential customers, and (2) lose control over its name and business reputation and suffer damage to its goodwill.

283. Constellation has shown that the TVH wines are different in style and taste that consumers of the Constellation/Beckstoffer TO KALON wines have come to expect. Given the price point of these wines, consumers expect high end wines to be of a consistent style. Most of these wines are sold on allocation at very high price points. If consumers tried the TVH wines expecting it to be yet another licensed TO KALON wine, their expectations would not be met and consumers might be dissuaded from purchasing future TO KALON branded wines, including those lawfully labeled by Constellation as TO KALON.

284. Further, as Professor McCarthy notes, "once a probability of proving likelihood of confusion at trial is shown, the trademark owner's business goodwill and reputation are at risk. … Because of the likelihood that confused persons will mistakenly attribute to plaintiff defects or negative impressions they have of defendant's goods or services, the plaintiff's reputation is threatened: it is in the hands of the defendant … A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation. This distinguishes trademark cases from the neighboring areas of patent and copyright law." 5 McCarthy on Trademarks and Unfair Competition § 30:47.70 (5th ed.); *see also Boulan S. Beach Master Ass'n, Inc. v. Think Properties, LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) (internal citations and quotations omitted); *see also Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc*., 735 F.3d 735, 741 (7th Cir. 2013) ("[I]rreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1   between the filing of a trademark infringement complaint and final judgment is sure not to be

2   trivial).").   Loss of control over "trademarks, reputation, and goodwill" are "a quintessentially

3   irreparable injury." *Adidas Am., Inc. v. Skechers USA, Inc*., 149 F. Supp. 3d 1222, 1249 (D. Or. 2016)

4   (citing *Herb Reed*, 736 F.3d at 1250 ("Evidence of loss of control over business reputation and damage

5   to goodwill c[an] constitute irreparable harm.")); *see also 2Die4Kourt v. Hillair Capital Mgmt., LLC*,

6   692 F. App'x 366, 369 (9th Cir. 2017) (affirming district court's finding of irreparable harm based on

7   loss of control over business reputation); *Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon*

8   *Rubber Corp*, No. 14-cv-1847-JAD-VCF, 2015 WL 6501228, at *4 (D. Nev. Oct. 26, 2015) (finding

9   harm where the plaintiff "has shown that it has spent considerable time and effort building its

10  reputation.").

11       285.    Third, the balance of hardship favors Constellation.   If TVH is allowed to

12  misappropriate Constellation's goodwill and free-ride on the decades of work invested by

13  Constellation in building up that goodwill through continued use of the TO KALON Marks in

14  connection with wine and wine related services (such as tasting, promotional events, etc.),

15  Constellation risks harm to its reputation and loss of goodwill. *E & J Gallo Winery v. Grenade*

16  *Beverage LLC*, No. 1:13-cv-0070-AWI-SAB, 2014 WL 4073241, at *14 (E.D. Cal. Aug. 15, 2014)

17  ("Courts have recognized that, in trademark cases, the injury caused by the infringement manifests as

18  the loss of control over a business' reputation, a loss of trade and loss of goodwill." (*citing CytoSport*,

19  617 F. Supp. 2d at 1080 ("Trademarks serve as the identity of their owners and in them resides the

20  reputation and goodwill of their owners. Thus, if another person infringes the marks, that person

21  borrows the owner's reputation, whose quality no longer lies within the owner's control.")))

22       286.    Moreover, TVH has only recently begun to use the TO KALON Marks, and, in fact,

23  filed the Declaratory Judgement Action so it could obtain court approval to do so). Using a different

24  name would not constitute any burden to TVH.   TVH sold its wines under its own brand "THE

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1
2

VINEYARD HOUSE from the inception of the company until late 2019 and preventing it from unlawfully usurping the name of Constellation's premier wine is not a cognizable hardship.

3
4
5
6
7
8
9

287.    Finally, is well settled that preventing consumer confusion and protecting valuable trademark rights serves the public interest.  *See*, *e.g., Stark*, 907 F. Supp.2d at 1067; *Brooklyn Brewery*, 156 F. Supp.3d at 1186; *CytoSport*, 617 F. Supp.2d at 1081 (the public has the right "not to be deceived or confused").  A permanent injunction against TVH's continuing infringement is in the public interest because "[t]he public has an interest in avoiding confusion between two companies' products." *Id.*; *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.,* 559 F.3d 985, 993 n. 5 (9th Cir. 2009).

10
11
12

288.    Consequently, Constellation is entitled to a permanent injunction prohibiting TVH from using the TO KALON MARKS in connection with the sale and promotion of grape growing and wine.

13
14

**IV.    CONSTELLATION IS ENTITLED TO THEIR ATTORNEYS' FEES UNDER THE LANHAM ACT**

15
16
17
18
19

289.    "The courts in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  The term "exceptional" is not defined by statute.  The Ninth Circuit has held that attorneys' fees are available where the acts of infringement are malicious, fraudulent, deliberate, or willful.  *Rio Properties, Inc. v. Rio Int'l InterLink*, 284 F.3d 1007, 1023 (9th Cir. 2002).

20
21

290.    Constellation reserves the right to seek attorney fees and will brief such in accordance with L.R. 54-5.

22
23
24
25
26
27
28

**Hunton Andrews Kurth LLP**
50 California Street, Suite 1700
San Francisco, CA 94111

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

DATED:  September 21, 2020                    HUNTON ANDREWS KURTH LLP


                                             By:   /s/ Edward T. Colbert
                                                   Timothy J. Carlstedt
                                                   Edward T. Colbert
                                                   William M. Merone
                                                   Erik C. Kane
                                                   Armin Ghiam

                                             *Attorneys for Defendant,
                                             Constellation Brands U.S. Operations, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that **DEFENDANT CONSTELLATION BRANDS U.S. OPERATIONS, INC.'S PROPOSED FINDINGS OF FACTS / CONCLUSIONS OF LAW** was served electronically upon the following parties by the CM/ECF system on this 21st day of September 2020:

Jeffrey M. Judd
Peter Bales
BUCHALTER
55 Second Street
Suite 1700
San Francisco, California 94105-3493
Tel.: (415) 227-0900
Fax: (415) 227-0770
Email: jjudd@buchalter.com
           pbales@buchalter.com

Dated:  September 21, 2020                    By:     /s/Erik C. Kane
                                                              Hunton Andrews Kurth LLP