BUCHALTER
A Professional Corporation
JEFFREY M. JUDD (SBN: 136358)
PETER H. BALES (SBN: 251345)
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 227-0900
Fax:        (415) 227-0770
Email:    jjudd@buchalter.com
          pbales@buchalter.com

Attorneys for
THE VINEYARD HOUSE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

| | |
|---|---|
| THE VINEYARD HOUSE, LLC<br><br>                    Plaintiff,<br><br>          vs.<br><br>CONSTELLATION BRANDS U.S. OPERATIONS, INC.,<br><br>                    Defendant.<br><br>CONSTELLATION BRANDS U.S. OPERATIONS, INC.,<br><br>                    Plaintiff,<br><br>          vs.<br><br>THE VINEYARD HOUSE, LLC<br><br>                    Defendant. | CASE NO. 4:19-cv-1424-YGR<br>CONSOLIDATED CASE<br><br>**[TVH'S CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT .................................................................................. 1

    A.    The Parties.......................................................................................................... 1

    B.    Background ......................................................................................................... 1

    C.    The To Kalon Estate During the Crabb Era ....................................................... 5

    D.    The Historic To Kalon Estate During the Churchill Era.................................... 10

    E.    The Historic To Kalon Estate After the Churchill Era....................................... 12

    F.    Geographic Significance of the Terms "To Kalon" and "To Kalon Vineyard" ... 12

    G.    "To Kalon's" Significance to the Wine Industry ................................................ 19

    H.    RMW's Knowledge of the Historical and Geographic Significance of the
           Term "To Kalon" in 1987 ................................................................................. 25

    I.    Geographic Origin and Historic Terms on Wine Labels ..................................... 29

    J.    RMW License for the To Kalon Marks ............................................................. 31

    K.    CBUSO Advertising of the Geographic Origin of Its To Kalon-Branded
           Wines................................................................................................................ 37

    L.    TVH Cultivates Premium Wine Grapes on Part of the Historic To Kalon
           Estate That Become Wine ................................................................................ 38

CONCLUSIONS OF LAW........................................................................................... 39

    A.    TVH's Claim for Declaratory Relief Regarding Fair Use ................................... 40

    B.    TVH's Claim for Declaratory Relief Regarding Fraud and Cancellation............ 41

           Misrepresentation of Material Fact. .................................................................. 42

           Knowledge of Falsity and Intent. ..................................................................... 42

           Reasonable Reliance. ........................................................................................ 43

    C.    TVH's Claim for False Advertising and False Designation of Origin, 15
           U.S.C. § 1125(a) .............................................................................................. 44

    D.    TVH's Claims for False Advertising and Unfair Competition (California State
           Law) ................................................................................................................. 45

    E.    CBUSO's Affirmative Defenses ........................................................................ 46

           Laches and Estoppel.......................................................................................... 46

           Unclean Hands .................................................................................................. 47

    F.    CBUSO's Claim for Trademark Infringement.................................................... 48

i

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

G.    *Sleekcraft* Analysis ................................................................... 51

H.    CBUSO's Remaining Claims ..................................................... 51

I.    TVH's Request for Disgorgement of Profits ............................. 52

ii

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

5

**Cases**

6

*Adobe Sys., Inc. v. Christenson*,
   809 F.3d 1071 (9th Cir. 2015).........................................................................52

7

*Adray v. Adray–Mart*,
   76 F.3d 984 (9th Cir.1995)...............................................................................42

8

9

*Allstate Insurance Co. v. Healthy America Inc.*,
   9 USPQ2d 1663 (T.T.A.B. 1988) .....................................................................43

10

11

*Alyn v. S. Land Co., LLC*,
   2016 WL 7451546 (M.D. Tenn. 2016) .............................................................42

12

13

*Am. Casualty Co. v. Baker*,
   22 F.3d 880 (9th Cir. 1994)..............................................................................47

14

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979)............................................................................52

15

16

*Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*,
   603 F.3d 1133 (9th Cir. 2010)..........................................................................47

17

18

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*,
   289 F.3d 589 (9th Cir. 2002).......................................................................50, 51

19

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*,
   289 F.3d at 595 (9th Cir. 2002)........................................................................50

20

21

*Bluetooth SIG, Inc. v. FCA US LLC*,
   2020 WL 2794632 (W.D. Wash. 2020) ............................................................50

22

23

*In re Bose Corp.*,
   580 F.3d 1240 (Fed. Cir. 2009)........................................................................43

24

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999)..........................................................................51

25

26

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
   70 F.3d 267, 36 U.S.P.Q.2d 1855 (2d Cir. 1995).............................................40

27

28

i

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

*Caymus Vineyards v. Caymus Medical Inc.*,
    107 U.S.P.Q.2d 1519, 2013 WL 3984638 (T.T.A.B. 2013) ...................................... 43

*Cochran Firm, P.C. v. Cochran Firm Los Angeles LLP*,
    641 F. App'x 749 (9th Cir. 2016) ........................................................................ 48

*Cyclone USA, Inc. v. LL&C Dealer Servs., LLC*,
    2007 WL 9662337 (C.D. Cal. 2007)..................................................................... 47

*E & G Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992)....................................................................... *passim*

*E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.*,
    905 F. Supp. 1403 (E.D. Cal. 1994)..................................................................... 48

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
    2018 WL 659105 (N.D. Cal. 2018).................................................................. 49, 52

*FreecycleSunnyvale v. Freecycle Network*,
    626 F.3d 509 (9th Cir.2010)............................................................................... 50

*Gaffrig Performance Indus., Inc. v. Livorsi Marine, Inc.*,
    2003 WL 23144859 (N.D. Ill. 2003).................................................................... 42

*General Electro Music Corp. v. Samick Music Corp.*,
    19 F.3d 1405, 30 USPQ2d 1149 (Fed. Cir. 1994)................................................ 43

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir.), cert. denied, 537 U.S. 1047 (2002) ................................ 47

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004)........................................................................................... 40

*LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*,
    No. 18-CV-02573-YGR, 2019 WL 160335 (N.D. Cal. 2019)................................ 46

*Monster, Inc. v. Dolby Labs. Licensing Corp.*,
    920 F. Supp. 2d 1066 (N.D. Cal. 2013) .............................................................. 50

*Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC*,
    184 F. Supp. 3d 572 (W.D. Ky. 2016),
    *aff'd*, 687 Fed. Appx. 429 (6th Cir. 2017) .......................................................... 41

*Oracle Corp. v. Light Reading, Inc.*,
    233 F. Supp. 2d 1228 (N.D. Cal. 2002) .............................................................. 42

*OTR Wheel Engineering v. West WW Srvs.*,
    897 F. 3d 1008 (9th Cir. 2020)........................................................................... 44

ii

*RingCentral, Inc. v. Nextiva, Inc.*,
  2020 WL 4039322 (N.D. Cal. 2020)................................................................................. 45

*Robi v. Five Platters, Inc.*,
  918 F.2d 1439 (9th Cir. 1990)......................................................................................... 42

*Sazerac Brands, LLC v. Peristyle*, LLC,
  892 F.3d 853 (6th Cir. 2018)........................................................................................... 41

*Scotch Whiskey Assoc. v Consolidated Distilled Products, Inc.*
  (1981, ND Ill) 210 USPQ 639......................................................................................... 45

*SinCo Techs. Pte Ltd. v. SinCo Elecs. (Dongguan) Co.*,
  2020 WL 906721 (N.D. Cal. Feb. 25, 2020).................................................................... 50

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  537 F.3d 1357 (Fed. Cir. 2008)....................................................................................... 43

*Swiss Watch International, Inc. v. Federation of the Swiss Watch Industry*,
  101 U.S.P.Q.2d 1731 (T.T.A.B. 2012) ........................................................................... 43

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
  2009 WL 2366439 (C.D. Cal. 2009), *aff'd*, 434 F. App'x 664 (9th Cir. 2011),
  opinion withdrawn and superseded, 473 F. App'x 522 (9th Cir. 2011) ................................ 43

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011)..................................................................................... 42, 48

*Tri–Tron International v. Velto*,
  525 F.2d 432 (9th Cir. 1975)........................................................................................... 53

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
  549 F. Supp. 2d 1168 (N.D. Cal. 2007) .......................................................................... 45

**Statutes**

15 U.S.C. §§ 1114, 1115 and 1115(b)(4)............................................................................. 40, 41

15 U.S.C. § 1117(a) ................................................................................................................. 53

15 U.S.C. § 1125(a) .............................................................................................. 40, 44, 45, 52

Cal. Bus. & Prof. Code § 17200 ............................................................................................. 46

**Other Authorities**

27 CFR § 4.25 (e)(1)(i), Part 9............................................................................................ 29, 31

iii

BUCHALTER
A Professional Corporation
San Francisco

The Vineyard House ("TVH"), plaintiff in the above-captioned action, respectfully submits its [Proposed] Findings of Fact and Conclusions of Law (the "Findings"), as follows:

## PROPOSED FINDINGS OF FACT

### A. The Parties

1.      Plaintiff and consolidated defendant TVH is a California limited liability company with its principal place of business at 1581 Oakville Grade, Oakville, California 94562. Jeremy Justin Nickel ("Nickel") is TVH's sole member, manager, and President. Nickel founded TVH in 2008 to produce and sell wine. Dkt. 30 (Amended Complaint).

2.      Defendant and consolidated plaintiff CBUSO is a New York corporation with its principal place of business at 235 North Bloomfield Road, Canandaigua, New York 14424. CBUSO is among the largest beverage and wine producers in the United States and trades under numerous names, including Robert Mondavi Winery ("RMW"). Dkt. 1 (4:20-cv-0238) (Complaint).

3.      In 1966, Robert Mondavi established RMW in Oakville, Napa Valley, California. In 1988, the PTO approved RMW's application to register "To Kalon" as a trademark; in 1995, the PTO approved RMW's application to register the "To Kalon Vineyard" mark. In 2004, CBUSO acquired RMW's assets – including the To Kalon Marks – and has continuously operated RMW since its acquisition. Dkt. 1 (4:20-cv-0238) (Complaint).

### B. Background

4.      After the passing of his father, Gil Nickel, in 2003, Nickel inherited approximately nine acres of land off Oakville Grade Road in Oakville, California. The land included a small vineyard and an 1850s-era farmhouse, which Nickel's father had always called "The Vineyard House." In 2014 or 2015, Nickel acquired an additional 34 acres of adjacent land as part of the settlement of a family dispute. Nickel Tr. Vol. I at 26:16-27:4. [1]

5.      TVH currently leases the combined 43-acre property (the "TVH Property") from a

---

[1] References are made to deposition testimony because these proposed findings are being submitted in advance of trial. TVH expects that witness trial testimony will be consistent with deposition testimony, but TVH reserves the right to conform these proposed findings to proof at trial.

1    Nickel-controlled affiliate, the Nickel Land Company. Nickel Tr. Vol. II at 51:8-21.

2        6.    The location and boundaries of the TVH Property are shown on a land survey. *See*

3    TX 10.

4        7.    Nickel became interested in the history of the TVH Property and the 170-year old

5    farmhouse that sits on it, so in 2011 he had TVH hire Architectural Resource Group LLC

6    ("ARG"), a company that specializes in historic preservation and permitting, to research the title

7    and determine the history of the house. One of ARG's tasks was to determine whether the

8    property Nickel now owned had been part of the history of any famous wineries in the area.

9    Nickel Tr. Vol. I at 20:4-8.

10       8.    ARG prepared a report, which determined that California pioneer William

11   Baldridge had built the farmhouse in the late 1860s, acquired approximately 168 acres of land by

12   federal land patent in 1870, and operated a farm – which included a wine grape vineyard – until

13   the property was sold to pioneering winemaker Henry Walker Crabb aka Hamilton Walker Crabb

14   aka H.W. Crabb ("Crabb"). *Id*.; *see* Miltenberger Report at Pars. 33-35.

15       9.    In 2005, TVH commenced its business operations and harvested its first vintage of

16   grapes to be sold in 2010. In 2011, Nickel again hired ARG to perform historical research in

17   connection with TVH's application for a permit to build a multi-use barn-like structure at the

18   TVH Property. At this time, Nickel first learned about Crabb's To Kalon Estate. Nickel Tr. Vol. I

19   at 20:23-21:2.

20       10.   In 2018, ARG produced another report, TX 1002, which provided the results of the

21   detailed research into Crabb's association with the TVH Property. Based on ARG's historical

22   reports, in 2018 Nickel concluded that Crabb and, after Crabb died, the To Kalon Vineyard

23   Company had owned and operated a portion of the TVH Property. Nickel thus formed the belief

24   that he could accurately claim that "To Kalon Vineyard" was the geographic origin of TVH wine

25   made from grapes grown on the portion of the TVH Property that Crabb and the To Kalon

26   Vineyard Company had once owned and operated. Nickel Tr. Vol. I at 25:22-26:10.

27       11.   TVH considers itself a "cult" winery that produces small batches of artisanal wines

2

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BUCHALTER
A Professional Corporation
San Francisco

BN 41821858v2

that are sold directly to consumers who qualify for the right to purchase an annual allocation of TVH wines by joining the TVH club, online wine merchants who sell to consumers and some restaurants, limited wholesale directly to restaurants, and at the production facility in St. Helena. Nickel Tr. Vol. I at 148:17-149:4; Norris Tr. Vol. II at 14:20-15:15, 21:8-12.

