**Volume 1**

**Pages 1 - 188**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | | |
|---|---|---|
| THE VINEYARD HOUSE, LLC,, | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| VS. | ) | **NO. CV 19-01424-YGR** |
| | ) | |
| CONSTELLATION BRANDS U.S. | ) | |
| OPERATIONS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim | ) | |
| Plaintiff. | ) | |
| _____ | ) | |

Oakland, California
Monday, November 30, 2020

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff/Counterclaim Defendant:
                         BUCHALTER
                         A Professional Corporation
                         55 Second Street, Suite 1700
                         San Francisco, CA  94105
              **BY:  JEFFREY M. JUDD, ESQUIRE**
                    **PETER H. BALES, ESQUIRE**

For Defendant/Counterclaim Plaintiff:
                         HUNTON ANDREWS KURTH LLP
                         2200 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20037
              **BY:  EDWARD T. COLBERT, ESQUIRE**
                    **ERIK C. KANE, ESQUIRE**
                    **WILLIAM M. MERONE, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

**APPEARANCES CONTINUED:**

For Defendant/Counterclaim Plaintiff:
                          HUNTON ANDREWS KURTH LLP
                          200 Park Avenue
                          New York, NY 10166
                    BY:   **ARMIN GHIAM, ESQUIRE**

<u>**I N D E X**</u>

Monday, November 30, 2020 - Volume 1

<u>**PLAINTIFF'S WITNESSES**</u>                                   <u>**PAGE**</u>  <u>**VOL.**</u>


<u>**MILTENBERGER, SCOTT**</u>
(SWORN)                                                  9   1
Direct Examination by Mr. Judd                          12   1
Cross-Examination by Mr. Merone                         62   1
Redirect Examination by Mr. Judd                       126   1
Examination by The Court                               133   1

<u>**FROST, DOUG**</u>
(SWORN)                                                139   1
Direct Examination by Mr. Bales                        142   1

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                              <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

  7A                                                    13   1

  313                                                  178   1

<u>**Monday - November 30, 2020**</u>                              <u>**8:29 a.m.**</u>

                              P R O C E E D I N G S

                                  ---oOo---

          **THE CLERK:**  Calling Civil Action 19-1424, The Vineyard
House vs. Constellation Brands U.S. Operations, Inc.

     I will have the judge direct counsel to state their
appearances.

          **THE COURT:**  Please do.

          **MR. JUDD:**  Jeffrey Judd, Buchalter, on behalf of The
Vineyard House.

     **MR. BALES:**  Good morning, Your Honor.  Peter Bales for
The Vineyard House as well.

          **MR. COLBERT:**  Your Honor, Edward Colbert of Hunton
Andrews Kurth for Constellation Brands.

          **MR. KANE:**  Good morning, Your Honor.  Erik Kane from
Hunton Andrews Kurth for Constellation as well.

          **MR. MERONE:**  William Merone for Constellation Brands
as well.

          **THE COURT:**  Good morning, everyone.

     For purposes of the record, we are still in the COVID-19
period.  We are doing this bench trial by Zoom.  Currently we
are on the webinar platform which allows video access, and that
may impact some of the proceedings in terms of the order of
evidence, but to the extent it does, we'll identify that for
the record.

1      For some reasons, which I will explain, if necessary,

2  later, I'm not currently in chambers.  I hope to be in chambers

3  in a day or two, but that may also impact some issues.  I don't

4  have for instance, Mr. Miltenberger's deposition transcript

5  with me, if I had it, but in any event, we will get to those

6  things and resolve them, if needed.

7      Is there anything anyone needs to do?  If not, we can

8  start with the Plaintiff's case.  Mr. Judd, anything on your

9  end?

10      **MR. JUDD:**  I need to get my connection to realtime.

11  I'm having a problem with the password.

12      **THE COURT:**  Okay.  So when I connected today -- you

13  have the link; right?

14      **MR. JUDD:**  Yes, Your Honor.

15      **THE COURT:**  And then you need to -- you need to go to

16  Room 8, and in the drop-down menu, there should be a number of

17  files.  One of those files is "The Vineyard House."

18      **MR. JUDD:**  Correct.  I'm in that.

19      **THE COURT:**  Once you click on that, then the second

20  line is for the password.

21      **MR. JUDD:**  Correct.

22      **THE COURT:**  Did you do that?

23      **MR. JUDD:**  I typed in "winery".

24      **THE COURT REPORTER:**  Capital "W".

25      **THE COURT:**  Mr. Judd, are you in now?

1        **MR. JUDD:**  I am.  Thank you.

2        **THE COURT:**  Anything else that the plaintiffs need to

3   put on the record?

4        **MR. JUDD:**  We're ready to proceed, Your Honor.

5        **THE COURT:**  All right.

6     Mr. Colbert.

7        **MR. COLBERT:**  Ready to proceed.  Mr. Merone -- I will

8   let him respond -- he will begin with witnesses.

9        **MR. MERONE:**  Good morning, Your Honor.  I just wanted

10   to raise two quick issues because we're not clear on them.

11      The first is the other side sent over some demonstratives

12   last night.  I don't know whether they are intending to use

13   these with Dr. Miltenberger or not.  It's entitled, "Social

14   Supporting Opinion Regarding To Kalon Descriptive" and some

15   other things like that, but half of these things that are

16   listed here as exhibits were never in Dr. Miltenberger's

17   report, so I just don't know what I'm looking at, these four

18   pages of demonstratives, because they don't match up with

19   what's in his report.  So that's question one.  Obviously if

20   they were going to be using those with Dr. Miltenberger and/or

21   showing him exhibits that weren't in his report, we would be

22   objecting, but since I don't know yet, I'm just raising that.

23      The second thing, I understand Mr. Frost is listening,

24   which I think we have no objection to, but Mr. Frost in his

25   report in coming to his opinions did not rely on anything

1    Dr. Miltenberger said or Dr. Miltenberger's opinions.  So while

2    he can observe, to the extent they intend to ask him, "What do

3    you think about what Dr. Miltenberger said," we just think that

4    would be improper.  I just want to raise that now.

5             THE COURT:  Okay.  Response.

6             MR. JUDD:  I believe all of the exhibits that we're

7    referring to have been on the Trial Exhibit List, and even

8    though the exhibit numbers on the Trial Exhibit List may not

9    refer directly to the titles used in the report, I believe that

10   all except an exhibit that we've stipulated to as parties have

11   been referred to or relied on by Dr. Miltenberger.  So --

12            THE COURT:  That's not what I understood the question

13   to be, Mr. Judd.  I understood the question to be some

14   demonstratives.  I mean, it doesn't matter.  I can deal with

15   that on the fly.  But the second question relates to Mr. Frost.

16            MR. JUDD:  Yes.  We're not going to be asking

17   Mr. Frost what he thinks of Dr. Miltenberger's testimony.

18            THE COURT:  Well, you all tell me, what is your

19   agreement?  Is your agreement that -- because my general order

20   is that witnesses are excluded.  You agreed that experts could

21   watch.  I assumed that what you were doing related to experts

22   who needed to hear testimony, but it's your agreement, not

23   mine.  So --

24            MR. JUDD:  I believe that Constellation said they had

25   no objection to Mr. Frost listening in, so other than a

1  potential objection to a question that we don't intend to ask,

2  I don't think there's anything to respond to.

3      **THE COURT:**  All right.

4    No issues, Mr. Merone?

5      **MR. MERONE:**  Well, Your Honor, just to respond to

6  counsel's statement, so, yes, what I'm saying is I have a

7  demonstrative here, and just the first page, for example,

8  lists --

9      **THE COURT:**  Mr. Merone, we will get to that in a

10  minute.  I'm actually more interested in Mr. Frost.

11      **MR. MERONE:**  My apologies.

12    If Mr. Frost just wanted to see how court works and hear

13  how the questions are, we have no objection to him listening,

14  but just so long as he is not going to be basing his opinion on

15  anything or being asked or "you heard Dr. Miltenberger say,"

16  that would be improper.

17      **THE COURT:**  That's fine.  Let's proceed.  Bring

18  Mr. Miltenberger on.

19      **MR. JUDD:**  It's "Dr. Miltenberger," for the record.

20      **THE CLERK:**  Your Honor, this is the courtroom clerk.

21  I don't see him as an attendee now.

22      **THE COURT:**  He's at the very bottom, Scott

23  Miltenberger.

24      **THE CLERK:**  Okay.

25      **THE COURT:**  Do you see him now?

1          **THE CLERK:** Yes.  Okay.

2          **THE COURT:** All right.  Mr. Miltenberger, let's go

3    ahead and get a sound check, please.

4          **THE WITNESS:** Scott Miltenberger.

5          **THE COURT:** All right.  Good morning.

6          **THE WITNESS:** Good morning, Your Honor.

7          **THE COURT:** If you will raise your right hand, the

8    courtroom deputy will swear you in.

9                        **SCOTT MILTENBERGER**,

10   called as a witness for the Plaintiff, having been duly sworn,

11   testified as follows:

12         **THE CLERK:** Would you please state your full name and

13   spell your last name.

14         **THE WITNESS:** Scott Anthony Miltenberger,

15   M-I-L-T-E-N-B-E-R-G-E-R.

16         **THE COURT:** And the courtroom deputy has some

17   questions and admonishments for you, sir.

18         **THE CLERK:** Keep in mind this is a formal U.S.

19   District Court proceeding and to act as if you are present in

20   the courtroom.

21       The court reporter is present on Zoom, is preparing a

22   written record of everything that is said during the

23   proceeding.  Please wait until the person speaking has finished

24   before responding to help our court reporter to create a clean

25   and accurate record.

1      Please confirm that you have the requisite hardware,

2   software, and internet resources for the Zoom platform and are

3   sufficiently familiar with accessing and using the Zoom

4   platform to provide the testimony in this trial.

5      Unless the Court requests, please do not mute yourself

6   during your testimony.

7      The judge or court reporter may interrupt you from time to

8   time.  If that happens, please stop speaking to allow the judge

9   or court reporter to speak.

10      If we encounter any technical difficulties, please stop

11  speaking until we all can connect again.  If technical

12  difficulty causes you to miss a statement or question, please

13  inform the Court immediately so the question or statement may

14  be repeated.

15      Please confirm that you have not monitored the trial or

16  any portion of it by any means unless you are an expert witness

17  for whom permission has been granted to do so.

18      Please confirm that you will remain in a single stationary

19  location while connected to the proceedings, except for any

20  breaks the Court calls.

21      Until you are excused by the Court, the following rules

22  apply during your testimony and during any breaks except as

23  specifically modified by the Court:  No other person is

24  physically present in the room or the location where you are

25  testifying.  You are not to have any other Zoom platform or

similar video or audio conferencing open during your testimony.
You are not allowed to have open and are not allowed to use any
or access any means of communication with any persons,
including but not limited to telephone, cell phone, text
message, email, social media, or other chat messaging platforms
or applications while you are testifying.  Except to the extent
needed to access a Zoom platform and exhibits during the trial,
you are not allowed to have any internet browsers, applications
or other electronic devices or software open and accessible.

  You are not allowed to look at or have access to any hard
copy or electronic documents, notes, or other materials while
testifying other than those introduced at trial.

  Do you understand these rules, instructions, and
admonitions?

    **THE WITNESS:**  I do.

    **THE CLERK:**  Do you agree to comply with these rules,
instructions, and admonitions?

    **THE WITNESS:**  I do.

    **THE CLERK:**  Do you have any questions before we
proceed?

    **THE WITNESS:**  Just one.

    **THE CLERK:**  Go ahead for the Court.

    **THE WITNESS:**  For the Court, I do have or I was --
understood that I could have a hard copy of my expert report in
the room with me, and I presently do.  Additionally, I have on

1    my desktop the supporting documents.  I didn't print out all of

2    them out, the supporting documents to my expert report.  May I

3    have access to those should the question arise?

4            **THE COURT:**  You may, Dr. Miltenberger.  My only

5    request is that if you are looking at something or relying on

6    something, you need to tell me what it is you're looking at or

7    relying on because you could be staring at that camera as you

8    are right now, and I don't know if you are actually staring at

9    the platform or if you are staring at a document, and I need to

10   know what it is you're looking at, and I need to know when

11   you're referring to something.  Okay?

12           **THE WITNESS:**  Understood, Your Honor.  Thank you.

13           **THE CLERK:**  Okay.  And then I have one more.  Identify

14   the -- it says the address, city, and state and physical

15   location such as the office or kitchen from where you are

16   testifying.

17           **THE WITNESS:**  I'm testifying from the conference room

18   at JRP Historical Consulting LLC, 2850 Spafford,

19   S-P-A-F-F-O-R-D, Street, Davis, California, 95618.

20           **THE COURT:**  All right.  Thank you.

21       Mr. Judd, you may proceed, but you're muted, sir.

22           **MR. JUDD:**  Sorry about that.

23                       **DIRECT EXAMINATION**

24   BY MR. JUDD:

25   **Q.**   Good morning, Dr. Miltenberger.

**A.**   Good morning.

**Q.**   What is your profession?

**A.**   I am a professional consulting historian.

**Q.**   And what does a professional consulting historian do?

**A.**   A consulting historian undertakes historical research and analysis for clients.

**Q.**   What professional degrees do you hold?

**A.**   I have a Bachelor's in History from Colegate University and a Master's and Doctorate in U.S. history from the University of California Davis.

**Q.**   Could you display Trial Exhibit 7A, please.

Dr. Miltenberger, the Trial Exhibit 7A is being displayed on the screen.  Is this a copy of your current CV?

**A.**   It is, yes.

**Q.**   And is this simply the same CV that was in Trial Exhibit 7, your report, updated to show assignments in the past 11 months?

**A.**   Yes.

**MR. JUDD:**  Your Honor, at this point I would ask that Trial Exhibit 7A be admitted into the record.

**THE COURT:**  Any objection?

**MR. MERONE:**  No objection.

**THE COURT:**  7A is admitted.

(Trial Exhibit 7A received in evidence)

1    **BY MR. JUDD:**

2    **Q.**   Dr. Miltenberger, do you specialize --

3              **THE COURT:**   Mr. Judd, I don't have 7A.  I have 7 but

4    not 7A, so we need to make sure that we get a copy of 7A.

5              **MR. JUDD:**   Okay.  I thought we had sent that,

6    Your Honor.

7              **THE COURT:**   You know, if you sent it recently, then

8    maybe it's there.  I'm just -- I just wanted it noted that when

9    I downloaded off of our server, I had 7 -- I saw that you

10   mentioned 7A, and I didn't see 7A.  We can figure it out.  Keep

11   going.

12             **MR. JUDD:**   Thank you, Your Honor.

13   **Q.**   Do you specialize in any particular field of history,

14   Dr. Miltenberger?

15   **A.**   Environmental history.

16   **Q.**   And what is environmental history?

17   **A.**   Environmental history is the study of human interactions

18   with the natural world over time.

19   **Q.**   Have you been qualified to provide expert testimony in

20   court before?

21   **A.**   I have, yes.

22   **Q.**   Please identify the cases you have qualified as an expert.

23   **A.**   I qualified as an expert in Sacramento County Superior

24   Court in *Modesto Irrigation District vs. Tanaka*; in Santa Clara

25   County Superior Court in *Parra vs. City and County of*

1   *San Francisco*; and I gave expert witness testimony in the Gila

2   River adjudication, Maricopa County, Arizona.

3   **Q.**   Can you describe generally the nature of the testimony you

4   gave in those three cases?

5   **A.**   My -- my work generally concerned land use and water use.

6   **Q.**   Is there a generally-accepted method of research in the

7   field of environmental history?

8   **A.**   There is, and it's generally the method that all

9   historians practice.

10  **Q.**   Please describe that method for the Court.

11  **A.**   Generally speaking, it involves framing or identifying a

12  question or problem of the past, identifying source material

13  that will allow you to answer that question, primary sources

14  such as firsthand accounts, newspaper articles, historic

15  photographs, property records; secondary sources which are

16  oftentimes analyses of those primary sources, having identified

17  those sources, collecting them, analyzing them, and

18  interpreting them, synthesizing them into an answer or maybe

19  many series of answers that might address the problems or

20  questions that have been framed.

21  **Q.**   What was your assignment in this case?

22  **A.**   My assignment in this case was twofold.  One was to

23  ascertain whether the name "To Kalon" had a geographic and

24  historic significance; two, whether -- or to ascertain or

25  assess the historical significance of H.W. Crabb, the

1    proprietor that had established -- the owner of To Kalon.  And

2    then kind of related to that second question, evolving out of

3    the second question was whether or not there was any grape

4    cultivation on the southernmost portion of Crabb's To Kalon

5    property, what I refer to as the Baldridge Farm or Baldridge

6    Tract.

7    **Q.**   Did you prepare a report in this case?

8    **A.**   I did.

9         **MR. JUDD:**   Your Honor, for the record,

10   Dr. Miltenberger's report is Trial Exhibit 7.

11   **Q.**   Can you please describe the materials and methods you used

12   to create your report at a fairly high level.

13   **A.**   Yes.  So I identified property records, newspaper

14   accounts, periodicals, trade publications from the 19th and

15   into the 20th century as well as secondary sources by wine

16   writers and other historians and researchers.

17        I should also mention that the additional primary source,

18   just to be complete, included historical maps and photographs

19   as well.

20   **Q.**   What did you do once you compiled and reviewed those

21   materials?

22   **A.**   I drafted my report.  I synthesized the information,

23   analyzed it, you know, critically, provided -- attempted to

24   provide some answers in my expert report.

25   **Q.**   Do you think your testimony will be helpful to assist the

1  judge understand the facts of this case?

2  **A.**   I do, for two reasons.  One, the relevant facts are very

3  extensive, and I believe that I can accurately summarize those

4  facts, and, two, the historical record was produced for reasons

5  other than the ones that confront us at this trial, and I

6  believe that I can provide context for documents and explain

7  and elaborate and clarify gaps in the historical record, the

8  reasonable inferences, and, again, context.

9          **MR. JUDD:**  Your Honor, at this time I tender

10  Dr. Miltenberger as an expert in the field of environmental

11  history.

12          **MR. MERONE:**  No objection.

13          **THE COURT:**  He's admitted.

14          **MR. JUDD:**  Thank you.

15  **Q.**   Could I have the slide 1 of the PowerPoint, please.

16      Dr. Miltenberger, exhibited on the screen is an aerial

17  photograph.  Can you describe what this is and how you will be

18  using it today?

19          **THE COURT:**  Is this a demonstrative or is this an

20  exhibit?

21          **MR. JUDD:**  This is a demonstrative, Your Honor.

22          **THE COURT:**  Okay.

23          **THE WITNESS:**  This is a selection, an image from

24  Google Earth of a contemporary aerial photograph of the

25  Oakville area of Napa County, California.

1  BY MR. JUDD:

2  **Q.**   And how will you be using this today?

3  **A.**   I'll be using it principally as we go through the property

4  transfers that create Historic To Kalon, Crabb's Historic

5  To Kalon, just to provide the Court with a general frame of

6  reference for what things look like now versus what they might

7  have looked like in the 19th century.

8  **Q.**   Thank you.

9       Could I have Docket 202-3.

10       Your Honor, the parties have stipulated, and what's been

11  added to the docket is No. 202-3, that for purposes of this

12  trial, a land survey that was provided by Jon Webb appended as

13  Exhibit 2 -- currently we've stipulated that this exhibit shows

14  that TVH currently owns and occupies a portion of land

15  previously owned by William Baldridge.

16       At this point, can I ask you to bring up slide 2, please.

17       Explain what we are looking at at this point, Doctor?

18  **A.**   What we're looking at is a survey that was done, I

19  believe, earlier in the year that depicts the approximate

20  location of the Baldridge Farm parcel in relation to the

21  current TVH property.  The Baldridge Farm parcel --

22       **THE COURT:**   Okay.  I'm going to interrupt.  Again, is

23  this just a demonstrative or is this an exhibit?

24       **MR. JUDD:**   This is actually Trial Exhibit 10,

25  Your Honor.  We're using it in the demonstrative deck.

1       **THE COURT:**  Okay.  Well, it's helpful -- it's helpful

2  to know.  All right.  Trial Exhibit 10.  Go ahead.

3       **MR. JUDD:**  And just for the Court's information, if

4  you look in the lower left portion of the --

5       **THE COURT:**  I see it.

6       **MR. JUDD:**  -- exhibit, it identifies the exhibit we're

7  looking at.

8  **Q.**   I'm sorry.  I -- my realtime is covered up right now.

9       You were saying this depicts the outline of the Baldridge

10  parcel and the boundary of the current TVH.

11       Your Honor, we're using "TVH" sometimes as a shorthand for

12  "The Vineyard House," just so the record is clear.

13       **THE COURT:**  That's fine.  And the record should also

14  be clear that Exhibit 10 is actually a declaration, so I'm

15  assuming that it is part of that declaration that you're

16  referring to.

17       **MR. JUDD:**  Correct, Your Honor.  It's Exhibit 2 to the

18  declaration.

19       **THE COURT:**  All right.  Go ahead.

20  **BY MR. JUDD:**

21  **Q.**   So if you can proceed to the next slide.

22       Would you please explain what the demonstrative is

23  currently showing and how Exhibit 10 is in relation to the

24  aerial photograph?

25  **A.**   Yes.  So the survey has now been superimposed, brought to

1   scale against the aerial photograph, and what you can see here

2   is a couple of things.  One is, as I was saying earlier, there

3   is the Baldridge Farm property, and that's the -- the pentagon,

4   the rough pentagon that is formed by dashed lines versus The

5   Vineyard House property, which is outlined in black.

6       What I have asked to be done here, too, is for the

7   original Baldridge House, a house that dates back to 1870, if

8   not earlier, to be identified by that orange dot or circle and

9   called out so that we have a general point of reference as we

10  move through several historical maps.

11  **Q.**   Dr. Miltenberger, what is To Kalon?

12  **A.**   To Kalon is the property, the real property in place of

13  the 19th century viticulturist, winemaker, wine seller and

14  farmer, H.W. Crabb.

15  **Q.**   And specifically, what was Crabb's To Kalon?

16  **A.**   Crabb's To Kalon consisted of three parcels of land that

17  he acquired between 1868 and 1889.

18  **Q.**   And what was the first parcel that Crabb acquired?

19      If we could have slide 4, please.

20  **A.**   The first parcel that Crabb acquired is illustrated here,

21  the white rectangle or square.  This --

22  **Q.**   And what -- I'm sorry.  Go on.

23  **A.**   This was approximately a little over 240 acres that he

24  acquired in 1868.

25          **THE COURT:**  And I take it there is no exhibit showing

1   what's being displayed here on the screen; is that right?

2          **MR. JUDD:**  Your Honor, we'll be showing in a few

3   minutes some historic maps overlaying on here that -- that are

4   oriented to the same --

5          **THE COURT:**  So the answer to my question is no,

6   there's not.  I shouldn't be looking for one; is that right?

7          **MR. JUDD:**  Not right yet.  There will be one later in

8   the presentation.

9          **THE COURT:**  All right.  Go ahead.

10  **BY MR. JUDD:**

11  **Q.**   What about the second parcel that Crabb -- next slide,

12  please.

13  **A.**   The second parcel Crabb acquired in 1879, a little under

14  120 acres adjacent to the 240 acres he acquired in 1868.

15  **Q.**   And what was the third parcel that Crabb acquired?

16  **A.**   The third parcel is -- is that pentagon that we were

17  leaving at earlier.  This is the property I refer to as the

18  Baldridge Farm or Baldridge Tract that Crabb acquired in 1889,

19  depicted here on this map.

20  **Q.**   And how -- if you would, please, explain the connection

21  between Historic To Kalon and the property currently occupied

22  by The Vineyard House?

23  **A.**   Yes.  So historic To Kalon, which consists of these three

24  parcels that Crabb brought together from 1868 to 1889, The

25  Vineyard House owns a portion of that.  And The Vineyard House

1  on this map, on this -- excuse me -- on this demonstrative is

2  outlined in yellow.

3  **Q.**   What facts do you rely on for your opinion that Historic

4  To Kalon is comprised of the three parcels that Crabb owned

5  after 1889?

6  **A.**   I rely on deeds from the county recorder, historic maps,

7  and historic accounts such as the one illustrated on this

8  demonstrative here.

9  **Q.**   And the article is Trial Exhibit 211.  What portion of

10  Trial Exhibit 211 are you referring to?

11  **A.**   The highlighted portion here, which I'll read:  "To Kalon

12  contains 500 acres of land, 360 being in the valley and 140 in

13  the Foothills."

14  **Q.**   And how does the acreage described in Trial Exhibit 211

15  compare with the acreage that Mr. Crabb acquired in the late

16  1800s?

17  **A.**   Well, according to county deed records, the total property

18  that Crabb owned was something more like 527 acres, consisting

19  of these three parcels.  So in this case, the acreage is

20  slightly off, which is something I generally attribute, in my

21  experience, to newspaper accounts of the era being just more

22  general in their descriptions of acreages.

23  **Q.**   Were there any other historic records that document

24  Crabb's real property acquisitions?

25  **A.**   Crabb's real property acquisitions can also be traced

1    through historic maps that were compiled from official surveys

2    and official records from the mid to late 19th century into the

3    early 20th Century.

4    **Q.**   And displayed on the screen is Trial Exhibit 186.  Explain

5    what that is, please.

6    **A.**   Trial Exhibit 186, what is depicted here, is an excerpt of

7    the official Napa County map from 1876.  That is overlaid over

8    the aerial photograph introduced earlier.  This particular

9    excerpt of the 1876 county map depicts the property that Crabb

10   acquired in 1868 on the valley floor, that roughly 240 acres

11   near Oakville, as well as the property that William Baldridge

12   patented in 1870 depicted in the Foothills.  Once again, the

13   original Baldridge House is called out as a reference point.

14   **Q.**   Can we have the next slide, please.

15       Dr. Miltenberger, displayed on the screen is Trial Exhibit

16   191.  Can you explain what that is, please.

17   **A.**   Yes.  So in this -- this is, once again, an excerpt from

18   one of the county maps.  In this case, it's the county map from

19   1881.  Depicted here is not only the property that Crabb

20   acquired in 1868 but also the adjacent parcel to the southeast,

21   the roughly 120 acres that he acquired from Eliza Yount in

22   1879.  Both of these are shown -- outlined in white.  Again,

23   the William Baldridge property or the Baldridge Farm property

24   is shown in white in the foothills along with the Baldridge

25   House.

1  **Q.**   Could we have the next slide, please.

2       Depicted on the screen is Trial Exhibit 216.  Can you

3  explain to the Court what that is?

4  **A.**   Once again, this is a selection of a county map; in this

5  case, a county map from 1895 superimposed on the aerial

6  photograph.  It depicts what I refer to as Historic To Kalon

7  which consists of the properties that Crabb acquired in the

8  valley floor as well as the property he acquired from William

9  Baldridge in the foothills to the south.

10 **Q.**   Is the property on the valley floor referred to as "the

11 north property" from time to time?

12 **A.**   I believe I have seen reference to it in that way.

13 **Q.**   Can you tell the Court the respective acreages of the

14 Historic To Kalon parcel, please.

15 **A.**   Collectively, Historic To Kalon is a little over

16 approximately 527 acres; in this case, about 360 on the valley

17 floor and a little over 168 or 168 and a half in the foothills.

18 **Q.**   Is there any other feature of Trial Exhibit 216 that is

19 significant to point out to the Court?

20 **A.**   Once again, the original Baldridge House is depicted as a

21 reference point outlined in orange.

22 **Q.**   What about the denomination of the ownership of the

23 Historic To Kalon parcels.

24 **A.**   Yes.  H.W. Crabb is shown as the owner of these two

25 discontiguous parcels.

1    **Q.**   Thank you.

2          Dr. Miltenberger, did you form an opinion as to whether

3    To Kalon is a historically significant term?

4    **A.**   I did.

5    **Q.**   And what is that opinion?

6    **A.**   Well, my opinion is that To Kalon is historically

7    significant for two reasons:  One, H.W. Crabb himself and, two,

8    for the wines, the noble grape varieties that were grown on the

9    property and used in the -- in the production of award-winning

10   wines by H.W. Crabb and others.

11   **Q.**   What did you rely on to form your opinion that Crabb was

12   responsible for making To Kalon historically significant?

13   **A.**   I relied on several -- numerous references in the

14   historical record to -- that describe Crabb as an experimenter,

15   an innovator; individual periodicals, profiles of the man,

16   newspaper accounts; and secondary sources, assessments by wine

17   historians and wine writers.

18   **Q.**   What did these sources tell you that you found to be

19   historically significant as relates to Crabb?

20   **A.**   Well, the portrait of Crabb that emerges from these

21   materials, these primary and secondary sources, is a gentleman

22   who was really at the tip of the sphere for the wine industry

23   in Napa County and Napa Valley and even California.  He was an

24   experimenter in terms of cultivating different types of

25   varietals.  He amassed an enormous collection of vines and

1  experimented for the quality of the grapes and attempting to

2  develop phylloxera-resistant root stocks.

