Timothy J. Carlstedt (State Bar No. 168855)
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, CA 94111
Tel.: (415) 975-3700
Fax: (415) 975-3701

Edward T. Colbert (DC Bar No. 206425)
William M. Merone (DC Bar No. 458104)
Erik C. Kane (DC Bar No. 4951546)
Jeremy Boczko (NY Bar No. 5004858)
Armin Ghiam (DC Bar No. 219290)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel.: (202) 955-1500
Fax: (202) 778-2201

*Counsel for Constellation Brands U.S. Operations, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VINEYARD HOUSE, LLC,<br>a California limited liability company,<br><br> *Plaintiff / Counterclaim-Defendant,*<br><br>v.<br><br>CONSTELLATION BRANDS U.S.<br>OPERATIONS, INC.,<br>a New York corporation,<br><br> *Defendant / Counterclaim-Plaintiff.* | Case No.: 4:19-cv-01424-YGR<br>Case No.: 4:20-cv-00238-YGR<br><br>**DEFENDANT'S POST-TRIAL BRIEF** |

  Further to this Court's request (Tr. 591:13-593:18),[1] Defendant / Counterclaim-Plaintiff,

Constellation Brands U.S. Operations, Inc., respectfully submits this post-trial brief in support of

the affirmative claims it is asserting in this action through its Complaint [ECF 1; Case No. 4:20-

CV-00238], and in opposition to the claims raised by Plaintiff / Counterclaim-Defendant, The

Vineyard House, LLC, in its First Amended Complaint [ECF30; Case No. 4:19-CV-01424].

---

[1] The Trial Transcripts ("Tr."), which were continuously paginated, are docketed in the "parent" case [4:19-CV-01424] as ECF 219-21, 226, 230-31, and 233. Certain portions were also sealed.

# TABLE OF CONTENTS

A.    Constellation's Trademark Claims....................................................................... 3

    1.    TO KALON VINEYARD is a Trademark.................................................. 4

    2.    Plaintiff's Use of TO KALON VINEYARD Will Cause Confusion ...................... 5

    3.    Plaintiff's Defenses are Meritless ............................................................. 8

        a.    Fair Use ............................................................................ 9

        b.    Primarily Geographically Descriptive......................................... 9

        c.    Abandonment ..................................................................... 11

        d.    Fraud on the Trademark Office................................................. 13

        e.    The Ezell Survey ................................................................. 18

B.    Constellation's False Advertising Claim ............................................................ 19

C.    Constellation's State Law Claims ..................................................................... 22

D.    Constellation's Request for an Injunction........................................................... 22

E.    Plaintiff's Claims ........................................................................................ 24

HUNTON ANDREWS
KURTH LLP

4:19-CV-01424-YGR
4:20-CV-00238-YGR

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Adidas Am., Inc. v. Skechers USA, Inc.*,
   149 F. Supp. 3d 1222 (D. Or. 2016) ....................................................................23

5

*Arizona Dream Act Coal. v. Brewer*,
6
   757 F.3d 1053 (9th Cir. 2014)............................................................................24

7

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*,
   289 F.3d 589 (9th Cir. 2002)..............................................................................12

8

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability*,
9
   524 F. Supp.2d 1166 (N.D. Cal. 2007) ...............................................................22

10

*In re Bose*,
   580 F.3d 1240 (Fed. Cir. 2009).................................................................13, 16, 18

11

*Brookfield Comm., Inc. v. West Coast Enter. Corp.*,
12
   174 F.3d 1036 (9th Cir. 1999).............................................................................7

13

*In re Century 21–RE/MAX Real Estate Adver. Claims Litig.*,
   882 F.Supp. 915 (C.D. Cal. 1994)......................................................................19

14

*Claar v. Burlington N.R.R.*,
15
   29 F.3d 499 (9th Cir. 1994)...............................................................................22

16

*Cleary v. News Corp.*,
   30 F.3d 1255 (9th Cir. 1994).............................................................................22

17

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
18
   251 F.3d 1252 (9th Cir. 2001).......................................................................18, 19

19

*In re Cotter & Co.*,
   228 USPQ 202 (TTAB 1985) ............................................................................10

20

*CytoSport, Inc. v. Vital Pharm., Inc.*,
21
   617 F.Supp.2d 1051 (E.D. Cal. 2009).................................................................24

22

*Daubert v. Merrell Dow Pharm.*,
   43 F.3d 1311 (9th Cir. 1995).............................................................................21

23

*Department. of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*,
24
   448 F.3d 1118 (9th Cir. 2006).............................................................................4

25

*E. & J. Gallo Winery v. Consorzio del Gallo Nero*,
   782 F.Supp. 472 (N.D. Cal. 1992) ......................................................................8

26

*eBay Inc. v. MercExchange LLC*,
27
   547 U.S. 388 (2006) ........................................................................................23

28

*Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East,*
542 F.2d 1053 (9th Cir. 1976)...........................................................................12

*FreecycleSunnyvale v. Freecycle Network,*
626 F.3d 509 (9th Cir. 2010)..........................................................................2, 12

*Frehling Enterprises, Inc. v. International Select Group, Inc.,*
192 F.3d 1330 (11th Cir. 1999)............................................................................8

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997).............................................................................................22

*GoTo.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000)...............................................................................6

*Halo Mgmt., LLC v. Interland, Inc.,*
2004 WL 1781013 (N.D. Call. 2004) ..................................................................12

*Herb Reed Enter., LLC v. Florida Enter. Mgmt., Inc.,*
736 F.3d 1239 (9th Cir. 2013)..............................................................................23

*International Order of Job's Daughters v. Lindeburg & Co.,*
633 F.2d 912 (9th Cir. 1980).................................................................................22

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999).............................................................................................21

*Kwan Software Eng., Inc. v. Foray Tech., LLC,*
2014 WL 572290 (N.D. Cal. 2014).......................................................................25

*MedAmerica, Inc. v. Med Staff America, Inc.,*
2011 WL 13258235 (N.D. Cal. 2011).....................................................................8

*Meeker v. Meeker,*
2004 WL 2457793 (N.D. Cal. 2004)...........................................................2, 4, 9, 14

*Mighty Enter., Inc. v. She Hong Indus. Co. Ltd.,*
2015 WL 276771 (C. D. Cal. 2015).................................................................24, 25

*Oberlin v. Marlin American Corp.,*
596 F.2d 1322 (7th Cir.1979).................................................................................12

*Official Airline Guides, Inc. v. Goss,*
6 F.3d 1385 (9th Cir.1993).......................................................................................7

*OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.,*
897 F.3d 1008 (9th Cir. 2018)...........................................................................2, 4, 13

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,*
469 U.S. 189 (1985)..........................................................................................4, 10

*In re Pebble Beach Co.,*
19 USPQ 2d. 1687 (TTAB 1991) ......................................................................2, 11

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014)........................................................................................4

*Pooshs v. Phillip Morris USA, Inc.*,
  287 F.R.D. 543 (N.D. Cal. 2012) ................................................................................22

*In re Societe Generale des Eaux Minerales de Vittel, S.A.*,
  824 F.2d 957 (Fed. Cir. 1987)...............................................................................10, 14

*Stark v. Diageo Chateau & Estate Wines Co.*,
  907 F.Supp.2d 1042 (N.D. Cal. 2012) .....................................................................6, 24

*Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*,
  2015 WL 6501228 (D. Nev. Oct. 26, 2015)................................................................23

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985).....................................................................................12

*Triad Sys. Corp. v. Southeastern Express Co.*,
  64 F.3d 1330 (9th Cir. 1995)........................................................................................24

*United States Olympic Comm. v. Xclusive Leisure & Hospitality Ltd.*,
  2008 WL 3971120 (N.D. Cal. 2008)..............................................................................6

*Wells Fargo & Co. v. ABD Ins. & Financial Serv.*,
  758 F.3d 1069 (9th Cir. 2014).....................................................................................19

*Zobmondo Enter., LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010).....................................................................................10

**Statutes**

15 U.S.C. § 1052(e) ...........................................................................2, 10, 11, 14, 17

15 U.S.C. § 1052(f)......................................................................................10, 17

15 U.S.C. § 1114(1) ...............................................................................................1, 3, 4

15 U.S.C. § 1115(b) ..............................................................2, 4, 9, 10, 20, 21, 25

15 U.S.C. § 1116 .................................................................................................24

15 U.S.C. § 1117(a) ............................................................................................22, 24

15 U.S.C. § 1125(a) ..............................................................................1, 3, 4, 17, 19

15 U.S.C. § 1127 ...............................................................................................3, 4

California Business and Professions Code § 17200..................................................22

**Other Authorities**

27 C.F.R. §§ 9.21-9.269............................................................................................11

*McCarthy on Trademarks and Unfair Competition* (5th ed. 2020) ...........................................13, 23

Federal Rule Evid. 702..........................................................................................................21, 22

Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual on Scientific Evidence* (Federal Judicial Center ed., 3d ed. 2011)............................................18

Julie C. Frymark, Note, Trademark Dilution: A Proposal to Stop the Infection from Spreading, 38 Val. U. L. Rev. 165 (2003) ......................................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HUNTON ANDREWS
KURTH LLP

**OVERVIEW**

This is a case that Plaintiff should never have filed, let alone continue to pursue after this Court granted a preliminary injunction (ECF 40 [4:20-CV-00238]) back in February and enjoined Plaintiff's infringing activities.  As was shown at trial, and will be discussed here, even *Plaintiff's* witnesses admit that all of the elements of trademark infringement are present.  Nothing was ever in dispute.  Plaintiff has just repeatedly and obstinately refused to accept how the law works.

