# EXHIBIT A
## TO DECLARATION
## (REDACTED)

BUCHALTER
A Professional Corporation
JEFFREY M. JUDD (SBN: 136358)
PETER H. BALES (SBN: 251345)
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 227-0900
Fax:        (415) 227-0770
Email:      jjudd@buchalter.com
            pbales@buchalter.com

Attorneys for
THE VINEYARD HOUSE, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA - OAKLAND**

| | |
|---|---|
| THE VINEYARD HOUSE, LLC<br><br>        Plaintiff,<br><br>    vs.<br><br>CONSTELLATION BRANDS U.S. OPERATIONS, INC.,<br><br>        Defendant. | CASE NO. 4:19-cv-1424-YGR<br>CONSOLIDATED CASE<br><br>**TVH'S POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT** |
| CONSTELLATION BRANDS U.S. OPERATIONS, INC.,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE VINEYARD HOUSE, LLC<br><br>        Defendant. | |

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. ANALYSIS AND ARGUMENT. ................................................................................... 2

    A.    TVH's Claim for Declaratory Relief Regarding Fraud and Cancellation.............. 2

        1.    The Significance the Name "To Kalon" Has in the Wine Industry. ........... 3

        2.    To Kalon Is a Primarily Geographically Descriptive Name ...................... 5

        3.    RMW's Deliberate Failure to Disclose Material Information in Response to the USPTO Office Action....................................................... 7

        4.    RMW's Failure to Disclose To Kalon's Geographical Descriptiveness Was Material .............................................................................................. 7

        5.    RMW Knew That Wine Consumers Attribute Great Significance to the Name "To Kalon" ..................................................................................... 8

        6.    RMW's Intent to Deceive the USPTO Can Be Inferred in This Case ...... 11

        7.    The USPTO Reasonably Relied on RMW's Misrepresentations ............. 13

    B.    TVH Has Fair Use Rights to the To Kalon Marks................................................ 13

        1.    Applicable Legal Standards ...................................................................... 13

        2.    The Name "To Kalon" Is Descriptive of a Portion of TVH's Property.... 17

        3.    TVH Used To Kalon Vineyard on Its Front Label as a Single Vineyard Designation, to Describe the Geographic Origin of Its Wine ................. 18

        4.    TVH Use of "To Kalon" Without Reference to "Vineyard" Is Also Descriptive of Geographic and Historic Origin ....................................... 20

        5.    TVH Has Used "To Kalon" In Good Faith, In a Non-Trademark Sense.. 22

        6.    TVH's Trademark Applications Do Not Estop TVH's Fair Use Claim ... 25

        7.    If There Is Any Risk of Confusion or Trademark Usage, the Court Can Require a Clarifying Disclaimer ............................................................... 27

    C.    TVH's Claim for False Advertising and False Designation of Origin, 15 U.S.C. § 1125(a) ................................................................................................. 27

        1.    CBUSO Uses To Kalon and To Kalon Vineyard as a Single Vineyard Designation ............................................................................................... 28

        2.    CBUSO's Use of the Single Vineyard Designation is False and

i

Misleading ............................................................................................ 30

D.   CBUSO's Affirmative Defenses ...................................................... 33

    1.   CBUSO Has Not Established Laches ...................................... 33

    2.   CBUSO Has Failed to Prove Unclean Hands ......................... 35

E.   CBUSO's Claim for Trademark Infringement ................................. 36

    1.   Legal Standards ..................................................................... 36

    2.   No Evidence Showing Actual Confusion Has Been Proffered ................ 38

    3.   The Only Survey In This Case Supports a Finding Of No Confusion ...... 39

    4.   Strength of Mark ................................................................... 43

    5.   Degree of Care Exercised by Purchaser................................. 44

    6.   Marketing Channels .............................................................. 46

    7.   Similarity Of Marks .............................................................. 46

    8.   TVH's Intent in Selecting the Mark ...................................... 47

F.   CBUSO Has Failed To Prove Any Recoverable Profits ................... 48

G.   Attorneys' Fees .............................................................................. 49

H.   TVH's Abandonment by Naked Licensing Defense......................... 50

III. CONCLUSION ........................................................................................ 54

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)...................................................................................... 26

*Adobe Sys., Inc. v. Christenson*,
    809 F.3d 1071 (9th Cir. 2015)................................................................................... 35

*Adray v. Adray–Mart*,
    76 F.3d 984 (9th Cir.1995)........................................................................................ 26

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
    616 F.2d 440 (9th Cir. 1980)..................................................................................... 45

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)..........................................................................36, 44, 45

*and Boston Duck Tours, LP v. Super Duck Tours, LLC*,
    531 F.3d 1 (1st Cir. 2008).......................................................................................... 25

*Arizona Skydiving Holdings, LLC v. Skydive Phoenix, Inc.*,
    703 F. App'x 579 (9th Cir. 2017)............................................................................... 48

*Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*,
    603 F.3d 1133 (9th Cir. 2010)................................................................................... 32

*Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*,
    289 F.3d 589 (9th Cir. 2002).......................................................................2, 49, 51, 52

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*,
    289 F.3d at 595–96.................................................................................................... 49

*Beacon Mut. Ins. v. OneBeacon Ins. Grp.*,
    376 F.3d 8 (1st. Cir. 2004)......................................................................................... 37

*Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*,
    633 F.2d 746 (8th Cir. 1980)..................................................................................... 31

*Bluetooth SIG, Inc. v. FCA US LLC*,
    2020 WL 2794632 (W.D. Wash. 2020) ..................................................................... 49

*In re Bose Corp.*,
    580 F.3d 1240 (Fed. Cir. 2009)................................................................................. 11

iii

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999)............................................................................... 35, 36, 46

*Cairns v. Franklin Mint Co.*,
292 F.3d 1139 (9th Cir. 2002)................................................................................ 14

*Canal Co. v. Clark*,
80 U.S. 311, 13 Wall. 311, 20 L.Ed. 581 (1872) ................................................. 16

*Car–Freshener Corp. v. S.C. Johnson & Son, Inc.*,
70 F.3d. 267 (2d Cir.1995).................................................................................... 13, 14

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
434 F.2d at 802...................................................................................................... 26

*Caymus Vineyards v. Caymus Medical Inc.*,
107 U.S.P.Q.2d 1519, 2013 WL 3984638 (T.T.A.B. 2013) ................................ 6

*Century Theatres Inc. v. Landmark Theatre Corp.*,
2000 WL 963997 (N.D. Cal. 2000)...................................................................... 15

*Charisma Brands, LLC v. AMDL Collections, Inc.*,
No. 819CV00312JLSKES, 2019 WL 6331399 (C.D. Cal. 2019) ......................... 25

*Chrysler Grp. LLC v. Moda Grp. LLC*,
796 F.Supp.2d 866 (E.D.Mich.2011)..................................................................... 16

*Cohn v. Petsmart, Inc.*,
281 F.3d 837 (9th Cir. 2002).................................................................................. 46

*Concrete Pipes & Products of Calif., Inc. v. Construction Laborers Pension Trust
for Southern Calif.*,
508 US 602 (1993) ................................................................................................. 13

*Daimler AG v. A-Z Wheels LLC*,
No. 16-CV-875-JLS (MDD), 2020 WL 6395592 (S.D. Cal. 2020)....................... 48

*Department of Parks and Recreation for State of California v. Bazaar Del Mundo
Inc.*,
448 F.3d 1118, 78 U.S.P.Q.2d 1887 (9th Cir. 2006) ............................................ 15

*Dreamwerks Prod. Grp. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998)................................................................................ 36, 46

*E & J Gallo v. Proximo Spirits, Inc.*,
103 U.S.P.Q.2d 1640, 2012 WL 273076 (E.D. Cal. 2012), *subsequent
determination*, 103 U.S.P.Q.2d 1656, 2012 WL 273077 (E.D. Cal. 2012) and
*aff'd*, 583 Fed. Appx. 632 (9th Cir. 2014)........................................................... 39

iv

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

*E. & J. Gallo Winery v. Consorzio del Gallo Nero,*
  782 F.Supp. 457 (N.D.Cal.1991) .......................................................................... 45

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
  12 U.S.P.Q.2d 1657, 1989 WL 159628 (E.D. Cal. 1989), *aff'd,* 967 F.2d 1280
  (9th Cir. 1992) ..................................................................................................... 36, 38

*EMI Catalogue Pshp. v. Hill, Holliday, Connors, Cosmopulos Inc.,*
  Docket No. 99-7922, 2000 U.S. App. LEXIS 30761 (2d Cir. Sep. 15, 2000) ........................ 22

*Eniva Corp. v. Global Water Sols.,*
  440 F. Supp. 3d 1042 (D. Minn. 2006) ................................................................ 25

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.,*
  2018 WL 659105 (N.D. Cal. 2018) ...................................................................... *passim*

*First Franklin Fin. Corp. v. Franklin First Fin., Ltd.,*
  356 F. Supp. 2d 1048 (N.D. Cal. 2005) (FRANKLIN FIRST FINANCIAL
  compared to FIRST FRANKLIN) ....................................................................... 45, 46

*FreecycleSunnyvale v. Freecycle Network,*
  626 F.3d 509 (9th Cir.2010) ................................................................................ 49, 52

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
  826 F.2d 837 (9th Cir. 1987) ............................................................................... 34

*General Electro Music Corp. v. Samick Music Corp.,*
  19 F.3d 1405, 30 USPQ2d 1149 (Fed. Cir. 1994) ............................................. 11

*General Mills, Inc. v. Kellogg Co.,*
  824 F.2d 622 (8th Cir.1987) ................................................................................. 43

*Glow Indus., Inc. v. Lopez,*
  252 F. Supp. 2d 962 (C.D. Cal. 2002) ................................................................. 45

*GoTo.com, Inc. v. Walt Disney Co.,*
  202 F.3d 1199 (9th Cir. 2000) ............................................................................. 42

*Harvey Barnett, Inc. v. Shidler,*
  338 F.3d 1125 (10th Cir.2003) ............................................................................ 37

*Innovation Ventures LLC v. Hoodiamax USA,*
  2010 WL 11520527 (C.D. Cal. 2010) ................................................................. 47

*Instant Media, Inc. v. Microsoft Corp.,*
  2007 WL 2318948 (N.D. Cal. 2007) .................................................................... 38

v

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

*Intra-Cellular Therapies, Inc. v. Iancu,*
    938 F.3d 1371 (Fed. Cir. 2019) .......................................................................................... 26

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
    304 F.3d 829 (9th Cir.), cert. denied, 537 U.S. 1047 (2002) ........................................... 32, 33

*JL Beverage Co., LLC v. Jim Beam Brands Co.,*
    828 F.3d 1098 (9th Cir. 2016) ............................................................................................ 36

*Keebler Co. v. Rovira Biscuit Corp.,*
    624 F.2d 366 (1st Cir. 1980) .............................................................................................. 25

*Kennedy v. Southern Calif. Edison Co.,*
    268 F3d 763 ........................................................................................................................ 13

*King Ranch, Inc. v. D.R. Horton, Inc.,*
    2012 WL 1788178 (S.D. Tex. May 16, 2012) ....................................................................... 15

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,*
    543 U.S. 111 (2004) ..................................................................................................... 13, 26

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,*
    502 F.3d 504 (6th Cir.2007) ................................................................................................ 16

*Lindy Pen Co. v. Bic Pen Corp.,*
    725 F.2d 1240 (9th Cir. 1979) ............................................................................................. 46

*Lindy Pen Co. v. Bic Pen Corp.,*
    982 F.2d 1400 (9th Cir. 1993) ............................................................................................. 47

*M2 Software, Inc. v. Madacy Entm't,*
    421 F.3d 1073 (9th Cir. 2005) ............................................................................................. 43

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.,*
    703 F. Supp. 2d 671 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) .......................... 43

*Malletier v. Burlington Coat Factory Warehouse Corp.,*
    2006 WL 1424381 (S.D.N.Y. 2006), *aff'd and remanded*, 217 F. App'x 1 (2d
    Cir. 2007) ........................................................................................................................... 41

*McGregor-Doniger, Inc. v. Drizzle, Inc.,*
    599 F.2d 1126, 202 U.S.P.Q. 81 (2d Cir. 1979) .................................................................. 44

*Merck Eprova AG v. Gnosis S.p.A.,*
    760 F.3d 247, 111 U.S.P.Q.2d 1950 (2d Cir. 2014) ............................................................ 31

*Midwest Research Inst. v. S & B Promotions, Inc.,*
    677 F. Supp. 1007 (W.D. Mo. 1988) .................................................................................... 14

vi

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

*Monster, Inc. v. Dolby Laboratories Licensing Corp.*,
   920 F.Supp.2d 1066 (N.D. Cal. 2013) ............................................................. 38, 49

*Nat'l Distillers Prod. Co., LLC v. Refreshment Brands, Inc.*,
   198 F. Supp. 2d 474 (S.D.N.Y. 2002) ..................................................................... 39

*New Sensor Corp. v. CE Distribution LLC*,
   303 F. Supp. 2d 304 (E.D. N.Y. 2004), *aff'd*, 121 Fed. Appx. 407 ......................... 15

*Nike, Inc. v. WNBA Enterprises, LLC*,
   85 U.S.P.Q.2d 1187, 2007 WL 763166 (T.T.A.B. 2007) ........................................ 25

*Norm Thompson Outfitters, Inc. v. General Motors, Corp.*,
   448 F.2d 1293 (9th Cir. 1971)................................................................................ 46

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
   2015 WL 9266497 (N.D. 2015) .............................................................................. 38

*Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC*,
   184 F. Supp. 3d 572 (W.D. Ky. 2016), *aff'd*, 687 Fed. Appx. 429 (6th Cir.
   2017) ................................................................................................................. 14, 16

*Oracle Corp. v. Light Reading, Inc.*,
   233 F. Supp. 2d 1228 (N.D. Cal. 2002) ................................................................. 26

*Ortiz v. Werner Enterprises, Inc.*
   (7th Cir. 2016) 834 F3d 760.................................................................................... 17

*OTR Wheel Engineering v. West WW Srvs.*,
   897 F. 3d 1008 (9th Cir. 2020)........................................................................... 2, 12

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
   469 U.S. 189 (1985) ................................................................................................ 13

*Playmakers LLC v. ESPN, Inc.*,
   376 F.3d 894 (9th Cir. 2004).................................................................................... 45

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014).................................................................................. 44

*Quality Semiconductor, Inc. v. QLogic Corp.*,
   1994 WL 409483 (N.D.Cal. 1994)........................................................................... 43

*Robi v. Five Platters, Inc.*,
   918 F.2d 1439 (9th Cir. 1990).................................................................................... 2

*Russell v. Caesar*,
   62 U.S.P.Q.2d 1125, 2001 WL 1835165 (N.D. Cal. 2001) .................................... 44

vii

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

*Sarco Creek Ranch v. Greeson,*
    36 F. Supp. 3d 726 (S.D. Tex. 2014) .............................................................. 15, 16

*Sazerac Brands, LLC v. Peristyle, LLC,*
    892 F.3d 853, 127 U.S.P.Q.2d 1677 (6th Cir. 2018) ................................. 13, 14, 15

*Sazerac Co., Inc. v. Fetzer Vineyards, Inc.,*
    265 F. Supp. 3d 1013 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019) ................. 39

*Schafer Co. v. Innco Mgmt. Corp.,*
    797 F. Supp. 477 (E.D.N.C. 1992), *aff'd*, 995 F.2d 1064 (4th Cir. 1993) ............................ 14

*Scotch Whiskey Ass'n v. Barton Distilling Co.,*
    338 F. Supp. 595 (N.D. Ill. 1971), aff'd in part, rev'd in part, 489 F.2d 809 (7th
    Cir. 1973) ............................................................................................................ 30

*Scotch Whiskey Assoc. v Consolidated Distilled Products, Inc.*
    (1981, ND Ill) 210 USPQ 639 ............................................................................. 30

*Shire City Herbals, Inc. v. Blue,*
    410 F. Supp. 3d 270 (D. Mass. 2019) .................................................................. 25

*SinCo Techs. Pte Ltd. v. SinCo Elecs. (Dongguan) Co.,*
    2020 WL 906721 (N.D. Cal. Feb. 25, 2020) ...................................................... 49

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,*
    537 F.3d 1357 (Fed. Cir. 2008)...................................................................... 11, 12

*Stark v. Diageo Chateau & Estate Wines Co.,*
    907 F. Supp. 2d 1042 (YRG N.D. Cal. 2012) ............................................... 25, 44

*Stone Brewing Co., LLC v. MillerCoors LLC,*
    445 F. Supp. 3d 1113 (S.D. Cal. 2020) ............................................................... 36

*Superior Consulting Servs. v. Shaklee Corp.,*
    710 Fed. Appx. 850 (11th Cir. 2017) .................................................................. 37

*Swatch AG v. Beehive Wholesale, LLC,*
    739 F.3d 150, 109 U.S.P.Q.2d 1291 (4th Cir. 2014) .......................................... 37

*Swiss Watch International, Inc. v. Federation of the Swiss Watch Industry,*
    101 U.S.P.Q.2d 1731 (T.T.A.B. 2012) ................................................................ 11

*In Re the Salem China Co.,*
    157 U.S.P.Q. (BNA) ¶ 600 (T.T.A.B. Mar. 27, 1968)......................................... 30

*Therma-Scan, Inc. v. Thermoscan, Inc.,*
    295 F.3d 623 (6th Cir. 2002)................................................................................ 37

viii

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

*Tie Tech, Inc. v. Kinedyne Corp.*,
  296 F.3d 778 (9th Cir. 2002) ................................................................. 35

*Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n*,
  345 F.2d 158, 145 U.S.P.Q. 244 (9th Cir. 1965), cert. denied, 382 U.S. 903, 15
  L. Ed. 2d 157, 86 S. Ct. 239, 147 U.S.P.Q. 541 (1965) (TILLAMOOK cheese
  products from Tillamook County, Oregon) ........................................... 14

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
  2009 WL 2366439 (C.D. Cal. 2009), *aff'd*, 434 F. App'x 664 (9th Cir. 2011),
  opinion withdrawn and superseded, 473 F. App'x 522 (9th Cir. 2011), and
  *aff'd*, 473 F. App'x 522 (9th Cir. 2011) ............................................... 11

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ................................................................ 26

*Venture Tape Corp. v. McGills Glass Warehouse*,
  540 F.3d 56 (1st Cir. 2008) .................................................................. 47

*VIP Products, LLC v. Jack Daniel's Properties, Inc.*,
  291 F. Supp. 3d 891 (D. Ariz. 2018) ................................................... 39

*W.W.W. Pharm. Co v. Gillette Co.*,
  984 F.2d 567 (2d Cir.1993) ................................................................. 45

*Walter v. Mattel, Inc.*,
  210 F.3d 1108 (9th Cir. 2000) ............................................................. 46

**Statutes**

15 U.S.C. § 1114 ........................................................................................ 13

15 U.S.C. § 1115 ........................................................................................ 13

15 U.S.C. § 1115(b) (1) .............................................................................. 2

15 U.S.C. § 1115(b)(4) ......................................................................... 16, 22

15 U.S.C. § 1117(a) .............................................................................. 47, 48

15 U.S.C. § 1125 ................................................................................... 32, 33

15 U.S.C. § 1125(a) .................................................................................... 13

15 U.S.C. § 1125(a) ................................................................... 26, 30, 31, 35

15 U.S.C. § 1125(a)(1) ............................................................................... 30

ix

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

15 USC 1056(a) ................................................................................................ 24

15 USCS § 1125(a)(1)(B) ......................................................................... 26, 30

**Other Authorities**

37 C.F.R. § 2.67 ............................................................................................... 25

2 McCarthy on Trademarks, § 4:17 ................................................. 13, 14, 30, 31

5 Callmann on Unfair Comp., Tr. & Mono. (4th Ed.) § 21:82 ...................... 37

6 Callmann on Unfair Comp., Tr. & Mono. § 23:37 (4th Ed.) ..................... 25

6 McCarthy on Trademarks and Unfair Competition, at § 31:66 (5th de. December 2020 Update) ................................................................................... *passim*

Federal Rule of Civil Procedure 30(b)(6) ..................................................... 37

Local Rule 54-5 ................................................................................................ 48

McCarthy on Trademarks and Unfair Competition § 18:48 (4th ed.) ........... 49

Restatement Third, Unfair Competition § 28, comment c (1995) ................. 21

x

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BN 42990117v2

The Vineyard House ("TVH"), plaintiff in the above-captioned action, respectfully submits this Post-Trial Brief in lieu of Closing Argument (the "Closing Brief").

## I.  INTRODUCTION

The Vineyard House ("TVH") and Constellation Brands U.S. Operations, Inc. ("CBUSO") each own vineyard land in a particular area of Oakville, Napa Valley, California. There are significant differences between the land each owns:

- TVH's vineyard is in the rolling foothills of the Mayacamas: CBUSO's vineyard is on the valley floor. Trial Tr. (Frost) at 213:14-17; (Nickel) at 489:3-11.

- TVH's vineyard is at an elevation of approximately 200': the elevation of CBUSO's vineyard is less than 50'. Trial Tr. (Frost) at 213:14-17; (Cadamatre) at 687:8-689:14, 839:23-840:4.

- The properties are is not contiguous: TVH's property approximately 500 yards to the south of CBUSO's property. Trial Tr. (Miltenberger) 24:2-25;  (Beckstoffer) at 266:18-25.

Even with all the above-noted differences between the properties – and there are more – CBUSO's vineyard and TVH's vineyard share the significant historical fact that both properties were, for over 11 years, owned by the famous wine pioneer Hamilton Walker Crabb ("Crabb") and are part of Crabb's historic To Kalon estate. From the late 1800s, when Crabb first coined the name for his place, "To Kalon" has had great historical and geographical significance to the California wine industry. [1] This lawsuit is about the simple idea that everyone who owns part of the Historic To Kalon estate – including TVH – should enjoy the rights to fairly use the term accurately to describe the history and geography of this part of Napa Valley, and not as a trademark. CBUSO and its predecessor, Robert Mondavi Winery ("RMW"), claim they acquired the legal right to control exclusively who can use the name "To Kalon" to tell the history and describe the geographic significance of this part of the Oakville area of Napa Valley. But CBUSO's claim is based on a trademark whose registration was fraudulently obtained.

In 1987, Robert Mondavi knew To Kalon's historical and geographical significance had continued well into the twentieth century because that is precisely why he sought and bought a

---

[1] H.W. Crabb originally coined the term "To-Kalon" to describe his place in the Oakville area of Napa County. Over the years, various spellings have been used, including "To Kalon," and "Tokalon." This Closing Brief uses the spellings contained in quotes as written, and will hereafter use the spelling "To Kalon" for consistency.

**TVH's POST TRIAL BRIEF IN LIEU OF C LOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

piece of the historic To Kalon estate, but RMW lied to the United States Patent & Trademark Office ("USPTO") when asked about the name's significance, to obtain the legal right to bar others from using the name. After fraudulently obtaining trademark registrations for To Kalon, CBUSO has not only prevented others from fairly using To Kalon but has filed for additional appellations of the mark in an attempt to expand its trademark hold on the term and to further prevent any use by third parties with legitimate rights to the name.

When Andy Beckstoffer stepped forward in 2002 to reveal RMW's fraud on the USPTO and ask a Court to declare fair use rights, RMW was able to silence the claims by entering into a settlement and license agreement, and thus avoid a public trial. CBUSO acquired the license agreement when it acquired RMW in 2004, but CBUSO has failed to "play a meaningful role" to control the quality of the licensed wines as is required of a wine trademark licensor, which is another basis for a court to cancel registration of the mark.

TVH maintains that "To Kalon" is a term with geographic and historical significance, that TVH's vineyard property is part of Historic To Kalon,[2] and that therefore TVH has the right to use the term "To Kalon" accurately to describe the geographic origin of the grapes from which the TVH wines are made and TVH's connection to Historic To Kalon and To Kalon's founder, H.W. Crabb.

## II. ANALYSIS AND ARGUMENT.

### A.   TVH's Claim for Declaratory Relief Regarding Fraud and Cancellation

TVH claims that RMW defrauded the USPTO to obtain registration of the trademark "TO-KALON" in 1988. To establish fraud, TVH must prove by clear and convincing evidence that:

- CBUSO's predecessor, RMW, misrepresented material facts to the USPTO in the trademark application process, and

- RMW knew that such misrepresentations were false when it made them, and

- RMW made such misrepresentations intending to induce the USPTO to reasonably rely on them, and

---

[2] "Historic To Kalon" refers to the three parcels of real property that H.W. Crabb owned at his death in 1899. *See* Trial Tr. (Miltenberger) at 20:15-22:8, 24:13-25:1; (Nickel) at 563:6-9, 564:3-10.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

- The USPTO reasonably relied on RMW's misrepresentations.

Dkt. 98 ("TVH's Second Claim") (*citing* 15 U.S.C. § 1115(b) (1); *OTR Wheel Engineering v. West WW Srvs.*, 897 F. 3d 1008, 1020 (9th Cir. 2020)); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990).

In this case, RMW made the misrepresentation through its trademark lawyer's response to the USPTO's office action. In the 1980s, if a USPTO examining attorney (an "EA") encountered questions about an application that could not be answered by the attorney's own research, office policy directed the EA to pose the question to the applicant. Trial Tr. (Cissel) at 1079:14-1080:5. As the application materials reflect, the EA attempted to reach RMW's trademark counsel on the phone to ask some questions about the meaning of "TO-KALON." Unable to reach RMW's attorney on the phone, on October 29, 1987, the EA issued an office action requesting RMW to "indicate whether TO-KALON . . . has any meaning or significance in the relevant trade or industry." TX18 (USPTO Inquiry).

RMW responded to the Office Action inquiry as follows:

> TO KALON . . . has no present meaning or significance in the relevant trade or industry. Prior to the turn of the 20th Century, there was a winery in the Napa Valley which used the name "Tokalon." Upon information and belief, that winery was sold off in parcels during the first fifteen to twenty years of the 20th Century and use of the name was discontinued. Accordingly, although the name has some historical significance, it has no current meaning or significance in the wine industry.

TX18. According to CBUSO, by the 1980s the name "To Kalon" was a forgotten brand that had been lost to history. Trial Tr. (De Vere) at 924:19-925:22. CBUSO claims that but for RMW's efforts to revise the To Kalon brand, both the name "To Kalon" and its founder, H.W. Crabb, would have remained forgotten.

**1.    The Significance the Name "To Kalon" Has in the Wine Industry.**

At trial, TVH compiled a clear evidentiary record that contradicts CBUSO's To Kalon myth, and reveals the lie in RMW's 1987 response to the USPTO. In the 1980s (and the decades that lead up to it) the wine industry attributed great significance to "To Kalon" as the name of an

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR

BN 42990117v2

historically significant landmark, and one of the best places for growing Cabernet Sauvignon grapes in California. Dkt. 237-4 (TVH Post-Trial FOF, Nos. 27-74, 78-95). The evidence demonstrating that "To Kalon" had significance to the wine industry in the 1980s came from multiple sources, including descriptions and discussions about To Kalon as the premier site for growing world-class Cabernet Sauvignon grapes by wine writers, mentions of To Kalon in the wine columns published in daily newspapers, testimony of long-time grape farmer, Andy Beckstoffer, and quotes attributed to Robert Mondavi personally as early as 1962.

For example, foreign-based authors, like Alexis Lichine (France), included a brief description of To Kalon in various editions of his World Encyclopedia of Wines & Spirits (1967, 1968) and New Encyclopedia of Wines & Spirits (1981), which span a period of 15 years. *See* TX292, TX293, TX334 ("In 1962 the Mondavis purchased approximately 500 acres of the historic To Kalon vineyard, considered to be the finest in all Napa Valley."). Many wine books written in the decades before 1988 – including books authored by some of the most influential wine writers of that era – and wine industry publications included references to To Kalon or To Kalon vineyard. *See*, *e.g*., TX267 (Idwal Jones, 1949); TX304 (Idwal Jones, 1972); TX306 (Leon Adams, 1973); TX311 (Frona E. Wait, 1973); TX312 (Michael Topolos, 1975); TX314 (Bob Thompson & Hugh Johnson, 1976); TX319 (Bob Thompson, 1977); TX335 (Gene Dekovic, 1981); TX336 (Roger Morris, 1981); TX339 (Ruth Teiser, 1983); TX341 (Cyril Ray, 1984); TX353 (Betty Dobson, 1988); TX288 (Wines & Vines (Vol 47, No. 10), 1966); TX297 (Wines & Vines, February 1969); TX346 (Wines & Vines, April 1987); see Trial Tr. (Beckstoffer) at 237:15-238:12, 238:22-239:17, 250:2-256:8.

Moreover, in the 1980s, wine columnists in local newspapers published throughout the United States made numerous references to To Kalon vineyard as the premier location to grow Cabernet Sauvignon grapes in Napa Valley, or California, or beyond. *See, e.g*., TX284 (Pacific Coast Review, 1962); TX278 (Santa Rosa Press-Democrat, 1962); TX279 (San Francisco Chronicle, 1962); TX291 (Napa Register, 1964); TX286 (St. Helena Star, 1965); TX294 (Napa Valley Register, 1969); TX325 (The Morning News (Wilmington, DE) 1980); TX327 (The

4

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

Morning News (Wilmington, DE) 1980); TX330 (The Marion Star (Marion, OH 1981); TX340 (California Living Magazine, 1984); TX342 (Chicago Tribune, 1985); TX343 (Pittsburgh Post-Gazette, 1985); TX344 (The Indianapolis News, 1986); TX345 (Daily Record (Morristown, NJ) 1987); TX347 (Atlanta Journal-Constitution, 1987); TX351 (The Salt Lake Tribune, 1987).

Credible witnesses also expressed their own perceptions that before, during, and after the time that RMW submitted its application to register To Kalon with the USPTO, To Kalon had great prominence within the wine community generally as one of the few truly premier Cabernet Sauvignon vineyards in California. *See* Trial Tr. (Beckstoffer) at 249:14-16 ("anybody you talked to in the Napa Valley in those days [*i.e.*, the 1980s] would – would recall and would state that To Kalon was a vineyard, a famous vineyard owned by Hamilton Crabb"); Trial Tr. (Frost) at 152:12-153:4 (Napa Valley understood to produce some of the best wine grapes and wines in California and U.S.; generally accepted that To Kalon produces some of the best grapes within Napa Valley itself). Finally, Robert Mondavi personally made numerous statements reflecting To Kalon's significance, as the following examples illustrate:

- "According to Robert Mondavi, vice president and general manager of Mondavi & Sons, owners of the Krug winery, the property is 'one of the best premium wine-growing locations in all of California.' […] The huge estate, once known as Tokalon, extends from the old Oakville railroad station south toward Yountville and west to the foothills of the Mayacamas range." TX279.

- "Robert Mondavi Winery today announced it had purchased 250 acres of choice vineyard land and varital [sic] producing vineyards from the estate of the late Carolyn Stelling. . . . The vineyards are located northwest of Oakville adjoining the present winery property—an area which is considered the heart of the prime wine growing region of Napa Valley—and are a part of the Tokalon Vineyards." TX294.

- On May 28, 1988, Robert Mondavi gave a speech to an unidentified group where he stated: "There was Henry Crabb, who founded the celebrated Tokalon Vineyard and Winery; encompassing 350 acres of superlative vineyard most of which the Robert Mondavi Winery has today." TX352.

**2.    To Kalon Is a Primarily Geographically Descriptive Name**

In addition to failing to inform the USPTO that To Kalon was widely known within the wine industry as one of a small handful of historic, world-class California vineyards where prime Cabernet Sauvignon grapes had been cultivated continuously for over 100 years, RMW also

5

failed to disclose that, for over a century To Kalon was a geographically significant name. From the time that H.W. Crabb christened "his place" To-Kalon, the name has been commonly used to refer to a specific location in the Oakville area of the Napa Valley. *See* Dkt. 237-4 (PFF 68-71). In the twentieth century, "To-Kalon" was commonly used, in various permutations (*i.e.*, "To Kalon," "Old To Kalon," "To Kalon Vineyards," and "To Kalon Winery") to refer to the combined 359-acres that Crabb had acquired in 1868 and 1879. For example, in 1950, a guide for The Wine and Food Society Tour of 1950 included a map that identified "Old Tokalon" as a vineyard in the Oakville area of the Napa Valley. *See* TX75; *see, also*, TX359 (Touristic Postcard printed by Italian Swiss Colony includes "Tokalon Vineyards" as a destination of interest); TX283 (Petaluma Argus-Courier, 11/20/1962: "Checking on a map that lists the wineries in Napa Valley, we judged it must have been the To-Kalon Vineyards and winery."). In addition to the vineyard and winery, there was a "To-Kalon Church" on the Oakville Grade Road, TX277 (Napa Register, 1961), and a "To Kalon Lane." *See, e.g.*, TX270 (Napa Valley Register, 1952: "George S. Rogers, Oakville rancher, passed away at his home on To-Kalon Lane in Oakville this morning after an illness of three months."); TX248 (St. Helena Star, 1916: "Hans Hansen . . . was driving his machine down the To Kalon lane to meet the late S.P. train."). Presumably both To-Kalon Church and To Kalon Lane were renamed after RMW registered "To Kalon" as a trademark. "To Kalon" or "To Kalon Vineyards" was also commonly used to identify a place having nothing to do with any business or business operation, as follows:

- "At noon today Miss Dorothy Churchill, daughter of Mr. and Mrs. Wilder Churchill, was married to Herman Hess at an al fresco wedding at the Churchill country place, 'To Kalon,' near Napa." TX245 (Oakland Tribune, 1916).

- "'To-Kalon Ranch' is one of the showplaces of the district, and is also the largest vineyard in that part of the country." TX249 (San Francisco Examiner, 1917).

- "One day last week Everett Hall accompanied Ed Churchill to San Francisco with a truck load of dressed turkeys and left his late model Ford roadster at the To-Kalon Ranch. On their return the Ford was missing." TX252 (St. Helena Star, 1930).

- "A demonstration of automatic French plows is scheduled for February 26. This demonstration is to be held at 2:00 p.m. at Tokalon Vineyards in Oakville. Turn west at Oakville Builders Supply and proceed to the office of Ivan Schoch. Signs will be provided directing growers to the demonstration area." TX275 (St. Helena

6

Star, 1955).

- "H.W. Crabb died at To-Kalon, his Oakville home, on March 2nd. He arrived in California early in 1853, and came to Napa County in 1865, when he purchased a large tract of land at Oakville. He was one of our pioneer viticulturists, and in experimenting planted 300 varieties of grapes on 300 acres of land. (In later years a part of the Crabb vineyard was used as the United States Agriculture Experiment Station where every known variety of vine, nearly fifteen hundred types was grown.)." TX286 (St. Helena Star, 1965).

