1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**NORTHERN DISTRICT OF CALIFORNIA**

6

| | |
|---|---|
| **THE VINEYARD HOUSE, LLC,** | Case No.  4:19-cv-01424-YGR |
| Plaintiff, | CONSOLIDATED CASE |
| v. | |
| **CONSTELLATION BRANDS U.S. OPERATIONS, INC.,** | **RULE 52 ORDER AFTER TRIAL ON THE MERITS** |
| Defendant. | |
| **CONSTELLATION BRANDS U.S. OPERATIONS, INC.,** | |
| Consolidated Plaintiff, | |
| v. | |
| **THE VINEYARD HOUSE, LLC,** | |
| Consolidated Defendant. | |

7
8
9
10
11
12
13
14
15
16
17
18

"To Kalon:" Defined by the Greeks as "Highest Good" or the "Highest Beauty."

19

Undisputedly used in Napa Valley by the famous winemaker H.W. Crabb beginning as early as

20

1886.  More recently trademarked by Robert Mondavi Winery ("RMW") in 1988.  The roots of

21

this action are embedded in the fundamental question of what "To Kalon" represents or signifies

22

now and for the last hundred and thirty years.  Like much in nature, "To Kalon" has transformed

23

with time.  Yet, despite this change, one conclusion is certain: The Vineyard House ("TVH")

24

cannot use the term in any way, shape, or form.  Based on a seven-day bench trial, the Court's

25

rationale is detailed below in its Findings of Fact and Conclusions of Law.[1]

26
27

---

[1]  The Court will not encumber these Findings of Fact and Conclusions of law with voluminous record cites as the same is clearly identified in the parties' post-trial filings found at Docket Numbers 239 and 240-4.  The Court admitted, considered, and reviewed over 600 exhibits.

28

United States District Court
Northern District of California

I.     **FINDINGS OF FACT**

A.     **History of To Kalon**

One cannot appreciate the full context of the significance of To Kalon without traveling

back to the 1880s.  Historians have told the tale, as early as 1889 (later reprinted in 1973), of the

life of H. W. Crabb that was known:

> Nestled cosily back from the county road, and half hidden by a
> wilderness of vines and trees, is the celebrated To Kalon Vineyard,
> belonging to Mr. Henry [sic] W. Crabb. The fact that Mr. Crabb is an
> Ohio man may have something to do with his phenomenal success as
> a vigneron, but his confrères seem to think that study and much
> practical experience are the qualifications which have crowned To
> Kalon products with success. "The name To Kalon " said Mr. Crabb,
> "is Greek, and means the highest beauty or the highest good but I try
> to make it mean the boss vineyard." There are 350 acres in vines
> ranging from 12 to 18 years old, and the whole tract is well sheltered
> from the sea breeze.
>
>                                        * * *
>
> As a successful wine-maker Mr. Crabb is without a peer in the State,
> . . . .

Wines and Vines of California, pp. 108, 109, (1889) (later reprinted in 1973) (TX0311); *see also*

California Wineries, Napa Valley, Volume One, p.79 (1975) (TX0312).

The legacy of Hamilton Walker Crabb[2] was repeated in numerous books among other

names which have remained constant in the Napa Valley for well over a century:

> Napa County's viticulture began as a direct descendant of Sonoma's
> when George Yount crossed the western Mayacamas range separating
> the two parallel valleys and set out cuttings from General Vallejo's
> Mission vines. Then for more than two decades it slumbered,
> progressing little, until Charles Krug made the same crossing. Krug
> brought with him the ideas and ideals of Agoston Haraszthy, and he
> sparked the Napa Valley's dramatic ascent to pre-eminence in both
> quantity and, to many palates, quality. It was at first a slow ascent, but
> between 1870 and 1880 wine production increased nearly ten-fold.
> By the end of that decade Napa was producing about half as many
> gallons as the state's leader, Sonoma, and almost as many as second-
> place Los Angeles County. A decade after that it led them all. . . .
>
> An even more adventuresome vineyardist was Hamilton Walker
> Crabb, an Ohioan who came to the Napa Valley in 1865 and, although

---

        [2]  Some historians refer to Mr. Crabb as "Henry W. Crabb," while others "Hamilton W.
Crabb."  The Court relies on the official probate records of the individual to refer to him as
"Hamilton."

1

2

3

> close to middle age, began planting vines with youthful single-mindedness.  He had a passionate interest in experimenting with different varieties, and he bought all he could lay his hands on, . . . .  A decade after he began he had nearly two hundred varieties, by the 1880s some four hundred.

4  Winemaking in California, Ruth Teiser, pp. 82, 83 (1983) (TX0339).  The record is replete with

5  references showing that Mr. Crabb used To Kalon (or some variation thereof) as a brand on wine,

6  the name of a company, and the name of his vineyard, all simultaneously.  The suggestion that it

7  only referred to a vineyard is defied by the evidence in the record.

8  According to Andrew Beckstoffer, the history of H.W. Crabb was well-known and well-

9  documented when Mr. Beckstoffer arrived in the valley in approximately 1967 or 1968 from

10  Connecticut charged with researching Napa Valley for Heublein, Inc., which was entering the

11  domestic wine business and in the process of buying the now well-known wineries called

12  Inglenook and Beaulieu Vineyards, in addition to Italian Swiss Colony.  Assuredly, those

13  interested in, and knowledgeable of, the history of California wines, were familiar with the history

14  of H.W. Crabb.

15  While the precise boundaries of Mr. Crabb's vineyard may have been illusive, the general

16  reference to the land was not.  Mr. Beckstoffer found five or six different books and each one

17  mentioned that the "To Kalon Vineyard as being the most outstanding vineyard in Napa Valley . .

