1   Timothy J. Carlstedt (State Bar No. 168855)
    HUNTON ANDREWS KURTH LLP
2   50 California Street, Suite 1700
    San Francisco, CA 94111
3   Tel.: (415) 975-3700
    Fax: (415) 975-3701

4

5   Edward T. Colbert (DC Bar No. 206425)
    William M. Merone (DC Bar No. 458104)
    Erik C. Kane (DC Bar No. 4951546)
6   Jeremy Boczko (NY Bar No. 5004858)
    Armin Ghiam (DC Bar No. 219290)
7   HUNTON ANDREWS KURTH LLP
    2200 Pennsylvania Avenue, N.W.
8   Washington, D.C. 20037
    Tel.: (202) 955-1500
9   Fax: (202) 778-2201

10   *Counsel for Constellation Brands U.S. Operations, Inc.*

11

12           **UNITED STATES DISTRICT COURT**

           **NORTHERN DISTRICT OF CALIFORNIA**

13

14   THE VINEYARD HOUSE, LLC,
    a California limited liability company,
15

16       *Plaintiff / Counterclaim-Defendant,*       Case No.: 4:19-cv-01424-YGR
                                  Case No.: 4:20-cv-00238-YGR
17   v.

18   CONSTELLATION BRANDS U.S.
    OPERATIONS, INC.,                  **DEFENDANT'S MOTION FOR**
19   a New York corporation,             **ATTORNEY FEES AND**
                                    **MEMORANDUM OF POINTS AND**
20       *Defendant / Counterclaim-Plaintiff.*    **AUTHORITIES IN SUPPORT**
                                    **THEREOF**

21

22

23

24

25

26

27

28

HUNTON ANDREWS
KURTH LLP                                               4:19-CV-01424-YGR
                                                   4:20-CV-00238-YGR

1
2

## NOTICE OF MOTION AND MOTION

3

**TO THE COURT AND ALL INTERESTED PARTIES:**

4          PLEASE TAKE NOTICE that on March 30, 2021, at 2:00 p.m., or as soon thereafter as

5    the matter may be heard, in Courtroom 1, 4th Floor, of the United States District Court, 1301

6    Clay Street, Oakland, California 94612, the Hon. Yvonne Gonzalez Rogers presiding, Defendant /

7    Counterclaim-Plaintiff, Constellation Brands U.S. Operations, Inc., as the prevailing party in this

8    consolidated matter, will and hereby does move pursuant to 15 U.S.C. § 1117(a) for an order

9    granting Constellation an award of $4.419 M as "reasonable attorney fees" for the entirety of this

10   case, as well as an award of $20,981 pursuant to Federal Rule 26(b)(4)(E) for the reasonable fees

11   spent by Constellation's experts in responding to discovery sought by Plaintiff / Counterclaim-

12   Defendant, The Vineyard House, LLC.  Plaintiff's claims were baseless from the start, and its

13   refusal to settle (even after being enjoined) and insistence instead on taking this matter all the way

14   through trial was objectively unreasonable, rendering this case "exceptional."

15          The Motion is based on Constellation's Motion for Attorney's Fees and the Memorandum

16   of Points and Authorities in Support Thereof; the Declarations (and exhibits thereto) of Edward T.

17   Colbert and Armin Ghiam in support of the motion; oral argument of counsel (if applicable); the

18   complete files and records in the above-captioned action; and such additional matters as the Court

19   may consider.  A Proposed Order is being submitted herewith.

20

21   Dated:  February 17, 2021          By: /s/ Edward T. Colbert_____
22                                          Edward T. Colbert
                                            HUNTON ANDREWS KURTH LLP
23                                          2200 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20037
24                                          Tel.: (202) 955-1500 / Fax: (202) 778-2201

25                                          *Counsel for Defendant,*
                                            *Constellation Brands U.S. Operations, Inc*
26

27

28

1

**TABLE OF CONTENTS**

2

TABLE OF AUTORITIES ................................................................................................. iii

OVERVIEW ........................................................................................................................ 1

ARGUMENT ....................................................................................................................... 5

A.      This Case Qualifies as "Exceptional" ....................................................................... 5

      1.      The Issues Plaintiff Took to Trial Were Frivolous ....................................... 6

      2.      Refusing to Settle and Insisting on Trial Was Unreasonable....................... 10

      3.      The Entire "Second Action" Was Unnecessary ........................................... 13

B.      The Fee Award Constellation Seeks is Reasonable ................................................. 17

      1.      The Number of Attorney-Hours Spent on the Case was Reasonable .......... 17

      2.      The Hourly Billing Rates Charged Were Reasonable .................................. 19

      3.      Constellation is Entitled to an Award Under Fed. R. Civ. P. 26(b)(4) ......... 22

C.      An Award of Full Fees is Appropriate in this Case .................................................. 23

CONCLUSION .................................................................................................................. 24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Cases**

*3M Co. v. Kanbar*,
2007 WL 2972921 (N.D. Cal. 2007)

*Banas v. Volcano Corp.*,
47 F.Supp.3d 957 (N.D. Cal. 2014)

*BladeRoom Group Limited v. Emerson Electric Co.*,
2020 WL 1677328 (N.D. Cal. 2020)

*Cairns v. Franklin Mint Co.*,
115 F. Supp.2d 1185 (C.D. Cal. 2000)

*Chalmers v. City of Los Angeles*,
796 F.2d 1205 (9th Cir. 1986)

*Christian v. Mattel, Inc.*,
286 F.3d 1118 (9th Cir. 2002)

*Contractual Obligation Prods., LLC v. AMC Networks, Inc.*,
546 F. Supp.2d 120 (S.D.N.Y. 2008)

*Cotton v. City of Eureka*,
889 F.Supp.2d 1154 (N.D. Cal. 2012)

*Dropbox, Inc. v. Thru Inc.*,
2017 WL 914273 (N.D. Cal. 2017)

*Eastman v. Allstate Ins. Co.*,
2016 WL 795881 (S.D. Cal. 2016)

*Ebates Inc. v. Cashbag.co.za*,
2018 WL 6816113 (N.D. Cal. 2018)

*Edwards v. Vemma Nutrition*,
2019 WL 5684192 (D. Ariz. 2019)

*Erdman v. Cochise County, Ariz.*,
926 F.2d 877 (9th Cir. 1991)

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015)

*Gilead Sciences, Inc. v. Merck & Co, Inc.*,
2016 WL 4242216 (N.D. Cal. 2016)

*Granite Rock Co. v. International Broth. of Teamsters*,
2008 WL 618897 (N.D. Cal. 2008)

*Guichard v. Universal City Studios, LLP*,
2008 WL 2220434 (N.D. Cal. 2008)

*Haworth v. State of Nev.*,
56 F.3d 1048 (9th Cir. 1995)

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)

*In re High-Tech Employee Antitrust Litigation*,
2015 WL 5158730 (N.D. Cal. 2015)

*J&J Snack Foods Corp. v. The Eathgrains Co.*,
2003 WL 21051711 (D. N.J. 2003)

*Jones v. Wild Oats Markets, Inc.*,
467 F.Supp.2d 1004 (S.D. Cal. 2006)

*K & N Engineering, Inc. v. Bulat*,
259 Fed. Appx. 994 (9th Cir. 2007)

*Kerr v. Screen Extras Guild*,
526 F.2d 67 (9th Cir. 1975)

*Ketab Corp. v. Mesriani & Assoc., P.C.*,
734 Fed. Appx. 401 (9th Cir. 2018)

*Kwan Software Eng., Inc. v. Foray Tech., LLC*,
2014 WL 572290 (N.D. Cal. 2014)

*Lewis v. Activision Blizzard, Inc.*,
2014 WL 4953770 (N.D. Cal. 2014)

*Marek v. Chesny*,
473 U.S. 1 (1985)

*Meeker v. Meeker*,
2004 WL 2457793 (N.D. Cal. 2004)

*Mighty Enterprises, Inc. v. She Hong Indus. Co. Ltd.*,
2015 WL 276771 (C. D. Cal. 2015)

*Milton H. Greene Archives, Inc. v. Julien's Auction House, LLC*,
2007 WL 4898365 (E.D. Cal. 2007)

*Moore v. James H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982)

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)

*OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.*,
897 F.3d 1008 (9th Cir. 2018)

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985)

*In re Pebble Beach Co.*,
19 USPQ 2d. 1687 (TTAB 1991)

*Perfect 10, Inc. v. Giganews, Inc.*,
2015 WL 1746484 (C.D. Cal. 2015)

*Peters v. Winco Foods, Inc.*,
320 F. Supp.2d 1035 (N.D. Cal. 2004)

*Prison Legal News v. Schwarzenegger*,
608 F.3d 446 (9th Cir. 2010)

*San Diego Comic Convention v. Dan Farr Prod.*,
807 Fed. Appx. 674 (9th Cir. 2020)

*Sazerac Company, Inc. v. Fetzer Vineyards, Inc.*,
2017 WL 6059271 (N.D. Cal. 2017)