12.     TVH does not sell its wines in supermarkets or wine stores. Nickel Tr. Vol. II, at 95:14-15.

13.     Since 2005, TVH has produced Chardonnay, Cabernet Sauvignon, and Cabernet Franc wines solely from grapes grown on the TVH Property. TVH's wines command high prices, with the Block 8 Cab currently selling for $325/bottle, the Cab Franc selling for $150/bottle, and the Estate Reserve Cab selling for $225/bottle. Norris Tr. Vol. I at 65:11-24, Norris Tr. Vol. II at 16:14-17:3.

14.     The prices TVH charges for its red wines are within the range that various "To Kalon Vineyard"-labeled Cabernet Sauvignon wines cost. *See* Frost Report (12-17-2019), at pp. 10-11.

15.     The wine media have largely published favorable reviews and ratings for TVH's wines, with scores ranging from 87 to 96 (on a 100-point scale). Nickel Tr. Vol. II at 209:16-18.

16.     TVH sells grapes to a neighboring winery, the Harlan Estate. Nickel Tr. Vol. II at 134:13-135:6. The Harlan Estate is a highly regarded winery whose wine has "become one of the most expensive, sought after the world over." TX 1681 (J. Swinchatt & D. G. Howell, *The Winemaker's Dance; Exploring Terroir in the Napa Valley*, pp. 195-96 (Univ. Cal. Press 2004)).

17.     In 2018, in homage to Crabb's historical association with the TVH Property, Nickel named the vineyard located on the portion of the TVH Property that was once owned and operated by Crabb (and, subsequently, the To Kalon Vineyard Company) "H.W. Crabb's To Kalon Vineyard." *See* TX 1350; TX 10 (land survey showing TVH vineyards relative to the Baldridge Farm parcel).

18.     In 2018, the exact bounds of the portion of the TVH Property that Crabb and the To Kalon Vineyard Company had once owned had not yet been delineated in a land survey.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1   Certain that Block 8 of TVH's newly named H.W. Crabb's To Kalon Vineyard was in its entirety

2   located within the former Crabb/To Kalon Vineyard Company-owned property, however, Nickel

3   decided to make an H.W. Crabb's To Kalon Vineyard-designate wine from at least 95% of the

4   Cabernet Sauvignon grapes grown on TVH's Block 8. Nickel Tr. Vol. I at 48:3-16.

5       19.     In 2018, TVH applied to register a number of marks that contained variations of

6   the name "To Kalon." Nickel Tr. Vol. 1 at 139:11-140:4. CBUSO obtained notice of TVH's

7   applications and promptly served TVH with a cease and desist letter. *See* Amended Complaint,

8   Exh. T (Dkt. 30-20).

9       20.     TVH obtained approval from the United States Department of the Treasury's

10  Alcohol and Tobacco Tax and Trade Bureau (the "TTB") for a label for three of TVH's 2015-

11  vintage wines to identify "H.W. Crabb's To Kalon Vineyard" as a single-vineyard designation, as

12  follows:

13          a.      Block 8 Cabernet Sauvignon (the "Block 8 Cab"). TX 138-141;

14          b.      Block 5 Cabernet Franc, with the fanciful name, "Crabb's Black

15  Burgundy" (the "Cab Franc"). TX 134-137; and

16          c.      Estate Blend Cabernet Sauvignon (the "Estate Blend Cab"). TX 142-144.

17      21.     Nickel believes that TVH has a fair use right to use "To Kalon Vineyard" to

18  accurately describe the geographic origin of the grapes used to make its wines and its historically

19  significant connection to Crabb and the To Kalon Vineyard Company. Based on that belief,

20  Nickel directed TVH to discuss its historical connection to Crabb and the "To Kalon Vineyard

21  Company" on the back-label of each of TVH's 2015-vintage red wines. Nickel Tr. Vol. II at

22  60:14-19; *see* TX 138-139 (Block 8 Cab); TX 134-135 (Cabernet Franc); TX 142-143 (Estate

23  Blend Cab).

24      22.     TVH was scheduled to deliver to its club members the allocation of the 2015

25  Estate Blend Cab in the fall of 2019, and prior to making those shipments TVH changed the

26  vineyard designation on the front label to "H.W. Crabb's Hermosa Valley." Nickel Tr. Vol. I at

27  47:25-48:2.

28

4

23.     During his December 17, 2019, deposition, Nickel testified that a week or two earlier he had caused an offer to sell TVH's Block 8 Cab – with the vineyard designation, "H.W. Crabb's To Kalon Vineyard" on the bottles' front label – to be sent to TVH's wine club members who were receiving their allocation of TVH's 2015-vintage wines. Nickel Tr. Vol. 1 at 49:7-19.

24.     As a result, in December 2019, TVH included a letter to its club members receiving allocation wine shipments that offered the opportunity to purchase the Block 8 Cab with the "H.W. Crabb's To Kalon Vineyard" designation on the front label. Nickel Tr. Vol. I at 118:20-119:8.

25.     In response to TVH's offer to sell the Block 8 Cab, CBUSO sued TVH for infringement in a complaint filed January 10, 2020. Dkt 1 (Case No. 4:20-CV-238).

26.     At the time it filed its infringement complaint, CBUSO also filed a Motion for Preliminary Injunction. On February 20, 2020, the Court issued an order granting the injunction, which prevents TVH from using the name "'TO KALON' . . . in conjunction with wines." Dkt. 40 (Case No. 4:20-cv-00238).

27.     In spite of TVH's efforts to eliminate any instance in which the term "To Kalon" was used in any respect in conjunction with TVH's wines, Nickel learned in mid-2020 that approximately 19 cases of TVH 2015-vintage wines had shipped with references to "To Kalon" on the back label. In response, TVH undertook a concerted effort to eliminate all references to "To Kalon" on TVH's 2015 vintage wines and instituted protocols with its contract warehouse and fulfillment center to ensure that all shipments of TVH wines comply with the preliminary injunction for so long as it remains in effect. Nickel Tr. Vol. 2 at 160:16-161:14.

**C.  The To Kalon Estate During the Crabb Era**

28.     Henry Walker Crabb aka Hiram W. Crabb aka H.W. Crabb ("Crabb") is widely recognized within the wine industry as one of the most successful and influential nineteenth century pioneer vineyardists and winemakers in Napa Valley. Miltenberger Report at par. 50; *see* TX218.

29.     Crabb first acquired land in Napa Valley in 1868, when he purchased a 240.66-

acre parcel in Oakville, Napa County, California, which became known as "Home Place." Miltenberger Report, at par. 21; TX 182.

30.     In 1879, Crabb acquired a parcel of land adjacent to Home Place, a 119.83-acre parcel referred to as "Lewelling Place." Miltenberger Report, at par. 21; TX 190.

31.     In 1889, Crabb acquired a 168.5-acre parcel referred to as the "Baldridge Farm" or "Baldridge Tract." Miltenberger Report at par. 32; TX 200.

32.     At his death in 1899, Crabb owned and operated Home Place, Lewelling Place, and Baldridge Farm as an integrated property called the "To Kalon Estate." Miltenberger Report at par. 32; TX 220. The phrase "Historic To Kalon Estate" is used in these findings to refer collectively to the three parcels of land that Crabb owned at the time of his death.

33.     Like most farmers in nineteenth century California, Crabb cultivated a variety of crops and produce, including grain, hay, oranges, chestnuts, and grapes. *See* Miltenberger Report at par. 29.

34.     For much of the decade after acquiring Home Place, Crabb emphasized the cultivation of table grapes and production of raisins. During this time Crabb called his place "Hermosa Vineyards." *See* Miltenberger Report at par. 29.

35.     Crabb developed an interest and expertise in the cultivation of wine grapes, however, and by 1873 Crabb had planted wine grapes on 70 acres of his property. *See* Miltenberger Report at par. 29.

36.     By the late 1870s, Crabb had established himself as one of the leading vineyardists in the Napa Valley and throughout California. During this time, Crabb experimented with grape varieties to determine those varietals that had the optimum combination of production yield and quality for making fine wine. *See* Miltenberger Report at par. 29. Examples of this include:

a.     In 1873, it was reported that Crabb had established a collection of approximately 250 different wine grape varieties that he acquired from all over the world – this was considered one of the largest collections in the world at the time. Miltenberger Report at par. 18; TX 192;

6

b.      In the late 1870s, Crabb had established his Hermosa Vineyards as reportedly one of the largest sources of wine grapes cultivated in Napa and California. Miltenberger Report at pars. 20-22;

c.      Crabb became known as a prolific maker of fine wines. In the mid-1880s, Crabb reportedly made over 500,000 gallons of wine per year, which was reportedly one-tenth of the entire amount made in Napa County. Miltenberger Report at par. 22;

d.      During this time, Crabb developed a reputation as an experimentalist and innovator in the vineyards and winery as:

i.   a viticulturist (Miltenberger Report at par. 22; TX 192);

ii.   wine producer (Miltenberger Report at par. 22); and

iii.  wine marketer (Miltenberger Report at par. 22)

e.      Crabb was reportedly one of the first winemakers to establish sales agencies to sell his bottled wines directly to consumers – as opposed to selling bulk wine to merchants who, in turn, sold wine to consumers – in Washington, D.C., New Orleans, LA, Chicago, IL, and San Francisco, CA. Miltenberger Report at par. 23; TX 214; TX 194.

f.      Crabb's winery was the first in Napa to use steam-powered equipment to crush, convey, and pump grapes and juice. Miltenberger Report at Par. 29.

37.    In the 1880s, many of Napa Valley's vineyards became infested with phylloxera, a parasitic louse that attacks the roots of grape vines, reduces fruit yields and eventually causes the plants to die. Miltenberger Report at par. 36.

38.    By 1889, the Napa Valley lost more than 10,000 acres of grape vineyards to phylloxera infestation. Miltenberger Report at par. 36.

39.    In 1893, Crabb reported that only 90 acres of his vineyard were "in bearing." Miltenberger Report at p. 20, fn. 56.

40.    In response to the phylloxera epidemic, in the 1890s Crabb devoted substantial effort and energy to identifying and developing phylloxera-resistant rootstocks, and the Baldridge Farm parcel figured prominently in those efforts as Crabb's experimental vineyard. Miltenberger

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO. 4:19-cv-1424-YGR**

BN 41821858v2

Report at pars. 36-37.

41.     Many of Crabb's contemporary vineyardists had begun planting hillside vineyards based on the belief that the environmental conditions present in mountains and hillsides inhibited phylloxera, and Crabb apparently endorsed that view. Miltenberger Report at par. 37.

42.     Crabb is quoted as saying that his efforts to develop resistant rootstocks include planting them in "higher and dryer" soils, TX 209, and "at the head of a cañon in the mountains." TX 213.

43.     The Home Place and Lewelling Place parcels are virtually flat and located on the Napa Valley floor; the Baldridge Farm parcel is the only known property Crabb owned or controlled that can fairly be described as having "higher and dryer" soils or that contains a "cañon in the mountains." Miltenberger Report at par. 43.

44.     Baldridge had established a substantial, productive wine grape vineyard prior to Crabb's acquisition of Baldridge Farm. TX 184 (By 1869, Baldridge had a "small vineyard, the product of which is entirely for domestic consumption."); TX 236 (In the early 1870s, Baldridge had "extensive vine plantings.").

45.     Baldridge sold wine grapes in 1881 to winemaker A. Jeanmonod. TX 193.

46.     Crabb was a practical man. *See*, *e.g.*, TX311; Miltenberger Report at par. 25, p. 14 (*quoting* Wait, Wines and Vines, at 108) (Crabb's "cellar at To Kalon [was] plain and unpretentious; . . . Crabb is one of the few men who do not believe that fine outsides to a cellar make fine wine.").

47.     Crabb made a series of reports in the 1890s on the materials and methods he was developing and evaluating to establish reliable phylloxera-resistant rootstocks, which reports indicate that Crabb was using Baldridge Farm as an experimental vineyard, as follows:

a.     In August 1892, Crabb reported he was propagating 20 acres of resistant Lenoir rootstock in "higher and dryer soil." TX 209.

b.     In 1894, Crabb reported that he was propagating resistant Riparia rootstock in the "head of a cañon in the mountains." TX 213.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO. 4:19-cv-1424-YGR**

c.      At the time of Crabb's death, the Crabb Estate Inventory identified 70 acres of hay on the Baldridge Farm parcel. TX 220 (Inventory & Appraisement).

d.      Crabb had described a method of planting "phylloxera-resistant rootstock that involved digging up vines, planting in grain for a year, and then in hay for a year." TX 213.

e.      Throughout the 1890s, various newspaper articles reported that Crabb's estate was comprised of some 500 acres, of which various acreage was reported as being "in vines" or the like. Miltenberger Report at pars. 19, 47 (TX 214).

f.      Crabb's "Home Place" and "Lewelling Place" parcels total 359 acres, and adding in the Baldridge Farm parcel – at 168.5 acres – yields a total aggregate acreage of a fraction over 527 acres. Miltenberger Report at p. 54, Figure 5.

g.      The aggregate acreage "in vines" on the Home Place and Lewelling Place parcels was substantially less than 359 acres, because those parcels were also occupied by a variety of structures and other crops, which included a stock farm, roadways and paths, winery buildings, a cooperage, distillery facilities, and a large residence. *See, e.g.*, TX 208; TX 188 (engraving of "Hermosa Vineyards"); TX 194; TX 337 (photos)).

h.      The winemakers in Crabb's time were engaged in a vigorous debate about whether wines made from grapes grown on the valley floor were superior to the wines made from grapes grown in the mountains and hillsides, with a plurality of the leading winemakers of the day arguing that mountain- and hillside-grown fruit made superior wines. *See* TX 348.

i.      Soil conditions on the Baldridge Farm parcel made it "first rate" agricultural land for cultivating crops such as grapes. TX 183 (Survey Field Notes).

j.      The Baldridge Farm parcel includes approximately 60 acres of what the USDA described as "arable soil," approximately 15 acres of which is located within the property TVH currently owns. Miltenberger Report at Par. 54; TX 262.