3      He also innovated technologically.  He was reported as the

4  first in Napa County to utilize steam to operate his presses

5  and conveyance systems.

6      His wines won numerous awards, both locally and

7  internationally.

8      These are some of the reasons I think that make Crabb

9  historically significant.

10  **Q.**   Is there anything else that you can think of that makes

11  Crabb historically significant in terms of To Kalon?

12  **A.**   If he wasn't the first, he certainly was among the first

13  to directly market his wines to consumers, really marking a

14  shift in the wine industry from bulk sales to consumers sales

15  in the late 19th century.

16  **Q.**   How would you describe Crabb's historical significance?

17  **A.**   Well, I would describe his historical significance is that

18  he really appears to prefigure the contemporary wine industry.

19  He anticipated it in terms of the experimentation with

20  different varietals to achieve crops of different qualities and

21  strengths, in terms of utilizing technology, a

22  technological-driven approach to wine production, and, again,

23  through his direct marketing to consumers.  I base this on, you

24  know, comparisons -- I understand to be comparisons of the

25  understanding that I have of the wine industry from

1    conversations I've had with Mr. Doug Frost.

2    **Q.**   In addition to Crabb's significance, what facts do you

3    rely on to say that To Kalon is historically significant as a

4    source of outstanding Cabernet Sauvignon grapes?

5    **A.**   I rely on, once again, historical records, accounts,

6    periodicals of that -- that relate to To Kalon, discussing the

7    quality of the product, of the wines produced there, and

8    because those accounts go beyond Crabb.  His legacy was carried

9    forth by the Churchill family under the To Kalon Vineyard

10   Company banner from the turn of the century into the -- into

11   the early decades of the 20th century.

12   **Q.**   Now, did you form an opinion as to whether or not Crabb

13   cultivated grapes on the Baldridge Farm property during his

14   lifetime?

15   **A.**   I did.

16   **Q.**   And what is that opinion?

17   **A.**   I think it's -- I think it's likely that he cultivated

18   grapes on the parcel.

19   **Q.**   Upon what do you base that opinion?

20   **A.**   I base that on a number of things.  Again, coming out of

21   the historical record.  One, the portrait of the man that

22   emerges from various accounts points to someone of great

23   practicality.  Each -- his prior acquisition of land had been

24   to expand his vineyard, and there's historical evidence that in

25   the -- certainly in the late 1860s, that William Baldridge had

1    a vineyard on his property.

2    **Q.**   Excuse me.   Could you display Trial Exhibit 184, please.

3        What's on the screen right now is Trial Exhibit 184.

4    Could you explain to the Court what that is?

5    **A.**   Yes.   This is from a newspaper article, *A Profile of*

6    *William Baldridge*, published in 1869 that describes his

7    property, and here in the specific call-out, it references the

8    vineyard that William Baldridge had on his property in 1869.

9    "Here we go" -- "we should mention that the orchard and

10   vineyard on the Baldridge property surrounded by ornamental

11   trees and hither and thither embellished with beautiful

12   fragrant flowers are situated in a rincon facing the hills on

13   the west."

14   **Q.**   Thank you.

15       What else did you rely on to support your opinion that

16   Crabb cultivated grapes on Baldridge Farm?

17   **A.**   Well, as I was saying, there is evidence that William

18   Baldridge cultivated grapes.   In the 1870s or looking back on

19   the 1870s, George Husmann called out Baldridge as being among

20   those in the Napa Valley with extensive plantings of vines.

21   **Q.**   And we're displaying Trial Exhibit 236.   Is this the

22   reference to Husmann?

23   **A.**   It is, yes.   In the highlighted part, "Early in the 1870s,

24   the following had extensive vine plantings in Napa County."

25   H.W. Crabb is there as well as William Baldridge.

1    **Q.**   What else did you rely on to support your opinion that

2    grapes were -- Crabb cultivated grapes at the Baldridge Farm

3    property?

4    **A.**   Well, in the 1880s, really the late 19th century, there

5    was a rather spirited debate within the wine community about

6    the quality of grapes that could be achieved on the hillsides.

7    This happened to coincide with the -- with the phylloxera

8    epidemic that was devastating the vineyards of Napa County and

9    really much of California in the 1880s and 1890s.

10   **Q.**   And do you have any evidence that -- or did you rely on

11   any evidence that Mr. Crabb was using the Baldridge Farm

12   property in connection with the development of

13   phylloxera-resistant foot stocks?

14   **A.**   I did.   I think there is two references that I found in

15   the historical record that relate to that.

16   **Q.**   We're displaying on the screen Trial Exhibit 209.   Can you

17   explain what we're looking at here.

18   **A.**   Yes.   This is a newspaper article discussing a

19   presentation that H.W. Crabb had made to a local wine growers

20   group, and here Crabb describes -- Crabb is quoted as

21   describing that he had, quote, "set out this season 20 acres of

22   Lenoir in higher and dryer soil."   The only property that sort

23   of -- that -- the portion, excuse me, of Crabb's property that

24   matches that description is the property on the Baldridge Farm,

25   which is higher than what was on the valley floor.

**Q.**   And could we have Trial Exhibit 213, please.

What is Trial Exhibit 213?

**A.**   This is a report that Crabb gave in his capacity as commissioner for the Napa district of the state Viticultural Commission from 1894 in which he discusses or mentions that he is propagating a vine discovered by Mr. Rampandahl in the head of a canyon in the mountains.  Specifically, he believed this specific vine to be Riparia, and Riparia and Lenoir Crabb believed were more phylloxera resistant as root stocks than others present.

Again, the description here, "in the head of a canyon in the mountains," most closely matches the -- the Baldridge Farm property which is situated, as the 1869 newspaper article indicated, in this space, this rincon, this canyon facing the hills to the west.

**Q.**   What other materials did you rely on to support your opinion that Crabb cultivated grapes on the property?

**A.**   Well, as I mentioned earlier, Crabb in the 1890s was seeking a way to combat phylloxera.  I believe by the early 1890s, he only had 90 acres himself, and tens of thousands of acres had been devastated by phylloxera.  He was looking for ways in order to combat this, and he seemed to have hit upon or believed that he hit upon a method of planting that would generate very resistant root stocks.  It was a method of planting that involved --

**Q.**   Excuse me.   What is displayed on the screen is Trial
Exhibit 215.   Can you explain what Trial Exhibit 215 pertains
to, please.

**A.**   Yes.   This particular -- this particular exhibit comes
from *Pacific Wine and Spirit Review*, a trade publication of the
era, and it presents a presentation that Crabb had made, again
in his capacity as a viticultural commissioner in the Napa
district, where he describes a method of planting that he
believed would result in more resistant root stocks.   In this
case, as is quoted here, "I, Crabb, pulled up the dead vines
and cultivated the land one year to grain and the next to hay.
I then plowed the land two or three times as deep as possible,
laid off the rows five, ten feet, and drew a deep furrow in the
five-foot line and subsoiled it."

He is talking about a method of crop rotation where he
would raise crops for -- excuse me -- raise vines for a time
period and then plow them under, the idea being that the next
group would be more resistant to various kinds of diseases.

**Q.**   Is there anything else that you relied on to support your
opinion that Crabb cultivated grapes at the Baldridge Farm
property?

**A.**   Well, what makes this notable and important is the
reference to hay because in the 1899 inventory and appraisement
of Crabb's estate, it identifies 70 acres of hay growing on the
Baldridge property.

1   **Q.**   I'm displaying on the screen Trial Exhibit 220.  Can you

2   explain what that is?

3   **A.**   This is a copy of the inventory and appraisement of the

4   Crabb estate.

5   **Q.**   Can you explain why that's significant, please.

6   **A.**   Excuse me.  I'm sorry.  In this particular call-out, what

7   we have depicted here is a line from the appraisement.  "About

8   70 acres growing hay and field on the Lewelling Tract."  The

9   Lewelling Tract is what the appraisers identified as the second

10  parcel that we discussed earlier, that roughly 120 acres on the

11  valley floor.  And then we have ditto marks.  "About 70 acres

12  growing hay, Baldridge Tract."

13  **Q.**   And why is that significant?

14  **A.**   Well, again, I think it points to or is indicative or

15  suggestive of this method or manner of crop rotation given the

16  fact that grapes were cultivated on the Baldridge property

17  prior to Crabb's acquisition, and he describes this method of

18  planting in the late 1890s as an effort to combat or generate,

19  promote root -- vine stocks that were resistant to disease, I

20  think it's strongly indicative of the fact that Crabb may have

21  at one time had grapes on the property.

22      And I should note, too, just for the Court's attention,

23  that the same decade that Crabb acquired the Baldridge

24  property, there is evidence of William Baldridge cultivating

25  grapes and selling grapes to other local area vintners or at

1    least one local winemaker.

2    **Q.**    Why is that significant?

3    **A.**    Well, I think it's significant because it's -- again, it

4    points to the presence of grapes in Crabb's lifetime on the

5    Baldridge property, on the same property that he would acquire

6    a few years later.

7    **Q.**    You've reviewed Trial Exhibit 220, the inventory and

8    appraisement, haven't you, Dr. Miltenberger?

9    **A.**    I have, yes.

10   **Q.**    Is there any mention of vineyards or vines growing on the

11   Baldridge Tract in the inventory and appraisement?

12   **A.**    No, there isn't.

13   **Q.**    How do you explain that?

14   **A.**    Well, I explain it in part by reference to the reference

15   to the hay growing there, which is consistent with the practice

16   that Crabb articulated that he was engaged in in the 1890s to

17   promote these resistant root stocks.

18        Additionally -- and here is an important bit of content --

19   the process that Crabb laid out for that very process and for

20   the grafting of vines to resistant root stocks took several

21   years.  It's possible that the appraisers, if there was any

22   vineyard there, may not have understood that or would have

23   identified that process.

24        Additionally, the seasons, the 1898 and 1899 seasons were

25   ones of exceptional dryness in Napa County, and a number of

vines died off in 1898 and a number just weren't able to make
it in 1899.

**Q.**   Upon what do you base that?

**A.**   This is based upon newspaper accounts of the era and other
secondary sources that point to the 18 -- the late 1890s being
a particularly dry period, probably the driest in the 19th
century since the 1860s.

**Q.**   What did -- what happened to Historic To Kalon after Crabb
died?

**A.**   Historic To Kalon was acquired by E.W. Churchill, a local
area banker, at public auction in 1899 following Crabb's death.

**Q.**   And what evidence do you rely on to support this?

**A.**   Recorded property transfers in the Napa County.

**Q.**   Can we have slide 12, please.

Displayed on the screen is the demonstrative exhibit with
Trial Exhibit 243 overlaid.  Could you explain to the Court
what Trial Exhibit 243 shows?

**A.**   Yes.  This is another source that I relied on.  This is an
excerpt of the 1915 official map of Napa County, and what's
outlined in white is the land that E.W. Churchill acquired in
1899 from the Crabb estate, again, the roughly 359, 360 acres
on the valley floor outlined in white and the little over --
well, 168 and a half acres in the hillsides, that rough white
pentagon.

**Q.**   Is there anything notable about Trial Exhibit 243

1  regarding the ownership of these parcels?

2  **A.**   Yes.   The ownership is indicated as the To Kalon Vineyard

3  Company, which was a company that was formed after Churchill's

4  death in 1903.

5  **Q.**   So what did the Churchills do with Historic To Kalon?

6  **A.**   The Churchills, through To Kalon Vineyard Company,

7  continued to produce award-winning wine on these parcels.

8  **Q.**   Did the Churchills, through their To Kalon Vineyard

9  Company, utilize all three parcels originally acquired by

10  Mr. Crabb?

11  **A.**   They did.

12  **Q.**   And explain to the Court what To Kalon Vineyard Company

13  is, when it was formed, its purpose, that sort of thing.

14  **A.**   To Kalon Vineyard Company, as I indicated earlier, was

15  formed after the death of E.W. Churchill in 1903.   It was

16  formed by his wife and his son and daughter-in-law.   It was

17  organized to continue to produce wine, to grow grapes, among

18  other purposes.   And as I indicated, they continued to produce

19  wine into the 19 teens.   They won awards both locally and

20  internationally.   The last major set of awards they won were

21  during the Pan Pacific Composition in 1915.

22  **Q.**   At what point in time did the To Kalon Vineyard Company

23  dissolve?

24  **A.**   The To Kalon Vineyard Company formally dissolved in 1919.

25  There was a familial dispute over the ownership of the company

in 1917.  Then ultimately it resulted not only in Mary Alice

Churchill, the daughter-in-law of Edward -- E.W. Churchill,

acquiring the assets of To Kalon Vineyard Company, but the

To Kalon Vineyard Company itself was dissolved.

**Q.**   And what happened to Historic To Kalon under Mary Alice

Churchill's ownership and management?

**A.**   Well, not long after Mary Alice acquired the property,

prohibition began, and during prohibition, there was a

possibility for producing wine for sacramental purposes and

producing industrial alcohol.

    So through the 1920s, Mary Alice Churchill, doing business

as To Kalon Vineyard Company, continued to produce wines under

federal permit into the early 1930s.

**Q.**   Did the Churchill family continue to operate Historic

To Kalon after prohibition?

**A.**   Yes.  But --

        **THE COURT:**  Wait.  I don't understand that question,

counsel.  I thought he testified that it dissolved.

        **MR. JUDD:**  He has testified that To Kalon Vineyard

Company dissolved.

        **THE COURT:**  Okay.  So repeat your question, then.

**BY MR. JUDD:**

**Q.**   Did the Churchill family continue to operate

Historic To Kalon after prohibition?

        **THE COURT:**  I see.  All right.  Go ahead.

1          **THE WITNESS:**  Yes.  Mary Alice Churchill, doing

2     business as To Kalon -- well, I should say they did, but

3     initially --

4          **THE COURT:**  Wait.  Wait.  Mary Alice doing business as

5     To Kalon.  Is that what you said?

6          **THE WITNESS:**  My apologies, Your Honor.  I got a

7     little ahead of myself.

8          Mary Alice Churchill doing business as To Kalon Vineyard

9     Company.

10         **THE COURT:**  There is evidence that she was doing

11    business as To Kalon Vineyard Company, even though the company

12    had dissolved?

13         **THE WITNESS:**  Yes, Your Honor.

14         **THE COURT:**  All right.  And what's the basis for that?

15         **THE WITNESS:**  I base that on federal permits and

16    records which identify in these permits Mary Alice Churchill

17    dba or doing business as To Kalon Vineyard Company and in her

18    official correspondence with federal agents about how she

19    operated during the -- during prohibition.

20         **THE COURT:**  Okay.  Continue.

21         **THE WITNESS:**  So Mary Alice Churchill did continue,

22    but initially she considered leaving the wine business in the

23    early 1930s, right before prohibition ended.

24    **BY MR. JUDD:**

25    **Q.**   At any point in time, did Mary Alice Churchill lose the

1   ability to produce wine?

2   **A.**   In 1932, federal agents recommended that her permits not

3   be renewed, and so in December of 1933, she looked to sell

4   the -- the vineyard to another operator.

5   **Q.**   Was it just the vineyard she was selling or was it the

6   entire wine operation?

7   **A.**   She was looking to sell the entire wine operation.

8   **Q.**   And was Mary Alice Churchill able to consummate the sale

9   of Historic To Kalon in 1933?

10  **A.**   No, she was not.

11  **Q.**   What happened?

12  **A.**   Well, Mary Alice had entered into a sales agreement with

13  two individuals, Oscar Kellstrom and A.J. Kauth.  Kellstrom and

14  Kauth failed to live up to the monthly obligations for the

15  purchase agreement, and Mary Alice in 1934 sued to quiet title

16  and regain control of the property.

17  **Q.**   May I have Trial Exhibit 258, please.

18       Displayed on the screen is Trial Exhibit 258.  Can you

19  explain what that is, Dr. Miltenberger?

20  **A.**   Yes.  This is a decree quieting title and removing cloud

21  that was recorded in the Napa County records, a decree from the

22  Napa County Superior Court.

23  **Q.**   What was the determination by the California Superior

24  Court with respect to the quiet title action?

25  **A.**   The Napa County Superior Court decreed that To Kalon

1   Vineyard described by reference as two parcels was the property

2   of Mary Alice Churchill.

3   **Q.**   How did you determine -- well, let me ask the question.

4   Was the Baldridge Farm included in this quiet title decree?

5   **A.**   Yes.   According to the quiet title decree, To Kalon

6   Vineyard consisted of two tracts.   The first tract, the legal

7   description which is appearing right here, corresponds to the

8   roughly 240 acres on the valley floor that Crabb acquired in

9   1868.

10      The second tract here, legal description here, corresponds

11   to the Baldridge Tract, the Baldridge Farm, with an exception

12   being that for this particular second tract, approximately 40

13   acres was excluded or carved out as not being part of this

14   quiet title action.

15   **Q.**   And how much acreage was included in the decree, Trial

16   Exhibit 258?

17   **A.**   The Napa County Superior Court decreed that the To Kalon

18   Vineyard consisted of 357 acres, which is the total that you

19   get when you add up the acreage that is given minus any of the

20   exclusions that are also given in the legal descriptions.

21   **Q.**   Did this decree include the second parcel that H.W. Crabb

22   acquired?

23   **A.**   It did not, no.

24   **Q.**   Why is that?

25   **A.**   Well, I presume -- I don't really know for sure.   I

1   presume that maybe it was a property that --

2        **THE COURT:**  Can you be more precise, Mr. Judd, when

3   you say "second parcel" what you mean?

4        **MR. JUDD:**  The parcel that was -- that Crabb acquired

5   in 1878 that is sometimes referred to as the Lewelling Place.

6   **Q.**   Do I have that right, Dr. Miltenberger?

7   **A.**   Yes.  The property that was -- the roughly 120 acres on

8   the valley floor that was acquired in 1879 and is referred to

9   in the inventory and appraisement as the Lewelling Tract or

10  Lewelling Place.

11  **Q.**   Was the Lewelling Tract or Lewelling Place part of the

12  sale to the Kellstrom group?

13  **A.**   It was not, no.

14  **Q.**   Okay.  What did Mary Alice Churchill do with

15  Historic To Kalon after setting aside the unsuccessful sale?

16  **A.**   She -- she --

17       **THE COURT:**  Okay.  So, Mr. Judd, are you saying that

18  the Historic To Kalon didn't include the Lewelling Tract?

19       **MR. JUDD:**  I'm saying the decree that the court made

20  did not include the Lewelling Tract --

21       **THE COURT:**  That wasn't your question.  Look, given

22  what is at stake here, I need to be very clear that questions

23  and answers are precise.

24       So you asked what did Mary Alice Churchill do with the

25  Historic To Kalon after setting aside the unsuccessful sale.

1          **MR. JUDD:**  Yes.

2          **THE COURT:**  That assumes that the Lewelling parcel,

3    which I just heard testimony was not part of that sale -- does

4    the question include that portion or not?

5          **MR. JUDD:**  Yes, it does, because she didn't sell that

6    portion and therefore that was not part of the contract that

7    was set aside.

8    **Q.**   Dr. Miltenberger, describe specifically for the Court what

9    portions of the -- of Historic To Kalon were sold to the

10   Kellstrom group, and if there is any exhibit that would help --

11   maybe slide 3.  Let's see if that will help.

12         **THE COURT:**  I think I understand.  All right.  We're

13   talking about three tracts; correct?

14         **MR. JUDD:**  Yes.

15         **THE COURT:**  My concern was with the form of the

16   question.  So during the period of time after the lawsuit,

17   that's what we're talking about --

18         **MR. JUDD:**  Yes.

19         **THE COURT:**  -- right?  Okay.  So reframe it in that

20   way, please.

21   **BY MR. JUDD:**

22   **Q.**   Following the lawsuit, Dr. Miltenberger, what -- what

23   property relative to Historic To Kalon did the Churchills own?

24   **A.**   The Churchills owned most of the valley on -- excuse me --

25   most of the land on the valley floor and a portion of the land

1  in the hillsides that came out of the Baldridge Farm tract.

2          **THE COURT:**  So they didn't own the entire Baldridge

3  Tract, only a portion?

4          **THE WITNESS:**  That's -- that's correct, Your Honor.

5  There were several other conveyances, small pieces of land,

6  that I believe were to the west of the property owned now by

7  The Vineyard House.

8          **THE COURT:**  Okay.

9  **BY MR. JUDD:**

10 **Q.**   And what did the Churchills, Mary Alice Churchill, do with

11 that portion of Historic To Kalon that the Churchills owned

12 following the setting aside of the sale?

13 **A.**   Mary Alice reengaged in the wine business.  She turned

14 over operational control to her son and daughter, who continued

15 to operate into the 1930s, that is until a -- a fire struck the

16 winery complex that dated all the way back to the Crabb era in

17 1939 and destroyed it.

18 **Q.**   What happened to Historic To Kalon after the winery fire

19 in 1939?

20 **A.**   In 1943, Mary Alice Churchill conveyed her remaining

21 property to Martin Stelling, Jr.

22 **Q.**   Who was Martin Stelling, Jr.?

23 **A.**   Stelling was a San Francisco entrepreneur who had an idea

24 to create a very large vineyard complex that also had a

25 residential complex as a component.

1    **Q.**   What happened to Stelling's plan?

2    **A.**   Stelling wasn't able to execute on them before he passed

3    away in 1950 in a car accident.

4    **Q.**   What happened to Historic To Kalon after Stelling died?

5    **A.**   Well, I didn't perform a chain of title on the property

6    from that point forward, but from the historic record I have

7    viewed, the property was sold off in pieces.

8    **Q.**   Can we have slide 13, please.

9        And who owns Historic To Kalon today?

10    **A.**   There are, I believe, several entities.  Just going in

11    chronological order, the area outlined in teal is the site of

12    an original experimental vineyard that the Churchills had set

13    aside in 1903 for experiments by the U.S. Department of

14    Agriculture.  Eventually that property was deeded out of their

15    control entirely in the 1920s and passed to U.C. Davis, and so

16    U.C. Davis is the current owner of that teal-marked area on the

17    map.

18        Robert Mondavi Winery acquired portions of the land on the

19    valley floor in 1966 and 1969 in two separate conveyances.

20        Beckstoffer Vineyards acquired the area outlined in green

21    in 1993.

22        And a portion of the land on the valley floor, as well as

23    the land outside of Historic To Kalon, was acquired in 2008 by

24    Opus One Winery, a Robert Mondavi joint venture.

25        **MR. MERONE:**  Your Honor, I'm going to object.  I'm not

```
 1   finding this analysis, like Opus One, in Dr. Miltenberger's
 2   report.  I might have missed it.
 3          THE COURT:  What is your objection, Mr. Merone?
 4          MR. MERONE:  Outside the scope of his expert report,
 5   Your Honor.
 6          THE COURT:  Response.  A response, please.
 7   BY MR. JUDD:
 8   Q.   Do you disagree with the analysis?
 9          THE COURT:  So is that in your report,
10   Mr. Miltenberger -- Doctor?
11          THE WITNESS:  Your Honor, I have a map that's very
12   similar to this --
13          THE COURT:  I just need a "yes" or "no."  If it's in
14   there, can you point me to the page?
15          THE WITNESS:  May I consult my report, Your Honor?
16          THE COURT:  You may.  The report number again,
17   Dr. Miltenberger?  What's your exhibit number?
18          MR. JUDD:  Trial Exhibit 7, Your Honor.
19          THE COURT:  Thank you.
20          MR. JUDD:  Your Honor, this is an ancillary point.
21   I'm happy to have it stricken from the record.
22          THE COURT:  All right.  It's stricken.
23          MR. JUDD:  Thank you.
24          THE COURT:  Proceed.
25
```

BY MR. JUDD:

Q.   Is there a difference between Historic To Kalon and what Robert Mondavi Winery refers to as the To Kalon Vineyard?

A.   Yes.

Q.   And upon what do you base that?

A.   I base that on -- on accounts, more contemporary accounts that identify To Kalon, comparing them with my own historical research indicating what Historic To Kalon is or was.

Q.   Dr. Miltenberger, do you have an opinion as to whether To Kalon is a geographically-descriptive name?

A.   I do.

        MR. MERONE:   I'm going to object, Your Honor.   I don't believe the phrase "geographically descriptive" was ever used in terms of Dr. Miltenberger's analysis.   I know he said he felt it's geographic.   Geographic descriptiveness is a legal term.

        MR. JUDD:   Your Honor, the report need not be recited verbatim in --

        THE COURT:   Is he attempting to make a legal analysis here?

        MR. JUDD:   No, Your Honor.   He is making --

        THE COURT:   Well, then rephrase the question.

BY MR. JUDD:

Q.   In your opinion, does To Kalon refer to a geographic location in the Oakville area of Napa, California?

1    **A.**   Yes.

2    **Q.**   On what do you base that opinion?

3         **MR. MERONE:**   I'm just going to object for

4    clarification.   Are you asking today or historically?

5         **THE COURT:**   Rephrase.

6    **BY MR. JUDD:**

7    **Q.**   Is there any limit in the time distinction that you make

8    in offering the opinion that To Kalon describes a geographic

9    location in Oakville?

10   **A.**   No.

11        **MR. MERONE:**   I'm going to object then, Your Honor.

12   This witness was not proffered to offer testimony as to the

13   meaning of To Kalon today and in fact testified at his

14   deposition that he wasn't, and it's not in his report.

15        **THE COURT:**   Is that true in terms of your deposition,

16   Doctor?

17        **THE WITNESS:**   I don't recall offhand the substance of

18   my deposition, Your Honor.   That's possible.

19        **THE COURT:**   Well, I've only heard testimony so far

20   through 1950, and that doesn't even relate to -- so 1943.   So

21   he can opine as to the last substantive time period to which

22   he's already opined.

23        Mr. Judd, proceed.

24   **BY MR. JUDD:**

25   **Q.**   In your opinion, following 1943 up until the early 1990s,

1  based on your review of the historic record, is it your opinion

2  that during that time frame, To Kalon described a geographic

3  location in the Oakville area of Napa?

4           MR. MERONE:  Objection.  Same objection.

5           THE COURT:  Well, it lacks foundation.

6           MR. MERONE:  That, too.

7           MR. JUDD:  I'm asking for the opinion, and I was going

8  to provide the foundation.

9           THE COURT:  Well, give me the foundation, and then we

10  can get to the opinion if there is sufficient foundation.

11           MR. JUDD:  Sure.

12  Q.   Have you reviewed the record, the historic record, between

13  1943 through the early 1990s as pertains to To Kalon?

14           MR. MERONE:  Objection.  Vague as to what the historic

15  record means.  That can mean anything.

16           THE COURT:  Well, we'll find out.  "Yes" or "no"?

17           THE WITNESS:  Yes.

18  BY MR. JUDD:

19  Q.   And what specific materials do you have in mind when you

20  say that you've reviewed the historic record during that time

21  frame from 1943 through the early 1990s?

22  A.   Accounts, descriptions in newspapers of To Kalon, accounts

23  by wine writers, other historians and researchers.

24  Q.   And based on that review, do you have an opinion as to

25  whether To Kalon describes a geographic location in the

1    Oakville area of Napa between 1943 and the early 1990s?

2    **A.**    I do.

3    **Q.**    And what is that opinion?

4    **A.**    I believe it does.  I believe it does describe a place.

5    **Q.**    Going back to the early days under Crabb's ownership, do

6    you have in mind some examples where To Kalon was used to

7    describe a particular geographic location in the Oakville area

8    of Napa?

9    **A.**    Yes.  I believe one of the best comes soon after Crabb had

10   started calling his place To Kalon, and this is from a

11   newspaper article in the *St. Helena Star* in 1886.

12   **Q.**    And what does that article provide?

13   **A.**    That article provides a description of To Kalon.  It

14   describes To Kalon as more than a place than a -- than a small

15   town in California.  And I'm paraphrasing a bit here.

16       As a historian, I rely on the text in the historical

17   record, and references to place to me denote a location, a

18   particular space on the earth.

19   **Q.**    Does To Kalon refer to anything other or in addition to a

20   place on the earth?

21   **A.**    Crabb used To Kalon as a name in other contexts.  I have

22   seen references to To Kalon Vineyard and Sellers, To Kalon

23   Stock Farm, but I believe all of these are -- principally point

24   to a place denoting Crabb's place, Crabb's place being

25   identified as To Kalon.

1   **Q.**   Did To Kalon continue to refer to a specific geographic

2   place after Crabb's death?

3   **A.**   Yes.

4   **Q.**   And do you have -- well, upon what do you base that

5   opinion?

6   **A.**   I base that again on continuing accounts that appear in

7   the local press that identify To Kalon as a place in relation

8   to other places or as place to go to.

9   **Q.**   Could we see Trial Exhibit 256, please.

10       Is Trial Exhibit 256 one of these examples that you're

11   referring to?