For example, Plaintiff's wine expert (Douglas Frost), with whom Plaintiff first consulted *more than a year ago*, ECF 45-2 [4:19-CV-01424], ¶ 1, readily <u>admits</u> that Constellation[2] has used the TO KALON VINEYARD designation for the last thirty years (directly and through its licensees) to denote the source of high-quality ultra-premium wines, *and* that Constellation's use of that designation has been exclusive.  Tr., 310:6-311:3, 311:16-22, 315:2-5.  Mr. Frost also <u>admits</u> that as a result of Constellation's thirty-plus years of exclusive use, which, in his words, built up "goodwill" in the TO KALON VINEYARD name, consumers have come to expect that a TO KALON VINEYARD-designated wine will be of the highest quality, and they therefore are willing to pay a premium for wines that bear that designation.  Tr., 311:9-12:3, 315:10-16, 316:5-13.  And Mr. Frost further <u>admits</u> that if consumers *were* to encounter a <u>non</u>-Constellation "TO KALON VINEYARD" wine in the marketplace (such as Plaintiff's wine, which, he agrees, does <u>not</u> originate from "To Kalon Vineyard," *see* Tr., 320:11-23), consumers would mistakenly believe that the wine comes from same vineyard from which the grapes for Constellation's famous TO KALON VINEYARD wines are sourced because "the vineyard designation informs consumers that the wine comes from the named vineyard."  *See* Tr. 219:6-220:3, 304:14-16.

That is **textbook** trademark infringement.  *See* 15 U.S.C. §§ 1114(1), 1125.  There are no mysteries or subtleties here.  Plaintiff <u>literally</u> took Constellation's TO KALON VINEYARD trademark, put it on competing bottles of ultra-premium wine, and began selling them last year even though *its own wine expert* knew (and by that point had basically already testified; *see* ECF 45-2 [4:19-CV-01424], ¶¶ 11-12, 16) that by doing so, Plaintiff would cause consumers to believe

---

[2] References to "Constellation" include the Robert Mondavi Winery and any of its former entities.

mistakenly that its wines came from the same vineyard as other TO KALON VINEYARD wines. *See* Tr. 304:14-16, 311:9-22, 319:13-321:2, 324:25-325:24.  Yet rather than be dissuaded by that objective reality, Plaintiff has continued to maintain that the sky is not blue and argue that consumers will somehow not be confused, postulating multiple "defenses" to Constellation's infringement claim and going so far as to commission a specious survey to "prove" its case.

None of Plaintiff's counters, however, have merit, and all can be disposed with dispatch. They are distractions and nothing more.  Plaintiff's "fair use" defense is statutorily inapplicable because its use of TO KALON VINEYARD as a "vineyard designation" is quintessential use "as a mark."  *See, e.g., Meeker v. Meeker*, 2004 WL 2457793, *8, 10 (N.D. Cal. 2004); Tr., 1119:18-1120:14; TX1385); *cf.* 15 U.S.C. § 1115(b)(4) (for "fair use" to apply, the use must, among other things, be "otherwise than as a mark").  Its "primarily geographically descriptive" argument is pre-empted by both principles of incontestability (15 U.S.C. § 1115(b)) and legal authority that makes clear what that phrase really means.  *See In re Pebble Beach Co.*, 19 USPQ 2d. 1687, 1688 (TTAB 1991); 15 U.S.C. § 1052(e)(2).  Its claim of "abandonment" is contradicted by the evidence (including by the testimony of its expert) and by the law.  *See* Tr., 315:10-316:13; *see also id.*, 282:15-288:17, 719:12-730:2, 751:7-758:13, 933:17-935:3-24; *cf. FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010).  Its allegations of "fraud" run contrary to the record and are insufficient to meet the heavy burden to prove up a cancellation claim (and, what is more, are irrelevant to all but one of the asserted causes of action).  *Cf. OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.*, 897 F.3d 1008, 1020, 1022 (9th Cir. 2018).  And its consumer survey (Plaintiff's only defense that allegedly goes to the merits) had nothing to do with the actual issues in this case, rendering it irrelevant even if one looked past its many design and methodological flaws.  *See* Tr, 1123:3-13, 1124:11-1125:22, 1129:6-1130:4, 1133:4-1134:19.

As Constellation has noted many times, this case is not about what did or did not happen 130 years ago–this is a trademark matter focused on how consumers view the phrase TO KALON VINEYARD when used on wine today.  However, *even if* we were to live in the past, Plaintiff fails there as well.  It offered no proof that its property was ever used by H.W. Crabb to grow grapes as part of his To Kalon Vineyard operations (or by the Churchills thereafter) and, what is

more, Plaintiff (through its principal, Jeremy Nickel) **knew** that no such link could be established *before* it adopted and began using the "TO KALON VINEYARD" name. *See* Tr. 546:25-548:3, 548:11-13, 550:9-19, 551:15-24, 554:21-556:2; TX1002 (pp. 11, 20-21); TX1003 (pp. 5, 13-14). Yet again, rather than accept that inconvenient fact and move on, Plaintiff turned the history of its land into a federal case, going so far as to hire a "research expert" whose one-sided reading of the historical record would have earned him a failing grade in a high school history class.

Nothing has changed since this Court concluded back in February that Plaintiff's use of the TO KALON VINEYARD designation was likely to confuse consumers and that its litany of asserted defenses would probably fail. *See* ECF 40 [4:20-CV-00238]. Plaintiff has not brought any compelling new evidence to light, nor has the foundational trademark law that undergirds this case changed. As detailed below, this Court should therefore enter judgment in favor of Constellation on all of the asserted claims and bring this needless action to a close.

## ARGUMENT

In its Proposed Findings of Fact and Conclusion of Law (ECF 236-1 [4:19-CV-01424]), Constellation sets out the factual and legal basis for why this Court should enter judgment in its favor on all claims. The claim summaries provided below are thus intended merely to underscore the propriety of the requested relief, not provide exhaustive cites to the record or the law.

**A.    Constellation's Trademark Claims (under Federal Law)**
**Count I (15 U.S.C. § 1114(1)) (ECF 1 [4:20-CV-00238], ¶¶ 59-69)**
**Count II (15 U.S.C. § 1125(a)) (ECF 1 [4:20-CV-00238], ¶¶ 70-74)**

To establish either trademark infringement or unfair competition under federal law, Constellation only needs to establish two things: (1) it owns a protectible mark in the name TO KALON VINEYARD, and (2) Plaintiff's use of that mark (or a similar one) is likely to confuse or deceive consumers as to the origin or "source" of its goods (*i.e.*, where the wine originate) or lead them to believe falsely that Plaintiff's goods are connected with another party's goods.[3] *See*

---

[3] To establish a claim for infringement under Section 1114(1), Constellation must additionally prove that it owns a federal registration for its mark. *See* 15 U.S.C. §§ 1114(1), 1127. Ownership of a registration, however, is not a prerequisite for a claim brought under Section 1125(a).

15 U.S.C. §§ 1114(1), 1125(a); *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).  Both elements were not only proven at trial, they were admitted.

### 1.      TO KALON VINEYARD is a Trademark

Constellation's incontestable federal registration for TO KALON VINEYARD (TX1488) is "conclusive evidence" that (1) the phrase functions as a mark, (2) Constellation owns the mark, and (3) the company has the exclusive right to use the mark with the goods in the registration— namely, "wine."  *See* 15 U.S.C. § 1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-201 (1985).  As such, unless Plaintiff prevails in cancelling the registration (*but see infra*), "the ownership interest element of [the] claim is met."  *Pom Wonderful*, 775 F.3d at 1124.

Regardless, *even if* Constellation's registration were ignored or set aside, the company nonetheless established at trial that it owns protectible common law rights in the TO KALON VINEYARD name, which is all that is required to support a Lanham Act claim.  *See OTR Wheel Eng.*, 897 F.3d at 1022; *Department. of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1131 (9th Cir. 2006); 15 U.S.C. §1125(a); *but cf.* n.3, *supra*. Although schooled wine professionals may label TO KALON VINEYARD a "vineyard designation," there is no dispute that a "vineyard designation" **is a trademark**—it is a name a company applies to its goods to identify and distinguish them from those made or sold by others. *See* Tr., 303:20-304:16, 1119:21-1120:14; 15 U.S.C. § 1127 (defining "trademark"); *see also* Tr., 608:2-610:3, 903:10-22, 1198:10-1199:12; TX1540; TX1743; *Meeker*, 2004 WL 2457793 at \*10. And as Plaintiff's expert (Mr. Frost) explained, Constellation's use of the TO KALON VINEYARD name over past thirty years with wines has not only been exclusive, that use, as experienced by thousands of consumers, and as filtered through the wine press, has created significant "goodwill" in the name and infused it with market pricing power, the very hallmark of a strong brand.  *See* Tr. 224:1-6, 310:6-312:20, 313:24-314:11, 315:2-316:13; *see also, e.g.,* Julie C. Frymark, Note, Trademark Dilution: A Proposal to Stop the Infection from Spreading, 38 Val. U. L. Rev. 165, 173 (2003) ("[T]the value of the trademark not only allows the manufacturer to keep other potential sellers out of the market, but it also enables the trademark owner to charge

1   more for the product.") (citing Beverly W. Pattishall et al., Trademarks and Unfair Competition,

2   pp. 207, 211 (5th ed., 2002)).  That is the very <u>essence</u> of what a trademark is and does.