Finally, the California Superior Court in Napa County expressly decreed that the Baldridge Parcel is part of "[a]ll that certain real property *known and described as* Tokalon Vineyard, near Oakville, Napa County, State of California." TX258 (emphasis added).

### 3. RMW's Deliberate Failure to Disclose Material Information in Response to the USPTO Office Action

RMW's failure to disclose that To Kalon had geographic significance as a name that describes a specific place in the Oakville area of Napa County has the same legal effect as an affirmative false statement: A deliberate omission of material information that an applicant has a duty to disclose can support a cancellation claim based on fraud. *See Caymus Vineyards v. Caymus Medical Inc.*, 107 U.S.P.Q.2d 1519, 2013 WL 3984638 (T.T.A.B. 2013) (in response to Examiner's question if the term CAYMUS for wine had a geographical significance, the applicant's attorney misled the Examiner in telephone conversation).

### 4. RMW's Failure to Disclose To Kalon's Geographical Descriptiveness Was Material

Moreover, RMW's failure to disclose that To Kalon was geographically descriptive was material to the USPTO's evaluation of RMW's trademark application. Robert Cissel, CBUSO's USPTO practice expert, admitted that the geographically descriptive aspect of the name "To Kalon" was material to the trademark examination process: "If it's a place name, if [To Kalon]'s the name of a location, it would be material." Trial Tr. (Cissel) at 1077:6-7, 1078:4-7.

> Q. So assuming that "To Kalon" refers to a specific location where grapes are grown in Napa Valley, a vineyard, and assuming that consumers of wine know that the name "To Kalon" refers to a specific place where grapes are grown in Napa Valley, the examining attorney, armed with that information, would conclude that "To Kalon" is geographically descriptive, wouldn't she?
>
> A. Yes, she would, *primarily geographically descriptive*.

7

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BN 42990117v2

Trial Tr. (Cissel) at 1081:9-15 (emphasis added); *see also* Trial Tr. (Miltenberger) at 48:19-25. As

Mr. Cissel further testified, because the term "To Kalon" was primarily geographically

descriptive, the EA should have denied RMW's application and refused registration. Trial Tr.

(Cissel) at 1064:19-1065:6.

     **5.**      **RMW Knew That Wine Consumers Attribute Great Significance to the Name "To Kalon"**

     There is no real question whether RMW knew of To Kalon's significance in 1987 when

RMW responded to the USPTO office action – it clearly did. As previously noted, Robert

Mondavi had personally made statements to the press and others that To Kalon vineyard was the

best location in California to cultivate Cabernet Sauvignon grapes. *See, e.g*., TX278; TX279;

TX296 (San Francisco Chronicle 1/14/1969) ("Robert Mondavi, president of Robert Mondavi

Winery, Oakville announces the purchase of 250 acres of the adjoining Tokalon Vineyards.");

TX294 (Napa Valley Register 1/11/1969) ("Robert Mondavi Winery today announced it had

purchased 250 acres of choice vineyard land . . . The vineyards are located northwest of Oakville

adjoining the present winery property – an area which is considered the heart of the prime wine

growing region of Napa Valley – and are a part of the Tokalon Vineyards."); TX295 (Los

Angeles Times 1/14/1969) ("Robert Mondavi, president of Robert Mondavi Winery, Oakville,

Napa Valley, has announced the purchase of 250 acres of vineyard land and producing vineyards

from Tokalon Vineyards, from [sic] approximately $730,000. The property is located northwest

of Oakville, directly adjoining Mondavi's present winery property."). Most prominently, perhaps,

in his 1998 memoir *Harvests of Joy: My Passion for Excellence*, Robert Mondavi explained why

he purchased part of the historical winemaking lands once owned and operated by Crabb and To

Kalon Vineyard Company, stating: "There was one [vineyard], though, that stood head and

shoulders above the others. It was a vineyard with a distinguished history and a magical name: To

Kalon." TX356 (at pp. 57-59) (hereafter, "*Harvests of Joy*").

     To rebut the statement in *Harvests of Joy* where Robert Mondavi expressed a clear

knowledge and understanding that To Kalon was significant to the wine world at the time RMW

purchased a portion of To Kalon vineyard in 1969, CBUSO proffered the transcript of Robert

8

1   Mondavi's deposition, which was taken in 2003 in Beckstoffer Vineyards lawsuit against RMW

2   that had alleged, among other things, that RMW had obtained registration of "To Kalon" by

3   defrauding the USPTO. According to CBUSO:

> Mr. Mondavi (who passed away in May 2008) testified under oath
> in a federal court proceeding that when he bought his first two
> parcels of land (in 1966 and 1968) (totaling about 262 acres) he
> only knew it as the "Stelling land"—at that time, he had never
> *heard* of "To Kalon," despite having been in the wine business
> most of his life. *See* Mondavi Dep. at 84:18-85:13 and 92:15-25 ("I
> knew the land as Stelling land … when I never heard of To Kalon.").

*See* Dkt. 236-3 (page 22 of 95) (*quoting* from TX1062 (the "Mondavi Depo. Tr.")). The attorney

who examined Mr. Mondavi in 2003 sought to clarify this point:

> Q. Okay. So you're certain as you sit here today that when you
> purchased the land in the late 1960s, you had no idea that it was
> called the To Kalon Vineyard?
>
> A. I wasn't aware of it and I don't know other people that were
> aware of it. At least I wasn't.
>
> Q. And anything in your book that's contrary to that –
>
> A. Well, no. The thing is that when we popularized the name, then
> when I talked to Paul Chutkow, I referred to To Kalon because to
> me it was more meaningful. You're filling in the gaps that maybe I
> had forgotten completely. So thank you.
>
> Q. When Louis Martini talked to you about the land, he was
> referring to a specific piece of property, a specific place, correct?
>
> A. Well, he did the same thing we did. We bought grapes from
> there. . . . And I exchanged ideas with him about winemaking and
> all and we talked about the Stelling Vineyard. We didn't talk about
> To Kalon in that regard. Now I may have used it here only because
> I knew the name itself was – this is the name that we were using to
> promote.

TX1062, at 87:21-88:19.

        That Mr. Mondavi knew about To Kalon prior to 1966 is beyond dispute, as reflected in

contemporaneous press reports like the following:

> According to Robert Mondavi, . . . the property is 'one of the best
> premium wine-growing locations in all of California.' […] The
> huge estate, once known as Tokalon, extends from the old Oakville
> railroad station south toward Yountville and west to the foothills of
> the Mayacamas range.

9

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

TX279 (San Francisco Chronicle, 1/19/1962). This disparity between the historically contemporaneous record and Mr. Mondavi's deposition testimony raises serious questions about whether Robert Mondavi testified truthfully at deposition. A similar disparity arises with respect to Mr. Mondavi's explanation as to why the story told in *Harvests of Joy* referred to "To Kalon" rather than the "Stelling Estate." As noted above, Mr. Mondavi testified that he "may have used it in [*Harvests of Joy*] because . . . this is the name that we were using to promote." TX1062, at 88:17-19. But in the context of recording an oral history of his life for RMW years before *Harvests of Joy* was published, *see* TX99 (PDF at 17-18 of 22), Mr. Mondavi told the same story about how Louis Martini promoted To Kalon vineyard as the premier Cabernet Sauvignon cultivation site, as follows:

> . . . when I talked to Louis Martini, I got a kick out of it. He said that without a doubt he felt the best Cabernet Sauvignon from the To-Kalon Vineyard because he had bought these grapes from time to time. And he laughed on that. I always remembered that.
>
> And because I also knew that we were crushing grapes from the To-Kalon Vineyard when Ivan – when Ivan Schoch had the property.

TX102 (at 16:16-24). In light of Mr. Mondavi's inconsistent statements, it is simply not reasonable to conclude that Robert Mondavi was ignorant of the To Kalon name until the late 1960s. According to Mr. Mondavi's contemporary, Andy Beckstoffer: "anybody you talked to in the Napa Valley in those days would recall and would state that To Kalon was a vineyard, a famous vineyard owned by Hamilton Crabb." Trial Tr. (Beckstoffer) at 249:14-16.

Employees and contractors for the Mondavi family and RMW also discussed and wrote about To Kalon since the early 1960s. For example, Francis Gould[3] wrote in Bottles and Bins, the Charles Krug Winery newsletter:

> The latest and most important addition to the vineyard program of Charles Krug Winery was the purchase in January of the 500-acre vineyard . . . by Mondavi Vineyards, a corporation wholly owned by C. Mondavi & Sons. Historically, the vineyard is a distinguished landmark of early Napa Valley viticulture. . . . In Crabb's day the

---

[3] Mr. Gould worked as a publicist for Mondavi businesses and was one of Robert Mondavi's confidantes. Trial Tr. (Miltenberger) at 58:13-15. For many years, Mr. Gould worked as publicist for Charles Krug Winery, while it was owned by C. Mondavi & Sons.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BN 42990117v2

estate was known as 'To Kalon.'

TX281. In 1963, Gould penned an article for the Charles Krug Winery that was published in the Pacific Coast Review. In that article Gould wrote: "In 1962 the historic To Kalon vineyard was purchased . . . These nearly 500 acres of vines in bearing are considered one of the most outstanding vineyard in California. The original owner, Hamilton Walker Crabb, ranked with Krug among the immortal pioneers." TX284.

In addition, John Daniel, Jr., one of RMW's Vice Presidents, prepared "Notes on the History of Napa County Viticulture and Wine Making" for presentation at a November 23, 1969 meeting of a wine course to be given at the Robert Mondavi Winery, which state "Crabb's ToKalon – which means in Greek, 'The Highest Good'.  Tokalon adjoins Benson's with most of the land centered on Walnut Drive, directly west of Oakville." TX299; Trial Tr. (Miltenberger) at 61:11-23. It is worth noting that "To Bob Mondavi" was written in red ink on the manila folder in which Mr. Gould's To Kalon materials are maintained. *See* TX299 (at PDF p, 3 of 4). And in a document, dated September 24, 1970, Mr. Daniels signed his name on behalf of "Robert Mondavi Vyd Inc.," on a receipt listing historic documents related to To Kalon that Francis L. Gould, of C. Mondavi & Sons, had agreed to loan to Robert Mondavi Vineyard, Inc. TX299 (at PDF 4 of 4).

## 6.    RMW's Intent to Deceive the USPTO Can Be Inferred in This Case

Having established that RMW made a material misrepresentation to the USPTO in its response to the office action inquiry that RMW knew was false, the only remaining element to assess is RMW's intent at the time it responded to the USPTO office action.

"[D]irect evidence of deceptive intent is rarely found and thus state of mind and intent must usually be proven by circumstantial evidence." 6 McCarthy on Trademarks and Unfair Competition, at § 31:66 (5th ed. December 2020 Update) (hereafter, "McCarthy on Trademarks"); *see In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009) (the challenger must "point to evidence to support an inference of deceptive intent" to satisfy clear and convincing standard. When drawing an inference of intent, "the involved conduct, viewed in light of all the evidence ... must indicate sufficient culpability to require a finding of intent to deceive." (citations

11

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BN 42990117v2

omitted)); *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 WL 2366439, at *11 (C.D. Cal. 2009), *aff'd*, 434 F. App'x 664 (9th Cir. 2011), opinion withdrawn and superseded, 473 F. App'x 522 (9th Cir. 2011), and *aff'd*, 473 F. App'x 522 (9th Cir. 2011) ("[A]n applicant or registrant may not make a statement he/she knew or should have known was false or misleading."); *see also Swiss Watch International, Inc. v. Federation of the Swiss Watch Industry*, 101 U.S.P.Q.2d 1731 (T.T.A.B. 2012) ("[M]aking a statement that, while true, gives only part of the story" can demonstrate falsity and intent.); *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 30 USPQ2d 1149, 1154 (Fed. Cir. 1994) ("[the submission of false or misleading statements] usually will support the conclusion ... of an intentional scheme to deceive the PTO"). Fraudulent intent is properly inferred where it is the "single most reasonable inference able to be drawn from the evidence" presented at trial. S*ee Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). In determining intent, all information available to the applicant must inform the response to a PTO office action. *See Allstate Insurance Co. v. Healthy America Inc.*, 9 USPQ2d – 1663 (T.T.A.B. 1988) (attorney may sign corporate client's interrogatory responses without personal knowledge of the information contained therein, but responses must be based on information available to client itself).

In this case, TVH has demonstrated beyond dispute that RMW knew that "To Kalon" referred to a specific location in the Oakville area of Napa County where exceptional wine grapes were grown. Dkt. 237-4 (PFF 75-92). The only question is what, if anything, might support an argument that RMW erroneously believed in good faith that in 1987 "although the name has some historical significance, it has no current meaning or significance in the wine industry." TX18. In that context, CBUSO attempts to justify RMW's misrepresentation to the USPTO as based in a good faith reliance on a 1980 report prepared by local wine historian William Heintz. In that report, Mr. Heintz concluded, "The name of 'To Kalon' is largely forgotten now as a *wine brand.* . . . Historical obscurity comes about quickly when a *winery and a wine brand* are retired or simply go out of business." TX329 (at PDF p. 31 of 46) (emphasis added). While Mr. Heintz's statements may be literally true, they pertain only to a "winery" and "wine brand," and say

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT – CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

nothing about the vineyard properties or how "To Kalon vineyard" was commonly used to describe a specific location in the Oakville area of Napa Valley. The Heintz report concludes with Mary Alice Churchill's sale of Historic To Kalon to Martin Stelling, Jr., *id.*, with no discussion of how "To Kalon" was commonly used as a geographic designation. It would be disingenuous, at best, to allow RMW to rely on the Heintz report to excuse RMW's misleadingly incomplete response to the USPTO office action, when the evidence is clear and unchallenged that Robert Mondavi knew of and used the name "To Kalon" in connection with grape-growing since 1962.

### 7. The USPTO Reasonably Relied on RMW's Misrepresentations

A finding that a misrepresentation was material also logically supports a finding that the USPTO reasonably relied on the representation. Reasonable reliance is shown if a reasonable examining PTO attorney would have relied on the material fact and considered such a fact in making the overall decision as to whether to grant the application. *See OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.,* 897 F.3d 1008, 1021 (9th Cir. 2018). In this case, because the EA thought that To Kalon might have had some other significance than what she was able to determine, she went and asked the applicant – RMW – for additional information. Because respondents to USPTO office actions have a duty to respond honestly, EAs rely on the responses to office action inquiries. Trial Tr. (Cissel) at 1080:6-21; Dkt. 237-4 (PFF Nos. 75-77).

As demonstrated above, TVH has established with clear and convincing evidence that RMW obtained registration of the To Kalon Marks by perpetrating a fraud on the USPTO. The To Kalon Marks should therefore be cancelled, with prejudice.

### B.   TVH Has Fair Use Rights to the To Kalon Marks

TVH has the right to use the name "To Kalon" because it falls within the Fair Use Doctrine under 15 U.S.C. §§ 1114, 1115, and 1125(a).  TVH also asserts fair use as a complete defense to CBUSO's infringement claim.

### 1.   Applicable Legal Standards

"'A classic fair use' is an affirmative defense to a charge of trademark infringement when the junior user argues that it is not using a descriptive, geographically descriptive, or personal

13

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

name designation in a trademark sense, but only to describe the defendant's goods or services, or their geographic origin, or to name the person involved in running the business."  2 McCarthy on Trademarks, § 4:17.

To succeed on a fair use defense, the defendant must (a) "use the label in a descriptive or geographic sense" and (b) "do so fairly in good faith." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 127 U.S.P.Q.2d 1677 (6th Cir. 2018). TVH bears the burden of proof on its fair use claim and defense under the preponderance of evidence standard, which simply requires showing that the existence of a fact is more probable than its nonexistence. *See Concrete Pipes & Products of Calif., Inc. v. Construction Laborers Pension Trust for Southern Calif.*, 508 US 602, 622 (1993); *Kennedy v. Southern Calif. Edison Co.*, 268 F3d 763, 770 (9th Cir. 2001; *see also* 9th Cir. Model Civ.Jur.Instr. 1.6.

The Supreme Court has explained that the Lanham Act adopts a certain leniency for fair use when a party such as CBUSO has selected a descriptive phrase to be a mark. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 543 U.S. 111, 122 (2004).  "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *Ibid; citing Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985) (noting safeguards in Lanham Act to prevent commercial monopolization of language); *Car–Freshener Corp. v. S.C. Johnson & Son, Inc*., 70 F.3d. 267, 269 (2d Cir.1995) (noting importance of "protect[ing] the right of society at large to use words or images in their primary descriptive sense").

The focus of the Court's fair use inquiry is on TVH's use of the name "To Kalon," not on how Constellation uses To Kalon. "What matters is whether the defendant is using the protected word or image descriptively, and not as a mark." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc*., 70 F.3d 267, 36 U.S.P.Q.2d 1855 (2d Cir. 1995); *see also Cairns v. Franklin Mint Co*., 292 F.3d 1139, 1151 (9th Cir. 2002) ("[T]he classic fair use analysis is appropriate where a defendant has used the plaintiff's mark *only* to describe his own product, and not at all to describe the plaintiff's product.").