18  . ." (Trial Transcript ("TT"), Vol. 2, p. 236: 8-9.)  He believes the references included such

19  publications as including Wines & Vines (1937); F. Schoonmaker and T. Marvel, American

20  Wines (1941); Wines & Vines, Vol. 24, No. 8 (1943); Wines & Vines, Vol. 32, No. 2 (1951).

21  Before 1988, other books existed which referenced To Kalon as part of Napa Valley's history,

22  continued before 1988.[3]   That said, there is sparse evidence that signs or maps demarcated the

23

24  _____

[3]  (See TT, Vol. 2, pp.250-56 (citing Wines & Vines, Vol. 50, No. 2 (1969); D. Corey, Hamilton Walker Crabb (1973); F. Wait, Wines & Vines of California (1973, reprint of 1889 book) (TX0311); M. Topolos and B. Dobson, California Wineries: Vol. I, Napa Valley (1975) (TX0312); R. Teiser and C. Harroun, Winemaking in California (1983) (TX0339); and in 1988 and thereafter: B. Dobson, Fruit of the Vine, 200 Years of Winemaking in California, (1988) (TX0353); T. Pinney, A History of Wine in America, (1989); D. Berger and R. Hinkle, An Inside Look at Napa Valley (1991); C. Sullivan, Napa Wine - A History from Mission Days to Present (1994); I. Haynes, Ghost Wineries of Napa Valley. (1995); C. Sullivan, A Companion to California Wine, (1998); L. Weber, Old Napa Valley, The History to 1900 (1998); S. Koplan, A Sense of Place: An Intimate Portrait of the Niebaum-Coppola Winery and the Napa Valley (1999);

25

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

boundaries of the vineyard (precise or otherwise) unlike other geographic areas such as the existing townships in Napa Valley or established American Vinicultural Areas ("AVA"). The Court acknowledges one historic map which showed the vineyard, but it was more of a general attraction.

Mr. Beckstoffer testified that he believed he learned the location of H.W. Crabb's To Kalon Vineyard, that being the "357 . . . contiguous acres in Oakville, California" where he "cultivate[d] grapes," in 1969, through his research and Beaulieu Vineyard's winemaker, Mr. Andre Tchelistcheff. (TT, Vol 2, pp. 243:14-15, 246:8-19.) More precisely, Mr. Crabb purchased 240.66 acres in 1868, then 119.83 contiguous acres in 1879 for a total of 360.49. All of this land sits in a geological formation called an alluvial fan on the floor of the Napa Valley which is created from a mixture of gravel and rock that had washed down the Mayacamas Mountains and settled onto the Napa Valley floor. No dispute exists that Mr. Crabb harvested grapes for wine from this acreage.

Rather, this action raised the question of whether wine grapes were grown on a separate parcel up the hill known as the Baldridge Parcel. An excellent summary of the historical record in this regard can be found in a report which plaintiff itself commissioned in 2018 to submit to the Napa County Planning Commission long before the filing of this action. (*See* TX1002.) That it was not done for purposes of litigation increases its reliability and credibility.

The report instructed that in 1872, Mr. Crabb switched from cultivating table grapes to wine grapes and renamed his operations "Hermosa Vineyards." *Hermosa* meaning "beautiful" in Spanish. The nature of the soil contributed to the success of his wine making. By 1878, he had planted half his property with 120,000 vines becoming, by the end of the decade, "one of the largest, most productive wineries in Napa Valley and perhaps the state."

Fourteen years later, in 1886, Mr. Crabb renamed his winery as the To-Kalon Winery Company. Over his career, Mr. Crabb won numerous domestic and European wine awards, spoke at conferences, wrote prolifically, and shared his expertise and knowledge about viticulture. He

---

W. Heintz, California's Napa Valley, One Hundred Sixty Years of Wine Making (1999)).)

also established a nationwide distribution network with locations in Washington D. C. and Chicago.  "His winery operation [was] characterized as a "young town" employing approximately 80 to 100 workers and comprised of a practical and efficient complex of well-insulated, one- and two-story, wood-frame buildings." Unquestionably, he was both a pioneer and instrumental force within the developing wine industry of Napa Valley.

### B.    Acquisition of the Baldridge Property

In 1889, William Baldridge[4] sold his property, approximately 168.5 acres, including his residence and the associated ancillary buildings to Mr. Crabb ("Baldridge Parcel").  Ten years later, Mr. Crabb died.

The evidence with respect to how Mr. Crabb actually used the Baldridge Parcel is scant, but with the purchase, Mr. Crabb owned over 500 acres of property.  Unfortunately, plaintiff's proffered historian, Dr. Scott Miltenberger, engaged in conjecture at trial to support TVH's trial position. Undisputedly, the land was known to be, and is, primarily "hilly acreage." (TX1002, p. 20.)  Indeed, as plaintiff's own report found, "[o]nly a narrow, flat portion of Baldridge's original property appears to have been cultivated for agricultural use, with the remaining portion consisting of wooded foothills of the Mayacamas Mountains."  (*Id.*; *see also* TX1003 p.10.)  Notably, Mr. Crabb loved horse racing and the need to grow hay to support this hobby has support in the record.

The Court finds the best evidence regarding Mr. Crabb's use of the land, at least relative to wine making, are the probate records for "Hamilton W. Crabb," dated March 25, 1899, which included an 11-page "Inventory and Appraisement" detailing his holdings.  (TX1440.)  With respect to his account receivables, the records identify certain affiliates, namely "To Kalon Wine Co" in Washington D.C. and "To Kalon Vineyard" in Chicago, Illinois.  However, more importantly, his "Real Estate" holdings, which were listed and consistent with the other historical records, provide the best evidence of the use of his three parcels.  The inventory reads:

---

[4]  William Baldridge himself had historical significance and was recognized as a "pioneer of pioneers."  Interestingly, he apparently "found himself in the position of single-handedly accepting the surrender of John Sutter at Sutter's Fort.  (TX 1002, p. 15.)  Winemaking, though, was never mentioned among Mr. Baldridge's fortes.

United States District Court
Northern District of California

<u>First Tract – Home Place</u>. Situated at Oakville in Napa County California and described as follows to wit [legal description and appraisal of land]. . . .

All of said land is planted to Resistant Vineyard, nearly all grafted, and 160 acres in bearing-we appraise the value of Vineyard improvement at

$35,900.

We appraise the Building improvements on said tract at

$14.900.

Second Tract- Known as Lewelling place, adjoining the above and described as follows, [legal description and appraisal of land]. . . . 45 acres of said land is planted to resistant vineyard and to orchard, the value of which we appraise at

2,250.

We appraise the Building improvements on said land at

2,400.

Third Tract-Baldridge Farm, [legal description] We appraise the land with the valuable timber thereon at

$3240.

The Building improvements thereon at

600.