*Spalding Labs., Inc. v. Arizona Biological Control Inc.*,
2008 WL 2227501 (C.D. Cal. 2008)

*Stonebrae L.P. v. Toll Bros.*,
2011 WL 1334444 (N.D. Cal. 2011)

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
839 F.3d 1179 (9th Cir. 2016)

*Technology Prop. Ltd. LLC v. Cannon Inc.*,
2017 WL 2537286 (N.D. Cal. 2017)

*TNS Media Research LLC v. TiVo Research & Analytics, Inc.*,
2018 WL 2277836 (S.D.N.Y. 2018)

*Townsend v. Holman Consulting Corp.*,
929 F.2d 1358 (9th Cir. 1990)

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
896 F.2d 403 (9th Cir.1990)

*Zobmondo Enter., LLC v. Falls Media, LLC*,
602 F.3d 1108 (9th Cir. 2010)

**Other Authority**

Fed. R. Civ. P. 11(b)

Fed. R. Civ. P. 26(b)(4)

Fed. R. Civ. P. 68

15 U.S.C. § 1117(a)

15 U.S.C. § 1115(b)

1    15 U.S.C. § 1125(a)

2    15 U.S.C. § 1127

3    28 U.S.C. § 1821

4    28 U.S.C. § 1920

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**OVERVIEW**

2

As Constellation has argued many times, Plaintiff should never have brought this case.

3 Before filing suit, Plaintiff knew that Constellation owned the exclusive right to use the TO

4 KALON VINEYARD name with wine; knew that the use of "To Kalon Vineyard" as a vineyard

5 designation on a competing wine was a "use as a mark" that would lead consumers to believe that

6 the wine came from the same vineyard used by Constellation; knew that the U.S. Trademark

7 Office (and others) had warned it against using the "To Kalon Vineyard" name; and knew that its

8 own land had never been used by H.W. Crabb to grow grapes.  *See, e.g.,* Tr., 512:4-11, 541:24-

9 542:10, 546:25-548:13, 554:21-556:2, 562:3-17, 608:2-609:21, 614:19-615:14, 617:13-21; 619:2-

10 621:18; TX1002 (pp. 11, 20-21); TX1003 (pp. 3-14); TX1341; TX1350; TX1544 (pp. 2-4);

11 TX1741.[1]  Nonetheless, and despite also knowing that it would be *misleading* to call land Mr.

12 Crabb had never used to grow grapes "To Kalon Vineyard," *see* Tr. 556:16-557:9, Plaintiff still

13 brought this case, seeking a declaration that its use of "To Kalon Vineyard" on a competing wine

14 would somehow be a geographically descriptive "fair use," whereas Constellation's legitimate

15 use would be "false advertising."  *See* ECF 1, ¶¶ 60-63; *cf.* 15 U.S.C. §§ 1115(b)(4), 1125(a).

16

When Plaintiff instigated this action, perhaps it was subjectively blind to the hypocrisy of

17 its behavior and was unfamiliar with trademark law.  Perhaps, for example, it did not realize that

18 this Court previously held that because a vineyard designation indicates the source of the grapes

19 used for a wine, it is "the very essence of use as a mark," thereby rendering a fair use defense

20 "without merit."  *See Meeker v. Meeker*, 2004 WL 2457793, *8, 10 (N.D. Cal. 2004) (White, J.);

21 *but cf.* Tr., 608:2-609:21 (Plaintiff previously applied to register several TO KALON names,

22 planning to use one or more "as trademarks").  And perhaps Plaintiff did not know that just

23 because a trademark can seem to refer to the physical location from which a company provides its

24 goods or services, and may even be listed on a map (like DISNEYLAND), that does not mean it

25 is "primarily geographically descriptive"—it is still a trademark. *See In re Pebble Beach Co.*, 19

26

27

28

---

[1] The Trial Transcripts ("Tr."), which were continuously paginated, are docketed in the "parent" case [4:19-CV-01424] as ECF 219-21, 226, 230-31, and 233.  Certain portions were also sealed. Unless otherwise noted, all "ECF" citations in this brief reference the "parent" case.

USPQ 2d. 1687, 1688 (TTAB 1991).  All of that is theoretically possible, just as it is possible that Plaintiff did not understand incontestability (which forecloses a challenge to the distinctiveness of a registered mark), did not appreciate that a party cannot engage in "false advertising" simply by using its own trademark, and did not know the sort of evidence it would need when claiming "fraud."  *Cf.* 15 U.S.C. § 1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-201 (1985); *Zobmondo Enter., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010); *OTR Wheel Eng., Inc. v. West Worldwide Serv., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018); *Mighty Enterprises, Inc. v. She Hong Indus. Co. Ltd.*, 2015 WL 276771, *3 (C. D. Cal. 2015).

Ignorance of the law, of course, is never an excuse.  But *even if* one were inclined to give Plaintiff a pass for filing a case it <u>objectively</u> should have known it could never win, and *even if* we ignore Plaintiff's predatory intent in adopting a valuable trademark that it *knew* was registered to someone else, *see* Tr., 615:14-617:21, any grace period for Plaintiff to do the right thing ended on February 21, 2020.  That is when this Court enjoined Plaintiff from continuing to use the "To Kalon Vineyard" designation, finding that Constellation was "likely to succeed on the merits" in proving infringement and that Plaintiff was *unlikely* to succeed with any of its defenses, including "fair use."  *See* ECF 40 [4:20-CV-00238], p. 2; ECF 99 ("Hearing Tr."), 22:14-37:7.  During the injunction hearing, the Court even *told* Plaintiff that it had seen no authority challenging the legal precept (recognized in *Meeker*) that a vineyard designation <u>is</u> a mark—an issue critical not only to Plaintiff's claim of "fair use," but also its historical analysis, "fraud" allegation, false advertising claim, and non-infringement defense.  *Cf.* Hearing Tr.*,* 32:15-33:16, 35:24-36:23; Tr., 983:17-20.

Respectfully, that should have <u>ended</u> the case.  Given the clear legal authority represented by *Meeker*, which this Court implicitly relied on in its ruling, *see supra*, not to mention the overwhelming, objective evidence presented during briefing that wineries regularly register and protect their vineyard names as trademarks, *see, e.g.,* ECF 23 [4:20-CV-00238], pp. 3-4 (¶¶ 9-11), 10-208 (Exs. B(1)-(24)) (two dozen federal registrations), it was not objectively reasonable for Plaintiff, after the injunction issued, to continue just to *argue* that using "To Kalon Vineyard" as a vineyard designation was a use "otherwise than as a mark,"  *cf.* 15 U.S.C. §§ 1115(b)(4), 1127 (defining "trademark"), even before one considers that while Plaintiff was making that argument,

1  it was simultaneously trying *to register* other vineyard designations "as trademarks." *See* Tr.,

2  608:14-610:3; TX1576; TX1578; TX1579.  It was also not reasonable for Plaintiff to continue to

3  argue after this Court's ruling that it could still use the same vineyard designation as Constellation

4  on the same type of wine and sell it to the same type of consumers without causing confusion. *Cf.*

5  Hearing Tr., 25:14-30:18.  In fact, Plaintiff's *own expert* (Mr. Frost) had by then given a sworn

6  declaration that consumers "immediately recognize[]" the TO KALON name as denoting a

7  specific vineyard that "produce[s] some of the best grapes and wines within Napa Valley." *See*

8  ECF 45-2 [4:19-CV-01424], ¶¶ 10-14; *see also* Tr., 304:9-16 ("Q: [T]he vineyard designation

9  informs consumers that the wine come from the named vineyard?  A: Yes").  Plaintiff also had in

10  its possession Mr. Frost's report, in which he reiterated the above and explained that the vineyard

11  that consumers knew as "To Kalon Vineyard" was the land *owned by Constellation* (and its

12  licensee)—they did <u>not</u> know it as Plaintiff's land.  *See* ECF 156 [4:19-CV-01424], pp. 8-10 (¶

13  10) (citing, *e.g.*, Thach, Liz, *Call of the Vine*); *see also* Tr., 320:11-23, 324:20-325:25; TX1708.

14       Plaintiff therefore had to know that this case was over and that nothing was going to

15  change that.  After all, the parties had been litigating in earnest for almost a year (including <u>two</u>

16  motions for preliminary injunction), so it was not as if Plaintiff suddenly was going to find new

17  legal authority or evidence.  The case was even set go to *trial* in two months—meaning almost all

18  written discovery (including most experts reports), document production, and depositions had

19  already been completed. *See Declaration of Armin Ghiam*, ¶ 15.[2]  The cake was baked.