48.      The Baldridge Farm parcel was an integral and important element of Crabb's grape-growing and winemaking operations: Baldridge Farm supplied water to power the steam engines in Crabb's winery and cellaring operations and to irrigate the crops grown on the Home

Place and Lewelling Place parcels. TX 194; TX 220; *see* Miltenberger Report at pars. 47-48.

49.     The timber stands at the Baldrige Farm property supplied lumber for Crabb's cooperage and construction of structures that housed Crabb's winery operations. Miltenberger Report at par. 49; TX 220 (substantial value attributed to water reservoir, water supply piping, and timber stands).

**D.   The Historic To Kalon Estate During the Churchill Era**

50.     After Crabb's death in 1899, his entire, approximately 527-acre estate sold at auction to E.S. Churchill. TX 222; Miltenberger Report at par. 58 ("At two public auctions held in June 1899 to satisfy the Crabb estate's outstanding debts, Edward S. Churchill purchased the Home Place, Lewelling Place, and Baldridge Farm Parcels.").

51.     In 1902, E.S. Churchill deeded the Historic To Kalon Estate to his wife Mary W. Churchill. TX 224.

52.     In 1903, the Churchill family consolidated and transferred the Historic To Kalon Estate to the To Kalon Vineyard Company. Miltenberger Report at pars. 61-62; TX 227.

53.     During the Churchill era, the three parcels that comprised the Historic To Kalon Estate were identified in the official records of Napa County as owned by the "To Kalon Vineyard Company." Miltenberger Report at par. 62, Fig. 14; TX 243.

54.     The Churchill family's To Kalon Vineyard Company deployed the resources of all three parcels in the To Kalon Estate to produce award-winning To Kalon-branded wines in the pre-Prohibition twentieth century. Miltenberger Report at par. 63 ("To Kalon Vineyard Company improved its holdings, making greater use of the former Crabb lands."); TX 229.

55.     In 1916 Mary W. Churchill filed suit against her son, E. Wilder Churchill, and daughter-in-law, Mary Alice Churchill,[2] claiming that the two intended to defraud her of her ownership of the historic To Kalon Estate property. Miltenberger Report at par. 66; TX 246.

56.     The Churchill family dispute case settled in 1917. Through a series of quitclaims and transfers, Mary Alice obtained ownership of the entirety of the To Kalon Vineyard

---

[2] To avoid confusing Mary Alice Churchill with her mother-in-law, Mary W. Churchill, Mary Alice Churchill is hereafter referred to in these Findings as "Mary Alice."

BUCHALTER
A Professional Corporation
San Francisco

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BN 41821858v2

Company's realty, and in early 1919 the To Kalon Vineyard Company dissolved. Miltenberger Report at pars. 64-66.

57.     The enactment of Prohibition in 1919 substantially disrupted the Napa Valley wine industry. Miltenberger Report, at par.70.

58.     During Prohibition, Mary Alice dba To Kalon Vineyard Company attempted to profit from "salvaging grapes not otherwise marketable." Miltenberger Report, at par.70, n. 131.

59.     During the 1920s, Mary Alice obtained a series of permits to sell wines for other than beverage purposes and apparently managed to eke out sufficient profits for the company to survive. Miltenberger Report at pars. 69-71.

60.     By the early 1930s, Mary Alice was ready to divest herself of the To Kalon Vineyard Company winery facility and land holdings. Miltenberger Report at par. 72.

61.     Over the next few years the winery facilities deteriorated, and in 1932 Mary Alice lost her federal permit to produce wine. Miltenberger Report at par. 73.

62.     In December 1933, Mary Alice entered into an agreement to sell "all of the vineyard north of the main avenue leading into the handsome property from Oakville, including the large family residence and all of the winery buildings and equipment." TX 253; Miltenberger Report at pars. 72-74.

63.     Mary Alice's attempt to sell the assets of To Kalon Vineyard fell through when the buyers failed to perform their monthly payment obligations. Miltenberger Report at par. 75.

64.     Mary Alice sued to rescind the sale agreement and quiet title, and in 1934 the California Superior Court issued a judgment that included a decree confirming that Mary Alice held title to "[a]ll that certain real property known and described as To Kalon Vineyard, near Oakville, Napa County, California." TX 258.

65.     By judicial decree, the "real property known and described as To Kalon Vineyard" included the Baldridge Farm parcel. *See* Miltenberger Report at pars 75-76.

66.     Mary Alice thus retained title to Crabb's Historic To Kalon Estate. Mary Alice decided to remain in the wine industry, but turned over operational control of winery operations

to her son and daughter. Miltenberger Report at par. 77.

67.    The winery remained in operation doing business as To Kalon Vineyard Company until May 1939, when a fire destroyed the winery complex that Crabb had originally built. At that time, wine production under the To Kalon label came to a hard stop. *See* Miltenberger Report at pars. 77-79.

**E.    The Historic To Kalon Estate After the Churchill Era**

68.    In 1943, Mary Alice sold the approximate 526 acres that had comprised the To-Kalon Vineyard Company's entire real property holdings to Martin Stelling Jr., together with all the water rights and infrastructure (*i.e.*, reservoirs and pipe lines). Miltenberger Report at par. 80; TX 264.

69.    Stelling reportedly had ambitious plans to assemble and operate the largest grape-farming and winemaking operation in Napa Valley, if not California. *See*, *e.g.*, TX 266.

70.    Following Stelling's death in 1950, the Historic To Kalon Estate was broken up and sold in pieces to various interests. Miltenberger Report, at par. 81; *see*, *e.g*., TX 268; TX 273.

71.    At present, the Home Place and Lewelling Place portions of the Historic To Kalon Estate are owned by the University of California – Davis, Robert Mondavi Winery, Beckstoffer Vineyards, and Opus One Winery. Miltenberger Report at par. 86 (47:18-48:5), Fig. 19 (p. 68).

72.    The portion of the Baldridge Farm parcel relevant to this suit is owned by Nickel Land Company and leased to TVH. *Id*.; Bearer Tr. at 25:3-10.

**F.    Geographic Significance of the Terms "To Kalon" and "To Kalon Vineyard"**

73.    In 1885, Crabb "christened his place 'To-Kalon.'" TX 198.

74.    "To Kalon" quickly assumed geographic significance as the name of Crabb's vineyards, residence, stables, and winery. The historical record variously refers to Crabb's "To Kalon" property as a "vineyard," an "estate," and a "ranch." Miltenberger Report at par. 5; TX 208.

75.    Crabb also used "To Kalon" as a brand name to market vine cuttings and wine produced on his property. Miltenberger Report at par. 23; TX 196.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

76.     In the late 19th century and early 20th century, the terms "To Kalon" and "To Kalon Vineyard" emerged as and were known to refer to a specific geographic place in the Oakville area of Napa Valley, California, encompassing the Historic To Kalon Estate. Miltenberger Report at pars. 57-58, 76, 80-86. Examples include:

a.      1890 – "He has named his place 'The To-Kalon,' a Greek word meaning "the best." TX 203;

b.      1891 – "About six years ago . . . he decided to place his wines on the market under his own name, and bearing the now familiar brand of 'To-Kalon,' the name of his place." TX 207;

c.      1899 – "H.W. Crabb . . . owned the Tokalon vineyard . . . ." TX 219;

d.      1899 – "MASTER OF TO KALON RANCH PASSES AWAY . . . H.W. Crabb . . . died at To Kalon, his home, near Oakville . . . ." TX 218;

e.      1903 – "E.S. Churchill . . . was . . . owner of the famous Tokalon vineyard and winery." TX 225;

f.      1903 – ". . . E.S. Churchill, owner of the famous To-Kalon vineyard and winery . . ." TX 226;

g.      1910 – "Improvements at To Kalon Vineyard. . . . At the To Kalon vineyards, Superintendent Hansen is exceedingly busy. . . . At the To Kalon residence which E.W. Churchill and family occupy in the Summer . . . ." TX 230;

h.      1916 – "TO KALON VINEYARDS IN FAMILY DISPUTE . . . Mrs. Mary W. Churchill . . . Has Filed Suit for Restitution of Property . . . A family dispute involving one of the most famous vineyards of the state . . ." TX 246;

i.      1916 – " . . . estate, which includes To Kalon vineyards . . . this vineyard property, which is one of the most famous in the State . . . ." TX 247;

j.      1917 – " . . . the sensational suit involving the To-Kalon vineyard, valuable realty in Napa . . . was settled out of court . . ." TX 250;

k.      1933 – "Negotiations for the sale of To-Kalon, famous Napa valley

13

vineyard property, have been completed . . . To-Kalon is a famed vineyard property, having turned out a product that gained nation-wide reputation during the years prior to prohibition." TX 253;

   l.  1934 – "Tokalon, the valuable Oakville vineyard property which for many years has been the property of Mrs. Alice Churchill . . . Tokalon is one of the most beautiful properties of Napa county . . . ." TX 256;

  77. The use of "To Kalon" and "To Kalon Vineyard" as geographic terms did not cease after Stelling acquired the Historic To Kalon Estate property in 1943, but rather continued well into the 1980s, as reflected in the following:

   a.  1944 – "Mr. Stelling also owns the former To-Kalon place recently purchased from Mrs. Alice Churchill . . . ." TX 266;

   b.  1950 – Map from "Bottled Poetry: Napa Winemaking From Prohibition to the Modern Era," James T. Lapsley, 1996. TX 75;

   c.  1951 – ". . . Italian Swiss Colony, announces the purchase of his company of 338 acres of the famous old To-Kalon vineyard, located near Rutherford in Napa county." TX268;

   d.  circa 1955 – Postcard showing "Old Tokalon" as an attraction off Highway 29. TX 359;

   e.  1955 – "A demonstration of automatic French plows is scheduled for February 26. This demonstration is to be held at 2:00 p.m. at Tokalon Vineyards in Oakville. Turn west at Oakville Builders Supply and proceed to the office of Ivan Schoch. Signs will be provided directing growers to the demonstration area." TX 274 & 275;

   f.  1961 – "According to Robert Mondavi, vice president and general manager of Mondavi & Sons, owners of the Krug winery, the property is 'one of the best premium wine-growing locations in all of California.' . . . The huge estate, once known as Tokalon, extends from the old Oakville railroad station south toward Yountville and west to the foothills of the Mayacamas range. [¶]It was first planted with premium grape varieties by Hamilton Walker

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

Crabb in the 1860s. . . ." TX 279;

g.     1962 – "Charles Krug Winery today announced for $1.35 million [the purchase] of the Hamilton Walker Crabb estate, one of California's largest independent premium wine-producing vineyards. yards. [*sic*] Sellers were Mr. and Mrs. Ivan N. Schoch of Oakdale [*sic*]. Robert Mondavi, vice president and general manager of Mondavi & Sons which owns the Krug interests, said the 500-acre estate, because of its near-perfect soil and weather conditions, 'is known by viticulturalists as one of the best premium wine growing locations in all of California…'" TX 278;

h.     1962 – "One hundred years of competition between two pioneer Napa Valley vintners came to an end yesterday with the acquisition of the old Hamilton Walker Crabb estate by the Charles Krug winery of St. Helena…The 500-acre estate, located about five miles south of St. Helena, was bought from Mr. and Mrs. Ivan N. Schoch of Oakville who had operated it for the past 10 years as independent growers. According to Robert Mondavi, vice president and general manager of Mondavi & Sons, owners of the Krug winery, the property is 'one of the best premium wine-growing locations in all of California.' […] The huge estate, once known as Tokalon, extends from the old Oakville railroad station south toward Yountville and west to the foothills of the Mayacamas range." TX 279;

i.     1962 – "The latest and most important addition to the vineyard program of Charles Krug Winery was the purchase in January of the 500 acre vineyard of Mr. and Mrs. Ivan N. Schoch by Mondavi Vineyards, a corporation wholly owned by C. Mondavi & Sons." "Historically, the vineyard is a distinguished landmark of early Napa Valley viticulture. The original owner, Hamilton Walker Crabb, ranked with Krug, Schram, Beringer and Niebaum among the immortal pioneer vintners of Napa County. It is particularly fitting that the lands of Crabb, should, a century after their inception, be united with the winery established by Charles Krug. In Crabb's day the estate was known as To Kalon. In 'Vines in the Sun,' Idwal Jones describes it in glowing terms and asserts that Mr. Crabb explained the name thus:—"the highest beauty, the highest good, and I try to make it the boss vineyard'. He succeeded in his endeavor,

15

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

for leading viticulture experts today proclaim the vineyard to be one of the most outstanding in Napa County, which from a table wine viewpoint means in all California. To Kalon surrounds two University of California vineyard experimental stations placed in that area because of its favorable location. The purchase of this historic vineyard brings to Charles Krug Winery a welcome supply of superior wine grapes to augment their already large production of fine wines." TX 281;