12   **A.**   It is.  I believe this example comes from the 1930s.  It's

13   local press coverage of the quiet title action, in this case,

14   in the called-out area:  "To Kalon, the valuable vineyard" --

15   excuse me -- "the valuable Oakville vineyard property which for

16   many years has been the property of Ms. Alice Churchill

17   yesterday became involved in an action in the superior court in

18   which Mrs. Churchill asked that a recent contract for sale of

19   the property be set aside and the property restored to her."

20       **MR. JUDD:**  Trial Exhibit 266, please.

21   **Q.**   Is this another example of a report that you rely on for

22   your opinion?

23   **A.**   It is.  It's a newspaper account of additional lands that

24   Mr. Stelling acquired in the 1940s, and here that acquisition

25   is placed into comparison or contrast with his acquisition he

1   made from Alice -- Mary Alice Churchill, and the called-out

2   portion here, "Mr. Stelling also owns the former To Kalon place

3   recently purchased from Mrs. Alice Churchill."

4        **MR. JUDD:**  Trial Exhibit 359.

5   **Q.**  Dr. Miltenberger, explain what Trial Exhibit 359 is,

6   please.

7   **A.**  This is a --

8        **THE COURT:**  359?  I don't see the number.

9        **MR. JUDD:**  Yes, Your Honor.

10       **THE COURT:**  Thank you.  Proceed.

11       **THE WITNESS:**  This is a postcard from 1950 that

12  depicts properties owned by Italian Swiss Colony, a winemaker

13  at the time, and here on the postcard To Kalon Vineyards is

14  identified schematically or generally in Oakville or near

15  Oakville.

16       **MR. JUDD:**  Can we have Trial Exhibit 279, please.

17  **Q.**  And what are we looking at in Trial Exhibit 279?

18  **A.**  This is a newspaper article from the early 1960s

19  discussing an acquisition made by Charles Krug Winery then

20  owned by C. Mondavi & Sons.  This is an acquisition of a

21  portion of the To Kalon property.

22       The called-out sections here, "According to Robert

23  Mondavi, vice-president and general manager of Mondavi and

24  Sons, owners of the Krug Winery, the property," in this case,

25  the property acquired by Ivan Schoch, one of the successors in

1    interest to the Churchills, is, quote, "one of the best premium

2    wine growing locations in all of California."

3        And then skipping down, it very clearly identifies the

4    property.  "The huge estate once known as To Kalon extends from

5    the old Oakville Railroad Station south toward Yountville and

6    west to the foothills of the Mayacamas Range."

7             MR. JUDD:  May we have Trial Exhibit 315, please.

8             THE COURT:  I am going to interrupt because I have

9    been keeping track.  Most of the exhibits that we've seen

10   today -- and we will go through them -- there is a stipulation

11   to admit except for Exhibit 359, and before we get too far away

12   from that, is there going to be a request to admit?  And if so,

13   I need to deal with the objection.

14           MR. MERONE:  Yes, Your Honor.

15           THE COURT:  There is an objection then.  Can you

16   respond?  Hearsay and authenticity.

17           MR. JUDD:  Well, Your Honor, it falls under the

18   antique records exception, both for the authenticity and the --

19   and the hearsay.  It was prepared prior to --

20           THE COURT:  So, Mr.--

21           MR. JUDD:  -- 1998.

22           THE COURT:  I don't have testimony with respect to the

23   preparation date, and there is an objection.

24   BY MR. JUDD:

25   Q.   Dr. Miltenberger, are you able to identify the date that

1    Trial Exhibit 359 was prepared?

2    **A.**   I -- I don't have all the trial exhibits memorized.   Was

3    359 the one we were just looking at?

4    **Q.**   The postcard.

5    **A.**   I'm sorry.   Could you repeat the question?

6    **Q.**   Yes.   Do you have any information as to the date that

7    Trial Exhibit 359 was prepared?

8    **A.**   I do.   It was an exhibit that was provided to me by

9    representatives of The Vineyard House, and I understood that it

10   was acquired through an eBay auction where the provenance was

11   documented as from being from the 1950s.   That is my

12   recollection as I sit here.

13   **Q.**   Is there anything on the face of the postcard that would

14   allow you to determine whether that was developed prior or

15   printed prior to 1990?

16   **A.**   Well, yes.   The -- the Italian Swiss Colony ownership that

17   is indicated here -- excuse me -- I know from other readings of

18   the record that Italian Swiss Colony was in operation in the

19   1950s.

20            **THE COURT:**   When did it expire?

21            **THE WITNESS:**   I do not know, Your Honor.

22   **BY MR. JUDD:**

23   **Q.**   Do you know -- I'm sorry.   Do you know whether Italian

24   Swiss Colony ceased to do business prior to 1998?

25   **A.**   I don't -- I don't know.   I don't see them in the

1    materials that I reviewed as being a wine producer in the area

2    past the 1950s.

3           MR. JUDD:  Your Honor, I believe the date has been

4    sufficiently determined to allow the Exhibit 359 to be admitted

5    under the antique records authentication and hearsay exception.

6           THE COURT:  Response.

7           MR. MERONE:  Your Honor, Dr. Miltenberger is basically

8    repeating what he was told by the Plaintiff, where they got it

9    and what it was and what it said on eBay.  Whether that can be

10   authenticated or not, it's not going to come through him.

11          THE COURT:  I agree.  I will reserve.  Not admitted at

12   this point.  If we can shore up the date, then it's possible,

13   Mr. Judd.

14          MR. JUDD:  Thank you, Your Honor.

15          THE COURT:  Continue.

16          MR. JUDD:  I'm sorry.  Trial Exhibit 313.

17          MR. MERONE:  Your Honor, I'm going to object.  I don't

18   see this in his report.

19   BY MR. JUDD:

20   Q.   Did you review Trial Exhibit 313 in preparing your report,

21   Dr. Miltenberger?

22          MR. MERONE:  Excuse me.  My objection is it's not

23   stated -- listed as a reference in the report, just to be

24   clear.

25          THE COURT:  Okay.  So I'm looking at the report.  Is

1  the answer "yes," and if so, if you could point me to the

2  report or the portion of the report where I can verify.

3         **THE WITNESS:**  Your Honor, are you asking that of me?

4  **BY MR. JUDD:**

5  **Q.**   Yes.  Did you review Trial Exhibit 313 when you prepared

6  your report?

7         **THE COURT:**  Are you checking your report, Doctor?

8         **THE WITNESS:**  Yes, Your Honor.  I'm sorry.

9         **THE COURT:**  Go ahead.

10        **THE WITNESS:**  I reviewed a number of works, not all of

11 which were -- not all of which I cited in my report.  I don't

12 have a citation for it, or I don't see a citation for Thompson

13 in my report, but I did review several secondary works in and

14 around my report as preparation, just general context and

15 reference.

16        **THE COURT:**  Okay.  Well, then, if it's not in the

17 report and you weren't -- the other side wasn't able to

18 cross-examine you on it, the objection is sustained.

19     I will note, though, that now having the report in front

20 of me that he does reference the Opus One Winery in Figure 19

21 of his report.  It's page 68.

22        **MR. JUDD:**  Your Honor, I don't -- that's ancillary.

23        **THE COURT:**  Okay.  So you don't need to go --

24        **MR. JUDD:**  I don't need that for our case.  Thank you.

25        **THE COURT:**  All right.

1    BY MR. JUDD:

2    Q.   What about Trial Exhibit 353, could we get that up,

3    please.

4          MR. MERONE:   I'm going to object to this one as well.

5    BY MR. JUDD:

6    Q.   Did you review Trial Exhibit 353 in preparing for your

7    report?

8          THE COURT:   Well, 353 is a stipulated exhibit, so I

9    don't know how you can object.

10         MR. MERONE:   He didn't rely on it, Your Honor.   It may

11   be an admissible exhibit, I have no problem with that, but this

12   expert didn't rely on it in his report, and he didn't rely on

13   any of the conclusions of it.   He didn't discuss it in the

14   report.   It very well may be used with other --

15         THE COURT:   Saying it once is sufficient for me.   You

16   don't need to say it three times.

17      All right.   Again, if it's not in the report and not

18   referred to, the objection is sustained.

19   BY MR. JUDD:

20   Q.   Did you rely on any other materials to inform your opinion

21   that To Kalon described a specific location in Oakville in the

22   1960s, '70s, and '80s?

23   A.   I did rely on newspaper accounts that describe

24   acquisitions that make reference to To Kalon.

25   Q.   What about To Kalon's significance to the wine industry or

| | |
|---|---|
| 1 | wine trade?  In 1987 when Robert Mondavi Winery applied to |
| 2 | register To Kalon as a trademark, did To Kalon have any meaning |
| 3 | or significance to the industry at that time? |
| 4 | **MR. MERONE:**  Objection, Your Honor.  This is outside |
| 5 | the scope of his report. |
| 6 | **THE COURT:**  Sustained.  And he can't testify as to the |
| 7 | industry. |
| 8 | **MR. JUDD:**  Okay. |
| 9 | **Q.**   Did you review any materials in preparing your report that |
| 10 | indicated that To Kalon was used as the name of an important |
| 11 | vineyard in the 40 years prior to 1987? |
| 12 | **A.**   Yes. |
| 13 | **Q.**   What did you rely on to determine that? |
| 14 | **A.**   I relied on archival source materials, papers, writings of |
| 15 | wine writers and newspaper accounts. |
| 16 | **Q.**   Did your historical research indicate whether or not |
| 17 | Robert Mondavi Winery was aware of To Kalon as being an |
| 18 | important vineyard in California? |
| 19 | **A.**   I think the materials I reviewed indicate that there was |
| 20 | an awareness in Robert Mondavi Winery. |
| 21 | **Q.**   And what materials specifically do you have in mind? |
| 22 | **A.**   Well, there's -- in the 1960s, for instance, there is the |
| 23 | newspaper article which we saw just a moment ago where -- |
| 24 | **Q.**   Let me bring that up. |
| 25 | Trial Exhibit 279, please. |

**A.** Yes. This particular one, which is discussing the acquisition of a portion of To Kalon by Krug which was owned and operated by C. Mondavi & Sons, and here we have Robert Mondavi quoted as identifying the property as one of the best premium wine growing locations in all of California.

**Q.** What about if we could look at Trial Exhibit 281. What about Trial Exhibit 281?

**A.** This is a publication by Charles Krug.

    **MR. MERONE:** I'm going to object, Your Honor, just because I don't find this in his report either. If you could direct me to the paragraph Dr. Miltenberger -- I'm sorry, counsel.

**BY MR. JUDD:**

**Q.** Did you use *Bottles and Bins* in your report, Dr. Miltenberger?

    **THE WITNESS:** Your Honor, may I consult my report?

    **THE COURT:** You may.

    And, Mr. Merone, you are instructed to direct your comments to the Court and not counsel or the witness unless you're examining.

    **MR. MERONE:** My apologies.

    **THE COURT:** While he's looking, Mr. Judd, just for your purposes, we'll take a break at 10:13, which is in 11 minutes.

    **MR. JUDD:** Thank you, Your Honor. I think we'll be

1    done by then, at least on the direct.

2          THE WITNESS:  I don't see *Bottles and Bins* cited in my

3    report, but I did review copies of it as part of my research in

4    this matter.

5          THE COURT:  Okay.  Well, in order to be consistent,

6    the objection is sustained.

7       Next question.

8    BY MR. JUDD:

9    Q.   Did you rely on any other historic materials that reflect

10   what you believed to be Robert Mondavi Winery's awareness of

11   the significance of To Kalon as a source of outstanding

12   Cabernet Sauvignon grapes?

13   A.   I did review materials at the Napa Valley Wine Library

14   compiled by or from materials that were compiled by Francis

15   Gould, a publicist and confidant of Robert Mondavi.

16   Q.   And are those cited in your report?

17         THE WITNESS:  Your Honor, may I examine my report?

18         THE COURT:  You may.

19      Is that spelled G-O-U-L-D?

20        MR. JUDD:  Yes, Your Honor.

21         THE WITNESS:  Yes.  I did use some of that material --

22   I cited some of that material in my -- in my report.

23         THE COURT:  Okay.  Could you identify where, please.

24         THE WITNESS:  Yes.  On page 13 of the report,

25   footnote -- well, two portions from that folder, footnotes 27

1   and 28.   This is what jumped out at me.   The materials

2   include -- in footnote 27, the letter between Roy Taylor and

3   Francis Gould, you know, cited as To Kalon Vineyard, file

4   folder, To Kalon Vineyard Box 27, and here I have an

5   abbreviation, Napa Valley Wine Library --

6            **THE COURT:**   That's fine.   Proceed.

7   **BY MR. JUDD:**

8   **Q.**   Yes.   Trial Exhibit 287, please.

9        Is this Trial Exhibit 287 the letter you referred to

10  between --

11  **A.**   It is.   This is a letter from Gould to -- excuse me --

12  from Roy Taylor with the Wine Industry Institute, excuse me, to

13  Francis Gould where Gould has inquired about Crabb's use of

14  To Kalon and the association of To Kalon and then Taylor's

15  response back.

16           **MR. MERONE:**   And what is the trial exhibit number?   I

17  apologize.

18           **MR. JUDD:**   287.

19           **MR. MERONE:**   Thank you.

20  **BY MR. JUDD:**

21  **Q.**   And Trial Exhibit 294, please.

22       Did you refer to Trial Exhibit 294 in your report,

23  Dr. Miltenberger?

24  **A.**   I believe so.   I don't -- I don't -- I would need -- I

25  believe so, yes.   I'm fairly confident.

1      So, yeah, this is a newspaper article discussing Robert

2  Mondavi's acquisition of 250 acres from the -- from the late

3  Carolyn Stelling, Martin Stelling's wife.  The specific

4  call-out here that I would want to draw the Court's attention

5  to is the second highlighted paragraph:  "The vineyards are

6  located northwest of Oakville adjoining the present winery

7  property, an area which is considered the heart of the prime

8  wine growing region of the Napa Valley and are a part of the

9  To Kalon Vineyards."

10  **Q.**  Did you refer in your report to any interviews that Robert

11  Mondavi gave to Julius Jacobs?

12       **THE WITNESS:**  Your Honor, may I consult my report?

13       **THE COURT:**  You may.

14       **THE WITNESS:**  I did review a transcript and collected

15  and reviewed a transcript of an interview between Julius Jacobs

16  and Robert Mondavi, but it's not cited in my report.

17       **MR. MERONE:**  Objection.

18       **THE COURT:**  I don't -- what's the objection?

19       **MR. MERONE:**  Oh, I mean -- I'm sorry.  I will wait for

20  the next question, Your Honor.

21  **BY MR. JUDD:**

22  **Q.**  Did you explain the relationship between Frank Gould and

23  Robert Mondavi?  If not, please explain the connection that

24  Frank Gould had with Robert Mondavi and Robert Mondavi Winery?

25  **A.**  Yes.  Gould worked as kind of a publicist for Robert

1    Mondavi -- well, excuse me, for C. Mondavi & Sons and Charles

2    Krug Winery, including publishing the -- a publication called

3    *Bottles and Bins*, which was a newsletter, a publicity piece for

4    that winery.

5         Having reviewed the Robert Mondavi papers at U.C. Davis,

6    it seems clear that they enjoyed a close relationship.  Gould

7    was a -- I would characterize him as a confidant of Robert

8    Mondavi.

9    **Q.**   And are you familiar with the name John Daniel, Jr.?

10   **A.**   I am, yes.

11   **Q.**   And what was John Daniel, Jr., in relation to Robert

12   Mondavi Winery?

13   **A.**   I understand him to be an executive with Robert Mondavi

14   Winery.

15   **Q.**   And upon what do you base that?

16   **A.**   Well, I base that on materials I collected from the Napa

17   Valley Wine Library which identify Daniels as working for

18   Robert Mondavi Winery.  In fact, Daniels took receipt of

19   materials that Gould had collected that relate to To Kalon and

20   H.W. Crabb.

21   **Q.**   Do you know approximately when Mr. Daniels took receipt of

22   the Gould materials that pertain to To Kalon and Crabb?

23   **A.**   I do.  September of 1970.

24   **Q.**   Thank you.

25        At this time, Your Honor, the --

1          **THE COURT:**  Pass the witness?

2          **MR. JUDD:**  Yes.

3          **THE COURT:**  Okay.  So this is a good time to take our

4     first 15-minute break.  In general, we will take breaks at

5     10:00 and at 11:45, but given that we started later, I thought

6     it was appropriate to take the full hour and a half, and as a

7     consequence of starting later, we will go a little later today

8     so we can get our full trial day in.

9          It is 10:12.  We will go back on the record at 10:27.  We

10    stand in recess.  Thank you.

11                     (Recess taken at 10:12 a.m.)

12                  (Proceedings resumed at 10:28 a.m.)

13         **THE COURT:**  Back on the record.  We're back on the

14    record.  As the record will reflect, the parties are present.

15         Cross-examination, Mr. Merone.  You may proceed.

16         **MR. MERONE:**  Thank you.  I have to get the right

17    screen.

18                       **<u>CROSS-EXAMINATION</u>**

19    **BY MR. MERONE:**

20    **Q.**   Dr. Miltenberger, when you came to the conclusions you

21    expressed in this case, were you trying to be objective?

22    **A.**   Yes.

23    **Q.**   And is it fair to say that an objective researcher when

24    reviewing each piece of evidence has to consider whether not

25    only that evidence supports stated conclusion but whether it

1  supports ultimate conclusions?

2  **A.**   Yes.

3  **Q.**   And if an objective researcher finds that the evidence

4  reasonably supports an alternative conclusion, he or she should

5  acknowledge that?

6  **A.**   Yes.

7  **Q.**   And if a researcher's stated conclusion was based on a

8  chain of evidence and one or more of the links in the chain is

9  broken, it wouldn't be proper just to maintain the original

10  conclusion.  You would have to reconsider it; right?

11          **MR. JUDD:**  Objection.  Incomplete hypothetical.

12          **THE COURT:**  Overruled.  Point taken.

13  **BY MR. MERONE:**

14  **Q.**   Let's walk through some of your opinions, sir, and see if

15  the evidence might support a more reasonable conclusion.

16       Now, one of the issues you reviewed -- you testified on

17  was how Mr. Crabb may or may not have used the Baldridge Tract

18  that he purchased in 1889, and you said your opinion was he

19  used it for grape cultivation and provided a number of reasons

20  for that; right?

21  **A.**   I think I said he likely used it for grape cultivation,

22  and I think my report also addresses some other attributes of

23  the property.

24  **Q.**   Right.  But in your testimony here, which is what I am

25  focusing on, you talked about -- you are correct.  You said he

1    likely used it for grape cultivation.

2        Now -- and you're familiar with the research work that was

3    done by the company called ARG; correct?

4    **A.**   Generally, yes.

5    **Q.**   Relating to the Baldridge property?

6    **A.**   Yes, generally.

7    **Q.**   Right.  They produced a report a couple years before this

8    litigation started, and you reviewed -- about the Baldridge

9    property, and you reviewed that report?

10   **A.**   Yeah.  I do recall reviewing it, yes.

11   **Q.**   Okay.  And ARG -- they are a historical research firm, but

12   they are not testifying in this case.  They worked before just

13   as a consultant?

14           **MR. JUDD:**  Is there a question?

15           **MR. MERONE:**  Okay.  I will move on.

16           **THE COURT:**  Is there --

17           **MR. MERONE:**  I'm sorry.  Improperly formed.  Right.

18   **Q.**   So ARG, the previous historical consultant, they wrote --

19   well, can we get Trial Exhibit 3, please.  This is our first

20   test.  We wanted the ARG report.

21       If you recall the ARG report -- take that down, please.

22   Someone can find it.  There we go.  Page 14.

23       If you highlight the top there, the first top paragraph.

24       So ARG concluded that it was unknown, based on the

25   research, how Crabb used the southern parcel, and that's the

1   Baldridge Tract; correct?

2   **A.**   I believe in this context, yes.

3   **Q.**   Right.  But their view was his residence, vineyards, and

4   winery operations were clearly located on the northern

5   property, which was the 360 acres in the valley; right?

6   **A.**   That's what it says here.

7   **Q.**   Okay.  Okay.  Take it down, please.

8        Now -- I'm sorry.  Put it back.

9        You note Mr. Crabb bred and sold race horses; right?

10  **A.**   Yes.

11  **Q.**   He had dozens of horses; right?  You discuss that in your

12  report?

13  **A.**   I don't know the exact number, but he had a number of

14  horses, yes.

15  **Q.**   Okay.  He ran what was called the To Kalon Stock Farm for

16  raising and breeding race horses?  Do you recall that?

17  **A.**   Yes.

18  **Q.**   Okay.  In fact, he even had his own race track, didn't he?

19  His horse race track?

20  **A.**   Yes.

21  **Q.**   So he had vineyard operations and he had these horse farm

22  operations; correct?

23  **A.**   Yes.  He practiced a pretty diversified agricultural

24  portfolio.

25  **Q.**   And one possibility ARG suggested -- if we can zoom in --

1    thank you -- is that Mr. Crabb may have purchased the property

2    to support his horse farm so he can grow more hay; right?

3    **A.**   May I examine the --

4    **Q.**   Sure.

5    **A.**   I don't see where it says that he used it to grow more hay

6    specifically for the horses.  I read it a little differently.

7    I -- I read it that he may have used the acres to support his

8    racing stock.  That's certainly possible, and as a man who I

9    think emerges from the historical record as very practical, I

10   don't think that one necessarily denies the existence of the

11   other.  The fact that he raised hay and could potentially use

12   it for his horses, even as he has practicing this method of

13   crop rotation, I don't see that as mutually exclusive.

14   **Q.**   I understand.  We will talk about the crop planting in a

15   bit, but there is evidence to support that in fact he used

16   Baldridge to grow hay; right?  You cited the appraiser's report

17   which said it was 70 acres of hay field; true?

18   **A.**   Yes.  And he used the Lewelling Tract to grow hay as well.

19   **Q.**   Right.  He grew hay on Lewelling, and he also bought 70

20   acres there, and he also grew hay on Baldridge?

21   **A.**   As of 1899.

22   **Q.**   Correct.  And the appraisal did not list any vineyard on

23   the Baldridge Tract; true?

24   **A.**   Yes.  It did not.

25   **Q.**   In fact, the court-appointed appraiser -- can we have

1712, page 395.

The court-appointed appraiser referred to the valley property as the To Kalon Vineyard property and referred to the Baldridge Tract as the Baldridge Tract; right?

**A.**   They are identified as such in the inventory and appraisement, right.

**Q.**   So just alternative possibilities -- you can take that down -- alternate possibilities could be he could have bought Baldridge to support his horse farm so he could have more hay. That's one possibility; right?

**A.**   It's -- it's possible.

**Q.**   Another possibility is he could have wanted to expand his winery operations, and so he wanted to move -- stop growing hay in the valley so he could put that land to higher economic use because that's the land that was already producing award-winning wine, and so he bought Baldridge to grow hay there instead to free up space.  Are those reasonable conclusions that one can think about why he might want to buy the property?

**A.**   They are reasonable.  I think they exist outside -- they exist in a kind of vacuum without some context.

**Q.**   Okay.  Well, let's go through some of the evidence that you cite to support your contrary conclusion that you believe it's likely Mr. Crabb used the property to grow grapes, even though it's not mentioned there being a vineyard there.

1      **THE COURT:**  Could I interrupt for a moment?  Could you

2  tell me what that -- the number of that last exhibit was,

3  please.

4      **MR. MERONE:**  I believe there is a number 1440,

5  perhaps.  I have different numbers just for reference.  They

6  put it up as well.  We took all of Dr. Miltenberger's exhibits

7  and put a label on them just so we could find them easily.

8  Yes.  It's also 1440.

9      **THE COURT:**  Okay.  Thank you.

10      **MR. MERONE:**  Sure.

11  **Q.**  All right.  So -- my apologies.

12      So one of the references -- one of the basis of the

13  evidence that you relied on when going through your conclusion

14  that Crabb likely cultivated grapes on the Baldridge property

15  was the Wine Growers Union article that you discussed in your

16  opening; right?

17  **A.**   I believe that's the one from 1892.

18  **Q.**   I believe so.  Can we have that on the screen, please.

19  Yes.  Here we go.  Right.

20      And that's an article where you said it was -- I believe

21  it was -- you are correct, it was 1892, and in the article it

22  reports that Mr. Crabb has set out this season 20 acres of this

23  Lenoir type of root stock in higher, dryer soil; right?

24  **A.**   Yes.

25  **Q.**   Okay.  And as we discussed, there was the

1   To Kalon Vineyard property that the appraiser referred to down

2   low in the valley, whereas the Baldridge Tract was up high in

3   the Foothills, so your conclusion is that because it says

4   "higher" there, he must have been referring to Baldridge here;

5   right?

6   **A.**   I think it's likely referring to Baldridge.  It was the

7   only property that he owned, Crabb owned, that was literally

8   higher.

9   **Q.**   Okay.  There is another possibility, though.  He could

10   have been -- he could have planted those vines on his low-lying

11   valley property; right?

12   **A.**   I don't see how.

13   **Q.**   Okay.  Well, the fact -- well, first, the fact -- we will

14   agree, the factory was there, right, the winery?  His workers

15   were there, and he had the space.  All true?

16   **A.**   Not necessarily from how I understand the layout of the

17   valley floor property.

18   **Q.**   Which part do you believe is true?

19   **A.**   Well, as I understand from descriptions that the -- the

20   western part of the 240 acres on the valley floor was generally

21   the location of where that winery complex was.  So some portion

22   of that land clearly wasn't set out in vine.

23     Additionally -- and maybe I should have begun with this.

24   As I understand, where we are in Oakville, generally there is a

25   slope towards the Napa River.  The Napa River is located east

1  of Highway 28, which more or less marks the boundary or the

2  eastern portion of the property on the valley floor.

3  So there is a slight grade as you go up, as you head

4  towards the west.  So if we're talking higher soils, then it

5  would make sense that they were going to be on the valley

6  floor, that they would be located on the western portion of

7  these lands.  The descriptions I have seen about Crabb's

8  properties in the 1890s is that the winery complex was largely

9  located again to the west of the home place property, and

10  generally the descriptions about where his racing track was in

11  the 1890s is on the southern 120 acres in that western portion.

12  So it seems to me that if it's generally that the slope is

13  downward towards Napa River -- so to kind of illustrate

14  generally, Your Honor, you are just coming at a rough diagonal

15  here.  The places -- if it was going to be planted on the

16  valley floor, if this 20 acres was going to be planted on the

17  valley floor, it would be on the western part of those two

18  parcels, and from the descriptions I have seen, that land was

19  dedicated to other purposes.

20  **Q.**   Okay.  Well, we will get there.

21  But we also know that valley land had already produced for

22  Mr. Crabb award-winning wine; right?  Just the year before, he

23  had won some international awards, I believe you discussed?

24  **A.**   Yes, he did.

25  **Q.**   And are you familiar with the concept in winemaking known

```
 1   as "Terrior," which is basically the land makes the wine?
 2              MR. JUDD:  Objection.  Beyond the scope of this
 3   witness's expertise.
 4              THE COURT:  Response.
 5              MR. MERONE:  If he's not familiar with it, that's
 6   fine.
 7              THE COURT:  You can answer the question.
 8              THE WITNESS:  I'm generally familiar with the concept,
 9   having had wine in the past.
10   BY MR. MERONE:
11   Q.   Okay.  And so just generally understanding that wine from
12   a specific area -- if you make an award-winning wine in soil
13   and you have more of that soil, it might make sense to grow
14   more there rather than go somewhere else, just as a general
15   concept?
16   A.   I suppose a general concept, but I'm not a wine expert.
17   Q.   Okay.  Well, we can agree, though, that the valley land of
18   Mr. Crabb is the only land that is ever specifically described
19   in any of the historical references you reviewed as having a
20   vineyard?
21   A.   No.
22   Q.   Really?  Can you identify the exhibit where it talks about
23   there is a vineyard with vines on the Baldridge Tract?
24   A.   There is the article we looked at in 1869 that identifies
25   a small vineyard that Baldridge had.  There is the Husmann --
```

1  George Husmann's account in the 1870s that Baldridge had

2  extensive plantings, and there is the -- I don't have the

3  exhibit numbers.  I should have led with that.  I don't have

4  the exhibit numbers memorized, but there is the 1881 newspaper

5  article that indicates that August Geaumoneaux -- pardon my

6  French, and no pun intended to any of that -- purchased grapes

7  from Crabb to -- to -- in 1881 to make wine.  So to me that

8  indicates there is evidence that there was a vineyard on that

9  property.

10 **Q.**   Well, let me clarify.  First you said the article said

11 that this gentleman purchased grapes from Crabb.  Did you mean

12 Baldridge in 1881?

13 **A.**   I did.  I meant Baldridge.  Excuse me.