### 2.   Plaintiff's Use of TO KALON VINEYARD Will Cause Confusion

4   Moving on to the second element that must be shown for a Lanham Act claim, asking if

5   consumers are likely to believe that an ultra-premium wine *labeled* as originating from "To Kalon

6   Vineyard" really *comes* from "To Kalon Vineyard" may seem like a trick question—the

7   trademark equivalent of asking "Who is buried in Grant's tomb?"  But that is actually the

8   "confusion" question before the Court.  And to be clear, just because the answer is self-evident

9   does not imply that we need search for complexity or plumb for depth.  It really *is* that simple.

10   Plaintiff's wine expert <u>admitted</u> at trial that by putting "TO KALON VINEYARD" on its

11   wine labels, Plaintiff was **literally telling consumers** that its wine originates from that named

12   vineyard.  *See* Tr., 304:9-16 ("Q: And the vineyard designation informs consumers that the wine

13   come from the named vineyard?  A: Yes"); *accord* Tr. 1114:17-1115:7, 1119:21-1120:14.  It is

14   undisputed, though, that only *Constellation's* wines (and those of its licensees) are, in fact, from

15   the vineyard consumers know as "TO KALON."  *See* Tr., 311:4-22, 315:10-16; *see also* Tr.,

16   321:21-325:24.  Thus, Plaintiff's use of "TO KALON VINEYARD" as a vineyard designation for

17   its wines is not only misleading and confusing, it is <u>objectively false</u>.  *Accord* Tr., 320:11-23.

18   Constellation and Plaintiff are putting the **same mark** (TO KALON VINEYARD) on the

19   **same goods** (ultra-premium Napa County Cabernet Sauvignon wines) sold to the **same people**

20   (affluent consumers of high-end Napa County red wines) through the **same marketing channels**

21   ("direct-to-consumer," including "allocation" programs and direct sales from the winery).[4]  *E.g.*,

---

22   [4] Although Plaintiff also displays the possessive "H.W. CRABB'S" in a separate line on its label,
*see* TX85, that does not change the fact that Plaintiff is still using Constellation's registered TO
23   KALON VINEYARD mark in its entirety.  Plaintiff's use merely mimics that of Mr. Beckstoffer
(Constellation's licensee), who uses "<u>BECKSTOFFER</u> TO KALON VINEYARD."  *See* Tr.,
24   273:13-25, 287:2-6.  Regardless, there is no evidence that use of the "H.W. CRABB'S" qualifier
resonates with consumers or, even if it does, that they would consider "H.W. CRABB'S TO
25   KALON VINEYARD" and "TO KALON VINEYARD" unrelated.  Just the opposite: many of
the respondents to Mr. Ezell's survey evidently did not even *notice* the use of "H.W. CRABB'S,"
26   *see, e.g.,* Tr., 467:11-19, nor, apparently, did Mr. Ezell.  *See* Tr., 342:5-10 (testifying on direct
that his assignment was conduct a survey to test whether "TVH's use of <u>To Kalon</u> as a vineyard
27   designation" was causing confusion); *see also* Tr., 462:17-21.  Likewise, Mr. Frost (Plaintiff's
wine expert) testified on direct that on Plaintiff's "Block 8" wine label, "To Kalon Vineyard" **was**
28   (continued)

Tr., 525:12-24, 527:8-22, 596:2-22, 842:8-12, 854:10-13; TX1085; TX1385.  Moreover, not only is there agreement that the mark at issue (TO KALON VINEYARD) is exceptionally strong,[5] *see, e.g.,* Tr., 291:4-19 ("To Kalon Vineyard is … one of the most famous of all single vineyards [] in the United States") (Mr. Frost), it is the type of source-indicator sophisticated consumers *look for* and *rely on* when purchasing wine.  As Plaintiff's expert testified, consumers consult the vineyard designation on the label when deciding whether to buy a bottle of wine because "knowing **where … the grapes come from is often the most important information** in determining if the wine is truly worth the money that is being asked for it."  Tr. 212:19-213:1, 213:21-214:9.  As a result, because Plaintiff is openly telling consumers that its wine *is actually from* "To Kalon Vineyard," no amount of "sophistication" could mitigate the potential for confusion in this case.  *Accord United States Olympic Comm. v. Xclusive Leisure & Hospitality Ltd.*, 2008 WL 3971120, *7 (N.D. Cal. 2008) ("[w]here the products are identical and the marks are strongly similar … the sophistication of the buyers *cannot* be relied on to prevent confusion") (emphasis in original).

On top of that, there is also the issue of Plaintiff's intent, which, although not necessary to a finding of infringement, *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000) ("even if … [the accused infringer] was as innocent as a fawn with *no* intent to copy or appropriate [the mark], it would prove nothing") (emphasis in original), further informs the view that this is an open-and-shut case.  Before Plaintiff began selling its infringing wine (in late 2019), it *knew* that TO KALON VINEYARD was Constellation's federally-registered trademark, *knew* that the name had commercial strength, and *knew* that Plaintiff's property had <u>never</u> (going back more than a hundred years) been used to make wine under the TO KALON brand or been called "To Kalon Vineyard"—it was land Mr. Nickel only knew as "Halter Valley."  *See* Tr., 511:23-513:3, 541:24-542:10, 543:11-16, 546:24-548:13, 550:9-19, 551:15-24, 555:3-557:9,

---

the "single vineyard designation" being used.  *See* Tr., 211:21-212:13.

[5] Legally, TO KALON VINEYARD is a "fanciful" mark.  It conveys no information about the wine; it functions solely to identify source—a vineyard with ever-changing boundaries that Constellation (since the mid-1980s) has chosen to call TO KALON.  *See, e.g., Stark v. Diageo Chateau & Estate Wines Co.*, 907 F.Supp.2d 1042, 1067 (N.D. Cal. 2012) ("Fanciful marks are 'coined' words or phrases that are either invented or selected—i.e., words that are unknown or out of common usage at the time—solely for the purpose of functioning as a trademark").

562:3-17, 596:2-17, 614:19-615:14; TX1002 (pp. 11, 20-21); TX1003 (pp. 13-14). Additionally, Plaintiff, which began applying to register dozens of TO KALON marks in its own name beginning in May 2018, *see* Tr. 601:18-603:13, 607:16-609:21; TX1403; TX1404, was told by the U.S. Trademark Office (in September 2018) that using any variant of Constellation's "TO KALON VINEYARD" mark (such as "H.W. CRABB'S TO KALON VALLEY VINEYARD") on wine **would likely cause consumer confusion**. *See* TX1544 (pp. 2-4) ("In light of the similarities between the marks and the relatedness of the goods, it is likely that consumers who encounter the parties' goods will falsely conclude that they originate from the same source."). Plaintiff was also warned *by its own Chief Financial Officer* (in May 2018) and by Constellation (in June 2018) not to use the TO KALON VINEYARD name, more than a year-and-a-half *before* Plaintiff began selling the infringing products at issue. *See* Tr. 616:15-621:18; TX1341; TX1741. In fact, Plaintiff's executive (Mr. Bearer) told Mr. Nickel that because putting TO KALON on a label would be seen as "**trying to capitalize on an association with the To Kalon brand**," he "should clear with lawyers." *See* TX1341 (emphasis added). Plaintiff, however, did not offer any evidence at trial that it secured (or even sought) a legal opinion on its proposed conduct.

When a party adopts a mark it knows belongs to another, they are acting with wrongful intent—a separate showing that they hoped to derive a benefit from their infringement is not required. *Brookfield Comm., Inc. v. West Coast Enter. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."). Here, however, Mr. Nickel's decision to use the famous TO KALON VINEYARD name—a name *his own research* established was never used for the property, and which everyone (including an executive from within his own company) was telling him was not available for use; *cf., supra*—can only reasonably be understood as an intent to *infringe*. Mr. Nickel knew he did not have (and could not establish) any legal (or historical) claim to the TO KALON VINEYARD name, but rather than use the designation "Halter Valley Vineyard" instead (his original plan; *see* Tr., 516:5-9; TX1387), he chose to fight it out, filing *dozens* of trademark applications *and* this

1    lawsuit because he knew that putting TO KALON VINEYARD on his wine would allow him to

2    charge higher prices.  *See* Tr., 312:4-7, 313:24-314:11, 315:10-316:13.  That is intent.

3          Even beyond that, though, Plaintiff's actions should be regarded as willful.  When a party

4    is formally warned by a trademark office (not to mention others) that its use of a mark is likely to

5    confuse consumers, it cannot simply plow ahead undeterred, especially where the evidence of

6    infringement (as here) is so clear-cut.  In such circumstances, the junior party is "reasonably

7    required to take … significant affirmative steps to ensure that is conduct would not constitute

8    infringement," such as by obtaining an opinion of counsel.  *See E. & J. Gallo Winery v.*

9    *Consorzio del Gallo Nero*, 782 F.Supp. 472, 473 475-76 (N.D. Cal. 1992) (where the Canadian

10   Trademark Office had rejected the junior party's mark as confusingly similar with another's, its

11   failure to consult trademark counsel before engaging in infringing conduct "support[ed] a finding

12   of willful infringement"); *MedAmerica, Inc. v. Med Staff America, Inc.*, 2011 WL 13258235, *5,

13   *6-*7 (N.D. Cal. 2011) (infringement was "likely intentional" and "willful" where the party

14   continued to use its mark after the U.S. Trademark Office rejected its application due to a

15   likelihood of confusion) (default judgment); *see also Frehling Enterprises, Inc. v. International*

16   *Select Group, Inc.*, 192 F.3d 1330 , 1340 (11th Cir. 1999) (use of infringing mark after receiving

17   an adverse Trademark Office decision and over the objections of the senior party "displays an

18   improper intent through intentional blindness").  Plaintiff here, however, took no mitigating steps.