A junior user can use another's registered trademark only in a non-trademark, geographically descriptive sense. McCarthy on Trademarks, at § 14:17; *see Oaklawn Jockey Club, Inc. v. Kentucky Downs, LLC*, 184 F. Supp. 3d 572, 578 (W.D. Ky. 2016), *aff'd*, 687 Fed. Appx. 429 (6th Cir. 2017) ("Defendants are protected by the fair use defense when describing where an event took place, even when the location described is most commonly conveyed using a registered trademark."). "Even if one seller has achieved secondary meaning in a geographic term or has used the term arbitrarily, anyone who is in fact located in that place has a limited right to tell purchasers of his location."  McCarthy on Trademarks, at § 14:12. "In other words, although a service provider may establish trademark rights in a geographic term by instilling in it a secondary meaning as an identifying symbol for its services, other providers maintain the right to employ the same term 'in its old, primary sense ...' which existed prior to the registrant's usage." *Schafer Co. v. Innco Mgmt. Corp.*, 797 F. Supp. 477, 481 (E.D.N.C. 1992), *aff'd*, 995 F.2d 1064 (4th Cir. 1993); *see also Midwest Research Inst. v. S & B Promotions, Inc.*, 677 F. Supp. 1007, 1015 (W.D. Mo. 1988).

Numerous courts have found that use of a geographic term is fair use. *See Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n*, 345 F.2d 158, 145 U.S.P.Q. 244 (9th Cir. 1965), cert. denied, 382 U.S. 903, 15 L. Ed. 2d 157, 86 S. Ct. 239, 147 U.S.P.Q. 541 (1965) (TILLAMOOK cheese products from Tillamook County, Oregon); *Sazerac Brands, LLC v. Peristyle*, LLC, 892 F.3d 853, 855 (6th Cir. 2018) (affirming judgment for defendant who used Old Taylor Distillery to describe its location); *King Ranch, Inc. v. D.R. Horton, Inc.*, 2012 WL 1788178 (S.D. Tex. May 16, 2012) (District court found that a developer who named its subdivision in Thornton, Colorado "King Ranch Estates" was using the trademark owned by King Ranch, Inc. and King Ranch IP, LLC in Texas fairly because "King Ranch" merely identified the location of the homes as the area in which the subdivision was located had been known as "King Ranch" for generations.); *Sarco Creek Ranch v. Greeson*, 36 F. Supp. 3d 726, 728 (S.D. Tex. 2014) ("Parmley is unable to show a likelihood of success in light of the Greesons' defense that 'Sarco Creek Ranch' is primarily geographically descriptive."); *Century Theatres Inc. v.*

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

1   *Landmark Theatre Corp.*, 2000 WL 963997, at *4 (N.D. Cal. 2000) (Denying motion for

2   preliminary injunction because use of name "Century Cinema" likely fair use because that was

3   the name of the former theatre in that same location); and *New Sensor Corp. v. CE Distribution*

4   *LLC*, 303 F. Supp. 304 (E.D. N.Y. 2004) (defendant's use of "Svetlana" name in Web site to

5   identify the factory in Russia where its goods were made did not constitute infringement of

6   plaintiff's "Svetlana" mark), *aff'd*, 121 Fed. Appx. 407, 2005-1 Trade Cas. (CCH) P 74676 (2d

7   Cir. 2004); *see also Department of Parks and Recreation for State of California v. Bazaar Del*

8   *Mundo Inc.*, 448 F.3d 1118, 78 U.S.P.Q.2d 1887 (9th Cir. 2006) (names of historical places in

9   Old Town San Diego such as CASA DI BANDINI required proof of secondary meaning).

10       In *Sazerac*, the plaintiff owned the trademark rights to the mark "Old Taylor." *Id.* at 855.

11   The defendant, a bourbon distiller, bought and renovated the "Old Taylor Distillery." *Id.* The

12   distiller "regularly referred to its location at 'the Former Old Taylor Distillery' or 'Old Taylor'

13   during the renovation period." *Id.* Those references were fair use of the "Old Taylor" mark. *Id.* at

14   859. The references were descriptive and geographic because they "referred to Old Taylor to

15   pinpoint the historic location where [the distiller] planned to make a new bourbon, not to brand

16   that bourbon." *Id.* at 857. Once the distiller developed its own brand name and opened the

17   renovated distillery, it would place a sign with the new name next to the "historic" "Old Taylor"

18   signs that came with the distillery. *Id.* The Sixth Circuit affirmed summary judgment for the

19   defendant holding that "[t]rademark law demands no more." *Id.*

20       "The plain language of 15 U.S.C. § 1115(b)(4) allows a fair use for trademarks which

21   describe 'the geographic origin' of Defendants' product—*i.e.*, where the depicted historical race

22   was run. *See* 15 U.S.C. § 1115(b)(4). The statute's geographic-origin protection stands for the

23   unremarkable proposition that defendants may state where the subject racing events occurred

24   without committing trademark infringement." *Oaklawn Jockey Club, Inc., supra,* at 578; *see also*

25   *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 512–13, 521 (6th Cir.2007) (use

26   of the name of a region of France did not infringe on the mark of a competing winery); *Chrysler*

27   *Grp. LLC v. Moda Grp. LLC*, 796 F.Supp.2d 866, 870 (E.D.Mich.2011) (use of the phrase

28

'imported from Detroit' did not constitute trademark infringement).

As noted in *Sarco Creek Ranch*, 36 F.Supp.3d at 728, "[i]n naming the ranches after the place where they are located, the parties demonstrate the durability of an observation the Supreme Court made almost 150 years ago: 'Nothing is more common than that a manufacturer sends his products to market, designating them by the name of the place where they were made.' *Canal Co. v. Clark*, 80 U.S. 311, 325, 13 Wall. 311, 20 L.Ed. 581 (1872)."

### 2. The Name "To Kalon" Is Descriptive of a Portion of TVH's Property

"To Kalon" is geographically descriptive of the portion of TVH's property that was once owned by Crabb. After significant research and review of the historical records, Dr. Miltenberger – the only witness who testified at trial that qualified to testify as a professional environmental historian – opined that "To Kalon is the property, the real property [] place of the 19th century viticulturist, winemaker, wine seller and farmer, H.W. Crabb." Trial Tr. (Miltenberger) at 20:11-14; *compare* (de Vere) at 922:22-924:15 (confirming that de Vere, who is not qualified as a historian, has no personal knowledge of To Kalon's history). "Crabb's To Kalon consisted of three parcels of land that he acquired between 1868 and 1889." *Id.* at 20:15-17; *see* TX26 [SEALED] ("…

…"); *see, also* TX211; TX214 (various 1890s newspaper articles reported that Crabb's estate was comprised of some 500 acres, of which various acreage was reported as being "in vines" or the like."); TX10 (land survey showing TVH vineyards relative to Crabb's To Kalon Estate parcel).

To Kalon is an historically and geographically significant term. Trial Tr. (Miltenberger) at 22:3-24:25 and 45:24-48:4; TX26 (at ¶ 9) [SEALED] ("

"); TX26 (at BV0067) [SEALED] ("

…"); Trial Tr. (Frost) at 152:12-153:4, 154:2-24, 155:25-156:8, 161:23-162:20, 163:19-164:2, 219:6-202:3, 311:5-312:7, 315:10-316:4, 492:23-493:6; Trial Tr.

17

(Beckstoffer) at 249:14-16 ("anybody you talked to in the Napa Valley in those days would recall and would state that To Kalon was a vineyard, a famous vineyard owned by Hamilton Crabb."); Trial Tr. (Ash) 659:13-15 ("Q. And you think it's common knowledge in the wine business that To Kalon is historic; right? A. Yes.").

### 3. TVH Used To Kalon Vineyard on Its Front Label as a Single Vineyard Designation, to Describe the Geographic Origin of Its Wine

The phrase "To Kalon Vineyard" describes land that Crabb owned and cultivated grapes on. Trial Tr. (Beckstoffer) at 235:4-16.; (Frost) at 220:8-222:13, 322:16-323:2; Seethoff Depo. at 21:24-25:11, 63:19-64:11. THV has used the phrase "H.W. Crabb's To Kalon Vineyard" to describe the geographic origin of the grapes from which the wine was made. Trial Tr. (Frost) at 209:2-12, 222:9-17, 224:1-6, 317:5-21; (Beckstoffer) at 235:4-12; Seethoff Depo. at 15:24-16:20, 30:3-19 , 64:5-11.

The preponderance of evidence standard can be met by circumstantial evidence. While TVH has not proffered direct evidence to establish that Crabb cultivated grapes on the Baldridge Farm parcel during his lifetime, there is more than sufficient circumstantial evidence to meet TVH's burden of proof. *See* 9th Cir. Model Civ.Jur.Instr. 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence."); *see also Ortiz v. Werner Enterprises, Inc.* (7th Cir. 2016) 834 F3d 760, 76 ("No evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect'").

The parties hotly dispute whether Crabb cultivated wine grapes on the Baldridge Farm parcel. CBUSO relies on the Probate Inventory – which was prepared to facilitate the probate sale of Crabb's estate shortly after his death – as evidence that Crabb had not cultivated grapes at Baldridge Farm. The Probate Inventory expressly identified vineyard acreage with particularity at Crabb's so-called "Home Place" and "Lewelling Place" parcels,[4] but made no mention of vineyards on the Baldridge Farm parcel. *See* TX 220 (Probate Inventory). While acknowledging that the Probate Inventory made no mention of vineyards on the Baldridge Farm parcel, TVH

---

[4] The Probate Inventory refers to the parcel that Crabb acquired in 1868 as "Home Place," and the parcel that Crabb acquired in 1879 as "Lewelling Place."

18

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

pointed to the following facts that support the conclusion that Crabb **did** cultivate grapes at

Baldridge Farm:

- It is well-documented in the historical record that Baldridge had established a substantial, productive wine grape vineyard prior to Crabb's acquisition of Baldridge Farm. TX236 (History of Solano and Napa Counties – In the early 1870s, Baldridge had "extensive vine plantings."); TX193 ("The Vintage of '81' – Baldridge sold wine grapes in 1881 to winemaker A. Jeanmonod.).

- It is extremely unlikely Crabb would have abandoned an existing vineyard at real property he owned because Crabb was "an intensely practical man," TX205; *see also* TX311 (Wait, Wines and Vines, at 108) (Crabb's "cellar at To Kalon [was] plain and unpretentious; . . . Crabb is one of the few men who do not believe that fine outsides to a cellar make fine wine.").

- Crabb made a series of reports in the 1890s on the materials and methods to reduce or eliminate phylloxera infestation that he was developing and evaluating, which involved, among other things, "digging up vines, planting in grain for a year, and **then in hay for a year**." TX213 (Report of H.W. Crabb, Commissioner for the Napa District, June 12, 1894 (emphasis added)). The description of the Baldridge Farm parcel contained in the Probate Inventory suggests that Crabb had started, but not concluded the recommended crop rotation cycle at Baldridge Farm prior to his death. Specifically, the Probate Inventory identified 70 acres of Hay on Baldridge Farm – the apparent size of the vineyard on that parcel. *See* TX220.

- Throughout the 1890s various newspaper articles reported that Crabb's estate was comprised of some 500 acres, of which various acreage was reported as being "in vines" or the like. Crabb's "Home Place" and "Lewelling Place" parcels total 359 acres, however, and adding in the Baldridge Farm parcel – at 168.5 acres – yields a total aggregate acreage of a fraction over 527 acres. Moreover, the aggregate acreage "in vines" on the Home Place and Lewelling Place parcels would have been substantially less than 359 acres, because those parcels were also occupied by a variety of structures and other crops, which included a stock farm, roadways and paths, winery buildings, a cooperage, distillery facilities, and a large residence. *See, e.g.*, TX208 (Breeder and Sportsman, May 7, 1892 (JRP00008)); TX188 (Engraving of Hermosa Vineyards – "Illustrations of Napa County – p. 18f (TVH05094-96)); TX 194 (Among the Winemakers (TVH00005126-5133)); TX 337 (HW Crabb compiled by Detert (JRP0000793-819) (photos)).

- During his career as a vineyardist and winemaker, Crabb exhibited a drive to excel and compete with the leading winemakers of his day. The winemakers in Crabb's time were engaged in a vigorous debate about whether wines made from grapes grown on the valley floor were superior to the wines made from grapes grown in the mountains and hillsides, with a plurality of the leading winemakers of the day arguing that mountain- and hillside-grown fruit made superior wines. *See* TX348 (Wm. Heintz, "Mountain or Hillside Grapes Versus Valley Floor Grapes in the Napa Valley" (JRP 000877-902)). Given Crabb's expressed desire to make the best possible wines and his experimental nature, it stands to reason that Crabb would have been interested in making wine from mountain- and hillside-grown grapes.

Most compelling is the fact that Baldridge had established a substantial wine grape

19

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

vineyard prior to Crabb's acquisition of the property: It is virtually inconceivable that Crabb would have willingly abandoned such an asset. When the above facts are taken into account, TVH has thus demonstrated it is more probable than not that Crabb cultivated grapes on a portion of the Baldridge Farm property. Trial Tr. (Miltenberger) at 27:12-18 ("I think it's likely that [Crabb] cultivated grapes on the parcel.").[5]

Moreover, as noted above, in 1934 the California Superior Court issued a judgment that included a decree confirming that Mary Alice Churchill held title to "All that certain ***real property known and described as To Kalon Vineyard***, near Oakville, Napa County, California." TX258 (emphasis added). That "certain real property" included the portion of the TVH property that Crabb owned between 1888 and his death in 1899. The Court should therefore find that TVH has the right to use the phrase "To Kalon Vineyard" as a single vineyard designation to describe the historic and geographic significance of TVH wine that comes from a portion of TVH's property that was owned by Crabb and used to cultivate grapes.

**4.      TVH Use of "To Kalon" Without Reference to "Vineyard" Is Also Descriptive of Geographic and Historic Origin**

TVH's declaratory relief claim and defense of fair use is not limited to use of the phrase "To Kalon Vineyard" as a single vineyard designation on the front labels of its wines. TVH also asserts that it has a fair use right to use "H.W. Crabb's To Kalon" or "To Kalon" in connection with its property and its wine because the property was a part of Crabb's To Kalon estate. Dkt. 30 (First Amended Compl.) at ¶ 4, 65-66, 72, 88, and Prayer ¶ 4.

Historians, the wine industry, and the parties use other To Kalon-related terms to describe the real property at issue here regardless of whether vines were grown by Crabb. There are numerous references to To Kalon without referring to any vineyards. Those terms include "historic To Kalon," "To Kalon estate," "To Kalon property," and "To Kalon place." TX356 (*Harvests of Joy* (at p. 57) *quoting* Robert Mondavi: "So at my urging, we [Krug] began buying

---

[5] In addition to the circumstantial evidence described above, Dr. Miltenberger had opined that Crabb's references to planting phylloxera-resistant rootstocks in "higher and dryer" soil and "at the head of a canon in the mountains," which on cross-examination was determined to be mistaken. That such evidence may have fallen short of expectation does not, however, justify rejection of the conclusion that Crabb cultivated grapes on the Baldridge Farm property outright, because that conclusion is still supported by unrefuted circumstantial evidence.

20

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

grapes grown on the To Kalon property, and in 1958 I think it was, we went even further. We purchased a 325-acre parcel of To Kalon for Krug in the name of the parent company my father had formed, C. Mondavi & Sons."); TX102 (1995 R. Mondavi Interview) at 15:8-17:12 ("At the C. Mondavi & Sons, Charles Krug Winery when I was running it, I was able to convince my father to agree […] to buy the To-Kalon Vineyard, which was 700s acres."); Seethoff Depo. Tr. at 65:25-66:14 ("We [Constellation] will call out historic To Kalon as being different than our current operations in our promotional materials."); TX266 ("Mr. Stelling also owns the former To Kalon place recently purchased from Mrs. Alice Churchill."); TX279 ("The huge estate once known as To Kalon extends from the old Oakville Railroad Station south toward Yountville and west to the foothills of the Mayacamas Range."); Trial Tr. (Cadamatre) at 691:2-7 referring to TX1679 ("Q. Now, the part that's outlined in red is not the entirety of the Robert Mondavi To Kalon Vineyard property, is it? A. No, it's not. Q. What does that represent, the red box? A. My understanding is this represents part of To Kalon – part of H.W. Crabb's To Kalon Estate."); Trial Tr. (Beckstoffer) at 244:2-15 (A. My understanding of Historic To Kalon is the land that Mr. Crabb initially bought in 1868, and he bought it in two or three different parcel times.") at 248:19-20 ("A. They [RMW] were advertising that To Kalon was bigger than land owned by Hamilton Crabb."); Trial Tr. (Miltenberger) at 34:10-11 ("A. Historic To Kalon was acquired by E.W. Churchill, a local area banker, at public auction in 1899 following Crabb's death."); Trial Tr. (Nickel) at 557:7-11 ("I would say, you know, any land that he owned upon his death would be estate and not necessarily To Kalon Vineyard. Q. Now, what do you mean by 'estate'? A. Well, the To Kalon Estate specifically.")

Regardless whether the Court finds that Crabb cultivated grapes at the Baldridge Farm parcel, the evidence is unrefuted that the Baldridge Farm parcel portion of TVH's property was an integral and important element of Crabb's To Kalon operations. Baldridge Farm's two-10,000 gallon reservoirs and irrigation piping system supplied water to power the steam engines in Crabb's winery and cellaring operations and to irrigate the crops grown on the adjacent parcels that Crabb had acquired in 1868 and 1879. TX194; TX220; Trial Tr. (Miltenberger) at 26:3-5,

21

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

33:2-6. Moreover, the timber at the Baldrige Farm property supplied lumber for Crabb's cooperage and construction of structures that housed Crabb's winery operations. TX220 (substantial value attributed to water reservoirs, water supply piping, and timber stands).