The system of Reservoirs and piping and the Water rights of said place in connection with first two tracts above described, we value at

$8000

(TX1440 (emphasis in original).)  The inventory also referenced "70 acres growing hay in field on Lewelling tr." and "Baldrifge [sic] tract" valued at $500 and $150, respectively.  Then, in the summary or "Recapitulation," the Inventory makes a distinct separation in Mr. Crabb's "Real Estate" between the "To Kalon Vineyard Property at Oakville 359 acres" valued at "$91250" and the "Baldridge Tract, including Water Rights" valued at "$11840."

How Mr. Crabb may have used the referenced water rights, piping and timber is irrelevant to whether he ever planted a vineyard on the Baldridge property.  The evidence overwhelming confirms that he did not, at least not with any commercial value, and that the Baldridge tract was principally "wooded" or full of "valuable timber." To find otherwise would require the Court to ignore a legal document, the entire purpose of which was to document accurately the state of Mr. Crabb's affairs at the time of his death.

The argument that Mr. Crabb planted commercial vines on the Baldridge tract lacks any

evidentiary basis.[5] That newspapers articles may have mentioned that Mr. Crabb's vineyards were over 500 acres does not compel a contrary result. (*See*, *e.g.*, TX0211.) The accuracy of such articles must always be considered against other known information. Collapsing the extent of Mr. Crabb's ownership of lands into a newspaper blurb regarding this vineyard does not seem particularly problematic from a "news" point of view but it does not persuade on the issue of actual use given the evidence to the contrary.

After Mr. Crabb's death, the winery operations continued until 1939 when a fire closed the operations. Not until 1951 does credible evidence, that being a United States Geological Survey topographic map, show vineyards growing on the Baldridge Parcel. With brief ownership by Robert Lieff in 1982, Gil Nickel acquired a portion of the Baldridge lands in 1984, transferred ownership to the Nickel Land Company which Jeremy Nickel inherited in 2003 upon his father's death. He then transferred the property to Nickel Vineyard Company LLC, which leases the land back to TVH (both of which are wholly owned by Jeremy Nickel).

**C.    Representations to the Trademark Office**

Robert Mondavi Winery was awarded the following U.S. Trademark Registrations (the "TO KALON Registrations"):

> **Mark**  TO KALON
> **Date of Reg.**   May 24, 1988
> **Reg. No. Goods** 1,489,619 Wine (IC 033)[6]

As a starting point, the TO KALON Registrations have achieved incontestability, which is conclusive evidence of Constellation's exclusive right to use TO KALON and TO KALON

---

[5] Importantly, plaintiff knew before filing suit that the historic record indicated that the Baldridge property was primarily wooded, and that "Baldridge's original estate does not appear to have been cultivated with grapes used by the To-kalon Vineyard Co." (TX1002, pp. 9, 10.) Mr. Baldridge lived on the property for four decades and while he may have grown grapes there is no indication that he did so to produce wine as opposed to raisins or sugar as was the custom of other Napa Valley farmers. (*Id.*, pp. 14-17; *see also* TX1003 at 5-7.)

[6] Constellation Brands U.S. Operations Inc.'s ("Constellation") predecessor trademark owner, RMW, was originally granted registrations for TO-KALON and TO-KALON VINEYARD (with hyphens). In 2004 and 2008, however, Constellation amended its registrations (as permitted under 15 U.S.C. § 1057(e)) to remove the hyphens, modernizing them to TO KALON and TO KALON VINEYARD. (TX1027 at 1-2; TX1042 at 1-2; Dkt. No. 202 at ¶7(m).)

United States District Court
Northern District of California

1    VINEYARD on wine. (TX1027 at 3, 8; TX1042 at 3, 5; 15 U.S.C. § 1115(b); Dkt. No. 202 at

2    ¶7(n).)

3         Plaintiff's challenge dates back to the initial application process.  In response to an Office

4    Action from the United States Patent and Trademark Office (USPTO) requesting additional

5    information regarding the proposed trademark, Robert Mondavi Winery, stated:

6         TO KALON . . . has no present meaning or significance in the
          relevant trade or industry. Prior to the turn of the 20th Century,
7         there was a winery in the Napa Valley which used the name
          "Tokalon." Upon information and belief, that winery was sold off
8         in parcels during the first fifteen to twenty years of the 20th
          Century and use of the name was discontinued. Accordingly,
9         although the name has some historical significance, it has no
          current meaning or significance in the wine industry.
10

11   (TX0018.)  The evidence of whether it had "no present meaning or significance" is mixed.  On the

12   one hand, the history of Mr. Crabb was well-documented in the voluminous historical writings

13   about the Napa Valley.  (*See supra* note 3.)  However, documentation alone does not necessarily

14   mean, for trademark purposes, that the "relevant trade or industry" afforded the phrase meaning

15   and significance.

16        The Court acknowledges that Mr. Beckstoffer credibly testified that when the USPTO

17   asked Robert Mondavi whether the name To Kalon had any historic or current meaning, and Mr.

18   Mondavi claimed it did not, that Mr. Beckstoffer reasonably believed that Mr. Mondavi knew that

19   he was misrepresenting the truth.  (TT, Vol 2, p. 249: 5-7.)  "[E]verybody – anybody you talked to

20   in the Napa Valley in those days would – would recall and would state that To Kalon was a

21   vineyard, a famous vineyard owned by Hamilton Crabb."  (*Id.* 249:14-16.)  That being said, Mr.

22   Beckstoffer also admitted that Mr. Mondavi had a reputation for honesty and believed that the

23   winemaker, more than the land, drove successful winemaking.  Further, RMW *did* advise the

24   USPTO of the historic vineyard and even Mr. Beckstoffer admitted to doing research to find the

25   boundaries of Mr. Crabb's original contiguous parcels.

26        Ironically, Mr. Mondavi himself may have added to the confusion as he worked to make

27   famous the trademark he had acquired. He repeatedly retold a story of the original significance of

28   the land remarking:

United States District Court
Northern District of California

8

> As I [Mondavi] narrowed my search, I considered three different properties in and around Oakville. There was one, though, that stood head and shoulders above the others. It was a vineyard with a distinguished history and a magical name, To Kalon. I had first encountered To Kalon during one of our early expansion phases at Krug. We needed more grapes to boost production, and were looking for a good vineyard to buy or lease. Old Louis M. Martini, Sr., one of the most knowledgeable and hardheaded vintners in the Napa Valley urged me to take a look at the To Kalon Vineyard in Oakville. "Bob," he said, "that darn place at To Kalon is one of the finest places in California for Cabernet Sauvignon." I went to see To Kalon, and Louis was right. It was a fine property producing first-rate grapes. So at my urging, we began buying grapes grown on the To Kalon property, and in 1958, I think it was, we went even further. We purchased a 325-acre parcel of To Kalon for Krug in the name of the parent company my father had formed, C. Mondavi & Sons.