20       Recognizing that, Constellation reached out to Plaintiff the following week and offered a

21  "walkaway" deal that **any reasonable party in Plaintiff's position would have taken**.  The

22  proposal was simple: Plaintiff would drop the lawsuit and stop using TO KALON.  *See*

23  *Declaration of Edward Colbert*, Ex. 5, pp. 1-2.  That was it.  Constellation did not seek damages

24  or compensation from Plaintiff, or even ask to recover the taxable costs it had incurred in

25  defending against this meritless suit that *Plaintiff* initiated—it simply wanted the litigation to end,

26  thereby avoiding (for both sides) the significant additional costs that would be associated with

27

28

---

[2] Because of the pandemic, trial was later delayed and was only completed this past December.

1   proceeding to trial.  *See id.*  Constellation warned, however, that <u>if</u> Plaintiff continued to pursue

2   what, by then, it had to realize were untenable claims, Constellation would seek to recover its

3   attorney fees after it won.  *See id.* (citing 15 U.S.C. § 1117).  Inexplicably, though, Plaintiff not

4   only refused to take Constellation up on its more-than-fair offer, it did not even respond.

5       So, here we are.  Between February 21, 2020, and the end of trial, nothing changed.

6   Plaintiff did not find any new, secret legal authority rebutting the principle that a vineyard

7   designation acts as a trademark, nor did it unearth evidence that altered the confusion dynamic.

8   Instead, Plaintiff just recycled the same arguments, evidence, and authority it had relied on at the

9   preliminary injunction stage.  *Compare generally* ECF 240-3, pp. 2-33, 43-48[3] *with* ECF 45-1,

10   pp. 10-18; ECF 18, pp. 4-16 [4:20-CV-00238].  The only new "proof" Plaintiff came forward

11   with after turning down Constellation's walkaway offer and litigating for another ten months was

12   the Ezell Survey, which was less scientific inquiry, more lawyer-manufactured fig leaf.

13       Plaintiff's principal, Mr. Nickel, has trouble being told "no."  He was told by the U.S.

14   Trademark Office that if he used TO KALON as part of a vineyard designation, "it is likely that

15   consumers who encounter the parties' goods will falsely conclude that they originate from the

16   same source." TX1544 (pp. 2-3); *see also* TX1341, TX1741.  He did it anyway.  Tr., 615:19-

17   621:18.  He was told by his chief financial officer (Mr. Bearer) that putting TO KALON on a

18   label would probably not "pass as fair use" and instead would be seen as "trying to capitalize on

19   an association with the To Kalon brand."  *See* TX1341.  He dismissed the warning and applied to

20   register and use TO KALON VINEYARD COMPANY as his own trademark the very next week.

21   *See* Tr., 601:18-602:22, 620:16-20; TX1403; *cf. also* Tr., 619:11-13 ("My former CFO cautioned

22   me about a lot of things.").  He was told by his research firm, ARG, that Mr. Crabb's vineyards

23   "were clearly located" on the northern, valley parcels, and that Plaintiff's "Baldridge" land "[did]

24   not appear to have been cultivated with grapes."  TX1002 (pp. 11, 20-21); *see also* TX1440 (pp.

25   3, 12).  He simply hired someone new (Dr. Miltenberger) who was willing to testify otherwise.

26

27   [3] To avoid confusion, page citations to a brief (*e.g.*, ECF 240-3) refer to the internal pagination, rather than the pages of the ECF document.  All other "ECF" citations are to the ECF pages.

28

1   *See* Tr., 547:19-548:13, 551:15-24, 556:3-23; *but cf.* Tr., 27:12-18.  He was told by this Court that

2   consumer confusion was likely, that his false advertising claim appeared doomed, and that all of

3   his defenses would probably fail.  ECF 40 [4:20-CV-00238], p. 2; *Ghiam Decl.*, Ex. 8, 24:4-25;

4   Hearing Tr., 22:14-37:7.  He insisted on having a trial.  He was told to stop wasting everyone's

5   time and money and just stop.  *See Colbert Decl.*, Ex. 5.  He did not even respond.[4]

6       Obstinacy is not advocacy.  Other than assuage wounded ego and drive costs up, no point

7   was served by Plaintiff turning down a walkaway settlement offer and insisting that this case be

8   fought to the bitter end.  Plaintiff's refusal to accept reality and its pointless pursuit of baseless

9   legal and factual claims renders this case "exceptional" and justifies an award in favor of

10  Constellation for some or all of the attorney fees it incurred during the course of this matter.

11

12                                         **ARGUMENT**

13  **A.      This Case Qualifies as "Exceptional"**

14      The Lanham Act provides that in "exceptional cases," a court "may award reasonable

15  attorney fees to the prevailing party."[5] 15 U.S.C. § 1117(a).  As the Supreme Court has explained,

16  however, an "exceptional case" is "simply one that stands out from others with respect to the

17  substantive strength of a party's litigating position (considering both the governing law and the

18  facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness,*

19  *LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *accord SunEarth, Inc. v. Sun*

20  *Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1180 (9th Cir. 2016).  When determining whether to

21  exercise its equitable discretion to award fees, a court is instructed to look to the "totality of the

---

22  [4] Nor has Mr. Nickel shown any sign of changing his ways.  Just this month, he advertised his
23  wine by falsely claiming that "H.W. Crabb … **originally farmed our … vineyards**."  *See
    Colbert Decl.*, Ex. 6.  He also continues to invoke the "H.W. Crabb" name to mislead consumers,
24  naming his wine "Crabb's Black Burgundy," and calling his land "H.W. Crabb's Hermosa
    Vineyard."  *See id.*  The land that historically was "H.W. Crabb's Hermosa Vineyard," however,
25  later *became known as "To Kalon"*—a fact Mr. Nickel knows well.  *See* TX1002, p. 19 (ARG
    reported that Crabb originally called his land "Hermosa Vineyards," but later "rebranded" it,
26  "switching from the Spanish word *hermosa* to the Greek phrase *to kalon*").  Thus, Plaintiff's land
    **was never part of "H.W. Crabb's Hermosa Vineyard,"** just as it was never part of "To Kalon."

27  [5] There can be no dispute that Constellation qualifies as the prevailing party in this action.  *See
    Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015).

28

circumstances," and should consider factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 572 U.S. at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

Constellation submits that, from the start, Plaintiff's claims were frivolous, its motivation predatory, and its conduct unreasonable. Whether (and how much of) this case is considered "exceptional" is, of course, trusted to "the case-by-case exercise of [the Court's] discretion," which "has lived with the case and the lawyers for an extended period." *Gilead Sciences, Inc. v. Merck & Co, Inc.*, 2016 WL 4242216, *1 (N.D. Cal. 2016) (quoting *Octane Fitness*, 572 U.S. at 554, and *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011)). However, regardless of how one may view the merits of Plaintiff's claims, motivation, and conduct from the start of this case, *but see supra*, it should be inarguable that this action *at least* became "exceptional" by **no later than** February 21, 2020, after Plaintiff, having just been enjoined by the Court, insisted that the matter be fully tried and later rejected a deal to end the dispute.[6]

### 1.   The Issues Plaintiff Took to Trial Were Frivolous

A claim is frivolous if it "lacks an arguable basis in law or in fact," even if the claim was not brought in bad faith. *See Peters v. Winco Foods, Inc.*, 320 F. Supp.2d 1035, 1037 (N.D. Cal. 2004). To be sure, a party can sometimes be excused for *filing* a claim it did not realize was frivolous. *See id.*; *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362, 1364 (9th Cir. 1990) (discussing in the context of applying Rule 11). However, a party that continues to *litigate* a claim after it is clear the claim lacks legal or factual support is engaging in the very conduct fee-shifting statutes are meant to address. *See Peters*, 320 F. Supp.2d at 1037, 1040-41; *see also Sazerac Company, Inc. v. Fetzer Vineyards, Inc.*, 2017 WL 6059271, *4, *10 (N.D. Cal. 2017) (awarding fees where the plaintiff continued to litigate after the court, although denying summary

---

[6] In Section A.3, *infra*, Constellation additionally discusses the exceptional nature of the separate civil action [4:20-CV-00238] Constellation was forced to file to stop Plaintiff from infringing the TO KALON VINEYARD mark while the original declaratory judgment action [4:19-CV-01424] was being litigated. The legal expenses associated with those activities were incurred during the period December 18, 2019, to February 20, 2020, and were tracked separately by counsel.

judgment, issued an order requiring plaintiff to show irreparable harm, "at which point it became objectively unreasonable to proceed without evidence of irreparable harm"); *Jones v. Wild Oats Markets, Inc.*, 467 F.Supp.2d 1004, 1010-11 (S.D. Cal. 2006) ("Plaintiff's choice to continue to argue that alleged barriers [to access] existed, in light of their own expert's [report] showing that the barriers did not in fact exist, deems the claims frivolous."); *Spalding Labs., Inc. v. Arizona Biological Control Inc.*, 2008 WL 2227501, *1-2 (C.D. Cal. 2008) (Lanham Act case became exceptional when plaintiff "insisted on pursuing a claim which was all but nullified" by the court's pre-trial rulings) ("[Plaintiff] had the responsibility to consider its case and determine whether it had merit, not only upon filing suit, but throughout the entire litigation process.").[7]