> j.      1962 – "Just before we arrived at Oakville we got a glimpse of a big stone building and it was just a glimpse because turns in the road and trees kept us from getting a real good look at it. Checking on a map that lists the wineries in Napa Valley, we judged it must have been the ToKalon Vineyards and winery." TX 283;

> k.      1963 – "In 1962 the historic To Kalon vineyard was purchased from Mr. and Mrs. Ivan N. Schoch. These nearly 500 acres of vines in bearing are considered one of the most outstanding vineyards in California. The original owner, Hamilton Walker Crabb, ranked with Krug among the immortal pioneers." TX 284;

> l.      1964 – "Fire of undetermined origin destroyed the famous old To-Kalon Winery at Oakville with a resultant loss of about $70,000. The winery, founded in 1868 by W. H. Crabb, To-Kalon was owned by Mr. and Mrs. E. W. Churchill of Napa. The winery was an historical landmark in the Napa Valley." TX 291;

> m.      1964 – "Napa Valley is doing a good job on wine education. . . . With University of California Vineyards and the Mondavi's ToKalon Vineyard in the same vicinity this is certainly a wine conscious neighborhood." TX 285;

> n.      1965 – "H.W. Crabb died at To-Kalon, his Oakville home, on March 2nd. He arrived in California early in 1853, and came to Napa County in 1865, when he purchased a large tract of land at Oakville. He was one of our pioneer viticulturists, and in experimenting planted 300 varieties of grapes on 300 acres of land. (In later years a part of the Crabb vineyard was used as the United States Agriculture Experiment Station where every known variety of vine, nearly fifteen hundred types was grown.) Mr. Crabb built a large wine cellar and produced the

To-Kalon wines which enjoyed high favor for many years. (To-Kalon is Greek, meaning 'the beautiful.')" TX 286;

        o.      1966 – "In Krug's vineyard expansion program, Peter Mondavi notes that more than 100 acres of land in the Yountville area of Napa Valley were recently acquired and will be planted exclusively to [*sic*] top quality varietals. He points out that this acreage is in addition to the 1962 acquisition of the To-Kalon vineyard of about 500 acres, and that it is of course in addition to the home vineyard." TX 288.

        p.      1969 – "Henry W. Crabb's ToKalon – which means in Greek, 'The Highest Good'. ToKalon adjoins Benson's with most of the land centered on Walnut Drive, directly west of Oakville. Crabb produced 200 to 500,000 gallons of wine per years on 300 acres of vines. He was famed for adopting Refosco and re-naming it Crabb's Burgundy. Crabb didn't believe that fine outsides to a cellar made fine wine, or in divulging figures which might reach the Assessor." TX 299;

        q.      1969 – "A supply of top varietal grapes was assured the Robert Mondavi Winery (Rutherford, Napa County) through the purchase of 250 acres of land and vineyard adjoining the winery property. Included in the purchase is the famed To Kalon Vineyard, formerly owned by Martin Stelling. Announcement of the purchase of the property, now named Robert Mondavi Vineyards, Inc., was made simultaneously by Robert Mondavi and Alan B. Ferguson, president of Sicks' Rainer Brewing Co." TX 297;

        r.      1969 – "Robert Mondavi, president of Robert Mondavi Winery, Oakville, announces the purchase of 250 acres of the adjoining Tokalon Vineyards. Since the death of Martin Stelling, pioneer California vintner, the Tokalon properties have been managed by the Stelling estate." TX 296;

        s.      1972 – "Another such farm between Yountville and St. Helena, but farther back in the hills, behind a spur that protected it wholly from the sea breeze, a desideratum in the driest wines, was Hiram W. Crabb's To Kalon Vineyard." TX 304;

        t.      1973 – "By the late 1800s there were 4000 acres of vines and 142 wineries

17

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

in Napa County. . . .Connoisseurs in New York and San Francisco were already serving wines from the To Kalon Vineyard of Henry Crabb near Oakville . . . ." TX 306;

u.      1973 – "Three miles past Yountville is an abandoned great stone cellar a half mile to the left. . . . The adjoining great vineyard, west of Oakville, was once the famous To Kalon, founded by Henry Crabb in 1868 but now divided among several owners." TX 306;

v.      1973 – "There were a lot of wineries here before Prohibition. There was a big one over there where Christian Brothers is now. Krug was there and Brun and Chaix had a winery in Oakville. And To Kalon was there. Tubbs over there. A lot of wineries." TX 307, at p. 31;

w.      1973 – "At the beginning, the Napa Valley drew its winery owners and winemakers from every corner of Europe. Gustav Nybom [*sic*], builder of Inglenook, was a Finn and a retired sea captain. William Bowers Bourn, who launched Greystone, and H.W. Crabb, who owned ToKalon, were Anglo types." TX 310;

x.      1976 – "The old ToKalon vineyards are at Oakville. Before Prohibition they belonged to H.H. [*sic*] Crabb, who used his property to test hundreds of grape varieties as well as to grow some of the great wines of that era. ToKalon has been divided among several owners of which Charles Krug is the principal one." TX 313;

y.      1976 – "Charles Krug joined the company of cellars with special wines from the Oakville-Rutherford region rather late, in 1963, after the owning Mondavi family bought the old ToKalon Vineyard. ToKalon originally belonged to a great experimental vineyardist named H.W. Crabb. . . ." TX 313;

z.      1980 – "Greeted by Robert Mondavi, chairman of the board and founder, and his daughter Marcia, vice president/Eastern sales, we were whisked to Oak Knoll and Tokalon vineyards for a first-hand look at the grapes." TX 362;

aa.      1980 – "But what the map doesn't show is where the grapes are grown. Mondavi's Cabernet, for example, might have come from a part of the old, adjacent Tokalon vineyard . . ." TX 327;

bb.    1985 – "[Charles] Thomas brought down three lab samples of wine made from sauvignon blanc grapes. No. 1 was from Mondavi's own Tokalon vineyards behind the winery. Tokalon soil is not very rich, but is very well-drained." TX 343;

cc.    1986 – "1981 Robert Mondavi Cabernet Sauvignon Reserve: This has 90 percent varietal. 5 percent Merlot and 5 percent Cabernet Franc and has spent 22 months in Nevers oak, 90 percent of which was new. The grapes came from the Tokalon Vineyard, which surrounds the famous Martha's Vineyard of Joseph Heitz." TX 344;

dd.    1988 – "Another very successful vintner was Harry W. Crabb, whose vineyards and cellars, called To Kalon, were between Yountville and Oakville." TX 353;

### G.  "To Kalon's" Significance to the Wine Industry

78.    The reputation that "To Kalon" enjoyed for outstanding wine grapes and wines – and which made it attractive to and recognized by wine writers, other vintners, and winemakers in the mid-to-late twentieth century – is attributable as much to the To Kalon Vineyard Company and the Churchill family as to Crabb. *See* Miltenberger Report at pars. 64-67 (35:14-36:11); TX 229; TX 239; TX 329.

79.    The significance of To Kalon to the wine trade or industry in the latter half of the twentieth century is reflected in the following:

a.    1962 – "Charles Krug Winery today announced [the purchase] for $1.35 million of the Hamilton Walker Crabb estate, one of California's largest independent premium wine-producing vineyards. . . . Robert Mondavi, vice president and general manager of Mondavi & Sons which owns the Krug interests, said the 500-acre estate, because of its near-perfect soil and weather conditions, 'is known by viticulturalists as one of the best premium wine growing locations in all of California…'" TX 278 & 280;

b.    1962 – "One hundred years of competition between two pioneer Napa Valley vintners came to an end yesterday with the acquisition of the old Hamilton Walker Crabb estate by the Charles Krug winery of St. Helena… According to Robert Mondavi, vice president and general manager of Mondavi & Sons, owners of the Krug winery, the property is 'one of the

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

best premium wine-growing locations in all of California.' […] The huge estate, once known as Tokalon, extends from the old Oakville railroad station south toward Yountville and west to the foothills of the Mayacamas range." TX 279-280;

      c.    1962 – "The latest and most important addition to the vineyard program of Charles Krug Winery was the purchase in January of the 500 acre vineyard of Mr. and Mrs. Ivan N. Schoch by Mondavi Vineyards, a corporation wholly owned by C. Mondavi & Sons." "Historically, the vineyard is a distinguished landmark of early Napa Valley viticulture. The original owner, Hamilton Walker Crabb, ranked with Krug, Schram, Beringer and Niebaum among the immortal pioneer vintners of Napa County. It is particularly fitting that the lands of Crabb, should, a century after their inception, be united with the winery established by Charles Krug. In Crabb's day the estate was known as To Kalon. TX 281;

      d.    1963 – "In 1962 the historic To Kalon vineyard was purchased from Mr. and Mrs. Ivan N. Schoch. These nearly 500 acres of vines in bearing are considered one of the most outstanding vineyards in California. The original owner, Hamilton Walker Crabb, ranked with Krug among the immortal pioneers." TX 284;

      e.    1964 – "Fred Holmes conducts an international travel bureau, Pacific Pathways, with offices in San Francisco, New York, London, Copenhagen, Tokyo and Sydney. In 1962, he and another neighbor, Ivan Schoch, started an enterprise called World Wines. With University of California Vineyards and the Mondavi's ToKalon Vineyard in the same vicinity this is certainly a wine conscious neighborhood." TX 285;

      f.    1965 – "H.W. Crabb died at To-Kalon, his Oakville home, on March 2nd. He arrived in California early in 1853, and came to Napa County in 1865, when he purchased a large tract of land at Oakville. He was one of our pioneer viticulturists, and in experimenting planted 300 varieties of grapes on 300 acres of land. (In later years a part of the Crabb vineyard was used as the United States Agriculture Experiment Station where every known variety of vine, nearly fifteen hundred types was grown.) Mr. Crabb built a large wine cellar and produced the To-Kalon wines which enjoyed high favor for many years." TX 286;

20

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

g.      1966 – In Krug's vineyard expansion program, Peter Mondavi notes that more than 100 acres of land in the Yountville area of Napa Valley were recently acquired and will be planted exclusively to [*sic*] top quality varietals. He points out that this acreage is in addition to the 1962 acquisition of the To-Kalon vineyard of about 500 acres, and that it is of course in addition to the home vineyard." TX 288;

h.      1967 – "In 1962 the Mondavis purchased approximately 500 acres in nearby Oakville of the historic To Kalon vineyard, considered to be the finest in all Napa Valley. Other sources of fine Napa Valley wine grapes contribute to the vineyard programme." TX 292;

i.      1964 – "Fire of undetermined origin destroyed the famous old To-Kalon Winery at Oakville with a resultant loss of about $70,000. The winery, founded in 1868 by W. H. Crabb, To-Kalon was owned by Mr. and Mrs. E. W. Churchill of Napa. The winery was an historical landmark in the Napa Valley." TX 291;

j.      1969 – "A supply of top varietal grapes was assured the Robert Mondavi Winery (Rutherford, Napa County) through the purchase of 250 acres of land and vineyard adjoining the winery property. Included in the purchase is the famed To Kalon Vineyard, formerly owned by Martin Stelling." TX 297;

k.      1969 – "Robert Mondavi Winery today announced it had purchased 250 acres of choice vineyard land and varital [sic] producing vineyards from the estate of the late Carolyn Stelling. . . . The vineyards are located northwest of Oakville adjoining the present winery property—an area which is considered the heart of the prime wine growing region of Napa Valley—and are a part of the Tokalon Vineyards." TX 294;

l.      1949/1972 – "Another such farm between Yountville and St. Helena, but farther back in the hills, behind a spur that protected it wholly from the sea breeze, a desideratum in the driest wines, was Hiram W. Crabb's To Kalon Vineyard. . . . He, too, like Jacob Schram, was a pioneer, and his wine was esteemed as early as 1874" TX 304;

m.      1973 – "By the late 1800s . . . . Connoisseurs in New York and San Francisco were already serving wines from the To Kalon Vineyard of Henry Crabb near Oakville,

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

. . . [one] great vineyard, west of Oakville, was once the famous To Kalon, founded by Henry Crabb in 1868 but now divided among several owners." TX 306; TX 309;

n.      1973 – "At the beginning, the Napa Valley drew its winery owners and winemakers from every corner of Europe. Gustav Nybom [*sic*], builder of Inglenook, was a Finn and a retired sea captain. William Bowers Bourn, who launched Greystone, and H.W. Crabb, who owned ToKalon, were Anglo types." TX 310.

o.      1973 – "[Frona Eunice Wait] obviously felt a special affection for the wines of Napa and Sonoma, which surely must please the Napa Valley Wine Library Association. In 1889 there were 142 cellars in Napa County! She especially praises Crabb's To Kalon, . . . ." TX 311;

p.      1975 – *"*The 1889 etching is of the wine press at the celebrated To Kalon Vineyard which was founded in Oakville in 1868 by Henry Crabb, seen below." TX 312;

q.      1976 – "The old ToKalon vineyards are at Oakville. Before Prohibition they belonged to H.H. [*sic*] Crabb, who used his property to test hundreds of grape varieties as well as to grow some of the great wines of that era. ToKalon has been divided among several owners of which Charles Krug is the principal one. . . . Charles Krug joined the company of cellars with special wines from the Oakville-Rutherford region rather late, in 1963, after the owning Mondavi family bought the old ToKalon Vineyard. ToKalon originally belonged to a great experimental vineyardist named H.W. Crabb, whose deserted stone winery building broods over one corner of the great block of vines. By the time the Mondavis acquired a substantial percentage of the original property its suitability for cabernet sauvignon was well established." TX 313;

r.      1977 – "At the beginning, the Napa Valley drew its winery owners and winemakers from every corner of Europe. Gustav Nybom, builder of Inglenook, was a Finn and a retired sea captain. William Bowers Bourn, who launched Greystone, and H.W. Crabb, who owned ToKalon, were Anglo types." TX 319;

s.      1980 – "'Those were Napa Valley wines that won most of the prizes, right?