14 **Q.**   And the three articles you are referencing all discussed

15 the fact that Mr. Baldridge had a small vineyard or a vineyard

16 up -- grew grapes up there; right?

17 **A.**   Yes.

18 **Q.**   Okay.  And I was asking during Mr. Crabb's stewardship of

19 the land, is there anything that specifically says that

20 Mr. Crabb had a vineyard in the foothills that expressly states

21 that?

22 **A.**   Nothing that expressly states that, no.

23 **Q.**   Okay.  So I want to consider the possibility that the 20

24 acres of Lenoir were actually planted on the valley floor, the

25 low-lying areas, and see if the evidence more reasonably

1    supports that conclusion.

2         Now, first 20 acres of vine is a lot.  It's like 20,000

3    vines; right?

4    **A.**   I don't know how that breaks down.  I certainly know from

5    other historical studies that I have done that fruit

6    cultivation of all kinds is very different in the 19th century.

7    For instance, I know you can get far more almonds on an acre of

8    land these days than you could in the 19th century or even

9    early 20th century, so I don't know that to be true.

10   **Q.**   Okay.  I'll -- it will come up again, but if -- there were

11   published reports at the time, some that you even cite, sir,

12   about the history and list the acreage and the amount of vines

13   being used, right, so let's just go with 20 acres is a lot of

14   land.  How about that?  A 20-acre vineyard is a pretty big

15   vineyard.

16   **A.**   It's -- it very well may be.  It's a little difficult for

17   me to assess in the abstract.

18   **Q.**   Okay.  As part of your research work, are you familiar

19   with contour maps?

20   **A.**   I'm sorry.  You cut out on me.

21   **Q.**   I'm sorry.  Are you familiar with a contour map?

22   **A.**   Yes.  I'm familiar with contour maps.

23   **Q.**   I'm going to show you a contour map, and a contour map

24   shows elevation changes of land; true?

25   **A.**   Yes.

1   **Q.**   Let's put up 1679.  Can you zoom in.

2                **THE COURT:**  I need an exhibit number.  You said --

3                **MR. MERONE:**  I'm sorry.  Exhibit 1679, Your Honor.

4                **THE COURT:**  Thank you.

5   **BY MR. MERONE:**

6   **Q.**   And I am being told I'm needing to move for admission of

7   certain things.  I'm not sure how this is working yet, but we

8   will go through this.

9        Okay.  Now, let's look -- I mean, this is a contour map.

10  We can ignore the red box.  This was a document that was

11  produced during the litigation, and someone added the red box

12  to it.  I believe it was actually in the ARG report.  If we can

13  zoom in on that, please, on just the map so we can read it.

14       Do you see the thick contour lines there labeled 200, 160,

15  140?

16  **A.**   I -- I do.  What's -- what's the base of this map?  Where

17  does this come from?

18  **Q.**   That's not the question, sir.

19  **A.**   No.  But for me to understand it, I need -- I need to know

20  what year this was and who produced it.  This looks like it's

21  an excerpt from a report so it's an excerpt of a published

22  contour map.  I think to really understand it, I need to see

23  the many -- the underlying map that this is reproduced from, I

24  suppose.

25  **Q.**   Why don't we stay with this.  If somebody wants to

1   redirect you on this, that's fine.  This is a map from your

2   client's records.

3        So, anyways, you agree that the thick contours, there are

4   about -- they indicate elevation change of 20 feet apart; yes?

5   **A.**   I don't readily see a 20-foot difference here.  I see some

6   thick lines --

7   **Q.**   200.

8   **A.**   Some that say 172, some that say 160.  Is there one

9   specifically that you're trying to point me to?

10  **Q.**   Sure.  Do you see a thick contour labeled "200"?

11  **A.**   I see 200 located to the west of the -- the western part

12  of that -- of the rectangle that is showing here.

13  **Q.**   Right.  And then if you go -- well, there is a thick

14  contour, another thick contour.  That is 160 feet, it's

15  labeled; right?  This is a standard contour map.

16  **A.**   No, it's not a standard contour map.  This is an excerpt

17  from a map.

18  **Q.**   Yes.  It's a zoomed --

19  **A.**   Well, no.  I mean, I see, for instance, 16.  I guess maybe

20  that is 160.  The red box kind of cuts it off.  I am not

21  exactly certain where you're -- I'm looking up because I

22  have -- I am not exactly certain where you are directing my

23  attention to.

24  **Q.**   Let's zoom in on the red box, please.

25       Are you familiar with the notations BM on a contour map?

1    **A.**    Generally, yeah.  They usually indicate benchmark.

2    **Q.**    So the benchmark where it's marked there is 155 feet;

3    correct?  Do you see that right near Oakville?

4    **A.**    Yes.

5    **Q.**    Do you see to the left of the box a contour labeled 200?

6    **A.**    Yes.  I see a line at the edge of the -- of the red

7    rectangle that says 200.

8    **Q.**    And does that line look like a contour line based on your

9    experience of working with contour maps?

10   **A.**    Yes.

11   **Q.**    Okay.  So if we agree this is a contour map or it's

12   established, would you agree that parts of the valley vineyard

13   property are 40 to 50 feet higher than the other parts?  It's a

14   big slope.  I think you said that in your testimony.

15   **A.**    Yes.

16   **Q.**    Okay.  And also this map -- there is a stream that runs

17   through the middle of the land Crabb owned that comes off from

18   this surrounding hills; right?

19   **A.**    Yes.

20   **Q.**    And you even put a picture -- can we have the TX753?  You

21   even put a picture of it in your report.  This is Exhibit 7,

22   Your Honor.  Right?  This is a drawing of Mr. Crabb's winery

23   back when he just was Hermosa Vineyard, and there is a big

24   stream there; right?

25   **A.**    There is a stream depicted, yes.

1    **Q.**   Okay.  So wouldn't it logically follow that some areas of

2    Mr. Crabb's valley property could be called higher than other

3    parts?

4    **A.**   There could be, yes.

5    **Q.**   All right.  And wouldn't it also logically follow that

6    parts of the -- parts of his land, especially towards the lower

7    ends of the bottoms of the slope, were perhaps wetter than the

8    other ends, the higher elevation, which would be dryer?

9    **A.**   Yes.

10   **Q.**   Okay.  Now, elsewhere in your report -- on a different

11   point, I will add -- you refer to a board -- a report by the

12   Board of State Viticultural Commissioners in 1893.

13        Can we have that, please.  Right.  There we go.

14        Correct?  You reviewed this report; yes?

15   **A.**   Yes.

16   **Q.**   Okay.  And this was published after the Wine Growers Union

17   article which said Crabb had planted in 1892 the 20 acres of

18   Lenoir in higher and dryer soil; correct?

19   **A.**   Yes.

20   **Q.**   And the Board of State Viticultural Commissioners was an

21   important governmental body for the state wine industry; right?

22   **A.**   Crabb was a commissioner the following year, I believe.

23   Yes.

24   **Q.**   Do you recall that the board in 1893 reported that

25   Crabb -- can we have that up, please -- had 120 acres of vine

1  and said his vineyard was low-lying; right?  And he reviewed

2  this?

3  **A.**   I see a phrase that says "vineyard low-lying," yes.

4  **Q.**   Dr. Miltenberger, you cite this report -- this page of

5  this report in your report; right?  Did you review this?

6  **A.**   Yes.

7  **Q.**   Okay.  And it says he had 120 acres, the vineyard was

8  low-lying; right?  So they're talking about the valley

9  property; true?

10  **A.**   I think it's very likely they're talking about the valley

11  property, yes, especially given what we know what the

12  circumstances were in the 1890s as referenced here with all of

13  the losses he had experienced because of phylloxera.

14  **Q.**   And also, if we just read, they say it's low-lying.  That

15  can't be Baldridge; right?

16  **A.**   This description here?

17  **Q.**   Right.

18  **A.**   It -- I wouldn't say it's describing the Baldridge

19  property, no.

20  **Q.**   Right.  And they even say it has southern and eastern

21  exposure, which Baldridge has a valley, but the valley property

22  was exposed to the south and exposed to the east; true?

23  **A.**   Yes.

24  **Q.**   And here it says in the second line there Crabb had 30

25  acres of Lenoir vines planted there.  So doesn't that match up

1   with him having said he planted 20 acres the year before?

2   **A.**   Not necessarily.  Possibly but not necessarily.

3   **Q.**   Let go to the next paragraph that you reviewed, and it

4   says that he is continuing to plant the Lenoir in his low-lying

5   vineyard on the high, dryer soil.  Do you see that?

6   **A.**   I do.

7   **Q.**   And you cited this exact page in your report on a

8   different point; correct?

9   **A.**   Yes.

10   **Q.**   Right.  So my question is doesn't this evidence more

11   reasonably suggest -- more reasonably support the conclusion

12   that the -- that the 1892 reference to Mr. Crabb planting 20

13   acres of Lenoir in higher, dryer soil, when you consider all

14   the evidence, referred to his valley property and not

15   Baldridge?

16   **A.**   I think it's possible.

17   **Q.**   I'm sorry.  Dr. Miltenberger, are you being objective

18   here?

19   **A.**   I'm trying to make the most sense of all of the available

20   historical evidence, and presented to me has just been two

21   sources, and it's possible that they could be referencing the

22   lower -- the lower valley lands, but as I was suggesting

23   earlier, explaining earlier, and even in that excerpt of a

24   contour map, if we're talking about higher soils, on the valley

25   floor where could they possibly be?  As we indicated on the --

1   on the map, it's a slope upward so you would expect them to be

2   in the western part of those, if you will, the western part of

3   either the two parcels, and from other descriptions of this

4   same era in 1890, there -- that property is -- a lot of it's

5   devoted to the actual wine production or the horse -- or the

6   racing track.

7        So it -- it -- it's possible that this could be

8   referencing that, but it -- to me in terms trying to assess all

9   of the historical evidence, it runs aground on the knowledge

10  that that western portion of the valley property was devoted

11  largely to production, and that was the highest.

12  **Q.**   So let me just make sure I'm clear, Dr. Miltenberger.

13  Now, first I do note you didn't cite any of this evidence as

14  countervailing evidence against your hypothesis that Crabb had

15  planted 20 aches of a Lenoir at Baldridge.  Why is that?

16  **A.**   Historians don't always discuss everything that could

17  possibly be an alternative interpretation when they are

18  presenting it.  The interpretation I offered, the opinions I

19  offer, that's my best assessment, my expert opinion of all of

20  the available historical evidence.  My report would be

21  considerably, considerably longer if I addressed every

22  possibility that might exist for each individual piece of

23  evidence.

24       That's really the craft of history, is trying to make

25  sense of all of this information.  So, yes, it's possible this

1    is on the -- the reference here is to the -- the lower -- the

2    valley floor.  It's possible the Lenoir he set out was on the

3    lower valley floor, but, again, there is other evidence that to

4    me suggests that makes that less likely than if it was on the

5    Baldridge property, which he owned and which was even higher

6    than what's on the valley floor.

7    Q.   So a record from the year following, he said he was

8    planting 20 acres of the Lenoir in higher -- in the high, dryer

9    soil.  That says -- this later record says he is planting the

10   Lenoir in his valley vineyard on high, dryer soil and says he

11   has 30 acres of Lenoir.  You think that's not worth mentioning

12   when you came to your conclusion that the Wine Growers Union

13   article supported the conclusion it had -- it was likely at

14   Baldridge?

15   A.   I'm sorry.  I -- I missed the question.

16   Q.   Okay.  The evidence we're looking at on the screen says

17   that Mr. Crabb is planting the Lenoir in his valley vineyard in

18   the high, dryer soil.  It says he has 120 acres, all of which

19   is in his low-lying vineyard.  It says he has 30 acres of the

20   Lenoir planted already.  And it's dated the year after the

21   newspaper article that said he had just that year set out 20

22   acres of the Lenoir.

23        And my question is given this evidence, why didn't you

24   cite it and discuss it as countervailing evidence against the

25   fact that you relied on was just you didn't think Mr. Crabb had

1    any other property that matched the description "higher"?

2    **A.**    Again, I don't know if I could answer any better than what

3    I already have, which is that for any individual document,

4    there could be an alternative reading.  I read a lot of

5    documents, and what I'm offering is my assessment, my

6    interpretation, my argument of how best to make sense of how

7    the Baldridge property was used.  And it seems to me likely,

8    given not only the Lenoir quotation from 1892 but other sources

9    that makes it likely.  Is it possible, again, that the

10   cultivation of Lenoir was on the low-lying land and is this

11   indicative of that?  It's possible, and it's also possible that

12   whatever he is laying out -- I mean, this is -- this is

13   referencing what he has presently, and it's talking about how

14   he is planning out resistance year by year.  To me that doesn't

15   deny or is not mutually exclusive, even if he did plant Lenoir

16   on the lower floor, that he didn't plant it up top either, up

17   in the Baldridge property.  These aren't mutually exclusive to

18   me.

19        And, again, it's easy to isolate one particular document

20   and say well, doesn't it mean X when you're saying it means Y.

21   Well, again, it has to be brought into dialogue with many

22   documents to really understand what's going on.  That's --

23             **THE COURT:**  Doctor, what was the point of the report?

24   Why was it prepared?

25             **THE WITNESS:**  Your Honor, this particular one?

1          THE COURT:  Yes.

2          THE WITNESS:  This was prepared -- it was generally a

3    kind of assessment of where everyone stood.

4          THE COURT:  So why wouldn't it be comprehensive if

5    that was the case?

6          THE WITNESS:  Well, I'm not suggesting that it's not

7    comprehensive, Your Honor.

8          THE COURT:  Well, you are.  You are suggesting that

9    there was something there that's not captured, and so I'm

10   trying to understand, given the timing of these reports, why it

11   would not be captured.

12         THE WITNESS:  Sure, Your Honor.  I'm -- I think that

13   there was an effort to be complete.  What gives me -- what

14   gives me a little bit of pause is something else which I hadn't

15   raised, is that this makes reference to 30 acres of Lenoir as

16   opposed to the article for 20 acres of Lenoir, both of which

17   are attributed to have come from Crabb.

18       The other piece of this is that Crabb's experimentation

19   with Lenoir and Riparia others have assessed as being

20   ultimately unsuccessful.  So it's possible to me that in one

21   year he planted 20 years of Lenoir up in the Baldridge property

22   that failed and maybe he has 30 acres of Lenoir down in the

23   lower -- on the lower valley.

24         THE COURT:  But he wouldn't have known that; right?

25   He wouldn't have necessarily known that at the time?

1    **THE WITNESS:**  I guess -- I suppose it would depend on

2    when the harvest is when I would need to know exactly -- I

3    don't recall, as I'm looking at this particular entry, when the

4    reporting was, the -- in terms of year and in terms of

5    correlating that to the harvest.

6    Another component of this, Your Honor, is that Crabb was

7    reputed to actually have undersold his property; that is to say

8    that he -- he avoided sort of complete statements to the

9    assessor in order to avoid his taxes.

10    Now, this isn't a statement to the assessor.  This is a

11    statement to his fellow viticulturists as they are struggling

12    with trying to deal with phylloxera, but it just does give me

13    pause because there are other accounts around the same time

14    frame with different acreages.

15    So, again, you know, I think it's possible that it was on

16    the valley floor.  I just weigh other evidence more heavily or

17    in a different way.  My reading is different based upon other

18    things that I know outside of just this particular document.

19    **THE COURT:**  All right.

20    Mr. Merone.  And that time is mine.  Go ahead.

21    **BY MR. MERONE:**

22    **Q.**  Just two quick followups on your statement,

23    Dr. Miltenberger, there.  First you mentioned 30 acres.  I

24    mean, vines don't mean -- he could have planted 10 the year

25    before; right?  That's how you can get to 30?

1   **A.**   That's possible.

2   **Q.**   I'm sorry.  Go ahead.

3   **A.**   Yes.

4   **Q.**   Okay.  And second, you talked about the harvest.  Is it

5   your impression that they rip out the vines when they harvest

6   the grapes?

7   **A.**   No.

8   **Q.**   Okay.  So if the vines were there, they would be there;

9   right?

10  **A.**   Right.  But I also read this as that's what is bearing,

11  not necessarily what's planted.

12  **Q.**   Well, read it again.  It says "120 acres, in bearing 90

13  acres."  Do you see the difference?

14  **A.**   Yes.  And then it goes on 100 acres of which 70 are

15  Riparia and 30 are Lenoir.

16  **Q.**   Yes.  If you break down the 120, you have 20 acres

17  infected and 100 acres of resistant; right?

18  **A.**   But only 90 are bearing.

19  **Q.**   Correct.

20  **A.**   70 plus 30 is 100.  Do you see what I'm saying.  So it's

21  possible --

22          **THE COURT:**  Well, I don't understand what you're

23  saying.  He has got 120 acres --

24          **THE WITNESS:**  Of which --

25          **THE COURT:**  -- and he's saying that 20 of those are

1   infested.  One hundred of them have Riparia vines, 30 have

2   Lenoir vines, but only 90 of those 100 are in bearing.  So I

3   don't understand what you are saying.

4           **THE WITNESS:**  That's what -- I think that's what I'm

5   trying to get at, Your Honor, is that there's -- of the 100 --

6   so there's only -- 100 acres may have been Riparia and Lenoir,

7   but a smaller subset of that, the way I read that, is actually

8   bearing.

9           **THE COURT:**  Well, 90 percent.

10          **THE WITNESS:**  Right.  But not knowing exactly how much

11  is Riparia and how much is Lenoir.  I only -- I only raise that

12  to answer the question is that no, my understanding of Crabb's

13  harvest for grapes doesn't involve tearing down any vines, but

14  it's possible to have a vine of Lenoir that is not bearing or

15  Riparia or vice versa.  That's all I'm saying, is that there is

16  more to it than I was understanding the question to be asking

17  me.

18  **BY MR. MERONE:**

19  **Q.**   But we can all agree it doesn't identify any vines,

20  bearing, not bearing, infested or not, at the Baldridge Tract,

21  just the low-lying vineyard, which has high and dry soil?

22  **A.**   The description here seems more consistent with the

23  lower -- with the valley floor property.

24  **Q.**   Let's move on.

25          You also rely in your report on the second -- you cited

1   TX213.

2        May we have that, please.  I don't know what the page is

3   there.  Okay.

4        Where -- yeah.  Penultimate paragraph -- there we go.

5        Where Mr. Crabb, now in his role as a commissioner to the

6   State of Viticultural Commissioners, in June of 1894 wrote

7   that, "I am propagating a vine discovered by Mr. Rampandahl in

8   the head of a canyon in the mountains"; right?  You relied on

9   that?

10  **A.**   Yes.

11  **Q.**   And you concluded, based on that statement, that Crabb

12  must have planted his -- this -- I'm sorry -- this Riparia vine

13  at Baldridge because it was the only land that matched the

14  description "the head of a canyon"; right?

15  **A.**   Yes.

16  **Q.**   Okay.  Again, I want to explore if the evidence might

17  support another conclusion.

18       First I just want to focus on that sentence; right?  Do

19  you agree that grammatically the phrase "in the head of a

20  canyon in the mountains" can properly be read as part of the

21  relative clause modifying the direct object "the vine"?  In

22  other words, "I am propagating a vine."  "What vine?"  "A vine

23  discovered by Mr. Rampandahl in the head of a canyon in the

24  mountains."

25       Do you agree grammatically that is a perfectly reasonable

1  and proper reading of that sentence?

2  **A.**   That's one reading of the sentence, yes.

3  **Q.**   Okay.  Now, you read it as if that final adjective --

4  adverbial prepositional phrase modifies "propagating" as

5  opposed to the verb "discovered," which is closer to it;

6  correct?

7  **A.**   Yes.

8  **Q.**   All right.  But Mr. Crabb did not say, "I am propagating

9  in the head of a canyon in the mountains a vine discovered by

10  Mr. Rampandahl."  We agree there?

11  **A.**   That's not what he wrote, no.

12  **Q.**   Now, Crabb was a commissioner; true?

13  **A.**   Yes.

14  **Q.**   And he was working with the board; right?

15  **A.**   Yes.

16  **Q.**   Okay.  And isn't it true that Mr. Crabb and the board had

17  set up an experimental viticultural station at Mr. Crabb's

18  valley vineyard back in 1887 for, among other things,

19  propagating and testing possibly resistant root stock?

20  **A.**   I recall seeing that, yes.

21  **Q.**   Can I have 1713 page 4.  Let's get page 1 first.

22          **THE COURT:**  Okay.  Is there another number for this

23  exhibit --

24          **MR. MERONE:**  1713 I have.

25       Can we scroll down to the first page of the book.  Next

1   page.  That's too hard to read.  Next.  Keep going until we see

2   something.  There we go.

3   **Q.**   So, Dr. Miltenberger --

4           **THE COURT:**  Okay.  Did you not hear me, Mr. Merone.

5           **MR. MERONE:**  Sorry.  I only have 1713.

6           **THE COURT:**  My exhibit list stops at 1701.  Is there

7   some other exhibit list?  And I'm looking at Docket 19 -- or

8   docket 183.

9           **MR. MERONE:**  Well, Your Honor, I guess this is then

10  for impeachment.  I know it has an exhibit sticker on it.  It's

11  a reference that I don't believe Dr. Miltenberger reviewed, and

12  I want to show him something.  Now maybe he did review it and

13  just not cite it.

14          **THE COURT:**  All right.  Then you need to let me know

15  that.

16          **MR. MERONE:**  My apologies.

17  **Q.**   So, Dr. Miltenberger, did you review this report?  Do you

18  recall reviewing this report?

19  **A.**   It looks familiar.  I can't -- I can't say though -- I

20  can't say definitively that I examined it.

21  **Q.**   Okay.  Let's go to page 74, please.

22      Now, this is a report from Mr. Wetmore who -- do you

23  recall that Mr. Wetmore, as stated in the report -- you cited

24  in your report, he was the chief viticultural executive of the

25  board; right?  You cite him several times in your report,

1   Mr. Wetmore?

2   **A.**   Yes.  I recall that, yes.

3   **Q.**   And so this is a report in 1887 which says, "We move to

4   establish a viticultural station at Mr. Crabb's vineyard for

5   propagation, experimentation of varieties of grapes, and also

6   testing certain resistance stocks"; true?

7   **A.**   Yes.

8   **Q.**   Okay.  And Mr. Crabb was going to be in charge of it;

9   right?

10  **A.**   That's what it says here, yes.

11  **Q.**   Right.  And this is from 1887.  That's before he purchased

12  Baldridge; right?

13  **A.**   Yes.  That's before he purchased Baldridge.

14  **Q.**   So Mr. Crabb and the board set up an experimental

15  viticultural station at the valley vineyard to test resistant

16  root stock.

17       Now, turning to the 16 -- 1680, which is a report you cite

18  in your opening testimony.

19       Now, can we go to 28, please, page 28 of the report.  Page

20  28.

21       Page 35 of the PDF, please.  Okay.

22       You reviewed this report that Mr. Crabb made to the board

23  in his role as a commissioner in June of 1894; correct?

24  **A.**   Yes.

25  **Q.**   All right.  And this is the one we were discussing where

1   it says he was propagating a vine.

2          Now, my question is did you read the pages before this?

3   **A.**   I'm certain that I did.   I don't recall the substance of

4   them.

5   **Q.**   Okay.   Well, let's walk through it.   Can we go to page 29

6   of this PDF which will be page 22 of the report.

7          So first we see here Mr. Wetmore gave a report that he was

8   going to establish a bunch of plots to plant Riparia and

9   hybrids from France, including in Mr. Crabb's vineyard in their

10  experimental station.   Do you recall that?

11  **A.**   Yes.

12  **Q.**   Okay.   Now, if we go to pages 26 and 27 of the report,

13  which is the page just before the one you cite Mr. Crabb's

14  report is on -- highlight the bottom -- and he says he has

15  planted at that experimental plot in Mr. Crabb's vineyard -- he

16  lists like 35 different varieties, that's the brands of the

17  varieties, as well as these hybrids that he received from

18  France; right?   So they were actually planting dozens of vines,

19  Mr. Crabb and the board, in the experimental viticultural

20  station on his valley property; true?

21  **A.**   I'm not sure.   Can we go back to the first page?

22  **Q.**   Sure.

23  **A.**   The way -- the way I read this is that this is a new

24  experimental plot, but there is four new ones, one to be

25  located at Crabb's vineyard.   That's -- that's how I read that.

1   **Q.**   Is that how you're reading it now or when you reviewed it?

2   **A.**   Well, as I testified earlier, I'm fairly certain that I

3   read this, but I don't -- well, let me back up and say -- just

4   to be clear for the record, I would have expected myself to

5   have read this.  I don't recall the substance which is one of

6   the reasons why I wanted to see what was written here.

7        So as I'm seeing this now, as I sit here, the way I'm

8   reading that sentence is that this is a new experimental plot,

9   one located on Crabb's vineyard.

10  **Q.**   Okay.  Is there any doubt that the experimental plantings

11  that Mr. Crabb and the board did was on his valley property in

12  the vineyard -- in the viticultural station that he and the

13  board established?

14  **A.**   There is a bit of doubt for me because it doesn't clearly

15  reference back that station, and it seems like in

16  referencing -- in the discussion about the station, it seemed

17  like it was specific to Crabb, and here there is other plots

18  that are being brought in.  It almost -- brought together, that

19  makes me think that yes, there may have been -- well, yes there

20  was an experimental plot established in 1887.  I don't know if

21  it was still around in 1892.  Maybe there is something in here

22  that addresses that, but certainly here in 1892, there is four

23  separate plots that are being established.  Maybe that was

24  one -- one of Crabb's was at the station that was established

25  in 1887, but it's not clear for me that that's true here.

1   **Q.**   Okay.   But just so we have a point of reference, you rely

2   on a statement that he planted in the head of the canyon of the

3   mountains to mean Baldridge, but this you're not sure whether

4   it's referring to the board's viticultural station in his

5   valley vineyard; true?

6   **A.**   I'm sorry.   Could you -- could you restate the question?

7   **Q.**   Let me go to another paragraph.   Let's go take a look at

8   pages 28 and 29 of -- sorry -- 35 and 36 of Exhibit 28 and 29

9   of the report -- and then also 29.   Call out the bottom of 28

10  and the top of 29.   Thank you.

11      So in the record, the portion that you know you reviewed,

12  in the paragraph right after the one that he talks about

13  planting this Riparia, doesn't he mention that he also planted

14  all the ones for the commissioners, 35 varieties including

15  those hybrids in their experimental plot; right?

16  **A.**   I'm -- I'm sorry.   I was reading.   Could you reask the

17  question?

18  **Q.**   Okay.   Isn't Mr. Crabb reporting that he planted 35

19  varieties of hybrids for the commission, with the commission,

20  in their -- for the commission in their experimental plot, and

21  he is reporting on how well they're doing.   Isn't that what

22  he's saying here?

23  **A.**   That's -- that's one reading.   You know, as I'm reading

24  this, when I think of "their," I -- I think maybe even I was

25  thinking about this when I -- when I drafted my report, that

1    "their" is referencing the hybrids rather than the commission,

2    but it's possible.  It's possible to read it that way.

3    **Q.**   So you considered this when drafting your report, but you

4    didn't mention this; correct?

5    **A.**   I didn't discuss this in my report, no.

6    **Q.**   But we also know that Crabb and the board were -- were

7    working to stop this plague of infestation; right?  It was a

8    huge concern; true?

9    **A.**   Yes.

10   **Q.**   And we know from the previous year's report that we looked

11   at about the 120 acres, right, that he had already planted 70

12   acres of Riparia in his valley property; right?

13   **A.**   Yes.  That's what the report stated.

14   **Q.**   So let me ask you, as someone doing historical research,

15   wouldn't it make sense to -- that Mr. Crabb, if he was going to

16   test a new Riparia vine, did so where he was already testing

17   other vines and where his vineyard, which had Riparia vines,

18   was located?

19   **A.**   That's possible, yes.

20   **Q.**   Okay.  Well, let me ask you, as an expert, doesn't this

21   evidence, all this evidence when taken together, including how

22   you can read the sentence, the fact that there is no mention of

23   any experimental plot or station in Baldridge, the fact that

24   the 1893 report doesn't identify any vines growing in

25   Baldridge, and the fact that we know that Mr. Crabb was working

1   with the board to test vines at that experimental station on

2   his valley vineyard -- doesn't this more reasonably support the

3   conclusion that Crabb would have planted the Riparia on his

4   valley lands and not up in the Baldridge parcel?

5   **A.**   It's -- it's possible.  As -- as I stated, it's possible,

6   confining us solely to these pieces of evidence.

7   **Q.**   Based on the evidence that's been presented here at trial,

8   do you believe it's more reasonable to conclude that Crabb

9   planted in his valley vineyard or he planted it at the

10  Baldridge property?

11  **A.**   What -- what specifically are you talking about in terms

12  of planting?

13  **Q.**   The Riparia vine discovered by Mr. Rampandahl.