19   In fact, although Plaintiff made a pretense of *filing* a request for a declaratory judgment regarding

20   its planned actions, removing any doubt it knew its conduct was problematic, *see* ECF 1 [4:19-

21   CV-01424], ¶¶ 60-63, in the end it did not even bother *to wait* until its case was heard—Plaintiff

22   needed to move its already-labeled product out of inventory, so it did so secretly; legal

23   consequences be damned.  *See* Tr., 621:9-18, 653:7-655:10.  That is <u>willful</u> infringement.

### 3.    Plaintiff's Defenses are Meritless

25         To counter this clear case of infringement, Plaintiff ostensibly raises several defenses.

26   None of them, however, has even the slightest merit.  All Plaintiff's "kitchen sink" approach has

27   managed to accomplish is to waste Constellation's and this Court's time and resources, dragging

28   out a case that any reasonable party would have ended the day the preliminary injunction issued.

1

### a.   Fair Use

The centerpiece of Plaintiff's defense has always been statutory "fair use."  *See, e.g.,* ECF 30 [4:19-CV-01424], ¶¶ 4, 64-67.  Anyone who *has read the statute*, however, knows that fair use can *only* apply to a use "otherwise than as a mark."  15 U.S.C. § 1115(b)(4).  In fact, Plaintiff's Chief Financial Officer (Mr. Bearer)—a man presumably with little legal training— even *warned* Mr. Nickel that using TO KALON on the front label of Plaintiff's wine would likely not be a "fair use."  *See* TX1341.  Unlike many areas of the law, the Lanham Act text is explicit on this point.

Plaintiff's use of TO KALON VINEYARD therefore cannot quality as a "fair use."  As discussed, *see supra*, a vineyard designation is a trademark—that point is not really debatable.  In fact, this Court previously *held* that putting a vineyard name on the front of a wine bottle (which is exactly what Plaintiff is doing with the TO KALON VINEYARD name; *see* TX1385) is "the very essence of use as a mark" and, thus, **cannot be** a "fair use."  *See Meeker*, 2004 WL 2457793 at *10.  Even beyond that, though, Mr. Nickel *personally* knew that a "vineyard designation" acts as a mark—the argument that he is making a "fair use" is a post-hoc litigation smoke screen.

In mid-2018, Mr. Nickel applied to register a series of "vineyard designations" (*e.g.*, TO KALON VALLEY VINEYARD) as trademarks.  *See* Tr., 608:2-609:16; TX1576; TX1578; TX1579.  And in each application, Mr. Nickel submitted a sworn declaration in which he said that he *planned to use* the vineyard designation **as a "mark."**  *See, e.g.,* TX1576 (p. 7).  Yet he *now* asks the Court to hold that his use of the TO KALON VINEYARD designation was "otherwise than as a mark," *cf.* 15 U.S.C. § 1115(b)(4), even while continuing to prosecute his applications.

That none of this makes sense is the point.  Plaintiff does not seem to understand what statutory "fair use" means, and its assertion of that defense is inappropriate, even before one considers that for Plaintiff to succeed, it would further need to show that its use of TO KALON VINEYARD was in "good faith" and that it merely "describe[s] … [the] geographic origin" of its goods, *see* 15 U.S.C. § 1115(b)(4), neither of which is true either.  *See supra* and *infra*.

### b.   Primarily Geographically Descriptive

The next defense Plaintiff seeks to rely on is its claim that "TO KALON VINEYARD" is supposedly "primarily geographically descriptive."  *See, e.g.,* ECF 30 [4:19-CV-01424], ¶¶ 2, 44-

63.  "Geographic descriptiveness," however, is not a *defense* to infringement—it is a challenge to a mark's inherent distinctiveness and validity.  *See* 15 U.S.C. § 1052(e)(2); *cf. id.*, § 1115(b)(1)-(9).  And because Constellation's TO KALON VINEYARD registration is incontestable (and granted based on a finding of inherent distinctiveness), that attack is not even *available* to Plaintiff.  *See* 15 U.S.C. § 1115(b) (an incontestable registration is "conclusive evidence of the validity of the registered mark"); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 193-201 (1985); *Zobmondo Enter., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010) ("Where the [Trademark Office] issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive."); TX1042 (pp. 1, 56-57) (proof of secondary meaning was not required); *cf.* 15 U.S.C. §§ 1052(e)(2), (f).

Again, though, even if we were to set the registration aside, nothing would change.  To show that TO KALON VINEYARD is ineligible for continued trademark protection on the basis that the phrase is "primarily geographically descriptive," Plaintiff would have had to establish that the "primary significance" of the phrase to the majority of wine consumers <u>today</u> is that of a defined geographic location **rather than a brand**.  *See* Trademark Manual of Examining Procedure, § 1210.02(b) (Oct. 2018); *cf. also In re Cotter & Co.,* 228 USPQ 202, 205-06 (TTAB 1985) (despite being the name of a town, WESTPOINT was not geographically descriptive because its primary significance was as the name of the United States Military Academy).  Plaintiff, however, offered no such evidence (*e.g.*, a survey, consumer testimony).  To the contrary, Mr. Frost testified that consumers today associate TO KALON VINEYARD with "high quality"—that is, they see it *as a brand*.  *See* Tr., 315:2-316:13; *see also* Tr., 1114:10-1115:7.[6]

---

[6] And even if a mark *could* be understood as referencing a defined geographic location, if that location was so obscure that the average purchaser of the goods (here, wine) would not recognize it "as an indication of the geographic source," the mark is still <u>not</u> geographically descriptive.  *See* TMEP, § 1210.04(c); *see also In re Societe Generale des Eaux Minerales de Vittel, S.A.*, 824 F.2d 957, 959-60 (Fed. Cir. 1987) (even though applicant's goods originated from Vittel, France, VITTEL was not primarily geographically descriptive because the name was not known to consumers, who were more likely to consider it a brand) ("[T]he evidence is inadequate to show that the bulk of cosmetics purchasers, or even a significant portion of them, would, upon seeing the word Vittel … conclude that it is a place name and that the [goods] came from there, rather than simply a trademark or trade name of a manufacturer like Chanel, Bourgois, or Vuitton.").

One of the reasons this case has gone on far longer than it should of is because Plaintiff has repeatedly refused to accept the well-settled principle that a company's brand can *also* refer to the fixed location from which the company provides its goods or services. "The mere fact that a term may be the name of a place that has a physical location does not necessarily make that term primarily geographically descriptive[.]" *In re Pebble Beach Co.*, 19 USPQ 2d. 1687, 1688 (TTAB 1991). For example, DISNEYLAND acts as a brand even though to many it is also "the place" where the Walt Disney Company provides amusement park services. *Accord id.* ("The present case is similar to the situation of privately owned amusement parks or shopping centers or colleges, whose locations may be well known and whose marks may even appear on maps to indicate the location where their goods are sold or their services rendered. Despite the fact that an amusement park, for example, occupies a specific physical location, and it renders services and sells goods under the name of the amusement park at that location, the park's name is not a geographic term."). What "place" has constituted "DISNEYLAND" at any point in time, however, has always been within the control of the Walt Disney Corporation, just as a winery can control what land falls within a given vineyard designation, or even assign a new name to the land. *See* Tr., 303:20-304:13, 307:3-309:15, 495:7-11, 609:7-610:3 ("Q: [A]s a vintner, you're able to name your own vineyard name; is that right? A: That is correct."). That is a brand.[7]

### c.    Abandonment

Plaintiff's abandonment defense (ECF 31 [4:20-CV-00238], p. 9) is even more strained. To establish abandonment due to so-called "naked licensing" (as Plaintiff suggests), a party has to show not only that the trademark owner failed to exercise quality control over its licensee, but

---

[7] Names that are truly "primarily geographically descriptive" have defined, immutable geographic boundaries, such as "Oakville," "Napa County," or "California." If they did not, it would be impossible for an Examining Attorney to determine if the mark was potentially "primarily geographically deceptively misdescriptive," 15 U.S.C. § 1052(e)(3), which assessment applies the same test as "primarily geographically descriptive," but further asks whether the goods "originate in the place identified in the mark"—something that would be impossible to determine unless the location had defined boundaries. *Compare* TEMP, § 1210.01(a) *with id.*, § 1210.05(b). In the wine industry, the closest thing to a primarily geographically descriptive name is an "AVA." *See* Tr., 303:8-17. It is undisputed, however, that "TO KALON VINEYARD" is not an "AVA." *See* Tr., 303:18-21; *see also* 27 C.F.R. §§ 9.21-9.269 (defining the boundaries of approved AVAs).