The above evidence shows that a portion of TVH's property was an integral part of Historic To Kalon and TVH should be entitled to accurately describe its property as such. Trial Tr. (Nickel) at 646:4-11 ("The thing that I find most important is that the Baldridge parcel was acquired by H.W. Crabb ten years before his death, and then the Baldridge parcel continued to be a part of the estate for another 43 years. If this land wasn't an important part of the overall story, why would they hold onto it for over 53 years? And I feel like a third of Mr. Crabb's holdings being owned as part of the estate for over five decades is significant and bears being told."); Trial Tr. (Beckstoffer), at 256:2-3 ("This gets to a major point -- is that To Kalon is a place, and you can't trademark a place, and so this and other references from Bob Mondavi and from other people always said that To Kalon was a place."); *see* Trial Tr. (de Vere) at 922:18-21 ("And so Robert Mondavi started telling Mr. Crabb's story and telling the story of the business that had previously occupied a similar location to us…").

TVH should be entitled to use "H.W. Crabb" and "To Kalon" to describe the portion of TVH's property where TVH's wine comes from. For example, TVH should be able to use To Kalon on the back of its label to refer to Crabb and his ownership of the historic To Kalon estate, even if the Court finds that TVH is not entitled to fairly use To Kalon Vineyard as a single vineyard designation.

### 5.    TVH Has Used "To Kalon" In Good Faith, In a Non-Trademark Sense

The evidence demonstrates that TVH has used and – if allowed to do so in the future it intends to use – To Kalon in good faith, not in a trademark sense, and not to trade off any goodwill established by CBUSO. *See* Restatement Third, Unfair Competition § 28, comment c (1995) ("Fair use is a reasonable and good faith use of a descriptive term that is another's trademark to describe rather than to identify the user's goods, services or business."); Lanham Act § 33(b)(4), 15 U.S.C.A. § 1115(b)(4) ("[T]he use of the name, term, or device charged to be an

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

infringement is a use, otherwise than as a mark … of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party."); *EMI Catalogue Pshp. v. Hill, Holliday, Connors, Cosmopulos Inc.*, Docket No. 99-7922, 2000 U.S. App. LEXIS 30761, at *24 (2d Cir. Sep. 15, 2000) ("Good faith" is a key element of the fair use defense.).

- **Mr. Nickel testified as to TVH's intent and good faith**. Trial Tr. (Nickel) at 491:11-19 ("I believe that The Vineyard House has the right to include To Kalon on wines that fall within the historic boundary of H.W. Crabb's To Kalon parcel…"); at 492:17-22 ("Q. What do you hope to communicate to consumers of The Vineyard House wines by putting To Kalon, H.W. Crabb's To Kalon Vineyard on the label? A. I would like to be able to communicate the history of the land and the geographic significance of a portion of my property."); at 493:3-6 ("when I discovered there was another parcel owned by Crabb that contributed to To Kalon, I think it's appropriate and fair to talk about that history and legacy.").  TVH's disgruntled former employee, Amy Ash, also confirmed that TVH did not use To Kalon to trade off of any trademark or CBUSO's goodwill.  Trial Tr. (Ash) at 659:6-9 ("Q. When The Vineyard House used H.W. Crabb's To Kalon Vineyard on its wine label, it was referring to the land that was one time owned by Crabb, correct?  That is my understanding.").

- **CBUSO and its witnesses could *not* testify as to TVH's good faith intent**. Trial Tr. (McDonald) at 1152:13-15 ("Q. You cannot testify on TVH's intent in using the term To Kalon, correct? A. I can't testify as to their intent.").

- **TVH does not want to use To Kalon as a brand or as a basis to increase the price of its wines**. TVH has not increased the price of its wines because of To Kalon, because it is already charging top price. Trial Tr. (Nickel) at 490:20-491:10.

- **TVH was not "trying to capitalize on the To Kalon brand."** TX 1341 (email written by TVH's former contract CFO). TVH does not want to trade off of or connect itself to CBUSO.  Trial Tr. (Nickel) at 645:19-23 ("I wanted to be recognized as owning a portion of H.W. Crabb's To Kalon Estate and being able to be different than anything Robert Mondavi has done or anything Beckstoffer has done.") and Trial Tr. (Nickel) at 506:17-507:2 ("A. With all due respect, Robert Mondavi Winery is not a winery that would qualify as in the same tier as The Vineyard House. It is mass-produced. Robert Mondavi Winery, I think, produces millions of cases a year, and so it would damage The Vineyard House's reputation if it was associated in any way with Robert Mondavi Winery or the marketing that they've done with To Kalon.").

- **TVH wants to and should be entitled to tell its customers about its historical connection to Crabb and To Kalon**. Trial Tr. (Nickel) at 646:2-3 ("I really want the story to be able to use a portion of the property and its relation to H.W. Crabb and To Kalon…"). CBUSO has a part of that history, but cannot claim exclusive right to that history. Trial Tr. (de Vere) at 914:11-15 ("Q. Now, earlier you testified that as part of your marketing responsibilities, you teach consumers about the history of To Kalon and Mr. Crabb? A. Yes. I often refer to it or include it. It's -- yes, in my education, in my trainings, in my presentations.") and (de Vere) at

23

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

922:18-21 ("And so Robert Mondavi started telling Mr. Crabb's story and telling the story of the business that had previously occupied a similar location to us…").

The evidence supports TVH's good faith belief that its property was part of Crabb's winery operations at the historic To Kalon Vineyard, or at the least part of Crabb's To Kalon estate. While TVH acknowledges the lack of direct evidence regarding Crabb's cultivation of grapes on the TVH property, TVH presented substantial circumstantial evidence showing it is more likely than not that Crabb farmed grapes on the Baldridge Farm property. Trial Tr. (Nickel) at 644:23-25 ("we have had difficulty finding any direct evidence that there was vintages planted on the Baldridge parcel. We have found inferences.").

TVH's good faith belief and fair use of the To Kalon terms is further supported by the confusion that the wine industry and neighboring property owners have about the geographic borders of Historic To Kalon. Trial Tr. (Frost) at 318:19-21 (A. I was just going to say I think the whole point of this trial and previous trials is that there is disagreement about where the boundaries exist…"); TX26 [SEALED]; Trial Tr. (Beckstoffer) at 244:8-9 ("The historic boundaries of those properties is – is determined by maps from time to time."); Trial Tr. (Nickel) at 561:5-562:2 (discussing Graham McDonald's contention that McDonald owns a portion of historic To Kalon simply because Crabb owned that property for a few days). The disagreements about the boundaries of Crabb's famous To Kalon estate remain unresolved as of this trial, but TVH has shown that its propeorty was clearly part of the historic To Kalon estate that H.W. Crabb owned and operated.

This is not the first time a legacy owner of a portion of Crabb's historic To Kalon estate has challenged CBUSO's exclusive claim to a key part of Napa Valley history. This will, however, be the first time for a Court to adjudicate these issues. In 2002, Beckstoffer Vineyards asserted that as owner of a portion of Historic To Kalon, it had a fair use right to have its grape-customer wineries describe the geographic origin of the grapes by referring to the historic vineyard. Trial Tr. (Beckstoffer) at 248:5-18, at 247:22-23 ("A. We used the name To Kalon because we – in our publicity because we said we had the fair use."); and 248:19-20 ("A. [RMW] were advertising that To Kalon was bigger than land owned by Hamilton Crabb."). The parties to

24

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1  that suit settled before trial.

2      RMW and Beckstoffer both recognized "To Kalon" is geographically descriptive, and

3  Beckstoffer used the name "To Kalon" fairly and in good faith only to describe the goods or the

4  geographic origin of them. RMW and Beckstoffer issued a joint press release concerning the

5  "███████████████████████████████████████." TX26 at ¶ 11 [SEALED]; TX26 at

6  Ex. C [SEALED] ("███████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ██████████████████████." ). RMW recognized Beckstoffer's "██████████

10  ████████████████████" TX26 at Ex. C [SEALED] (Beckstoffer's portion of "████

11  ████████████████████" ). RMW, through its Chairman, R. Michael Mondavi, stated

12  "██████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ██████████████████████████████████████████████

15  ██████████████████████████████████ …" *Id.*

16      Beckstoffer's historical research and lawsuit were not focused on TVH's property and its

17  connection to Crabb and To Kalon. Trial Tr. (Beckstoffer) 267:14-20. The evidence submitted in

18  this trial supports TVH's good faith belief in its right to fairly use To Kalon to describe the

19  historical and geographic significance of its property and wines. TVH seeks the Court's

20  declaration of its fair use rights and does so in good faith.

21      **6.    TVH's Trademark Applications Do Not Estop TVH's Fair Use Claim**

22      That TVH applied for trademarks that include the term "To Kalon" does not prevent TVH

23  from seeking a fair use adjudication from this Court. Depending on the Court's judgment in this

24  case (*i.e.* cancellation of CBUSO's marks or a declaration on the scope of fair use rights), TVH

25  can and will disclaim any component of a trademark application that contains the term 'To Kalon'

26  as may be required to comply with the Court's judgment.  15 USC 1056(a) ("An applicant may

27  voluntarily disclaim a component of a mark sought to be registered."); TMEP 1213.01(c)

28

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

Voluntary Disclaimer of Registrable or Unregistrable Matter, 2018 WL 6255924; *see* Trial Tr. (Nickel) at 601:11-17. (Q "When you adopted To Kalon, you intended to use it as a trademark, didn't you? A. I wanted to be able to use it fairly. Q. Did you intend to use it as a trademark? A. Don't know how to answer that. I wanted to be able to use it fairly for wines that I produced within the boundaries of H.W. Crabb's land.").

All of TVH's trademark applications have been suspended and stayed pending the outcome of this trial. *See Shire City Herbals, Inc. v. Blue*, 410 F. Supp. 3d 270, 298 (D. Mass. 2019) ("the PTO's initial rejection of Plaintiff's second trademark application was a non-final office action that invited Plaintiff to submit evidence and arguments supporting its application. And the PTO's subsequent suspension of the application is not an adjudication on the application's merits; it is merely a stay pending the resolution of this litigation. *See* 37 C.F.R. § 2.67."). TVH should be entitled to seek alternative remedies and not be estopped from seeking a fair use declaration. *See Charisma Brands, LLC v. AMDL Collections, Inc.*, No. 819CV00312JLSKES, 2019 WL 6331399, at *5 (C.D. Cal. 2019), *citing Eniva Corp. v. Global Water Sols.*, 440 F. Supp. 3d 1042, 1049 (D. Minn. 2006) *and Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 22-23 (1st Cir. 2008) (*citing Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 375 n. 7 (1st Cir. 1980)) ("statements made to the USPTO do not bind registrants for all time,' but also that if they are considered at all, they should merely be incorporated into the 'evidentiary mix,' rather than given preclusive effect."); *see also Nike, Inc. v. WNBA Enterprises, LLC*, 85 U.S.P.Q.2d 1187, 2007 WL 763166 (T.T.A.B. 2007) (allowing the defendant to argue in an infringement action that plaintiff's mark was generic despite a previous attempt to register the mark under the Puerto Rico trademark statute).

CBUSO's reference to non-final USPTO office actions has little legal effect here, as it is not binding precedent on this Court. "The decisions of the Patent and Trademark Office are not binding as precedent upon the courts." 6 Callmann on Unfair Comp., Tr. & Mono. § 23:37 (4th Ed.) § 23:37. The Ninth Circuit has held that a preliminary determination by a PTO administrator is entitled to consideration but should not be accorded much weight where the examiner did not

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT – CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

have access to the all the evidence before the District Court." *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1053 (N.D. Cal. 2012); *see also Intra-Cellular Therapies, Inc. v. Iancu*, 938 F.3d 1371, 1373 (Fed. Cir. 2019) ("A final Office action, as opposed to a non-final Office action, marks the end of formal prosecution of an application.").

Any non-final determination by the PTO "is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence" that TVH has presented to this Court. *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d at 802; *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000) ("[A]lthough an initial PTO determination by an EA may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court.").

### 7. If There Is Any Risk of Confusion or Trademark Usage, the Court Can Require a Clarifying Disclaimer

That "fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004). To address any possible risk of confusion, the Court may require TVH to use a disclaimer, such as "TVH is not affiliated with Robert Mondavi Winery or Beckstoffer Vineyards" whenever it uses "To Kalon," if allowed to do so in the future. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011); *Adray v. Adray–Mart*, 76 F.3d 984, 990–91 n. 7 (9th Cir.1995); s*ee also Oracle Corp. v. Light Reading, Inc.*, 233 F. Supp. 2d 1228, 1232 (N.D. Cal. 2002) (the defendant ordered to state it "is not affiliated with" the plaintiff).

### C. TVH's Claim for False Advertising and False Designation of Origin, 15 U.S.C. § 1125(a)

CBUSO has engaged in false advertising under the Lanham Act by misdescribing its wine as coming from "To Kalon Vineyard," when the fruit from which the wine was made came from vineyards that Crabb had never owned or cultivated grapes on during his lifetime. The Lanham Act explicitly prohibits false designation of origin that "misrepresents the . . . geographic origin

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT – CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

of his or her or another person's goods[.]" 15 USCS § 1125(a)(1)(B).

In this case, CBUSO used "To Kalon" and "To Kalon Vineyard" for years in its labeling and marketing collateral to advertise that wine was exclusively sourced from the lands owned by H.W. Crabb at the time of his death. However, CBUSO has admitted that this is not the case, and that CBUSO in fact sources grapes for its wine from both Crabb's lands and the surrounding parcels – without disclosing this fact to its customers. TX054 at Supp. Resp. to Interrogatory 10. ("Defendant states that the wines identified in response to this Interrogatory No. 9 contain more than 5% wine from grapes sourced from land other than the Crabb's 1868 and 1881 parcels").

### 1.    CBUSO Uses To Kalon and To Kalon Vineyard as a Single Vineyard Designation

CBUSO, through RMW, uses the terms "To Kalon" and "To Kalon Vineyard" to describe the geographic origin of the grapes, rather than as a brand. First, the wine label from the Robert Mondavi Winery's 2015 Cabernet Sauvignon Reserve bottle, includes "To Kalon Vineyard" under the Cabernet Sauvignon label, grouped together with the designations of Oakville and Napa Valley. *See* TX1035. Notably, "To Kalon Vineyard," "Oakville," and Napa Valley" are displayed in a separate group, in identical typeface, font size, small capital-letter style, and visually distinct from all other label content. "Oakville" and "Napa Valley" are clearly geographical descriptions – which CBUSO does not dispute – and "To Kalon Vineyard" is visually indistinguishable from the other geographically descriptive information in that section of the RMW label.

The tasting notes that accompany the RMW 2015 Cabernet Sauvignon Reserve, TX69, includes "To Kalon Vineyard" in the same position and states that "Each year the blend reflects the 'First Growth' quality of the To Kalon Vineyard." Under the heading VINEYARDS, the document states "Grape Sourcing: 100% Napa Valley, 100% Oakville District, 100% To Kalon Vineyard."

TVH's expert Doug Frost testified that the use of To Kalon on this label was not as a brand. Trial Tr. (Frost) at 215:5-8. Rather, Frost testified: "It is used as an explanation of where the grapes come from that are used to make this particular bottle of wine. That they come from a

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

1   single vineyard, you know, geographically-designated place." Trial Tr. (Frost) at 215:8-11. Frost

2   further testified that in his opinion, "a sophisticated consumer is likely to understand that when a

3   vineyard is named on a label, it means that the grapes come from that single vineyard, that

4   designated -- geographically-designated area." Trial Tr. (Frost) at 215:22-25. He reiterated later

5   that "It is my confident opinion that To Kalon Vineyard on the label represents a specific place

6   from which the grapes in that bottle are drawn." Trial Tr. (Frost) at 332:3-7. Frost further stated

7   that where a term is used as a geographic designation rather than as a brand, "It would absolutely

8   be on a separate portion on the label and have to follow the federal requirements." Trial Tr.

9   (Frost) at 333:15-19.

10      RMW has made its association with Crabb even more explicit, particularly in marketing

11   related to its 2016 Highest Beauty vintage. In its associated marketing, RMW wrote, "Deep in the

12   heart of Napa Valley, H.W. CRABB planted a vast empire of vines in the 1860s. Eventually it

13   grew THICK WITH GRAPES, ORANGE TREES, AND ITALIAN CHESTNUTS. So rich was it

14   with life and bounty that Crabb nobly bestowed upon the wine produced from the vineyard the

15   Greek name TO KALON, or 'HIGHEST BEAUTY.' Today, TO KALON Vineyard Company is

16   dedicated to crafting unique expressions of CABERNET SAUVIGNON from this storied place."

17   TX72. On RMW's website, RMW wrote, "Originally planted in 1868, the To Kalon Vineyard has

18   become recognized as one of the finest first-growth vineyards of the world. Ancient Greek for

19   'the highest beauty,' To Kalon is the historic vineyard that provides Robert Mondavi Winery with

20   grapes for its world-class Cabernet Sauvignon Reserve and Oakville District Cabernet Sauvignon,

21   and is the exclusive source of our Fume Blanc Reserve." TX73.

22      Other evidence similarly shows that RMW used To Kalon as a geographic designation,

23   not a brand. In his deposition, John Seethoff testified that RMW used To Kalon as a vineyard

24   designation for some of its wines, including the Robert Mondavi Cabernet Sauvignon Reserve.

25   Seethoff Depo. Tr. at 15:21-16:20.[6] Seethoff stated this again specifically in reference to the 2014

26   vintage. Seethoff Depo. Tr. at 30:3-19.

27

28

---

[6] At the time of his 30(b)(6) deposition, John Seethoff was CBUSO's Vice President of Marketing for CBUSO's Luxury wine portfolio. By the time of trial, Mr. Seethoff was unavailable to testify.