(TX0356 pp. 57-58; *see also* TT, Vol. 2, pp. 254-256.) A review of the actual deed transfers indisputably demonstrates that Mr. Mondavi's story was not true. As noted, one can reasonably presume that he created the story to heighten the stature of To Kalon.

Even from today's perspective, the record is replete with conflicting evidence showing how narrow, or alternatively, how widespread, is the reference to To Kalon. Mr. Nickel himself testified that he (originally) and normal wine consumers generally do not know the origins of To Kalon. The Court finds, based on a complete review of all the evidence, that sophisticated wine consumers, merchants, and professionals immersed in the Northern California wine industry have a current understanding of To Kalon. However, that finding does not extend to the time prior to 1988. Rather, prior to 1988, the Court finds that the knowledge was much more limited and certainly not widespread.

### D. Survey Evidence

The survey evidence presented in this case was fundamentally flawed and provides virtually no useful evidence for resolving the issues of confusion in this action. Moreover, the manner in which the surveyor, Matthew G. Ezell, created and conducted the survey strains credulity and presents a cautionary tale for those who seek to provide courts with useful information.

The generic "EverReady" survey approach was intended to be used either in a specific context or requires modification to provide any useful insights. The use here revealed virtually

United States District Court
Northern District of California

1  nothing.  The critical presumption underlying the approach is that the respondents have been

2  exposed to the mark.  This is necessary because they must make a "mental leap" to the senior

3  mark in order for there to be any revelation of confusion.  Without the exposure, the survey does

4  not work, at least not without modification.

5       Where the query concerns marks for everyday products, used by vast majority of

6  consumers, such as Apple, Coca-Cola, or EverReady, the short simple survey can provide some

7  insights.  That is not, and never was, this case.[7]  Here, the mark at issue concerned a very narrow

8  group of individuals.  Mr. Nickel describes his clientele as "affluent connoisseurs, and collectors

9  of Napa cult cabernets."  That description can be reasonably expanded to include a consumer of

10 ultra-premium and luxury-premium wine, which are generally priced above $100, and affluent

11 consumers of high-end Napa County red wines.  (*See* Dkt. No. 239 at 11; Dkt. No. 240-4 at 53.)

12      The relevant universe is those who one reasonably believes are potential purchasers of the

13 juniors' goods.  Mr. Ezell did not sufficiently determine whether those surveyed were actually

14 prospective purchasers of the class of goods.  Using a generic web-based survey pool, who are not

15 adequately screened, does little to find the relevant universe.  In fact, it is unlikely that such a tool

16 could ever be used to find affluent consumers of Napa Valley wines willing to spend luxury prices

17 of over $100 per bottle.

18      Mr. Ezell performed no validation to test, even at the highest level, the results of his

19 survey.  For instance, extrapolating the survey data to the national framework suggests that 84

20 percent of wine drinking consumers have ordered one bottle of wine online or through a wine

21 club, which would be more than half of all Americans.  Focusing solely on those who purchased a

22 bottle of wine of $100 or more, the data suggests that 32 percent of wine consumers or 20 percent

23 of Americans bought such a bottle online or through a wine club.

24      Further, the questions were not particularly helpful to determine whether TVH's use of To

25

26      [7]  The notion that Mr. Ezell conducted the survey in this manner because Constellation
   claimed it was a "strong source identifier" for "Constellation Brands" itself in an unverified

27 complaint strains credulity and elevates a technicality over substance.  Rule 8 requires only notice
   pleading.  The belief that such a tactic would warrant any measure of serious consideration defies

28 logic.

1   Kalon as a vineyard designation would cause confusion with the use of To Kalon as a trademark.

2   Remarkably, Mr. Ezell even miscategorized statements from respondents with respect to

3   confusion.

4        Given the stark failures in conducting the survey, the Court finds Mr. Ezell's credibility to

5   be entirely lacking and affords his opinion little to no weight.

6   **II.**     **CONCLUSIONS OF LAW**

7       **A.**    **Claims at Issue in Both Actions**

8        Having issued a preliminary injunction in this action, the Court begins with Constellation's

9   claim that TVH's use of the name To Kalon constitutes trademark infringement under the Lanham

10   Act, 15 U.S.C. § 1114.

11        TVH is liable for infringement under 15 U.S.C. § 1114 for using the To Kalon marks if:

12   (1) Constellation owns a valid, protectable trademark; (2) TVH used the name To Kalon on wine

13   products without Constellation's consent; and (3) such use was in a manner likely to cause

14   confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of such

15   wine.  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (trademark

16   infringement claim requires trademark owner to show (1) it has a protected ownership interest in

17   the subject mark, and (2) the accused infringer's use of a similar mark is likely to cause consumer

18   confusion, thereby infringing the trademark owner's rights.); *Dep't of Parks & Rec. v. Bazaar Del*

19   *Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *E & G Gallo Winery v. Gallo Cattle Co.*, 967

20   F.2d 1280, 1290 (9th Cir. 1992).

21        When assessing confusion, courts in the Ninth Circuit generally use the eight "*Sleekcraft*

22   factors" to guide their analysis, namely (1) the similarity of the marks; (2) the relatedness of the

23   goods; (3) the marketing channels used; (4) the strength of the senior mark; (5) the degree of care

24   likely to be exercised by purchasers; (6) the defendant's intent in selecting its mark; (7) any

25   evidence of actual confusion; and (8) the likelihood the parties will expand their product lines.

26   *E & G Gallo Winery*, 967 F.2d at 1290.  The factors are not exhaustive, some are more important

27   than others, and not all are necessarily relevant in each case.  *See E & G Gallo*, 967 F.2d at 1290;

28   *cf. also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) ("[w]e have

*United States District Court*
*Northern District of California*

11

previously emphasized the minimal importance of the intent factor"); *Brookfield Comm., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999) ("an intent to confuse customers is not required").