The issues Plaintiff insisted on taking to trial were frivolous. Consider, for example, the claim of geographic "fair use," the core of Plaintiff's case. As Plaintiff knew from the start, if a party uses a designation as a mark—that is, "to identify and distinguish" its goods from those offered by others and indicate "the source of the goods"—it <u>cannot</u> claim statutory "fair use." *See* 15 U.S.C. §§ 1115(b)(4), 1127; *see also* ECF 1, ¶¶ 60-63; ECF 240-3, pp. 14-15, 22-23. Furthermore, Plaintiff not only previously applied to *register* a series of "TO KALON" vineyard names as its own trademarks—with Mr. Nickel declaring each time that Plaintiff intended to "use the [TO KALON-variant] mark in commerce," *see* TX1576 (pp. 6-7); TX1578 (pp. 6-7); TX1579 (pp. 6-7); *see also* Tr., 608:2-609:21—it <u>knew</u> by the injunction hearing that another Judge in this District had already found use of vineyard designations on wine bottles to be "the very essence of use as a mark," *see Meeker*, 2004 WL 2457793, *10 (rejecting "fair use" as "without merit"), *and* that this Court agreed with that precedent. *See* Hearing Tr., 36:2-19. The Court even subtly warned Plaintiff at the injunction hearing that if it planned to raise "fair use" at trial, it "may want to start looking for some [authority]" in support of its position. *See id.*, 36:20-24.

---

[7] *See also Technology Prop. Ltd. LLC v. Cannon Inc.*, 2017 WL 2537286, *4 (N.D. Cal. 2017); *J&J Snack Foods Corp. v. The Eathgrains Co.*, 2003 WL 21051711, *2 (D. N.J. 2003); *TNS Media Research LLC v. TiVo Research & Analytics, Inc.*, 2018 WL 2277836, *4 (S.D.N.Y. 2018); *Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, 546 F. Supp.2d 120, 130–31 (S.D.N.Y. 2008) (denial of its preliminary injunction motion put plaintiff "on notice" as to the inapplicability of its Lanham Act claim, after which point "plaintiff knew that it had no basis for its … claim, and plaintiff should have withdrawn that claim from its action against defendants").

So then, what was Plaintiff's plan for trial?  What objectively reasonable basis did Plaintiff have for continuing to litigate despite knowing that its "fair use" defense failed on the question of "use"? *Cf. Sazerac*, 2017 WL 6059271 at *10.  Clearly, Plaintiff did not intend to cite countervailing *legal* authority—its post-trial brief does not even mention the *Meeker* ruling, let alone explain why use as a vineyard designation (which, as its wine expert agreed, identifies the goods and informs consumers of their source; *see* Tr., 303:20-304:16) would not meet the legal definition of "trademark." *Cf.* 15 U.S.C. § 1127.  And it is not as if the *facts* were suddenly going to change—Plaintiff's label said what it said, and Mr. Nickel's sworn statements to the Trademark Office about "use" were not going away.  Instead, it appears Plaintiff's plan was just to keep *saying* it was not using the "To Kalon Vineyard" designation "as a mark," *see* ECF 240-3, pp. 22-24, as if subjective protestations (repeated enough) could overcome statutory text.  What is more, even if it *could* show "use otherwise than as a mark," 15 U.S.C. § 1115(b)(4), for "good faith geographic fair use" to apply, Plaintiff would *still* have had to show that its property (part of the so-called "Baldridge Tract") was historically known as a source of grapes for TO-KALON wine, which it <u>knew</u> was untrue. *See id.*; *cf.* TX1002 (pp. 11, 20-21); TX1440 (pp. 3, 12).

"Fair use," though, was not the only baseless claim Plaintiff insisted on taking to trial after being rebuffed at the injunction stage.  Plaintiff's non-infringement argument was also doomed.  As this Court discussed during the injunction hearing, the major *Sleekcraft* factors (similarity of marks, similarity of goods, similarity of marketing), plus "intent," all weighed in Constellation's favor, and Plaintiff's counter that "some other" test should be used because Plaintiff supposedly was "not using [the designation] in a trademark sense," *but see supra*, had no legal support. *See* Hearing Tr., 25:10-27:4, 29:7-30:18, 35:13-16 ("You don't have any authority … that I should be using some other test [than *Sleekcraft*] … so that's what I'm going to do.").  So, again, one has to ask, after this Court provided guidance on the "use as a mark" issue (Hearing Tr., 36:2-24) and then said *Sleekcraft* applied, what was left to litigate?  What was Plaintiff's objectively reasonable basis for continuing to deny a likelihood of confusion and insisting the issue be tried?

Was Plaintiff intending to argue that it *wasn't* using "To Kalon Vineyard" on its label?  That it *wasn't* selling a high-end Napa County cabernet sauvignon?  That it *wasn't* marketing its

wine the same way (and to the same consumers) as Constellation?  That Constellation *hadn't* used the TO KALON name as a trademark for more than thirty years?  That the TO KALON mark *wasn't* registered[8] and Constellation's use *hadn't* been exclusive?  Which *Sleekcraft* factors did Plaintiff believe it would "flip" at trial, and what new evidence was it planning to offer?  Was it reasonable for Plaintiff to expect that its new defense of "naked licensing"—which Plaintiff only raised *after* this Court issued the injunction; *see* ECF 98, pp. 8-9—would be a game changer?

Likewise, how could Plaintiff have reasonably believed it would win on false advertising?  Plaintiff claimed that Constellation's use of TO KALON for its "I Block" wine was "literally false" because the "I Block" supposedly was not part of what luxury wine consumers know today as "To Kalon."  *See* ECF 30, ¶¶ 51-52, 60; ECF 240-3, p. 32.  Thus, for Plaintiff to prove "literal falsity" false advertising, it would not only have to defeat Constellation's registrations, *cf. Mighty Enter.*, 2015 WL 276771 at *3; 15 U.S.C. § 1115(b), it would have to show that "To Kalon" had an unambiguous meaning as referring only to Mr. Crabb's original 359 acres.  *See Kwan Software Eng., Inc. v. Foray Tech., LLC*, 2014 WL 572290, *5 (N.D. Cal. 2014) ("To be 'literally false' the statement must be unambiguously false.") (citing authority); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[I]f the language … is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false.").

Plaintiff's *own expert*, however, underlined disagreed.  In the report he served two months before the preliminary injunction hearing, Mr. Frost—whom Plaintiff planned to rely on to show what wine consumers understood "To Kalon" to mean—*see* Tr., 153:5-8; 219:6-220:3—offered evidence that many wine professionals and luxury wine consumers regarded the "I Block" as part of "To Kalon," *see* TX1 (¶ 10); TX1708 (Thach book), and he reaffirmed that view later at trial.  *See* Tr., 324:20-325:24.  It was therefore **objectively impossible** for Plaintiff to prove an "unambiguous" meaning and, thus, "literal falsity."  *Cf. Jones*, 467 F.Supp.2d at 1010-11 (S.D. Cal. 2006) (plaintiff's decision to continue to litigate was frivolous after its expert submitted a report

---

[8] Even if Plaintiff *had* canceled Constellation's TO KALON registrations, that would not have changed anything—Plaintiff's use would still infringe Constellation's *marks*.  "[A] trademark need to be registered to be enforceable."  *OTR Wheel Eng.*, 897 F.3d 1008, 1022 (9th Cir. 2018).

contradicting its factual assertion); *see also Spalding Labs.*, 2008 WL 2227501 at *1 (false advertising case became "exceptional" once plaintiff knew it "no longer had admissible evidence of literal falsity"); *Cairns v. Franklin Mint Co.*, 115 F. Supp.2d 1185, 1189 (C.D. Cal. 2000) ("[P]laintiffs should have either not brought the [false advertising] claim …, or … dismissed it when it was clear that there was no evidence to support it."), *aff'd* 292 F.3d 1139 (9th Cir. 2002).

None of Plaintiff's claims had a basis in law or fact, making them frivolous, *see Peters*, 320 F. Supp.2d at 1037, and by the time of the injunction decision, Plaintiff had to know there was nothing new it could offer at trial to support its case. *Cf. Ketab Corp. v. Mesriani & Assoc., P.C.*, 734 Fed. Appx. 401, 411 (9th Cir. 2018) ("It was not an abuse of discretion for the district court to find that [plaintiff] pursued groundless, frivolous, and unreasonable arguments, especially after the court saw [plaintiff] was unable to produce evidence of infringement during the bench trial.") (upholding award under the Lanham Act to prevailing defendant).  We may, of course, never know why Plaintiff insisted on litigating all the way through trial—maybe costs were not a concern for someone in Mr. Nickel's position, or maybe his own fees had already hit a "cap."  What we do know, however, is that Plaintiff did not have an objectively reasonable chance of winning at trial after losing the injunction.  This case should have ended then and there.