22

And if there was an existing market to sustain the Beringers and Charles Krug, the man called Henry Crabb with his To Kalon, Inglenook . . .' He waved both hands excitedly. . . . I've got To Kalon—wines you can't buy if you looked at them. I've got samples of every Napa Valley wine that won a prize at the 1889 Paris Exposition.'" TX 319 (a novel);

> t.   1980 – "However, while many California wineries are crossing estate lines and paying less attention to how close the winery and grapes are, the vineyards are nevertheless getting more attention on the label. […] That practice is growing, and even Robert Mondavi is considering putting vineyard designation on some of his Cabernets – ToKalon – even though he owns the vineyard." TX 325;

> u.   1980 – "But what the map doesn't show is where the grapes are grown. Mondavi's Cabernet, for example, might have come from a part of the old, adjacent Tokalon vineyard . . ." TX 327;

> v.   1981 – "Almost half of the grapes the winery crushes in making its varietal wines are grown in the Robert Mondavi Vineyards. . . . The To-Kalon Vineyard surrounds the winery." TX 335;

> w.   1981 – "They call them Vintage Selection and Private Reserve and other such premium designations, and they are advertised as wines of special qualities. And they command prices with an Ouch Factor. The three most prestigious Cabernet Sauvignons are Beaulieu Vineyards Private Reserve, Heitz' Martha's Vineyard and Mondavi Reserve. […] Grapes for Mondavi Reserve come largely from an area designated as Block P in the winery's To-Kalon vineyards south of the winery in Oakville." TX 330-331;

> x.   1981 – "In 1962 the Mondavis purchased approximately 500 acres in nearby Oakville of the historic To Kalon vineyard, considered one of the finest in all Napa Valley." TX 334

> y.   1981 – "Almost half of the grapes the winery crushes in making its varietal wines are grown in the Robert Mondavi Vineyards. . . . The To-Kalon Vineyard surrounds the winery." TX 335

z.      1981 – "However, while many California wineries are crossing estate lines and paying less attention to how close the winery and grapes are, the vineyards, are nevertheless getting more attention on the label. . . . That practice is growing, and even Robert Mondavi is considering putting vineyard designations on some of his Cabernets – ToKalon – even though he owns the vineyard." TX 336;

aa.      1983 – "Hamilton W. Crabb, a plain man, gave his estate unexpectedly poetic names: Hermosa, Spanish for 'beautiful,' and the similar To Kalon. As he explained to writer Frona Eunice Wait, when she visited him in the late 1880s, "The name *To Kalon* is Greek and means the highest beauty, or the highest good, but I try to make it mean the boss vineyard.'" TX 339;

bb.      1984 – "Crabb was a pioneer of fine-wine production, selling in bottle to the carriage-trade agents in New York, Washington, Chicago and New Orleans, and setting the pace for Napa Valley wine-growers of our own time by winning medals at a Paris exposition and in Bruges . . . .  [T]he 600-acre vineyard adjoining the [RMW] winery is still To Kalon . . . " TX 341;

cc.      1984 – "Although the [Opus One] joint venture has been purchasing grapes for its first few vintages from Mondavi's prime Tokalon vineyard, it has just purchased its own 120 acres, and has already planted out 70 acres of grapes." TX 340;

dd.      1984 – "[T]he 600-acres vineyard adjoining the [RMW] winery is still To Kalon . . . ." TX 341;

ee.      1985 – "As we take in the 360-degree panorama of Inglenook's hillside vineyards, [John] Richburg, a native of this valley, points out other vineyards. 'There, across from the Yountville hill, is [Robert] Mondavi's To-Kalon Vineyard.'" TX 342;

ff.      1985 – "[Charles] Thomas brought down three lab samples of wine made from sauvignon blanc grapes. No. 1 was from Mondavi's own Tokalon vineyards behind the winery. Tokalon soil is not very rich, but is very well-drained." TX 343;

gg.      1986 – "1981 Robert Mondavi Cabernet Sauvignon Reserve: . . . The

24

grapes came from the Tokalon Vineyard, which surrounds the famous Martha's Vineyard of Joseph Heitz." TX 344;

      hh.   1987 – "Surrounded by the 'To-Kalon' vineyard of 593 acres, the [Mondavi] winery is a modern Spanish-style building. The To-Kalon vineyard is nearly a century old . . . ." TX 345;

      ii.   1987 – "Grapes for the reserve wines come from the winery-owned To-Kalon Vineyard." TX 346;

      jj.   1987 – "Most of the Mondavi Reserves come from the extensive To-Kalon vineyard just south of Mondavi's Oakville winery in an area many experts believe is America's finest source of Cabernet Sauvignon." TX 347;

      kk.   1987 – "Grapes for the reserve wines come from the winery-owned To-Kalon Vineyard." TX 350;

      ll.   1987 – "The tradition of continuing excellence is evident when visiting their Napa Valley, Calif., operation. The two vineyards in this area are To-Kalon and Oak Knoll. To-Kalon is in Oakville just north of Yountville; it encompasses 593 acres." – TX 351

      mm.   1988 – "Another very successful vintner was Harry W. Crabb, whose vineyards and cellars, called To Kalon**,** were between Yountville and Oakville." TX 353;

      nn.   1988 – "There was Henry Crabb, who founded the celebrated Tokalon Vineyard and Winery; encompassing 350 acres of superlative vineyard most of which the Robert Mondavi Winery has today." TX 352;

**H. RMW's Knowledge of the Historical and Geographic Significance of the Term "To Kalon" in 1987**

80.    On June 9, 1987, RMW filed an application to register "To-Kalon" as a trademark for wine. TX 17.

81.    On October 29, 1987, the U.S. Patent and Trademark Office ("USPTO") issued an office action requesting RMW to "indicate whether TO-KALON . . . has any meaning or significance in the relevant trade or industry." TX 18 (USPTO Inquiry).

82.    On November 21, 1987, RMW's patent counsel filed a response stating, "TO

25

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

KALON . . . has no present meaning or significance in the relevant trade or industry. Prior to the turn of the 20th Century, there was a winery in the Napa Valley which used the name 'Tokalon.' Upon information and belief, that winery was sold off in parcels during the first fifteen to twenty years of the 20th Century and use of the name was discontinued. Accordingly, although the name has some historical significance, it has no current meaning or significance in the wine industry." TX 18.

83.     In January 1962, Charles Krug Winery – which was owned and operated by Mondavi & Sons – acquired a large portion of the Historic To Kalon Vineyard and newspapers reported that Robert Mondavi, as the Vice President and General Manager of Mondavi & Sons made the announcement, as follows:

a.     TX 279-280 (San Francisco Chronicle 1/19/1962) ("According to Robert Mondavi . . . the property is 'one of the best premium wine-growing locations in all of California.' . . . . The huge estate, once known as Tokalon . . . was planted with premium grape varieties by Hamilton Walker Crabb in the 1860s . . .");

b.     TX 278 (Santa Rosa Press Democrat 1/19/1962) (". . . Robert Mondavi, vice president and general manager of Mondavi & Sons, which owns the Krug interests, said the 500-acre estate, because of its near-perforce soil and weather conditions, 'is known by viticulturalists as one of the best premium wine growing locations in all of California . . .").

84.     Francis L. Gould, a publicist for Charles Krug Winery in the 1960s, wrote in the Krug newsletter "Bottles and Bins" about Krug's new vineyard acquisition, as follows: "The latest and most important addition to the vineyard program of Charles Krug Winery was the purchase in January of the 500-acre vineyard . . . by Mondavi Vineyards, a corporation wholly owned by C. Mondavi & Sons. Historically, the vineyard is a distinguished landmark of early Napa Valley viticulture. . . . In Crabb's day the estate was known as 'To Kalon.'" TX 281.

85.     In 1963 Gould published an article in the Pacific Coast Review for Krug, entitled "Charles Krug – Wines in the Traditional Manner," which stated: "In 1962 the historic To Kalon vineyard was purchased . . . These nearly 500 acres of vines in bearing are considered one of the

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO. 4:19-cv-1424-YGR**

most outstanding vineyard in California. The original owner, Hamilton Walker Crabb, ranked with Krug among the immortal pioneers." TX 284.

86.     In 1966, the wine trade magazine "Wines and Vines" published an article entitled, "Things Are Moving at Charles Krug," which reported on Krug's vineyard expansion program, noting that the recent acquisition of 100 acres of land in the Yountville area was "in addition to the 1962 acquisition of the To Kalon vineyard . . ." TX 288.

87.     In 1969, RMW purchased approximately 250 acres of vineyard property. Newspapers reported Robert Mondavi made the announcement. TX 296 (San Francisco Chronicle 1/14/1969) ("Robert Mondavi, president of Robert Mondavi Winery, Oakville announces the purchase of 250 acres of the adjoining Tokalon Vineyards."); TX 294 (Napa Valley Register 1/11/1969) ("Robert Mondavi Winery today announced it had purchased 250 acres of choice vineyard land . . . The vineyards are located northwest of Oakville adjoining the present winery property – an area which is considered the heart of the prime wine growing region of Napa Valley – and are a part of the Tokalon Vineyards."); TX 295 (Los Angeles Times 1/14/1969) ("Robert Mondavi, president of Robert Mondavi Winery, Oakville, Napa Valley, has announced the purchase of 250 acres of vineyard land and producing vineyards from Tokalon Vineyards, from approximately $730,000. The property is located northwest of Oakville, directly adjoining Mondavi's present winery property.").

88.     In 1969, John Daniels, Jr., one of RMW's Vice Presidents, prepared "Notes on the History of Napa County Viticulture and Wine Making" for presentation at a November 23, 1969 meeting of a wine course to be given at the Robert Mondavi Winery, which states "Crabb's ToKalon – which means in Greek, 'The Highest Good'.  Tokalon adjoins Benson's with most of the land centered on Walnut Drive, directly west of Oakville." TX 299.

89.     In a document, dated September 24, 1970, John Daniels, Jr. of Robert Mondavi Vineyard signed a receipt listing historic documents related to To Kalon loaned by Francis L. Gould of C. Mondavi & Sons.  TX 301.

90.     In or around 1979, Tim Mondavi asked William Heintz, a local wine historian, to

27

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

prepare a report summarizing research relevant to the establishment of a To Kalon "appellation," and Heintz advised Mondavi, among other things, that RMW was not the only owner of the To Kalon estate and that RMW had only purchased part of the Historic To Kalon Estate property. TX 320 (March 8, 1979); TX 321 (September 18, 1979); TX 324 (March 7, 1980).

91.     While researching his book, *Robert Mondavi of the Napa Valley*, published in 1984, author Cyril Ray interviewed Robert Mondavi, and Ray's book noted that RMW's "600-acre vineyard adjoining the winery is still To Kalon." TX 34.

92.     On May 28, 1988, Robert Mondavi gave a speech to an unidentified group where he stated: "There was Henry Crabb, who founded the celebrated Tokalon Vineyard and Winery; encompassing 350 acres of superlative vineyard most of which the Robert Mondavi Winery has today." TX 352.

93.     In 1995, RMW retained Julius Jacobs, a retired wine writer and publicist, to interview the members of the Mondavi family who worked at RMW – Robert, Michael, Tim, and Marcia – to compile an historical record. *See* TX 99 (correspondence between RMW personnel and Julius Jacobs about RMW's oral history project).

94.     Jacobs recorded a series of interviews with Robert Mondavi, who stated, among other things: "Not only that when I talked to Louis Martini, I got a kick out of it. He said that without a doubt he felt the best Cabernet Sauvignon came from the To-Kalon Vineyard because he had bought these grapes from time to time. And he laughed on that. I always remembered that." TX 102 (Transcript of .MP3 audio file); TX 101 (.MP3 file of tape); TX 100 (Jacobs' handwritten edits on original 1995 transcript).

95.     In his 1998 memoir, *Harvests of Joy: My Passion for Excellence*, Mondavi explained why he purchased part of the historical winemaking lands of Crabb and To Kalon Vineyard Company, stating: "There was one, though, that stood head and shoulders above the others. It was a vineyard with a distinguished history and a magical name: To Kalon." TX 356 (Harvests of Joy, Robert Mondavi, pp. 57-59 (TVH_00005908-5909.)

        a.     Mondavi stated that he had first encountered To Kalon "during one of our

early expansion phases at Krug. We needed more grapes to boost production, and we were looking for a good vineyard to buy or lease. Old Louis M. Martini, Sr., one of the most knowledgeable and hard vintners urged me to take a look at the To Kalon Vineyard in Oakville. 'Bob,' he said, 'that darn place at To Kalon is one of the finest places in California for cabernet sauvignon." *Id*.

96.     When RMW purchased portions of Crabb's Historic To Kalon Estate, Robert Mondavi was personally aware of the name "To Kalon" before the land acquisition in 1966. *See* TX 278-281, TX 284, TX 287-288, TX 294-296, TX 299.