14  **A.**   I -- I still believe that it's more -- more likely, given

15  the description, that it was at the Baldridge property.  You

16  know, what's been laid out is a possible -- is a possible

17  reading.

18       I can see a reading where in terms of experimentation and

19  because in the 1890s there was some notion that perhaps the

20  hillsides produced better fruit, more resistant fruit, that you

21  could have it both ways, experiment on the valley floor and

22  experiment at Baldridge.  I see that as a possibility as well.

23  **Q.**   All right.  But we are not talking about possibilities.

24  We are talking about probabilities.  I don't want you to

25  speculate on what he could have done.  I'm asking you does the

1    evidence, in your professional opinion, more reasonably support

2    the view that it's at the Baldridge property or more reasonably

3    support the view that it was probably on the valley property.

4    **A.**    The Riparia?

5    **Q.**    Yes.

6    **A.**    I'm -- I'm still struck by "in the head of a canyon" in as

7    much as there is that same or very similar description of the

8    Baldridge property and the way it's characterized.  I'm still

9    struck by that.

10   **Q.**    Can you answer the question?  I asked you which one was

11   more probable, in your expert opinion.

12   **A.**    I still believe it's more reasonable that it was the

13   Baldridge property for the reasons I laid out.

14   **Q.**    Okay.  And that's objective?

15   **A.**    That's interpretive.

16   **Q.**    Okay.

17   **A.**    As a historian, we strive to make sense of, again, all of

18   the evidence, and to me, the reference to "the canyon," to

19   Rampandahl, absolutely, you can read it one way, but I have to

20   take into consideration other sources as well that, in my mind,

21   point more in the direction of the Baldridge place being a site

22   for these types of cultivations rather than the valley floor.

23   **Q.**    Okay.  And just so I'm -- I'm going to the list of things

24   that you cited in your testimony, sir.  You talked about

25   Lenoir, and we've discussed that.  You have talked about

1    Riparia.  We discussed that.

2         What is the other evidence that suggests that the

3    Baldridge property -- not possible, hypothetical, speculative,

4    it can be planted anywhere -- that the Baldridge property was

5    used?  What is the evidence you are referring to?

6    **A.**   I am referring to that evidence as well as the context in

7    which, the timing in which Baldridge acquired the -- excuse

8    me -- in which Crabb acquired the Baldridge property and the

9    method of planting that identifies hay as being a component of

10   this effort to develop resistant root stock.

11   **Q.**   Okay.  You also testified that -- well, you talked about

12   the fact that Mr. Baldridge grew grapes on his property; right?

13   **A.**   Yes.

14   **Q.**   But the last evidence that he had grapes there I believe

15   you said was 1881; true?

16   **A.**   That's the last -- that's the last source I've seen in the

17   historical record, yes.

18   **Q.**   Right.  So there is no evidence that Baldridge grew grapes

19   or sold -- after 1881?

20   **A.**   That's correct.

21   **Q.**   And you agree there is no evidence there was a vineyard

22   there when Crabb bought it?  It's not mentioned in the transfer

23   deed, there is no articles, there is no direct evidence that

24   says there was a vineyard there?

25   **A.**   I'm sorry.  Could you repeat the question?

1   **Q.**   Do you agree there is no evidence saying there was a

2   vineyard on the Baldridge tract when Crabb bought it in 1889?

3   **A.**   That's correct.  I have not seen direct evidence.

4   **Q.**   And as you point out in your report, by 1889, more than, I

5   think you said, 10,000 acres of vineyard in Napa County had

6   been wiped out by the phylloxera pest; right?

7   **A.**   Yes.

8   **Q.**   And Baldridge was selling his land, and we don't know why;

9   true?

10  **A.**   He was selling his land, yes.

11  **Q.**   Right.  And we don't -- and you don't opine -- we don't

12  know why he sold it?

13  **A.**   I don't know definitively why he sold it, no.

14  **Q.**   Okay.  All right.

15       Now, several times -- can we get 215 up, please.  I think

16  it's probably on the next page in the article Dr. Miltenberger

17  discussed.  Right.  Yes.

18       Now, several times you've talked about crop rotation.  Do

19  you recall that?

20  **A.**   Yes.

21  **Q.**   Okay.  But there's no mention of Crabb purposely taking

22  out a vine, planting something in the vine again.  It's not

23  really crop rotation; right?  This is a method for planting;

24  right?

25  **A.**   I'm sorry.  You cut out.

1  Q.   I'm sorry.

2       What Mr. Crabb discusses in this article is a method for

3  planting vines; right?

4  A.   Yes.  Method of planting.

5  Q.   Right.  And his method is if you have dead vine, grow hay

6  and grain for two years, and then plant your new vine?

7  A.   Yes.

8  Q.   Okay.  He doesn't say like, just so we're clear, crop

9  rotation is plant corn one year, plant potatoes the next year,

10 and you change it.  He is just saying if you've got to plant

11 new vines where the dead ones are, basically essentially let it

12 lay fallow for two years or grow something else before you

13 plant the new one?

14 A.   I'm sorry.  I missed the question.

15 Q.   Okay.  Mr. Crabb isn't saying plant vines for a certain

16 number of years and then plant hay or grain and then plant

17 vines again.

18 A.   I think -- I think he is for the purposes of achieving a

19 more resistant root stock.  Crop rotation I'm using more

20 generally because it seems to me he is still cultivating grain

21 and hay, other crops, that I would presume as any good

22 agriculturalist he would utilize even if it was only to sell

23 it.  I guess that's what I mean when I'm talking about crop

24 rotation.

25 Q.   Can you show me where in the first part of your answer --

1   where you say Mr. Crabb is suggesting that you rotate as

2   opposed to just, if you have dead vines, plant something else

3   for two years and then plant your vines?

4   **A.**   Well, I take it from my reading of the -- of the --

5   reading of the whole paragraph, because as we get to the end,

6   he talks about how you get to a certain kind of vine and then

7   "the canes, hence, are strong, the leaves are strong, and the

8   roots are correspondingly large and strong," so my

9   interpretation of the statement was you have dead vines, you

10  engage in this practice where you pull them up, you plant the

11  grain, you plant the hay, and then you go through this more

12  elaborate structure of trying to prepare the land.

13          **THE COURT:**  Wait a minute.  It's your testimony that

14  they are supposed to do this, let's call it three-year

15  rotation, every three years?  Is that your testimony?

16          **THE WITNESS:**  No, Your Honor.  My testimony is that

17  Crabb is laying out a practice that he thinks might result in a

18  more resistant root stock.

19          **THE COURT:**  Correct.  So as I read it, the words there

20  are "I pulled up the dead vines, and then you plant grain for

21  one year, and then you plant hay the next year.  You plow it as

22  deep as you can."  That's what it says.  And then you replant

23  your vines.  Are you saying that you are supposed to take those

24  vines out after you've done that preparation of the land?

25          **THE WITNESS:**  No.  I'm not, Your Honor.  I'm not,

1    Your Honor.

2         What I'm getting at is again he's laying out a practice

3    where he can cultivate grapes or achieve root stock that is

4    more resistant to pests, and I'm not suggesting he is saying

5    you do this every year, but I think he is sort of laying this

6    out as a method to accomplish that outcome.  And so taken into

7    conjunction with the references to hay on the Lewelling Tract

8    and Baldridge Tract I see this as part of an ongoing effort to

9    try to combat phylloxera, to try to combat the pests.

10   **BY MR. MERONE:**

11   **Q.**   Now, what I wanted to ask you about, Dr. Miltenberger, is

12   that you mentioned that when Crabb died in early 1899, they

13   noted his field in Baldridge was in hay; right?

14   **A.**   Yes.

15   **Q.**   It was all in hay?  And you agree, would you not, that

16   would be consistent with the conclusion he's using it for his

17   horse farm; true?

18   **A.**   No.

19   **Q.**   No?  Growing hay is not consistent with horses?

20   **A.**   No.  You had said earlier that all of Baldridge Tract was

21   in hay.  All of Baldridge Tract wasn't in hay.

22   **Q.**   I'm sorry.  I believe the number was 70 acres.  All of the

23   arable land there was essentially in hay; correct?

24   **A.**   Yes.  70 acres was in hay.

25   **Q.**   And that was all -- and I believe you said only 60 to 70

1    acres was even arable in your report; right?

2    **A.**    Right.  Based upon a comparison of soils, soil maps.

3    **Q.**    So all the arable land was in hay?

4    **A.**    Yes.

5    **Q.**    Okay.  And my question was isn't that consistent with an

6    interpretation that Mr. Crabb was using it, using the Baldridge

7    property, to support his horse farm?  He was growing hay there?

8    **A.**    He was growing hay there in 1899, and I would imagine he

9    utilized the hay to support his stock.

10   **Q.**    Okay.  Where I'm going with this, though, is you talked

11   about the rotation.  If he had hay there and he was -- if

12   you -- you sort of suggested in your opening testimony that

13   because he had hay there, that that suggested that he was using

14   it for grapes.  That was part of your testimony when you were

15   talking about the appraisal, and you talked about this method

16   of planting.

17       But it's not the planting.  The hay comes before the

18   vines; right?

19   **A.**    Well, but the sequence, as I understood it, is vines,

20   grain, hay, vines.

21   **Q.**    Well, that's what I was asking you about, that is, that

22   would be true crop rotation, but that's not it.  It's if you

23   have a dead vineyard, you plant this stuff, and then you plant

24   vines.  You don't rip out perfectly good vines to plant new

25   ones; right?

**A.**   No.   And I wouldn't have expected Crabb to do that if
there was an existing vineyard in Baldridge, which the evidence
suggests that at least in the 1880s there was.

**Q.**   Okay.   1881.

And so what I'm saying is the fact that he had hay there
doesn't mean -- hay comes before -- even if -- even if he was
doing -- hay doesn't indicate there was a vineyard there;
right?

**A.**   No.

**Q.**   Okay.   And, in fact, we know that in 1893, based upon that
report we looked at, there was no indication of a vineyard
there; right?

**A.**   That 1893 report does not identify a vineyard clearly at
the Baldridge property.

**Q.**   Right.   So, I mean, are you suggesting that Mr. Crabb,
between 1893 and 1898, because he died in early 1899, somehow
planted vines and then planted grain and then planted hay to
show up on the appraisal all during that little time period?

**A.**   No.   I'm not saying that.   What --

**Q.**   Okay.   Then -- sorry.   Go ahead.

**A.**   What I'm saying is that these pieces of evidence to me
point to the likelihood of grapes being cultivated on the
Baldridge property.   An essential part in understanding that or
essential piece of why I believe that to be true is statements
about the size of Crabb's vineyard.   There's a newspaper

1  article that George Husmann -- it's attributed to George

2  Husmann where he report that Crabb at one time had 450 acres in

3  his vineyard.  So one of the things that I also run up against

4  in this analysis is the statements about the size of the

5  vineyard, some cases from Baldridge himself, which would have

6  to include some acreage on Baldridge in order to really be

7  complete.

8  **Q.**   Okay.  Well, since you mentioned that, you didn't mention

9  it in your direct, but you're mentioning the Husmann article.

10  Let's talk about that.

11       Can we have 1712, page 367, please.  Okay.

12       This is the article to which you are referring in your

13  testimony right there?

14  **A.**   This is the one that I was recalling, yes.

15  **Q.**   Right.  Where it says that Mr. Crabb had 450 -- at one

16  point had lost the greater part of his vineyard of 450 acres;

17  true?

18  **A.**   Yes.

19  **Q.**   Right.  And your conclusion is and you relied on this, I

20  guess is what I'm hearing -- is that well, Crabb must have been

21  using Baldridge; right?

22  **A.**   Well, he owned no other land that would get close to this

23  figure and assessing the fact that all Baldridge wasn't -- was

24  likely not planted to grapes.

25  **Q.**   Okay.  Now -- but we understand that the valley property

1  was 359, 360 acres; right?

2  **A.**  Yes.

3  **Q.**  But that included an orchard, hay field, the winery;

4  right?

5  **A.**  The creek, the road, pasture, depending upon -- depending

6  upon the era that we're looking at.

7  **Q.**  Well, we're looking at the era here when this article was

8  published in 1896, I believe; right?

9  **A.**  I -- I don't see that from the citation, but that's what I

10  recall from memory.

11  **Q.**  Okay.  And you believe it's referring to him having

12  property on Baldridge, so it had to be referring to then the

13  early -- 1890s?

14  **A.**  Yes.

15  **Q.**  Okay.  So -- and during that time, would you agree -- and

16  based upon other references that I believe you've looked at

17  that Crabb had about -- could have about 390 -- I'm sorry --

18  290, 300 acres planted at any one time in his valley land?

19  **A.**  That is possible.  I didn't -- I didn't try to assess

20  exactly how much, and there may be statements to that effect,

21  but, again, some of them very specific to the time of year,

22  doubts, phylloxera.

23  **Q.**  Can we have 1714, page 272, please.  Okay.

24     Let me show you a page that I believe you've relied on

25  where it lists from 1881 -- I'm sorry -- yeah 1881 -- the

1    history of Lake and Napa counties.  Do you recall that

2    reference?

3    **A.**    I do.

4    **Q.**    Okay.  This is a page from that book that you reviewed,

5    and do you see where it says Crabb had 200.  This is an 1881,

6    so before Baldridge; right?

7    **A.**    Yes.

8    **Q.**    Okay.  And it said Crabb had 290 acres in vines; right?

9    **A.**    Yes.

10   **Q.**    And, by the way, there is your 10,000 vines per acre

11   number.  Do you recall that?

12         Okay.  We will move on.

13   **A.**    That's what is listed here.

14   **Q.**    We'll move on.

15         And we know from the appraisal, at his death, he had

16   around 270 -- 270 acres of vines as well when we add those all

17   up, right, roughly?

18   **A.**    Well, I would -- I would need to see the inventory and

19   appraisement because my recollection is that the appraisers

20   divide vineyard and then further divide it between what's

21   bearing and what's not bearing, and I think even in the

22   Lewelling Tract property, they kind of lump vineyard and

23   orchard together.

24   **Q.**    Yes, they do.  That's why I was saying it was about 270,

25   275.  I'm just trying to establish he never had more than about

1    300 acres of vines planted in the valley, did he?  Did you see

2    any reference that he did?

3    **A.**   I seem to recall references that he makes to having a

4    vineyard of about 500 acres or about 500 acres.

5    **Q.**   I'm talking about on his 360 acres, based upon the

6    references you reviewed, Crabb never grew more than 290 or 300

7    acres on that 360?

8    **A.**   That's -- that's possible, but I think it would again vary

9    by source and by year.  I -- that's possible.  I -- I think

10   there may be sources that may put it slightly higher.

11   **Q.**   Have you identified any?

12   **A.**   There are many exhibits and many references.  If you would

13   like, we can go through some of the exhibits, and there may be

14   ones that would shed more light precisely on that.

15   **Q.**   No.  I think we're okay with this.

16        Let's move on.  You agree -- in your report you said

17   Baldridge only had 60 acres in total that could be cultivated;

18   right?

19   **A.**   Again, that was my assessment based upon descriptions of

20   soil surveys and just doing some very basic GIS work to assess

21   those areas, approximately how large they were.

22   **Q.**   Okay.  So simple math, 450 acres could not be his valley

23   property of about 300 acres plus Baldridge, which could at max

24   have about 60 acres.  It doesn't add up; right?

25   **A.**   I'm sorry.  You cut out on me.  What was that again?

**Q.**   I said the Husmann article, which mentioned 450 acres,
correct, of vine, a vineyard of 450 acres?

**A.**   Yes.

**Q.**   If the valley parcel can only have about 350 acres and
Baldridge can only have about 60 acres, it doesn't add up, does
it?

**A.**   Those -- those figures don't exactly add up to 450, no.

**Q.**   Well, far from not even not exactly.  They are off by a
huge amount, aren't they?

**A.**   They are off -- they are off -- yes, they are off.

**Q.**   And that would be presuming every space in Baldridge was
planted; right?

**A.**   Presumably, yes.

**Q.**   Right.  And -- but we know from the 1893 article -- report
there was no mention of a vineyard being there at all; correct?

**A.**   There -- there -- the 1890 -- sorry.  1893 article or --

**Q.**   Report.

**A.**   Report.  The 1893 report does not indicate that there
were --

**Q.**   So --

**A.**   120 acres.

**Q.**   So --

**A.**   I'm not exactly sure what it was.  I think I was saying
that the report only identifies 120 acres.

**Q.**   So then referring to the Husmann article, sir, wouldn't it

1   be more reasonable -- is it more reasonable or not to think

2   that the 450 acres suggests he planted vineyard on Baldridge?

3   **A.**   I don't -- I don't understand the question.

4   **Q.**   Let me rephrase it.  You are right.  It was a poorly

5   phrased question.  I apologize.

6        In light of the fact that the valley plus Baldridge could

7   not equal 450 acres, do you still believe that the Husmann

8   article supports the conclusion that Crabb was growing grapes

9   on Baldridge?

10  **A.**   There is a piece of context here that I think is important

11  to understand.  George Husmann, the -- the person whom that's

12  attributed to, was a pioneering enologist, one of the first

13  academically-trained enologists.  I think his assessment needs

14  to be weighed in that context, someone who understood what a

15  vineyard was and what it might be.

16       On top of that, Husmann was one of the proponents of

17  hillside grape agriculture, so that, to me, kind of weighs on

18  understanding what he is getting at when he says 450.

19  **Q.**   I'm not following you, Dr. Miltenberger.  Mr. Husmann said

20  Crabb -- and Mr. Husmann understands what a vineyard is.  As

21  you say, he was a very knowledgeable man.  He says in the

22  article, 1712, that Mr. Crabb had lost the greater part of his

23  magnificent vineyard of 450 acres and that he was replanting it

24  and that he replanted 300 already.  And my -- and you said, you

25  testified that that article supported your conclusion that

1  Mr. Crabb was using the Baldridge property because it said 450

2  acres.

3      And my question to you is given that he could -- Mr. Crabb

4  could only have about 300 acres on his valley property and

5  Baldridge only had about 60 arable acres at all, isn't that,

6  your reliance on this as supported in that conclusion,

7  misplaced?

8  **A.**   I would say that the -- I agree, that the math does not

9  add up.

10  **Q.**   Okay.

11      Could I have 243, please.  Transition to the Churchill era

12  briefly.

13      You looked at a map.  There we go.  Do you remember

14  testifying about this map in your direct?

15  **A.**   Yes.

16  **Q.**   Right.  And as you noted, it says -- now, the names there,

17  just so we're clear, they would be the entity, the legal entity

18  or person that owns the property; correct?

19  **A.**   Often but not always.

20  **Q.**   Okay.  What is your understanding of this map in terms of

21  what those names indicate?

22  **A.**   Well, I -- I only offer that for context because sometimes

23  these maps will list someone as an owner when in fact they're

24  not an owner, but in general, it is indicating, I believe,

25  ownership, particularly of the To Kalon Vineyard Company

1    property.

2    **Q.**    Okay.  And so the legal owner is the corporate entity

3    known as To Kalon Vineyard Company; correct?

4    **A.**    Yes.

5    **Q.**    Okay.  It doesn't mean that there was a vineyard there;

6    correct?

7    **A.**    This -- this map doesn't identify vineyards for any of the

8    parcels.

9    **Q.**    Right.

10        Now, focusing on the Churchill era, we know from the 1899

11   appraisal that there was only hay on Baldridge; right?

12   **A.**    Well, that's the only thing that was growing on Baldridge

13   in 1899.

14   **Q.**    Right.  There was no vineyard there; correct?

15   **A.**    No vineyard is identified in the 1899.

16   **Q.**    Okay.

17   **A.**    By Baldridge.

18   **Q.**    Now, do you have any evidence that the Churchills had a

19   vineyard on the Baldridge property where it says they're using

20   that property as a vineyard?

21   **A.**    There -- there is two pieces of evidence that come to

22   mind.  One is I believe a newspaper article with -- that is an

23   interview with Hans Hansen who was Crabb's superintendent, and

24   it carried over to the -- to the Churchills, who I believe he

25   states something like 300 acres were in bearing or something to

1   that effect, which could theoretically be inclusive of

2   Baldridge.

3        I also -- I also note the 1934 -- the 1934 decree quieting

4   title which, by legal description, includes the Baldridge

5   property as To Kalon Vineyard.

6   **Q.**   Okay.  So -- well, we established you could have roughly

7   300 acres on the valley property; right?

8   **A.**   Certainly as of 1881, yes.

9   **Q.**   Okay.  All right.  Now -- and we know there was no

10  vineyard on Baldridge in 1899; right?

11  **A.**   One is not noted in the inventory and appraisement.

12  **Q.**   And we also know your client has aerial photos of the land

13  from the early 1940s, and there is no vineyard there either;

14  right?

15  **A.**   I -- I recall seeing some aerial photos.  I don't know if

16  I recall the ones you reference.

17  **Q.**   Okay.

18       TX 1313, please.  Zoom to -- oh, we need the bottom.

19  Sorry.

20       First we will note the bottom which says the year, bottom

21  right corner.  That's fine.  I see it says it's 1940 to '42 on

22  the bottom right, sir?

23  **A.**   Yes.

24  **Q.**   And do you agree this is that -- that valley land that

25  plaintiff uses today; right?

1   **A.**   Yes.

2   **Q.**   And the Baldridge Track is only basically the left corner

3   of this.  If we look at the maps you had earlier, you showed

4   how The Vineyard House land goes outside of Baldridge; right?

5   **A.**   Yes.

6   **Q.**   Do you remember that?  Okay.

7        So we're just kind of looking for the upper left here, but

8   the point is there is no vineyard there; right?

9   **A.**   Well, actually this -- this -- I'm not an expert in

10  interpreting aerial photographs, so I -- I'm not a hundred

11  percent certain what's being depicted here except for the area.

12  **Q.**   Okay.  That's fair enough.

13       But you have no direct evidence that there was a vineyard

14  on the Baldridge property during Churchill's time there?

15  **A.**   Well, again, 1934 decree where the Napa County Superior

16  Court is saying this is To Kalon Vineyard which consists of

17  these two properties I think is pretty compelling, and that was

18  the same property that was subject to the sale agreement, and

19  Kellstrom and Kauth reportedly produced wine, so those things

20  taken together lead me to that conclusion.

21  **Q.**   And if someone were to look at this photograph which

22  doesn't show -- and they conclude this doesn't show any

23  vineyard there, six, seven -- seven, eight years after that

24  decree, wouldn't that be evidence that maybe that decree wasn't

25  trying to tell us where they were growing grapes?  It was just

1    referring to property generally?

2    **A.**   Possibly, but as we also know, wine operations ceased at

3    To Kalon after the winery burned down in '39.

4    **Q.**   I understand that, but where did the vines go?

5    **A.**   Well, what I mean is there is a context here.  I'm not an

6    expert to interpret this, but to me it's important to sort of

7    place these things into a context.  Thirty-four is a decree

8    saying this is To Kalon Vineyard from the Napa Valley Superior

9    Court.  This is the same property that was subject to the sale.

10   Mary Alice was looking to get out of selling wine.  This was

11   the property that she was selling to these guys to produce

12   wine.

13       The fact that years later after the winery operations

14   ceased, that there is no vines there, to me does not do

15   violence to the fact that during the Churchill era, there was

16   indications that grapes were being used or being grown, excuse

17   me, on the property.

18           **THE COURT:**  Mr. Merone, we will take a break in two

19   minutes, unless you are almost done.

20           **MR. MERONE:**  This would be fine to take a break here.

21   I was going to transition to another topic, Your Honor.

22           **THE COURT:**  Okay.  It's 11:55.  We will stand in

23   recess for 15 minutes until 12:10.  Thank you.

24                  (Recess taken at 11:55 a.m.)

25                  (Proceedings resumed at 12:11 p.m.)

1          **THE COURT:**  We're back on the record.  The record will

2    reflect that the parties are present.

3          Mr. Merone, you may proceed.

4          **MR. MERONE:**  Thank you.

5    **Q.**   Dr. Miltenberger, I want to change gears and discuss your

6    testimony about To Kalon supposedly being a geographic place.

7          Now, first -- is he here?  Oh.  Okay.  I'm sorry.  I

8    didn't see him on the screen.  My apologies.

9          First, you're not a marketing expert; true?

10   **A.**   That's right.

11   **Q.**   Okay.  And you're not a brand historian; true?

12   **A.**   No.

13   **Q.**   And your specialty, I believe, is in water rights; right?

14   **A.**   Well, that's where a lot of projects have been.

15   **Q.**   Okay.

16   **A.**   I consider myself an environmental historian.

17   **Q.**   Okay.  And so in your report and in your testimony, you've

18   given -- you gave some examples of what you said was use of

19   To Kalon as a geographic place.  I'd like to look at some of

20   those.  Okay?

21         Let's have the first one, please.  This is page 50 of

22   your -- well TX 7, page 50, Figure 1 of your report.  Zoom,

23   please.

24         Now, I believe you said in your report that this

25   advertisement is an example and you believe the first example

1   of referring to To Kalon Vineyard as a place; right?

2   **A.**   Yes.

3   **Q.**   Okay.  So this is an advertisement; right?

4   **A.**   Yes.

5   **Q.**   Advertisement -- I don't know what paper -- 1885 it says

6   at the bottom there; right?  "To Kalon Vineyard" appears at the

7   top in big letters?  And Mr. Crabb is advertising vine cuttings

8   for sale; true?

9   **A.**   Yes.

10  **Q.**   Okay.  And isn't he using To Kalon Vineyard in this ad as

11  the name for his business?

12  **A.**   No.  I don't believe so.

13  **Q.**   So you believe this is an example and the type that you

14  relied on when forming your opinion of use as -- not as a --

15  the brand of his business; right?

16  **A.**   Yes.

17  **Q.**   All right.  You also noted in your testimony -- out of

18  curiosity, Dr. Miltenberger, focusing on this advertisement, if

19  Mr. Crabb wanted to use To Kalon Vineyard as his business name

20  in this ad, how would he do it in a way that you would agree is

21  not used as a place?

22  **A.**   The -- I've seen -- in the 19th century, I've seen a

23  variety of ways in which things were advertised, and I can't

24  say that my -- the history of advertising is pretty rich, but I

25  can't say it's this sort of specialty of mine.  Putting it at

1    the top makes sense, but I've seen it in different places.

2    **Q.**   Okay.  You also note in your report -- you cited an

3    article that talked about the fact that Mr. Crabb had a sign

4    over the gateway to his vineyard with the name To Kalon

5    emblazoned in gold.  Do you recall that in your report?

6    **A.**   I do.  I think it's -- I think maybe it was described as

7    the entrance to his place.

8         Actually, Your Honor, may I consult my expert report?

9    **Q.**   To help you, it's paragraph 10.  Can we put it on the

10   screen?

11           **THE COURT:**  And you may.

12   **BY MR. MERONE:**

13   **Q.**   We'll just blow that up, paragraph 10.  Do you see that,

14   sir?

15   **A.**   I do.  I think there is another place where I use it as

16   well.

17   **Q.**   Okay.  You also believe that that use of To Kalon property

18   and the sign is also an example of using it for a specific

19   geographic place; correct?

20   **A.**   Yes.  I would like to find the specific reference, if I

21   may.

22   **Q.**   Well, we are looking at paragraph 10, is where you say

23   his -- it was a specific geographic place called To Kalon, and

24   you talk about the sign.

25   **A.**   Yes.  And I also discuss it elsewhere in my report, and

1   this is based on that, so I'd like to see that.

2        Yes.  On page 31, line 4 and 5, it's a profile of Crabb

3   from the *Breeder and Sportsman* from 1892.  The name To Kalon,

4   quote, "was emblazoned in gold over the arched gateway of this

5   famous place near the village of Oakville, the entrance to

6   Crabb's holdings, which included a stock farm, vineyard, and

7   orchard."

8   **Q.**   Right.  And you're testifying is that use of a sign over

9   the entrance is a use as a geographic place and not for the

10  name of a brand his business operations; right?

11  **A.**   That's right.

12  **Q.**   Okay.

13       Can I get Figure 6, Miltenberger exhibit Figure 6, which

14  is TX 7, page 55.  Okay.

15       You -- in your report, you also included a photograph of

16  the To Kalon Depot which you believe was in New Orleans.  It

17  looks like it.

18       Did you consider this use of To Kalon as a geographic

19  place?

20  **A.**   The pictures of the To Kalon Wine Depot -- I considered

21  it, To Kalon Wine Depot, to be the name of this particular

22  place -- of this particular business.  Excuse me.

23  **Q.**   It says "To Kalon Depot" there.

24  **A.**   To Kalon Wine Depot.  If you -- the picture is --

25  admittedly of somewhat poor quality, but the actual -- if you

1   blow it up sufficiently, it says "To Kalon Wine Depot."

2   **Q.**   Okay.  So this isn't used as a place.  This is being used

3   to identify the business?

4   **A.**   That's how I interpret it, yes.