HUNTON ANDREWS
KURTH LLP

4:19-CV-01424-YGR
4:20-CV-00238-YGR

that *the consequence* of abdication is that the trademark no longer "represents the quality of the product or service the consumer has come to expect." *See FreecycleSunnyvale*, 626 F.3d at 512 n.1; *see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017 (9th Cir. 1985) ("A … licensor must maintain control over the quality of the finished product or service to guarantee to the public that the goods or services are of the same, pre-license quality."). Plaintiff's *own witness*, however, testified that TO KALON-branded wines are consistently of the highest quality year after year. *See* Tr., 315:2- 316:4. So, as an objective matter, whatever quality control Constellation has been exercising over the past decades admittedly works.

The burden to prove otherwise a heavy one. *E.g., Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976). After all, a license does not even need to provide for formal quality control where "the particular circumstances of the licensing arrangement indicate that the public will not be deceived."[8] *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (quoting authority). Thus, "courts have upheld licensing agreements where the licensor [was] familiar with and relie[d] upon the licensee's own efforts to control quality," *see id.*, and where the licensor trusted in the "ability and integrity" of its licensee, "backed by the fact that [it] never received any complaints" about the goods that were produced. *See Transgo*, 768 F.2d at 1018. As the Ninth Circuit has explained, the purpose of the Lanham Act is to "ensure the integrity of registered trademarks, not to create a federal law of agency." *Id.* (quoting *Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1327 (7th Cir.1979). Thus, "[t]he scope of a licensor's duty of supervision of a licensee who has been granted use of a trademark must be commensurate with [that] limited goal." *See id.*

---

[8] The Ninth Circuit has suggested that if a license *includes* a right to inspect and supervise a licensee's operation, then, by definition, it is <u>not</u> a naked license. *See FreecycleSunnyvale*, 626 F.3d at 516-17 (explaining that "[t]he *lack* of an express contract right" is "not conclusive evidence of lack of control") (emphasis added); *see also Halo Mgmt., LLC v. Interland, Inc.*, 2004 WL 1781013, *4 (N.D. Call. 2004). That both Constellation's license agreement with Mr. Beckstoffer (TX1048) and Mr. Beckstoffer's agreements with his sublicensees (*e.g.*, TX1416) includes quality control provisions is not reasonably in dispute. *See, e.g.,* Tr., 761:14-768:3, 806:15-21, 807:10-810:16, 811:7-813:22. In fact, Mr. Reidl, Plaintiff's licensing expert, testified that he negotiated licenses with remarkably similar terms. *See* Tr. 1201:2-1209:3; TX11D.

Here, the evidence is overwhelming that Constellation and its licensee (Mr. Beckstoffer) carefully control the quality of wines sold under the TO KALON VINEYARD name.  The parties have established objective standards for quality, require the submission of samples for evaluation, employ specialized testing labs, and monitor critical and public reception of branded goods.  *See, e.g.*, Tr., 282:15-288:17, 719:12-730:2, 751:7-758:13, 793:17-795:17, 933:17-934:15, 935:3-24; TX98; TX108; TX1260; TX1420.  To suggest this is insufficient control ignores both reality and what "naked licensing" means, and also loses sight of the harm the doctrine is meant to prevent. Consumers are not deceived when they buy a bottle of genuine TO KALON VINEYARD wine.

### d.    Fraud on the Trademark Office

Like many litigants, Plaintiff also hopes to avoid a finding of infringement by firing back with a claim of "fraud."  As noted above, however, cancellation of Constellation's TO KALON VINEYARD *registration* would have little impact on this case, which concerns infringement of Constellation's *mark*.  *See, e.g., OTR Wheel Eng.*, 897 F.3d at 1022 ("fraud on the PTO does not affect the mark's validity, because a trademark need not be registered to be enforceable"). Plaintiff has played its attacks on the character of Robert Mondavi as a sideshow, nothing more. *See also McCarthy on Trademarks and Unfair Competition*, § 31:60 (5th ed. 2020) ("It is difficult to understand why defendants in many trademark infringement suits expend so much time, effort and money in vigorously pursuing the claim that plaintiff's federal registration was obtained by fraud.  It has been held several times that even if defendant succeeds in proving that the plaintiff's registration was fraudulently obtained, plaintiff's common law rights in the mark continue unabated and are sufficient to require an injunction against an infringing defendant.").

Regardless, Plaintiff has in no way carried its burden to show fraud.  Not only must fraud be "proven 'to the hilt' with clear and convincing evidence," *see In re Bose*, 580 F.3d 1240, 1243, 1245 (Fed. Cir. 2009); *OTR Wheel Eng.*, 897 F.3d at 1020, the party alleging fraud must offer compelling proof of willful and deceptive intent—that is, that the applicant knowingly lied to the Trademark Office to trick it into granting a registration.  *See Bose*, 580 F.3d at 1243 ("absent the requisite intent to mislead … even a material representation [does] not quality as fraud under the

1    Lanham Act warranting cancellation").  "There is no room for speculation, inference or surmise

2    and, obviously, any doubt must be resolved against the charging party."  *Id.* (quote omitted).

3          Plaintiff's fraud claim hinges on its contention that Robert Mondavi supposedly knew that

4    wine purchasers in the mid-1980s considered TO KALON primarily geographically descriptive,

5    but he withheld that information from the Trademark Office so he could get a registration.  There

6    are, however, a multitude of problems with this theory, each of which is fatal to Plaintiff's

7    contention that Robert Mondavi—"the father of California wine"— committed fraud.

8          First, Plaintiff has not established that "TO KALON" was even *known* by a substantial

9    segment of wine purchasers in the mid-1980s, the first requirement for a phrase to be considered

10    "primarily geographically descriptive."  *Cf.* Tr., 1066:19-21; TX15 (pp. 30-31).  The only

11    evidence of purchasers' awareness is the <u>lack</u> of evidence—the Examining Attorney assigned to

12    review the application searched hundreds of publications in the Nexis database (*e.g.*, *Restaurant*

13    *Business*, *Travel Weekly*, *The Washington Post*, *The New York Times*, *Nation's Restaurant News*,

14    *Playboy*, *Pacific Business News*) and did not find "To Kalon" (or "Tokalon") mentioned in any

15    document with "wine."  *See* Tr., 1082:10-23, 1093:7-12, 1110:15-1112:18; TX363; TX1027 (p.

16    72).  Thus, because "TO KALON" was "minor" or "obscure" among wine purchasers at the time,

17    it **could not have been** "primarily geographically descriptive."  *See In re Societe Generale*, 824

18    F.2d at 959-60; *see also* Tr . 1066:5-21, 1073:21-1074:9; TX15 (pp. 30-31) ("Registration should

19    not be refused if the geographic meaning of the mark is minor, obscure, [or] remote[.]").

20          Second, even if wine purchasers *were* generally aware of "TO KALON" in the mid-1980s,

21    *but see supra*, the operative question would still be whether they considered the phrase's "primary

22    significance" to be that of a specific, geographically-defined location rather than a brand.  *Cf.* 15

23    U.S.C. § 1052(e)(2); Tr., 1064:22-1065:1; TX15 (p. 30).  And here again, it is important to note

24    that a vineyard designation <u>is</u> a brand.  *Accord, e.g., Meeker*, 2004 WL 2457793 at *10.  So, even

25    if wine consumers in the mid-1980s may have known from history that Mr. Crabb (or Mr.

26    Stelling) once used "To Kalon" as the name of a winery or vineyard, or (more likely) they knew

27    that Mr. Mondavi had started using "TO KALON" as the name of *his* vineyard, that would have

28    been irrelevant; they had to "know" that "To Kalon" was an immutable location with defined,

geographic boundaries.  *See* Tr., 1072:14-20; TX15 (p. 30).  However, not only is there no evidence purchasers had such an understanding, there never *was* a geographic location defined as "To Kalon."  That is why when the Examining Attorney searched through a dictionary, atlas, and gazetteer (a list of place names), she found no reference to "To Kalon."  *See* Tr. 1072:7-1073:9, 1081:23-1082:5, 1084:4-15; TX1027 (p. 72).  Just as today, the name was always a brand.

Third, even if one assumes that the phrase "TO KALON" was known to wine purchasers in the mid-1980s (*but see supra*), *and* that its "primary significance" to them was as a specific, geographically-defined location (rather than a historical brand), there is no proof Robert Mondavi *knew* that most consumers understood "To Kalon" that way.[9]  Indeed, before Mr. Mondavi began using TO KALON as a brand  (prior to filing his trademark application; *see* TX1027 (pp. 39-45)), the researcher he hired to document the history of his land (William Heintz) told him that the name "To Kalon" had been "largely forgotten," *see* Tr., 924:21-925:22; TX329 (p.31), prefacing the Examining Attorney's later inability to find any modern references to the name.   And although Plaintiff cites an interview Mr. Mondavi gave a decade later (in the late 1990s) when helping write *Harvests of Joy* as supposed "proof" of his knowledge, *cf.* TX102; TX356, Mr. Mondavi's use of "To Kalon" in that later interview (and in his book) when referring to the land he bought was made long after the fact—similar to if Walt Disney reminisced about "buying Disneyland."  He was not suggesting that he or others associated the name with the boundaries of the former Crabb estate. *Cf.* TX1062, 84:18-85:13 ("I knew the land as Stelling land … when we were interested in buying it. … I heard of Stelling, but I never heard of To Kalon."); *see also id.*, 83:14-24 ("I used [To Kalon] afterwards [because] I felt that was a better name than Stelling property. …  We were trying to build the name as we went along.").  In fact, the land Mr.