29

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1    In fact, as part of the settlement agreement between RMW, Schrader Cellars, LLC, and

2    Beckstoffer Vineyards II, RMW was prevented from putting "To Kalon" on the same line as the

3    words "Robert Mondavi" or "Mondavi" specifically to make it clear that "To Kalon" was being

4    used as a vineyard designation, and not as a brand. TX26 at ¶¶ 2-3 [SEALED]; Seethoff Depo.

5    Tr. at 62:18-63:5. Seethoff further testified that there is a distinction between a vineyard

6    designation and a brand, and that this distinction is important because "brand is another

7    contributor to the value of a wine." Seethoff Depo. Tr. at 75:10-76:3. This is particularly relevant

8    because RMW is not the only winery that uses To Kalon as a single vineyard designation. Trial

9    Tr. (Frost) 224:7-13.

10    The Settlement Agreement also provides, "███████████████████████████

11    ████████████████████████████████████████████████████████████████████

12    ████████████████████████" TX26 at ¶ 7 [SEALED]. The

13    Settlement Agreement also requires, "███████████████████████████████████

14    ████████████████████████████████████████████████████████████

15    ████████████████." Id. at ¶ 9. [SEALED]. Exhibit B to the Settlement Agreement

16    states, "████████████████████████████████████████████████████████

17    ████████████████████████" Id. at Ex. B [SEALED].

18    For these reasons, it is clear that when RMW included the phrase To Kalon and/or To

19    Kalon Vineyard on its label, it was intended as a single-vineyard designation referring to the land

20    owned by H.W. Crabb at the time of his death.

21    **2.    CBUSO's Use of the Single Vineyard Designation is False and Misleading**

22    Between 2014 and 2019, RMW labeled several of its wines with the vineyard designation

23    of "To Kalon" or "To Kalon Vineyard," which it sourced from the approximately 549 acres of

24    land it owns in Oakville, CA. TX26 at Ex. B [SEALED]. However, the acreage of the so-called

25    "Mondavi To Kalon Vineyard" is substantially larger than the combined acreage of the Home

26    Place and Llewing Place parcels that H.W. Crabb owned at the time of his death. TX1413; Trial

27    Tr. (Beckstoffer) at 296:9-297:3; TX1413; Trial Tr. (de Vere) at 998:14-999:6. For example, in

28

30

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

one promotional document, RMW referred to To Kalon Vineyard as consisting of 450 acres, significantly larger than the portion of Historic To Kalon it owns. *See* TX1059 (at CBUSO_006421).

CBUSO has admitted that between 2014 and 2019, it did not distinguish between grapes sourced from the portion of its vineyard that Crabb had previously owned versus the portion of its vineyards that Crabb had never owned in wines it labeled as To Kalon or To Kalon Vineyard. TX54 (at pp. 8-10) (responses to Interrogatories 9-10). CBUSO admitted that it used the "To Kalon" designation on six different wines, and 27 total vintages, between 2011 and 2016, despite the fact that these wines were not in fact at least 95% sourced from the 1868 ("Home Place") and 1881 ("Lewelling Place) Historic To Kalon parcels that Crabb owned when he died. TX54 at pp. 8-10 (responses to Interrogatories 9-10).

The Lanham Act prohibits any person from misrepresenting the geographic origin of his or her goods in its commercial advertising or promotion. 15 USCS § 1125(a)(1)(B). CBUSO shall be liable for false advertising and false designation of origin under 15 U.S.C. § 1125(a) if:

- CBUSO used in commerce (i) a name, or (ii) any false designation of origin, false or misleading description of fact, or (iii) a false or misleading representation that is likely to cause confusion, mistake, or deceive as to the origin, sponsorship, or approval of goods; OR

- in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of goods, AND

- TVH believes that it is likely to be damaged by such act.

Each of the above elements is present here.

The Lanham Act forbids a misrepresentation of the "geographic origin" of goods. 15 U.S.C. § 1125(a)(1). A misrepresentation of "geographic origin" includes "geographic origin and commercial (trademark identifying) origin." McCarthy on Trademarks, at § 27:49; see also *Scotch Whiskey Assoc. v Consolidated Distilled Products, Inc.* (1981, ND Ill) 210 USPQ 639. ("Specifically, plaintiff contends that the Loch-A-Moor mark falsely describes the product as having Scotland as its place of origin."); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 338 F. Supp. 595, 598–99 (N.D. Ill. 1971), *aff'd in part, rev'd in part*, 489 F.2d 809 (7th Cir. 1973)

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

("Defendant's use of its 'HOUSE OF STUART Blended Scotch Whiskey' label in Panama and the Canal Zone for spurious Scotch whiskey including spirits not produced in Scotland constitutes a false designation of geographic origin in violation of Section 43(a) of the Trademark Laws of the United States[.]"); *In Re the Salem China Co.*, 157 U.S.P.Q. (BNA) ¶ 600 (T.T.A.B. Mar. 27, 1968) ("By the use of the word, 'LIMOGES', in its mark, applicant is deceptively linking its dinnerware to the dinnerware made only in Limoges, France. Such deception does not exist in the actual place where applicant's dinnerware is made, but in the fact that purchasers may be deceptively misled into believing that applicant's dinnerware is of the same quality, type or grade of Dinnerware made in Limoges, or that it is actually made from the clay imported from Limoges, France."); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 750 (8th Cir. 1980) ("We agree with the district court that several cases prior to the Lanham Act protected groups of plaintiffs-producers who asserted their right to the use of a geographical designation in a suit against other producers who did not manufacture their goods in said area but nevertheless used the geographical designation in their name or label.")

If the challenged ad is found to be literally false on its face, then actual deception is presumed. McCarthy on Trademarks, at § 27:36 (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 257, 111 U.S.P.Q.2d 1950 (2d Cir. 2014) ("Once literal falsity … was proved, no further evidence of actual consumer confusion was necessary."))

Here, CBUSO uses the single vineyard designation of "To Kalon Vineyard," and in associated marketing associates itself with H.W. Crabb, clearly representing to the public that its To Kalon wines come from H.W. Crabb 's To Kalon Vineyard. TX1035; TX69. However, CBUSO admits that these wines are not at least 95% sourced from the Home Place and Lewelling Place parcels, and are in fact sourced from the surrounding parcels as well, which means that the single-vineyard designation is literally false and deception is presumed. TX54 (at pp. 8-10) (responses to Interrogatories at 9-10). As a result, CBUSO has misrepresented the geographic origin of its products, in violation of the Lanham Act.

TVH has shown that it is likely to be damaged by CBUSO's misrepresentations. Trial Tr.

(Nickel) at 506:17-507:2. Accordingly, the Court should find that CBUSO is liable for false advertising and false designation of origin under 15 U.S.C. § 1125(a).

**D.    CBUSO's Affirmative Defenses**

**1.    CBUSO Has Not Established Laches**

CBUSO seeks a ruling that TVH's false advertising claim against it, even if established, is barred by the defense of Laches. *See* Dkt. 236-3 (Nos. 280-283). CBUSO, however, fails to establish the essential elements of the defense.

To establish laches, CBUSO bears the burden of proving that

- TVH's delay in filing suit was unreasonable, and

- CBUSO would suffer prejudice caused by the delay if the suit were to continue."

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir.), cert. denied, 537 U.S. 1047 (2002). "A court must find both factors for a suit or remedy to be barred by laches." *Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1139 (9th Cir. 2010).

CBUSO cites to *Jarrow Formulas,* for the propositions that "The reasonableness of the plaintiff's delay is considered in light of the time allotted by the analogous limitations period" and "if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." 304 F.3d at 837-838. The limitations period runs from the time the plaintiff "knew or should have known about his § 43(a) [15 U.S.C. § 1125] cause of action." *Id.* at 838. CBUSO contends the applicable limitations period is three years.  (CBUSO's FOFCOL, Nos. 281).

TVH did not delay in filing its false advertising lawsuit and, in fact, filed well within three years after discovery of its § 43 cause of action.  In 2018, ARG produced a report, TX1002, that provided the results of detailed research into Crabb's association with the TVH Property. Based on ARG's historical reports, in 2018 Nickel concluded that Crabb and, after Crabb died, the To Kalon Vineyard Company, had owned and operated a portion of the TVH Property. Nickel thus formed the belief that he could accurately claim that "To Kalon Vineyard" was the geographic origin of TVH wine made from grapes grown on the portion of the TVH Property that Crabb and

1    the To Kalon Vineyard Company had once owned and operated. Trial Tr. (Nickel) at 491:11-19,

2    492:5-493:6.

3         It was not until after review of the 2018 ARG report, however, that TVH knew or should

4    have known that it had a potential cause of action against CBUSO for false advertising related to

5    the use of "To Kalon." CBUSO contends, in support of its Laches defense, that TVH "was well

6    aware of TO KALON at least as early as 2011, well before the 3-year limitations period." Dkt.

7    236-3 (No. 282). CBUSO also points out that its sale of "TO KALON branded wines was open

8    and notorious for more than 30 years" and "TVH's principal Mr. Nickel grew up in Napa and in

9    fact lived directly *across the street* from the Mondavi Winery with its TO KALON VINEYARD

10   sign facing his childhood home…" *Id*. These allegations – that is, simply being aware of the

11   name, "To Kalon" – have no probative value because they do not pertain to when TVH learned

12   that it had a ***cause of action***. 15 U.S.C. § 1125 provides that someone who is in violation of the

13   statute "shall be liable in a civil action by any person who believes that he or she is or is likely to

14   be damaged by such act." Mr. Nickel certainly did not have standing to sue RMW as a child, and

15   TVH did not become aware of its potential cause of action against CBUSOuntil it learned of Mr.

16   Crabb's association with the TVH property from the 2018 ARG report. Simple knowledge of

17   RMW's To Kalon brand or historic To Kalon vineyard is not legally sufficient to have put TVH

18   on notice of its cause of action against CBUSO. TVH filed suit within less than two years after

19   learning of its connection to Mr. Crabb and, as such, did so timely and without delay.

20        Moreover, even if the Court were to find that TVH delayed unreasonably in bringing its

21   false advertising claim against CBUSO (it did not), CBUSO has failed to carry the burden of

22   demonstrating how it has been prejudiced by the alleged delay. CBUSO has simply not provided

23   any support for that element of the defense, and the reason is clear – CBUSO has not been

24   prejudiced by any delay in bringing the action. If anything, CBUSO has benefitted from being

25   able to continue falsely designating the origin of its wine is another day CBUSO *benefits* from

26   that falsehood. Therefore, CBUSO has failed to establish either element of the Laches defense.

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BN 42990117v2

## 2.     CBUSO Has Failed to Prove Unclean Hands

CBUSO also seeks a ruling that TVH's false advertising claim is barred by the "unclean hands" defense. "To prevail [in establishing the Unclean Hands defense], the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). CBUSO fails to establish either element, contending:

> Here, TVH's false advertising claim is premised on Constellation's alleged use of TO KALON to suggest its wines are associated with H.W. Crabb's historic vineyard under the same name. However, TVH seeks to exploit TO KALON for the same purpose. TVH advertises and labels its wine products using the TO KALON label and refers to the historic H.W. Crabb To Kalon Vineyard. TVH has even applied for its own trademarks covering TO KALON. Yet, TVH fails to present any evidence that its property was historically used by H.W. Crabb in his vineyard operations."

Dkt. 236-3 (No. 285).

In short, CBUSO's argument is that TVH has unclean hands because it seeks to use To Kalon "for the same purpose" that it alleges CBUSO has improperly used To Kalon. This argument misses the mark (and is false). As a primary matter, the alleged conduct underpinning CBUSO's argument – the exploitation of To Kalon for the purpose of advertising and labeling wine products, and the filing of trademark applications – is not inequitable. TVH's claim against CBUSO, on the other hand, is premised on several of RMW's labels, which between 2014 and 2019 displayed the vineyard designation of "To Kalon" or "To Kalon Vineyard," which it sourced from the approximately 549 acres of land it owns in Oakville, CA. TX26 [SEALED]. However, approximately less than half of this property is a portion of Historic To Kalon. *See* TX1413; Trial Tr. (de Vere) at 998:8-999:6. TVH has no issue with CBUSO's desire to designate wine it sources from Historic To Kalon as such, but it disputes that CBUSO can properly use that designation on wines that are not made from at least 95% To Kalon grapes, in the sense that the grapes were grown on a portion of the property that was owned by Crabb at the time of his death. Thus, CBUSO's argument draws a false equivalency between what it alleges TVH has done and the CBUSO conduct that TVH actually seeks to restrain.

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

1    Additionally, the alleged conduct CBUSO relies on (*i.e.*, TVH's use of "To Kalon" to

2  advertise and label its wine and TVH's filing of trademark applications) does not relate to the

3  subject matter of ***TVH's claim*** – that CBUSO's use of the name To Kalon related to the sale of

4  wine products that are not at least 95 percent sourced from Historic To Kalon constitutes false

5  advertising and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a). Dkt. 237-

6  4 (No. 176). CBUSO's allegations of TVH's misdeeds are collateral to TVH's cause of action.

7              Collateral misdeeds, no matter how indicative of general
              unworthiness, are not presently material. Since the rationale of the
8              doctrine of unclean hands is that equity will not aid a person to reap
              the benefits of his own misconduct, a misdeed is regarded as
9              'collateral' in this context when the right for which the plaintiff
              seeks protection in the injunction suit did not accrue to him because
10             of the misdeed.

11  McCarthy on Trademarks § 31:48 (*quoting* Restatement Second of Torts § 940). The right that

12  TVH seeks to protect in its action against CBUSO did not accrue to TVH because of TVH's

13  conduct, as CBUSO alleges in support of the defense. Therefore, the acts alleged by CBUSO are,

14  *at most*, collateral misdeeds, and thus immaterial and insufficient to support an affirmative

15  defense of unclean hands.

16  **E.**    **CBUSO's Claim for Trademark Infringement**

17         **1.**    **Legal Standards**

18    CBUSO must carry the burden of proof on its infringement claim. *See Tie Tech, Inc. v.*

19  *Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("Overall, the plaintiff retains the ultimate

20  burden of persuasion in a trademark infringement action, namely proof of infringement.").

21    "The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether

22  the similarity of the marks is likely to confuse customers about the source of the products."

23  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053–54 (9th Cir. 1999)

24  (citations and internal quotations omitted). "The core element of trademark infringement is

25  [p]rotecting against a likelihood of confusion, which helps to ensur[e] that owners of trademarks

26  can benefit from the goodwill associated with their marks and 'that consumers can distinguish

27  among competing producers.'" *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, 2018 WL

28

**BUCHALTER**
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

659105, at *1 (N.D. Cal. 2018); *citing Adobe Sys., Inc. v. Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) (internal quotations and citations omitted).

In *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), the Ninth Circuit established an eight-factor test "intended to guide the court in assessing the basic question of likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992). The "Sleekcraft factors" are:

- strength of the mark;
- proximity of the goods;
- similarity of the marks;
- evidence of actual confusion;
- marketing channels used;
- type of goods and the degree of care likely to be exercised by the purchaser;
- defendant's intent in selecting the mark; and
- likelihood of expansion of the product lines."

*Sleekcraft*, 599 F.2d at 348-49.

The Ninth Circuit authority that governs how to balance the *Sleekcraft* factors was recently summarized in *Stone Brewing Co., LLC v. MillerCoors LLC*, 445 F. Supp. 3d 1113, 1128 (S.D. Cal. 2020). "The factors are non-exhaustive and applied flexibly; the Sleekcraft factors are not intended to be a 'rote checklist.'" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (*quoting Rearden*, 683 F.3d at 1209). "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp*, 174 F.3d 1036, 1054 (9th Cir. 1999) (*citing Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1130-32 (9th Cir. 1998)); *see also Stone Creek*, 875 F.3d at 432 ("Two particularly probative factors are the similarity of the marks and the proximity of the goods."). "A determination may rest on only those factors that are most pertinent to the particular case before

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden*, 683 F.3d at 1209.

### 2. No Evidence Showing Actual Confusion Has Been Proffered

"According to some authorities, actual confusion is the best evidence of likelihood of confusion." 5 Callmann on Unfair Comp., Tr. & Mono. (4th Ed.) § 21:82; *see also Therma-Scan, Inc. v. Thermoscan, Inc*., 295 F.3d 623, 634 (6th Cir. 2002) ("Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."); *Superior Consulting Servs. v. Shaklee Corp*., 710 Fed. Appx. 850, 859 (11th Cir. 2017) (same); *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 109 U.S.P.Q.2d 1291 (4th Cir. 2014) (same); *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1135 (10th Cir.2003) (same); *Beacon Mut. Ins. v. OneBeacon Ins. Grp*., 376 F.3d 8, 18 (1st. Cir. 2004) (same).

CBUSO offered no witnesses to testify at trial about actual confusion. CBUSO withdrew Elisabeth Baron – CBUSO's current Vice President for Marketing Luxury Wine Division – as a live witness, but the Court admitted Ms. Baron's Federal Rule of Civil Procedure 30(b)(6) deposition, which included testimony proving a lack of any confusion. *See* Rebuttal Deposition Designation of Elisabeth Baron ("Baron Depo.") Tr. at 141:4-9 ("Are you [CBUSO] aware of any facts or research that shows that a consumer of TVH wine believes that TVH is somehow associated with Constellation? […] THE WITNESS: No.'), 143:9-13 ("Is Constellation aware of any facts that Constellation believes shows that consumers are likely to confuse TVH's To Kalon wines with Constellation's wines?  […] THE WITNESS: I'm not aware of that.").