Here, no material dispute exists as to the first two elements:  First, Constellation owns a valid, protectable trademark in the term To Kalon.  Whether it should be cancelled is a separate and distinct inquiry.  Second, TVH not only used the mark without consent, but it did so in violation of this Court's preliminary injunction and steadfastly maintains that it should be able to use it.  Thus, the Court focuses on the final element, that is, likelihood of confusion.  The evidence strongly shows likelihood of confusion under *Sleekcraft*.  First, TVH used the precise words of the trademark on both sides of the bottle which establishes similarity: To Kalon and To Kalon Vineyard.



(TX0085, TX0086.)

12

Second, the goods overlap: both parties sell high end luxury wines.  The wines at issue do not just retail for over $100. The highest end "cult" wines sell for over $300 including TVH wines.

Next, the marketing channels overlap: both use wine clubs and online sales.  Further, TVH wants to expand to include sales at the vineyard itself as is shown by its application to the Napa County Planning Commission for a tasting room.

With respect to the strength of the mark and degree of care by consumers, the Court notes that while the clock cannot be turned back 33 years to determine with surgical precision the extent of the market's historical knowledge of To Kalon, what *is* known is that in the last 33 years, the mark has gained substantial notoriety in the wine market among consumers and those in the trade. The mark is understood to be connected to the alluvial fields in the Oakville American Viticultural Area, but even experts in the field cannot easily distinguish between, on the one hand, the Home Place parcel or the Lewelling parcel (which TVH calls "historic To Kalon"), or on the other hand, the contiguous additional acreage which has the same geologic characteristics, such as the I-Block. That RMW, and now Constellation, use the term as a both a brand and a reference to all of their alluvial fields in the Oakville AVA does not weaken the mark.  Rather, it is the combined effect that has strengthened the mark.

Further, there is no credible evidence to show, nor is it logical to believe, that consumers would be able to distinguish the infringing wine from those which appropriately bear the trademark given how the label creates the source of confusion.  Said differently, while the wine from the hilly Baldridge parcel may taste differently than the wine from the alluvial valley parcels, one first encounters the product by looking at a label.  The use of To Kalon has meaning and the precise location of parcels is difficult to discern, whether it be a valley parcel or a nearby hillside parcel.  (*See e.g.* TX1413, TX1414 (maps denoting different vineyard blocks on the valley floor).) Nothing on a label can explain to a consumer the lines on a parcel map which have changed with ownership, nor the geological differences of valley versus hillside land, all of which took many hours of trial time to unravel.  It is not reasonable to expect consumers to read TVH's label and understand the historic and geological differences in the various parcels at play.  Rather, confusion is much more likely if "To Kalon" is allowed on the label.  Further, and as noted above, TVH's

attempt to show lack of confusion fails entirely given the significant inadequacies of the purported survey.[8]

Finally, TVH's intent is unambiguous.  TVH wants consumers to associate its wine with the wine which they understand to be sourced from those formerly belonging to the H.W. Crabb's To Kalon Vineyard.  According to Nova Cadamatre, the issue and price of "cult" wines is largely a function of access.  The more demand for a limited production of wines, the higher the price. For instance, TVH sells 75 percent of the grapes from the Baldridge property to Harlan Estates whose wine is widely known as a cult wine.  Those are priced between $350 to $750 per bottle. (TT, Vol. 3, p. 509:15-18.)  While Mr. Nickel may be truthful when he claims not to want to be affiliated with "Mondavi," increasing the prestige of his wine by affiliating it with To Kalon is a wholly different motivation.  If TVH can increase the prestige of its wine, then it can increase demand, and over time, increase the price of a self-admitted "cult wine."

Thus, the Court finds all the *Sleekcraft* factors are satisfied and the risk of confusion substantial.  Constellation has proved a prima facie case of trademark infringement.

TVH asserts numerous affirmative defenses including that (i) TVH used the name To Kalon fairly and in good faith only to describe the goods and their geographic origin and not as a trademark, (ii) the trademark registrations should be cancelled, (iii) Constellation has unclean hands, and (iv) Constellation abandoned the trademark. The Court addresses each.

### B.    Affirmative Defenses

#### i.    *Fair Use*

TVH claims fair use in referencing To Kalon on its wine bottles because H. W. Crabb owned the Baldridge Parcel for the last ten years of his life and produced wine from grapes grown thereon. The Court disagrees.

In general, the first requirement of the "fair use" defense is that the use a party seeks to

---

[8] Interestingly, the one person in the survey who revealed knowledge of the senior mark (as is necessary for the efficacy of the survey) indicated that there *was* confusion.  Many others also identified confusion, though not credited by the "expert," and only acknowledged in post-trial briefing by the lawyers.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  exclude from a claim of infringement must be "otherwise than as a mark." 15 U.S.C. § 1115(b)(4).

2  A phrase functions as a trademark if it is used to "identify and distinguish" a party's goods from

3  those sold by others and to indicate source. *See id*, § 1127; *see also TMEP*, § 1202.  In some

4  circumstances, however, a junior user can use another's registered trademark so long as it is in a

5  non-trademark, geographical sense. 2 McCarthy on Trademarks and Unfair Competition § 14:17

6  (5th ed. September 2020 Update) (hereafter "McCarthy on Trademarks").  Producers of goods that

7  are located in a specific place have a limited right to tell purchasers of their location.  McCarthy

8  on Trademarks, at § 14:12; *see Sazerac Brands, LLC v. Peristyle*, LLC, 892 F.3d 853, 855 (6th

9  Cir. 2018) (affirming judgment for defendant who used Old Taylor Distillery to describe its

10  location). 15 U.S.C. § 1115(b)(4) allows a fair use for trademarks that describe "the geographic

11  origin" of a junior trademark user's product.  *See* 15 U.S.C. § 1115(b)(4); *see also Sazerac*

12  *Brands, LLC v. Peristyle*, LLC, 892 F.3d at 855-859 (references were descriptive and geographic

13  because they "referred to Old Taylor to pinpoint the historic location where [the distiller] planned

14  to make a new bourbon, not to brand that bourbon.").