## 2.   Refusing to Settle and Insisting on Trial Was Unreasonable

The claims Plaintiff insisted on litigating were truly frivolous, both as to the law and the facts.  *See supra*.  But what really makes this case "stand out from others" is the unreasonable manner in which Plaintiff litigated it given that objective lack of claim strength.  *Cf. Octane Fitness,* 572 U.S. at 554.  This case should never have been filed by Plaintiff in the first place, but, regardless, there was simply no rational reason for it to have continued past February.

As mentioned, *see* pp. 3-4, *supra*, one week after this Court enjoined Plaintiff from using the TO KALON mark, Constellation reached out and offered Plaintiff a walkaway deal.  To say the offer was fair is to undersell it.  Constellation proposed that if Plaintiff ceased "all use of term TO KALON in conjunction with … wines" and withdrew its complaint, the case would end, without Plaintiff paying <u>any</u> damages, costs, or fees.  *See Colbert Decl.*, ¶ 29, Ex. 5.  And in its letter offering settlement, Constellation called Plaintiff's particular attention to the same points it

makes here—notably, that this Court had already rejected Plaintiff's claims and defenses and found confusion likely, and that "in view of the exhaustive discovery [already] taken … it [was] virtually impossible for [Plaintiff] to be able to offer any new evidence or argument that would support a stronger showing of its positions" at the "rapidly approaching" trial. *See id.*, Ex. 5, p. 1. Plaintiff was also told that if it "continue[d] to pursue [its] baseless claims," Constellation would seek to recover its attorney fees, which, Plaintiff was warned, would be "substantial." *See id.*

Plaintiff (through inaction) chose to reject Constellation's offer, which means Plaintiff had to believe one of two things. Either Plaintiff thought it still had an objectively reasonable chance of winning at trial (and thus achieve a better result) or it reasoned that by continuing to litigate and forcing Constellation to incur further costs, it could improve its negotiating position and secure a more favorable deal, notwithstanding the lack of case merits. Neither thought process, however, could have justified Plaintiff's decision to refuse the offer and keep fighting.

As to the first possibility, Plaintiff believing it would win at trial by relying on the same arguments and evidence just rejected at the preliminary injunction hearing would not only have been unreasonable, it would have approached the colloquial definition of insane.[9] The decision to continue to litigate at that point fails even the Rule 11 test—Plaintiff knew that both the relevant law (*Meeker*, *Sleekcraft*, *Pebble Beach*) and facts (*e.g.*, same marks; same goods; same markets; no "literal falsity"; no proof Crabb grew grapes on "Baldridge") were against it; knew it had already suffered two legal defeats; and knew (having litigated for almost a year) that it was unlikely to find any new legal or evidentiary support. *Cf.* Fed. R. Civ. P. 11(b). Furthermore, by then, **Plaintiff had already worked with all of its experts** (and secured all but one report), meaning it could have questioned them each in depth about their opinions (including on the issues and inconsistencies Constellation later raised at trial) before deciding whether to keep litigating.[10]

[9] Albert Einstein is often misidentified as the source of the aphorism that "Insanity is doing the same thing over and over again, but expecting different results." The statement more likely has roots in the early literature of addiction and recovery, although it defies precise attribution.

[10] The only one of Plaintiff's experts who had not prepared a report by that time was its survey expert, Matthew Ezell. Mr. Ezell, however, completed his survey (and thus Plaintiff had access to all of his data) by February 12, 2020. *See* TX12A, p. A-2; *see also* Tr., 343:14-15.

*Cf. Townsend*, 929 F.2d at 1364 (the "reasonable inquiry" prong of Rule 11 is assessed "under 'all the circumstances of the case,'" including, among other things, how much time counsel had to investigate the matter) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990)); *cf. also Peters*, 320 F. Supp.2d at 1037, 1040-41; *Sazerac*, 2017 WL 6059271 at *4, *10. Given all that, Plaintiff's refusal to settle was baffling and suggests it was litigating this case in an "unreasonable manner," setting it well apart from the norm. *Cf. Octane Fitness*, 572 U.S. at 554.

The alternate possibility is that Plaintiff *knew* deep down it had a losing case when it rejected the deal, but, keenly sensitive to its sunk costs (financial, emotional, and reputational) from almost a year of litigation and the dozens of trademark filings it had made, *see* Tr., 607:16-609:21; TX1404, figured it might as well just keep going. Trial was only two months away, and Mr. Nickel had deep pockets. So why not continue to fight and hope Constellation's corporate officers tired of paying lawyers and authorized a better deal? Any new offer from Constellation would likely not be worse, and entrepreneurs are not known for giving up and conceding defeat.

The problem, however, is that obstinacy carries a cost, and in a litigation, that cost is borne not only by the unyielding party but also by its adversary. That is why the Federal Rules encourage parties in unwinnable positions to make offers of judgment and stop the financial bleeding—for both sides. *See* Fed. R. Civ. P. 68; *Marek v. Chesny*, 473 U.S. 1, 5 (1985) ("Rule [68] prompts both parties … to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits."); *Erdman v. Cochise County, Ariz.*, 926 F.2d 877, 880 (9th Cir. 1991). And make no mistake, Constellation's settlement proposal was basically a Rule 68 offer of judgment in reverse—the sort of offer *Plaintiff* could have made, but with even *more favorable* terms. *Compare* Fed. R. Civ. P. 68(a) (offer must allow judgment "with the costs then accrued") *with Colbert Decl.*, Ex. 5 (not seeking to recover costs).[11]

When presented with a fair settlement offer, litigants are expected to "think very hard" before committing to continue the fight. *See Marek*, 473 U.S. at 11 (discussing Rule 68); *see also*

---

[11] The party pursuing a Lanham Act claim cannot make an offer of judgment. *See* Fed. R. Civ. P. 68(a) (limiting it to "a party defending against a claim"). Given that plaintiffs in trademark actions often only seek injunctive relief, this seems an unfortunate oversight in the Rules.

*Haworth v. State of Nev.*, 56 F.3d 1048, 1052 (9th Cir. 1995) (considering a prevailing party's refusal to settle when assessing the reasonableness of the fees the party incurred). And that holds doubly true when the party has a losing case: a reasonable party that knows it cannot prevail on the merits does not turn down a walkaway deal, especially when facing a potential statutory award of fees (such as in copyright and trademark cases). Acting otherwise would be irrational or suggest the party had an improper motive, such as hoping to use continued litigation as leverage or a weapon of spite. *See Lewis v. Activision Blizzard, Inc.*, 2014 WL 4953770, *3 (N.D. Cal. 2014) (copyright plaintiff who pursued objectively unreasonable claim, made unreasonable settlement demands, and turned down an offer whereby the defendant would "forego any claim to attorneys' fees if [plaintiff] would dismiss her suit" likely acted with "an improper motive") (awarding fees); *Edwards v. Vemma Nutrition*, 2019 WL 5684192, *16 (D. Ariz. 2019) ("The fact that [plaintiff] was offered the opportunity to walk away without paying any fees and refused that offer, necessitating an expensive round of litigation on the issue of attorneys' fees, weighs heavily in favor of granting the fees motions."); *see also K & N Engineering, Inc. v. Bulat*, 259 Fed. Appx. 994, 995 (9th Cir. 2007) (lower court could properly consider the defendant's "failure to resolve the trademark violation through settlement" as a factor when awarding statutory damages under 15 U.S.C. § 1117(c)); *Milton H. Greene Archives, Inc. v. Julien's Auction House, LLC*, 2007 WL 4898365, *5 (E.D. Cal. 2007) (copyright plaintiff's failure to make a reasonable settlement offer was "indicative of improper motivation" and helped support an award of fees).

Again, we cannot know *why* Plaintiff refused the lifeline it was thrown last February—maybe it was hubris, maybe it was denialism, maybe it was just bad advice. What we *do* know, however, is that viewed through the lens of our societal construct for how cases *ought* to be litigated, this case "stands out from others." *Cf. Octane Fitness*, 572 U.S. at 554. Plaintiff's refusal to accept the deal it was offered was objectively unreasonable, and its decision to keep fighting had the direct consequence of causing Constellation to incur significant, needless costs.

### 3. The Entire "Second Action" Was Unnecessary

In the two sections above, Constellation details why Plaintiff's decision to continue to push its frivolous claims and defenses after losing on the preliminary injunction and turning down

settlement renders at least the post-injunction phase of the case "exceptional."  There is, however, another issue that needs to be discussed, although it does not fit neatly into the narrative.  Within the arc of this case there were actually <u>two</u> proceedings: the initial declaratory judgment action Plaintiff filed in March 2019 [4:19-CV-01424] ("the First Action"), and the later proceeding Constellation brought in January 2020 [4:20-CV-00238] ("the Second Action").  And although the two cases were consolidated right after the injunction, *see* Hearing Tr., 2:20-3:8, and thus can (and should) be treated as the same "exceptional case" <u>post</u>-hearing, *see* 15 U.S.C. § 1117(a), the fact the Second Action *needed to happen at all* provides an independent basis for a separate fee award, covering the costs Constellation incurred from December 18, 2019, through February 20, 2020 (the date of the injunction hearing), and which pertained to that separate matter.