**I.   Geographic Origin and Historic Terms on Wine Labels**

97.     To Kalon is generally understood within the wine industry (*i.e.*, grape growers, wine makers, winery owners and employees, wine sellers, wine writers, and wine reporters, among others whose work is related to wine) as being a specific geographic location in the Oakville AVA,[3] with a long history of grape cultivation and winemaking dating back to the beginnings of the wine industry in Napa Valley in the mid-1800s. Miltenberger Report at pars. 80-86; Frost Rebuttal Report at par. 10.

98.     For decades, To Kalon has been an area within Napa Valley that generates significant discussion in the wine industry and among consumers of high-end wines. *Id*., at par. 11.

99.     Napa Valley is widely understood to produce some of the best grapes and wines in California and the U.S., and it is generally accepted that To Kalon produces some of the best grapes and wines within Napa Valley itself. *Id*., at par. 4 (4:25-5:1).

100.     The association between "To Kalon" and a specific area in the Napa Valley is so well-established within the wine trade that trade publications for wine industry insiders frequently make reference to To Kalon without further explanation. Frost Report, at par. 10 (6:7-14).

101.     The wine market has tens of thousands of labels, and it is hard to attract a

---

[3] An "AVA" – that is, American Viticultural Area – is "[a] delimited grape-growing region having distinguishing features as described in [27 CFR Part 9] and a name and a delineated boundary as established in [27 CFR Part 9]." 27 CFR § 4.25 (e)(1)(i).

BUCHALTER
A Professional Corporation
San Francisco

BN 41821858v2

consumer's attention, particularly consumers of high-end wines (frequently referred to as "ultra-premium" and "luxury-premium" wines), which range in price from $100 to well over $500 per bottle. Frost Report at par. 5 (5:4-9).

102.    Consumers of such wines are generally sophisticated purchasers who place great emphasis on the location, lineage, and history of the source of grapes used in wines offered as ultra-premium and luxury-premium wines. *Id.*

103.    Prospective purchasers of ultra-premium and ultra-luxury wines (*i.e.*, wines that cost more than $100 per bottle) are generally sophisticated, well-educated consumers who are primarily interested in a wine's provenance and origin. Frost Report at par. 14.

104.    Luxury wine consumers know that wine labels contain important information about the origin of the wine, including identifying the company that has made the wine, the geographic location where the grapes that the wine was made from were grown, and whether the wine is a product of a single or more than one vineyard. Frost Rebuttal Report (1-8-2020) at par. 15.

105.    Wine consumers would generally understand a reference to "H.W. Crabb's To-Kalon Vineyard" on the front label of TVH wines to be information designating the geographic source of the grapes from which the wine contained in the bottle was made. Frost Rebuttal Report at par. 2:18-27).

106.    The typical label architecture of a lawful (hypothetical) label might look like this:

CABIN CREEK [brand name]

Robin's Vineyard [vineyard designation]

Stags Leap District [AVA]

Reidl Report (12-16-2019), at par. 23.

107.    In addition to the geographic origin information on the front label, back labels frequently provide additional information to consumers, and purchasers of ultra-premium and ultra-luxury wines look to the back-label for additional information about the provenance and origin of the wine contained in that particular bottle. Frost Rebuttal Report at par. 4.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO. 4:19-cv-1424-YGR**

108.    Producers of luxury wines generally use the back label to share important information about the wine contained in the bottle to provide purchasers information focused on the provenance and origin of that particular wine. Frost Rebuttal Report at par. 4.

109.    Back-label information might include (see Frost Rebuttal Report at par. 4):

a.    the geographic location of the vineyards where the grapes made into the wine were grown

b.    historical information about the vines or vineyards where the grapes were grown

c.    unique climate features of the relevant vineyard(s) where the grapes were grown

d.    unusual weather events that affected the grapes that were made into the wine

e.    a description of the winemaker(s) who made the wine

f.    other facts that describe and distinguish the specific wine in the bottle.

110.    Consumers perceive the content of a back-label of ultra-premium and ultra-luxury wines – as the story of wine contained in the bottle – not a "brand story" to enhance the producer's brand identity. Frost Rebuttal Report, at Par. 4 (3:2-20).

**J.    RMW License for the To Kalon Marks**



---

[4] Without CBUSO's permission or a court order, TVH is prohibited from filing in the public record any information designated by CBUSO. *See* Dkt. 42 (Stipulated Protective Order), section 12.3 ("Filing Protected Material"). CBUSO's confidentiality designations required redactions and a motion to seal. If TVH's request to file under seal is denied by the Court then TVH may file the material in the public record unless otherwise instructed by the Court. *Id.*
[5] To avoid confusion, "Beckstoffer" shall refer to the company, Beckstoffer Vineyards, and "Andy" shall refer to its CEO, William "Andy" Beckstoffer.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO. 4:19-cv-1424-YGR**

BN 41821858v2

32

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BN 41821858v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

128.    The wine industry has not adopted any standard quality control provision for use in

33

wine trademark licenses, because the scope of quality control contained in such a license depends on the legal and business risks of each specific licensing program, as well as the value of the trademark. *Id*., at Par 29 (13:17-18).

129.   Where the licensed goods are wine and wine products, the industry practice is for the quality control provision to focus on managing business risk arising from the license, which means ensuring the physical quality and purity of the goods and protecting the goodwill of the brand from potential product issues. *Id*., at Par. 29 (13:20-14:1).

130.   Wine trademark licenses typically require the licensee to maintain the physical quality of the goods in accordance with identified standards, provide a contractual means to play a meaningful role in controlling the quality of the goods, and for the licensor to actually play a meaningful role to control the quality of the licensed product. *Id*. at Par. 30 (14:11-16).

131.   At a minimum, licensing agreements in the wine industry focus on meeting the well-identified best practices for risks such as preventing contamination, ensuring that the product in the bottle is accurately described on the label, and verifying the alcohol content. Licensors typically accomplish these quality control objectives by requiring a licensee to either provide (i) samples of the product, so the licensor can run standard batteries of laboratory tests to determine if the wine meets regulatory requirements, is labeled properly, and is free of contamination, or (ii) certified lab reports that evidence compliance with applicable standards. Neither CBUSO nor Beckstoffer produced evidence of any such lab testing of the Sublicensees' wines in connection with the License Agreement. *Id*. at pars. 31-32 (14:17-15:11).

132.   Not a single document produced by Constellation or Beckstoffer demonstrated that any wine made by any Beckstoffer Sublicensee was ever tested or evaluated against any quality standard. *Id*. at par. 44 (19:12-14).

34

1



2

3

4

5

6

7

8

9

10

11

12      137.    CBUSO personnel do "occasional," "irregular" tasting of some of the wines made

13   by some of the Beckstoffer Sublicensees, which tastings are "not tied to the license agreement."

14   De Vere Tr. Vol. 1 (2-6-2020) at 147:15-148:20, 155:4-8.

15



16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

36

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

[black redacted block spanning lines 1–16]

**K.  CBUSO Advertising of the Geographic Origin of Its To Kalon-Branded Wines**

151.    In 2004, RMW was acquired by and merged into CBUSO. Dkt. 1 (4:20-cv-0238) (Complaint).

152.    CBUSO owns all right, title, and interest to the To Kalon Marks. By stipulation.

153.    CBUSO grows grapes from and operates the RMW winery on approximately 549 acres in Oakville, California (the "RMW Property"). De Vere Tr. Vol. 1 at 80:7-15.

154.    An estimated 188 acres of the RMW Property is a portion of the Historic To Kalon Estate. TX 57 (De Vere Ex. 21 (12-20-19 Depo.))

155.    The remaining approximately 361 acres of the RMW Property was not a part of the Historic To Kalon Estate.  TX 57 (De Vere Ex. 21 (12-20-19 Depo.))

156.    From at least 2014-2019, RMW wines labeled with To Kalon were not made from

37

at least 95% of grapes sourced from the historic To Kalon Estate portion of the RMW Property. TX 54 (Interrogatory No. 10).

157.    From at least 2014-2019, CBUSO advertised wines labeled with To Kalon as being 100% sourced from the Historic To Kalon Estate, but they were not. TX 1668 (Seethoff Decl., Exh. A. (Dkt. 62-60, at 3)); *Id.* (Workman Ex. 45 (CBUSO007111)); TX 32 (Workman Ex. 49 (CBUSO006440)); TX 69 (Ex. 71 to Reibstein Depo. (2015 Winemaker Notes)); *see also* TX 25, 27, 33, 49, 70-71 (Bhatti Decl in Support of PI, Exs. 49-52, 54, 56).

158.    From at least 2014-2019, RMW advertised that its so-called "To Kalon Vineyard" was all part of the Historic To Kalon Estate, but it was not. TX 32 (Workman Ex. 49 (CBUSO006440 at 48)); TX 72 (Ex. L to FAC (To Kalon Vineyard Website)); TX 73 (Ex. M to FAC); TX 57 (Ex. O to FAC).

███████████████████████████████████████████████████████

**L. TVH Cultivates Premium Wine Grapes on Part of the Historic To Kalon Estate That Become Wine**

160.    TVH grows grapes from and operates its winery on a portion of the Historic To Kalon Estate, an estimated 15 acres of land. *See* TX 10; Miltenberger Report at par. 53.

161.    TVH's vineyard designated by TVH as "Block 8" is located on the 15-acre portion of the Historic To Kalon Estate. TVH currently grows cabernet sauvignon grapes at its Block 8. TX 10 (Declaration of Jon Webb, Ex. 2 "Land Survey").

162.    TVH did not discover that it grows grapes and operates its winery on a portion of the Historic To Kalon Estate until four years prior to filing a Complaint in this action. Nickel Tr. Vol 1. 25:25-26:10.

163.    TVH seeks to use the term "H.W. Crabb's To Kalon Vineyard" to describe the geographic origin of wine produced from grapes grown on TVH's portion of the Historic To Kalon Estate. Nickel Tr. Vol. 1 at 168:7-169:11; Frost Rebuttal Report at par. 4.

164.    TVH seeks to refer to "To Kalon" to describe the historical association between

38

TVH, Crabb, and the Churchill's To Kalon Vineyard Company. *See, e.g.*, TX 86, 88, 89, 90 (back label photos).

165.    The primary brand – "THE VINEYARD HOUSE" – is at the top of the Block 8 Cab label in the largest typeface, and the geographic origin – "H.W. Crabb's To Kalon Vineyard, Oakville, Napa Valley" – is located at the lower portion of the label, in much smaller typeface than the TVH house trademark. *See* TX 85 (photos of front label).

166.    In December 2019, TVH used the term To Kalon in an advertising letter it sent to its wine club members to refer to its 2015 vintage of Block 8 Cab. Nickel Tr. Vol 1 at 49:14-25.

167.    TVH made a 2015 Estate Blend Cabernet Sauvignon, a 2015 Block 8 Cabernet Sauvignon, and a 2015 Estate Cabernet Franc for which the bottles originally had the words, "H.W. Crabb's To-Kalon Vineyard" silkscreened onto the bottles as part of the front label. TX 1302 (photos).

168.    Before selling and delivering any of the bottles of the 2015 Cabernet Sauvignon and Cabernet Franc wines, TVH covered the reference to "To-Kalon" on the front label with "Hermosa Valley" pending the outcome of the trial. Nickel Tr. Vol. 1 at 114:8-11.

169.    Miscommunication among operations personnel caused TVH to inadvertently sell 231 bottles of 2015 wines that refer to "To Kalon" on the back label, which accounted for $41,260.42 in total sales. Nickel Tr. Vol. 2 at 174:13-175:18.

170.    TVH removed all other references to "To Kalon" in conjunction with wine, and none of the 2015 wine bottles sold since the injunction have had any reference to To Kalon on the front label. Nickel Tr. Vol. 2 at 164:9-175:18.

171.    TVH's use of the term "To Kalon" is not likely to cause confusion among ordinary consumers of TVH's wine as to the source, sponsorship, affiliation, or approval of such wine, as determined by an *Eveready* survey undertaken by Ford Bubala & Associates. *See* TX 12.

## CONCLUSIONS OF LAW

172.    Based on the above findings of fact, the court makes the following conclusions of law:

39

### A.  TVH's Claim for Declaratory Relief Regarding Fair Use

173.    TVH seeks a declaration that TVH has the right to use the name "To Kalon" because it falls within the Fair Use Doctrine under 15 U.S.C. §§ 1114, 1115, and 1125(a). TVH shall have the right to use the name To Kalon if (a) the name "To Kalon" is descriptive of geographic origin, and (b) TVH used the name "To Kalon" fairly and in good faith only to describe the goods or their geographic origin. Dkt. 98 ("TVH's Second Claim") (*citing* 15 U.S.C. § 1115(b)(4)).

174.    The Lanham Act adopts a certain leniency for fair use.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004).  "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well-known descriptive phrase." *Id.*

175.    The focus of the Court's fair use inquiry is on TVH's use of the name To Kalon, not on how CBUSO uses the name. *See Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 36 U.S.P.Q.2d 1855 (2d Cir. 1995)

176.    A junior user can use another's registered trademark so long as it is in a non-trademark, geographical sense. 2 McCarthy on Trademarks and Unfair Competition § 14:17 (5th ed. September 2020 Update) (hereafter "McCarthy on Trademarks"); *see Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC*, 184 F. Supp. 3d 572, 578 (W.D. Ky. 2016), *aff'd*, 687 Fed. Appx. 429 (6th Cir. 2017) ("Defendants are protected by the fair use defense when describing where an event took place, even when the location described is most commonly conveyed using a registered trademark.").