5   **Q.**   Okay.  Figure 8, please.  This is letterhead you refer to.

6   How about this?  Is Mr. Crabb referring to To Kalon Vineyard as

7   a place?  This is evidence of being a place?

8   **A.**   Well, I think the reference to To Kalon Vineyard is.

9   **Q.**   Okay.  So all I'm saying is as you testified today that

10  you considered To Kalon to be a place, historically understood

11  or used as a place, this is an example that you relied on as

12  supposedly evidencing use as a place; true?

13  **A.**   I believe so.  I'm trying to remember.

14      Your Honor, may I consult my report?  I'm trying to

15  remember the context in which I used this.

16  **Q.**   Well, let me just ask you here without the context, you've

17  testified that you believe To Kalon Vineyard was a place.  Is

18  this an example of something that you feel supports that view,

19  or does this show use as a brand?

20  **A.**   I -- I believe it's denoting a place, but it could be --

21  it could be indicative of a brand of a kind.  I'm not -- I'm

22  not a brand expert, I'm not a marketing expert, so what "brand"

23  may mean or constitute is beyond my expertise.

24  **Q.**   Okay.  You are right.  I will limit it to is it indicating

25  a place to you?

**A.**   It is to me.

**Q.**   It is to you.  And that's what you mean when you say
"place."  This is an example of it; right?

**A.**   Yes.

**Q.**   Okay.

Can we see 1703, please, page 48.

I'm going to show you another letterhead from during the
Stelling time.

Let me ask you, To Kalon Vineyard, identifying a business
here -- I'm sorry -- identifying a place?  Because you
mentioned Mr. Stelling in your direct; right?

**A.**   Yes.

**Q.**   Okay.  So is this identifying a place?

**A.**   I recall seeing this from -- I recall seeing this at one
point in time.  What is the era?  What is the date?

**Q.**   This is Mr. Stelling.

**A.**   I mean, the -- this particular -- I mean, I -- I think it
is calling out to a specific place.  It could also be calling
out to a business.  I mean, even as I testified, Crabb used
To Kalon to refer to -- he used To Kalon in a number of
contexts.

**Q.**   Right.  But I'm just trying to get at when you say it's a
place, you feel this is an example of referring to a place?

**A.**   I think it's capturing that, yes.

**Q.**   Now, I believe Mr. Stelling owned, I believe, 2,000 acres

1    of land, of vineyard land, when he consolidated.  He bought the

2    various properties and then bought -- I believe you talked

3    about the -- he bought Doak -- in your report, you talk about

4    how he acquired a lot of acreage.  Do you recall that?

5    **A.**   I recall that he acquired a lot of acreage.  I don't know

6    the exact amount as I sit here.  I'm not certain if my report

7    refers to it either.  I certainly know that Stelling acquired

8    more land than is in Historic To Kalon.

9    **Q.**   Right.  Well, if I could direct you -- I mean, you, at

10   page 45 of your report, just mentioned -- I won't dwell on

11   it -- talk about him purchasing the McGill 1700-acre estate.

12   Okay.  Just to refresh your recollection there.

13   **A.**   Oh, yes.  Yes.  And this was an exhibit we talked about

14   earlier in my direct.

15   **Q.**   Right.  And go back to the -- go back, please, on the

16   letterhead.

17       And you also mentioned he also had some of the original

18   Crabb land, not all of it but some of it; right, I believe?

19   **A.**   Yes.  He certainly had whatever Mary Alice Churchill

20   conveyed to him in 1940.

21   **Q.**   So the place -- if this is referring to a place, it means

22   a different place because now he has 2,000 acres; right?

23           **MR. JUDD:**  Objection.  Lacks foundation.

24           **THE COURT:**  Sustained.

25           **MR. MERONE:**  Okay.

1    **Q.**   Does this refer -- as you said, this refers to a place.

2    Does this refer to all of Mr. Stelling's land or just part of

3    his land?

4              **MR. JUDD:**  Objection.  Lacks foundation.

5              **THE COURT:**  If you can establish foundation.

6    Sustained at this point.

7    **BY MR. MERONE:**

8    **Q.**   Dr. Miltenberger, you testified that Mr. Stelling

9    purchased the Crabb land, which is however -- how many acres of

10   Crabb land from the Churchills did he acquire?

11   **A.**   I would need to consult my report and maybe the underlying

12   conveyances to assess the exact acreage that Stelling acquired

13   of Historic To Kalon.

14   **Q.**   Can you ballpark it?  I don't need the exact number.

15   Clearly it was less than 528 or it can't be any more than 528?

16   **A.**   No.  It couldn't be more than 528, but, again, I don't

17   know exactly, and I don't want to be misleading the Court.

18   **Q.**   That's fine.

19        And he also acquired the McGill estate, which was another

20   1,700 acres; right?  You discussed that in your report?

21   **A.**   Yes.

22   **Q.**   So Mr. Stelling had more than 1,700 acres, however we do

23   the math; correct?

24   **A.**   Yes.

25   **Q.**   Okay.  And what I'm asking you is if this was being used

1  by Mr. Stelling, is it referring to only one part of his land

2  or is it referring to what he calls To Kalon Vineyard?

3       **MR. JUDD:** Objection.  Lacks foundation.

4       **THE COURT:** Overruled.

5       **THE WITNESS:** I don't think I can determine just from

6  a letterhead what that means.  I mean, there's -- going to the

7  right it says vineyards at Rutherford and Oakville.  Well, are

8  those all the To Kalon Vineyards he's asserting?  There is also

9  a reference to the San Francisco office.  It's -- I wouldn't

10 say that a letterhead is the best evidence for ascertaining

11 what To Kalon is as a geographic place.

12 **BY MR. MERONE:**

13 **Q.** Okay.  Let's look at Miltenberger Figure 15, please.

14     How about this wine label that you say was used by the

15 Churchills in the '30s.  Is To Kalon a place?

16 **A.** I think in this particular context, as I'm reading the

17 label, they are calling the wine To Kalon.  I mean, that's what

18 the -- I think what the label is.  But, again, you know it's

19 being produced by the To Kalon Vineyard Company at the Bonded

20 Winery No. 44.  That's located at Historic To Kalon.

21 **Q.** Okay.  Now, is Disneyland a place?

22 **A.** Yes.

23 **Q.** Okay.  And in your experience, does Disneyland appear on

24 advertisements?

25 **A.** I have never been to Disneyland.  I mean, I have certainly

1   seen advertisements for it on television, which is the happiest

2   place on earth, I guess.

3   **Q.**   Are you aware there is a big sign outside of Disneyland

4   that says "Disneyland"?  Have you ever heard of the famous

5   Disneyland sign?

6   **A.**   No, I haven't.

7   **Q.**   Have you ever been to an amusement park that has a sign

8   that identifies the place?

9   **A.**   I can't -- I can't recall.  Maybe.

10  **Q.**   You can't recall.  Okay.

11       Let's assume that Disneyland -- Disney and others -- put

12  Disneyland aside.  Are you aware that Disney uses Disneyland

13  for other things such as the Disneyland Hotel?  Have you heard

14  about that?

15  **A.**   I think I may have heard about that, yes.  I know people

16  who have gone to Disneyland.

17  **Q.**   As someone who is familiar with mapping, would you think

18  that Disneyland shows up on Google Maps as a place?

19  **A.**   I -- I don't know.  I have never Googled it.  I have never

20  used Google Earth to identify Disneyland.

21  **Q.**   Have you ever located any amusement park on a map, on

22  Google Maps?

23  **A.**   I don't think so.  I haven't gone to amusement parks.

24  **Q.**   Okay.  How about a golf course?  Do they show up on maps?

25  **A.**   I'm sorry?

1    **Q.**   Do they show up on maps?

2    **A.**   When I said "I'm sorry," you cut out on me.

3    **Q.**   Okay.  I'm sorry.

4         Well, have you ever seen a tourist map listing points of

5    attraction of a city?

6    **A.**   I think I probably have, yes.

7    **Q.**   Do they list the businesses and show where they are on the

8    maps?

9    **A.**   The ones that I'm mostly familiar with, as I sit here

10   today, are maps of when my -- my father was stationed in Europe

11   in the 1980s, and we would take day trips in Germany, and we

12   would go to -- that's what I kind of recall, so going to -- oh,

13   the name escapes me, but castles and those types of things.

14   **Q.**   Okay.  So you haven't seen maps of localities like area

15   attractions identified on the map?

16   **A.**   Not that I immediately recall.  Not that I recall, at

17   least not in my research, again, as I recall.

18   **Q.**   But would you agree that even if Disneyland shows up in

19   advertisements, is on a big sign outside the park, is used on

20   other properties, shows up on tourist maps, shows up on area

21   attraction maps, maybe even Google Maps, you agree Disneyland

22   is the name of a business; right?

23   **A.**   Well, I understand the name of the business to be Walt

24   Disney Company.

25   **Q.**   Yes, but Disneyland itself is the name of a business?

**A.**   I -- I -- to be honest, I -- to be frank, I assumed Walt Disney Company is the company and Disneyland is the place it operates.   I didn't understand it or know it to be a separate business.   I'm not -- I'm not a business expert.

      **MR. MERONE:**   Your Honor, impeachment deposition.

      **THE COURT:**   I'm going to trust you on this because I don't have his transcript in front of me, so go ahead.

      **MR. MERONE:**   Old-fashioned.

**Q.**   Dr. Miltenberger, didn't you testify at your deposition in response to -- the question was -- is, "Is Disneyland also the name of a business," you said, "Of that, I" -- sorry.   I got the wrong cite.   My bad.

      **THE COURT:**   Mr. Merone, if you would identify --

      **MR. MERONE:**   I will withdraw it.   I literally got the wrong page in front of me, and I don't want to lose it.   So -- okay.

    I think, Your Honor, that is all with the exception of we do want to move for a couple of exhibits into evidence.

      **THE COURT:**   Let's see -- hold on.   Hold on to that, and let's do redirect.   We are going to go through all exhibits, and we will do it before Dr. Miltenberger leaves.

    Redirect.

**REDIRECT EXAMINATION**

BY MR. JUDD:

**Q.**   Dr. Miltenberger, in your research, you determined that

1   vineyards have a duration that lasts over a number of years,

2   didn't you?

3   **A.**   Yes.  I've seen that.

4   **Q.**   And is it your understanding that in 1889 when Crabb

5   purchased the Baldridge Farm property, that the vineyards that

6   William Baldridge had operated in fact still existed on the

7   land?

8   **A.**   I have -- I don't have any reason to think that they

9   weren't.

10  **Q.**   There is no direct evidence one way or the other; correct?

11  **A.**   There is no direct evidence.

12  **Q.**   Is there an inference whether you determined that -- the

13  fact that there were vineyards recorded on the property prior

14  to Crabb's acquisition, you infer that those vineyards were

15  likely to be there when he acquired the property in 1889?

16        **MR. MERONE:**  I'm going to object to leading.  This is

17  their witness.

18        **THE COURT:**  Sustained.

19  **BY MR. JUDD:**

20  **Q.**   Dr. Miltenberger, there is no direct evidence one way or

21  the other whether Crabb cultivated grapes on the Baldridge

22  property?

23  **A.**   That's correct.

24  **Q.**   What type of evidence to support your conclusion that

25  grapes were cultivated by Crabb on Baldridge did you use if

1    there is no direct evidence?

2    **A.**   I -- I used a couple of different pieces of evidence.   One

3    is the portrait I think of the man that emerges from the

4    historical record, that is to say Crabb.   As a -- as is

5    portrayed in numerous accounts, he was an experimenter, he was

6    practical.   These things to me suggests someone who would not

7    abandon an existing vineyard that would -- that one would

8    expect on the property or at least we know direct evidence of

9    was there in 1881.

10        There is a bigger question here, too, that drove some of

11   my analysis which is that why did Crabb acquire Baldridge in

12   the first place, and it seemed like there were a number of

13   things that drove in that direction, not the least of which was

14   the fact that other competitors of his were engaged in hillside

15   cultivation in the 1880s and 1890s and garnered awards for it.

16   As somebody who was competitive and an innovator, experimenter,

17   the Baldridge property had that quality to it.

18        Additionally, this is the era in which there are some --

19   some -- he was facing challenges and pressures of his existing

20   vineyard.   I think that represented an opportunity -- the

21   acquisition of those lands could represent an opportunity to

22   engage in that hillside cultivation and potentially expand his

23   vineyards.

24        The water was very important on the Baldridge --

25            **MR. MERONE:**   Objection, Your Honor.   This is going to

1   a subject that they did not cover in their direct.  They talked

2   about cultivating grapes, not water or anything like that.

3          **THE COURT:**  As to the last point, sustained.

4   **BY MR. JUDD:**

5   **Q.**  Dr. Miltenberger, is there -- isn't it -- let me rephrase

6   that.

7          Dr. Miltenberger, did you find anything out in your

8   research regarding the conditions that applied to vineyards

9   around the time Crabb acquired the property, the Baldridge

10  property?

11  **A.**  I did.  I know that in the 1880s, there was several

12  periods of drought that had diminished many vineyards and

13  diminished Crabb's own production.

14         **MR. MERONE:**  Objection, Your Honor.  We are getting

15  into another topic that wasn't discussed in direct.

16         **THE COURT:**  Well, the question is whether it was

17  discussed on cross, not whether it was discussed on direct.

18         **MR. MERONE:**  That, too.  I did not raise anything

19  about water or irrigation because they did not raise it on

20  direct.

21         **THE COURT:**  Mr. Judd, what topic was raised during the

22  cross that you're seeking to redirect on?

23         **MR. JUDD:**  Phylloxera, infestation.

24         **THE COURT:**  Well, then you need to talk about

25  phylloxera and infestation.

1          **MR. JUDD:**  I will.

2          **THE COURT:**  Start there.

3     Sustained.

4     **BY MR. JUDD:**

5     **Q.**   Dr. Miltenberger, at the time that Crabb acquired the

6     Baldridge property in 1889, what was the condition of vineyards

7     in Napa with respect to phylloxera?

8     **A.**   They had been devastated.

9     **Q.**   And when you say "devastated," what do you mean by that?

10    **A.**   There was a large loss of vines and crop.

11    **Q.**   And I believe you earlier testified that there was some 60

12    acres, more or less, of arable land on the Baldridge Farm

13    property; correct?

14    **A.**   Correct.

15    **Q.**   And what is your understanding of what that 60 acres was

16    used for at the time that William Baldridge operated the

17    property?

18    **A.**   I believe Baldridge operated a farm of his own that

19    included an orchard and vineyard.

20    **Q.**   And what is your understanding of what Crabb did with a

21    vineyard that he owned that was subject to phylloxera

22    infestation?

23    **A.**   He pulled it out.

24    **Q.**   And what did he do after he removed the diseased vines

25    from the vineyards -- this is Mr. Crabb we're talking about --

1   that were diseased?

2   **A.**   I understood it to be that he engaged in plowing, pulled

3   them out, planted grain, planted to hay in successive years.

4   **Q.**   And there is no direct evidence that he didn't engage in

5   that method of planting, is there?

6   **A.**   No, there isn't.

7   **Q.**   Did your research identify where Mr. Baldridge went to

8   live after he sold his property to Crabb in 1889?

9   **A.**   Yes, it did.

10   **Q.**   And where is that?

11   **A.**   He relocated to the Yountville Veteran's Home.

12   **Q.**   Do you have any understanding as to what the Yountville

13   Veteran's Home was back in the 1889/1890 time frame?

14   **A.**   It was a retirement community of the era specifically for

15   military veterans, and Baldridge was a veteran of the

16   Mexican-American war.

17   **Q.**   Could we bring up Exhibit 1703, please.  I believe that's

18   the letterhead.

19             **THE COURT:**  Yes.  Please do.

20             **MR. JUDD:**  We don't have it.  Could we rely on --

21             **THE COURT:**  Yes.  If Constellation will bring that up,

22   please.

23   **BY MR. JUDD:**

24   **Q.**   Dr. Miltenberger, do you have any evidence that

25   establishes that this letterhead was being used by Stelling in

1  the 1940s?

2  **THE COURT:**  By whom?

3  **MR. JUDD:**  Stelling.

4  **THE COURT:**  Okay.  Thank you.

5  **THE WITNESS:**  I do not.

6  **BY MR. JUDD:**

7  **Q.**  That was simply something that counsel asked you to

8  assume; correct?

9  **A.**  Correct.

10  **Q.**  And is there a difference, any significant difference,

11  between the name that's on this letterhead, To Kalon Vineyards,

12  and the reference to the property, To Kalon Vineyard?

13  **A.**  Could you -- could you -- I think you kind of froze on me.

14  **Q.**  I'm wondering if there's any difference between the

15  inscription on the letterhead, To Kalon Vineyards, that you

16  consider significantly different than a reference to the place

17  To Kalon Vineyard?

18  **A.**  Well, there's, of course, the plural there.  And one thing

19  that gave me -- gives me pause looking at this is the crest.

20  The intertwined TKV seems to be more suggestive of, I believe,

21  an intertwined symbol used by To Kalon Vineyard Company.

22  **Q.**  However, To Kalon was used, whether to modify "vineyard"

23  or "winery" or "stock farm" -- To Kalon Vineyard, To Kalon

24  stock vine, To Kalon Winery -- do you have any opinion as to

25  whether that use of "To Kalon" in that context refers to a

1   place?

2   **A.**   Yes.  I believe it does refer to a place.

3   **Q.**   And why is that?

4   **A.**   Well, I -- it's a modifier.  There is -- I found no

5   evidence of there being a To Kalon Stock Farm Company, a

6   To Kalon Winery Company.  You know, to me these are just, right

7   on their face, identifying where the stock farm is, where the

8   winery is, where the vineyard is.

9            **MR. JUDD:**  I have nothing further at this time,

10  Your Honor.

11           **THE COURT:**  Any recross?

12           **MR. MERONE:**  No, Your Honor.

13           **THE COURT:**  I have just a couple of questions.

14       We -- and I don't know.  It's in the 200 series in terms

15  of exhibits, but there was -- one of the reports of the state

16  viticultural commissioners was entitled a "progress report."

17                          EXAMINATION

18  BY THE COURT:

19  **Q.**   Do you know which one I'm talking about, Dr. Miltenberger?

20  Maybe 213, 214.  It was used during Mr. Merone's examination.

21  And the exhibit list doesn't refer to it as a progress report,

22  but THE progress report seems to indicate that there are a

23  series of reports prior to the one that's listed.  Do you have

24  and did you review the whole series of reports, only two of

25  which have been referenced in this case?

1   **A.**   I -- I don't believe so, Your Honor.  I don't believe I

2   reviewed all of the -- all of the reports of the State Board of

3   Viticultural Commissioners.

4   **Q.**   When you saw -- because that was the title -- when you saw

5   that there was a reference to a progress report, did you

6   undertake any investigation to determine the whole history of

7   the reports and the whole series of reports?

8   **A.**   No, I did not, Your Honor.

9   **Q.**   The reference to the valley, "the head of the canyon" by

10  Rampandahl -- is that how you say it?

11  **A.**   That's how I pronounce it, Your Honor.

12  **Q.**   Did you undertake any investigation to determine who

13  Rampandahl was, where that person was located, anything to try

14  to nail down that person's role in this saga?

15  **A.**   If memory serves, Your Honor, I did both prior to and

16  following my report, following completion of my report.

17  **Q.**   Is any of that referenced in your report, or did you find

18  any documents that were produced?

19  **A.**   I'm not sure if I quite understand the question,

20  Your Honor.

21  **Q.**   Well, you did some investigation, but you didn't report on

22  it.

23  **A.**   That's correct, Your Honor.

24  **Q.**   Or you did report on it and is it somewhere I can find it?

25  **A.**   I -- Your Honor, I did not report on it.

1   **Q.**   Why not?  Where was the person located, Mr. Miltenberger?

2   **A.**   I was not able to find where Mr. Rampandahl was located.

3   I was able to find and I -- again, if memory serves, this would

4   be after I completed my report.  I believe that I identified

5   him as a resident of Napa County, but I don't think I was able

6   to determine where he lived, where he was located.

7   **Q.**   Okay.

8        Anything on my questions, Mr. Judd?

9            **MR. JUDD:**  No, Your Honor.

10           **THE COURT:**  Mr. Merone?

11           **MR. MERONE:**  No, Your Honor.

12           **THE COURT:**  Okay.

13      Before I have Dr. Miltenberger stand down, you wanted to

14   talk about exhibits, Mr. Merone.

15           **MR. MERONE:**  Yes.  I just wanted to move the admission

16   of 1003 and 1679.  Those are the two reports that

17   Dr. Miltenberger said he had saw that were made by ARG produced

18   by Plaintiff.

19           **MR. JUDD:**  1003 and --

20           **MR. MERONE:**  1679, I believe, ma'am.

21           **THE COURT:**  Any objection?

22           **MR. JUDD:**  Let me locate those, please.

23      Yes, Your Honor.  There is no testimony that

24   Dr. Miltenberger relied on those for any opinion or even

25   considered them other than as background to read.  They are

1    hearsay reports for which no exception has been identified.

2            THE COURT:  Okay.  Let's start with 1003.

3        Any response?  You have the testimony.  Why is it that you

4    need the report?  And what is the exception to the hearsay

5    rule?  Obviously everything he has looked at doesn't come into

6    evidence; otherwise, I'd already have many reports, including

7    his own expert report.

8            MR. MERONE:  1003 then, Your Honor, that's fine

9    because --

10           THE COURT:  Okay.  So the request is withdrawn.

11       1677.

12           MR. MERONE:  1679, I believe, Your Honor.

13           THE COURT:  Sorry.  1679.

14           MR. MERONE:  I believe that was -- I believe that's

15   the one that he testified at his deposition he had reviewed

16   when forming the basis of his research.  I'm sorry.  He had

17   reviewed it so he could authenticate it, but that's fine,

18   Your Honor.  If they had already been -- we've already talked

19   about them.  I don't think we need that one in the record then,

20   so I withdraw that.

21           THE COURT:  All right.  It does seem to me, though,

22   that a number of exhibits from his report should be admitted

23   that were discussed, and that includes -- the ones that we

24   talked about during his testimony included Exhibit 1,

25   Exhibit 4, Exhibit 6, Exhibit 8, and I believe Exhibit 15 and

1    18.

2         **MR. JUDD:**  Unfortunately, the parties had previously

3    stipulated and I thought the Court had ordered that any

4    documents that had been stipulated as being admissible are

5    admitted.

6         **THE COURT:**  So, Mr. Judd, Exhibit 7 was not stipulated

7    as admissible.

8         **MR. JUDD:**  And I'm sorry, Your Honor.  You are talking

9    about Trial Exhibit 7A?

10         **THE COURT:**  No.  7A is his vitae.

11         **MR. JUDD:**  Right.

12         **THE COURT:**  Exhibit 7 was not stipulated.  Exhibits,

13   though, to his report, the ones I just listed, it seems to me

14   are admissible, and we've discussed them, so it seems to me

15   that they should be admitted so that I can actually refer to

16   them and use them.  And I just went through the ones that I

17   personally noted we had used.

18         **MR. JUDD:**  Your Honor, I'm not tracking the exhibit

19   numbers that you're referring to.

20         **THE COURT:**  Mr. Merone, is there any objection?

21         **MR. MERONE:**  No, Your Honor.

22         **THE COURT:**  Okay.  Is there any objection, Mr. Judd,

23   to me admitting the figures that are attached to his report?

24         **MR. JUDD:**  No, Your Honor.  I'm just --

25         **THE COURT:**  As long as there is an objection, we will

1    go through them in totality, but I want to be able to, if

2    there's something that he needs to address -- I want to be able

3    to have it addressed with him here.  So if there's no

4    objection, we can discuss the numbers again later.  That's

5    fine.  It doesn't sound like there is an objection from either

6    side.

7              MR. JUDD:  I have no objection, but I don't understand

8    what exhibit -- for example, 4, 6, 8 are when --

9              THE COURT:  If you look at his report, he has a bunch

10    of figures in his report.

11              MR. JUDD:  Oh, so Figure 4, Figure 6.  Is that what

12    you're referring to, Your Honor?

13              THE COURT:  Yes.

14              MR. JUDD:  Oh, oh, I'm sorry.  I misunderstood.  I

15    have no objection.

16              THE COURT:  Okay.  All right.  Then he can step down.

17    Thank you, sir.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  Next witness.

20              MR. BALES:  Yes, Your Honor, Peter Bales for TVH.  We

21    would like to call expert Doug Frost.

22              THE COURT:  Okay.  Let's bring Doug Frost on.

23              THE CLERK:  This is the clerk, Mr. Frost.  If you

24    could do your video, please, and unmute, please.

25              THE WITNESS:  There we are.

1          **THE CLERK:**  So I will go ahead and swear you in.

2                           **<u>DOUG FROST</u>**,

3     called as a witness for the Plaintiff, having been duly sworn,

4     testified as follows:

5          **THE CLERK:**  It's difficult to hear you.

6          **THE WITNESS:**  I'm sorry.

7          **THE CLERK:**  You can put your arm down.  Is there a way

8     to sit closer, increase your volume?  It's difficult to hear

9     you.

10         **THE WITNESS:**  Yes.  I will certainly see if I can

11    improve things in that fashion.

12         **THE CLERK:**  When you lean back -- no.

13         **THE WITNESS:**  I'm sorry.  Are you having trouble

14    hearing me?

15         **THE CLERK:**  That's good right there.  I'm going to go

16    ahead and read the admonitions to Mr. Frost.

17         This is the courtroom clerk.  Keep in mind this is a

18    formal U.S. District Court proceeding and to act as if you are

19    present in the courtroom.

20         The court reporter is present on Zoom and is preparing a

21    written record of everything that is said during the

22    proceeding.  Please wait until the person speaking has finished

23    before responding to help our court reporter to create a clean

24    and accurate record.

25         Please confirm you have the requisite hardware, software,

internet resources for the Zoom platform, you're familiar with accessing and using it to provide testimony in this trial. Unless the Court requests, please do not mute yourself during your testimony.

The judge or court reporter may interrupt you from time to time.  If that happens, please stop speaking to allow the judge or court reporter to speak.

If we encounter any technical difficulties, please stop speaking until we can all connect again.  If a technical difficulty causes you to miss a statement or question, please inform the Court immediately so the question or statement may be repeated.

Please confirm you have not monitored the trial or any portion of it by any means unless you are an expert witness for whom permission has been granted to do so.

Please confirm you will remain in a single stationary location while connected to the proceeding except for any breaks the Court calls.

Until you are excused by the Court, the following rules apply during your testimony and during any break, except as specifically modified by the Court:  No other person is physically present in the room or location where you are testifying; you are not to have any other Zoom platform or similar video or audio conferencing open during your testimony; you are not allowed to have open and are not allowed to use or

1   access any means of communication with any persons, including

2   but not limited to any telephone, cell phone, text message,

3   email, social media or other chat or messaging platforms or

4   applications while you are testifying except to the extent

5   needed to access a Zoom platform and exhibits introduced during

6   the trial; you are not allowed to have any internet browsers,

7   applications or other electronic devices or software open and

8   accessible; you are not allowed to look at or have access to

9   any hard copy or electronic documents, notes or other materials

10  while testifying, other than those introduced at trial.

11         And this you can answer to the Court.  Do you understand

12  these rules, instructions and admonitions?

13              **THE WITNESS:**  Yes, I do.

14              **THE CLERK:**  Okay.  And do you agree to comply with

15  these rules, instructions, and admonitions?

16              **THE WITNESS:**  Yes, I do.

17              **THE CLERK:**  And do you have any questions for the

18  Court before we proceed?

19              **THE WITNESS:**  No.  It's understood that I was

20  observing previously, so I was in fact observing previous to

21  this testimony.

22              **THE CLERK:**  All right.

23         And then identify the address, city and state, and the

24  physical location, such as an office or kitchen, from where you

25  are testifying, please.

1          **THE WITNESS:**  Yes.  I am at 4510 West 82nd Terrace.

2     That's in Prairie Village -- two words, Prairie and Village --

3     Kansas.  The zip is 66208.  And I am in my basement office.

4          **THE COURT:**  Okay.  Good afternoon, Mr. Frost.  Just a

5     reminder then, if you were listening to the other testimony,

6     you cannot review or look at any documents without asking my

7     permission or being directed to do so by the lawyers.  I need

8     to know when you're looking at something versus when you're

9     just testifying, all right, from your own memory.

10         Mr. Bales, you may proceed.

11         **MR. BALES:**  Thank you very much, Your Honor.

12                        **DIRECT EXAMINATION**

13    BY MR. BALES:

14    **Q.**  Mr. Frost, can you hear me clearly?

15    **A.**  Yes, I can.

16    **Q.**  Can you also see me clearly?

17    **A.**  Yes.

18    **Q.**  Okay.  If at any point you do not hear me or see me

19    clearly, can you please let me know?

20    **A.**  I will.