---

[9] And even if consumers *had* such an understanding, what *was* that specific "location"?  The 550 acres Mr. Mondavi purchased in the late 1960s and early 1970s was <u>not</u> all the same land owned by Hamilton Crabb (who had 359 acres on the valley floor) *or* by Mr. Stelling (who owned upwards of 2,000 acres).  *See* Tr., 120:25-121:14.  In fact, a large chunk of Mr. Crabb's property (roughly 89 acres) was owned by Beaulieu in the late 1960s and was called "BV No. 4."  Tr. 295:23-296:7.  So how could the Examining Attorney have assessed whether "TO KALON" was "primarily geographically descriptive" versus "deceptively <u>mis</u>descriptive" if there was no consensus as to defined boundaries?  *Cf.* TX15 (p. 33).  That is further evidence it was <u>a brand</u>.

Mondavi called "To Kalon" (the roughly 550 acres he bought) was not even the same land *Mr. Crabb* called "To Kalon," *see id.*, 69:21-70:16, further proof that "To Kalon" had no set meaning—it was just a brand different people used at different times to mean different things.[10]

Lastly, regardless of what wine purchasers might have known, and what Mr. Mondavi supposedly knew *about* their knowledge, there is no proof Mr. Mondavi acted with deceptive intent.  The Federal Circuit has held that "[s]ubjective intent to deceive, however difficult it may be to prove, is **an indispensable element**" of the fraud analysis.  *See Bose*, 580 F.3d at 1245 (emphasis added).  And although deceptive intent can in theory be inferred from indirect and circumstantial evidence, the offered proof "must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement."  *Id.* (quote omitted).

The evidence here, however, does not even *remotely* suggest that Mr. Mondavi acted in a dishonorable way.  As Plaintiff's witness, Mr. Beckstoffer, confirmed, Mr. Mondavi was a skilled winemaker, a leader in Napa Valley, and "a very honest man."  Tr., 299:16-300:6.  Furthermore, at the time he filed his trademark application, Mr. Mondavi already owned all of the former Crabb land (except for the portion Beaulieu owned and called "BV No. 4") and he had started using the TO KALON name on wine.  *See* Tr. 925:23-926:9; *see also* TX1027 (pp. 39-45).  Thus, Mr. Mondavi had no real need to secure a federal registration—he already possessed common law trademark rights in the TO KALON name, and even if the name *was* "primarily geographically descriptive" among wine purchasers, only Mr. Mondavi could have really used it because he is

---

[10] Undoubtedly, there were some in the wine industry during that time, especially those who read wine histories (such as Mr. Beckstoffer; *see* Tr., 295:23-296:4), who would have recalled that TO KALON had been used as a vineyard designation up through the late 1940s.  It bears repeating, though, that use as a vineyard designation is use *as a brand*, meaning that even among those few area residents, etc. who knew of the past use, the phrase TO KALON was still not "primarily geographically descriptive."  *Cf.* TX15 (p. 31) (TMEP, § 1210 [1986]); Tr., 1071:4-19.  Further to this point, note also that in the industry and local publications upon which Plaintiff relies, the size of what is termed "To Kalon" varies wildly, underscoring that people tended to associate the name with the various *vineyards* that carried that name over the years, *see, e.g.,* TX253 ("357 acres") (1933); TX278 ("500 acres") (1962) (thus, including land not owned by Mr. Crabb); TX297 ("250 acres") (1969); *see also* TX102 (31:9-11) ("700 acres") (1995) (Robert Mondavi interview), and not with a defined location.  Beyond that, it must further be remembered that the test for geographic descriptiveness focuses on wine *purchasers*, not producers.  Tr., 1066:12-18.

the one who *owned* the Crabb land.[11]  Beyond that, though, "primary geographic descriptiveness" is not even a bar to eventual registration—the only thing that would have happened if the TO KALON application had been refused on Section 2(e)(2) grounds is that Mr. Mondavi would have needed to refile it a few years later and claim "acquired distinctiveness" (a/k/a "secondary meaning") based on five years of use.  *See* Tr., 1065:7-9; TMEP § 1210.07(b) ("A term that is primarily geographically descriptive of the goods/services under §2(e)(2) may be registered on the Principal Register if it is shown to have acquired distinctiveness under §2(f)."); 15 U.S.C. § 1052(f) (an applicant may rely on five years of use as evidence that a mark has acquired distinctiveness); *accord* TX15 (p. 31).  There was simply no reason for Mr. Mondavi to lie.

Nor did he.  When the Examining Attorney asked Mr. Mondavi whether TO KALON had "<u>any</u> meaning or significance" in the wine industry, he honestly answered that it had "<u>no present</u> meaning or significance," TX1027 (pp. 47, 52) (emphasis added), the only thing he needed to say in response to her query.[12]  Mr. Mondavi, though, <u>continued</u> and *volunteered* additional information that was not required for (or even material to) prosecution, telling the Examining Attorney that there used to be "a winery in the Napa Valley which used the name 'Tokalon,'" that it was "sold off in parcels" during the early part of the 20th Century, and that the TO-KALON name therefore had "some historical significance."  *See id.* (p. 52); *see also* Tr., 1067:15-1068:24.

If Mr. Mondavi were trying to deceive the Trademark Office, why would he do that?  Why tell the Examining Attorney that TO-KALON could *also* be spelled "Tokalon," thereby potentially aiding her electronic search?  Why—if Mr. Mondavi was *trying to hide* the mark's "geographic descriptiveness"—reveal that the former winery was "**in the Napa Valley**"?  And why admit that the winery's land was broken up into separate "parcels"?  Wouldn't all of that

---

[11] After all, if the phrase "To Kalon" *was* "primarily geographically descriptive" in the mid-1980s and limited by the boundaries of Crabb's original 359 acres (as Plaintiff suggests), *but cf., e.g.,* TX278 ("500 acres"); TX102 (31:9-11) ("700 acres"), then, by definition, any use by someone who did <u>not</u> own the Crabb land would have been false advertising.  *See* 15 U.S.C. § 1125(a).

[12] When asking about "meaning or significance," Examining Attorneys are not looking for the history of how a mark was used as a brand—they are asking to assess descriptiveness.  *See* Tr., 1074:19-1075:14.  For example, for all the Examining Attorney knew, maybe "To Kalon" was someone's name, or maybe it was the name of the grape varietal used to make the wine, either of which (if true) would have provided a basis for refusal.  *Cf.* 15 U.S.C. §§ 1052(e)(1), (e)(4).

help the Examining Attorney hone her search strategy and "discover" the secret Mr. Mondavi supposedly was trying desperately to protect?   None of what Plaintiff postulates make sense.

The burden, of course, is on Plaintiff to *prove* "fraud," not for Constellation to disprove the defense.  Regardless, in the end, there is simply no "there" there.  Plaintiff has not established <u>any</u> of the elements required to show of fraud, and rather than come forward with "clear and convincing" evidence, it tries to get by with "speculation, inference, [and] surmise."  *Cf. Bose*, 580 F.3d at 1245.  That is not acceptable.  Character assassination is not an infringement defense.

### e.   The Ezell Survey

Plaintiff's final counter to infringement is its reliance on a consumer survey conducted by Matthew Ezell that purports to show that consumers who encounter Plaintiff's TO KALON VINEYARD-designated wines will supposedly not be "confused."  As was demonstrated at trial, however, the Ezell Study is nothing less than junk science masquerading as helpful opinion.

Mr. Ezell designed his survey to ask the *wrong questions* of the *wrong people*, which is never a good start.  *See* Tr., 411:12-21, 414:11-15, 421:11-25, 423:13-24, 427:3-429:25, 432:6-435:8, 462:17-465:9,  And on top of *that*, Mr. Ezell did not "sample" the people he thought he would be getting (unless one is prepared to believe that 20% of all Americans are buying $100 bottles of wine online every year), and he then put his thumb on the scale when counting answers, discounting respondents who answered "To Kalon Vineyard" because they saw the name on the wine label, even though **that was the key point**.  *See* Tr., 436:4-9, 439:18-25, 455:13-21, 456:21-457:15, 467:11-19.  Yet despite all of that, he *still* found confusion.  Tr., 471:8-472:25.

"A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant."  Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual on Scientific Evidence* 359, 377 (Federal Judicial Center ed., 3d ed. 2011).  Likewise, a survey is irrelevant if it does not collect information germane to the legal controversy (here, whether Plaintiff's use of "TO KALON VINEYARD" is confusing).  *See id.* at 373; *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) (a survey that tests an irrelevant issue should be excluded, even if properly performed).  Only after those threshold

issues of relevance are met do "follow-on issues," such as methodology, question clarity, answer coding, etc., come into play, going to weight.  *See Clicks Billiards*, 251 F.3d at 1263.

Mr. Ezell's survey was both irrelevant and unreliable.  *See supra*; *see also* Tr., 1123:3-13, 1124:11-1125:22, 1129:6-1130:4, 1133:4-1134:19.  To be blunt, none of Mr. Ezell's numbers can be trusted and his conclusions have no basis in fact.  They do not disprove confusion.

**B.**   **Constellation's False Advertising Claim (under Federal Law)**
    **Count I (15 U.S.C. § 1125(a)) (ECF 1 [4:20-CV-00238], ¶¶ 75-80)**

Constellation should also prevail on its claim for false advertising.  The test is whether a party has made a false statement of fact that is likely to deceive consumers and influence their purchasing decision.  *See, e.g., Wells Fargo & Co. v. ABD Ins. & Financial Serv.*, 758 F.3d 1069, 1071 (9th Cir. 2014).  And as with confusion, all those elements have again been met.