TVH's customers have not expressed any confusion whatsoever.  Trial Tr. (Nickel) at 507:3-8  ("Q. Mr. Nickel, has any consumer or customer of The Vineyard House ever expressed any confusion about the – The Vineyard House wines with respect to Constellation, To Kalon Vineyard, or other products, including the Beckstoffer licensees? A. I have not had any customers express any confusion or association between the two.").

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT – CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

### 3.      The Only Survey In This Case Supports a Finding Of No Confusion

"Several courts, when assembling the evidence within a likelihood of confusion framework of factors such as the Polaroid Eight [or Sleekcraft Eight], have put survey evidence under the heading of 'actual confusion.'" McCarthy on Trademarks, § 32:184 ("Likelihood of confusion—Is survey data evidence of actual confusion?"); and *see Monster, Inc. v. Dolby Laboratories Licensing Corp.*, 920 F.Supp.2d 1066, 1072 (N.D. Cal. 2013) ("Undoubtedly, survey evidence is 'often the most persuasive' evidence concerning likelihood of confusion.").

Usually the plaintiff in an infringement case presents the Court with survey evidence. Trial Tr. (McDonald) at 1136:25-1137:1 ("I'm accustomed to seeing plaintiffs proffer that kind of evidence."). In this case, Constellation did not present the Court with any survey evidence whatsoever. Constellation's failure to present its own survey gives rise to a presumption that the results would have been unfavorable.  *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *15 (N.D. Cal. 2007) ("[the plaintiffs'] failure to submit its own survey may support an inference that [the plaintiff] predicted that the results of such a survey would be unfavorable."); *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, 2015 WL 9266497, at *4 (N.D. 2015) ("a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it.").

TVH did arrange for a qualified survey expert, Matthew Ezell, to perform and testify about a consumer confusion survey. TVH tested CBUSO's likelihood of confusion allegations through a so-called "Eveready" format survey. *See* Dkt. 1 (CBUSO's Complaint in 3:20-cv-00238) at ¶ 64 (Alleging that consumers of TVH wine are likely to be confused that TVH wine products, not grapes, are "*authorized, endorsed, sponsored or approved by Constellation*" or "*connected with, or are associated with Constellation*."). Mr. Ezell designed a survey according to accepted principles that tests the infringement allegations CBUSO made in its Complaint, namely, to measure the degree, if any to which TVH's use of To Kalon as a vineyard designation is likely to cause confusion as to the source, authorization or approval of, or business affiliation or business connection with CBUSO.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

"The Eveready survey format is widely regarded as an appropriate method of testing for likelihood of confusion." McCarthy on Trademarks, § 32:174; *citing*, among other circuits, Ninth Circuit- *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657, 1674, 1989 WL 159628 (E.D. Cal. 1989), *aff'd*, 967 F.2d 1280, 1292–1293 (9th Cir. 1992) (proper to admit and rely upon Eveready survey to find infringement); *E & J Gallo v. Proximo Spirits, Inc.*, 103 U.S.P.Q.2d 1640, 2012 WL 273076, *5 (E.D. Cal. 2012), *subsequent determination*, 103 U.S.P.Q.2d 1656, 2012 WL 273077 (E.D. Cal. 2012) and *aff'd*, 583 Fed. Appx. 632 (9th Cir. 2014) (Eveready-type survey was "highly probative" of an absence of likely confusion. On summary judgment, no likelihood of confusion was found.); *VIP Products, LLC v. Jack Daniel's Properties, Inc.*, 291 F. Supp. 3d 891, 908 (D. Ariz. 2018) (The Eveready format is "the prevailing standard for trademark survey research in cases involving strong marks."). "In cases involving strong marks, the Eveready test should be considered the gold standard for fundamental cognitive and marketing reasons." McCarthy on Trademarks, § 32:174 (citations omitted). CBUSO's expert did not object to the use of the Eveready format. Trial Tr. (McDonald) at 1138:16 ("Mr. Ezell chose the Eveready forma, and while he offers no explicit justification, I do not specifically object to that decision.").

This same Eveready format used by Mr. Ezell or a similar version of it has been applied to a number of cases involving trademarks in the alcoholic beverage industry. *E & J Gallo v. Proximo Spirits, Inc.*, 2012 WL 273076, at *4–5; *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019); and *Nat'l Distillers Prod. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474 (S.D.N.Y. 2002). As Mr. Ezell explained, the survey was designed in accordance with standards and procedures generally accepted in the field of surveys. Trial Tr. (Ezell) at 342:2-343:4. The survey was also designed to meet the criteria for survey trustworthiness. *Id.* at 345:1-5. And, specifically, the survey was designed in conformance with the Reference Manual on Scientific Evidence. *See* TX0012A (at PDF p. 67 of 101). This is not to suggest that Mr. Ezell's survey was perfect – it clearly was not. But the defects that CBUSO's experts pointed out and that were raised on cross-

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

examination does not warrant eliminating the survey entirely from the evidence the Court considers to decide CBUSO's infringement claim.

The likely purchaser of the TVH wine is a consumer of 'ultra-premium' and 'luxury-premium' wines, which are generally wines priced above $100. Trial Tr. (Frost) at 165:2-166:5, 279:22-280:6, 315:2-316:4. CBUSO itself defines "Luxury" wines as "any wine that costs more than $20 a bottle." Seethoff Dep. Tr. at 13:13-15:1. Before conducting the survey, Mr. Ezell conducted an omnibus survey that confirmed that 88% of past purchasers of wine costing more than $100 were in the house hold income of $75,000 annually or more with no maximum income. Therefore, Mr. Ezell targeted those consumers who were known purchasers of wine. Trial Tr. (Ezell) at 396:20-398:10 and TX14A. The survey sought to identify consumers of premium wines by asking whether (a) each survey respondent had purchased a bottle of wine costing at least $100 in the prior year and (b) if so, whether the respondent intended on purchasing a bottle of wine costing at least $100 in the upcoming year. Only those respondents who answered "Yes" to both questions were allowed to complete the survey. TX12.

"[T]he 'Eveready' survey format does not inform survey respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience." McCarthy on Trademarks at § 32:174 ("Survey Formats"); Trial Tr. (Ezell) at 342:19-24 ("The complaint submitted by Constellation indicated that the To Kalon mark or To Kalon name was a strong mark for them."). Mr. Ezell's survey asked the widely accepted first question in the Eveready format that asks consumers "who or what company, do you believe makes or puts out this wine?" *Id.* This question is a wide open-ended source question and asks consumers not only who makes the bottle, but where do the grapes that are used to make the wine come from. Trial Tr. (Ezell) at 473:15-474:20.

Out of the 200 people who responded to all the questions on the survey, only four (4) consumers (2%) indicated any confusion or connection between TVH's Block 8 Cab and CBUSO, Robert Mondavi Winery, or any of the Beckstoffer sublicensees. TX12 at Table 5.

41

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1    Despite CBUSO's contention that To Kalon is a strong brand and source identifier for

2   their wines, there was only one respondent in the entire survey who mentioned any connection

3   between CBUSO and To Kalon.  *See* TX12 at p. 30 (Respondent No. 1013: "To-Kalon used to be

4   part of Mondavi, don't know about now.").

5    Every other response that mentioned To Kalon made no mention of its connection to

6   CBUSO, Robert Mondavi Winery, or Beckstoffer.  TX 12. It was clear that those consumers who

7   did mention To Kalon, or *Crabb's* To Kalon were simply reading from the label and were not

8   confusing TVH wine with any other wine.  TX12 at p. 32 (Respondent 1042: "H.W. Crabb's To-

9   Kalon Vineyard [because it is] Indicated by the main part of the bottle."); at p. 33 (Respondent

10   1153: "H.W. Crabb To-Kalon Vineyard [because ] It says so at the bottom of the b[o]ttle."); at p.

11   34 (Respondent 1164: "H.W. Crabb's To-Kalon Vineyard [because] It is on the front label."); and

12   at p. 42 (Respondent 1063: "H.W. Crabb To-Kalan Vineyard [because it] Says so on the bottle").

13   Across the entire survey there were a total of 28 consumers who mentioned To Kalon from

14   reading the label, not from associating it with CBUSO. TX12. Those 28 consumers were properly

15   not counted as likely confused. But even if the Court were to add those 28 to CBUSO's category,

16   the total number would be 32 out of 200 or 16%, which still falls below the standard for finding

17   likelihood of confusion. McCarthy on Trademarks, at § 32:188 ("Likelihood of confusion—

18   Percentage figures in the cases—Evidence of a likelihood of confusion") ("Survey percentages

19   demonstrating confusion levels over 50% are almost always viewed by courts as persuasive

20   evidence of likely confusion. […] As noted, an "appreciable" number does not require a

21   majority. Generally, figures in the range of 25% to 50% have been viewed as solid support for a

22   finding of a likelihood of confusion.") (emphasis added and citations omitted).

23    While not dispositive, that TVH proffered a consumer confusion survey that shows

24   demonstrates qualitatively the absence of confusion, while CBUSO has failed to proffer a

25   consumer survey showing confusion on any theory is strong evidence of no infringement. That

26   Mr. Ezell's survey may have issues that limit its weight does not satisfy CBUSO's burden of

27   proof to show likelihood of confusion. *See* M*alletier v. Burlington Coat Factory Warehouse*

28

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT -
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1  *Corp.*, 2006 WL 1424381, at *7 (S.D.N.Y. 2006), *aff'd and remanded*, 217 F. App'x 1 (2d Cir.

2  2007) ("Plaintiff pointed out alleged weakness(es) in Defendant's survey evidence, but has

3  offered no survey itself, and has also offered no anecdotal evidence showing that a single

4  consumer was ever confused between the parties' handbags, either pre- or post-sale.").

5        **4.      Strength of Mark**

6        "The more likely a mark is to be remembered and associated in the public mind with the

7  mark's owner, the greater protection the mark is accorded by trademark laws." *Equinox Hotel*

8  *Mgmt., Inc.*, at *4, *citing GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir.

9  2000). The "strength" of a mark "is evaluated in terms of its [1] conceptual strength and [2]

10  commercial strength." *Id.*

11       Descriptive or suggestive words are not conceptually strong marks. *See* 9th Cir. Model

12  Jury Instruction 15.19 ("Strength as a Factor for Evaluating Likelihood of Confusion.")

13  ("Suggestive word marks are regarded as not being as conceptually strong as coined or arbitrary

14  marks. […] Descriptive word marks are not inherently distinctive.").

15       To Kalon is a geographically descriptive name. Trial Tr. (Beckstoffer) at 249:14-16

16  ("anybody you talked to in the Napa Valley in those days would recall and would state that To

17  Kalon was a vineyard, a famous vineyard owned by Hamilton Crabb."); Trial Tr. (Miltenberger)

18  at 22:3-24:25, 45:24-48:4; TX26 at ¶ 9 [SEALED] ("

19

20                                          "); TX26 at Ex. B [SEALED] ("

21

22                      "); Trial Tr. (Frost) at 152:12-153:4, 154:2-24, 155:25-156:8, 161:23-162:20,

23  163:19-164:2, 219:6-202:3, 311:5-312:7, 315:10-316:4, 492:23-493:6; Trial Tr. (Ash) 659:13-15

24  ("Q. And you think it's common knowledge in the wine business that To Kalon is historic; right?

25  A.  Yes.").

26       CBUSO admits that it uses To Kalon as a geographically descriptive term rather than as a

27  trademark or brand.  Seethoff Depo. Tr. at 16:7-8 ("We use To Kalon as a brand unless we have a

28                                          43

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1  single vineyard designate.") and Trial Tr. (de Vere) at 922:18-21 ("And so Robert Mondavi

2  started telling Mr. Crabb's story and telling the story of the business that had previously occupied

3  a similar location to us…").

4      Beckstoffer also uses To Kalon as a geographically descriptive term. Trial Tr.

5  (Beckstoffer) at 256:2-6 ("This gets to a major point -- is that To Kalon is a place, and . . . Bob

6  Mondavi and []other people always said that To Kalon was a place.").

7      Commercial strength "is the amount of marketplace recognition of the mark." 9th Cir.

8  Model Jury Instruction 15.19 ("Strength as a Factor for Evaluating Likelihood of Confusion.").

9  CBUSO's evidence did not focus on the commercial strength of the To Kalon Marks. That only

10  one participant of 200 consumers surveyed mentioned any connection between To Kalon and

11  CBUSO indicates the brand's weak commercial strength.  The evidence also shows that

12  Beckstoffer is largely credited with building a name for To Kalon in the present era. Trial Tr.

13  (Frost) at 230:3-4 ("I think it could be reasonably argued that the wineries that Mr. Beckstoffer

14  sells grapes to that subsequently put To Kalon Vineyard on their label have done more to spread

15  the fame of To Kalon Vineyard."). "Use of similar marks by third-party companies in the relevant

16  industry weakens the mark at issue."  M2 *Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1088

17  (9th Cir. 2005) (citing Miss World, supra, 856 F.2d at 1449); *Quality Semiconductor, Inc. v.*

18  *QLogic Corp.*, 1994 WL 409483, at *2 (N.D.Cal. 1994) ("an arbitrary mark may be classified as

19  weak where there has been extensive third party use of similar marks on similar goods") (*citing*

20  *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987)).

21      **5.      Degree of Care Exercised by Purchaser**

22      "The more sophisticated the potential buyers of the goods or the more costly the goods,

23  the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution

24  may be. They may be less likely to be confused by similarities in the plaintiff's and defendant's

25  trademarks."  *See* 9th Cir. Model Jury Instruction 15.18. "If the goods or services are relatively

26  expensive, more care is taken and buyers are less likely to be confused as to source or affiliation."

27  McCarthy on Trademarks at § 23:95. "In making purchasing decisions regarding 'expensive'

28

44

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1    goods, the reasonably prudent person standard is elevated to the standard of the 'discriminating

2    purchaser.'" *Id.* at § 23:96 (citations omitted).

3          Purchasers of expensive luxury wines are more likely to display a high degree of care.

4    *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 695 (W.D. Ky. 2010),

5    *aff'd*, 679 F.3d 410 (6th Cir. 2012) ("Potential purchasers of Reserva are likely to display a high

6    degree of care because the Reserva is a relatively expensive liquor—the $100 price tag alone

7    mitigates against a casual purchase. The Reserva purchaser is also likely to be sophisticated,

8    because Reserva is an ultra-premium product that would tend to appeal to connoisseurs.

9    Additionally, those who buy Reserva are likely to be knowledgeable about the Cuervo brand and,

10   therefore, less likely to confuse it with others. Moreover, those Maker's Mark afficionados who

11   do purchase Reserva are likely to know that their favorite brand sells no other kind of liquor and,

12   therefore, is unaffiliated with Cuervo."); *see also McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599

13   F.2d 1126, 1137, 202 U.S.P.Q. 81, 92 (2d Cir. 1979) (purchasers of women's overcoats and

14   raincoats priced from $100-$900: "the relevant purchasing group tends to be sophisticated and

15   knowledgeable about women's apparel"); *compare Russell v. Caesar*, 62 U.S.P.Q.2d 1125, 2001

16   WL 1835165 (N.D. Cal. 2001) (purchasers of $15/bottle wine are unsophisticated, which

17   enhances the likelihood of confusion between similar marks); and S*tark v. Diageo Chateau &*

18   *Estate Wines Co.*, 907 F. Supp. 2d 1042, 1046-47 (N.D. Cal. 2012) ) ("Stark Wine® ranges in

19   price from $28 to $44 per bottle, with an average price point of $36. […] Plaintiffs launched Stark

20   Thirst™ as a more affordable brand, marketed towards these younger wine drinkers.  It retails for

21   approximately $16 per bottle.").

22          Potential purchasers of TVH's wines are sophisticated and not likely to be confused. Trial

23   Tr. (Nickel) at 486:11-15 ("Q.  And how would you describe the target consumer that The

24   Vineyard House targets? A. I would describe The Vineyard House's customers as highly educated

25   in the wine industry, affluent collectors of fine wines.") and (Frost) at 166:6-167:3 ("…they are

26   sophisticated consumers at least as compared to, as we discussed earlier, someone spending less

27   than ten dollars a bottle.").

28

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

### 6.   Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). "If the plaintiff's and defendant's [wines] are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion." *See* 9th Cir. Model Jury Instruction 15.18.

TVH sells a majority of its wine – and to date, the entirety of its wine that displayed "To Kalon" anywhere on its labels – through its exclusive wine club. The other two channels are online and through retail distributors. Trial Tr. (Nickel) at 527:12-14 and 525:16-18. TVH targets high end wine collectors. *Id.* at 486:3-15. CBUSO failed to show at trial how TVH's exclusive customer base overlaps with the marketing channels CBUSO uses to reach its customers.

### 7.   Similarity of Marks

"The similarity of marks must be analyzed 'as they are encountered in the marketplace.'" *Equinox Hotel Mgmt., Inc.*, 2018 U.S. Dist. LEXIS 16914 at *7; *citing Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (*quoting Sleekcraft*, 599 F.3d at 351). "In evaluating the similarity of marks which share a common word, courts consider whether the marks contain 'other words' in conjunction with a common word, or are otherwise visually distinguishable." *Equinox Hotel Mgmt., Inc.*, 2018 U.S. Dist. LEXIS 16914 at *7; *citing Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897, n.1 (9th Cir. 2004) (PLAYMAKERS compared to PLAY MAKERS); *First Franklin Fin. Corp. v. Franklin First Fin., Ltd.*, 356 F. Supp. 2d 1048, 1051 (N.D. Cal. 2005) (FRANKLIN FIRST FINANCIAL compared to FIRST FRANKLIN); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 996-97 (C.D. Cal. 2002) (GLOW and GLOW BY J. LO). "The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar with the one party's mark, is presented with the other party's goods alone." *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 466 (N.D.Cal.1991).