15         As referenced above, the Court does not find that the historical record supports TVH's

16  claim that Mr. Crabb grew wine grapes on the Baldridge Parcel.  TVH's hired historian

17  manipulated a sentence in a historic report to conclude incredulously that such a vineyard was not

18  only possible, but likely.[9]  Counsel's post hoc attempt to rehabilitate Dr. Miltenberger does not

19  persuade where he was adamant in his trial testimony and unflinching in his resolve with respect

20  to his opinion.  The Court agrees that Mr. Crabb was an innovator and a businessman, but one

21  must strain to suggest that he used the Baldridge parcel to grow grapes given the probate records.

22  At most, one might surmise that the parcel contained a source of water which he piped to the

23  valley.

---

25         [9]  "A: I -- I still believe that it's more -- more likely, given the description, that it was at the
26  Baldridge property. You know, what's been laid out is a possible -- is a possible reading.  I can see
    a reading where in terms of experimentation and because in the 1890s there was some notion that
27  perhaps the hillsides produced better fruit, more resistant fruit, that you could have it both ways,
    experiment on the valley floor and experiment at Baldridge. I see that as a possibility as well."
28  (TT Vol. 1, p. 95:14-22.)

1   TVH's theory does not have support in even less historic times.  Mr. Beckstoffer himself

2   testified that he only knew the land as a forest dating back to the late 1960s.  TVH's own wine

3   expert Doug Frost conceded that the wine industry *did not* consider the reference to To Kalon to

4   include hillside vineyards and the ARG report submitted for the TVH's tasting room also

5   concluded the same.

6         Given the overwhelming lack of evidence to support this theory, to allow TVH to make

7   such a representation on its wine would itself mislead the wine consuming public.  The affirmative

8   defense of fair use fails.  Similarly, TVH's claim for declaratory relief of non-infringement due to

9   fair use also fails.

10           *ii.*   *Cancellation*

11         Next TVH requests cancellation of the mark.  Here, TVH claims that RMW

12   misrepresented a material fact to the USPTO in the trademark application process, RMW knew

13   that these representations were false when it made them, RMW made such misrepresentations

14   intending to induce the USPTO to rely on them, and the USPTO reasonably relied thereon.  15

15   U.S.C. § 1115(b)(1); *Intellimedia Sports, Inc. v. Intellimedia Corp.*, 43 U.S.P.Q.2D (BNA) 1203,

16   1206 (Trademark Trial & App. Bd. May 20, 1997) (fraud on the USPTO as basis for cancellation

17   of registered mark); *see, Int'l House of Pancakes v. Elca, Corp.*, 1982 TTAB LEXIS 17, *9

18   (Trademark Trial & App. Bd. November 30, 1982) (same).  Cancellation on the basis of fraud on

19   the USPTO requires "clear and convincing evidence for the elements of fraud on the [US]PTO."

20   *OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.*, 897 F.3d 1008, 1020 (9th Cir.

21   2018).  For a claim for cancellation based on fraud, a party must establish the following elements:

22   "1) a false representation regarding a material fact; 2) the registrant's knowledge or belief that the

23   representation is false; 3) the registrant's intent to induce reliance upon the misrepresentation; 4)

24   actual, reasonable reliance on the misrepresentation; and 5) damages proximately caused by that

25   reliance."  *Id*. at 1019.

26         RMW's application shows that RMW explicitly advised the USPTO that To Kalon had

27   previously had a historical usage, stating: "[p]rior to the turn of the 20th Century, there was a

28   winery in the Napa Valley which used the name 'Tokalon.'" This was true, as is the fact that the

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1   "use of the name was discontinued."  Had the name been as famous in the 1980s as it is today, it

2   would have been unnecessary for Mr. Mondavi to commission a historical report on the land

3   which compiled all the historic information.  The context of the commission increases the

4   reliability of its findings and provides circumstantial evidence of Mr. Mondavi's state of mind.

5   Notably, TVH identifies no motive for the alleged misrepresentation or need to have skewed the

6   historical record.  Nor does the Court discern one.  Rather it is much more likely that the name was

7   known to some but not all.  Moreover, the representation to the USPTO was accurate.

8     In terms of whether RMW could have been more complete in its response to the USPTO,

9   the Court agrees with Mr. Robert Cissel who credibly testified that this historic information is not

10  the type of material information which is determinative of whether the "primary significance" of a

11  term is geographic.  To Kalon does not refer to an AVA or a town or any other primary geographic

12  location.  The record is replete with evidence showing that Mr. Crabb used To Kalon both as a

13  brand *and* as a reference to his vineyard. TVH's attempt to make a stark distinction which did not

14  exist historically fails.

15    The weight of the evidence supports the finding that RMW provided the USPTO with

16  sufficient information and did not represent the then-current historical view of To Kalon, and, in

17  any event, given that historic use of the term as both a brand and a vineyard, there was no need for

18  the USPTO to reject the application on the basis that the "primary significance" of the term was

19  geographic.  The affirmative defense of cancellation fails.  Similarly, TVH's claim for declaratory

20  relief of non-infringement due to cancellation also fails.

21    *iii. Unclean Hands*

22    TVH argues that it should have no liability for infringement of Constellation's "To Kalon"

23  marks because Constellation has unclean hands, in that it has misrepresented the origin, nature,

24  characteristics, qualities, or geographic origins of its goods by selling wine labeled "To Kalon"

25  that is not at least 95 percent sourced from the "Home Place" and "Lewelling Place" parcels.  15

26  U.S.C. § 1125(a).  The Court disagrees.

27    To prevail on an unclean hands defense, the party "must demonstrate that the [opposing

28  party's] conduct is inequitable and that the conduct relates to the subject matter of its claims."

United States District Court
Northern District of California

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987).  "[E]quity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.*  A party must demonstrate unclean hands in a trademark action by "clear, convincing evidence."  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 (9th Cir. 2011).

Here, Constellation not only has an incontestable mark which it can use accordingly, but, the manner in which it has used the mark does not misrepresent the origin, nature, characteristics, qualities or geographic origins of the wine on the labels.  All of the wines at issue originate from either the Home Place or Lewelling Place parcels or those areas contiguous thereto which have the same alluvial geographic structure and the same microclimate which contribute to the flavor of the grapes.  There is no misrepresentation.  Nor is there a requirement, given the incontestable mark, that Constellation only use the mark on the wines originating from those two parcels.