Constellation has argued repeatedly that Plaintiff never should have filed the First Action:  Mr. Nickel had been warned repeatedly (by Constellation, the Trademark Office, Plaintiff's CFO) that using "To Kalon" as a vineyard designation would likely cause confusion, and he also knew going in (having been told by ARG) that his land had never been used by Crabb to grow grapes. *See, e.g.,* pp. 1, 4, *supra* (citing evidence).  Nonetheless, Plaintiff chose to fight Constellation for the right to use TO KALON, and whether Mr. Nickel was motivated by a cynical belief he could achieve his goal through attrition, or he just wanted his winery in the news, we cannot know.

Either way, this entire case was unnecessary.  However, if there is one thing Plaintiff did right, it did not start *using* "To Kalon" right away—it sought a declaratory judgment, asking that the judicial system rule first on whether it *could* use the name.  As Plaintiff wrote at that time, "[a] judicial declaration [was] necessary and appropriate … for Plaintiff to promptly ascertain its rights and protects its interests" with respect to the land Plaintiff owned, and so it could determine "what *can* be featured on labels for its next release of wines."  *See* ECF 1, ¶ 63; *see also id.*, ¶¶ 61-62 (emphasis added).  Plaintiff also (rightly) acknowledged it would likely "be subject to an infringement action" from Constellation <u>if</u> it began to use TO KALON.  *See* ECF 16, pp. 7-8.

After a few months, though, Mr. Nickel apparently tired of letting the judicial process play out and decided instead to engage in self-help.  For example, beginning in mid-2019, he resumed filing trademark applications for variants of Constellation's TO KALON name, such as "H.W.

CRABB'S TO-KALON WINE CO.," and, most outrageously, applied to use **the same logo** H.W. Crabb had used in the late 1800s, even though Mr. Nickel <u>knew</u> that his southern, "Baldridge" land had never been used by Mr. Crabb as part of his TO KALON VINEYARD operations:

**Plaintiff's Proposed Trademark**          **Crabb's Original Logo**

   

*Compare Ghiam Decl.*, Ex. 7 *with* ECF 156-2, pp. 14 (¶ 24), 58 ("Fig. 8"); *cf.* TX1002 (pp. 11 ["Baldridge's original estate does not appear to have been cultivated with grapes used by the To-[K]alon Vineyard Co."], 20-21 ["[Crabb's] … vineyards[] and winery operations were clearly located on the northern property"]); *see also Ghiam Decl.*, Exs. 5, 6; TX1404.  Then, later in the fall, Mr. Nickel prepared his "Block 8" wine (which used the TO KALON VINEYARD name) for sale, Tr., 621:9-18, and Plaintiff began offering it to customers in early December, while its own motion for a preliminary judgment (ECF 45) was being briefed.  *See* ECF 5-3 [4:20-CV-00238], p. 326 (49:7-15).  Notably, Plaintiff also kept all of this planning secret—promising in discovery that it would <u>not</u> sell any TO KALON-labeled wine until the "threat of litigation has been resolved[.]"  *See id.*, pp. 6-7 (Resp. to Interrog. No. 2).  In fact, even *after* it started offering its "Block 8" wine for sale, Plaintiff represented to both Constellation and the Court that it was <u>not</u> yet selling any "wines that have To Kalon on the label."  *See id.*, pp. 548-550 (17:16-19:19).

Plaintiff's unilateral alteration of the *status quo* was unwarranted—nothing had happened that could have suggested to Plaintiff that it was now free to sell TO KALON-labeled wine.  Nor is it likely that Plaintiff received legal clearance to do so—even its lawyers apparently did not know that Plaintiff had begun making sales. *See id.*, p. 549 (18:14-121).  Rather, it appears that Mr. Nickel just did not care—he had inventory in his warehouse to sell, so he did, despite having been warned repeatedly that doing so would confuse consumers. *See* Tr., 615:19-616:14; 617:13-

21; 619:2-621:18; TX1341; TX1544 (pp. 2-4); TX1741.  Moreover, Mr. Nickel knew all along that when Constellation found out, it would surely respond.  *See* ECF 5-3 [4:20-CV-00238], pp. 6-7 (Resp. to Interrog. No. 2); *see also* ECF 45-1, p. 20 (in a filing it made two weeks before it began infringing, Plaintiff acknowledged that "Constellation [had] threatened to sue [Plaintiff] for [t]rademark infringement if it … use[s] the To Kalon name" and represented that it "ha[d] been *prevented from entering* the market" because of Constellation's rights) (emphasis in original).

The Second Action was thus both provoked and pointless.  The issue of infringement was already being litigated in the First Action (as part of Plaintiff's declaratory judgment claim; *see* ECF 30, ¶¶ 86-89), and trial was only a few months away.  *See* ECF 28.  Thus, there was no reason why Plaintiff *had* to start selling its infringing product when it did (other than, one supposes, to clear out inventory in advance of an expected post-trial injunction).  Plaintiff unnecessarily forced Constellation to bring the Second Action and to move for a preliminary injunction—work that all would have been avoided if Plaintiff had done what it promised and waited until the first case had been resolved.  *Cf.* ECF 5-3 [4:20-CV-00238], pp. 6-7.

Like the entirety of the consolidated case, the Second Action was therefore "exceptional" as well.  Not only was Plaintiff's litigating position substantively weak (same mark, same goods, same markets, etc.), its conduct was unreasonable.  By forcing Constellation to file a new action and to bring a motion for a preliminary injunction, Plaintiff unnecessarily multiplied the proceedings, driving up costs.  *Cf., e.g., Guichard v. Universal City Studios, LLP*, 2008 WL 2220434, *3 (N.D. Cal. 2008) (awarding Lanham Act fees where plaintiff, among other things, "needlessly multiplied the proceedings").  Further, immediately after it learned of the "Block 8" sales, Constellation told Plaintiff's counsel that it intended to file infringement claims and seek a preliminary injunction.  *See* ECF 73, p. 2; *Colbert Decl.*, ¶ 28.  Even then, however, Plaintiff was not dissuaded from continuing with its plan of infringement, nor did it ever explain why it could not have waited until the First Action had been resolved.  The entire Second Action was a needless and wasteful exercise, and Plaintiff should bear all the costs for it.

**B.     The Fee Award Constellation Seeks is Reasonable**

Litigation is expensive; there is no disputing that.  To date, Constellation has spent more than $4.9 M in fees and disbursements (including expert fees, research services, etc.) on this case. *See Ghiam Decl.*, ¶ 2.  Given what was at stake, however, Constellation's costs were reasonable. According to the most recent data collected by the American Intellectual Property Association, the average cost for litigating a high-value trademark action on the West Coast is $4.5 M, *see Colbert Decl.*, ¶ 25, Ex. 2, putting Constellation's costs within the norm.

**1.     The Number of Attorney-Hours Spent on the Case was Reasonable**

The most common starting point for determining a reasonable attorney fee award is a "lodestar" calculation, whereby the number of hours reasonably expended on the litigation is multiplied by a reasonable hourly rate.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). There is "no precise rule or formula" for establishing the number of hours a litigation reasonably should take, and courts have discretion in making this equitable judgment. *Id.* at 436-37; *but see Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir. 1975) (listing some factors courts consider when arriving at a fee, such as "the time and labor required," "the novelty and difficulty of the questions," and "the skill requisite to perform the legal service").  The overarching consideration is simply that a reasonable fee award should exclude any hours that were "excessive, redundant, or otherwise unnecessary," a culling the Supreme Court equated with a lawyer's ethical obligation to exercise "billing judgment" when charging a client.  *See Hensley*, 461 U.S. at 434.

As detailed in the *Ghiam Declaration*, Hunton Andrews Kurth (counsel for Constellation) dedicated 5,977 hours of legal professional time to litigating this case, with the largest part of that work coming after the preliminary injunction. *See Ghiam Decl.*, ¶¶ 2, 8, Ex. 3.  During the client billing process, however, the Hunton billing partner (Edward Colbert) "wrote off" just under five percent of that time (279 hours), striving to eliminate in advance any entries that arguably could be viewed as "excessive,"  "redundant," or otherwise "unnecessary."  *See Colbert Decl.*, ¶ 2. This contemporaneous reduction, which is standard practice at the Firm, *see id.*, means the total number of hours Hunton billed was already meant to be "reasonable."  *Cf. Hensley*, 461 U.S. at 434.  It is also worth noting that Constellation has timely paid its bills, and has done so since the

start of the case.  *See Ghiam Decl.*, ¶ 6.  That means that it too considered the time Hunton has spent on this matter to be "reasonable" and as falling within existing commercial and case expectations.  *See Stonebrae L.P. v. Toll Bros.*, 2011 WL 1334444, *6 (N.D. Cal. 2011) (the presumption that fees were reasonable is "particularly forceful" where "the fees were billed to and actually paid by the [client] during the course of the litigation, the relationship between counsel and the [client] was a valid business relationship, and [client] exercise[d] business judgment in retaining and paying counsel"); *BladeRoom Group Limited v. Emerson Electric Co.*, 2020 WL 1677328, *1 (N.D. Cal. 2020) (quoting *Stonebrae*); *Sazerac*, 2017 WL 6059271, *11.