177.    Producers of goods that are located in a specific place have a limited right to tell purchasers of their location.  McCarthy on Trademarks, at § 14:12; *see Sazerac Brands, LLC v. Peristyle*, LLC, 892 F.3d 853, 855 (6th Cir. 2018) (affirming judgment for defendant who used Old Taylor Distillery to describe its location).

178.    15 U.S.C. § 1115(b)(4) allows a fair use for trademarks that describe "the geographic origin" of a junior trademark user's product. *Oaklawn Jockey Club, Inc., 184 F. Supp.*

*3d at* 578; *see* 15 U.S.C. § 1115(b)(4); *see also Sazerac Brands, LLC v. Peristyle*, LLC, 892 F.3d at 855-859 (references were descriptive and geographic because they "referred to Old Taylor to pinpoint the historic location where [the distiller] planned to make a new bourbon, not to brand that bourbon.").

179.    The Court finds that the name "To Kalon" is descriptive of geographic origin.  The Court finds that TVH has used the name "To Kalon" fairly and in good faith only to describe the wine and its geographic origin.  TVH thus has the fair use right to describe the geographic origin of its wine – *i.e.*, that the grapes used to make the Block 8 Cab were grown on a portion of the Historic To Kalon Estate, using "H.W. Crabb's To Kalon Vineyard" as a single-vineyard designation on the front label of its wine bottle, using "To Kalon" and "To Kalon Vineyard" to describe TVH's historic association with Crabb's Historic To Kalon Estate on the back label. PFF Nos. 4-10, 17-18, 21, 28-79, 83-100, PCL Nos.173-178.

180.    To address any possible risk of confusion, the Court may order TVH to use a disclaimer, such as "TVH is not affiliated with Robert Mondavi Winery or Beckstoffer Vineyards" whenever it uses "To Kalon Vineyard" as a single-vineyard designation on the front label of its wine. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011); *Adray v. Adray–Mart*, 76 F.3d 984, 990–91 n. 7 (9th Cir.1995); and *see also Oracle Corp. v. Light Reading, Inc.*, 233 F. Supp. 2d 1228, 1232 (N.D. Cal. 2002) (the defendant ordered to state it "is not affiliated with" the defendant).

**B.   TVH's Claim for Declaratory Relief Regarding Fraud and Cancellation**

181.    CBUSO's TO KALON and TO KALON VINEYARD trademarks should be cancelled if:

a.    CBUSO's predecessor-in-interest RMW misrepresented a material fact to the USPTO in the trademark application process, and

b.    RMW knew that such misrepresentations were false when it made them, and

c.    RMW made such misrepresentations intending to induce the USPTO to

41

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1    reasonably rely on them, and

2             d.      The USPTO reasonably relied on RMW's misrepresentations.

3    Dkt. 98 ("TVH's Second Claim") (*citing* 15 U.S.C. § 1115(b) (1); *OTR Wheel Engineering v.*

4    *West WW Srvs*., 897 F. 3d 1008, 1020 (9th Cir. 2020)); *see also Robi v. Five Platters, Inc.*, 918

5    F.2d 1439, 1444 (9th Cir. 1990).

6    Misrepresentation of Material Fact.

7        182.    To constitute 'fraud,' the knowing misrepresentation to the PTO must be

8    "material" in the sense that but for the misrepresentation, the federal registration either would not

9    or should not have issued. McCarthy on Trademarks, at § 31:67; *see also Gaffrig Performance*

10   *Indus., Inc. v. Livorsi Marine*, *Inc.*, 2003 WL 23144859, at *14 (N.D. Ill. 2003)

11   (misrepresentation material because without it, "the federal registration should not, or would not,

12   have been issued."); *Alyn v. S. Land Co., LLC*, 2016 WL 7451546, at *5 (M.D. Tenn. 2016)

13   (misrepresentation material because "PTO likely would have refused to register marks if the

14   applicant had indicated the applied-for mark was a term with geographical significance.").

15   Knowledge of Falsity and Intent.

16       183.    "Direct evidence of deceptive intent is rarely found; state of mind and intent must

17   usually be proven by circumstantial evidence." McCarthy on Trademarks, at § 31:66; *see In re*

18   *Bose Corp*., 580 F.3d 1240, 1246 (Fed. Cir. 2009) (the challenger must "point to evidence to

19   support an inference of deceptive intent" to satisfy clear and convincing standard. When drawing

20   an inference of intent, "the involved conduct, viewed in light of all the evidence ... must indicate

21   sufficient culpability to require a finding of intent to deceive." (citations omitted)); *Tokidoki, LLC*

22   *v. Fortune Dynamic, Inc.*, 2009 WL 2366439, at *11 (C.D. Cal. 2009), *aff'd*, 434 F. App'x 664

23   (9th Cir. 2011), opinion withdrawn and superseded, 473 F. App'x 522 (9th Cir. 2011), and *aff'd*,

24   473 F. App'x 522 (9th Cir. 2011) ("[A]n applicant or registrant may not make a statement he/she

25   knew or should have known was false or misleading."); *see also Swiss Watch International, Inc.*

26   *v. Federation of the Swiss Watch Industry*, 101 U.S.P.Q.2d 1731 (T.T.A.B. 2012) ("[M]aking a

27   statement that, while true, gives only part of the story" can demonstrate falsity and intent.);

28

*General Electro Music Corp. v. Samick Music Corp*., 19 F.3d 1405, 30 USPQ2d 1149, 1154 (Fed. Cir. 1994) ("[the submission of false or misleading statements] usually will support the conclusion ... of an intentional scheme to deceive the PTO"). Fraudulent intent is properly inferred where it is the "single most reasonable inference able to be drawn from the evidence" presented at trial. S*ee Star Sci., Inc. v. R.J. Reynolds Tobacco Co*., 537 F.3d 1357, 1366 (Fed. Cir. 2008).

184.    A deliberate omission of material information that an applicant has a duty to disclose can support a cancellation claim based on fraud. *See Caymus Vineyards v. Caymus Medical Inc.*, 107 U.S.P.Q.2d 1519, 2013 WL 3984638 (T.T.A.B. 2013) (in response to Examiner's question if the term CAYMUS for wine had a geographical significance, the applicant's attorney misled the Examiner in telephone conversation.).

185.    In determining intent, all information available to the applicant must inform the response to a PTO office action. *See Allstate Insurance Co. v. Healthy America Inc.*, 9 USPQ2d 1663 (T.T.A.B. 1988) (attorney may sign corporate client's interrogatory responses without personal knowledge of the information contained therein, but responses must be based on information available to client itself).

Reasonable Reliance.

186.    A finding that the representation was material also logically supports a finding that the USPTO reasonably relied on the representation. Reasonable reliance is shown if a reasonable examining PTO attorney would have relied on the material fact and considered such a fact in making the overall decision as to whether to grant the application. *See OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.,* 897 F.3d 1008, 1021 (9th Cir. 2018).

187.    TVH has established by clear and convincing evidence that CBUSO's predecessor-in-interest RMW fraudulently misrepresented a material fact to the USPTO in the trademark application process, namely that To Kalon had no then-present meaning or significance in the wine industry and that the USPTO reasonably relied on that misrepresentation. The Court finds and declares that CBUSO's TO KALON and TO KALON VINEYARD trademarks are

43

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

cancelled based on fraud.  PFF Nos.77-100, PCL Nos.181-186.

### C. TVH's Claim for False Advertising and False Designation of Origin, 15 U.S.C. § 1125(a)

188.     TVH asserts that CBUSO's use of the name To Kalon related to the sale of wine products that are not at least 95 percent sourced from the historic To Kalon Estate constitutes false advertising and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a). Dkt. 98 ("TVH's First Claim") (*citing 1*5 U.S.C. § 1125(a) and *Alfasigma USA, Inc. v. First Databank, Inc.* 398 F.Supp.3d 578 (N.D. Cal. 2019)).

189.     CBUSO shall be liable for false advertising and false designation of origin under 15 U.S.C. § 1125(a) if:

a.     CBUSO used in commerce (i) a name, or (ii) any false designation of origin, false or misleading description of fact, or (iii) a false or misleading representation that is likely to cause confusion, mistake, or deceive as to the origin, sponsorship, or approval of goods; or

b.     In commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of goods, and

c.     TVH believes that it is likely to be damaged by such act.  Dkt. 98, *supra*.

190.     The Lanham Act forbids a misrepresentation of the "geographic origin" of goods. 15 U.S.C. § 1125(a). A misrepresentation of "geographic origin" includes "geographic origin and commercial (trademark identifying) origin." McCarthy on Trademarks, at § 27:49; *see also Scotch Whiskey Assoc. v Consolidated Distilled Products, Inc.* (1981, ND Ill) 210 USPQ 639. ("Specifically, plaintiff contends that the Loch-A-Moor mark falsely describes the product as having Scotland as its place of origin.").

191.     If the challenged ad is found to be literally false on its face, then actual deception is presumed. McCarthy on Trademarks, at § 27:36 (*citing Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 257, 111 U.S.P.Q.2d 1950 (2d Cir. 2014) ("Once literal falsity … was proved, no further evidence of actual consumer confusion was necessary.")).

192.     In commercial advertising or promotion of its To Kalon-branded wines, CBUSO

misrepresented the geographic origin of its wines and TVH has shown that it is likely to be damaged by CBUSO's misrepresentations. PFF Nos.151-159, PCL Nos.188-191.  Accordingly, the Court finds that CBUSO is liable for false advertising and false designation of origin under 15 U.S.C. § 1125(a).

### D.  TVH's Claims for False Advertising and Unfair Competition (California State Law)

193.    TVH asserts that CBUSO's use of the To Kalon marks constitutes false advertising and unfair competition under California state law. Dkt. 98 ("TVH's Third Claim" and "TVH's Fourth Claim").

194.    "Claims of unfair competition and false advertising under California's False Advertising Law ('FAL') and California's Unfair Competition Law ('UCL') are 'substantially congruent' to claims under the Lanham Act." *RingCentral, Inc. v. Nextiva, Inc.*, 2020 WL 4039322, at *2 (N.D. Cal. 2020); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) ("Here, AirHawk has adequately alleged false advertising in violation of the Lanham Act. Accordingly, for the same reasons discussed supra, AirHawk has also adequately alleged violation of the UCL.")).

195.    The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

196.    "California's FAL prohibits the dissemination of any advertising 'which is untrue or misleading.'" *LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*, No. 18-CV-02573-YGR, 2019 WL 160335, at *10 (N.D. Cal. 2019) (*citing* Cal. Bus. & Prof. Code § 17500; *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985–86 (S.D. Cal. 2014)).

197.    Because TVH's FAL and UCL claims are based entirely on conduct that forms the basis of its Lanham Act claim, TVH's state law claims rise and fall with TVH's Lanham Act claim. *See LegalForce RAPC Worldwide P.C., supra*, 2019 WL 160335, at *11.

198.    TVH must show at least a "trifle of injury," in that its inability to use the To Kalon geographic name has caused it lost business and lost business opportunities. *See LegalForce*

45

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1   *RAPC Worldwide P.C.*, *supra,* 2019 WL 160335, at *12 ("The Court concludes that allegations of

2   'plaintiffs' . . . lost business and decrease in business value, in the overall context of the FAC and

3   its allegations of wrongfully denied business opportunities, suffice to plead standing under the

4   UCL's expansive standing doctrine. Because these allegations also suffice for pleading injury in

5   fact under Article III.").

6       199.    The Court finds that CBUSO's use of the To Kalon marks constitutes false

7   advertising and unfair competition under California state law.  PFF Nos.151-159, PCL Nos.193-

8   198.

9       **E.  CBUSO's Affirmative Defenses**

10      200.    In defense against TVH's equitable claims, CBUSO asserts the affirmative

11  defenses of laches, estoppel, and unclean hands, each of which is discussed below:

12  Laches and Estoppel

13      201.    CBUSO claims that TVH's First Claim for Relief is barred by the doctrine of

14  laches and estoppel based on TVH's long history and awareness of CBUSO and its use and

15  ownership of the TO KALON and TO KALON VINEYARD marks. Dkt. 98 (*See* CBUSO's

16  Affirmative Defenses to TVH's First Claim for Relief.") A presumption of laches arises in a

17  Lanham Act claim where the TVH filed suit more than four years after it knew or should have

18  known of its claim, and TVH's delay was unreasonable. *Ibid;* (citing *Pinkette Clothing, Inc. v.*

19  *Cosmetic Warriors Limited*, 894 F.3d 1015, 1025 (9th Cir. 2018); *Jarrow Formulas, Inc. v.*

20  *Nutrition Now*, Inc., 304 F.3d 829, 835 (9th Cir. 2002)).

21      202.    To establish laches, CBUSO bears the burden of proving that "(1) [TVH's] delay

22  in filing suit was unreasonable, and (2) [CBUSO] would suffer prejudice caused by the delay if

23  the suit were to continue." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th

24  Cir.), cert. denied, 537 U.S. 1047 (2002). "A court must find both factors for a suit or remedy to

25  be barred by laches." *Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1139

26  (9th Cir. 2010).