21    **Q.**  Can we start by just stating your name and spelling it for

22    the record.

23    **A.**  Yes.  My name is Doug Stuart, S-T-U-A-R-T, last name is

24    Frost, F-R-O-S-T.

25    **Q.**  Before we talk about your assignment in this case, I'd

1    like to start off talking about your expertise in the wine

2    industry.  Let's start with your resume.

3         Can we please pull up Trial Exhibit 1A.  And for the

4    record, Your Honor, Trial Exhibit 1A is a subset of Trial

5    Exhibit 1.  It is PDF pages 27 to 29, and we will get this

6    subpart of that to the Court.

7              **THE COURT:**  Thank you.  We'll talk about that, those

8    sub-designations later.  Thank you.

9              **MR. BALES:**  Thank you, Your Honor.

10   **Q.**   Mr. Frost, is this a copy of your resume?

11   **A.**   It is.

12   **Q.**   If we go to the next page, is that a copy of your complete

13   resume that we just looked at?

14   **A.**   It is, with the caveat that I am currently the owner and

15   the president of a winery based in Walla Walla, Washington, and

16   that is not on this particular resume.

17   **Q.**   You can take that down.

18        How many years have you been involved in the wine

19   industry, Mr. Frost?

20   **A.**   Approximately 40 years.

21   **Q.**   Can you please summarize for the Court your education,

22   degrees and honors as it relates to wine?

23   **A.**   Yes.  Aside from a Bachelor's in Communications, I

24   concluded the Court of Master Sommeliers Master Sommeliers

25   title in 1991.  I achieved my Master of Wine title in 1993 and

1  have received perhaps some honors since that time, but that's

2  primarily the educational achievements.

3  **Q.**   Explain for the Court what is a Master Sommeliers?

4  **A.**   A Master Sommeliers is someone who has gone through a

5  series of exams.  The exam itself or the title itself is a bit

6  more than a half century old.  It includes blind tasting of

7  wines in which you are asked to analyze and identify wines.  It

8  includes a theory examination which is verbal in the final exam

9  in which you're being queried as to the breadth of wines

10  available around the world and their nomenclature, and then

11  finally a service exam in which one demonstrates proper

12  service, proper etiquette at the table, understanding of

13  management, of beverage programs in the hospitality setting and

14  such.

15  **Q.**   You mentioned a Master of Wine.  Please explain for the

16  Court what a Master of Wine is.

17  **A.**   Yes.  A Master of Wine is someone who has concluded --

18  completed a series of examinations which includes rather

19  extensive blind tasting.  The final examination is 36 wines

20  that you'll be asked to identify correctly.  It also is based

21  upon writing of essays, and so there are extensive requirements

22  that you write essays in a timed fashion that will include

23  matters of grape growing, winemaking, wine maturation, wine

24  marketing, and larger wine industry issues.

25  **Q.**   How many people in the wine industry have both the Master

1 of Wine and Master Sommeliers title?

2 **A.**   There are three of us in the world who have both.

3 **Q.**   Do you have any teaching experience in these programs, the

4 Master of Wine and Master Sommeliers?

5 **A.**   Yes.   After concluding each, I certainly became involved

6 as soon as possible in teaching and even in examining as --

7 certainly as a means to give back to these organizations that

8 obviously had contributed to my career and also as a means to

9 stay current, if you will, as to -- to matters in the industry.

10 **Q.**   Summarize for the Court your current and past work

11 experience as it relates to wine.

12 **A.**   Yes.   I began as a teenager washing dishes in the back of

13 a restaurant.   Certainly came out to the front of the house, as

14 we call it, as the money was much better, so I worked in

15 restaurants or bars or hotels until such time as I became a

16 wholesaler living in the Kansas City area, where I still live.

17 As a wholesaler then my role was to bring wines into this

18 market, whether from outside the country or within it, and to

19 resell those products to restaurants, retail settings, hotels,

20 and such.

21    I did that for about 15 years and then had developed

22 enough of an outside client base that I was able to -- to stop

23 working full time for an individual wholesaler and began

24 consulting with wholesalers or restaurants or restaurant groups

25 or retailers, lecturing on the road and/or writing educational

1    materials and similar matters.

2    **Q.**   Your consulting work, who do you consult with in the wine

3    industry?

4    **A.**   At present, I have been consulting with United Airlines

5    for about 15 years.  I select their wines internationally.  I

6    work with Princess Cruise Lines internationally.  I have retail

7    chain clients in North Carolina and based in Florida as well,

8    retail groups such as P.F. Chang's -- pardon me -- restaurant

9    groups such as P.F. Chang's and others.  So that would -- in

10   the past I have consulted with wineries, wine groups,

11   importers, distributors, and distilleries.

12   **Q.**   As part of your consulting work do you consult on

13   consumers' expectations and understanding of wine, wine labels?

14   **A.**   Yes.  I certainly believe that part of my value to a

15   client is that they perceive me to be knowledgeable and to have

16   an understanding of consumer expectations of wines at all price

17   levels.

18       Those price levels can vary enormously.  Certainly in the

19   First Class or Business Class section of United Airlines

20   internationally, that is one set of wines, if you will, while

21   in the Economy Class, it's a different set of wines.

22       The restaurants and the retail groups that I consult for

23   have similar differentiation of wine prices and therefore

24   differing expectations that consumers and their customers will

25   have at each of those price points.

1    **Q.**   You mention price points.  Do you have experience in

2    consulting on marketing of wines priced above a hundred dollars

3    per bottle?

4    **A.**   Yes.  I am expected to be knowledgeable of that category.

5    Certainly Princess Cruise Lines has a number of very expensive

6    wines.  In one of my past iterations managing a James Beard

7    award-winning restaurant called the American Restaurant in

8    Kansas City, its wine list had many wines available for more

9    than a hundred dollars a bottle.

10        So each of my clients, I would say with the exception

11   perhaps of P.F. Chang's, which has maybe one or two bottles

12   over a hundred dollars -- each of them expects me to know that

13   market.

14   **Q.**   And you talked about consulting with your clients.  What

15   about the consumers?  Do you have experience with talking with,

16   interacting with consumers about wines priced above a hundred

17   dollars per bottle?

18             **THE COURT:**   Could I ask, Mr. Bales, are you talking

19   about retail or wholesale?  Does it matter?

20             **MR. BALES:**   I believe we are talking about retail,

21   Your Honor.

22             **THE COURT:**   Okay.

23             **THE WITNESS:**   Would you mind repeating the question?

24   BY MR. BALES:

25   **Q.**   Yes.  Do you have experience talking and interacting with

1   consumers about wines priced above a hundred dollars per

2   bottle?

3   **A.**   Yes.   I currently work with a restaurant here in Kansas

4   City called The Restaurant at 1900, and we have multiple

5   bottles for over a hundred dollars a bottle, and I would say

6   that I love that I'm still able to interact with those

7   customers, those consumers so that I can continue to learn

8   about this, you know, very malleable and ever-changing

9   marketplace.

10  **Q.**   Do you have experience outside the restaurant in the four

11  decades of your experience in the wine industry dealing with

12  consumers and their understanding of wine and wine labels?

13  **A.**   Yes.   Aside from other restaurants that I have worked at

14  where I've worked on the floor, coming in, you know, particular

15  contact with those consumers, as well I have been an officer in

16  wine groups.   I've led wine tasting groups or wine tasting

17  clubs.   Many of those people are prime examples of those people

18  who wish to have the very best wines they can possibly -- they

19  can possibly procure.

20      So, yes, I feel that I've spent my entire career

21  interacting with, I would put it, real people in terms of wine

22  consumption.

23  **Q.**   And dealing with real people, how does wine education play

24  a role in the marketing of wine to consumers?

25  **A.**   Well, I -- I strongly believe that wine education has been

1    used as a tool for wine marketing.  To explain, I would say

2    that those of us who are enthusiasts of wine are always seeking

3    out new wines, new grapes, new styles, new brands, new places,

4    and we have -- I think as a wine industry I think it is

5    commonplace that the industry has accepted that educating its

6    consumers will encourage them to spend more money, whether it's

7    to buy more wines, to consume wine more frequently, or,

8    frankly, to consume better wines as -- as they -- as people

9    like to describe it, as they continue on their journey.

10       My view of this is that education has been part and parcel

11   of how the wine industry has grown rapidly over the last 50

12   years or so.

13   **Q.**   And is part of that wine education where the wine is from

14   and the history of the wine?

15   **A.**   Oh, yes.  Very much.  We have spent, again, decades

16   telling our consumers and telling ourselves and telling

17   everyone in the wine community that origin has a strong impact

18   upon the character, the quality, the value, the ageability of a

19   specific wine.  So, yes, we have very much -- and I believe

20   correctly -- taught the wine community that the place where the

21   grapes come from is crucial to the character of the wine.

22   **Q.**   Do you have special knowledge or expertise when it comes

23   to Napa Valley wines?

24   **A.**   I -- yes.  I certainly believe that my many visits to Napa

25   Valley and my long time in the industry has led to a keen

understanding of Napa Valley wine in the marketplace.

**Q.**   Have you authored books, articles or other publications in the wine industry?

**A.**   Yes.  I have several books that I have authored over the years, primarily in 1995.  A larger hard cover book in 2001.  A book that specialized on the wines of Spain that was in its third edition when, about four years ago, it went to an online site.

I'm currently finishing up as a contributing editor to "The Oxford Companion to Spirits and Cocktails."  I contribute to "The Oxford Companion to Wines," "Sotheby's World Wine Encyclopedia," "Opus Vino," numerous books, and have been writing for magazines and newspapers for much of my career.

**Q.**   I understand that Robert Mondavi did a forward in one of your books.  What was that?

**A.**   Yes.  That was the 2001 book.  Mr. Mondavi was kind enough to provide a forward to the book.

**Q.**   Do you review publications by persons other than yourself in the wine industry both from current and past?

**A.**   In the pursuit of this particular case, in my research, are you asking?

**Q.**   No.  In general.  In your expertise and your consulting, do you review publications in the wine industry from others, whether it's current or from the past?

**A.**   Oh, yes.  Yes.  I -- yes.  I believe that it's imperative

1   to it stay as current as one can because it is changing all the

2   time, but it's also -- I would admit that I have a keen -- you

3   know, a strong love of history to understand -- help me teach

4   other people how it is we got to where we are so we may have

5   some idea of where it is we might be going.

6   **Q.**   Do you give presentations and speeches in the wine

7   industry?

8   **A.**   I do and have done most of my career.

9   **Q.**   What about expert witness work for litigation?  What

10  percentage of your work has been as an expert witness like you

11  are today?

12  **A.**   I believe over the four decades, this would be the third

13  time I've sat on the stand and offered testimony.

14  **Q.**   So it's not a big part of your work?

15  **A.**   No.  I have rarely done something of this nature.

16  **Q.**   I will refer to The Vineyard House also as TVH.  Do you

17  understand who I am referring to, the company?

18  **A.**   I do.

19  **Q.**   Have you ever been hired by TVH outside of this case?

20  **A.**   No.

21  **Q.**   Mr. Frost, has To Kalon come up in your career?

22  **A.**   Yes.  Absolutely.

23          **THE COURT:**  Mr. Bales, I would also like to know

24  whether he's been hired by Mr. Nickel.

25

1   **BY MR. BALES:**

2   **Q.**   Yes.  Please answer the judge's question, if you have been

3   hired by Jeremy Nickel outside of this case.

4   **A.**   No, I have not.

5   **Q.**   Excluding your hourly rate for this expert witness case,

6   do you have any monetary or other interest in the outcome of

7   this case?

8   **A.**   No, I do not.

9   **Q.**   Let's get back -- Your Honor, may I proceed?

10              **THE COURT:**  You may.  Thank you.

11              **MR. BALES:**  Thank you.

12   **Q.**   Has To Kalon come up in your career?

13   **A.**   Yes.  It is a very famous vineyard.  It is a vineyard that

14   most of us who have been traveling and visiting the Napa Valley

15   have long ago heard of as a place of some of the most prized

16   and most expensive wines that come out of the Napa Valley.

17   **Q.**   And is that only associated with Robert Mondavi Winery or

18   are there other wineries that are associated with that

19   vineyard?

20   **A.**   There are numerous wineries associated with that vineyard.

21   **Q.**   Please, how do you explain the term "To Kalon" in your

22   custom and practice if you were saying -- showing a bottle with

23   the term "To Kalon" on it?

24   **A.**   I would explain to whomever I was showing the bottle to

25   that this phrase, "To Kalon Vineyard," means that this -- that

1   the grapes in this bottle, minimum 95 percent -- the grapes in

2   this bottle come from a specific place with

3   geographically-designated boundaries within the Oakville AVA

4   which is itself a sub-AVA of the famed Napa Valley.

5           MR. BALES:  Your Honor, TVH would like to offer

6   Mr. Frost as an expert on the wine, wine labels, the

7   significance of To Kalon in the wine industry, and how the wine

8   community and consumers understand that term.

9           MR. MERONE:  No objection to the first two.  The last

10  two, yes.  I mean, there is no expert on the meaning of

11  To Kalon.  We will stipulate he is an expert in wine and wine

12  labeling, and he can testify --

13          THE COURT:  And fourth, do you have an objection?

14          MR. MERONE:  Yes.  I think it was essentially the same

15  thing they were saying.

16          THE COURT:  Well, I will admit him to be an expert on

17  wine and wine labels.  I will reserve on the significance of

18  To Kalon in the wine industry and how the wine community and

19  consumers understands that term.

20          MR. MERONE:  Oh, I'm sorry.  We would object to the

21  extent that he's going to opine about -- well --

22          THE COURT:  I am reserving on the last two,

23  Mr. Merone.

24          MR. MERONE:  Yes.  Thank you, Your Honor.

25          THE COURT:  Proceed.

1          **MR. BALES:**  Thank you, Your Honor.

2     **Q.**   Mr. Frost, what was your initial assignment in this case?

3     **A.**   I was asked to offer my opinion as to the significance of

4     the term "To Kalon Vineyard," and I was asked to explain what

5     significance that phrase, "To Kalon Vineyard," has in the wine

6     community and its historical significance as a market product,

7     if you will, in -- and a name in the wine industry.

8     **Q.**   Were you also asked to opine on the understanding of

9     To Kalon in the wine community?

10    **A.**   Yes.  Yes.  I was asked to -- to explain what I believed

11    to be the understanding of that term in the community.

12    **Q.**   When you use the term "wine community," who were you

13    referring to?

14    **A.**   The wine community in my parlance is to describe the

15    entirety of that set of people who come into contact with wine,

16    often specifically whether, you know, they are growing the

17    grapes or making the wine or own the winery or selling the

18    barrels or bottles or the distributor or importer or wholesaler

19    who then makes the wines available to retail stores or to

20    restaurants or hotels or cruise lines or airlines and -- and

21    then the clerks or servers at each of those, you know -- in

22    each of those channels, and then finally, perhaps most

23    importantly, the end user, the consumer of that wine to me is

24    the community that I'm speaking of.

25          **MR. MERONE:**  Your Honor, I'm going to have to object.

1    Mr. Frost's report only speaks to wine professionals'

2    awareness.  It does not get into consumers, so we would object

3    to any testimony about perception among consumers as to

4    To Kalon Vineyard.

5           **THE COURT:**  Okay.  Let's go to the report, Mr. Bales.

6           **MR. BALES:**  Yes, Your Honor.

7           **THE COURT:**  And where -- where is the industry defined

8    or do you --

9           **MR. BALES:**  There are two reports, Your Honor.  It is

10   Trial Exhibit 1 and then --

11          **THE COURT:**  I have No. 1.  So start with 1.

12          **MR. BALES:**  Okay.  We have the definition of "wine

13   community" in paragraph 1, which includes consumers.

14          **THE COURT:**  I see it.

15          **MR. BALES:**  We also respond to Dr. McDonald's report

16   with a rebuttal report that is focused on a consumer's

17   understanding of the word "To Kalon."  I think this is clearly

18   within the understanding of the report.

19       I would also note that Constellation did not choose to

20   take Mr. Frost's deposition to explore anything in the report.

21          **THE COURT:**  Objection is overruled.  I also didn't

22   receive a *Daubert* on this.

23       Continue.

24          **MR. BALES:**  Yes, Your Honor.

25   **Q.**  Mr. Frost, we were talking about the wine community that

1  includes the consumer; correct?

2  **A.**   Yes, sir.

3  **Q.**   It includes the purchasers of wine?

4  **A.**   Yes, sir.

5  **Q.**   It includes -- does dose it also include the press and

6  wine reviewers, people who rate wines?

7  **A.**   Yes.  I absolutely would include wine writers and wine

8  reviewers in this wider wine community.  Absolutely.

9  **Q.**   We talked about your initial assignment.  Were you also

10  asked to review expert reports offered by Constellation in this

11  case?

12  **A.**   Yes.  I certainly reviewed a number of reports.  Those

13  included the report from Mark de Vere, a report from Nova

14  Cadamatre, a report from Michael Leibstein, another from Susan

15  McDonald, and also certainly other reports as well.

16  **Q.**   Did you prepare reports for this case?

17  **A.**   I did.

18         **MR. BALES:**  Your Honor, for the record, Trial Exhibit

19  1 is Dr. Frost's initial report and Trial Exhibit 8 is his

20  rebuttal report.

21         **THE COURT:**  Thank you.

22  **BY MR. BALES:**

23  **Q.**   Mr. Frost, let's talk about the TVH wine at issue in this

24  case and the typical consumer of that wine.  Are you familiar

25  with TVH's 2015 Block 8 Cabernet Sauvignon?

1    **A.**   Yes.

2    **Q.**   How so?

3    **A.**   I had the opportunity to taste it several times and

4    certainly know of it through the wine press.

5    **Q.**   Are you familiar with any reviews or ratings of the 2015

6    Block Eight Cab?

7    **A.**   Yes.  I have certainly seen reviews of that particular

8    bottle of wine and -- and have seen, you know, scores that --

9    that that particular wine received.

10   **Q.**   How has that wine been received in the wine industry?

11            **MR. MERONE:**  Objection.  Outside the scope of any of

12   his reports.

13            **THE COURT:**  Is that in the report, Mr. Bales?

14            **MR. BALES:**  Your Honor, he is rebutting Dr. McDonald

15   who is talking about TVH's wine label.

16            **THE COURT:**  Mr. Bales, Mr. Bales, I haven't heard

17   McDonald's testimony.

18            **MR. BALES:**  This is, I believe, Your Honor, within the

19   scope of his report.  This is not a materially new or different

20   opinion, and this is --

21            **THE COURT:**  Are you asking him for a wine rating?

22   What are you asking him for?

23            **MR. BALES:**  I am asking him how his -- how the TVH

24   wine has been received based on reviews that he reviewed.

25            **THE COURT:**  So I have his report in front of me.

1    Which opinion, please, so I can look at it?

2         **MR. BALES:**  This opinion relates to the prospective

3    customers and their understanding of the reference to To Kalon

4    and the TVH wine which is contained in his rebuttal report,

5    Trial Exhibit 8.

6         **THE COURT:**  Do the parties have an agreement that we

7    are taking witnesses out of order?

8         **MR. MERONE:**  That was actually my next question,

9    Your Honor, whether this is -- I mean, we weren't expecting him

10   to testify about rebuttal evidence here.  We understood he

11   would testify as to his initial report, which I would note in

12   paragraph 10 is expressly limited to wine professionals, and he

13   would testify as to Dr. McDonald after she testifies, and

14   that's his rebuttal report.

15        **THE COURT:**  Is there an explicit -- Mr. Bales, is

16   there an explicit agreement with respect to the -- and I have

17   to say, I'm pretty sure that I asked you all to think about

18   this.  So do I have an agreement from the parties that these

19   opinions can come in out of order?

20        **MR. BALES:**  Your Honor, it was my understanding that

21   we would -- I don't know if we have a clear agreement or

22   stipulation on that, Your Honor.

23        **MR. MERONE:**  The answer is no, Your Honor.

24        **MR. BALES:**  The opinions by Mr. Frost are related in

25   both his rebuttal --

1           **THE COURT:**  Let's be very clear.  I'm sure -- you

2      know, perhaps they are, but rebuttal opinions are, by

3      definition, rebuttals.  So if he isn't -- if it's not in his

4      affirmative -- as part of your affirmative case, then it can't

5      come in without an agreement from the parties that you are

6      going to proceed in that way.

7           **THE WITNESS:**  Am I allowed to ask a question,

8      Your Honor?

9           **THE COURT:**  Go ahead.

10          **THE WITNESS:**  There is, in this initial expert report,

11     a series of exhibits having to do with wine scores.

12          **THE COURT:**  Okay.  And do you have one, Mr. Frost, for

13     TVH?

14          **THE WITNESS:**  I would have to look at the document to

15     be certain of that.  I don't recall if that is in that

16     particular document, I'm sorry to say.

17          **THE COURT:**  I don't think it is.  You can look.

18          **MR. MERONE:**  Your Honor, I believe Mr. Frost might be

19     confusing a declaration that he submitted at one time in the PI

20     motion, but it's not in his report.

21          **THE WITNESS:**  Would I be allowed to look?

22          **THE COURT:**  You can.

23          **THE WITNESS:**  Thank you.  I have to open a computer to

24     do so.

25          **THE COURT:**  If not, we can move on.  We only have

1    about 10 more minutes, and then we can figure this out offline,

2    Mr. Bales, if you don't want to use the time.

3              **MR. MERONE:**  Your Honor, may I raise an objection?

4              **THE COURT:**  There is nothing pending.

5              **MR. MERONE:**  I was going to revisit the first one

6    because if he is not testifying about rebuttal, then his

7    opening expert report is expressly limited only to the

8    understanding of wine professionals.

9              **THE COURT:**  I don't see that.  I'm looking at page 4,

10   paragraph 1, line 4, it mentioned consumers.

11             **MR. MERONE:**  Well, that's what he says he is assigned.

12   I'm looking at his actual opinions if you look at paragraph 10,

13   Your Honor, and the actual statement of his opinions rather

14   than what he says was his assignment.  There is no discussion

15   of how consumers perceive To Kalon.  It's expressly limited to

16   grape growers, winemakers, etc., etc., everyone who works with

17   wine, and he says wine professionals' awareness.  There is not

18   a consumer-facing report.

19             **THE COURT:**  Response, Mr. Bales.

20             **MR. BALES:**  Yes, Your Honor.  He says an example.  He

21   talks about consumers.  Consumers are referenced throughout his

22   report.  Had they taken his deposition, they could have

23   explored all of this.  There is no prejudice to them

24   cross-examining him about this opinion.  They were aware that

25   he was going to testify on consumers' understanding --

1          **THE COURT:**  I see in paragraph 17 a reference to

2     consumer expectations, but he is limited to the scope of his

3     report.

4          **MR. BALES:**  Your Honor, I believe he is limited to the

5     scope of his report, but he's not limited to verbatim what is

6     in his report.

7          **THE COURT:**  So that's why I asked you, Mr. Bales,

8     whenever there is an objection, I need you to point me to the

9     section so I can see whether or not it's within the scope.

10         **MR. BALES:**  I believe, Your Honor, this is within the

11    scope of his opinions of what he was retained to do.

12         **THE COURT:**  So you want me to read the entire report

13    right now so I can decide?

14         **MR. BALES:**  No, Your Honor.  I believe I have given

15    you references.  It's paragraph 1, paragraph 3.  He talks about

16    consumers in paragraph 5.

17         **THE COURT:**  Okay.  The question does not come within

18    the scope of paragraph 3.

19         **MR. BALES:**  Your Honor, if I may ask a few questions

20    of the witness, I think I can explore this.

21         **THE COURT:**  All right.  Go ahead.

22    BY MR. BALES:

23    **Q.**   Mr. Frost, you talk about the wine industry, the wine

24    community.  Do you use those terms interchangeably?

25    **A.**   I do.

1   **Q.**   Okay.  And the wine industry and wine community both

2   includes the consumer; correct?

3   **A.**   Absolutely.  It has no purpose without consumers.

4   **Q.**   And the opinions that you prepared in your report focus on

5   the wine industry and community as a whole which includes

6   consumers?

7   **A.**   Absolutely.

8            **THE COURT:**  Mr. Frost, you expect me to believe that

9   all wine consumers as opposed to grape growers, winemakers,

10  wine owners, employees, wine sellers, wine writers, wine

11  reporters, understand that the Oakville AVA -- that they

12  understand the Oakville AVA with the long history of grape

13  cultivation going back to the 1800s?  You don't separate those

14  two?

15           **THE WITNESS:**  I don't expect you to believe that all

16  consumers understand that any more than I expect you to believe

17  that all retail clerks or all grape growers understand that to

18  be true.  What I'm trying to state is that it is a generally

19  well-understood vineyard name for anyone who is knowledgeable

20  of Napa Valley wines.

21           **THE COURT:**  Right.  But in your report, you

22  identify -- with respect to that specific opinion --

23           **THE WITNESS:**  Yes.

24           **THE COURT:**  -- you identified a specific -- what

25  appears to be a subset of people who understand the statement

1    that you're making, and you went to great lengths.  You've got

2    two lines here of who is apparently understanding this, and you

3    don't include consumers, even though you included consumers

4    only two paragraphs above.

5            THE WITNESS:  May I look at the report to double check

6    this?

7            THE COURT:  Because it appears to me that you are

8    making a distinction -- you have consumers later, but you seem

9    to be making a distinction in paragraph 3.

10           THE WITNESS:  May I look at the --

11           THE COURT:  You may.

12           THE WITNESS:  Thank you.

13           THE COURT:  And I will contrast that with paragraph 5

14   where you do, in fact, talk about consumers.

15           THE WITNESS:  All right.  Thank you for your patience,

16   Your Honor.

17       All right.  So -- so can I -- forgive me, but do you mind

18   clarifying what it is you're asking me?

19           THE COURT:  It seems to me -- and just from reading

20   those two paragraphs -- that there is a particular set of

21   consumers, as you identify in 5, that have an understanding of

22   To Kalon as distinguished from what you're saying in paragraph

23   3, which is related to a specific portion of the wine industry.

24   It seems to me that you have -- right.  Because consumers of

25   10-dollar bottle wine, right, would not necessarily know about

1    To Kalon; correct?

2           **THE WITNESS:**  You are quite correct, yes.

3           **THE COURT:**  So you've made a distinction in terms of

4    parts of the -- of the wine industry that you reference in 3

5    and then the nature of the consumer in paragraph 5.

6           **THE WITNESS:**  Yes, ma'am.  Yes, Your Honor, that's

7    correct.  I have.

8           **THE COURT:**  All right.  So what's your question,

9    Mr. Bales?

10          **MR. BALES:**  I was asking before this about he's

11   familiar with reviews or ratings of the TVH wine, and it goes

12   along the lines of how consumers perceive and understand this

13   wine and specifically the reference to To Kalon.  And I believe

14   that is covered within the report, both 3 and 5, where he says

15   few names of California wines are immediately recognized within

16   this price point segment and To Kalon is one, and we are

17   talking about particular consumers of high-end wines which is

18   in opinion No. 3 in paragraph 5.

19          **THE COURT:**  All right.  Ask a question.

20          **MR. BALES:**  Yes.

21   **Q.**   How has the TVH Block 8 Cab been received or reviewed?

22   **A.**   The wine has been, in the main, well-received.  The

23   typical, not universal, but typical method of reviewing wines

24   these days is on a hundred point scale, and typically the wine,

25   that particular wine, has scored in -- you know, in the middle

1   90s or so.

2   **Q.**   Is there a hierarchy of grape varietals in the wine

3   industry?

4   **A.**   Yes, I think there is.  I think that in general, Cabernet

5   Sauvignon is a grape that is perceived as being the grape

6   likeliest to provide the highest price, to live the longest,

7   therefore -- in a cellar, therefore to hold its value the

8   longest.  There are, of course, exceptions.

9        There are tens of thousands of grapes, but it is, I think,

10  inarguable that Cabernet Sauvignon is in general -- if you had

11  to pick one single grape variety, that one seems to be a top of

12  the pyramid, if you will, of all of these grape varieties.

13  **Q.**   Focusing on that variety, Cabernet Sauvignon, are there

14  price categories for that grape variety?

15  **A.**   Yes.  Price categories will vary from -- from person to

16  person and, as you're suggesting, from grape to grape.  Often

17  anything under five dollars a bottle is an everyday wine or so

18  and under ten dollars a bottle some people will call value

19  wines.  Above ten dollars people will begin to use the term

20  premium.  And then terms like "super premium" come into play,

21  but when we begin to talk about hundred-dollar-plus bottles of

22  wine, often the term used might be "luxury" or "ultra premium"

23  or "ultra luxury" and the like.

24  **Q.**   So ultra premium or luxury premium is -- in the Cab

25  varietal is anything over a hundred dollars?

1  **A.**   I would view it to be, yes.  Yes, I would, view it that

2  way.