Plaintiff admits that by putting the "TO KALON VINEYARD" designation on its labels, it is advertising that its wine comes from "To Kalon Vineyard," *see* Tr., 304:9-16, which is a false statement of fact.   *See* Tr., 320:11-23.  Plaintiff also admits that consumers are likely to *believe* that a wine comes from the vineyard designated on the label, *and* that consumers' belief as to a wine's "source" will influence their purchasing decision.   Tr. 212:19-213:1, 213:21-214:9.  Plaintiff is thus making a false statement of fact that is likely to deceive consumers and influence their purchase, and that is the *definition* of false advertising.[13]  *See Wells Fargo*, 758 F.3d at 1071.

At times, Plaintiff has argued that its use of "TO KALON VINEYARD" nonetheless should be deemed "fair" because Plaintiff supposedly is only using the phrase to describe the

---

[13] In addition to the literal false statements on the front of its bottles, Plaintiff also puts false and misleading statements on the *back* labels that further contribute to the false advertising.  *Cf. In re Century 21–RE/MAX Real Estate Adver. Claims Litig.*, 882 F.Supp. 915, 922-23 (C.D. Cal. 1994) (noting that false advertising can arise either from statements that are "literally false" [*e.g.*, "To Kalon Vineyard"] or from statements that, even if literally true, are "likely to mislead or confuse consumers").  For example, Plaintiff falsely states that its "44-acre property" was formerly owned by H.W. Crabb, even though Mr. Nickels admits that Mr. Crabb only owned, at most, "12 or 14 acres."  *See* TX86; *but cf.* Tr., 489:12-13, 547:15-18.  Plaintiff also refers to its vineyard as the "Boss Vineyard" just before quoting Mr. Crabb as referring to *To-Kalon* as "the boss vineyard." *See* TX86.  Thus, Plaintiff is clearly hoping that consumers will associate its vineyard with Mr. Crabb's vineyard operations, even though (as established at trial) **there is no evidence** that Mr. Crabb <u>ever</u> grew grapes on the Baldridge land, let alone use them in his TO KALON wine.

"geographic origin" of its goods.  *See, e.g.,* ECF30 [4:19-CV-01424], ¶¶ 65, 88.  As discussed, however, *see* Section A.3.a, *supra*, the concept of "fair use" is incompatible with *trademark* use, *cf. also* 15 U.S.C. § 1115(b)(4), and Plaintiff is using TO KALON VINEYARD on its label as a mark.  Further, what matters is what is, not what was, and there is no evidence that anyone <u>today</u> considers Plaintiff's land part of what is generally understood to be "To Kalon Vineyard."

However, even if we ignore Constellation's registrations, the Lanham Act's "fair use" text, *and* the meaning of "To Kalon Vineyard" to wine purchasers today, Plaintiff's "geographic origin" argument would still be meritless.  Before adopting TO KALON VINEYARD as his vineyard name, Mr. Nickel hired a research firm (ARG) that spent a full seven years, and close to half-a-million dollars, researching what historical connection (if any) Plaintiff's property had with Hamilton Crabb, apart from the fact that Mr. Crabb once owned a small portion of Plaintiff's land.  *See* Tr., 546:25-548:3.  Specifically, one of the tasks Mr. Nickel gave ARG was to "determine if Mr. Crabb ever grew grapes on [the] property."  Tr., 548:11-13.  That is, he wanted to find out if any part of the land was ever within Mr. Crabb's "To Kalon Vineyard."

After researching the question, ARG reported back in June 2016 that it could not find any evidence that Mr. Crabb used "the Halter Valley property" (as ARG called the land) to grow grapes, noting that all of Mr. Crabb's "**vineyards[] and winery operations** were <u>clearly located</u> on the northern property" (the 359 acres Mr. Crabb owned on the valley floor).  Tr. 550:9-19, 551:15-24; TX1003 (pp. 1, 5, 13-14) (emphasis added).  Mr. Nickel then asked ARG to conduct further research on his behalf, and in December 2018 (which was roughly a year before Plaintiff began selling its infringing wine), ARG issued a new report that not only reaffirmed its original finding, but which was even more explicit.  Most notably, ARG repeated its view that Mr. Crabb's vineyards were "clearly located" on the northern, valley parcels, *see* Tr., 554:21-556:2; TX1002 (pp. 1, 20-21), and then further wrote (when discussing the "Churchill" era [1903-1943]) that "Baldridge's original estate **does not appear to have been cultivated with grapes** used by the To-[K]alon Vineyard Co."  *Id.* (p. 11) ("United States BATF records from the 1930s and 1940s suggest that only the northern acreage … was used by the vineyard company.").

HUNTON ANDREWS
KURTH LLP

Thus, when Plaintiff filed suit **three months later** (in March 2019) and suggested that it *needed* to "identify Crabb's historic To Kalon estate" to "accurately describe the … ingredients and geographic origin of Plaintiff's goods," *see* ECF 1 [4:19-CV-01424], ¶¶ 51-54, it was not acting in good faith.  Plaintiff <u>knew</u> there was no historical connection between its vineyard and the famous "To-Kalon Vineyard" operated by Mr. Crabb, yet it argued (and continues to argue; *see* ECF 30 [4:19-CV-01424], ¶¶ 64-67]) that labeling its wine as originating from "TO KALON VINEYARD" would somehow be a "descriptive fair use."  *See id.*; *but cf.* 15 U.S.C. § 1115(b)(4) ("fair use" only applies when a name is used other than as a mark *and* only if "used fairly and in good faith" to "describe [the geographic origin] [of] the goods or services of [the] party").

Nor did Plaintiff offer any evidence at trial that would allow one to conclude that its use of "TO KALON VINEYARD" to indicate "geographic origin" is necessary or fair.  Instead of relying on ARG's years of research, Plaintiff hired a new researcher (Dr. Scott Miltenberger), who admits he saw "no direct evidence" that Mr. Crabb ever grew grapes on the Baldridge Tract. *See* Tr., 127:20-23.  Yet, instead of concluding (as ARG did) that this lack of evidence *disproves* Plaintiff's thesis (especially in light of the wealth of historical evidence that Mr. Crabb's vineyard was "clearly located" on the valley floor; *cf., e.g.,* Tr., 77:10-78:19 [1893], 101:11-102:9 [1899]; TX1440 (pp. 3. 12)), Dr. Miltenberger merely speculated that it was *not impossible* that Crabb used the land to grow grapes.  *Cf.* Tr., 127:20-128:23.  His expert "conclusion," however, came mostly from a grammatical assault on two snippets of historical text plus, for some reason, the fact Mr. Crabb used Plaintiff's land *to grow hay* for his race horses.  *See* Tr., 27:12-33:23, 68:11-69:8, 87:16-88:11.  Moreover, each of Dr. Miltenberger's inferences was disproved by other records **he admits he saw**, but which he did not discuss because they challenged his opinion.  *See* Tr., 77:10-82:22, 86:25-88:20, 90:14-96:15, 103:5-19, 110:3-9; TX1680[14] (pp. 29, 33-36); *see also* Tr., 80:12-81:6 ("[t]hat's really the craft of history").  His "expert analysis," is, thus, not only contrary to the evidence, at its core it is fundamentally unreliable.[15]  *Cf.* Fed. R. Evid. 702.

---

[14] TX1680 is a complete copy of the document excerpted as TX213.

[15] The reliability requirement inherent in Rule 702 ensures "that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same (continued)

The historical record thus contradicts Plaintiff's created-for-litigation claim that its land was once part of Mr. Crabb's "To Kalon Vineyard."  Therefore, any statement on Plaintiff's label to the contrary must be considered literally false *even if* we ignore Constellation's trademark rights and the meaning that TO KALON VINEYARD has to wine purchasers today.

## C.    Constellation's State Law Claims
### Count I (Trademark Infringement) (ECF 1 [4:20-CV-00238], ¶¶ 81-91)
### Count II (Unfair Competition) (ECF 1 [4:20-CV-00238], ¶¶ 92-102)
### Count III (Cal. Bus. & Prof. § 17200) (ECF 1 [4:20-CV-00238], ¶¶ 103-106)

Constellation's three state law claims turn on essentially the same tests as do their federal law counterpart claims.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition  and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.") (quoting *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 916 (9th Cir. 1980)).  Thus, there is no need for the Court to perform a separate analysis to hold that Plaintiff's conduct also violates the state law claims.