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

TVH wines' primary brand is "The Vineyard House." When overlapping terms are used in connection with primary brands, consumers are unlikely to confuse the terms, even for identical goods.  *See W.W.W. Pharm. Co v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) (RIGHT GUARD SPORT STICK not confusingly similar to SPORTSTICK; "when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened"); *Norm Thompson Outfitters, Inc. v. General Motors, Corp.*, 448 F.2d 1293, 1298 (9th Cir. 1971) (likelihood of confusion mitigated where "the name of the company invariably accompanied the [trademarked] slogan"); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (no confusion where distinctive house mark displayed and accused mark used as "tagline"); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (no confusion when registered mark "never appears alone; rather, it is invariably accompanied by a reference to Barbie, which is clearly the 'salient part of the mark indicative of the product's origin.'"); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1979) (similarity of identical marks negated by "dominance of company marks and logos on the pens themselves and on all packaging and promotional material").

"Courts have found that additional words tip against a finding of confusion." *Equinox Hotel Mgmt., Inc.*, 2018 U.S. Dist. LEXIS 16914 at *7; *citing First Franklin*, 356 F. Supp. 2d at 1051.  For the front label of the Block 8 Cab, TVH added "H.W. Crabb's…" to describe the historic and geographic significance of To Kalon and to distinguish it from CBUSO's trademark or "Beckstoffer's To Kalon Vineyard." On the back label, TVH clearly notes that "To Kalon" is used to describe history and geography, and not as a brand or to CBUSO's trademarks. *See* Trial Tr. (de Vere) at 952:10-19 ("[Alexis Lichine] qualifies it by referring to it as 'Historic To Kalon Vineyard.'"; Trial Tr. (de Vere) at 952:10-12 ("But it's a fine vineyard, and he specifically says it was historic. He uses the name qualified by 'historic.'"); Seethoff Depo. Tr. at 63:6-64:11 (confirming that CBUSO does "make a distinction" between "historic To Kalon" and To Kalon.).

**8.     TVH's Intent in Selecting the Mark**

"Generally, the intent factor will be of minimal importance because intent can be hard to prove and 'intent to confuse customers is not required for a finding of trademark infringement.'"

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1  *Equinox Hotel Mgmt., Inc.*, 2018 U.S. Dist. LEXIS 16914 at \*9; *citing Brookfield*

2  *Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999)),

3  (*citing Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1132 (9th Cir. 1998)

4  ("Absence of malice is no defense to trademark infringement.")).

5         As noted above when discussing fair use, the evidence shows that TVH's use of To Kalon

6  is in good faith and in a non-trademark sense. *See*, infra, section II.B.5. Mr. Nickel testified

7  directly about TVH's intent and good faith.  Trial Tr. (Nickel) at 491:11-19 ("I believe that The

8  Vineyard House has the right to include To Kalon on wines that fall within the historic boundary

9  of H.W. Crabb's To Kalon parcel…"); Trial Tr. (Nickel) at 492:17-22 ("Q. What do you hope to

10  communicate to consumers of The Vineyard House wines by putting To Kalon, H.W. Crabb's To

11  Kalon Vineyard on the label? A. I would like to be able to communicate the history of the land

12  and the geographic significance of a portion of my property."); Trial Tr. (Nickel) at 493:3-6

13  ("when I discovered there was another parcel owned by Crabb that contributed to To Kalon, I

14  think it's appropriate and fair to talk about that history and legacy."). TVH's disgruntled former

15  employee, Amy Ash, also confirmed that TVH did not use To Kalon to trade off of any trademark

16  or CBUSO's goodwill. Trial Tr. (Ash) at 659:6-9 ("Q. When The Vineyard House used H.W.

17  Crabb's To Kalon Vineyard on its wine label, it was referring to the land that was one time owned

18  by Crabb; correct? A. That is my understanding."). CBUSO and its witnesses could not testify as

19  to TVH's good faith intent. Trial Tr. (McDonald) at 1152:13-15 ("Q. You cannot testify on

20  TVH's intent in using the term To Kalon, correct?  A. I can't testify as to their intent.").

21  **F.      CBUSO Has Failed To Prove Any Recoverable Profits**

22         If the Court finds TVH liable for trademark infringement, CBUSO has failed to satisfy its

23  burden to prove the amount of profits that TVH allegedly earned as a result of the asserted

24  infringement. The reason is simple: ███████████████████████████████. TX91

25  [SEALED]; TX96 [SEALED].  CBUSO bears the burden of showing relevant infringing sales

26  *before the burden shifts* to TVH to show deductions and expenses. 15 U.S.C. § 1117(a). CBUSO

27  must demonstrate that "a reasonable basis for computation" exists and carry the "burden of

28

BUCHALTER
A Professional Corporation
San Francisco

BN 42990117v2

establishing the defendant's gross profits from the infringing activity with reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993); *see also Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 64 (1st Cir. 2008) (finding tax returns indicating gross sales over the **relevant period** satisfied plaintiff's burden); and *Innovation Ventures LLC v. Hoodiamax USA*, 2010 WL 11520527, at *2 (C.D. Cal. 2010) (the relevant sales are "sales of the infringing product.").

The accused products at issue in this case are TVH's 2015 vintage wines. TVH did not offer any of those wines for sale until the fall of 2019. Trial Tr. (Nickel) at 596:14-22. CBUSO's expert Mr. Jarosz completely ignored 2019 and 2020. Instead, Mr. Jarosz incorrectly assumed that "█████████████████████████████████████" Trial Tr. (Jarosz) at 1041:17-25 [SEALED]. But CBUSO could not point to any infringing sales in 2018. *Id.* at 1043:4-7 [SEALED]. More importantly, CBUSO and its expert admitted that they did not have sufficient information to quantify TVH's revenues and profits earned in connection with the use of To Kalon. *Id.* at 1044:17-1046:4 [SEALED].

The evidence established that ██████████████████ as a result of its minimal use of the To Kalon name. TX96 [SEALED]; Rebuttal Deposition Designations of Tom Bearer ("Bearer Depo.") at 14:5-17, 15:6-7, 16:8-17:6, 22:13-21, 27:6-31:1, 31:3-37:5, 37:25-38:32, 40:2-44:3, 47:17-49:15, 50:18-56:16, 62:18-65:18, 66:4-68:8, 73:10-76:1, 77:23-78:1, 79:3-80:22, 98:7-8, 108:10-17 [SEALED]; Trial Tr. (Nickel) at 640:3-5. The increase in sales from 2017 to 2018 had nothing to do with any use of the term To Kalon. *See* Bearer Depo. Tr. at 73:23-76:1 [SEALED].

## G.   <u>Attorneys' Fees</u>

According to CBUSO's pre-trial and post-trial brief, CBUSO "reserves the right to seek attorney fees and will brief such in accordance with L.R. 54-5." If the Court finds infringement, CBUSO bears the burden of proof to show that this case is "exceptional." 155 U.S.C. § 1117(a). *Arizona Skydiving Holdings, LLC v. Skydive Phoenix, Inc.*, 703 F. App'x 579, 580–81 (9th Cir. 2017) ("The burden of proof remains with the party seeking attorneys' fees to demonstrate that

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

the case is exceptional."); *Daimler AG v. A-Z Wheels LLC*, No. 16-CV-875-JLS (MDD), 2020 WL 6395592, at *5 (S.D. Cal. 2020) ("[T]he Court does not find that Plaintiff has met its burden by a preponderance of the evidence to establish that the case is exceptional, warranting an award of attorney's fees."). CBUSO did not satisfy its burden at trial to establish an exceptional case, but TVH will wait until such time that CBUSO may move for fees to address these issues in further briefing.

**H.      TVH's Abandonment by Naked Licensing Defense**

TVH shall have no liability for using the name To Kalon if the trademarks were abandoned by naked licensing. *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.,* 289 F.3d at 595–96; *see FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 515 (9th Cir.2010); *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1076 (N.D. Cal. 2013); *see also SinCo Techs. Pte Ltd. v. SinCo Elecs. (Dongguan) Co.,* 2020 WL 906721, at *3 (N.D. Cal. Feb. 25, 2020) ("Whether SinCo actually controlled the quality of XingKe's products is contested. Likewise, it is up to the jury to decide if SinCo's reliance on XingKe's quality control was reasonable."); *Bluetooth SIG, Inc. v. FCA US LLC,* 2020 WL 2794632, at *13 (W.D. Wash. 2020).

Naked licensing is a defense to trademark infringement based on the theory that "if a trademark owner fails to control the quality of the goods and services sold under that trademark by its licensees, the trademark may cease to function as a symbol of quality and source for consumers and effectively be considered to have been abandoned." *Monster, Inc.*, 920 F. Supp. 2d at 1076; *citing FreecycleSunnyvale*, 626 F.3d at 515-16 (*citing Barcamerica Intern. USA Trust*, 289 F.3d at 595–96 *and* 3 McCarthy on Trademarks and Unfair Competition § 18:48 (4th ed.)). "Thus, the naked licensing claim is fundamentally a claim that the trademark is no longer valid and enforceable because of the licensor's neglect in policing its use." *Id.*

CBUSO will have abandoned its trademarks if CBUSO licensed the use of the TO KALON AND TO KALON VINEYARD trademarks and thereafter failed to adequately control the quality of wines produced by its licensees and sub-licensees. *Barcamerica Int'l USA Tr.*, 289

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

F.3d 589 at 595-96. The controlling case on naked licensing in the wine industry is *Barcamerica*:

> . . . in this case we deal with a relatively simple product: wine. Wine, of course, is bottled by season. Thus, at the very least, one might have expected [the licensor] to sample (or to have some designated wine connoisseur sample), on an annual basis, in some organized way, some adequate number of bottles of the [licensee's] wines which were to bear [the licensor]'s mark to ensure that they were of sufficient quality to be called "Da Vinci." But [the licensor] did not make even this minimal effort.

*Barcamerica*, 289 F.3d at 598. *Id*.

The Ninth Circuit has thus defined the "minimal effort" that a wine trademark licensor must make to control the quality of a licensee's wines to avoid a finding of naked license, as follows:

- A designated wine connoisseur must sample

- on an annual basis

- in some organized way,

- some adequate number of bottles of the licensee's wines

- to ensure they are of sufficient quality to carry the licensed mark.

In this case, RMW entered into a License Agreement with Beckstoffer Vineyards that pertains only to the use of "To Kalon Vineyard" on the front label of wines made by the wineries that buy Beckstoffer To Kalon Vineyard grapes (the "Sublicensees"). TX108 [SEALED]. Because TVH had asserted abandonment by naked licensing as an affirmative defense, CBUSO presented evidence at trial intending to demonstrate to the Court that the quality control "program" at RMW may be "informal" and subject to serendipity, but has been sufficient to ensure for some 17 years that the wine made by Beckstoffer's Sublicensees is consistently outstanding quality. *See* Trial Tr. (Cadamatre) at 834:8-12 (Q. Constellation Brands can say with certainty that it does not annually submit the wines produced by all of the sublicensees in a given vintage for chemical analysis; correct? A. We do not test all of the sublicensees' wines. We do test some every year."), 835:25-838:8 (communications between Beckstoffer and CBUSO regarding license agreement were "informal"; CBUSO did not attempt to formalize the quality standards applicable to the license agreement until 2018; CBUSO has never requested that

1    Beckstoffer Vineyards certify that Sublicensees adhere to license agreement's quality standards).

2         In brief, the evidence CBUSO presented to demonstrate the sufficiency of its quality

3    control program showed that the RMW winemaking team organizes tastings of wines for various

4    reasons that occur on a fairly random and opportunistic basis. which causes RMW to taste *some*

5    of the Sublicensees' wines in any given vintage. Nova Cadamatre, the CBUSO manager who

6    leads the CBUSO winemaking team, testified that the tasting of Sublicensees' wines is within her

7    purview, as an informal job duty. Trial Tr. (Cadamatre) at 826:14-827:19. But Ms. Cadamatre

8    was unable to say whether every sublicensee's wine for every vintage had been tasted by RMW

9    winemaking staff, Trial Tr. (Cadamatre) at 830:9-831:12, and she admitted that it was possible

10   that not every Sublicensee's wine for every vintage had been tasted by RMW winemaking

11   personnel, Trial Tr. (Cadamatre) at 832:21-24. Ms. Cadamatre also admitted that it was possible

12   that some Sublicensee's wines had *never* been tasted by RMW winemaking staff. Trial Tr.

13   (Cadamatre) at 834:19-835:10. Ms. Cadamatre further testified that its normal business practice at

14   CBUSO is to *not* retain records that document the tasting or chemical testing of Sublicensees'

15   wines. Trial Tr. (Cadamatre) at 828:6-21, 832:9-12, 832:25-833:22. Ms. Cadamtre's testimony

16   thus establishes that CBUSO's tasting of Sublicensees' wines does not meet the *Barcamerica*

17   "minimal effort" standard, which requires that a wine trademark licensor sample an adequate

18   number of bottles of the licensee's wines on an annual basis, in some organized way. *See*

19   *Barcamerica*, 289 F.3d at 598. It would stretch credulity to suggest that CBUSO's apparently

20   haphazard and random tastings, whether or not caused by its failure to keep records, ensures that

21   CBUSO samples an adequate number of bottles of the Sublicensees' wines annually.

22        Perhaps to address the shortfalls in its Sublicensee wine sampling efforts as a basis to

23   satisfy the legal requirement to play a meaningful role in controlling the quality of the

24   Sublicensees' wine, both Beckstoffer and CBUSO suggested that the mainstay of its quality

25   control program has been to review the ratings and reviews of the Sublicensees' wines, and thus

26   rely on the expertise of professional wine-tasters and raters. There is nothing in the abstract that

27   would prevent a licensor from meeting its quality control obligation by designating one or more

28

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

1   specific wine connoisseurs who review and rate wines professionally to sample the Sublicensees'

2   wines. The problem with relying on third-party professional wine reviewer-raters, however, is

3   that a licensor cannot designate a specific reviewer-rater. Even if CBUSO or Beckstoffer were to

4   designate a publication in lieu of a particular person to review and/or rate the Sublicensees'

5   wines, a Sublicensee can only submit its wines for review and rating: The reviewer-raters have

6   absolute discretion to decide whether or not a specific Sublicensee's wines will be reviewed in a

7   given vintage. In that sense, a licensor cannot satisfy the "designated wine connoisseur must

8   sample" prong of the *Barcamerica* minimal effort standard. A review of Beckstoffer Vineyards'

9   web-page summary of the reviews and ratings for its Sublicensees demonstrates that not every

10  Sublicensee was reviewed or rated for a given wine in a given vintage. *See* TX98 (no ratings for

11  2008 and 2017 vintage Bacio Divino Janzen Beckstoffer To Kalon Vineyard Cabernet

12  Sauvignon). Most important, the way that CBUSO monitors review-ratings – that is, being alerted

13  when a review or rating is published – provides no indication when a Sublicensee's wine has ***not***

14  been reviewed or rated for any given vintage.

15      Moreover, while TVH raised serious questions about the system CBUSO's marketing

16  department used to collect and store the ratings and review records CBUSO does maintain, Mr. de

17  Vere was not able to provide answers. Trial Tr. (de Vere) at 1019:2-12, 1020:8-1022:8.

18      To TVH it appears that CBUSO had not really thought about how to play a meaningful

19  role to control the quality of the Beckstoffer Sublicensees' wines, as the *Barcamerica* and

20  *Freecycle* cases require, until after the naked licensing defense had been raised in this case.

21  Instead, it appears that CBUSO has attempted to characterize a variety of normal activities – like

22  competitor wine analyses, and collecting published reviews and ratings of the Sublicensees'

23  wines – as activities that could satisfy the "minimal effort" legal requirement for wine trademark

24  licensors to play a meaningful role in controlling the quality of  Sublicensees' wines.

25      But the *Barcamerica* case makes clear that to play a meaningful role to control the quality

26  of Sublicensees' wines, quality control sampling must be done annually in an organized way. In

27  this case there is no basis to conclude that every sublicensee's wine is tested annually, or semi-

28

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**

annually, or even every 3 years. Moreover, CBUSO failed to adduce any evidence demonstrating that each of Sublicensee's wines had been reviewed or rated for each year the License Agreement has been in effect. It seems beyond doubt that CBUSO's efforts fall far short of the "minimal effort" standard that the Ninth Circuit established for wine trademark licenses. On that basis the To Kalon Marks should be cancelled, with prejudice.

## III. CONCLUSION

TVH requests the Court to issue a judgment cancelling CBUSO's trademark registrations for the To Kalon Marks on the basis of fraud. Alternatively, TVH asks the Court to find the To Kalon Marks were abandoned by naked licensing. If the trademarks survive judgment, TVH requests a declaration that TVH has the right to use "To Kalon" as a vineyard designation or otherwise to describe fairly and accurately the geographic origin of its portion of its wine and historic association with Crabb's To Kalon estate property.

Respectfully submitted,

DATED:  December 24, 2020                    BUCHALTER
                                            A Professional Corporation


                                            By:   /s/ Jeffrey M. Judd
                                                       JEFFREY M. JUDD
                                                       PETER H. BALES
                                                       Attorneys for
                                                    THE VINEYARD HOUSE

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 42990117v2

54
**TVH's POST TRIAL BRIEF IN LIEU OF CLOSING ARGUMENT –
CASE NO. 4:19-cv-1424-YGR**