The lawsuit between Mondavi and Beckstoffer which ended in a settlement and license agreement resolved any issues which may have existed by specifying labeling practices to protect against any legitimate concern.  There is no evidence that Constellation is in violation of those practices.  The affirmative defense of unclean hands fails.  Similarly, TVH's claim for relief based on false advertising and false designation of origin under 15 U.S.C. 1125(a) also fails.[10]

     *iv.   Abandonment and Naked Licensing*

Finally, TVH argues that Constellation has effectively abandoned the mark by failing to control licensing adequately—in other words, Constellation has issued naked licenses to its sublicensees and has effectively abandoned the To Kalon trademark.

To prove abandonment, TVH must show that Constellation licensed the use of the To Kalon and To Kalon Vineyard trademarks and then failed to control the quality of goods produced by its licensees and sub-licensees in an adequate manner.  *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595-96 (9th Cir. 2002).  "[T]he proponent of a naked license theory

---

[10]  Accordingly, to the extent not otherwise addressed in this Order, the Court declines to address Constellation's affirmative defenses to TVH's affirmative claims for relief.

of trademark abandonment must meet a stringent standard of proof." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514-15 (9th Cir. 2010).[11]  As the Ninth Circuit has explained:

> Naked licensing occurs when the licensor fails to exercise adequate quality control over the licensee. . . . Naked licensing may result in the trademark's ceasing to function as a symbol of quality and a controlled source. . . . We have previously declared that naked licensing is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor. . . . Consequently, where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark. . . .

*Id.* at 515-16 (internal quotation marks and citations omitted).  The purpose of "controlling" the "quality of goods" is to protect the trademark.

Trial evidence demonstrated that the fundamental approach to marketing of wines has remained relatively consistent for decades. The focus on quality is preeminent.

> This is all promotion.  It did not happen overnight, nor by accident. Greater affluence, with the consequent increase in travel and social occasions, has opened new vistas on the world of wine.  The "new" consumer with an informed taste for good wine did not just suddenly appear, as Agricultural Economist Dr. Kirby Moulton says, "like Venus on the half-shell." He is the result of quiet but persistent industry promotion. . . . Quality is still and above all the answer. Nobody needs a crystal ball to predict that quality wines will never be oversupplied.

California Wineries, Napa Valley, Volume One, p.79 (1975) (TX0312).  Thus, in the wine industry and the maintenance of one's trademark, the focus is on quality and, perhaps, for lower-end wines consistency.  In this way, the issue of quality differs given the nature of the wine. Importantly, the question of commercial adequacy, in terms of control, cannot be untethered from the realities of the industry itself nor arbitrarily tied to stale generic requirements as TVH would have the Court do.

Even assuming TVH could argue abandonment as an affirmative defense, the facts do not

---

[11]  To date, the Ninth Circuit has not clarified whether a "stringent standard of proof" requires "clear and convincing" evidence or a "preponderance of the evidence." *Id.*  The parties have both indicated that they believe the "clear and convincing" standard applies.  In any event, the Court need not resolve this issue, because under either evidentiary standard, TVH has failed to show that Constellation has indeed abandoned the To Kalon mark under a naked licensing theory.

United States District Court
Northern District of California

United States District Court
Northern District of California

support TVH's position.  Undisputedly, Constellation has licensed the trademark to Beckstoffer who has sub-licensed to wineries who buy grapes from Beckstoffer's vineyards.  Here, Constellation and Beckstoffer are operating in an electronic age.  Hard files do not exist as they did in the past so the lack thereof does not prove abandonment.  Informality does not necessarily mean lack of control in a close-knit environment.  Everyone of import to the question, that is Constellation, Beckstoffer, and all the sublicensees, have an incentive to ensure the quality of the goods, and by extension, the strength of the trademark as it is the trademark that adds value and goodwill to the goods.  Thus, the fact that Constellation receives reports with hyperlinks showing the wine ratings of wine critics for wines using the To Kalon trademarks is evidence of control.  The acknowledgement and informal monitoring that wines being produced from these grapes are done so by some of the most prominent wine makers in the industry and sold at luxury prices is evidence of control.  The periodic tasting of the wines also evidences control.

Had a formal program been implemented, this issue would never have been raised, but to claim abandonment strains credulity.  There is no need to overregulate quality where no evidence exists that quality is in peril.  The process of producing luxury wines is organic, artistic and extends over many years.  The day-to-day informal monitoring of these wines evidences control.  Mr. Beckstoffer admitted that at least once, he had to discuss concerns with a sublicensee over which he would have terminated the license due to quality issues.[12] The law does not demand documentation, although documentation often resolves issues without the need of litigation.

That Gallo Wineries conducts chemical experiments to monitor its mass produced, low-end wines does not serve as useful corollary.  Again, issues regarding adequate control need not be formulaic.  Mr. Paul Reidl credibly testified as to the process used by Gallo Wineries, but the concern about a consistent flavor or any health effects from a low-end product does not mean that its approach is commercially reasonable for luxury wines.  Even Mr. Reidl's template for a license

---

[12]  Counsel's cross-examination of Mr. Beckstoffer did not persuade.  Mr. Beckstoffer credibly testified that under his sublicense agreement he was entitled to terminate for failure to comply with the requirements therein including quality issues.  Counsel's attempt to corner him on certain technical language in the sublicense failed and did not result in any evidence to support plaintiff's theory.

1    tied to quality control (*see* TX00011D) is consistent with the actions taken by Constellation and

2    Beckstoffer.  Moreover, the informal approach used here has, in fact, worked.  There is not even a

3    hint of a suggestion that the wines produced by the licensees and sub-licensees were not of high

4    quality.

5              In short, it appears that the "defense" was raised merely as a hail-Mary attempt to cancel a

6    mark so TVH could capitalize on it.  Notably, the claim was never made until after the Court

7    issued its preliminary injunction and the prospect of an award of attorneys' fees became more

8    realistic.  The claim of abandonment fails.