A granular-level review of the billing records similarly confirms that the time Hunton attorneys spent on this litigation was not only "reasonable," it was necessary.  This case was complicated—at times more historical reconstruction than trademark analysis.  It featured two separate actions; two sets of pleadings; multiple rounds of written discovery; some five thousand individual produced documents; twenty-one depositions (not counting those that were canceled); eleven third-party subpoenas; twenty-two expert reports (from fourteen different experts); numerous discovery disputes; <u>two</u> motions for preliminary injunction (each of which included substantial factual submissions); seven pre-trial motions; more than a thousand trial exhibits; and seven days of trial.  *See Colbert Decl.*, ¶¶ 26-27.  It took real, sustained legal work.

Nor was this an example of Constellation using a sledgehammer to swat a fly.  Plaintiff not only *brought* this action, it set both the stakes and the scope of the dispute.  Plaintiff initially sought an award **of more than $25 M** on its claim of "false advertising," *plus* its attorney fees.  *See* ECF 30, ¶ 85, pp. 32-33 ["(3)", "(7)"]; *see also* ECF157-1, Exs. A1-A5 ("*Wagner Report*"), ¶¶ 40-82.  Furthermore, it was *Plaintiff* that served the bulk of the discovery; noticed the majority of the depositions; first engaged a team of experts (to whom Constellation's experts mostly just responded); and was directly responsible for *both* preliminary injunction filings (the first as the instigator, the second as the provocateur).  *See Colbert Decl.*, ¶¶ 26-28.  As the Ninth Circuit has suggested, when a litigant "fires a big gun," it should be hard-pressed to complain if its adversary

1 returns at least equal fire. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1126 (9th Cir. 2002)

2 (quoting lower court quoting *Brandt v. Schal Assoc., Inc.*, 960 F.2d 640, 648 (7th Cir. 1992)).[12]

3 The total number of hours Hunton billed for this case for legal services (*i.e.*, after any

4 "write offs") should therefore be considered reasonable. That number, though, has been further

5 reduced here because Constellation is not seeking to recover for time spend on the damages claim

6 that it asserted in its affirmative case (roughly 41 hours), *see Ghiam Decl.*, ¶ 9, which claim it

7 withdrew after trial. ECF 239, p. 22 n.16. That brings the total number of recoverable hours

8 down to 5,656 hours for the case, roughly three-fifths of which were either incurred after the

9 injunction issued (3,260 hours), or related solely to the Second Action (246 hours). *See id.*, Ex. 3.

10 **2. The Hourly Billing Rates Charged Were Reasonable**

11 Once a reasonable number of hours for the litigation is determined, it is then multiplied by

12 a reasonable hourly rate for providing the services to arrive at the "lodestar" figure. *Hensley*, 461

13 U.S. at 433 ("This calculation provides an objective basis on which to make an initial estimate of

14 the value of a lawyer's services."). Setting a reasonable hourly rate "involves examining the

15 prevailing market rates in the community charged for similar services by lawyers of reasonably

16 comparable skill, experience, and reputation." *E.g.*, *Cotton v. City of Eureka*, 889 F.Supp.2d

17 1154, 1167 (N.D. Cal. 2012). "The 'relevant community' for the purposes of determining the

18 reasonable hourly rate is the district in which the lawsuit proceeds." *Dropbox, Inc. v. Thru Inc.*,

19 2017 WL 914273, *4 (N.D. Cal. 2017) (citing *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir.

20 1997)). "Affidavits of the [prevailing party's] attorney and other attorneys regarding prevailing

21 fees in the community, and rate determinations in other cases, particularly those setting a rate for

22 the [the party's] attorney, are satisfactory evidence of the prevailing market rate." *United

23 Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir.1990).

24 Hunton initially staffed this case with a core of three experienced trademark attorneys, and

25 later brought in additional help as needed (*e.g.*, for document review, research, trial preparation),

---

[12] In *Christian*, the Ninth Circuit ultimately did not rule on the issue of fees, reversing the lower court's Rule 11 order on other legal grounds. *See* 286 F.3d at 1131. Instead, the court simply reiterated that the amount of fees subject to an award must be "reasonable." *See id.* at 1131-32.

HUNTON ANDREWS
KURTH LLP

4:19-CV-01424-YGR
4:20-CV-00238-YGR

ensuring matters were handled in an efficient manner.  *See Ghiam Decl.*, ¶ 11.  Lead counsel was Edward Colbert, a nationally-recognized intellectual property litigator with more than thirty-five years of trademark experience.  He was assisted by William Merone and Erik Kane, counsel at the Firm with 25 years and 16 years of experience respectively.  *See Colbert Decl.*, ¶¶ 3-5.  Mr. Merone further has a subspecialty and advanced degree in survey research, making him particularly well-suited to some of the issue raised in this case.  *See id.*  Others billing significant time to this matter included Jeremy Boczko (a newly-promoted partner who was added to the team as the case approached trial) and Armin Ghiam, a junior associate.  *See id.*, ¶¶ 6-7.

Hunton's hourly rates are set each year following a detailed analysis of the rates charged by other large law firms with similar national practices, including firms based in San Francisco (where the Firm has an office).  *See id.*, ¶¶ 21-22.  That market-review process led the Firm to establish the following billing rates for the principal members of the litigation team:[13]

| Attorney | Experience | Title | 2019 / 2020 / 2021 Hourly Rate[14] |
|----------|-----------|-------|-----------------------------------|
| Edward Colbert | 35 years | Partner | $1,110 / $1,165 / $1,215 |
| William Merone | 25 years | Counsel | $775 / $800 / $835 |
| Erik Kane | 16 years | Counsel | $775 / $800 / $835 |
| Jeremy Boczko | 9 years | Assoc. / Part. | $685 / $850 / $885 |
| Armin Ghiam | 7 years | Associate | $635 / $720 / $795 |

Given the subject matter of this case and the skill and experience of the Hunton attorneys, the hourly rates charged were reasonable.  To start, the fact Hunton customarily charges its clients in accordance with the fee schedule above is itself evidence that the rates are consistent with prevailing market rates.  *See Moore v. James H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir. 1982) ("Unless counsel is working outside his or her normal area of practice, the billing-rate multiplier is, for practical reasons, usually counsel's normal billing rate."); *see also, e.g., Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746484, *18 (C.D. Cal. 2015) ("At minimum the rate an

---

[13] Collectively, the five identified lawyers accounted for just under 90% of all time billed to this matter, *see Ghiam Decl.*, Ex. 1, which is why, for purposes this motion, it makes sense to focus on these individuals.  The qualifications and rates for the other Hunton personnel who billed time (including paralegals and other staff) are discussed in the *Colbert Declaration* (¶¶ 8-20).

[14] The Firm's hourly rates are adjusted each year, effective January 1.  *See Colbert Decl.*, ¶ 21.

attorney actually charges its client is a good starting to point because the actual rate that the attorney can command in the market is itself highly relevant proof of the prevailing community rate.") (quotes omitted).   In addition, though, courts in this District have regularly approved similar rates for lawyers of similar levels of experience, adding to the presumption the rates are reasonable.   *See Dropbox*, 2017 WL 914273, *4 ("Comparable fee awards by courts are competent evidence for determining the reasonableness of hourly rates."); *Banas v. Volcano Corp.*, 47 F.Supp.3d 957, 965-66 (N.D. Cal. 2014) ("hourly rates ranging from $355 to $1,095 per hour for partners and associates … and $245 to $290 per hour for paralegals" were within prevailing market rates [in 2014] for the Northern District); *In re High-Tech Employee Antitrust Litigation*, 2015 WL 5158730, *9 (N.D. Cal. 2015) (hourly rates of up to $975 for partners, $800 for counsel and associates, and $430 for support staff were "reasonable in light of prevailing market rates in this district" [in 2015]); *Ebates Inc. v. Cashbag.co.za*, 2018 WL 6816113, *18 (N.D. Cal. 2018) (approving hourly rates of $854 (attorney with 22 years of experience), $795 (19 years), $570 (10 years), and $400 (5 years)); *see also Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (to determine if a rate is within "prevailing market rates," courts may consider rates charged by other "attorneys in the relevant community engaged in equally complex Federal litigation, no matter the subject matter") (internal quotes omitted).[15]

---

[15] As discussed, the standard rates Hunton charges are reasonable—they are in line with the rates other firms command, they are similar to rates courts have approved, and they are what many clients are charged.  *See Colbert Decl.*, ¶¶ 21-22; *see also supra* (citing comparable authority). Given the volume of work Hunton does for Constellation, however, the client receives a special, tiered discount across multiple matters (including those unrelated to this case), the confidential details of which are explained in the *Colbert Declaration*.  *See Colbert Decl.*, ¶ 23.  Regardless, Constellation does not believe that the rates used in the lodestar should reflect this client-specific discount.  *See Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) (when setting a "reasonable rate," courts should use the "the rate prevailing in the community," not the rates that were "actually charged [to] the prevailing party").  However, should the Court disagree and believe a discount should apply, Constellation asks that the lodestar be adjusted to reflect the average discount offered by other firms (rather than the specific discount given to Constellation), which would not only better reflect "prevailing rates," it would preserve confidentiality.  *Cf. Colbert Decl.*, ¶ 24, Ex. 1 (research suggests law firms discount their rates an average of 8.5%).