27      203.    An equitable estoppel defense shall apply when: (1) TVH knew the defendant was

28

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BN 41821858v2

selling a potentially infringing product; (2) TVH's actions or failure to act led CBUSO to reasonably believe that TVH did not intend to enforce its trademark right against the CBUSO; (3) CBUSO did not know that TVH actually objected to the sale of its potentially infringing product; and (4) due to its reliance on the TVH's actions, CBUSO will be materially prejudiced if TVH is allowed to proceed with its claim.  Dkt. 98 (*See* CBUSO's Affirmative Defenses to TVH's First Claim for Relief.") (*citing 3M Co. v. Rollit, LLC*, 2008 WL 8820473, at *5 (N.D. Cal. 2008)).

204. "Where any one of the elements of equitable estoppel is absent, the claim must fail." *Am. Casualty Co. v. Baker*, 22 F.3d 880, 892 (9th Cir. 1994).

205. CBUSO's laches and estoppel defenses are based on the same theories and facts. Dkt. 98 (*See* CBUSO's Affirmative Defenses to TVH's First Claim for Relief."); *see also* McCarthy on Trademarks, at § 32:105 ("An estoppel can be created by a plaintiff's knowing acquiescence in defendant's activities, or by an unreasonable delay coupled with prejudice, creating an estoppel by laches."); *Cyclone USA, Inc. v. LL&C Dealer Servs., LLC*, 2007 WL 9662337, at *6 (C.D. Cal. 2007) ("To properly understand the defense of estoppel in the context of a federal trademark infringement claim it is necessary to discuss it along with the defenses of laches and acquiescence to which it is closely related."). *E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1414 (E.D. Cal. 1994) ("Estoppel by acquiescence includes the two elements of laches ... and adds [a third element].")

206. CBUSO has failed to carry its burden to show unreasonable delay and prejudice resulting from TVH's alleged delay in bringing the declaratory relief action. PFF Nos. 4-10, 17-19, PCL Nos. 200-205.  Therefore, the Court finds TVH's claims are not barred by laches or estoppel.

Unclean Hands

207. CBUSO asserts unclean hands as an affirmative defense. Dkt. 98 (*See* CBUSO's Affirmative Defenses to TVH's First Claim for Relief."). An unclean hands defense shall apply if: "(1) TVH's conduct is inequitable; and (2) "that the conduct relates to the subject matter of [TVH's] claims." *Ibid.* (*citing Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1    (9th Cir.1987).).

2    208.    "[W]here the law invoked by plaintiff is really for the protection of the public,

3    unclean hands is not a defense." McCarthy on Trademarks at § 31:53. To prevail on an unclean

4    hands defense in a trademark action, a defendant must demonstrate unclean hands by "clear,

5    convincing evidence." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 (9th Cir.2011).

6    209.    "'Bad intent is the essence of the defense of unclean hands.'" *Cochran Firm, P.C.*

7    *v. Cochran Firm Los Angeles LLP*, 641 F. App'x 749, 750 (9th Cir. 2016); *citing Japan Telecom,*

8    *Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir.2002).

9    210.    CBUSO has not satisfied its heighted burden of proof to establish with clear and

10   convincing evidence that TVH acted in bad faith and with unclean hands. PFF Nos. 1-171, PCL

11   Nos. 207-209. Therefore, the Court finds TVH's claims are not barred by laches or estoppel.

12   **F.   CBUSO's Claim for Trademark Infringement**

13   211.    CBUSO bears the burden of proof on the following elements of the asserted

14   trademark infringement claim: (1) CBUSO owns a valid, protectable trademark, and (2) TVH

15   used the name To Kalon on wine products without CBUSO's consent, and (3) Such use was in a

16   manner likely to cause confusion among ordinary consumers as to the source, sponsorship,

17   affiliation, or approval of such wine.  To show a likelihood of confusion on a trademark

18   infringement claim, the trademark owner must establish that (1) it has a protected ownership

19   interest in the subject mark, and (2) the accused infringer's use of a similar mark is likely to cause

20   consumer confusion, thereby infringing CBUSO's rights.  Dkt. 98 (*See* CBUSO's First Claim)

21   (*citing Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014); *Dep't of Parks &*

22   *Rec. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *E & G Gallo Winery v.*

23   *Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)); *see also Equinox Hotel Mgmt., Inc. v.*

24   *Equinox Holdings, Inc.*, 2018 WL 659105, at *1 (N.D. Cal. 2018) (*citing Adobe Sys., Inc. v.*

25   *Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) ("trademark holder must show that the

26   defendant's use of its trademark 'is likely to cause confusion, or to cause mistake, or to deceive'")

27   (*quoting Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025,

28

48

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BUCHALTER
A Professional Corporation
San Francisco

BN 41821858v2

1030 (9th Cir. 2010)); *citing also* 9th Cir. Model Jury Instruction 15.6 Infringement—Elements and Burden of Proof—Trademark (updated July 2017)).

212.     [*Alternative 1*]  Based on the conclusion of law and findings of fact addressed above, finding cancellation of CBUSO's trademarks on the grounds of fraud, CBUSO cannot carry its burden to a valid, protectable trademark.  As such, CBUSO's trademark infringement claim fails as a matter of law.  PFF Nos. 73-100, PCL No.181-187.

213.     [*Alternative 2*] Based on the conclusion of law and findings of fact addressed above, declaring that TVH has a fair use right to use the terms To Kalon as specified above, TVH has also carried its burden on its fair use affirmative defense and CBUSO's trademark infringement claim fails as a matter of law.  PFF Nos..4-10, 17-18, 21, 28-79, 83-100, PCL No.173-178.

214.     [*Alternative 3*] TVH asserts an affirmative defense based on abandonment by naked licensing.  TVH shall have no liability for using the name To Kalon if: (1) CBUSO licensed the use of the TO KALON AND TO KALON VINEYARD trademarks and (2) CBUSO failed to adequately control the quality of goods produced by its licensees and sub-licensees.  Dkt. 98 (TVH's Affirmative Defenses to CBUSO's First Claim) (*citing Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir. 2002)).

215.     TVH shall have no liability for using the name To Kalon if the trademarks were abandoned by naked licensing.  *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.,* 289 F.3d at 595–96; *see FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 515 (9th Cir.2010); *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1076 (N.D. Cal. 2013); *see also SinCo Techs. Pte Ltd. v. SinCo Elecs. (Dongguan) Co.,* 2020 WL 906721, at *3 (N.D. Cal. Feb. 25, 2020) ("Whether SinCo actually controlled the quality of XingKe's products is contested. Likewise, it is up to the jury to decide if SinCo's reliance on XingKe's quality control was reasonable."); *Bluetooth SIG, Inc. v. FCA US LLC,* 2020 WL 2794632, at *13 (W.D. Wash. 2020).

216.     Naked licensing is a defense to trademark infringement based on the theory that "if

49

a trademark owner fails to control the quality of the goods and services sold under that trademark by its licensees, the trademark may cease to function as a symbol of quality and source for consumers and effectively be considered to have been abandoned." *Monster, Inc.*, 920 F. Supp. 2d at 1076; *citing FreecycleSunnyvale*, 626 F.3d at 515-16 (*citing Barcamerica Intern. USA Trust*, 289 F.3d at 595–96 *and* 3 McCarthy on Trademarks and Unfair Competition § 18:48 (4th ed.)). "Thus, the naked licensing claim is fundamentally a claim that the trademark is no longer valid and enforceable because of the licensor's neglect in policing its use." *Id.*

217.    CBUSO will have abandoned its trademarks if CBUSO licensed the use of the TO KALON AND TO KALON VINEYARD trademarks and CBUSO failed to adequately control the quality of wines produced by its licensees and sub-licensees. *Barcamerica Int'l USA Tr.*, 289 F.3d 589 at 595-96.  The controlling case on naked licensing in the wine industry is *Barcamerica*:

> . . . in this case we deal with a relatively simple product: wine. Wine, of course, is bottled by season. Thus, at the very least, one might have expected [the licensor] to sample (or to have some designated wine connoisseur sample), on an annual basis, in some organized way, some adequate number of bottles of the [licensee's] wines which were to bear [the licensor]'s mark to ensure that they were of sufficient quality to be called "Da Vinci." But [the licensor] did not make even this minimal effort.

*Barcamerica*, 289 F.3d at 598. *Id.*

218.    The Ninth Circuit has thus defined the "minimal effort" that a wine trademark licensor must make to control the quality of a licensee's wines to avoid a finding of naked license as follows:

- A knowledgeable person ("connoisseur") must sample

- on an annual basis

- in some organized way,

- some adequate number of bottles of the licensee's wines

- to ensure they are of sufficient quality to carry the licensed mark.

219.    The Court finds that TVH has established that CBUSO has abandoned the trademark by naked licensing. RMW and CBUSO have engaged in naked licensing by failing to monitor and control the quality of wines produced by Sublicensees and sold under the License

50

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 41821858v2

1    Agreement and have thus abandoned the To Kalon marks.  PFF Nos.111-150, PCL Nos.214-218.

2    Therefore, CBUSO's trademark infringement claim fails as a matter of law.

3         **G.  *Sleekcraft* Analysis**

4         220.    [*Alternative 4*] The focus of the trial is on the third element, likelihood of

5    confusion. "The core element of trademark infringement is the likelihood of confusion, *i.e.*,

6    whether the similarity of the marks is likely to confuse customers about the source of the

7    products." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053–54 (9th Cir.

8    1999) (citations and internal quotations omitted). "The core element of trademark infringement is

9    [p]rotecting against a likelihood of confusion, which helps to ensur[e] that owners of trademarks

10   can benefit from the goodwill associated with their marks and 'that consumers can distinguish

11   among competing producers.'" *Equinox Hotel Mgmt., Inc.,* at *1, *citing Adobe Systems*, 809 F.3d

12   at 1081 (internal quotations and citations omitted).

13        221.    In *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), the Ninth

14   Circuit set forth an eight-factor test "intended to guide the court in assessing the basic question of

15   likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1290 (9th Cir.

16   1992). The "Sleekcraft factors" are as follows: "1) strength of the mark; 2) proximity of the

17   goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6)

18   type of goods and the degree of care likely to be exercised by the purchaser; 7) defendant's intent

19   in selecting the mark; and 8) likelihood of expansion of the product lines." Dkt. 98 (CBUSO's

20   First Claim) (*citing Sleekcraft*, 599 F.2d at 348-49).

21        222.    After evaluating the evidence and the factors that are most pertinent to this

22   particular case along with the other evidence related to likelihood of confusion, the Court finds

23   that CBUSO has not carried its burden on its claims for trademark infringement.  PFF Nos.101-

24   110, 159-171, PCL Nos.191-192.

25        **H.    CBUSO's Remaining Claims**

26        223.    CBUSO's remaining claims against TVH are for unfair competition under the

27   Lanham Act, 15 U.S.C. § 1125(a), false advertising and designation of origin under the Lanham

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

1  Act, 15 U.S.C. § 1125(a), trademark infringement under California common law, unfair

2  competition under California common law, and unfair competition under California state law.

3  Dkt. 98 (CBUSO's Second, Third, Fourth, and Fifth Claims). These remaining claims all rely

4  upon the existence of an enforceable trademark and a finding that TVH has no right to use the

5  term To Kalon in connection with the sale of its wines. Dkt. 98 (CBUSO's Second, Third, Fourth,

6  and Fifth Claims). Based on the conclusions stated above, the Court finds that TVH is not liable

7  for these claims.  PFF Nos. 1-171, PCL Nos.173-222.

8  **I.   TVH's Request for Disgorgement of Profits**

9  224.   Plaintiff seeks disgorgement of CBUSO's profits obtained in the sale of wine

10  labeled To Kalon where less than 95% of the grapes used in making that wine come from the To

11  Kalon Estate.  15 U.S.C. § 1117(a). PFF Nos. 151-159, PCL Nos.188-191.

12  225.   Any conclusion of law herein that is actually a finding of fact shall be so

13  considered and construed.  *Tri–Tron International v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975).

14
15       Respectfully submitted,

16  DATED:  September 30, 2020                    BUCHALTER
                                                  A Professional Corporation

17

18                                          By:   /s/ Jeff Judd
19                                                JEFFREY M. JUDD
                                                  PETER H. BALES
20                                                Attorneys for
                                                  THE VINEYARD HOUSE

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**[TVH's CORRECTED PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW - CASE NO.
4:19-cv-1424-YGR**

BN 41821858v2

1

2                    **CERTIFICATE OF SERVICE**

3        The undersigned certifies that

4        • **[TVH'S CORRECTED PROPOSED] FINDINGS OF FACT AND
5          CONCLUSIONS OF LAW**

6    were served electronically upon the following parties by email on this 30th day of September,

7    2020.

8    Timothy J. Carlstedt
     (tcarlstedt@huntonak.com)
9    HUNTON ANDREWS KURTH LLP
     50 California Street, Suite 1700
10   San Francisco, CA 94111
     Tel.: (415) 975-3700
11   Fax: (415) 975-3701

12
     Edward T. Colbert
13   (ecolbert@huntonak.com)
     Erik C. Kane
14   (ekane@huntonak.com)
     William M. Merone
15   (wmerone@huntonak.com)
16   HUNTON ANDREWS KURTH LLP
     2200 Pennsylvania Avenue, N.W.
17   Washington, D.C. 20037
     Tel.: (202) 955-1500
18   Fax: (202) 778-2201
19   Counsel for Constellation Brands U.S. Operations, Inc.

20
     DATED: September 30, 2020          BUCHALTER
21                                      A Professional Corporation

22

23                                      By:   */s/ Amara Getzell*

24

25

26

27

28
     BN 40636812v1
     **CERTIFICATE OF SERVICE**