3  **Q.**   If you assumed that TVH sells its Block 8 wine for around

4  300, what price category does that fall within?

5  **A.**   That definitely would be a luxury wine, in my view.

6  **Q.**   How would you describe the prospective customer of the TVH

7  Block 8 wine considering that it falls within that ultra

8  premium category?

9  **A.**   My experience with those buyers is that they are great

10  enthusiasts for wine, that they know full well what it is

11  they're spending that much money per bottle on, which is to say

12  they often do a great deal of research, whether scores or

13  other, to understand precisely why it is they should spend that

14  kind of money on a single bottle of wine.

15  **Q.**   How would you describe --

16  **A.**   I'm sorry.  Go ahead.

17  **Q.**   No.  I don't want to interrupt you.

18  **A.**   I was just going to say that they are sophisticated

19  consumers at least as compared to, as we discussed earlier,

20  someone spending less than ten dollars a bottle.

21  **Q.**   What does it mean to be a sophisticated consumer in the

22  wine industry?

23  **A.**   In the wine industry, a sophisticated consumer is someone

24  who has spent time and effort in trying to understand the

25  provenance of a wine, the origin of a wine, those factors which

1    we believe in the wine industry and we certainly tell wine

2    consumers are the most important factors in -- in generating a

3    great -- quote/unquote, great and valuable bottle of wine.

4    **Q.**   The term cult wines, what does that mean?

5    **A.**   It's a -- it's a casual term, generally reflecting that

6    there are many more people who want the bottle of wine than can

7    afford or can find the bottle of wine or are able to actually

8    procure it, and so often a cult wine status is conferred

9    because there are not just people on the mailing list for that

10   winery, there are people on a waiting list for the mailing list

11   for that winery.

12   **Q.**   What is an AVA?

13   **A.**   An AVA is a terminology that is used by the federal

14   government to define geographic boundaries, and those

15   geographic boundaries then appear on labels in -- in -- where

16   appropriate.  That's to say there is such a thing as an

17   American wine where you won't see any geographic boundaries

18   there, but in general, since the early '90s, we have utilized

19   nomenclature that gives geographic boundaries to certain

20   places.

21       The idea of the AVA or American Viticultural Area is --

22   harks to a European model of Appalachian, Appalachian origin,

23   but in the United States, those rules pertain only to

24   geographic boundaries whereas in Europe, often they might

25   prescribe grape varieties or harvest dates or time in barrel

1   and similar criteria.

2   **Q.**   What is the Oakville AVA?

3   **A.**   The Oakville AVA is within the greater Napa Valley AVA and

4   is considered to be one of the finest in the United States.  It

5   certainly is the site of many historical vineyards such as

6   To Kalon.  It's an AVA that many people would say is the heart

7   and soul of Napa Valley, although I'm sure nextdoor neighbors

8   Rutherford would argue.

9   **Q.**   What is a single vineyard designation?

10  **A.**   Single vineyard is what it sounds like.  When a single

11  vineyard designation appears on a label, 95 percent minimum of

12  the grapes must come from this specific vineyard.  With an AVA,

13  it need not be quite that draconian.  So a single vineyard has

14  the greatest, if you will, requirement or the highest

15  requirement for a minimum source of grapes from a specific

16  origin.

17      Now, a single vineyard could be a very large vineyard or

18  it could be a very small vineyard.

19  **Q.**   And do they have to be contiguous?

20  **A.**   Actually, no.  There are certainly examples that are not.

21  **Q.**   Before we talk about The Vineyard House's wine label,

22  let's talk about the typical parts of a wine label, especially

23  one from Napa Valley.

24      Can we pull up demonstrative?

25      I have on the screen -- can you see this?  It says "How to

1  Read a Wine Label," Mr. Frost?

2  **A.**   Yes.

3  **Q.**   What is this and where did you get it from?

4  **A.**   I got this from the Napa Valley Vintners.

5  **Q.**   And what is it?

6  **A.**   So this is a sample label of how many -- not all, but

7  many, if not most, wine labels are laid out.

8  **Q.**   Using this slide as a example, can you please explain to

9  the Court the typical parts of the front of a wine label.

10  **A.**   Yes.  Typically the dominant feature on a wine label would

11  be the brand name or the name of the winery or wine producer,

12  often accompanied, as here, by an image.  And then as we go --

13  cascade down the label, we'll begin to see other information,

14  in this case, a special designation.  "Reserve" in the

15  United States has no -- well, at least in California has no

16  specific meaning, so we're calling that a special designation

17  here.

18      The vintage from which the grapes -- during which the

19  grapes were harvested.  Estate bottle factors that might be

20  pertinent.  But usually the second largest font is reserved for

21  the name of the grape inside that bottle.  We see increasingly

22  blends, red blends particularly, so it isn't always so, but

23  often Cabernet Sauvignon, Chardonnay, Merlot, etc., and then

24  perhaps a fanciful name, in this case.  And then finally as we

25  get down near the bottom of the label, we begin to see the

1    place of origin.  In this case, the Jackse Estate Vineyard is a

2    single vineyard designation, as it says here, 95 percent of the

3    grapes must come from there, and then finally we see the two

4    AVAs, if you will, St. Helena, which is an AVA within the

5    larger AVA of Napa Valley and then things like alcohol content

6    or bottle size.

7            THE COURT:  Okay.  I have given you some extra

8    minutes, Mr. Bales, given my colloquy with the witness.  We're

9    at the end of our trial day, so I will have the witness step

10   down for today.  We will start with you, Mr. Frost, at 8:30

11   Pacific Time tomorrow.

12       I do need to give my staff some break, counsel, but we

13   will reconvene in 30 minutes to go over exhibits and to discuss

14   how we are going to proceed tomorrow.  So you may want to have

15   your own discussion on that topic if we are going to proceed in

16   this manner tomorrow or not.

17       We also have to talk about if we are proceeding in this

18   manner, how we are dealing with issues with respect to sealing.

19           After Mr. Frost, who do we have in terms of witness order?

20           MR. BALES:  Your Honor, after Mr. Frost -- Jeff --

21           MR. JUDD:  Yes, Your Honor.  We've arranged for

22   Mr. Beckstoffer's testimony tomorrow at 9:00 a.m., so I think

23   we may have to break into Mr. Frost's to take on

24   Mr. Beckstoffer, and then we could conclude with Mr. Frost, and

25   at that point, we'll probably call Mr. Nickel.

1          **THE COURT:**  I didn't hear you, Mr. Judd.  After

2    Mr. Frost and Beckstoffer?

3          **MR. JUDD:**  We'll -- we intend to call Mr. Nickel,

4    depending on the time.

5          **THE COURT:**  Okay.  Good enough.

6       So it's 1:46 my time.  Let's stand in recess until 2:15.

7    Okay.

8       Mr. Frost, you are entitled to talk to the lawyers during

9    this break.  I don't always allow, but we are not yet in

10   cross-examination, so it's fine with me.  All right.

11         **MR. JUDD:**  Your Honor, can we get a -- where we are

12   with the time?  We'll cover that in -- when we return?

13         **THE COURT:**  I will be sending to you Excel

14   spreadsheets at the end of every evening, so I keep track, and

15   then we'll send them to you.  Like I said, I try to -- I'm

16   doing a couple of things.  I'm affording each of you a few more

17   minutes because these admonitions are taking much longer than

18   we would typically have in court.  And when I spend, you know,

19   a chunk of time myself, then I take that on my own, so you

20   don't get docked for it.

21      Okay.  But you will get it later, not this minute,

22   Mr. Judd.  I have to do some math, but you will get it.

23      All right.  Okay.  We will stand in recess until 2:15

24   Pacific time.  Thank you.

25                    (Recess taken at 1:47 p.m.)

1          (Proceedings resumed at 2:16 p.m.)

2          **THE COURT:**  We are back on the record.  The record

3     will reflect the parties are present.

4          Okay.  So let's go ahead and start with what I've noted as

5     exhibits that have been admitted.  And these -- what I was

6     cross-referencing were those that were used during the trial

7     and for which the parties had stipulated could be admitted, or

8     during the course of the trial so far, they were offered and

9     there was no objection.

10         Okay.  So what I am showing in numerical order is 7A, 84,

11    86, 209, 211, 213, 215, 216, 220, 236, 243, 256, 258, 266, 279,

12    287, 294, 1313, 1440, and 1680.

13         You can review your notes tonight and get back to me.  Are

14    there any comments right now with respect to those that I

15    either forgot to include, included something that I shouldn't

16    have, etc.?

17         **MR. JUDD:**  Your Honor, you made reference to Exhibits

18    84, 86, 89, I believe?

19         **THE COURT:**  84 and 86.

20         **MR. JUDD:**  I'm not -- 84, 86, and 89.  I'm not aware

21    that those came up.

22         **THE COURT:**  Okay.  I don't know why I checked those.

23    All right.  So not 84, not 86.  I didn't mention 89.

24         **MR. JUDD:**  But I wrote it down.

25         **THE CLERK:**  Your Honor, there was -- this is the

1   clerk.  There was a 186 that was mentioned in the direct of

2   Mr. Miltenberger and a 191.

3           **MR. JUDD:**  Yes, Your Honor.

4           **THE COURT:**  Okay.  So 186.

5           **THE CLERK:**  And then 191, I have.

6           **MR. GHIAM:**  Is there any possibility to go over the

7   numbers again?  I'm afraid I missed a couple of them.

8           **THE COURT:**  I know what I did.  I'm missing something.

9   So Ms. Stone is right.

10          So 7A, 184, 186, 209, 211, 213, 215, 216, 220, 236, 243,

11  256, 258, 266, 279, 287, 294, 1313, 1440, 1680.  And then I

12  also had the figures that were attached to Exhibit No. 7.

13          **MR. JUDD:**  Your Honor, in some cases, those figures

14  may also be trial exhibits that have a TX number.  I can't

15  figure that out right now, but if you give us the figure list

16  again, then I can --

17          **THE COURT:**  So the figures that I had that were

18  attached to Exhibit 7 were Figures 1, 4, 6, 8, 15, 18.

19          **MR. JUDD:**  What I'll do, with your consent, is to

20  identify those that have already been marked with a trial

21  exhibit number.

22          **THE COURT:**  That's fine.

23          **MR. JUDD:**  And match that up.

24          And then I wanted to remind Your Honor that the parties

25  stipulated that those exhibits on Docket 183 that haven't been

1    reserved where objections have not been preserved, that we have

2    stipulated that those documents may be admitted without

3    necessarily being discussed at trial.

4            **THE COURT:**  Well, Mr. Judd, what good does it do me if

5    you don't discuss them?

6            **MR. BALES:**  Your Honor, one of those documents was

7    Trial Exhibit 313, which was attempted to discuss during the

8    Miltenberger examination.  They objected.  However, on 183,

9    they stipulated to admit to it.

10           **THE COURT:**  So, look, I don't know -- and this is the

11   reason we're having this discussion.  People can stipulate -- I

12   don't know what your agreement is; that is, did you stipulate

13   that all these things come in regardless if they're ever used

14   at trial, or just did you stipulate that they would be admitted

15   once they were used so that you didn't have to lay the

16   foundation so that they could actually be admitted as much of

17   this has happened?

18       So today's trial proceedings went by quite efficiently

19   because you didn't have to go through and lay the foundation

20   for all of this to have it admitted.  I saw that it was

21   admitted.  I just checked -- I've got a spreadsheet.  I checked

22   my box.  We move on.  We never even say anything.  But I don't

23   know why I would admit something if I don't have any context

24   for using it in terms of making a decision in this case.

25           **MR. JUDD:**  This was something the parties discussed.

1      **THE COURT:**  Okay, Mr. Judd.  That's why I asked.  What

2   was your agreement?

3      **MR. JUDD:**  Our agreement was the former, that a

4   document can become part of the trial record whether or not a

5   witness discusses it during trial to the extent that we

6   stipulated to its admissibility.  I think you find that -- I

7   believe it's 202.  Is that the correct docket number?

8      **THE COURT:**  Is that correct, Mr. Colbert?  Mr. Kane?

9      **MR. KANE:**  Yes, Your Honor.

10      **THE COURT:**  Okay.  Then if it was, then 313 is

11   admitted.

12      Mr. Merone was wrong in -- once evidence is admitted into

13   trial, then people can be asked a question about it.  So I

14   don't know why there is an objection from the Defense when the

15   agreement was that this was part of the trial record.

16      Mr. Colbert?  Mr. Kane?

17      **MR. MERONE:**  Your Honor, the -- part of the trial

18   record -- I mean, lots of things become part of the trial

19   record.  An expert, however, cannot say I based my opinion on

20   things that they didn't put in their report because it wasn't

21   in his report.  That was the objection.  He didn't rely on it

22   there, not that it wasn't admissible into evidence.  It can

23   come through Mr. Nickel.  But if Mr. Nickel is going to admit

24   documents, Mr.--

25      **THE COURT:**  Well, first of all, a witness never admits

1   documents, only the judge does --

2         **MR. MERONE:**  Well -- understood.

3         **THE COURT:**  Hold on.  The wine book, the -- the wine

4   book was referenced in a couple of ways.  One, as I'm looking

5   at the trial exhibit description, through a declaration of

6   Mr. Miltenberger.

7         **MR. MERONE:**  Yes.  During the PI.

8         **THE COURT:**  Okay.  So it's not as if we don't believe

9   that he hasn't seen it or read it, and it's not as if you

10  weren't on notice of it given that it's in the -- in the

11  court's docket.  Perhaps you're right, he couldn't, you know --

12  he -- he didn't base his current opinion on it, but I don't

13  know why I got an objection if it's part of the evidence.

14        **MR. MERONE:**  Well, the objection, Your Honor, is

15  because if it's -- if a witness has not relied on it as a basis

16  for his opinion and the basis for his opinion are set forth in

17  his report, he can't just -- he just can't talk about new

18  evidence and say, "I relied on this new evidence that I didn't

19  discuss before or say that I was relying on."  That was the

20  basis for my objection.

21        **THE COURT:**  So how do you plan, Mr. Judd, to use this

22  evidence?  I don't even know what it is.

23        **MR. JUDD:**  I -- I had thought that -- or I had

24  intended for Dr. Miltenberger to go through it and discuss its

25  significance as related to the case.

1          **THE COURT:**  And how -- and how would you do that given

2     that he didn't base his opinion on it?

3          **MR. JUDD:**  Well, it relates to the substance of his

4     opinion and is another source.  It seems to me that he should

5     be able to discuss the record and how it affects the

6     significance of the issues in the case.

7          **THE COURT:**  I agree with Mr. Merone.  He can't, in

8     that context -- and I guess -- I guess you all will use it in

9     terms of argument.  I don't know how else you can discuss it.

10    There's no point.  I haven't seen it.  I haven't read it.

11         Experts can only, you know -- the point of an expert

12    report -- and Mr. Bales is right.  It doesn't have to be

13    specifically in there, but it does have to be within the scope,

14    and you can't be pulling things out at trial that you didn't

15    give the other side notice of because there could have been

16    something in that book that totally contradicted what he was

17    opining, and parties have a right to expose that during

18    cross-examination and during depositions.  So --

19         **MR. JUDD:**  Your Honor, we provided a declaration from

20    Mr. Miltenberger authenticating virtually all of these

21    documents.

22         **THE COURT:**  Was the declaration provided before or

23    after the deposition?

24         **MR. JUDD:**  After the deposition.

25         **THE COURT:**  Then that's not sufficient; right?

1      **MR. JUDD:**  Okay.

2          **THE COURT:**  It's not in his report.  They weren't on

3   notice of it before they took his deposition.  I'm suspecting

4   you didn't offer to have him re-deposed based upon his -- the

5   new basis for his opinions.

6      Now, it's different with Frost.  If they choose not to

7   take his deposition, that's on them, not on you.

8          **MR. JUDD:**  Thank you, Your Honor.

9          **THE COURT:**  Okay.  So 313 is in.

10         (Trial Exhibit 313 received in evidence)

11         **THE COURT:**  What else was referenced?  Or I guess I'll

12  just go through -- if that was your agreement, I will go

13  through and everything for which there is a stipulation on

14  Docket 183 is admitted.

15         **MR. JUDD:**  Thank you, Your Honor.

16         **THE COURT:**  Okay.

17     So let's talk about this morning's technical difficulties.

18  Do you want to continue on this platform, or do we want -- do

19  the parties want to work with Ms. Stone and your tech support

20  to figure out how we can get those links working?

21         **THE CLERK:**  This is the courtroom clerk, and I think

22  it's possible to get those links to work.  I can start at 7:30

23  tomorrow with people testing to get in, and if it doesn't work,

24  then we're set ahead of time, but I'm going to work right after

25  this with -- you know, to get it right.

1          **THE COURT:**  What do the parties want to do?  Mr. Judd?

2          **MR. JUDD:**  May I ask a question?

3          **THE COURT:**  You may.

4          **MR. JUDD:**  Is this the difference that we earlier

5    discussed with respect to people who were observing the

6    proceeding can take photos or record the proceeding and that's

7    why we went to the other?

8          **THE COURT:**  The court's website indicates that it

9    is -- that they are prohibited from doing that.  So anybody

10   who's observing, you know, should not be -- if they -- if they

11   somehow take a picture or record it or do anything like that,

12   they are in violation of a court order.

13         **MR. JUDD:**  I understand.  That's the difference

14   between this webinar platform versus the one we were talking

15   about?

16         **THE COURT:**  Well, not only -- the other difference is

17   that we can't put your witness in a waiting room, so, for

18   instance, if you have somebody who you're going to call who's

19   not -- let's say Mr. Beckstoffer.  If you -- he's not an expert

20   so he's not supposed to be watching, and typically the next

21   person would come on the stand once a witness was finished.  To

22   be efficient, right, we would put them in a waiting room, and

23   then as soon as we were done with one, we would release them,

24   and we would pull in the one from the waiting room.  The person

25   in the waiting room cannot see or hear any of the proceedings.

1          This option, they can be watching.  The way we'd have to

2    do it is, you know, you would have to be communicating on a

3    cell phone or some other manner to say okay, now you can come

4    in.  So there's no holding -- there's no lobby for them, so to

5    speak.

6          **MR. JUDD:**  Given our time constraints, it's my view

7    that having that waiting room per se is helpful.  So if we can

8    make that effective, use the platform that allows that, that

9    would be my initial --

10         **THE COURT:**  And then you understand everyone else

11   can't watch, they can only listen?

12         **MR. JUDD:**  Yes.

13         **THE COURT:**  Okay.

14     Mr. Colbert?

15     **MR. KANE:**  That would be our preference as well with

16   the caveat we are going to test it tomorrow at 7:30, as I

17   understand it.

18         **THE CLERK:**  Yes.

19     **MR. KANE:**  So the only issue that we might run into is

20   we've already provided that private link to Mr. Beckstoffer's

21   counsel, and so we don't have direct communication with

22   Mr. Beckstoffer because we're going through his counsel, so if

23   we do have to revert back to the public access link, then there

24   might be that delay that we have to get through to his counsel

25   who will then contact Mr. Beckstoffer.

1      **MR. COLBERT:**  My understanding, Mr. Kane, is that

2   Mr. Beckstoffer will not be the first witness up so we will

3   have some time if we need it.

4      **MR. KANE:**  Right.

5      **MR. JUDD:**  Only a half hour, but, yes.

6      **THE COURT:**  Okay.

7      So, Ms. Stone, does anybody need to stay on afterwards to

8   work with you?

9      **THE CLERK:**  If -- if the -- Ms. Hauff, who is the

10  TrialGraphix square, she could stay on with me, that would help

11  on there, and then I hope to get this resolved this evening and

12  be able to resend links or get it -- I think part of it is you

13  have to be out of your Zoom program at your work, at your

14  corporation, and log in to our zoom.gov, but I'm going to work

15  out those details, hopefully tonight, and then test it tomorrow

16  at 7:30.

17     **MR. BALES:**  Thank you so much for all your efforts.

18     Your Honor, the one thing I would ask if we go on this

19  platform is that we remind of the no recording, no photographs,

20  because I understand that is your court order, but people

21  listening in may not have seen that.

22     **THE CLERK:**  Well, if they went -- I'm sorry.  It's the

23  clerk.  If they went to the link, it's there.  If they went to

24  the court link on the web page, it is there also.

25     **MR. BALES:**  Okay.  Thank you.

1     **THE COURT:**  They are only going to get the link in one

2   of two ways; right?  Either through you, in which case you

3   should make sure to mention that, or they go to the web page,

4   and that should be mentioned as well.  But we've got a -- we

5   can train a camera on a notification, if we need to, so that it

6   stays up and it's part of the platform.  The problem is that

7   people who want to violate the court order have figured out how

8   to do it.  We will also get -- our IT seems to be trying to

9   figure out how to help us with the links.

10    Okay.  Well, if we are on the other platform, then it

11  seems to me we'll have less of an issue in terms of sealing.

12  What we will do -- well, do we expect sealed evidence tomorrow?

13    **MR. JUDD:**  Your Honor, tomorrow Mr. Beckstoffer I'm

14  sure is going to be talking about the license agreement which

15  is designated confidential, so I think we should figure that

16  out now.

17    I have a suggestion, if the Court wants to entertain it.

18    **THE COURT:**  Go ahead.

19    **MR. JUDD:**  Perhaps -- and I don't know what areas are

20  particularly sensitive to Constellation or Beckstoffer about

21  that license, but to the extent that we're going to be focusing

22  on certain areas, if they are not within the sensitive area,

23  maybe we could deal with it through redactions or otherwise and

24  not have to worry about sealing the courtroom.

25    **THE COURT:**  Who is doing that witness for the Defense?

1           **MR. KANE:**  I'm sorry, I will be handling

2     Mr. Beckstoffer.  So we can -- I think if Mr. Judd wants to let

3     us know what sections of the license agreement, we can review

4     those and determine whether they are sensitive or not.

5           **MR. JUDD:**  I will be focusing on paragraphs 9 and 7.

6     We will talk about it more generally, but that will be the

7     textual references that we're focusing on.

8           **MR. KANE:**  I would need to review those, Your Honor,

9     and get back to Mr. Judd about those two particular sections

10    because I don't have them committed to memory.

11          **THE COURT:**  Okay.  Let me do this.  Let me ask that

12    the two you meet and confer when we're done here offline so

13    you're not talking about this publicly.  Figure out if you can

14    do it in a way that would still make it accessible for

15    Mr. Beckstoffer.  That's part of my concern.  There's lots of

16    things that we could do with stipulations if it -- I mean,

17    because he's an older -- elderly gentleman; right?

18          **MR. JUDD:**  He's 80.

19          **THE COURT:**  Okay.  Well -- no, I mean --

20          **MR. JUDD:**  Doesn't sound that old anymore, does it?

21          **THE COURT:**  No.  You know, I come from a law firm

22    where the -- you know, Mr. Godward I think worked every day

23    until he was about 90, 95, so it all depends on the person.

24        And then I think what we will test with our IT people is

25    we will get into that meeting room and then what we would have

1    to do to seal the courtroom, we would have to open up a meeting

2    room and only bring in those people who should be in the sealed

3    courtroom.  We will leave everybody else out.  I think that's

4    the way we'd have to do it.

5         The other alternative would be to just disconnect the

6    public line and then reopen the public line once we were done.

7    The concern with that then is that your clients have been

8    participating by listening.  They haven't been on the platform.

9    So they wouldn't be there for that part unless we brought them

10   onto the platform.

11        Any thoughts?

12        **MR. KANE:**  Your Honor, in terms of the Beckstoffer

13   license, obviously this will depend on the exhibits that we're

14   referring to.  If we are referring to the Beckstoffer license,

15   that is a document that is a -- a document between

16   Mr. Beckstoffer and Mondavi/Constellation so I think it would

17   be appropriate in that circumstance for a Constellation witness

18   representative to be able to be present, the same as when we

19   are discussing Constellation's finances, for example.  And on

20   the flip side, if TVH was presenting its finances, we would

21   expect Mr. Nickel to be present but the Constellation

22   representative would not be.

23        **MR. JUDD:**  I think that's subject to whether it's

24   Attorneys' Eyes Only or not.

25        **THE COURT:**  I would agree with that.  Was it

1    designated in that manner?

2            **MR. KANE:**  The finances are Attorneys' Eyes Only.  I

3    believe the Beckstoffer license itself was confidential, as I

4    recall.  I believe Mr. Beckstoffer, when he produced it as

5    confidential, redacted the pricing information from the -- I'm

6    sorry.  That's the grape contracts.  I stand corrected,

7    Your Honor.

8            **THE COURT:**  All right.  Do you all want to meet and

9    confer on this topic and then let me know?

10           **MR. KANE:**  Yes, Your Honor.

11           **MR. JUDD:**  Why don't we.

12           **THE COURT:**  Okay.  The other thing is -- and it was

13   very helpful.  I did receive from TVH a list of the exhibits

14   they were going to use today, and we created a sub-folder so

15   that we could have fast access to them.  I would like to, since

16   I don't have the witness binders -- I'd like you all to

17   continue to do that for your witness-in-chief.  I don't need

18   this in a formal document.  I'm not trying to make busywork for

19   you.  So if you could send us an email.  All we're trying to do

20   is create sub-folders so that we don't have to access the huge

21   files with all of the electronic exhibits but so that we can

22   create subfiles and then just have easy access to them during

23   the witness's testimony.

24           **MR. COLBERT:**  Your Honor, if I may, would you like to

25   have them just the evening before or as far in advance of that

1  witness as possible?

2       **THE COURT:**  As far in advance would be great.  I mean,

3  that just means that we can get it done sooner rather than

4  later.

5      Okay.  Then there was a problem with -- I believe there

6  was a problem with Constellation's flash drive.  Apparently we

7  tried to download it, and the USB key is password protected so

8  we couldn't get into it.  It was locked by BitLocker.

9       **MR. KANE:**  I believe, Your Honor, Mr. Ghiam sent a new

10  flash drive to the Court that was unencrypted.  It had no

11  password.

12       **THE COURT:**  Okay.  Hold on.  We did receive a new one.

13  It's still locked.  Both were locked by BitLocker.

14       **MR. KANE:**  We will overnight -- let me confer to find

15  out if there is a password we can email to the Court, but

16  otherwise, we will endeavor to overnight to you an unencrypted

17  one yet again.  That was our instruction, and it could be our

18  security software and our firm's computers are just

19  automatically encrypting them.  We told them to ensure there

20  was no encryption.

21       **THE COURT:**  Okay.

22       **MR. GHIAM:**  Didn't the flash drive come with a cover?

23       **THE COURT:**  Say that again.

24       **MR. GHIAM:**  I think there was a password printed on

25  the cover that came with the flash drive.

1          **THE COURT:**  Okay.  Hold on.  Okay.  They didn't see

2     that.  Let them try it, and we'll get back to you.

3          Okay.  Anything else you want to cover today?

4          **MR. JUDD:**  Your Honor, do you want us to try to pare

5     down the admonitions?  I had no idea they were going to take

6     that long, and I'm wondering if we just can't have something

7     more in the nature of an omnibus that's not quite as detailed.

8          **THE COURT:**  That would be fine for me.  It's -- like I

9     said, I'm adding time because this admonition takes so long.

10    It's also why I asked Ms. Stone to do it so I didn't have to.

11    But a shorter one is fine.

12         **THE CLERK:**  The courtroom clerk speaking.  If somebody

13    just wants to redline one and send it to me, agree what you

14    want to read and redline it.  You don't have to print it all

15    over again, and I will just read what's not lined out.

16         **MR. JUDD:**  Sure.  We will include that in our

17    meet-and-confer this afternoon.

18         **THE COURT:**  Okay.

19         **THE CLERK:**  So then I have one more thing.  It was the

20    courtroom's deputy's fault that things didn't go well today.  I

21    didn't uncheck a button that said "your authenticity" -- your

22    email, so that's why people couldn't get in.  So we have

23    unchecked that, and -- but I still would like to test it at

24    7:30 tomorrow with at least, you know, one from each side and

25    the tech people and your paralegal staff, if I could still do

 1   that, but I think it will work.

 2            THE COURT:  Okay.  Day 1 has always got its kinks.  As

 3   I told my law clerks, it usually takes a couple of days for the

 4   lawyers to figure me out, and then it all works pretty well

 5   after that.

 6            MR. COLBERT:  I actually thought, Your Honor, that

 7   technically -- so this is my first Zoom trial ever.  It went

 8   okay.

 9            THE COURT:  I think -- I don't know.  My first Zoom

10   trial, too.  We have only -- I am the third in the district.  I

11   would have been the first if not for young Mr. Bales, but --

12   all right.  Okay.  Anything else?

13            MR. JUDD:  Nothing from TVH, Your Honor.

14            MR. KANE:  No, Your Honor.

15            THE COURT:  All right.  Then we will see everybody

16   tomorrow morning, and we are adjourned for the day.  Thank you.

17                 (Proceedings adjourned at 2:49 p.m.)

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, November 30, 2020

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25