## D.    Constellation's Request for an Injunction

Independent of the issue of damages,[16] Constellation is entitled to equitable relief, specifically, an injunction barring Plaintiff from continuing to associate itself with "To Kalon"—

---

level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Factors relevant for determining whether an expert's testimony is sufficiently reliable include whether the expert (1) developed his or her opinion expressly for purposes of testifying (*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*") (calling this a "very significant fact")); (2) unjustly extrapolated from the data to an unfounded conclusion (*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing … requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.")); (3) adequately accounted for obvious alternative explanations (*Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994)); or (4) is being less careful than someone in their profession would be in their regular work, that is, when not serving as a paid consultant (*Kumho Tire*, 526 U.S. at 152).  See Fed. R. Evid. 702 (Advisory Committee Notes) (citing authority); *see also Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 546-47 (N.D. Cal. 2012); *In re Bextra and Celebrex Marketing Sales Practices and Product Liability*, 524 F. Supp.2d 1166, 1171 (N.D. Cal. 2007).  Expert testimony cannot be considered helpful if it is merely speculative.  *General Electric*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[16] To simplify proceedings, Constellation is withdrawing its claim for damages, including for profits.  *Cf.* 15 U.S.C. § 1117(a).  Constellation believes, however, that this case qualifies as an "exceptional" one, *see id.*, and thus intends to move at the appropriate time for an award of fees.

either as that phrase is presently understood *or* was used historically. Plaintiff's vineyard has nothing to do with Constellation TO KALON VINEYARD and *had* nothing to do with Crabb's "To-Kalon Vineyard." Thus, Plaintiff cannot be allowed to trade off either legacy.

To obtain an injunction, a party must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law … are inadequate to compensate for that injury; (3) that … the balance of hardships between the [parties] [warrants] a remedy in equity; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006); *see also Herb Reed Enter., LLC v. Florida Enter. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Each of those factors has unquestionably been met.

Losing control over one's trademarks, reputation, and goodwill is "a quintessentially irreparable injury." *Adidas Am., Inc. v. Skechers USA, Inc*., 149 F. Supp. 3d 1222, 1249 (D. Or. 2016) (citing *Herb Reed*, 736 F.3d at 1250); *see also Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*, 2015 WL 6501228, *4 (D. Nev. Oct. 26, 2015) (finding irreparable harm where trademark owner had "spent considerable time and effort building its reputation"); *McCarthy on Trademarks*, § 30:47.70 ("A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation."). And as was established at trial, that is the exact harm Constellation faces if Plaintiff is not enjoined.

Absent an injunction, Plaintiff will resume using the TO KALON VINEYARD name on its wine and in ancillary ways (social media, etc.). Tr., 598:3-11; *see also* TX1143. That use will then lead to a change in consumers' expectations as to what the TO KALON VINEYARD brand means. As Mr. Frost explained, those consumer expectations were formed as the result of years of exposure (both directly and through the wine press) to the consistent quality, style, and value of the wines Constellation (and its licensees) have sold under the TO KALON VINEYARD designation. *See* Tr., 311:4-312:3, 315:2-316:13; *see also id.*, 707:10-708:6. Therefore, using the TO KALON name for Plaintiff's *hillside* wine—which is fundamentally different from the wine Constellation produces from its *valley* lands; *see, e.g.,* Tr., 297:18-298:21; 733:4-735:20—would defy those consumer expectations and undercut the brand message. Consumers who previously

relied on the TO KALON VINEYARD designation to tell them "where the grapes come from"—which, as Plaintiff agrees, "is often the single most important information in determining if a wine is truly worth the money"; *see* Tr., 212:19-213:1, 231:21-214:9—could no longer rely on the brand to denote source because it could now refer to two *separate* and dissimilar vineyards.

The other elements warrant the grant of a permanent injunction as well.  It is axiomatic that monetary damages cannot adequately compensate for the irreparable harm *future* trademark infringement will cause, *see, e.g., Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy."); *compare also* 15 U.S.C. § 1116 *with id.*, § 1117(a), and it understood that preventing consumer confusion rightly serves the public interest.  *See Stark*, 907 F.Supp.2d at 1067; *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F.Supp.2d 1051, 1081 (E.D. Cal. 2009) (the public has the right "not to be deceived or confused").  Meanwhile, in terms of the relative hardships of the parties, any harm Plaintiff might suffer from an injunction would be from its inability to continue its infringing activities, which is not a relevant consideration in the "balancing of the equities" test. *See Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995).

**E.     Plaintiff's Claims**[17]
**Count I (False Advertising -- Federal) (ECF 1 [4:19-CV-01424], ¶¶ 81-85)**
**Count II (Declaratory Judgment) (ECF 1 [4:19-CV-01424], ¶¶ 86-89)**

Finally, Plaintiff is also asserting two claims in this case.  However, one of those claims (Count II) is just an affirmative posturing of Plaintiff's "fair use" and "fraud" defenses, *see* ECF 30 [4:19-CV-01424], ¶¶ 88-89), and thus may be denied for the same reasons already discussed. That leaves only Count I, through which Plaintiff insists that Constellation's use of TO KALON on its own wine is somehow "false" or "misleading."  *See id.*, ¶¶ 82-84.  That claim fails as well.

As an initial matter, though, because Plaintiff cannot cancel Constellation's federal registrations for "fraud," *see* Section A.3.d, *supra*, this claim fails as a matter of law—a party's use of its own registered mark for the covered goods cannot be "unfair" or "false or misleading." *See Mighty Enter., Inc. v. She Hong Indus. Co. Ltd.*, 2015 WL 276771, *3 (C. D. Cal. 2015)

---

[17] Plaintiff has withdrawn Counts III and IV of its First Amended Complaint.  Tr., 977:23-978:1.

("there can be no claim for false advertising against a company that advertises with a registered trademark it owns"); *cf.* 15 U.S.C. §§ 1115(b), 1125(a). However, even if Constellation's trademark registrations again were set aside, Plaintiff's cause of action would still fail.

Plaintiff claims that using TO KALON VINEYARD as a vineyard designation for wine made from grapes grown outside the boundaries of Mr. Crabb's original 359 acres of land (the "Home Place" and "Lewelling Tract") is false and misleading. *See, e.g.,* Tr., 978:2- 980:6. As an example, Plaintiff points to the Mondavi "I Block" wine, which is produced from a portion of Constellation's TO KALON VINEYARD that is within the so-called "1891 Parcel" (or "Davis Parcel"). *See id.*; *see also* ECF 1 [4:19-CV-01424], ¶¶ 51-52. However, not only is the "I Block" fully inside what Constellation *calls* TO KALON VINEYARD, *see* Tr., 926:13-927:3, 1001:19-1002:2; TX56; TX1413, consumers *understand* "I Block" to be part of TO KALON VINEYARD. *See* Tr., 324:3-325:24, 687:8-17; TX1708. Thus, calling an "I Block" wine a TO KALON VINEYARD wine is neither false nor misleading—it is *literally* the correct way that this "single vineyard" wine should be labeled according to government regulations. *See* Tr. 257:1-4.

In response, Plaintiff suggests that consumers will view use of TO KALON on "I Block" wines as referring <u>not</u> to *Constellation's* vineyard but, instead, to the land *Plaintiff* calls "Historic To Kalon," which Plaintiff says is literally false. *See, e.g.,* Tr., 980:16-20. However, that makes no sense. Constellation **does not use** "<u>Historic</u> To Kalon" as a vineyard designation—it uses TO KALON (or TO KALON VINEYARD). So, for Plaintiff to sustain its claim for false advertising, not only would it have to defeat Constellation's registrations, *cf. Mighty Enter.*, 2015 WL 276771 at *3, it would have to meet the "rigorous" standard for proving literal falsity and show that "TO KALON" has an unambiguous meaning among wine consumers as referring <u>only</u> to Mr. Crabb's original 359 acres. *See Kwan Software Eng., Inc. v. Foray Tech., LLC*, 2014 WL 572290, *5 (N.D. Cal. 2014) ("To be 'literally false' the statement must be unambiguously false.") (citing authority). But even Plaintiff *own expert* testified that "TO KALON" is understood as including the "I Block," *see* Tr., 324:3-16, and he further cited third party references (*e.g.*, the Thach book) that *define* "To Kalon" as coextensive with Constellation's lands. *See* Tr., 324:20-325:24; TX1708. Thus, using TO KALON to refer to what is understood to be "To Kalon" is proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons set for above, Constellation respectfully requests that this Court enter judgment in Constellation's favor on all of the asserted claims, and that Plaintiff be permanently enjoined from using the TO KALON or TO KALON VINEYARD names, or otherwise trying to associate itself with any current or historic "To Kalon Vineyard" operations.

Dated:  December 24, 2020      By: /s/ *Edward T. Colbert*

Timothy J. Carlstedt (State Bar No. 168855)
Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111
Tel.: (415) 975-3700
Fax: (415) 975-3701

Edward T. Colbert (DC Bar No. 206425)
William M. Merone (DC Bar No. 458104)
Erik C. Kane (DC Bar No. 4951546)
Jeremy Boczko (NY Bar No. 5004858)
Armin Ghiam (DC Bar No. 219290)
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel.: (202) 955-1500
Fax: (202) 778-2201

*Counsel for Defendant,*
*Constellation Brands U.S. Operations, Inc.*

HUNTON ANDREWS
KURTH LLP

4:19-CV-01424-YGR
4:20-CV-00238-YGR

1

### CERTIFICATE OF SERVICE

2

3        The undersigned certifies that **DEFENDANT'S POST-TRIAL BRIEF**, along with all

4   supporting exhibits, was served electronically upon the following parties by the CM/ECF system

5   on this 24th day of December 2020:

6                        Jeffrey M. Judd
                        Peter Bales
7                        BUCHALTER
                        55 Second Street, Suite 1700
8                        San Francisco, CA 94105-3493
                        Tel: (415) 227-0900
9                        Fax: (415) 227-0770
                        Email: jjudd@buchalter.com
10                               pbales@buchalter.com

11

12  Dated:  December 24, 2020            By:     /s/ *Armin Ghiam*
13                                               Armin Ghiam

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28