9         **C.    Constellation's State Law Claims**

10             Constellation's three state law claims turn on essentially the same tests as do their federal

11   law counterpart claims.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This

12   Circuit has consistently held that state common law claims of unfair competition and actions

13   pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to

14   claims made under the Lanham Act.") (quoting *International Order of Job's Daughters v.*

15   *Lindeburg & Co.*, 633 F.2d 912, 916 (9th Cir. 1980)).  The elements of the state law count for

16   trademark infringement[13] (Fourth Claim), unfair competition[14] (Fifth Claim) and Section 17200 of

17   California Business and Professions Code[15] (Sixth Claim) overlap with that of the federal claim.

18             ────────────────

19        [13]  TVH shall be liable for infringement under California common law if: (i) Constellation
     made prior use of the TO KALON or TO KALON VINEYARD trademarks, and (ii) there is a

20   likelihood that TVH's uses of the name To Kalon will be confused with Constellation's use of
     those marks.  *See Wood v. Apodaca*, 375 F. Supp. 2d 942, 947-48 (N.D. Cal. 2005).

21
22        [14]  TVH shall be liable for unfair competition under California common law if: (i) TVH
     wrongly exploited Constellation's TO KALON and/or TO KALON VINEYARD trademarks,

23   and/or reputation, and (ii) Constellation suffered a "competitive injury" as a result of TVH's
     conduct.  *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) ("Claims for false

24   designation of origin under the Lanham Act and unfair competition under California common law
     both share a single test: likelihood of confusion."); *Microsoft Corp. v. Buy More, Inc.*, No. 15-

25   56544, 703 F. App'x 476, 480 (9th Cir. June 27, 2017) ("The analysis for these claims is therefore
     identical to the analysis for [the trademark owner's] trademark infringement claim.") (internal

26   citations omitted).

27        [15]  TVH shall be liable under California Business & Professions Code § 17200 *et seq.* if TVH
     committed either (i) an unlawful business practice, or (ii) a fraudulent business practice, or (iii) an

28   unfair business practice, or (iv) an act prohibited by Bus & Prof. Code 17500 *et seq.*, and

United States District Court
Northern District of California

The Court relies on the prior analysis except as is noted herein. The Fourth Claim for trademark infringement under state law is the same as the federal claim and the Court finds in favor of Constellation on the same grounds as discussed above.  With respect to Fifth Claim for unfair competition, the first element is satisfied for the same reasons as discussed above.  With respect to the second element regarding "competitive injury," the Court finds it is satisfied by TVH's acts of selling wine with the good will which accompanied the use of Constellation's trademark.  The Court finds in Constellation's favor on this claim.  However, with respect to the Sixth Claim, while the Court finds the first element satisfied for the same reasons referenced above, Constellation failed to provide any evidence that it lost money or property.  This claim fails for lack of proof.

## III.  RELIEF

The Court acknowledges that Constellation has withdrawn its claims for damages (*see* Dkt. No. 236, n.16), but seeks injunctive relief.  Given the findings of fact and conclusions of law, a permanent injunction is aptly supported.

Under Ninth Circuit law, an injunction should issue upon proof that the plaintiff (1) "suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that . . . the balance of hardships between the [parties] [warrants] a remedy in equity; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006); *see also Herb Reed Enter., LLC v. Florida Enter. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  Each of those factors has unquestionably been met.

The loss of control over one's trademarks, reputation, and goodwill is "a quintessentially irreparable injury." *Adidas Am., Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1249 (D. Or. 2016) (citing Herb Reed, 736 F.3d at 1250); *see also Toyo Tire & Rubber Co. v. Kabusikiki*

---

Constellation has suffered injury in fact and has lost money or property as a result of the unfair competition.  Cal. Bus. & Prof. Code § 17200; *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009); *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994) (explaining what "unlawful" and "fraudulent" business practices are).

United States District Court
Northern District of California

*Kaisha Tokyo Nihoon Rubber Corp*, 2015 WL 6501228, *4 (D. Nev. Oct. 26, 2015) (finding irreparable harm where trademark owner had "spent considerable time and effort building its reputation"); McCarthy on Trademarks, § 30:47.70 ("A likelihood of damage to reputation is by its nature 'irreparable.' Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.").[16]

As trial evidence showed, To Kalon has become a fixture in Northern California's wine industry. Attempting to quantify the goodwill which would be lost, especially amongst the narrow luxury wine market, is incredibly difficult. Without an injunction, The Vineyard House, LLC will continue to try and use the term for its own benefit and such use will not only be a violation of Constellation's trademark rights but will harm the public as it will suggest an inference regarding the origin of the wine that is unsupported in any credible manner. The Vineyard House, LLC will suffer no hardship as it has no right, or credible basis, to use the term.

Further, the evidence demonstrated convincingly that Mr. Nickel, as the sole owner of The Vineyard House, LLC, has acted in a manner to combine and leverage his various commercial pursuits and does not maintain boundaries. In a vacuum, such conduct may be reasonable from a small business perspective. However, given the context here, the Court has little to no confidence that Mr. Nickel will be able to keep separate his horse, or stock, farm business which caters to the billionaires of Wellington, Florida from his wine business as run by The Vineyard House, LLC which caters to consumers of luxury cult wines. Relief is issued given that context.

---

[16] The Trademark Modernization Act of 2020 (codified as part of the Consolidated Appropriations Act, 2021, Pub. L. 116-260) was signed into law on December 27, 2020. That law, *inter alia*, modified the text of 15 U.S.C. § 1116(a) relating to awarding injunctive relief in trademark infringement actions by inserting the following sentence after the first sentence:

> A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.

Pub. L. 116-260. Here, in light of the Court's analysis, the insertion of the above sentence only reinforces the appropriateness of a permanent injunction requested by Constellation.

United States District Court
Northern District of California

Accordingly, the requested relief shall be granted and The Vineyard House, LLC and any and all of its agents, members, officers, directors, employees, and/or principals shall be permanently enjoined from using the words To Kalon or To Kalon Vineyard or any variation thereof in any manner on any wine, wine-related product, reference to a wine product, or event or activity where such wine is present or referenced.  The permanent injunction extends to any affiliate of The Vineyard House, LLC and its principal Jeremy Nickel including without limitation the To-Kalon Farm.[17]

The Clerk of the Court is directed to enter judgment accordingly and to close this matter.[18]

This Order terminates Docket Numbers 236, 237, and 240.

**IT IS SO ORDERED.**

Dated: January 26, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

United States District Court
Northern District of California

---

[17]  The Court defers any finding on attorneys' fees until further briefing from the parties.

[18]  Additionally, for the good cause shown therein, the Court **GRANTS** the parties' administrative motions to seal with respect to the parties' post-trial briefing.