3.      **Constellation is Entitled to an Award Under Fed. R. Civ. P. 26(b)(4)**

Beyond the "lodestar" calculated per the above, Constellation is also entitled to an award under Federal Rule 26(b)(4)(E), which provides (absent "manifest injustice") that a party that seeks discovery of an expert must "pay the expert a reasonable fee for time spent in responding to [the] discovery," *see* Fed. R. Civ. P. 26(b)(4)(E)[16], such as for the time the expert spends at the deposition, plus for a reasonable amount of time preparing.  *See Granite Rock Co. v. International Broth. of Teamsters*, 2008 WL 618897, *2 (N.D. Cal. 2008); *but see 3M Co. v. Kanbar*, 2007 WL 2972921, *3 (N.D. Cal. 2007) (suggesting time spent on preparation should only be recoverable in "especially complex" cases); *Eastman v. Allstate Ins. Co.*, 2016 WL 795881, *4-*5 (S.D. Cal. 2016) (summarizing differing lines of decision on expert preparation and noting that "[t]here is no Ninth Circuit authority on point and no consensus among district courts within this circuit").

Further to Rule 26(b)(4)(E), Constellation requests reimbursement from Plaintiff in the amount of $20,981, which represents the expert fees associated with the four depositions Plaintiff noticed and pursued.[17]  Of that amount, 16.33 hours (amounting to $11,681) represents the actual time Constellation's experts (Dr. McDonald, Dr. Reibstein, and Mr. Cissel) spent at their three depositions, and three hours ($2,025) represents a good-faith estimate of the time Dr. McDonald spent unnecessarily preparing for a second deposition, which Plaintiff noticed but then cancelled the day before it was set to proceed.  *See Ghiam Decl.*, ¶ 14; *Colbert Decl.*, Ex. 3.  The remaining amount ($7,275) represents a reasonable amount of time (three hours each) the experts spent preparing for the three depositions that went forward, *cf. Granite Rock*, 2008 WL 618897, *2 (finding three hours of preparation reasonable), which is less than the time they actually spent reviewing documents and preparing to respond to Plaintiff's questions.  *Cf. Ghiam Decl.*, ¶ 14.

---

[16] Prior to December 1, 2010, Rule 26(b)(4)(E) was designated Rule 26(b)(4)(C).  *See* Fed. R. Civ. P. 26, Advisory Committee Notes, "Committee Notes on Rules – 2010 Amendment."

[17] Plaintiff deposed Robert Cissel (Constellations' expert on U.S. Trademark Office practice and procedure) on Jan. 7, 2020; Dr. Susan McDonald (an expert on marketing and survey research) on Jan. 14, 2020; and Dr. David Reibstein (an expert on branding) on Jan. 15, 2020.  *See Ghiam Decl.*, ¶ 14.  Separately, Plaintiff noticed a second deposition of Dr. McDonald for Aug. 18, 2020, but canceled it the day before it was scheduled to occur.  *See Colbert Decl.*, ¶ 26(c), Ex. 3.

1   The reasonableness of an expert's hourly rate for purposes of a Section 26(b)(4)(E)

2   calculation is subject to the discretion of the trial court and involves an evaluation of factors

3   similar to those considered when setting hourly rates for legal services.  *See Granite Rock*, 2008

4   WL 618897, *1 (identifying seven factors, such as the expert's "area of expertise," his or her

5   "education and training," and the fee "actually charged") (quoting *Fisher-Price, Inc. v. Safety 1st,*

6   *Inc.*, 217 F.R.D. 329, 333 (D. Del. 2003)).  Detailed information about the expertise, background,

7   and qualification of each of the above experts, plus the hourly fees they individually charged, may

8   be found in the expert reports previously submitted to the Court.  *See* ECF 151-2, pp. 4-6 (¶¶ 2-6),

9   33-65 [Dr. Reibstein] [$1,200 per hour]; ECF 151-3, pp. 2 (¶¶ 1-9), 14-15 [Mr. Cissel] [$550 per

10  hour]; ECF 151-4, pp. 3-4 (¶¶ 3-8), 5 (¶ 10), 10-16 [Dr. McDonald] [$675 per hour]).

11  **C.      An Award of Full Fees is Appropriate in this Case**

12          Constellation has spent more than $4.9 M litigating this case, and none of those outlays

13  would have been necessary if Plaintiff had heeded the repeated warnings about infringement,

14  respected Constellation's established rights, and chosen a different name.  Plaintiff <u>started</u> this

15  fight, and it did so because it wanted to divest Constellation of an extremely valuable trademark

16  and exploit it for its own benefit.  It should therefore be no surprise Constellation fought back.

17          The legal fees Constellation seeks to recover are "significant"—just as Constellation

18  warned Plaintiff they would be when it offered the walkaway deal.  *See Colbert Decl.*, Ex. 5, p. 2.

19  In total, Constellation requests an award of $4.419 M as "reasonable attorney fees" for the

20  entirety of this case, plus an additional $20,981 in expert witness-related costs as permitted under

21  Rule 26(b)(4)(E).  Should the Court elect only to award fees for the post-injunction phase and the

22  Second Action, the recoverable amounts would be $2.57 M (post-injunction) and $190 K (Second

23  Action), plus the Rule 26(b)(4)(E) reimbursable costs.  There is a strong presumption that these

24  fee amounts, which were calculated using the "lodestar" method, *see Ghiam Decl.*, ¶¶ 2, 6, 8-10,

25  12, Exs. 1-3, represent "reasonable fees."  *See United Steelworkers*, 896 F.2d at 407.

26          Parties should not be permitted to ignore reality and litigate by attrition.  Decisions have

27  consequences, and Plaintiff's decision to sue Constellation for the right to use a vineyard name

28  (TO KALON) that it had no reasonable reason to think it could use caused Constellation to spend

1    millions of dollars unnecessarily to defend its intellectual property rights.  Constellation can never

2    be made whole—even a full award of legal fees would not fully compensate it for the roughly

3    $1.2 M in non-recoverable costs (*e.g.*, most expert fees, travel, Trademark Office filings) it also

4    incurred in this matter, *cf. San Diego Comic Convention v. Dan Farr Prod.*, 807 Fed. Appx. 674,

5    676-77 (9th Cir. 2020) (limiting "costs of the action" as used in Section 1117(a) to mean just the

6    six categories of "costs" specified by Congress in the general costs statutes [28 U.S.C. §§ 1821,

7    1920]) (applying *Rimini St., Inc. v. Oracle USA, Inc.*, --- U.S. ----, 139 S. Ct. 873, 877-78 (2019)),

8    not to mention the indirect costs it suffered from the disruption of its business (lost employee

9    time, negative publicity, etc.).  A full award of legal fees would, however, be a good start.

10   This case "stands out from others," making it "exceptional."  *See Octane Fitness*, 572 U.S.

11   at 554; 15 U.S.C. § 1117(a).  It should never have been filed, and it certainly should have never

12   been brought to trial.  Thankfully, though, we have at least reached the end.

13

14                                      **CONCLUSION**

15   For the reasons set for above, Constellation respectfully requests that this Court award it

16   some or all of the attorney fees it incurred during the course of this consolidated action, as herein

17   detailed, as well as for the costs recoverable under Federal Rule 26(b)(4)(E).

18

19   Dated:  February 17, 2021        By: /s/ Edward T. Colbert_____
20                                    Edward T. Colbert
                                      HUNTON ANDREWS KURTH LLP
21                                    2200 Pennsylvania Avenue, N.W.
                                      Washington, D.C. 20037
22                                    Tel.: (202) 955-1500 / Fax: (202) 778-2201

23                                    *Counsel for Defendant,*
                                      *Constellation Brands U.S. Operations, Inc.*

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3

The undersigned certifies that **DEFENDANT'S MOTION FOR ATTORNEY FEES**

4

**AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**,

5

along with all supporting exhibits, was served electronically upon the following parties by the

6

CM/ECF system on this 17th day of February 2021:

7

8

Jeffrey M. Judd
Peter Bales
BUCHALTER
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Tel.: (415) 227 – 0900
Fax: (415) 227 – 0770
Email: jjudd@buchalter.com
          pbales@buchalter.com

9

10

11

12

13

14

Dated:  February 17, 2021                    By:     */s/Erik Kane*_____

15

16

17

18

19

20

21

22

23

24

25

26

27

28